PRICE MEESE SHULMAN & D'ARMINIO, P.C.
50 Tice Boulevard, Suite 380
Woodcliff Lake, NJ 07677
Tel. (201) 391-3737
Fax (201) 391-9360
Edward W. Purcell (036332012)
epurcell@pricemeese.com
Attorneys for Plaintiff Palisades Properties, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PALISADES PROPERTIES, LLC<br><br>Plaintiff,<br><br>vs.<br><br>THE ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF KINNELON, a local board of the Borough of Kinnelon, and a municipal body of politic and corporate governed and organized under the laws of the State of New Jersey, THE BOROUGH OF KINNELON, a municipal body of politic and corporate governed and organized under the laws of the State of New Jersey  & MAYOR AND BOROUGH COUNCIL OF THE BOROUGH OF KINNELON, the local governing body of the Borough of Kinnelon.<br><br>      Defendants. | Civil Action No. _____<br><br>**VERIFIED COMPLAINT** |

## VERIFIED COMPLAINT

Plaintiff, Palisades Properties, LLC ("Plaintiff" or "Palisades"), by its undersigned attorney, as and for its Complaint against the Zoning Board of Adjustment of the Borough of Kinnelon (the "Board"), the Borough of Kinnelon (the "Borough"), and the Mayor and Council of the Borough of Kinnelon (collectively the "Mayor and Council"), Morris County, New Jersey (collectively the "Defendants"), respectfully alleges as follows and hereby petitions this Court to: conduct a review of Defendants' violations of the federal Fair Housing Act (42 U.S.C. §§ 3601-1619) ("FHA") and the Fair Housing Amendments Act ("FHAA") (42 U.S.C. § 3601, et seq.), and related New Jersey State law claims, with respect to its intentional discrimination against handicapped individuals resulting from their failure to permit or provide a reasonable accommodation the operation of a Cooperative Sober Living Residence ("CSLR") for use by individuals who are recovering drug and alcohol addicts, and to grant a temporary restraining order, preliminary and permanent injunctive relief and declaratory relief to Palisades permitting use of the subject property as a CSLR.

## **JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1343 and 1331, and 42 U.S.C. §§ 3612 and 3613, among other federal laws. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over those claims

arising from the same core of operative facts. Plaintiff brings this action pursuant to 42 U.S.C. § 3613(a)(1)(A).

2.      The real property that is the subject of this civil action is located at 21 Wood Chase Lane in the Borough of Kinnelon, County of Morris, State of New Jersey. Venue is proper under 28 U.S.C. § 1391.

## THE PARTIES

3.      The Mayor and Council is the governing body of the Borough of Kinnelon.

4.      The Board is a properly constituted zoning board of adjustment which has been authorized by the Council pursuant to the New Jersey Municipal Land Use Law ("MLUL") N.J.S.A. 40:55D-69, and by way of its enactment of Section 47-14 of the Code of the Borough of Kinnelon (the "Code").

5.      The Board is an instrumentality of the Borough.

6.      The Borough, which is governed by the Mayor and Council, enforces the Code.

7.      Plaintiff is a New Jersey limited liability company whose primary purpose is to operate CSLRs as homes for individuals while they are undergoing outpatient treatment for their drug and alcohol addiction. Plaintiff's primary place of business is located at 2 Kensington Court, Tenafly NJ 07670.

## OPERATIVE FACTS

### The New Jersey Department of Community Affairs Adopts Regulations Concerning Cooperative Sober Living Residences

8.    The New Jersey Department of Community Affairs ("DCA") adopted regulations, effective January 16, 2018, which established rooming and boarding house rules governing Cooperative Sober Living Residences, more commonly referred to as CSLRs (the "Regulations").

9.    The Regulations define a CSLR as a "residential setting that serves solely as a home for individuals who are recovering from drug and alcohol addiction and intended to provide an environment where residents can support each other's sobriety and recovery…" N.J.A.C. 5:27-2.1.

10.    The Regulations require that all CSLRs apply for, and obtain, a Class F rooming and boarding house license from the DCA. N.J.A.C. 5:27-1.6

11.    Under the Regulations, all CSLRs must, *inter alia*, abide by the following requirements:

   a. Management by an entity or organization that provides an operator who shall reside in the residence and exercise some level of control over the operation of the residence and establishes the residence's rules;

b. Occupancy shall not exceed 10 individuals, exclusive of the operator;

c. The requirement of the maintenance of an alcohol and drug free environment;

d. No provision of on-site counseling, therapy, clinical treatment, or alcohol and/or drug treatment by the licensee;

e. No provision of food, laundry, financial, or other personal services by the licensee;

f. Ability of licensee, at its discretion, to provide non-clinical recovery and support services. The licensee may also elect to mandate or encourage residents to attend self-help recovery programs, participate in activities related to maintaining sobriety and continuing recovery, or receive off-site services deemed desirable or necessary to maintain sobriety; and

g. Ability of licensee, at its discretion, to require drug or alcohol testing of residents.

12.    In promulgating the Regulations, the New Jersey DCA specifically stated that CSLRS "fill an important niche" and should be "encouraged." 49 N.J.R. 1276(a).

13.    In adopting the regulations, the DCA made comparisons between CSLRs and Oxford Houses, which are resident operated homes for those addicted to drugs and alcohol. 50 N.J.R. 310(a).

14.    The DCA stated that "CSLRs have more supervision and oversight than do Oxford Houses."

15.    Under New Jersey law, DCA "shall be the sole enforcing agency for Cooperative Sober Living Residences licensed as Class F rooming houses." N.J.A.C. 5:23-3.11 (k).

## The Home

16.    The CSLR operated by Plaintiff ( the "Home") is located is located at Block 56301, Lot 137 of the Borough of Kinnelon Tax Map, more commonly known as 21 Wood Chase Lane in the Borough of Kinnelon (the "Property").

17.    The Property is owned by Sal Gargiulo.

18.    Plaintiff entered into a lease with Mr. Gargiulo on or about March 1, 2019.

19.    The Property is 1.39 acres and was, at the commencement of the lease, and is still, improved with a 2-story house.

20.    The Property has a three (3) car garage.

21.    The house has three (3) access points and sits on a small hill above, and set back from, street level. There is a stone retaining wall and tree screening the view of the house from various vantage points along the street.

22.    The access points into the home are the front door, the garage, and the back door.

23.    The Property includes a patio situated behind the house and the backyard is landscaped and private.

24.    The first floor includes one (1) bedroom, a kitchen, a dining room, a living room, a recreational room, a staff office with a bathroom, a laundry room, and a half-bathroom. The second floor includes four (4) bedrooms and three (3) full baths. The basement, where the garage entrance is located, has an exercise room.

25.    Plaintiff began operating the Home on the Property in November 2019.

26.    The Home provides a safe place for up to ten (10) adults to live as a single housekeeping unit while in recovery from their drug and alcohol addiction.

27.    Plaintiff notes that the Superior Court of New Jersey has ruled that CSLRs operate as "single housekeeping units." *See* HEF Ventures v. Township of Moorestown, Docket No. BUR-L-2283-21, attached hereto as **Exhibit "A."**

28.    Since the Home began operation, there has been, on average, generally eight (8) residents present at a given time.

29.     Depending on the shift, there are a between two (2) to four (4) staff members present at the Home.

30.     The purpose of the Home is to, more specifically, provide a safe place for residents to live in sobriety after they leave in-patient addiction treatment and to provide a means to integrate each resident back into society.

31.     While living at the Home, residents act as family, eat their meals together and have chores.

32.     Plaintiff requires each resident to comply with house rules.

33.     Among the various house rules are the following:

- Residents will use NO alcohol or illegal narcotic or mind-altering drugs while on or off Palisades Properties.

- Residents agree to whatever consequence is deemed necessary by Palisades Properties for violation of Palisades Properties rules/policies.

- Residents will be expected to clean the entire house weekly.

- Residents may be expected to share a room with a roommate.

- Residents may not bring appliances, furniture, candles, excessive property, or pets to the premises.

- Resident's will be respectful, kind, and considerate to all Palisades Property staff and community partners.

- Physical violence and threatening the same will result in 911 call and/or immediate discharge from the Home and treatment program.

34. While living at the Home, each resident must receive outpatient treatment.

35. No treatment takes place at the Home.

36. While, subject to available space, Plaintiff will permit any person who is in outpatient treatment to reside at the Home, to date all residents have received outpatient treatment at Plaintiff's affiliated treatment center "North Jersey Recovery Center" located in Fair Lawn, NJ.

37. Residents' bedrooms in the sober living home do not have locks.

38. Most residents, or residents' family members, pay for their stay at the sober living home with personal funds.

39. With respect to transportation to Plaintiff's affiliated outpatient treatment clinic, residents are transported by a van operated by Plaintiff that travels to and from the clinic during the week. Plaintiff does not permit residents to have personal vehicles at the Property or to drive themselves during their residency at the Home.

40.     The driveway/garage area can accommodate a number of vehicles; however, Plaintiff has implemented a policy where no more than five (5) vehicles will be parked at the Home at any given time – up to two (2) of Plaintiff's company vehicles are parked in the garage and up to three (3) of the staff member's personal vehicles are parked in the driveway.

41.     Residents are not permitted to have vehicles on the Property.

42.      As a condition of approval, Plaintiff stipulated to provide landscaping adjacent to the driveway in front of the area where the employee vehicles park.

43.     Residents generally stay four (4) to six (6) weeks at the Home but some stay longer and some stay shorter period of time.

## The Code and Notice of Violation

44.     The Property is located in the Borough's Residential Zone.

45.     CSLRs are not a permitted use in the Code and are not permitted in any zone of the Township of Kinnelon.

46.     Section 207-9 of the Code provides that "no building…shall be used…for any use which does not comply with all the zone regulations established by this chapter for the zone in which the building…is located."

47.     Section 207-14(G) of the Code also provides that any use "not expressly permitted in [the Borough's schedule of permitted uses] is prohibited.

48.    Pursuant to Section 207-27 of the Code, "Single family dwellings" are permitted in the Borough's Residential Zone.

49.    Section 207-4(B) of the Code defines "Single family dwellings" as "[a] building which is designed for the residential use of one family or for any other use of single-family dwellings protected by state statute."

50.    Section 207-4(B) of the Code also defines a "family" as:

> One or more persons occupying a dwelling as a single nonprofit housekeeping unit, whose relationship is of a permanent and domestic character and who are living together as a stable and permanent living unit, using certain rooms and cooking or bathing facilities in common, and being a traditional family unit or the functional equivalent thereof. Nothing herein contained shall be deemed to interfere with or restrict the placement of children in a group home pursuant to N.J.S.A. 40:55D-66c or any other use of single-family dwellings protected by state statute. All commercial residences, nonfamilial institutional uses (except for community residences for the developmentally disabled, community shelters for victims of domestic violence, community residences for the terminally ill and community residences for persons with head injuries), boarding homes and other such occupancies shall be excluded from one-family zones. [emphasis added].

51.    On October 1, 2024 the Borough's Property Maintenance Official issued a notice of zoning violation to Mr. Gargiulo for failure to obtain permits for a change of use related to the operation of the Home.

**<u>Request for a Use Variance Pursuant to N.J.S.A. 40:55D-70(d)(1) and a</u>**

**<u>Reasonable Accommodation Pursuant to 42 U.S.C. §3604(f)(3)(B).</u>**

52.    On November 1, 2024 Plaintiff filed an application for a use variance pursuant to <u>N.J.S.A.</u> 40:55D-70(d)(1) permitting Plaintiff's CSLR in the Residential Zone as the required a "reasonable accommodation" under the FHAA pursuant to 42 U.S.C. §3604(f)(3)(B).

53.    Defendant Board held three (3) hearings on Plaintiff's application on July 1, August 5 and September 2, 2025. A copy of the transcripts for these hearings is attached hereto as **Exhibit "B".** [1]

54.    Over the course of the hearings, Plaintiff submitted the following exhibits:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A-1 | State of New Jersey Department of Community Affairs Licenses |
| A-2 | Survey of the Property |
| A-3 | Photographs of the Property |
| A-4 | Palisades Property House Rules |
| A-5 | Curriculum Vitae of Dr. Sugerman |
| A-6 | Letter from Dr. Sugerman dated July 25, 2025 |

---

[1] The transcripts for Defendant Board hearings will be referred to as the following:

1T – July 1, 2025

2T – August 5, 2025

3T -  September 2, 2025

| A-7 | Employee Training Course Description List |
| A-8 | Borough of Kinnelon Fire Safety Certificate issued on August 27, 2024 |
| A-9 | Electrical Code Permit for 100 AMP Panel |
| A-10 | Evaluation Report of New Jersey DCA dated July 11, 2025 |

A true and accurate copy of the above exhibits is collectively attached hereto as Exhibit "C."

55.    During the course of the hearings, Plaintiff also requested a variance from the Code's requirement that "[p]arking of commercial vehicles except where incident to their use or where such vehicle provides daily transportation for and is required by the resident in his daily employment. All commercial trucks must be garaged, and permitted vehicles shall not exceed 3/4 ton." Section 207-14(C)(6) of the Code.

56.    Jay Jonas, co-owner of Plaintiff Palisades Properties, provided testimony during the hearings related to the Home's operation.

57.    Mr. Jonas testified that Plaintiff owns and operates two (2) other CSLRs – another in Kinnelon and one in Mahwah. 1T:58:1-2.

58.    Mr. Jonas testified that the Home began operation in November 2019 and that no signs had been placed on the Property advertising its existence as a CSLR. 1T:16:3-4; 1T:29:16-19.

59.    Mr. Jonas testified that residents view the CSLR as their home, and a place to return to, specifically noting that residents receive mail and even have pictures of their families in their rooms. 1T:22:18-24.

60.    According to Mr. Jonas, the purpose of the Home is to provide a safe location to help residents re-enter back into society as they seek to overcome their addictions to alcohol and drugs. 1T:8:4-9.

61.    Mr. Jonas further described the Home as "a single-family home with individuals living together inside that home in a single housekeeping unit." 1T:11:22-24.

62.    Mr. Jonas testified that "every resident has their specific chore. It alternates through the different chores and during the weekend – usually it's Sunday – everyone is partaking in cleaning the house. . . ." 1T:39:1-5.

63.    During his testimony, Mr. Jonas further testified as to the Home's location:

> We were looking for one of the nicest houses we could find within reason and that's because we feel that our residents deserve that. . . . Our residents wanted a pleasant, nice

experience, a nondiscriminative experience, and we want to be able to provide that.

If anything, I think Kinnelon is an amazing town. It's a beautiful town. It's a very desirable town.  1T:56:11-20.

64.    Referring to Exhibit A-3, Mr. Jonas also testified that "this particular house in Kinnelon, you see the pictures. It's an excellent home for what we do. It has privacy and it checks off the boxes for what we do comparatively to other sober livings in New Jersey. This is a very nice CSLR. . . ." 1T:55:21-25.

65.    With respect to the need for the Home for the residents who live there, Mr. Jonas testified that:

A lot of times people don't have a place to go back to and it's not just so easy to just get right into your own setup and so these things take time. We try to be as patient as we can with the residents. It's not an easy experience. Most people count you out. It's hard to find employment. It's hard to get consistent. It's hard to get back on your feet.

By the time you made it to us you've burned everything you have, you know, your resources, all your everything. You're starting from ground zero and you need a chance, you know, and that's what we try to provide." 1T:49:24-50:11.

66.    During the course of the hearings Plaintiff presented testimony of Dr. Rachel Sugarman, who was recognized by the Board as an expert in the field of mental health and addiction recovery.

67.     Dr. Sugerman testified that 17.1% of Americans ages 12 and older met the diagnostic criteria for a substance use disorder. 1T:143:7-9.

68.     Dr. Sugerman testified that "recovery housing is based on social model recovery principles." 1T:144:15-16.

69.     Dr. Sugerman further testified that:

> [T]he U.S. Department of Health and Human Services[,] Substance Abuse and Mental Health Service Administration, SAMSA. . . leads public health and service delivery efforts that promote mental health, prevent substance misuse and provide treatment and support to foster recovery. The organization delineates that having a home or stable and safe place to live is one of the major dimensions of supporting a life in recovery.
>
> Basically recovery housing is a safe family-like, healthy and substance-free environment that supports individuals in recovery from addiction centered on pure support and connections that promote long-term recovery and emphasizes the importance of social, cultural and environmental factors in recovery. 1T:144:20-145:10.

70.     As for how CSLRs resemble families, Dr. Sugerman testified:

> [F]irst it offers strong emotional bonds for residents so residents are able to turn to each other in moments of struggle. They're able to celebrate victories together. They provide one another with empathy without judgment, similar to how supportive family members would be.
>
> Residents in sober living homes also hold one another accountable and the environment offers structure, support, routine and a sense of shared responsibility as we mentioned earlier. Just like in a family, everyone contributes to the household. They do chores. They share meals together. They

ensure that shared living spaces are clean and kept in good order… 1T:145:16-146:4.

71.     Dr. Sugerman also solidified the therapeutic basis for permitting ten

(10) residents to reside at the CSLR, and not, a lesser number by testifying:

> I think mostly the most important thing is that sober living creates a sense of community. So having the maximum number of residents that's allowed under the CSLR license is important because it enables those individuals to foster relationships and not isolate themselves. 1T:147:11-16.

72.     Dr. Sugerman further described benefits of the creation of a sense of

community among the residents by testifying:

> So mainly support and accountability. It increases the chances of residents having an opportunity to identify with one another through shared similar experiences. There is an increase in accountability. Basically, more eyes on one another leads to, you know, enforcing house rules and also maintaining sobriety. It also, like I mentioned before, reduces isolation, helps build community, and there's also less of an impact on turnover. So if one person leaves the house it doesn't destabilize the whole community. 1T:147:19-25; 1T:148:1-5.

73.     Plaintiff also presented testimony of Paul Grygiel, P.P., AICP during

the hearings, who was recognized by the Board as an expert in the field of

professional planning.

74.     Mr. Grygiel testified that CSLRs are not permitted in any zoning district

of the Borough. 2T:64:4-6; 2T:64:10-11.

75.    The Municipal Land Use Law ("MLUL") defines an "inherently beneficial use" as "a use which is universally considered of value to the community because it fundamentally serves the public good and promotes the general welfare. Such a use includes, but is not limited to, a hospital, school, child care center, group home, or a wind, solar, or photovoltaic energy facility or structure." [emphasis added] N.J.S.A. 40:55D-4.

76.    The designation of a use as "inherently beneficial" is an analytical short cut for the analysis of positive criteria analysis that would otherwise be required for a use variance under the MLUL. Bell Atlantic v. Riverdale Zoning Board of Adj., 352 N.J. Super. 407, 411 (App. Div. 2002).

77.    Mr. Grygiel testified that a CSLR is an "inherently beneficial use" because: 1) CSLRs are akin "group homes" because of the communal or cooperative living element of their operation; 2) because of the niche policy purpose stated in the DCA's rule proposal (N.J.R. 1276(a)); and 3) because of the need demonstrated by various drug and alcohol attributed death statistics in Morris County and the State of New Jersey. 2T:65:21-66:7; 2T:73:23-74:1-2; 2T:75:1-17; 2T:78:12-79:1.

78.    Mr. Grygiel testified that pursuant to the regulations adopted by the DCA, CSLRs are required to be single-family homes because they provide a

residential setting for individuals recovering from drug or alcohol addiction. 2T:79:24-80:3.

79.    Mr. Grygiel testified that the Home looks like other single family homes in the neighborhood. 2T:79:8-23; 2T:82:14-21.

80.    Likewise, Mr. Grygiel testified that the subject use is "the functional equivalent to [a] family in terms of the chores that are being done, in terms of assisting each other in their recovery . . . providing a mutual supportive – emotionally supportive environment for recovery." 2T:83:4-8.

81.    Mr. Grygiel testified that the Home had sufficient space for parking, particularly with Plaintiff's decision to park some of its vehicles in the garage and limit the number of vehicles onsite. 2T:84:19; 2T:87:12-24.

82.    Mr. Grygiel testified that there were no attributes of the use that have substantial negative impacts on the surrounding area, the zone plan or the Township's zoning ordinance. 2T:84:8; 2T:87:24.

83.    In sum. Mr. Grygiel demonstrated the positive and negative criteria necessary for a d(1) use variance for the Home either as an inherently beneficial use or a non-inherently beneficial use.

84.    Mr. Grygiel also demonstrated that the requested variance was not an unreasonable accommodation under the FHAA.

85.    The Board Planner did not refute any of the professional opinions of Mr. Grygiel.

86.    Nor did the Board Engineer raise any concerns apart from requiring that Plaintiff comply with all applicable septic requirements, which Plaintiff agreed to.

87.    In fact, no expert testimony was placed into evidence contrary to Mr. Grygiel's testimony.

88.    With the exception of one (1) objector, no sworn testimony was taken in opposition to Plaintiff's application.

89.    Consequently, the weight of such testimony is minimal at best.

90.    After deliberation, the Board voted to deny the Application at its September 2, 2025 meeting.

**91.    The Board's denial was memorialized by way of a resolution adopted at its October 7, 2025 meeting, which is attached hereto as Exhibit "D."**

92.    Upon information and belief no newspaper notice of the resolution memorializing the denial has been published.

93.    This timely appeal follows.

## <u>COUNT I</u>
**(Failure to Grant a Reasonable Accommodation as required by the FHAA)**

94.    Plaintiff repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated here.

95.    Under the FHAA, it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person, a person residing in or intending to reside in that dwelling, or any person associated with that person. 42 U.S.C. § 3604(f)(2).

96.    The Third Circuit has long held that the enactment of the FHAA "was a clear pronouncement of a national commitment to end the unnecessary exclusions of persons with handicaps from the American mainstream." Helen L. v. DiDario, 46 F.3d 325, 333 n.14 (3d Cir. 1995), cert. denied 116 S. Ct. 64 (1995).

97.    The Third Circuit has further held that drug and alcohol treatment facilities, even for short term durations of fourteen (14) days, constitute dwellings under the FHAA because, in part, while residing there, residents treat the facility like a home, eat together, receive mail, and decorate their rooms. Lakeside Resort Enters., LP v. Bd. of Supervisors v. Palmyra Twp., 455 F.3d 154, 158-160 (3d Cir. 2006), cert. denied 127 S. Ct. 1170 (2007).

98.    A plaintiff may prove a violation of the FHAA in one of three ways: (1) intentional discrimination (disparate treatment); (2) disparate impact; or (3) a refusal to make a reasonable accommodation. E.G. Community Services, Inc. v. Wind Gap Municipal Utilities Authority, 421 F.3d 170, 176 (3d Cir. 2005).

99.    Furthermore, a plaintiff must also prove that the requested reasonable accommodation was necessary to afford its residents an equal opportunity to use and enjoy housing in the municipality they seek to live in. Lapid Laurel v. Zoning Board of Adjustment of Township of Scotch Plains, 459-460 (3d Cir.2002).

100.    Plaintiff provides housing to handicapped adults in recovery from drugs and alcohol and therefore is an aggrieved party under the FHAA.

101.    The Home is a "dwelling" under the FHAA and the residents are "handicapped" as adults in recovery from drugs and alcohol. *See* 42 U.S.C.§ 3602(b), (h).

102.    CSLRs are not permitted in any zone of the Borough of Kinnelon.

103.    Plaintiff also demonstrated that the requested reasonable accommodation, as was testified to by Dr. Sugerman, was necessary to afford its residents an equal opportunity to use and enjoy a dwelling in the Borough of Kinnelon under the applicable law.

104.    The FHA's "reasonable accommodations" provision prohibits the enforcement of "zoning ordinances and local housing policies in a manner that denies people with disabilities access to housing on par with that of those who are not disabled." Hovsons Inc. v. Township of Brick, 89 F.3d 1096, 1104 (3d Cir. 1996).

105.    Once an applicant has met its burden that an accommodation is necessary, then the burden shifts to the government entity to demonstrate that same is "not reasonable." Id. at 1103.

106.    An accommodation is only "unreasonable" if it would impose: 1) an undue financial or administrative burden on the municipality; 2) an undue hardship on the municipality; or 3) would require a fundamental alteration of the zone plan and ordinance. Id. at 1104.

107.    In order to successfully allege that an accommodation fundamentally alters the zone plan and ordinance, a municipality cannot simply rely on blanket statements. The Hovsons Court held that, the purpose of zoning law is to "prevent the problems caused by the pig in the parlor instead of the barnyard." Id. at 1105.

108.    The Hovsons Court held that locating a 210 bed nursing home in a residential zone would not be an "unreasonable accommodation." The Court reasoned:

> [The municipality] appears to rely upon the blanket proposition that nursing homes are clearly out of place in residential zones. This is precisely the type of land use planning that the FHA was enacted to prevent and, if necessary, overrule. Furthermore, the design construction of [the nursing home] is similar to that of the local planned residential retirement communities, a permitted use in [subject zone]…Hovsons, supra. at 1105.

109.   Because CSLRs are not permitted in any zone of the Borough of Kinnelon, a reasonable accommodation to the Borough's zoning was required by the FHAA.

110.   Plaintiff likewise demonstrated that a reasonable accommodation was necessary to provide an equal opportunity to its residents for housing in the Borough.

111.   The Board failed to meet its burden in denying Plaintiff's request for a reasonable accommodation under the FHA because there is no basis in law or fact to demonstrate that such an accommodation is unreasonable.

112.   The evidence overwhelmingly showed that Plaintiff's residents live communally and cooperatively akin to families living in other single-family homes in the area.

113.   Indeed, according to the testimony presented by Plaintiff, residents of a CSLR operate as a "single housekeeping unit" because they live together cooperatively, clean the Home together on the weekends and split other household chores, eat meals together, and socialize with one another throughout the whole house and not just as they pass one another in the hallways to and from their rooms.

114.   Such a result is also supported by the HEF Ventures case where the Superior Court of New Jersey held that a CSLR operates as a single housekeeping unit. *See* HEF Ventures, Supra.,  Exhibit "A."

115.    Plaintiff did not propose to alter, in any way, the existing single-family home located on the Property.

116.    The provision of oversight for residents of the Home help minimize any negative impact related to addiction relapse.

117.    Furthermore, Plaintiff agreed to certain conditions, particularly with respect to parking and landscaping, to further ameliorate any perceived concerns.

118.    Indeed, the Board's own planner did not provide any testimony to rebut Plaintiff's planner's testimony regarding the reasonableness of the accommodation requested.

119.    Furthermore, the Board's engineer did not raise any issue with respect to any access or circulation issues and simply requested that Plaintiff comply with all necessary septic requirements (which Plaintiff stipulated to).

120.    In sum, the record shows that the Home would **<u>not</u>** require "a fundamental alteration of the [Borough's] zone or zone plan."

121.    Consequently, the Board was required by the FHAA to grant an accommodation to permit the lawful operation of the Home.

122.    The Board violated the FHAA by refusing to grant said reasonable accommodation.

123.   Furthermore, under the FHAA a principal is legally responsible for the acts, conduct, and statements of its agents done within the scope of the agent's authority. Meyer v. Holley, 537 U.S. 280, 285-286, 123 S. Ct. 824 (2003).

124.   The Department of Housing and Urban Development ("HUD") has also promulgated regulations which provide "a person is vicariously liable for a discriminatory housing practice by the person's agent or employee, regardless of whether the person knew or should have known of the conduct that resulted in a discriminatory housing practice, consistent with agency law." 24 CFR § 100.7(b).

125.   Consequently, the Borough, and the Mayor and Council is vicariously liable for the Board's refusal to grant a reasonable accommodation to permit the continued operation of the Home in the Residential Zone.

**WHEREFORE, as relief for the harms covered in Count 1, Plaintiff respectfully demands judgement as follows:**

A. A declaratory judgement that the Defendants engaged in discrimination prohibited by the FHAA.

B. Reversing the Board's decision and directing the Board to issue a use variance to Plaintiff and any other approvals necessary for Plaintiff to lawfully utilize the Home as a CSLR.

C. A temporary restraining order, and a preliminary and final injunction prohibiting the Borough and Mayor and Council from enforcing the Board's denial and the Code's purported prohibition against CSLRs as against the subject Home.

D. An award of compensatory damages and punitive damages.

E. The payment of Plaintiff's costs and reasonable attorney's fees.

F. Such other and further relief as the Court may deem equitable and just.

## COUNT II
### (Municipal Land Use Law)

126.    Plaintiff repeats the allegations contained the foregoing paragraphs as if repeated and/or set forth at length herein.

127.    A land use board's decision on an application shall be reduced to writing and include findings of fact and conclusions based thereon. Further, a board shall provide its findings and conclusions through a written memorializing resolution. N.J.S.A. 40:55D-10(g)(1)-(2).

128.    A land use board's action will be reversed if unsupported by the record or is so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion. Smart SMR of New York, Inc v. Borough of Fair Law Bd of Adjustment, 152 N.J. 309, 327 (1998).

129.   Here, the record in the subject matter is devoid of any facts which would support a denial of Plaintiff's application for a use variance for an inherently beneficial use.

130.   As set forth above, the Home operates as a place for individuals to stay while in recovery from alcohol and drug addiction.

131.   Alcohol and drug addiction is a serious policy problem both in the United States but also in New Jersey, the County of Morris and the Borough of Kinnelon.

132.   The fact that Palisades is a "for profit" entity does not vitiate the "inherently beneficial" nature of its use.

133.   Because the subject CSLR is an "inherently beneficial use" the "positive criteria" or "special reasons" requirement set forth in Medici v. BPR Co. was met because the use, *per se*, promotes the general welfare. 107 N.J. 1 (1987).

134.   Pursuant to the last unnumbered paragraph N.J.S.A. 40:55D-70 "no variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not impair the intent of the zone plan and zoning ordinance."

135.   In Sica v. Wall Township Board of Adjustment, the New Jersey Supreme Court set forth the four (4) part balancing test for inherently beneficial uses:

First, the board should identify the public interest at stake. Some uses are more compelling than others. . .

Second, the Board should identify the detrimental effect that will ensue from the grant of the variance. . .

Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. . .

Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. . . 127 N.J. 152, 165 (1992).

136.   The Resolution utterly fails to provide the factual and legal support necessary to support a denial under the Sica test.

137.   First, as demonstrated by the DCA's rulemaking and the data provided related to alcohol and drug related deaths in Morris County and New Jersey, not to mention the policy purposes behind the FHAA itself, there is a weighty and important public interest at stake with respect to permitting the subject CSLR to operate in the Borough such that people with disabilities will not be excluded from society.

29

138.   Second, the record likewise demonstrates little detrimental effects ensuing by the grant of the variance. Plaintiff's residents are living in a single-family residence like other residents of the Borough live in their homes. Apart from blanket, and unsworn, statements made by members of the public there are no concrete detrimental effects which can be mustered to support a variance denial.

139.   Third, with respect to reasonable conditions that could ameliorate detrimental effects, Plaintiff offered a number of such conditions, including codifying the Plaintiff's parking restrictions as a condition of approval and adding additional landscaping.

140.   Fourth, balancing the positive and negative criteria clearly indicates that the variance should be granted given the important and weighty policy concerns related to providing housing for those with disabilities.

141.   In sum, the Board wrongfully and unlawfully denied the Application in violation of the MLUL.

**WHEREFORE, as relief for the harms alleged in Count Two, Plaintiff respectfully demands judgement as follows:**

A. An order adjudging the Resolution is substantively defective as a matter of law.

B. An order reversing the Board's decision to deny the Application and directing the issuance of a variance for the Home.

C. Such other and further relief as the Court may deem equitable and just.

Respectfully submitted,

PRICE MEESE SHULMAN &
D'ARMINIO, P.C

By:  /s/ Edward W. Purcell
Edward W. Purcell, Esq. 036332012
50 Tice Boulevard
Woodcliff Lake, New Jersey 07677
(201) 391-3737

*Attorneys for Plaintiff Palisades*
November 19, 2025               *Properties, LLC*

## **VERIFICATION**

I, Jay H. Jonas, declare as follows:

1. I am the co-owner of the Plaintiff in the present case.

2. I have person knowledge of this matter and the facts set out in the above verified complaint.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements made in this complaint are true and correct.

By: _____

Jay H. Jonas

November 19, 2025

32

## L. CIV. R. 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, and 28 U.S.C. § 1746, the undersigned member of the bar of this Court hereby declares that the matter in controversy is not presently the subject of any other action pending in any other Court, or of any pending arbitration or administrative proceeding. Notwithstanding the foregoing, Plaintiff reserves the right to file claims in state court with respect to any violation of the New Jersey Law Against Disabilities arising out of the operative facts of this case. N.J.S.A. 10:5-1 *et seq.*

PRICE, MEESE SHULMAN & D'ARMINIO, P.C.

By:  /s/ Edward W. Purcell
Edward W. Purcell, Esq. 036332012
50 Tice Boulevard
Woodcliff Lake, New Jersey 07677
(201) 391-3737

November 19, 2025

# EXHIBIT A

| | |
|---|---|
| HEF VENTURES, LLC,<br><br>                  Plaintiff,<br><br>v.<br><br>TOWNSHIP OF MOORESTOWN, a New Jersey municipal corporation, TOWNSHIP OF MOORESTOWN TOWNSHIP COUNCIL, TOWNSHIP OF MOORESTOWN ZONING BOARD OF ADJUSTMENT, a New Jersey municipal agency, and PETER CLIFFORD, in his official capacity as the Zoning Officer of the Township of Moorestown.<br>Defendants<br><br>                  Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BURLINGTON COUNTY<br>DOCKET NO.: BUR-L-2283-21<br><br>Civil Action<br><br>**ORDER** |

**THIS MATTER** having come before the Court upon Plaintiff's complaint in lieu of prerogative writs, and the Court having reviewed the papers submitted and having heard oral argument of counsel, and for the statement of reasons attached hereto, and for good cause shown;

**IT IS** on this <u>27th</u> day of <u>    October    </u> 2023 **ORDERED** that the Township of Moorestown Zoning Board of Adjustment's decision rendered in Resolution #2021-21 was arbitrary, capricious, and unreasonable and is hereby reversed.

**IT IS FURTHER ORDERED** that this Order shall be deemed effectuated upon all parties upon its upload to eCourts. Movant shall serve all parties not electronically served within seven (7) days of the date of this Order.

_Richard Hertzberg_
_____
Richard L. Hertzberg, J.S.C.

**Statement of Reasons**

This matter arises from a zoning dispute in Moorestown Township ("Moorestown"). Specifically, the Township of Moorestown Zoning Board of Adjustment ("Zoning Board" or "Board") determined that Plaintiff's two cooperative sober living residences ("CSLRs") did not constitute a single-family dwelling and thus could not be located in a district zoned for "one housekeeping unit." Township of Moorestown Zoning Board of Adjustment Hearing Resolution #2021-21, pp. 6, dated September 21, 2021. Upon considering the evidence of record, the language of the relevant ordinance, and applicable case law, the Court finds that the Board's decision was arbitrary, capricious, and unreasonable.

**Background**

Plaintiff owns two CSLRs in Moorestown in R-1 and R-1A zones, which are single-family residential districts. CSLRs are regulated by the New Jersey Department of Community Affairs and house individuals recovering from alcohol and drug addiction. Plaintiff was required to obtain a zoning permit as a single-family dwelling for each of the two properties.

In considering the application, the Zoning Board was charged with construing the relevant municipal ordinance. The Moorestown ordinance at issue defines a single-family dwelling as "a wholly detached building constructed or adapted for use exclusively as a place of residence for one family only," and defines family as "[r]elated persons living together as one housekeeping unit; provided however, that domestic employees residing with the family shall be deemed to be members of the 'family' for the purposes of this chapter." Moorestown Township Zoning Code §180-2.

1

In the course of the public hearing, Plaintiff established that individual residents in the CSLRs share common areas, prepare and eat meals together, share household chores, and may leave the home at their discretion. Township of Moorestown Zoning Board Adjustment Hearing 30:5-22, 32:2-8, 33:5-35:6, dated August 17, 2021. At the hearing, the Zoning Board solicitor was Melanie Levan, Esq., and its planning expert was Michelle Taylor, AICP, PP.

Ms. Levan advised the Board that it needed to determine whether each CSLR constituted a "housekeeping unit." She also opined that the portion of the ordinance's definition of "family" requiring that residents be "related" was unenforceable under New Jersey law. Township of Moorestown Zoning Board Adjustment Hearing 16:1-23, dated August 17, 2021. In response to inquiry as to whether the Board could consider the duration of time persons resided in the CSLR she noted that the ordinance's definition of family did not include any language regarding "stability" or "permanency." Moorestown Zoning Board of Adjustment Regular Meeting 14:5-23, dated August 31, 2021.

Board planning expert, Ms. Taylor, offered the opinion that the CSLRs constituted single "housekeeping units" and thus were single-family dwellings under the ordinance. In so concluding she relied upon, among other things, the sharing of living areas and chores as well as the common use of a single kitchen. She opined that Plaintiff's CSLRs did in fact meet the definition of "one housekeeping unit." Michelle Taylor's Opinion Letter to Peter Clifford, dated August 3, 2021; Plaintiff's Trial Brief, Exhibit G; Defendant's Trial Brief, Exhibit 7.

Nevertheless, by a vote of 4-3, the Board determined that Plaintiff's CSLRs did not qualify as single-family dwellings and therefore did not belong in a residential zone. The Zoning Board

appears to have based its decision on the testimony of objecting Moorestown residents, rather than on the advice of its experts.[1]

The Zoning Board made the following findings:

1.     The individuals living in the CSLRs "do not choose who will occupy the Premises with them, as one typically does in determining living arrangements.  Rather, each occupant signs up to live on the Premises."

2.     Despite there being common areas, the individuals may or may not cook, eat, or perform other household duties together.  The individuals are "essentially strangers."

3.     The "length of stay and casual nature" of the CSLR does not show an intent to form a housekeeping unit, and the individuals can leave at any time.  Township of Moorestown Zoning Board of Adjustment Hearing Resolution #2021-21, pp. 6, dated September 21, 2021.

The Board concluded that the CSRL living arrangement does not meet the definition of "family" and thus is not a single "housekeeping unit."  Id.

Accordingly, the Plaintiff's permit was denied, and this lawsuit followed.

## Analysis

A zoning board's decision "enjoy(s) the presumption of validity." Price v. Himeji, LLC, 214 N.J. 263, 284 (2013) (citing Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 81 (2002)).  Because zoning boards have "peculiar knowledge of local conditions," they shall be

---

[1] Although not bound by their experts' opinions, Defendants fail to show any justification for disregarding their advice. While objecting residents may provide insight regarding impact on the community, their lay observations do not contravene an expert's opinion or supersede relevant law.  The Board's reliance on lay testimony in this regard was unreasonable.

"allowed wide latitude in the exercise of delegated discretion." Kramer v. Bd. of Adjustment, 45 N.J. 268, 296 (1965). In addition, a zoning board has discretion to accept or reject an expert's testimony if the board's decision was made on a "rational and reasonable basis." Reich v. Borough of Fort Lee Bd. of Adjustment, 414 N.J. Super. 483, 504-05 (App. Div. 2010).

However, a zoning board's decision may be reversed upon the challenger's showing that such a decision was "arbitrary, capricious, or unreasonable." Medici v. BPR Co., 107 N.J. 1, 15 (1987). The arbitrary and capricious standard is analogous to the substantial evidence standard. Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 89 (2002).[2] A zoning board's decision will not be disturbed unless the decision does not comport with the statutory criteria and is not founded on adequate evidence. Burbridge v. Mine Hill, 117 N.J. 376, 385 (1990) (citing Fobe Assocs. v. Mayor of Demarest, 74 N.J. 519, 538 (1977)). If there is insufficient support in the record, the decision will be deemed arbitrary or capricious. Id. at 385 (citing Kramer, 45 N.J. at 296).

The threshold question is whether the CSLR living arrangement constitutes a family. It is well-settled that a "family" need not be related by "blood, marriage, or adoption" in order to be recognized as such. Glassboro v. Vallorosi, 117 N.J. 421, 427-28 (1990). Rather, a variety of living arrangements can fall within the definition of "family." The Vallorosi court found that a group of individuals who live together, prepare and eat meals together, share household chores, and share common living expenses constitutes a housekeeping unit. Vallorosi, 117 N.J. at 424-25. There, unrelated, college students were permitted to reside in a single-family residential zone. The

---

[2] Factual findings are supported by substantial evidence if "a reasonable man upon consideration of the entire record could reasonably conclude" as it did. Pilon v. Bd. of Alcoholic Beverage Control, 112 N.J. Super 436, 441 (App. Div. 1970).

court reasoned that the students functioned as one housekeeping unit by pooling finances together, eating and cooking together, and sharing common areas.  Id.

The nature of residents' interpersonal relationship is immaterial.  The determinative issue is whether persons living together engage in the described household functions.  The evidence presented to the Board and to this Court establishes that CSLR residents perform these functions.  Township of Moorestown Zoning Board Adjustment Hearing 30:5-22, 32:2-8, 33:5-35:6, dated August 17, 2021.

The Board Solicitor properly advised the Board in this regard.  Thus, Moorestown's ordinance is unconstitutional to the extent it incorporates "related" in its definition of family.  After removing "related" from the definition, a family must be considered "persons living together as one housekeeping unit." Moorestown Township Zoning Code §180-2.  Accordingly, the Board's findings that (1) each CSLR occupant signs up to live on the Premises," and (2) the residents are "essentially strangers," are not germane to any determination of whether CSRLs are single family dwellings.  Cherry Hill Tp. v. Oxford House, Inc., 263 N.J. Super. 25 (App. Div. 1993) is instructive.

In Oxford House, individuals who were recovering from drug and alcohol addictions lived together in a home in Cherry Hill Township.  Id. at 32.  The court found that these individuals constituted a family and were permitted to remain in their home in a single-family dwelling.  Nowhere in the court's analysis is there any consideration of the residents' personal relationships.  The court looked solely at the conduct of the individuals, not at any emotional bond they might or might not have.  Pursuant to Oxford House, the Zoning Board decision was without legal basis to the extent it relied on finding that (1) residents "signed up" to live at a CSLR or that (2) they are

5

"strangers" to each other.  How the residents arrived at the CSLR and whether they knew the other residents is immaterial.  The Board acted arbitrarily in rejecting Plaintiff's permit application on these grounds.

The third basis proffered for denying the permit application is that the "length of stay and casual nature" of the CSLR does not show an intent to form a housekeeping unit.  Otherwise stated, Defendants contend that because the Moorestown CSLRs lack stability and permanence, they cannot be considered single-family households.  Defendants assert that the length of the residents' stay is relevant to a determination of whether a Moorestown CSLR is a single-family household. This argument missed the mark.

In Oxford House, the municipal zoning board concluded that "Oxford House residents [did] not constitute a 'family' as defined by the Township's zoning ordinance."  Oxford House, 263 N.J. Super. at 37.  In ruling in favor of the municipality, the Chancery Court had recrafted the ordinance in question by injecting a permanence and stability requirement where none existed.  Id. at 50. The Appellate Division rejected this approach ruling that it is for the municipality, not the court, to include any such requirement in the ordinance.  Id. at 51.  In other words, a zoning board has no grounds to consider a resident's length of stay unless the applicable ordinance incorporates a stability and permanence requirement.  Id.  Nothing in the Moorestown ordinance requires that a housekeeping unit function for any specific time period. Moorestown Township Zoning Code §180-2.  The Zoning Board's solicitor's suggestion that the Board may consider stability and permanence in the exercise of "common sense" does not serve as a substitute for incorporating such a requirement in the Moorestown Code.  The Board was not entitled to inject a permanency requirement into its interpretation of an ordinance that contained no such provision.  Nor is this

6

Court empowered to revise the ordinance to include such language.  *See* <u>Oxford House</u>, 263 N.J. Super. at 51.  "If the Township requires 'permanence and stability' as part of its definition of family, it must include these requirements in its ordinance . . . The Township must draft the ordinance; the judiciary does not have the duty to create or redraft local legislation to bring it within constitutional limits."  <u>Id.</u>  The Board acted arbitrarily in denying a permit on grounds found nowhere in the Township Code.[3]

## <u>Conclusion</u>

The Moorestown Zoning Board's decision was arbitrary, capricious, and unreasonable. The first two grounds for the Board's decision rests on an incorrect interpretation of what constitutes a family.  The third ground impermissibly injects a permanency requirement into an ordinance which incorporates no such language.  The Zoning Board's determination is reversed.

Richard L. Hertzberg, J.S.C.

---

[3] Nor does the for-profit nature of the CSLR support the Board's decision.  Nothing in the Moorestown Code links economic arrangements underlying a housekeeping unit with determining whether a residence should be considered single-family.

7

# EXHIBIT B

1

BOROUGH OF KINNELON
BOARD OF ADJUSTMENT

IN RE:                        :
Application No. #1571,        :   TRANSCRIPT OF
21 Wood Chase Lane,           :   PROCEEDINGS
Palisade Properties,          :
LLC.                          :
-----------------------

Tuesday, July 1, 2025
7 p.m.
Kinnelon Municipal Building
130 Kinnelon Road, Kinnelon, N.J.


B E F O R E:

KINNELON BOARD OF ADJUSTMENT

Tim Lockwood - Chairperson
Mike Nicosia- Vice Chairman
Fran Maletsky - Member
Cheryl Canale - Member
Rachel Herrington - Member
Morgan Wilkes - Member
Ron Mondello - Alt#1
Olga Gilhooley - Alt#2




Alex Petreski - Town Engineer
Jennifer Highers - Secretary

Alison Kopsco - Professional Planner



QUICK COURT REPORTING, LLC
(973) 618-0872
Office@quickreporters.com

A P P E A R A N C E S :

WEINER LAW GROUP

629 Parsippany Road

Parsippany, New Jersey 07054

BY:  STEVEN R. TOMBALAKIAN, ESQ.

Attorney to the Board

PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.

50 Tice Boulevard, Suite 380

Woodcliff Lake, New Jersey 07677

BY:  EDWARD W. PURCELL, ESQ.

Attorney for the Applicant, Palisade

Properties, LLC.

---

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| A-1 | Department of Community Affairs Licenses | 20 |
| A-2 | Survey of the Property | 23 |
| A-3 | Photographs | 23 |
| A-4 | Palisades Property House Rules | 36 |
| A-5 | Curriculum Vitae of Dr. Sugerman | 142 |

---

I N D E X

| WITNESS | PAGE |
|---------|------|
| JAY JONAS | |
| Direct examination by Mr. Purcell | 14 |
| RACHEL SUGERMAN, Ph.D. | |
| Direct examination by Mr. Purcell | 141 |

---

1       (Proceeding commenced at 7 p.m.)

2           (Role call taken.)

3           CHAIRMAN LOCKWOOD:  New business.

4   Application number 157121, Wood Chase Lane, Palisade

5   Properties, LLC.

6           MR. PURCELL:  Good evening.  Can you

7   hear me?

8           CHAIRMAN LOCKWOOD:  We can.  Good

9   evening.

10          MR. PURCELL:  Thank you very much.  My

11  name is Edward Purcell.  I'm a partner at Price,

12  Meese, Shulman & D'Arminio.  I'm here tonight on

13  behalf of Palisades Properties.

14          Before I get into the meat of the

15  application I have some opening remarks just to kind

16  of set the table.  I believe there were some waivers

17  that were requested for the checklist.  Is that

18  something you need to vote on now?

19          CHAIRMAN LOCKWOOD:  Yes.  We can.

20          MR. PURCELL:  The wetlands

21  delineations, stormwater maintenance plan and

22  completed stormwater summary form I believe.

23          CHAIRMAN LOCKWOOD:  Yeah.  All three

24  waivers were approved by the engineers.  Can I have

25  a motion to accept the waivers?

**6**

1    MS. HERRINGTON:  I make a motion to
2  accept the waivers.
3    MS. MALETSKY:  I'll second that.
4    CHAIRMAN LOCKWOOD:  All in favor.
5    (All board members vote in favor of
6  the motion.)
7    CHAIRMAN LOCKWOOD:  Can I also get a
8  motion to the completeness of the application?
9    MS. MALETSKY:  I'll make a motion for
10  completeness.
11    MS. HERRINGTON:  I second.
12    CHAIRMAN LOCKWOOD:  All in favor.
13    (All board members vote in favor of
14  the motion.)
15    CHAIRMAN LOCKWOOD:  Good to go,
16  Mr. Purcell.
17    MR. PURCELL:  And then the second item
18  was just the notice.  Mr. Tombalakian, did you get a
19  chance to review it?
20    MR. TOMBALAKIAN:  I did.  I didn't
21  find any issues with it.
22    MR. PURCELL:  Excellent.  So with all
23  that housekeeping stuff done, again, Ed Purcell,
24  partner at Price, Meese, Shulman & D'Arminio here on
25  behalf of Palisades Properties.

**7**

1    Palisades is here for a D-1 use
2  variance, which I'm sure that you're familiar with,
3  also for a reasonable accommodation under the Fair
4  Housing Amendments Act, or the FHAA, to operate a
5  sober living residence or, more colloquially, a
6  sober living home at 21 Wood Chase Lane.
7    And before we go to the testimony and
8  talk about facts and planning argument I just kind
9  of wanted to set the table of, you know, what this
10  case is going to look like.  I think it's useful to
11  kind of talk about that at the top.
12    So at bottom I think we all know
13  somebody who has an addiction, who is addicted to
14  drugs or alcohol, whether it be a child, a friend, a
15  sister or brother a mother, father.  Right?  I mean
16  it's just something that exists now and I think we
17  all have experience with.  And what Palisades
18  Properties does is provides housing for individuals
19  who are in recovery, who are addicted to drugs and
20  alcohol and are in recovery and are seeking
21  treatment or obtaining treatment.
22    You know, one thing that is going to
23  be said tonight, you're going to hear this mentioned
24  I think a couple times, is that addiction is very
25  isolating.  So people who are addicted -- and you

**8**

1  maybe have had this experience with people you know.
2  People who are addict to drugs and alcohol are
3  isolated from their families, from their friends and
4  from society, and the purpose of the sober living
5  home is to provide a place for those individuals to
6  live in while they're receiving outpatient
7  treatment.  And while they're living in that sober
8  living home one of the things they do is interact
9  with other people.
10    So we're offering a cooperative sober
11  living residence and the cooperative part of that is
12  actually pretty important because it's important
13  that people live together, learn how to live
14  together, learn how to deal with little stressors
15  that we all have to deal with during our days and do
16  that in a sober environment with people who support
17  them and that's ultimately, you know, a big help and
18  a big step on the road to recovery and that's
19  something that's going to be discussed here tonight.
20    I also want to talk a little bit about
21  stigma.  So, again, you know, the reality is we all
22  know people with addiction.  Notwithstanding that, a
23  lot of people treat those with addiction
24  differently, maybe try to exclude them.  I wouldn't
25  expect that anyone on this board would have any of

**9**

1  those feelings, but that is something that exists
2  and that's why Congress passed the FHAA.  So what
3  the FHAA does -- and this is from the Congressional
4  record -- is a necessary exclusion of people with
5  handicaps from the mainstream.  And in this case
6  recovering addicts are living in a single-family
7  home that is licensed as a cooperate sober living
8  residence.
9    Just as a side note, I'll say that the
10  only homes that can be licensed as CLSR's are
11  single-family homes.  So if it's a CSR it's going to
12  be a single-family home, and the FHAA gives these
13  individuals the right to live in that home.  So it's
14  important to understand the mechanics of the FHAA.
15    The applicant has the burden to show
16  that its requested accommodation here, a D-1 use
17  variance, is necessary to afford a handicapped
18  person an equal opportunity to use and enjoy a
19  dwelling and I think that burden is pretty easily
20  met here because CSLR's are not permitted in any
21  zone in the township and that an accommodation of
22  that variance is necessary in order to provide the
23  individuals equal opportunities to live in Kinnelon.
24    So once that requirement is met the
25  burden shifts to the Board to show that the

10

1  requested accommodation is not unreasonable and it
2  can only be unreasonable in three ways.  The first
3  is that it imposes an undue financial burden on the
4  municipality.  The second is that it imposes an
5  undue hardship on the municipality, and the third is
6  that it requires a fundamental, fundamental,
7  alteration in the nature of the zoning program.
8        So as we'll discuss through testimony
9  and I think will be demonstrated clearly, none of
10  those factors really are met here with respect to
11  what we're proposing.  While the DCA regulates the
12  CLR's as boarding houses, they don't really operate
13  substantively like a boarding house because the
14  whole CLR operates as one housekeeping unit.
15        You can imagine a boarding house with
16  a bunch of people who go into their individual
17  rooms.  They lock the door.  They don't support one
18  another.  They don't live together.  They don't eat
19  their meals together.  It is a number of different
20  housekeeping units, but that's not this house.
21        This house is a sober living home.
22  The people that live in this home live together.
23  They live cooperatively with one another and they're
24  a housekeeping unit.  That's discussed in the letter
25  that was provided to you in the application by

11

1  Mr. Raywood.  He's the chief of the boarding home
2  section of the New Jersey Department of Community
3  Affairs and also that was a topic in the Morris
4  County case that I also provided you with a copy of
5  in the application.
6        So, you know, a sober living, well,
7  you know, operates just like a home, and also
8  there's a saying -- and maybe you heard it before --
9  the proof is in the pudding.  This home has been
10  operational for six years.  There hasn't really been
11  any issues with its operation, you know, no
12  emergency, no police calls.  So in sum, you know,
13  the requested use variance is a reasonable
14  accommodation, you know, that should be granted.
15        And also, in addition to what we're
16  doing with the FHAA, we'll also put on standard
17  proofs for a variance.  This should be considered an
18  inherently beneficial use.  The positive criteria
19  will be met.  We'll provide testimony on that.
20        The negative impacts, they're minimal
21  for the same reasons as why this accommodation is
22  reasonable.  It really is a single-family home with
23  individuals living together inside that home in a
24  single housekeeping unit.
25        MS. GILHOOLEY:  May I ask a question?

12

1        CHAIRMAN LOCKWOOD:  Go ahead.
2        MS. GILHOOLEY:  So for those of us
3  that don't live in the world of residential and
4  zoning and all that, so the reason why we're here,
5  just to clarify, so it's currently zoned as a
6  residence and what you're asking for is a use
7  variance.  So that means it's going to be zoned for
8  something other than a residence?
9        CHAIRMAN LOCKWOOD:  They're asking for
10  a variance because they are -- I don't want to
11  classify it, Mr. Purcell.  I believe they're a
12  commercial property that is looking to become an
13  allowed to take part as a residence.
14        MS. GILHOOLEY:  Okay.  So it's
15  changing it from residential to commercial?  That's
16  basically it.
17        CHAIRMAN LOCKWOOD:  There's asking for
18  a variance to allow that.
19        MS. GILHOOLEY:  Okay.
20        MR. PURCELL:  If I could just add one
21  thing to that answer which is very good, the one
22  thing I would add is it's not a commercial activity.
23  It's a commercial use.  The reason I think we need a
24  use variance is the way that the definition of a
25  single-family home is defined in the code and the

13

1  word family is also defined in your code and it
2  excludes boarding homes from being considered a
3  family and this is the way the DCA chose to regulate
4  these residences as boarding homes.
5        MS. GILHOOLEY:  Let me clarify then.
6  Let's fast-forward 20 years or 10 years and assuming
7  that whoever the owner of this is they would like to
8  sell it to some sort of other business I guess.
9  They would be allowed to do so?
10        MR. TOMBALAKIAN:  No.  The use
11  variance if approved would be specific to this use.
12  It may not be to this applicant.  So let's say this
13  applicant gets approval, Palisades Property, and
14  then they sell it to some other company.  As long as
15  they're operating the use that was approved by this
16  board it continues.  They can't turn it into a
17  McDonald's or a warehouse, no.  Not just any
18  commercial user.  It's specific this use as they're
19  proposing it this evening.
20        MS. GILHOOLEY:  Okay.  And you said
21  you've been in operation for six years already?
22        MR. PURCELL:  Correct.  With respect
23  to the road map tonight, we have three witnesses.
24  The first is Jay Jonas.  He's one of the principals
25  of Palisades to provide some factual testimony.  We

14

1  have Dr. Rachel Sugerman. She's an expert in
2  addiction recovery. And Paul Grygiel who's going to
3  be providing planning.
4           MS. CANALE: Is the owner of the
5  property here tonight?
6           MR. PURCELL: No, he's not.
7           MR. TOMBALAKIAN: Are we ready to go?
8           MR. PURCELL: Yes.
9           MR. TOMBALAKIAN: Raise your hand.
10  J A Y  J O N A S, Sworn.
11           MR. TOMBALAKIAN: Can you please state
12  and spell your name for the record?
13           MR. JONAS: Jay Jonas, J-A-Y,
14  J-O-N-A-S.
15           MR. TOMBALAKIAN: Thank you very much.
16  DIRECT EXAMINATION BY MR. PURCELL:
17
18       Q.    Mr. Jonas, could you please give a
19  brief biography of yourself and explain Palisades
20  Property, LLC's mission?
21       A.    Yeah. Let me just start my name is
22  Jay Jonas. I'm from Bergen County. I grew up in
23  Bergen County, and we opened our treatment center
24  and our sober living as a result of a need to
25  provide high quality drug and alcohol treatment

15

1  which is what we do.
2           I'm a 50 percent owner of Palisades
3  Properties. The home is in Kinnelon that we're
4  discussing. I have 10 years personally working with
5  people in recovery in the field of addiction. No
6  treatment happens at the Kinnelon residence.
7  Treatment takes place at another clinical location,
8  a licensed clinical location.
9           And then I'm also a 50 percent owner
10  of Bergen Enterprise Center, LLC, d/b/a North Jersey
11  Recovery Center, which is in Fair Lawn and that's
12  where the treatment -- we provide treatment there.
13  We provide outpatient services at that location.
14       Q.    But, again, no treatment takes place
15  in Kinnelon?
16       A.    Yeah. No treatment takes place in the
17  sober living home.
18       Q.    And how many years has Palisades been
19  in operation and how many CLSR's does it operate?
20       A.    We've been in operation, like I said,
21  six years and we have three sober living homes.
22       Q.    Dan, Mr. Jonas, does Palisades
23  Properties own the subject property or does it rent?
24       A.    We rent.
25       Q.    And when Palisades Properties entered

16

1  into a lease for the property -- I should say when
2  did Palisades enter into a lease for the property?
3       A.    We entered in March, March 1st of
4  2019, and we started using it in November of 2019.
5       Q.    And the subject home is licensed by
6  the DCA as a cooperative sober living residence;
7  correct?
8       A.    Yes.
9       Q.    And can you explain what a sober
10  living home, CLSR, is?
11       A.    So basically a sober living home is a
12  safe place for people to recover from addictions and
13  live in a cohesive environment that's a community
14  environment for that.
15       Q.    Again, no treatment takes place in the
16  home? That takes place at a separate location;
17  right?
18       A.    No treatment takes place at the sober
19  living home.
20           MS. GILHOOLEY: May I ask another
21  question? So you said renting since March of 2019
22  and you've been operating at this location since
23  November? So I think I'm a little confused. So
24  then why like if you've been operating then why are
25  we going for this use variance?

17

1           MR. PURCELL: So they've been
2  operational for a number of years. There is a
3  provision in the Uniform Construction Code that
4  talks about how -- that the DCA solely regulates,
5  solely regulates CSR's, and I think there's been a
6  point of confusion there where some operators, my
7  client included, believed that that permitted them
8  to operate without local zoning, but they've come to
9  understand and disabused of that notion by the
10  township and by myself explaining that to them and
11  that's why they're here. So that's sort of why they
12  operated. They didn't need to get any type of
13  certificate of occupancy from the town. The DCA
14  handles that. So basically they were just in
15  operation. They received a notice of violation and
16  then that's how it came here.
17           MS. GILHOOLEY: That's what brings it
18  here? Okay. Got it.
19           MR. PURCELL: Yeah.
20  BY MR. PURCELL:
21       Q.    Mr. Jonas, can you just explain the
22  type of person that's in recovery, essentially what
23  their addiction is, how it affects their life, how
24  the recovery process starts and, you know, where
25  this stage in the process is where they're at the

18

1 sober living home fits into the recovery process?

2 **A.    Yeah.  So a person who is in recovery**

3 **will be somebody who suffers from what's called**

4 **substance use disorder.  A person who has this**

5 **disorder basically uses drugs and/or alcohol with no**

6 **control and has basically lost control and**

7 **manageability of everyday life.  A person with this**

8 **may have anxiety or depression.**

9 **When someone's going into recovery if**

10 **they are actively using the process would start in a**

11 **detoxification program which is basically an**

12 **inpatient setting where the resident would live and**

13 **receive services to come off of the drugs and/or**

14 **alcohol because there are safety issues with**

15 **withdrawal from these substances.**

16 After the detoxification program our

17 resident usually winds up in what's called a

18 residential program which is an inpatient style

19 program, like inpatient drug and alcohol treatment.

20 Usually it could be 30 days.  This is the most

21 intensive part of treatment, and once that part is

22 complete basically with clinical approval that

23 resident would be going home in theory back to their

24 loved one or parents or whatever the case may be and

25 doing some form of an outpatient treatment clinic as

19

1 the next step in the continuum of treatment.

2 And basically when they're at that

3 point the loved one, the family, isn't necessarily

4 quite ready for that person initially to come right

5 back home and just integrate straight back into

6 everyday live, and the resident also isn't

7 necessarily ready just to integrate straight back

8 into everyday life.  And as experienced

9 professionals I mean that's what -- we are

10 experienced as well and we agree with that.

11 Persons with addictions have basically

12 burned all of the bridges that they had up until

13 that point.  And that's what we are.  We are a

14 bridge for that resident to integrate back into

15 everyday life.  What we do at the sober living or in

16 our community we create a community family-like

17 environment for our residents to gain those life

18 skills and kind of go through those basic motions.

19 **Q.    So while there's no treatment going on**

20 **in the home, you know, there's a therapeutic benefit**

21 **to them having to live with other people and sort of**

22 **interact and, you know, have conflicts and live?**

23 **A.    Yeah.  I think the environment would**

24 **be described as a therapeutic style environment.**

25 **Q.    It's helpful?**

20

1 **A.    Meant to replicate the inner workings**

2 **of the family environment.**

3 **Q.    And the State of New Jersey regulates**

4 and inspects CSLR's; is that right?

5 **A.    Yes.**

6 **Q.    And this residence is licensed by the**

7 state?

8 **A.    Correct.**

9 **Q.    And we have copies of those licenses.**

10 Is this a copy of the existing licenses that you

11 have for this home?

12 **A.    Yes.**

13 **Q.    Right?**

14 **A.    Uh-huh.**

15 **MR. PURCELL:  Mr. Chairman, I'm going**

16 **to mark this as Exhibit A-1 if I can find my**

17 **stickers.**

18 **(Licenses marked Exhibit A-1.)**

19 **Q.    So, Jay, just to go over these**

20 licenses, there's three of them, and just tell me if

21 I'm correct in this.  The DCA issued three licenses

22 for a CSLR.  It issues one to the owner, to the

23 entity that is renting the property and to the

24 operator; is that correct?

25 **A.    Correct.**

21

1 **Q.    And here the owner is Sal Gargiulo; is**

2 that right?

3 **A.    Yes.**

4 **Q.    He has a license; right?**

5 **A.    Yes.**

6 **Q.    And then Palisades Properties, LLC has**

7 a license?

8 **A.    Yes.**

9 **Q.    And then you, Jay Jonas, has a**

10 license; correct?

11 **A.    Yes.**

12 **Q.    What is the maximum occupancy**

13 permitted by the State of New Jersey for a CSLR?

14 **A.    10 residents.**

15 **Q.    Are the residents men or women or**

16 both?

17 **A.    We have both men and women in the**

18 **residence.  We just don't allow any sharing of the**

19 **same rooms.**

20 **Q.    Could you talk about oversight in the**

21 CSLR's?

22 **A.    The State requires us to as CSLR**

23 **operators to have oversight, and we'll talk about**

24 **the oversight in terms of the actual staffing of the**

25 **house, but the intent is to provide a community like**

22

1 environment at the house, to kind of induce that
2 style of living through various forms.
3     Q.    Are you as the operator, you know,
4 Palisades in a sense sort of like their parents,
5 like kind of demands them and --
6     A.    Yeah.  I would say it's a chaperone
7 parent type of -- it's meant to induce that type of
8 environment and there's some form of accountability
9 within the home environment.
10     Q.    Okay.
11     A.    Yeah.
12     Q.    What is the range of resident stays?
13     A.    Residents stay anywhere from four to
14 six weeks.  Some stay shorter, some stay longer,
15 just depending on circumstances.
16     Q.    And do the residents get mail at the
17 sober living home?
18     A.    They do.  It's their home so anything
19 like that they get to that home.
20     Q.    Do the residents have ability to put
21 up pictures of loved ones?
22     A.    Yeah.  For the most part residents put
23 personal keepsakes in their personal space, their
24 assigned personal space within the house.
25     Q.    Jay, this is a survey of the subject

23

1 property; is that correct?
2     A.    Yes.
3     Q.    Prepared by Surtech dated June 14th,
4 2025, last revised June 4th, 2025.
5     MR. PURCELL:  Mr. Chairman, I'd like
6 to mark this as Exhibit A-2.
7     (Survey marked Exhibit A-2.)
8     Q.    And then I'll also mark some
9 photographs.  Jay, these are photographs of the
10 CSLR, the subject CSLR; is that right?
11     A.    Yeah.
12     Q.    And these photographs were taken by
13 Mr. Grygiel a couple weeks ago?
14     A.    Yes.
15     MR. PURCELL:  Okay.  I'm going to have
16 Mr. Grygiel qualify these exhibits when he provides
17 testimony but I'll enter them as Exhibit A-3.
18     (Photographs marked Exhibit A-3.)
19     Q.    Mr. Jonas, could you just go over the
20 survey and photographs and describe the property?
21 We'll start with the survey.
22     A.    Sure.  So it's a two-story stone and
23 stucco dwelling.  It has three access points.
24 There's a front door, a back door and a garage.
25 1.39 -- 1.393 acres.  One driveway.  The house is on

24

1 Wood Chase Lane.  Stone retaining wall at the front
2 of the property.  The patio is located in the back.
3 And it's three-car garage.
4     Q.    The house kind of sits up a little bit
5 on a hill above the street; is that right?
6     A.    Yes.  You can see that in the
7 pictures.
8     Q.    Okay.  The first picture is the view
9 from Wood Chase Lane; right?
10     A.    Yes.
11     Q.    You can see some screening of the
12 trees?
13     A.    Yes.
14     Q.    And then this would be a picture from
15 the right?
16     A.    Yeah.  From the right.  From the road.
17     Q.    The third is looking down the
18 driveway?
19     A.    Yeah.
20     Q.    What's the fourth picture?
21     A.    That's the backyard, the fourth
22 picture.  That's the edge of the -- it shows the
23 privacy of the backyard.
24     Q.    Okay.  What's the fifth picture?
25     A.    Also the backyard.  It shows this more

25

1 of the backyard for a better angle of the privacy.
2     Q.    And the sixth?
3     A.    This is the front from the top of the
4 driveway and it's looking down from the top of the
5 driveway.
6     Q.    And the seventh?
7     A.    This is looking up from the street
8 into the driveway at the house directly from
9 basically the bottom of our driveway across the
10 street.
11     Q.    And I see here the change in
12 elevation?
13     A.    Yeah.  This next one is just a street
14 view of the street -- of Wood Chase Lane and then
15 this last one is -- is this the last one?
16     Q.    Yes.
17     A.    This last one is just the end of the
18 backyard.  So it's just a third picture of the
19 backyard just showing the fully circled in backyard
20 of privacy.
21     Q.    Thank you, Mr. Jonas.
22     Could you also describe the home and
23 its, you know, various parts?  This is a standard
24 single-family home; right?
25     A.    Yes.

26

1    Q.    Living room, bathroom, kitchen?

2    A.    Yeah.  So the home has five bedrooms.
3  It's four and a half bathrooms.  It's 4,372 square
4  feet.  The basement/garage entrance has an open
5  space when you walk into the basement.  We have an
6  exercise room, like a utility room.

7          On the first floor we have a kitchen.
8  We have a TV room, a rec room and a dining room.
9  All three are open kind of rooms.  We have a bedroom
10 on that floor.  We have an office for staff which
11 has a full bathroom.  We have a laundry room and a
12 half bath down there.  And then on the second floor
13 we have four bedrooms and three bathrooms.

14   Q.    And could you explain the parking
15 situation on the property?

16   A.    Yes.  So residents aren't allowed to
17 have cars at that property at all so...

18   Q.    So what kind of vehicles are there?

19   A.    So Palisades Properties has three
20 vehicles that could be parked up there which we have
21 a full-size van, we have a minivan and we have a
22 SUV, and those vehicles are used to transport our
23 residents to and from treatment and we take them to
24 -- sometimes whether it's an outside meeting or an
25 activity of some sort on the weekend.  That's what

27

1  our vehicles are used for.

2    Q.    And they park -- I'm looking at the
3  survey -- by the entrance to the three-car garage?

4    A.    Yeah.  In the picture actually I think
5  you can see the angle of where up top by the garage
6  that's where they park right up against the
7  three-car garage.

8          MR. WILKES:  Excuse me.  I have a
9  question as well.  So you have the three vans but
10 what about as far as the staff, at any one time is
11 it three on staff or is it one person on staff?

12   Q.    Actually, we're going to talk about
13 that but maybe you want answer the question about
14 the vehicles now.

15   A.    Yes.  The vehicles -- sometimes you
16 could have one in use with one -- let's just say one
17 staff member and two could just be parked at the
18 residence or overnight.  They're not always sitting
19 there all three all the time though.  They're in
20 motion and being used.

21         MR. WILKES:  But getting to and from
22 they use their own vehicle?

23         THE WITNESS:  The employee?  Generally
24 speaking -- well, just depends.  It depends.
25 Sometimes our vans could be parked in our treatment

28

1  center's parking lot for example so if they need to
2  transport to and from.  We don't have our staff
3  though park at the Kinnelon house though at all
4  so...

5    Q.    They park somewhere off premises?

6    A.    Yes.

7    Q.    And they use the van to access the
8  property, to get to the property?

9    A.    Correct.

10         CHAIRMAN LOCKWOOD:  So why would there
11 be extra cars there?

12         THE WITNESS:  There weren't.

13         CHAIRMAN LOCKWOOD:  I was there
14 yesterday there were three.

15         THE WITNESS:  Once in a.

16         MS. FEGAN:  Moon my staff could stop
17 in with a personal car but overnight there won't be
18 -- you'll never see a personal car parked there like
19 that.  Just the staff vehicles could be parked there
20 overnight.

21         MR. PURCELL:  Does anybody else have
22 any questions on that?

23   Q.    Mr. Jonas, has the septic system been
24 upgraded to meet the size requirements that the
25 township requested?

29

1    A.    Yeah.  We obtained the upgrade.  The
2  work is actually supposed to start sometime this
3  week.

4    Q.    Just going back a little bit -- I'm
5  kind of skipping around here -- but with respect to
6  the vehicles that are visible that are parked at the
7  top of the driveway, would Palisades stipulate to a
8  board-on-board fence in that area in order to screen
9  those vehicles from the street?

10   A.    Yeah, we would.

11   Q.    And just to be clear, if you go to I
12 think it's picture five it would be a fence sort of
13 in this -- right by where the grass meets the
14 asphalt?  Is that what we're talking about?

15   A.    Yes.

16   Q.    Are there any advertising signs or
17 commercial signs indicating this property is a sober
18 living home?

19   A.    No.  Nothing.

20   Q.    And how many residents live at this
21 home?

22   A.    10, 10 residents.  There's space for
23 10 residents to live at the home.  I would say we
24 average about eight residents, give or take, just
25 with turnover and the movement of people and

30

1 **availability when you get to those last couple bed**
2 **spaces.**
3      Q.   So you have space for 10. Because of
4 turnover generally on average you have eight, but
5 let's say you had a maximum of eight. Would you say
6 you have on average like six, you usually have two
7 less than what your maximum is?
8      A.   Yeah. I would say, yeah, we could
9 **range on average in residents of like six to eight I**
10 **would say. It can go as high as 10 and it can go**
11 **less obviously, too.**
12      Q.   But the less you have the maximum,
13 you're always going to have generally on average
14 less than that maximum number?
15      A.   Yeah. It's hard to remain at that
16 **absolute peak number of people. It just never works**
17 **out that exact way.**
18         MS. GILHOOLEY: How many employees did
19 **you say at any given point in time?**
20         THE WITNESS: During the day, during
21 our -- so our residents are required to be in
22 treatment during the day that live in that home. If
23 someone were sick --
24         MS. GILHOOLEY: At the same time?
25         THE WITNESS: Yeah. At the same time

31

1 all during the daytime. Let's just stay from 9 to
2 about 4-ish, right around 4. If someone were like
3 just say sick, someone would stay back with them.
4 From that 4 to 12 shift though we have three staff
5 members that work at that home every day of the
6 week, and then overnight we have a 12 to 8 a.m.
7 shift which is around -- they go to treatment after
8 the 8 a.m. shift but we have two staff members that
9 work overnight 12 to 8 at the home.
10         MS. GILHOOLEY: Three between 4 and
11 midnight?
12         THE WITNESS: Correct.
13         MS. GILHOOLEY: And you're saying they
14 don't drive there? They drive someplace else?
15         THE WITNESS: We have our staff park
16 in -- as I said earlier, I'm a 50 percent owner of
17 North Jersey Recovery Center, drug and alcohol
18 treatment center. So we have them park --
19         MS. GILHOOLEY: In Fair Lawn?
20         THE WITNESS: Yeah. And we have a big
21 parking lot.
22         MS. GILHOOLEY: So they park there and
23 then they get bussed, the employees?
24         THE WITNESS: Yeah. They can pick up
25 -- most likely the van will be there though in that

32

1 parking lot when they pull in. Like I said, the
2 vans are -- the three vehicles are only there
3 overnight together like at one time. Could they be
4 there at one time? Yes. From a regular operation
5 they'd be there overnight all three but --
6         MR. NICOSIA: What do you consider a
7 van? I know you said SUV, minivan. What is a van?
8         THE WITNESS: The van is the bigger
9 one.
10         MR. NICOSIA: How many seats?
11         THE WITNESS: I think seats 12 maybe.
12 Sprinter type of van, bigger body.
13         MR. NICOSIA: Thank you.
14         MS. GILHOOLEY: With logos?
15         THE WITNESS: The vans do have logos.
16 They're very -- they're like gray. Just they say
17 Palisades Properties on the side of the van.
18 They're not very -- they're pretty subtle.
19 BY MR. PURCELL:
20      Q.   And, Mr. Jonas, how many beds are
21 there in the house?
22      A.   **Total beds in the house are 11 beds.**
23 **The reason that there's the 11th bed though is**
24 **because we do have men and women in the house and so**
25 **just from moving people around at times you need the**

33

1 **flexibility with the way the bedrooms are structured**
2 **bed-wise to just mix and match and move so you have**
3 **the flexibility.**
4      Q.   So maximum 10 residents but there is
5 11 beds, but that's just really just to be able to
6 make sure there's never going to be a man and woman
7 --
8      A.   **Same sex in the same room.**
9         MS. HERRINGTON: I have a question to
10 **go back to the cars. Just so I understand, for**
11 **example, you use the three vehicles to transport the**
12 **residents to the treatment facility. They get their**
13 **treatment and then your new staff shows up at the**
14 **treatment center and then the new staff that's**
15 **taking the 4 to midnight shift drives those vans**
16 **back to the house with the residents?**
17         THE WITNESS: Correct.
18         MS. HERRINGTON: And then at midnight
19 how does that staff shift happen if the three vans
20 are already at the house?
21         THE WITNESS: They're not all at the
22 house. Like I said, only overnight. So let's say
23 at probably around midnight there will be three at
24 that house. We have three sober living homes so
25 these vans are used for all of our sober living

34

1  homes.  They're moving around all from 4 to
2  midnight.  They're moving around for different, all
3  the different houses.  They use those to run errands
4  for the residents and if there's appointments or
5  anything that's coming up.  So they're all in motion
6  at one time.  So like, for example, the overnight
7  might pick up -- maybe not the van but the SUV let's
8  just say and drive it to Kinnelon to start -- for
9  the start of the shift.
10         MS. HERRINGTON:  Okay.  And then in
11  terms of the 11th bed, so I think I'm understanding
12  what you're saying that if you have four men and,
13  let's say, four women and then a fifth woman comes
14  in and a fifth man you can't necessarily put the
15  woman and the man in the same room.  So one room
16  could theoretically have three women?
17         THE WITNESS:  One room in the house
18  has three actual beds in it from a size standpoint
19  and so that's what creates the off number of that so
20  yeah.
21         MS. HERRINGTON:  And you're saying
22  you've never had 11 people staying there?
23         THE WITNESS:  No.
24  BY MR. PURCELL:
25     Q.    Mr. Jonas, would you just go over the

35

1  living arrangements and how the cooking and eating
2  works and rules and how they're enforced?
3     A.    Yeah.  I'm just going to go through my
4  list.  So each resident is encouraged to cook and
5  eat their meals together amongst each other.
6  Obviously like any house, some are ordering in
7  different versions of how they do, but they do eat
8  together a lot of times and staff will encourage it
9  as well.
10         All the residents have their assigned
11  beds like we discussed.  They all kind of keep their
12  keepsakes there and have their own setups.
13         The residents all are assigned chores
14  that they complete weekly different parts of the
15  house, floors, garbage, you know, all together kind
16  of unit.
17         Residents generally aren't allowed to
18  have visitors.  If they're going to have a visitor
19  it would be approved by myself just for argument's
20  sake than would be just an immediate family member
21  if it's like confirmed that it actually is an
22  immediate family member and we check the I.D. and we
23  make sure it's who they say it is, etc.
24         Or for the people in our houses in
25  recovery, if they're in like AA or some type of

36

1  program like that there's something called a sponsor
2  and so we would approve a confirmed sponsor as well.
3         Residents have to be home by 10 p.m.
4  We ask residents to be respectful of course of our
5  neighbors.  At the house there's a strict no
6  drinking and no illegal drugs policy for residents.
7  If a resident breaks their sobriety or is found
8  let's just say with drugs they're immediately
9  discharged from the sober living, and the primary
10  purpose of that is I mean it's just protecting the
11  other people and the residents and their sobriety
12  and the safe environment that we're trying to
13  create.  So that is a big focus for us so to speak.
14     Q.    Mr. Jonas, I'm holding here in my hand
15  a copy of the current house rules for the subject
16  property; is that right?
17     A.    Yes.
18         MR. PURCELL:  Mr. Chairman, I'd like
19  to mark Palisades Property House Rules as Exhibit
20  A-4.
21         (House Rules marked Exhibit A-4.)
22         MS. CANALE:  Mr. Jonas, you said that
23  the residents are required home by 10 p.m.  If
24  they're not driving where are they?
25         THE WITNESS:  So we have the same

37

1  rules for all of our residents.  Sometimes at this
2  particular home residents go out on what we call
3  pass.  Depending on how well they're doing in their
4  own process we can give them permission to go out
5  for the day on weekends, like a Saturday or Sunday,
6  with same thing, it would probably be family or some
7  sort of sober support.  Generally speaking, a
8  sponsor.  It's hard to find other like confirmed
9  sober supports.
10         Our other two houses though, other
11  than that house, the other two houses have more
12  freedom in the level of how we operate the home and
13  so those houses that 10 p.m. rule is for those
14  houses mainly in that way, but if they do go on pass
15  it's the same thing.  We want them back by 10.  A
16  lot of our nighttime processes happen right at 10 so
17  we want everyone in there for that.
18         MS. GILHOOLEY:  What happens if
19  they're not?
20         THE WITNESS:  We would -- it depends.
21  We would issue some sort of consequence of some
22  sort, whether it's like an earlier curfew of some
23  sort or something.  We would work with them in that
24  way if they -- there are minor rules within the
25  rules that we just submitted that could be broken at

38

1  any time. We have various forms of accountability
2  that we try to implement, like I said, for curfew
3  purposes. Maybe they get put on like a p.m. curfew
4  which nobody wants to be in the house at 6 p.m.
5  They don't particularly like that so that would be
6  one example for that.
7           CHAIRMAN LOCKWOOD: Do you mind if I
8  go back to the food question because you mentioned
9  that some of your residents get takeout? I mean is
10 that inspected when it comes through?
11          THE WITNESS: Yeah. So anything that
12 gets -- food delivery on the spot, packages come in,
13 things like that, if they have something delivered
14 to the house, there's nothing that comes in the
15 house without being inspected specifically. Just
16 from our own experience that has to be part of the
17 process.
18 BY MR. PURCELL:
19      Q.   Could you also describe the process in
20 which the house gets cleaned, how regularly it gets
21 cleaned?
22      A.   I mean it gets tidied up daily and it
23 gets thoroughly cleaned every single week. We have
24 professional cleaners come in from time to time, but
25 relative to the way the house is assembled and the

39

1  way it operates is just, like I said, every resident
2  has their specific chore. It alternates through the
3  different chores and during the weekends -- usually
4  it's Sunday -- everyone is partaking in cleaning the
5  house for two hours, you know, block of the
6  morning, of the late morning.
7           MS. MALETSKY: Are they allowed to
8  have pets with them? I noticed that there was a dog
9  when I went to visit. He came out barking at me
10 which is very friendly but, you know, I'm good with
11 animals but...
12          THE WITNESS: I would say generally
13 you can't have just any pet. That particular pet
14 was a service, confirmed service animal with service
15 papers. On both ends of it, on the sober living and
16 the treatment side, both require that type of thing.
17 That's the only time we've ever had a dog and it's
18 just a unique experience because it's hard to
19 discriminate against somebody in that situation who
20 has an actual service --
21          MS. MALETSKY: Than dog would go off
22 premises with them to their treatment, etcetera?
23          THE WITNESS: Everywhere, yeah. That
24 dog went, that particular resident, everywhere. It
25 was that type of dog was needed for.

40

1           MS. CANALE: That's an emotional
2  service dog is what you're saying?
3           THE WITNESS: It's not an emotional
4  service dog though. There's two types of service
5  animals. One is like the emotional service and then
6  one is the --
7           MS. HERRINGTON: Medical.
8           THE WITNESS: Yeah. There's a real
9  deal version of it. The emotional one is the lower
10 of the two. This particular person was an Army
11 veteran and had some things and that's why that
12 particular situation with that dog.
13          MS. MALETSKY: And I believe Kinnelon
14 requires commercial vehicles to be garaged, you
15 know, here as one of our -- are you aware of that
16 or --
17          THE WITNESS: It's just it's hard to
18 fit the vehicles in the garage setup that we have.
19 That's really the main --
20          MR. PURCELL: That has been something
21 that's raised. Let me answer that question. That
22 has been something that's been raised in the notice
23 of violation about the operation of the sober living
24 home. To the extent that that is something that
25 needs to be obtained, obviously one would argue that

41

1  the use variance capsulates all the other types of
2  ordinance requirements, but we would separately, you
3  know, ask for that.
4           MS. GILHOOLEY: Are these your rules
5  or are they mandated by some other governing body?
6           THE WITNESS: These specific rules
7  here, the ones that we just submitted, are our
8  company's house rules.
9           MS. GILHOOLEY: So there's no alcohol.
10 Marijuana is okay?
11          THE WITNESS: It's not okay. We don't
12 -- in our version of recovery, treatment, etcetera,
13 I know that the marijuana one is obviously unique in
14 the sense of the legality of it.
15 BY MR. PURCELL:
16      Q.   It's still a schedule one drug on a
17 federal level; is that right?
18      A.   Yes. And for us as a abstinence free
19 program it's just -- it encapsulates any substances.
20          MS. GILHOOLEY: I was just wondering.
21          THE WITNESS: I know it's a unique one
22 obviously now. There are people in our home -- just
23 to add to that -- there are people in the home
24 suffering from marijuana addiction and they're
25 recovering from it and so that's part of it. It's

42

1  not necessarily only about legality. It's just like
2  alcohol, same type of concept.
3  BY MR. PURCELL:
4      **Q.**   Mr. Jonas, the house has been
5  operational for about six years. Are you aware of
6  any major incidents that required the police to come
7  to the house?
8      **A.**   **No. Nothing major or any type of**
9  **issues.**
10     **Q.**   And are residents permitted to lock
11 their doors?
12     **A.**   **No. There's no locks on any of the**
13 **doors in the house just for safety purposes.**
14     **Q.**   Can you explain how residents get
15 treatment and how they're transported there? We
16 talked about that a little bit.
17     **A.**   **Yeah. I mean we kind of touched on**
18 **that. I mean all of our residents are required to**
19 **be in treatment, in some form of treatment in a**
20 **program. Most of our actual residents go to North**
21 **Jersey Recovery Center but they could go to other**
22 **treatment as long as it's confirmed that they're in**
23 **a treatment center. And we have vehicles that**
24 **transport them to and from treatment like I said.**
25     **Q.**   Now, there are Alcoholics Anonymous,

43

1  or AA, meetings on the property?
2      **A.**   **No. There's no, no meetings by**
3  **definition at the property. The most you get is a**
4  **couple residents together in their own little -- you**
5  **know, that live in the house but no outside any**
6  **meetings whatsoever.**
7      **MR. WILKES: Mr. Jonas, I have another**
8  **question for you on these rules where -- stating**
9  **that if they refuse the breathalyzer test, how many**
10 **do you allow before maybe something has to be done?**
11     THE WITNESS: We would be -- you would
12 be out of Palisades Properties if you fail a
13 breathalyzer.
14     MR. WILKES: What if you refuse?
15     THE WITNESS: I would say refusals
16 most likely the same thing. A refusal would be, if
17 we're -- if our staff is in front of you and you're
18 visibly under suspicion in that way and you're
19 refusing it the odds are you're going to be asked to
20 leave Palisades Properties because anyone who is
21 refusing it probably did it.
22 BY MR. PURCELL:
23     **Q.**   Mr. Jonas, just to clarify, there's
24 some language here, residents agree to take a random
25 or requested UA test, urinalysis test?

44

1      **A.**   **Yes.**
2      **Q.**   And breathalyzer. Any denied test
3  would be considered a positive test?
4      **A.**   **Yes.**
5      **Q.**   Does that speak to what you're saying?
6      **A.**   **Yes. Correct.**
7      **Q.**   If someone refuses to take a test then
8  the rules would have them considered to be that they
9  are drinking or they are on drugs and what would
10 happen then?
11     **A.**   **They'd be asked to leave Palisades**
12 **Property.**
13     **MR. NICOSIA: Mr. Chairman, as a**
14 **follow-up to referencing the rules and law**
15 **enforcement involvement, I suspect there's been no**
16 **major instances involving law enforcement? I know a**
17 **number of your rules you do reference law**
18 **enforcement notification. Can you speak to how**
19 **often those rules are enacted?**
20     THE WITNESS: Yeah. We haven't had
21 any incidents where for us we've had to go out of
22 our way to call police let's just say to the
23 property. Like if the question is like remove
24 somebody, for example, we haven't had that issue.
25 Not that it couldn't. It's in there because it

45

1  could happen.
2      Again, we've been there six years and
3  we haven't had any major issues at this property at
4  all and we haven't had any real reasons to reach
5  out. Obviously we reserve the right to do it God
6  forbid somebody is aggressive and resistant and like
7  won't leave the property or whatever the case may
8  be, especially if they're under the influence.
9      MR. NICOSIA: Okay. Thank you.
10 BY MR. PURCELL:
11     **Q.**   Mr. Jonas, could you also -- let's go
12 over how residents pay for their stay.
13     **A.**   **All residents are expected to pay.**
14 **The rent is $200. Given the entry level of where we**
15 **are, the person coming in, generally speaking, was**
16 **just in a full-on inpatient residential treatment**
17 **for an extended stay. Generally speaking, they**
18 **can't afford it right away when they get out. You**
19 **do sometimes have support of family and things like**
20 **that but you also have a lot of burnt bridges.**
21     **And so if someone, for example, can't**
22 **pay we would do some form of financial hardship**
23 **where they prove they can't or they don't have the**
24 **finances and we encourage them to get jobs in the**
25 **process of living in the home and in that sobriety**

46

1  process.

2      Q.    Okay.  Thank you, Mr. Jonas.

3              Mr. Chairman, that's all I have.

4              MS. CANALE:  You encourage them to get

5  a job while they're living in the hone.  How are

6  they getting there?

7              THE WITNESS:  So, again, I mentioned

8  so this particular home has the three staff members

9  during the day and the two staff members overnight,

10  in the 4 to 12 and the overnight.  This is our

11  highest level supervision home.  This is the home

12  they go to when they come straight out of the

13  residential level of care.

14              We have two other homes that operate

15  with more of the house manager style rules set for

16  the CSLR which are less restrictive to the residents

17  in terms of what they can and can't do.  So they go

18  from this house at 21 Wood Chase.  They go from this

19  house to the next, one of our two houses in their

20  process of stepping.

21  BY MR. PURCELL:

22      Q.    And at those houses they would have

23  the opportunity to work?

24      A.    Correct.  Those houses is -- the

25  resident has already done a little bit of the

47

1  outpatient treatment, has gotten some of the -- you

2  know, they have their phone.  They're talking to

3  family again.  They're getting all those problems

4  they left behind coming back in their phone, all

5  that stuff.  All that stuff gets flushed out in the

6  first, that first level of care when you first get

7  out of residential.

8              And then when you're ready and you get

9  to the next, you know, whether it's four weeks later

10  or six weeks later or eight weeks later and you go

11  to the other house, by then hopefully you've been on

12  a few passes.  You've gotten out a little bit.  And

13  we would encourage you at that point to integrate

14  fully back into society in that way and that's when

15  we want you to get a job.

16              MS. CANALE:  Who determines the length

17  of time that a resident will stay in the first step

18  out of the rehab process?

19              THE WITNESS:  So, first of all, just

20  generally speaking, when someone comes out of the

21  inpatient treatment level they just -- that would be

22  the level they're going to step into.  That level of

23  housing kind of goes hand-in-hand with the level of

24  treatment that they're also experiencing in the

25  outside clinic.

48

1  BY MR. PURCELL:

2      Q.    Let's pause for a moment.  I think we

3  can go over this again.  So there's an inpatient

4  treatment center.  That's a first step, right, and

5  then where do they go after that?

6      A.    To an outpatient treatment center, but

7  outpatient treatment centers have different levels

8  of care.  I know this is off topic but outpatient

9  treatment centers have partial -- what's called

10  partial care treatment.  They have intensive

11  outpatient treatment and outpatient treatment, which

12  vary in the amount of hours they do per day, how

13  many days per week.

14              So subject to that this home goes with

15  the highest level of care.  So there's clinical

16  recommendations at times that go in the resident's

17  experience that we would consider to some extent,

18  but because it is a totally separate entity and it

19  kind of operates on its own a lot of those decisions

20  are subject to observation and interaction with the

21  resident and monitoring where they're at in their

22  process relative to what we see every day from them

23  on a repetitive basis.

24      Q.    So as they move from a different

25  treatment level at the outpatient treatment

49

1  facility, is that representative of where they're

2  staying?

3      A.    Yeah.  And as long as everything on

4  the action side outside of that checks off, all the

5  boxes are checked off, their urines are clean and

6  you're experiencing a positive experience with them

7  where you can visibly see the growth, there would be

8  no reason not to transition them to the next level

9  of housing.

10      Q.    When do they wind up home?  When do

11  they go home in the process?

12      A.    I would just say every single

13  situation is very different.  You could be -- some

14  people could be in various versions of sober living

15  from -- I mean you could have six months' worth of

16  sober living and you could have as short as -- like

17  in this specific home you could be four to six weeks

18  roughly more on average, but as you get into the

19  lower -- you know, everybody's home experience is

20  very different.  There's no one version of what your

21  home life looks like.  There's no one version of how

22  bad you burned those bridges before you went away

23  for help.

24              A lot of times people don't have a

25  place to go back to and it's not just so easy to

50

1  just get right into your own setup and so these
2  things take time.  We try to be as patient as we can
3  with the residents.  It's not an easy experience.
4  Most people count you out.  It's hard to find
5  employment.  It's hard to get consistent.  It's hard
6  to get back on your feet.
7          By the time you made it to us you've
8  burned everything you have, you know, your
9  resources, all your everything.  You're starting
10 from ground zero and you need a chance, you know,
11 and that's what we try to provide.
12         MR. MONDELLO:  Mr. Jonas, I know that
13 you're trying to create, induce, design a family
14 setting, but how does one do that if the residents
15 only stay for 30 days?  So there's one to eight
16 people turning over every 30 days.  It's almost like
17 a short-term apartment as opposed to a family
18 setting.  Maybe you need to educate me as to what
19 you mean by family setting.
20         THE WITNESS:  So I would say this.  I
21 would say a family setting -- I'm just speaking
22 freely, but I don't know if it's necessarily tied to
23 the length that you live in such -- whatever the
24 home is as much as it what the everyday actions of
25 thee home are and this home operates in that

51

1  communal way.  I mean everyone participates in
2  chores.  We encourage them to participate in
3  community eating dinner together.  We do a lot of
4  community style I guess events which would be no
5  different than how a family lives.  They all sleep
6  under the same roof.  They kind of all go through
7  the who's using the laundry at what time, and all
8  the things that happen within a family environment
9  on the action side of what happens in a home is what
10 happens in this home.
11         The length of time though, I mean it's
12 part of the -- treatment is treatment.  That part is
13 going to be what it is relative to the process, but,
14 again, the actions are that of a home and there is a
15 layer of accountability somewhat similar in that
16 way.
17         MR. MONDELLO:  Thank you.
18         MR. PURCELL:  There is a legal answer
19 to that question, too.  There's a case called
20 Lakeside Resort Enterprises v. Borough of
21 Supervisors of Byram Township that speaks to the
22 concept that, you know, in that case there were
23 individuals living together for 14, 28 days and the
24 Court said that was enough to be considered a
25 domicile.  These are people, you know, this is their

52

1  home.  If they're living there for 14 days that's a
2  long enough period of time for it to be considered a
3  domicile and residents and something that's
4  protected by the FHAA.
5          MR. MONDELLO:  Thank you.
6          CHAIRMAN LOCKWOOD:  Mr. Jonas, you're
7  a for-profit organization I assume?
8          THE WITNESS:  Yes.
9          MS. CANALE:  Mr. Jonas, I have a
10 question for you.  In your application addendum
11 there's a sentence on page four.  As set forth in
12 Mr. Raywood's letter, blah, blah, blah, demonstrates
13 sober living home residents live as a family
14 notwithstanding the fact that the home itself is
15 licensed as a boarding house.  Okay?  But that term
16 family as defined by the U.S. Government for the
17 census program are people who are related to one
18 another.  How do you coincide with this particular
19 statement and the way family is defined by the U.S.
20 Government?
21         MR. PURCELL:  So there's all different
22 sorts of families in the world and from a
23 Constitution perspective it's really not up to the
24 government to say what is a family and what is not a
25 family.  So in this particular situation, you know,

53

1  this is a family.
2          What Mr. Raywood was saying in his
3  letter is that this is a housekeeping unit.  They
4  support each other, these people that are there,
5  than, you know, the result of that is that it is
6  like a family that does the same thing.  I mean it's
7  not -- you know, I'll be honest.  This isn't
8  probably the average family but it is a family for
9  the purposes of the FHAA and the protections.  Does
10 that answer your question?
11         MS. CANALE:  No.  It was worth a try.
12         CHAIRMAN LOCKWOOD:  Any other
13 questions for Mr. Jonas?
14         MS. HERRINGTON:  I have one.
15 Regarding the employees, what kind of backgrounds do
16 these employees have?  Are they going through
17 background checks?  Are they going through -- I
18 guess what do you look for when you're hiring these
19 employees that are caring for others and then also
20 managing this house?
21         THE WITNESS:  Yeah.  These are people
22 that are in long-term recovery.  And, yeah, we look
23 for people who are in long-term recovery who have
24 consistent resume history.  Just like any other
25 person you job interview, I mean we do the best we

54

1   can in our job interview with the person.  These
2   people drive company vehicles so we do driver's
3   license checks and things like that.
4   BY MR. PURCELL:
5      **Q.**   Why do you look for people in
6   long-term recovery?  What kind of interactions do
7   they have with the residents?
8      **A.**   **This is a sober living home and the**
9   **residents are all in recovery and it's not easy to**
10   **relate to people in recovery and it's not easy to**
11   **manage people in recovery and so our staff are**
12   **relatable to the residents.  They're the people that**
13   **the residents trust that have experienced what**
14   **they've experienced but are a beacon of hope for**
15   **them on the other side of it that this thing does**
16   **work than regardless of the stigma that exists you**
17   **can recover and you do matter and everyone deserves**
18   **the chance.**
19      **And so that's really the best way I**
20   **can put it they're the most relatable people that**
21   **we could hire and the most capable people we can**
22   **hire to handle our residents.  That's the most**
23   **honest way I can put it.**
24      **MR. MONDELLO: So, Mr. Jonas, this may**
25   **be a very general question but what drew us to**

55

1   **Kinnelon as opposed to perhaps setting up another**
2   **house in Fair Lawn so the commute wasn't that long?**
3   **I don't know.  Probably about 25 miles from here.**
4   **That's where my office is, in Fair Lawn.  So what**
5   **were the factors that drew you to Kinnelon as opposed**
6   **to I guess municipalities that are closer to that**
7   **treatment facility?**
8      THE WITNESS:  I would say that in the
9   process of opening sober living homes in general
10   you'd either be surprised or maybe you wouldn't be
11   surprised but it is very difficult to rent when you
12   tell people what you do and almost everybody turns
13   you down and has that judgment over what we do for a
14   living and judges the people that live in the
15   residence.  And this is the stigma.  It's not easy
16   to find a home to rent from.
17      MR. MONDELLO:  You have answered the
18   question, sir.  I understand.  You found a willing
19   owner and it's difficult to find others.
20      THE WITNESS:  And just in total
21   honesty this particular house in Kinnelon, you see
22   the pictures.  It's an excellent home for what we
23   do.  It has privacy and it checks off the boxes for
24   what we do comparatively to other sober livings in
25   New Jersey.  This is a very nice CSLR and this house

56

1   was a home run in our minds in terms of the setup of
2   it relative to all of the factors for the operation
3   side of it.
4   BY MR. PURCELL:
5      **Q.**   Jay, the landscaping for that house is
6   absolutely beautiful in the backyard.  Does that
7   have any impact on the people that live there?  Do
8   you think it's a benefit?
9      **A.**   **I think that the quality of anything**
10   **that for -- I'm speaking just for programs.  The**
11   **quality is one of the most important things.  We**
12   **were looking for one of the nicest houses we could**
13   **find within reason and that's because we feel that**
14   **our residents deserve that.  We are for-profit.  Our**
15   **residents wanted a pleasant, nice experience, a**
16   **nondiscriminatory experience, and we want to be able**
17   **to provide that.**
18      **If anything, I think Kinnelon is an**
19   **amazing town.  It's a beautiful town.  It's a very**
20   **desirable town.  So those are all factors as well.**
21   **Definitely didn't come here with bad intentions or**
22   **anything like that, and, again, we've been here for**
23   **six years and we haven't had any major issues.**
24      **MS. MALETSKY: How long have you been**
25   **in business?**

57

1      THE WITNESS:  Since November of 2019.
2      MS. MALETSKY:  And you said you had
3   three -- you have three residences; correct?  Did
4   you lease them all at the same time or were they --
5      THE WITNESS:  Similar, similar
6   timeframes.
7      MS. MALETSKY:  And you mentioned that
8   the one in Kinnelon is when they're in the inpatient
9   rehab this is the first location that they'll come
10   to; correct?
11      THE WITNESS:  So after inpatient they
12   would discharge that treatment center, yes, and then
13   come to this.
14      MS. MALETSKY:  And then you transition
15   them to other facilities after that.  So what's the
16   difference between the Kinnelon facility and the
17   other facilities?
18      MR. PURCELL:  I wouldn't say the word
19   facility.  I would say CSLR or home.
20      MS. MALETSKY:  Pardon me.  Other homes
21   following their stay in Kinnelon; is that correct?
22      THE WITNESS:  Yes.
23      MS. MALETSKY:  So their stay in
24   Kinnelon and then where are those other homes
25   located?

58

1    THE WITNESS:  One also is in Kinnelon
2  on Mulberry and then the other one is in Mahwah.
3    MS. MALETSKY:  So they would spend
4  four to six weeks in Kinnelon an -- I know --
5    THE WITNESS:  The average, yeah.
6    MS. MALETSKY:  But would they spend a
7  similar time in each of other homes?
8    THE WITNESS:  Could be similar time.
9  Could even be longer, but it could be for the, yeah,
10  you could say around that time.  Could be a month,
11  could be two months.  Again, it could be longer.
12  Just depends.
13    MS. MALETSKY:  And when they're in
14  that Kinnelon home, the first one, the shortest
15  Kinnelon home, are there activities like outdoor
16  activities?  Are they out walking the streets?  Are
17  they engaging in other activities that are either
18  group or individual or what do they do in their free
19  time when they're not in treatment?
20    THE WITNESS:  So, first of all,
21  relative to the neighborhood itself, the residents
22  that live at Wood Chase, we don't allow them to like
23  leave the residence during the off hours on their
24  own I mean and just, let's just say walk the street,
25  walk down the street and come back on their own.  So

59

1  we don't allow that every night though Monday
2  through Friday pretty much we bring them to an
3  outside let's call it AA meeting.  Could be like be
4  an NA meeting, Alcoholics Anonymous, Narcotics
5  Anonymous meeting, which they have locally in
6  different towns.  And then on the weekends we try to
7  find, you know, fun activities for them do it.  I
8  mean it could be like bowling, could be movies.  Any
9  of those kinds of activities that help you feel like
10  you're --
11    MS. MALETSKY:  Living.
12    THE WITNESS:  Yeah, living.  That's a
13  good way of putting it.  So things like that.
14    MS. MALETSKY:  Do you have a long-term
15  lease on this property?
16    THE WITNESS:  We do.
17    MS. MALETSKY:  And what are the terms
18  or the length of that lease?
19    THE WITNESS:  I think -- I forget how
20  much we have left.  Maybe a year or two left?
21    MR. PURCELL:  How about we'll find
22  that information and provide that?
23    MS. MALETSKY:  Thank you.
24    MS. CANALE:  If there's a second home
25  in Kinnelon has that been -- have you been

60

1  approached for a variance on that one as well?
2    MR. PURCELL:  That has also been
3  filed.
4    MS. CANALE:  I'm not going to ask any
5  questions about the treatment or anything.  I'm just
6  a little concerned about the dates that are lining
7  up with how long you have been in business.
8    I did notice the Township of Mahwah
9  minutes going back to March of 2021 where there is a
10  statement that says, The Kinnelon Police have not
11  given any information with regard to any incidents
12  that have happened in Kinnelon at that time.
13    Then I looked through the licensing
14  for the owner of the house March of 2025, yourself
15  and --
16    MR. PURCELL:  Is there a question
17  that's attached to this?
18    MS. CANALE:  Yeah, yeah.  If I could
19  finish.  I'm just a little concerned about all the
20  timing it's taken for you to come to this point here
21  knowing that you need to get a variance to operate
22  this property.  I will stop talking about all the
23  different things.  That's my concern.  You've been
24  in business 10 years and there's dates all over the
25  place and it's now come to your attention that, oh,

61

1  I need a license or I need a variance.  I would have
2  thought that you would have had that information
3  already in hand.
4    MR. PURCELL:  What's the question?
5  Can you restate that question?
6    MS. CANALE:  I was just curious about
7  with all the time that's passed since you have been
8  in business and the different dates and the Township
9  of Mahwah you approached, the different dates on
10  licensing that have been approved and you've been in
11  business for 10 years why we're seeing you after six
12  years for a D-1 variance?
13    MR. PURCELL:  Does that have some --
14  okay.  I'm going to answer that question.
15    MS. CANALE:  I'm just curious about
16  you've been in operation for six years at this
17  property.  Why are we hearing about it now?
18    MR. PURCELL:  Because there was a
19  notice of violation issued.
20    MR. MONDELLO:  Because we let him for
21  six years.
22    MS. CANALE:  You've been operating
23  illegally.
24    MR. PURCELL:  Again, I'm happy to
25  answer that question.

62

1       MS. CANALE:  You've answered it.
2   Thank you.
3       MR. PURCELL:  I'm happy to answer it,
4   but I'll say I don't understand the bearing of that
5   with respect to the proofs either for a D-1 use
6   variance or for a reasonable accommodation under the
7   FHAA, but I'm happy to answer that question.  Thank
8   you.
9       MS. CANALE:  Are there any felons in
10  this house?
11      MR. PURCELL:  Again, I'm going to say
12  that Mr. -- I'm going to say that I object to that
13  question because, again, it represents your stigma
14  issue that exists and I'm uncomfortable with that.
15      MS. CANALE:  Okay.
16      MR. PURCELL:  Mr. Jonas can answer to
17  the extent that he's aware.
18      THE WITNESS:  I couldn't answer on a
19  specific like that of if there is specifically one
20  right now.  I would just say it would be hard to
21  discriminate that.  I know personally many families
22  with kids that are felons that live in the homes and
23  have those same problems.  It's just the not in my
24  town type of thing that doesn't exist, but in real
25  life there's felons in all types of homes.

63

1       MS. CANALE:  It exists.
2   BY MR. PURCELL:
3       Q.  Mr. Jonas, you've been in operation
4   for six years and there hasn't been any particular
5   issue with criminality of residents; is that
6   correct?
7       A.  Yeah, yeah.  Similar to Kinnelon, the
8   Town of Mahwah came to us and we've been here six
9   years and we've never had one problem with Kinnelon
10  directly and we got served this as a result of
11  probably I think a different situation.
12      MR. MONDELLO:  The way I interpret
13  Cheryl's question, I know that she did not mean just
14  because you've been here and operating for six years
15  you've got a black hat on, you're a bad guy.  I know
16  she doesn't mean that.  I think what she means is
17  with all of your business experience and going into
18  other towns she probably would have thought that
19  maybe you should have done some more investigation
20  whether a D-1 variance was needed, etcetera,
21  etcetera.  She's not suggesting that you have the
22  black hat on because you have been operating
23  "illegally" or without a D-1 variance for six years.
24  I'm positive of that.
25      THE WITNESS:  Nor is it perceived that

64

1   way.
2       MS. CANALE:  Thank you.
3       THE WITNESS:  Totally understandable.
4   I don't have that much experience with towns in
5   general.  Mahwah would be the only other experience
6   I have.  And so apologies that it didn't go the way
7   you're asking the question but understood why you're
8   asking it the way you're asking it.
9       But just to say we are trying to do
10  the right thing and it's not an easy business to
11  prove that you're trying to do the right thing, but,
12  again, I think the proof is in the pudding like Ed
13  said earlier that we have been here six years and we
14  haven't had any issues.  And I hope you guys see
15  from three staff members and two overnight that we
16  staff it heavily and I just don't think you're going
17  to find as many sober livings that staff the way we
18  do and take as much pride like we do.  I hope I
19  conveyed that here.
20      CHAIRMAN LOCKWOOD:  Any other
21  questions for Mr. Jonas?
22      MR. MONDELLO:  No, Mr. Chairman, but
23  if you could make an announcement to the public that
24  there will be an opportunity to ask questions and
25  speak because it's getting -- I can hear it.  It's

65

1   getting loud and I see the hands waving, you know,
2   like we're at a concert.
3       MR. NICOSIA:  One more question,
4   Mr. Chairman.  Mr. Purcell, you could also say that
5   you have a professional coming.  You briefly
6   mentioned septic and changes.  I know you mentioned
7   it.  Could you just elaborate on what's taking place
8   or planned to take place?  Or you could say I have a
9   professional coming.
10      MR. PURCELL:  We have a professional
11  coming.
12      MR. NICOSIA:  That's fine.
13      MR. PURCELL:  Let me just answer that
14  question.  We did receive -- because a CSLR under
15  the applicable rules is basically a congruent living
16  facility, there's a different amount of flow
17  required for each day and as I understand it we were
18  slightly below that.
19      Mr. Jonas, correct me if I'm wrong,
20  but with respect to the septic has there ever been a
21  failure of the septic or a blowout or anything like
22  that that you're aware?
23      THE WITNESS:  No.  Not that I'm aware
24  of.
25      MR. PURCELL:  So there was a summons

66

1  and a citation that was issued. In response to that
2  an application was filed to improve the septic
3  system to adopt an advanced treatment tank to
4  upgrade the 1,000-gallon pump tank and to increase
5  the disposal field by an area of 9 feet by 24 feet
6  than permit was approved and the work should be
7  starting on that this week.
8        So as I understand it, I think that
9  issue is closed because we submitted the permitting.
10  We're going to be doing the work. I wasn't really
11  considering having someone testify as to that
12  because the work is -- the permit was submitted and
13  approved. It's being done. If the Board Engineer
14  feels differently I can reconsider that but that's
15  where we are now.
16        MR. NICOSIA: Thank you.
17        MR. PETRESKI: The septic was reviewed
18  and approved by the Board of Health.
19        CHAIRMAN LOCKWOOD: 9:45, folks, will
20  be the time limit for witnesses. If anyone doesn't
21  make 9:45 we will have to carry over to the next
22  meeting.
23        MR. TOMBALAKIAN: Just so you know,
24  the way it works right now this witness is giving
25  his direct testimony. The Board has been asking

67

1  Mr. Jonas questions. Mr. Chairman, are you going to
2  be allowing the public to ask Mr. Jonas questions?
3        So once the Board is done asking
4  questions then we'll open it for public questions.
5  Not comments. Questions to Mr. Jonas concerning his
6  testimony and so you'll be able to ask him
7  questions, not give speeches or give opinions. Ask
8  questions.
9        MR. MONDELLO: One more time. Ask
10  questions.
11        CHAIRMAN LOCKWOOD: Any other
12  questions from the Board?
13        Anyone from the public have any
14  questions? Please step up to the microphone.
15  Please state your name and address.
16        MS. RITACCO: Jennifer Ritacco, 11
17  Bent Tree Lane. If I can just describe -- are you
18  aware of the geography of the street because it's a
19  horseshoe?
20        MR. PURCELL: Is that a question?
21        CHAIRMAN LOCKWOOD: Are you going to
22  be asking a question?
23        MS. RITACCO: So I'm on Bent Tree Lane
24  and it's the shortest path to 21 Bent Tree Lane.
25  There's a tremendous amount of traffic. You state

68

1  that you operate as a family and you eat as a family
2  but do deliveries come as a family? Like when I
3  order for my family we order once. The number of
4  deliveries that make the wrong turn or U-turn in the
5  cul-de-sac, speed around the corner is not conducive
6  for a family that's ordering food. It's about 10,
7  15 orders. Do you order food together to operate as
8  a family unit?
9        THE WITNESS: To answer your question
10  directly, one, they could order food together. Two,
11  in my house, me and my family might order
12  separately. Like me and my wife sometimes order
13  separately.
14        MS. RITACCO: That's two people.
15        THE WITNESS: But I'm just making a
16  point that we could order separately in our house.
17        MS. RITACCO: I purchased a house on a
18  street that was not a thoroughfare purposely and now
19  it's a thoroughfare so I'm just pointing that out.
20        You state that there haven't been any
21  incidents. One of --
22        MR. PURCELL: I'm going to have to
23  object. If there's a factual statement -- ask
24  questions.
25        MR. TOMBALAKIAN: Maybe Mr. Jonas can

69

1  -- she's asking about deliveries. Can you address
2  as part of the normal CLSR for this home how many
3  deliveries do you receive daily? How often --
4        THE WITNESS: I couldn't answer that
5  with -- give you an actual number. I would just say
6  that Amazon --
7        MS. RITACCO: Visitors, employees.
8        THE WITNESS: I would say that like
9  any person who lives in a home I mean if you order
10  something on Amazon then you order something on
11  Amazon. If you ordered pizza for the house maybe
12  you order pizza for the house. I would say
13  deliveries, food delivery, definitely isn't like an
14  everyday thing necessarily, but I couldn't give you
15  an answer as to exactly on a daily, even an average
16  of what it would be. It's not like -- it's being
17  overstated in that way.
18        MR. WILKES: Everybody individually
19  orders whatever they want to order so --
20        THE WITNESS: I wouldn't say it's as
21  free-for-all though as just like everybody orders
22  when they want to order.
23        MR. WILKES: But there's not like a
24  delivery truck that comes and supplies food for the
25  whole establishment?

70

1      THE WITNESS:  No.  For the most part,
2  just to be clear though because I think there's a
3  misunderstanding, all residents food shop for their
4  food for the week.  Every single resident food shops
5  for their primary food.  If they order it's just
6  because they want something other than cooking.
7  They don't feel like cooking or whatever the case is
8  than does happen from time to time, but their
9  primary form of eating is groceries in the fridges
10  that we have.  We have multiple fridges in the
11  house.
12      MR. MONDELLO:  So they primarily cook?
13      THE WITNESS:  Oh, yeah, yeah.  They
14  primarily do cook.  I hope that's not being -- the
15  perception is being changed by the comments.  They
16  do cook, mostly cook.  There are deliveries at
17  times.  Again, it happens in any family.  And
18  packaged deliveries happens as well.  I mean if the
19  Amazon truck is coming one day during that week he's
20  going to every house that ordered Amazon and
21  delivering as many packages for that day that was
22  delivered from Amazon.  It's one trip for the whole
23  block from Amazon.  So I'm just, you know, it would
24  be hard to say it's different from any other home.
25  It's just that you have a certain amount of

71

1  residents there.  It's the number of residents and
2  not a difference from a home thing.
3      MR. MONDELLO:  Do the residents cook
4  together?  It's sort of a bootstrap to my family
5  question.
6      THE WITNESS:  We encourage them to
7  cook together.  We have our staff engage with them
8  in that process of doing it.  I'd say no matter
9  always there's a couple of them eating together
10  depending on who and what makes and how they get
11  along and whatnot.
12      And there's always those couple that,
13  again, Ed said, addiction is very isolating and so
14  even when you're in this home the tendency is -- the
15  discomfort of interaction and so the tendency is try
16  to isolate.  So you get that from time to time and
17  then you have a lot of ebb and flow.  So you get
18  people that just want the privacy of eating solo
19  sometimes.
20      MS. MALETSKY:  How many refrigerators
21  do you have with 10 individuals?
22      THE WITNESS:  We have two large
23  refrigerators in the house and then we have one
24  separate also freezer as well.
25      MR. WILKES:  Commercial?

72

1      THE WITNESS:  I couldn't say if
2  they're commercial or -- I mean they're large
3  fridges though.  Two-door large fridges, both of
4  them.  I would say that it comfortably holds the
5  food though.  We haven't had a need operationally to
6  get a third fridge and if we did we absolutely
7  would.  Again, that's our priority is the comfort of
8  the residents and we pay close attention to all that
9  type of stuff.
10      MS. GILHOOLEY:  So I'm curious.  You
11  mentioned Amazon.  Is it just one Amazon account for
12  the group?
13      THE WITNESS:  No.  I guess my point is
14  just -- no.  Let's say a resident orders from
15  Amazon.  They're ordering their own Amazon.
16      MS. GILHOOLEY:  Right.  But I'm
17  responsible for my own Amazon account and he's
18  responsible for his own so we can do whatever we
19  need to do ordering and like nobody is sitting there
20  coordinating saying, you know, the package is coming
21  on Monday so we're all doing Monday.  Everybody is
22  independently managing their individual Amazon
23  accounts.
24      THE WITNESS:  I would say that people
25  don't just order like to order in the real life

73

1  operation.  I'd say that when somebody needs
2  something they'll go to staff and say I need X, Y,
3  Z.  If they want a specific version of that specific
4  thing they might say I want to order this one, the
5  one that I want, and staff would most likely say yes
6  as long as there's like nothing dangerous or
7  whatever.
8      MS. GILHOOLEY:  It has to be approved?
9  Their purchases are approved?
10      THE WITNESS:  Yeah.  Everything is not
11  only approved but it's all inspected prior to being
12  given to any resident ever no matter what, anything
13  that comes to the house, whether it's a box of pizza
14  is getting opened and inspected to come in the house
15  no matter what.
16      MS. RITACCO:  So there was an incident
17  where an employee cut in front of the bus with their
18  flashing lights on and almost hit my son as he was
19  getting onto the bus and I called the police.  You
20  wouldn't just classify that as an incident?
21      THE WITNESS:  I don't personally have
22  experience with that incident, no.
23      MS. RITACCO:  Okay.  There was another
24  situation where I was coming home and there was
25  someone parked in the cul-de-sac and seemed to be

74

1  under stress and I called the police. They came and
2  found that the person was waiting for somebody at
3  21 Wood Chase Lane to take them to the hospital
4  because they were having some sort of overdose
5  situation. That wasn't considered an incident?
6         THE WITNESS: Again, I don't know the
7  exact incident you're speaking to in this situation
8  or if it's accurate or true.
9         MS. RITACCO: It's on police record.
10  I mean the police were called both times.
11         THE WITNESS: They came to our
12  residence?
13         MS. RITACCO: No. Because they were
14  in front of my house, but they stated they were
15  waiting for the person at 21.
16         MR. PURCELL: I think we're crossing
17  the boundaries here of questions versus statement.
18         MS. RITACCO: That was a question.
19         MR. TOMBALAKIAN: Let me just explain
20  how it works. So eventually when all of the
21  applicant's witnesses have been questioned and
22  cross-examined then the public have an opportunity
23  to present testimony and proofs and you, for
24  example, can submit police reports. You can submit
25  whatever you want to show that, you know, try to

75

1  support whatever arguments you want.
2         So at that point in time if there are
3  police reports that you think are germane that
4  mention this property, issues at the property, you
5  can present them because right now we don't have
6  them in front of us. We haven't seen them. It's
7  your word -- I mean, you know, we're trusting that
8  you're telling us the truth but we don't know that.
9  So why don't you when that time comes presents us
10  with the information and explain why you think
11  that's --
12         MS. RITACCO: Are we going to be able
13  to do this another time so I can gather that?
14         MR. TOMBALAKIAN: Oh, yeah. I mean
15  unless this applicant can get through all his
16  witnesses in the next one hour and 20 minutes
17  chances are this hearing will be carried to another
18  date and then whether the applicant will finish that
19  night, but the applicant has to finish his direct
20  case before we begin public comment. That's how it
21  works.
22         MS. MALETSKY: These are questions and
23  then there will be another time tonight for the
24  comments.
25         MR. TOMBALAKIAN: Maybe not tonight.

76

1         MS. MALETSKY: Possibly tonight if we
2  don't run out of time.
3         MR. TOMBALAKIAN: The comments only
4  happen when Mr. Purcell has completed his case.
5  When he says I'm done then we open it up to the
6  public to offer comments, give presentations.
7  That's when you can offer opinions.
8         MS. RITACCO: Can I ask another
9  question?
10         MR. TOMBALAKIAN: You can ask
11  questions of this witness as to his testimony.
12         MS. RITACCO: To his testimony. So
13  you stated that you screen your applicants. Are
14  they screened for Megan's Law and registry? Do you
15  follow up that they report their address, where
16  they're living to the police? Because of the
17  stipulation of Megan's Law you have to tell the
18  police where you're living at all times.
19         MR. PURCELL: Just to correct
20  Mr. Jonas' testimony, I believe he's not testify
21  that he screens the residents. He screens the
22  employees; is that correct?
23         THE WITNESS: Correct.
24         MS. RITACCO: And you're certain that
25  the employees don't park their cars at the

77

1  residence?
2         THE WITNESS: There's no permanent
3  parking of any employee vehicle. Maybe they stop in
4  at the residence if there's something unique to the
5  job at the time and someone doesn't have -- whatever
6  the case may be. It could happen so I don't want to
7  absolutely say it never will be a car there ever.
8         MS. RITACCO: They don't come in at
9  8 o'clock in the morning in their own vehicle and
10  park that same vehicle in the driveway from
11  8 o'clock until they finish their shift at 4 o'clock
12  it is?
13         THE WITNESS: Not to my knowledge, no.
14         MS. RITACCO: Well, I think you don't
15  have --
16         THE WITNESS: We don't have anyone
17  working at that house between 8 and 4.
18         MR. PURCELL: Is that the time when --
19         THE WITNESS: The residents are --
20         MS. RITACCO: So when I'm sitting at
21  the bus stop every morning at 8 a.m. and the worker
22  who I see every day at 8 a.m. pulls into the street
23  and drives past me you're telling me that person
24  doesn't work at the house and park their car in the
25  driveway?

78

1    THE WITNESS:  You're talking about
2    their personal vehicle?
3    MS. RITACCO:  Yes.
4    THE WITNESS:  And you're saying it's
5    parked there every day all day?
6    MS. RITACCO:  Well, does Palisades
7    Property own a gold Pathfinder?
8    THE WITNESS:  No.
9    MS. RITACCO:  Then it's a personal
10   vehicle.
11   MR. PURCELL:  Again, we're kind of --
12   MS. RITACCO:  I'm done.  Thank you.
13   MR. SARMASTI:  I do have some
14   questions.
15   CHAIRMAN LOCKWOOD:  Step up.  State
16   your name and your address please.
17   MR. SARMASTI:  Vafa Sarmasti.  I live
18   at 286 Brook Valley Road which is right on the
19   corner of Wood Chase.  I forgot my glasses so I have
20   to use my temporaries.
21   One of the I guess questions or
22   several questions that were asked and answered
23   related to the vans.  To me it didn't make sense and
24   I would like to follow up if you don't mind.
25   From what I understood the testimony

79

1    the vans are not parked there overnight or at least
2    they're parked there overnight -- the math didn't
3    seem to work with the testimony.  If the vans are
4    used to take the residents out and bring them back
5    how is it possible that if there's only one employee
6    at the facility overnight how is it that all three
7    vans are parked there overnight?
8    MR. TOMBALAKIAN:  I think he said
9    there were two employees there overnight and he did
10   say that the vehicles are parked overnight.  That
11   was the testimony provided.
12   MR. SARMASTI:  I thought the testimony
13   was there's one employee overnight from 12 a.m. to
14   8 a.m.  No?
15   MR. TOMBALAKIAN:  There's two.
16   MR. SARMASTI:  So three vans parked
17   there overnight?
18   THE WITNESS:  They could be parked
19   there overnight.  Three vans could be there
20   overnight.  They're not guaranteed all there
21   overnight but there could be up to three of our
22   vehicles there.
23   MR. SARMASTI:  So I apologize if I
24   misunderstood your testimony, but if the vans are
25   being rotated and they're only used to take

80

1    employees -- I'm sorry -- the individuals from the
2    home to the treatment and back, are they also used
3    for shopping?
4    THE WITNESS:  One van really is
5    primarily is the main transport van which is the big
6    transit type of van that fits all the residents in
7    one van.  We have an Explorer, like I said, and a
8    minivan and they could be used for different things.
9    If there's an individual resident with an
10   appointment maybe they get the smaller one and
11   there's no -- they're all moving around in different
12   places at different times.  So there's no -- it's
13   not so cut and dry of black and white how you're
14   stating it.
15   MR. SARMASTI:  Okay.  Well, I was just
16   trying to understand your testimony.
17   THE WITNESS:  No.  I understand.
18   MR. SARMASTI:  So what is the
19   facility's responsibility if they ask a resident to
20   leave the facility because of a violation of a rule?
21   In other words, what is your facility's relocation
22   responsibility?  You can't just push them out into
23   the street, can you?
24   THE WITNESS:  No.  And we don't.
25   MR. SARMASTI:  So what is the

81

1    responsibility?
2    THE WITNESS:  At minimum we would
3    bring them to a hospital.  At minimum.  If they're
4    willing to take a referral to another program we
5    would facilitate that transfer.
6    MR. SARMASTI:  You can't take them to
7    a hospital if they don't have a medical condition or
8    medical emergency.
9    THE WITNESS:  Just to be clear though,
10   this would be considered a medical condition and/or
11   emergency and the hospital does accept them.  When
12   they break their sobriety we can bring them to the
13   hospital for that.
14   MR. SARMASTI:  But if they violate the
15   house rules that doesn't involve breaking
16   sobriety what is your legal obligation?  You can't
17   just kick them out into the street; correct?
18   THE WITNESS:  I don't know the
19   legalities in terms of if we can or can't kick them
20   into the street, but from a policy we would not
21   choose to kick them to the street.  We would choose
22   to refer them to another program, similar program to
23   what we do.
24   MR. SARMASTI:  And in the past six
25   years how many times has that occurred where you've

82

1  asked residents to leave or individuals to leave
2  that house?
3          THE WITNESS:  I would just say that a
4  part of the function of the operation it does
5  happen.  I couldn't tell how often.  I couldn't say
6  how often like that.  It's not just a specific
7  average something that happens all the time.  It's
8  just very individualized.  We could go months
9  without it happening at all.
10         MR. SARMASTI:  Has it happened more
11  than five times?
12         THE WITNESS:  In the six years has it
13  happened more than five times?  Yes.
14         MR. SARMASTI:  Has it happened more
15  than 10 times?
16         THE WITNESS:  Could have.  I couldn't
17  tell you.
18         MR. SARMASTI:  When you say it could
19  have, you don't recall or you don't keep --
20         MR. PURCELL:  Mr. Jonas --
21         THE WITNESS:  I couldn't tell you
22  specifically for this question how many.
23         MR. PURCELL:  If you don't know the
24  answer to a question we can find the information.
25         THE WITNESS:  I could find out for you

83

1  to the best of my ability in the past over the years
2  how many people have been referred out to other
3  programs for various reasons, yes.
4          MR. SARMASTI:  And is this information
5  -- did you review any of this information before
6  your testimony tonight?
7          THE WITNESS:  When you say review this
8  information, what information?
9          MR. SARMASTI:  Any documents or
10  information that concerned whether or not you were
11  asked -- you had asked any individuals or residents
12  to leave the facility because of some rule
13  violation.
14         THE WITNESS:  This was not part of
15  what I was asked to be prepared for for this in any
16  way, shape or form.  That's why I don't have that
17  information for you.
18         MR. SARMASTI:  Do you recall when the
19  most recent time that that occurred?
20         THE WITNESS:  No.
21         MR. SARMASTI:  Okay.  So the 10
22  instances that you said probably to, is that because
23  you don't recall or because you haven't --
24         THE WITNESS:  It's just because you're
25  asking me a question that I have not reviewed the

84

1  fact and I don't want to answer in a misleading
2  fashion with a specific number that you're trying to
3  have me tell you.
4          MR. SARMASTI:  I appreciate that.  How
5  involved are you individually in the day-to-day
6  operations of that location?
7          THE WITNESS:  I'm relatively involved,
8  yes.
9          MR. SARMASTI:  And you testified
10  earlier that one of the decisions that you
11  personally made is whether or not any residents are
12  allowed to have guests at the house; correct?
13         THE WITNESS:  Correct.
14         MR. SARMASTI:  So would you agree that
15  that's intricate involvement in the operations of
16  the house?
17         THE WITNESS:  Which I just said I
18  could have involvement.
19         MR. SARMASTI:  Okay.  And if a
20  decision is to be made for the resident to leave
21  that house who makes that decision?
22         THE WITNESS:  Staff on site could make
23  that decision.
24         MR. SARMASTI:  But who makes it
25  typically?

85

1          THE WITNESS:  Staff on site typically
2  would make that decision based on the presenting
3  circumstances.
4          MR. SARMASTI:  And do they report to
5  you about those instances?
6          THE WITNESS:  They're reported in
7  general, yes but, again, to where you're leading
8  this conversation, you're leading it to that I
9  should have a specific number and I told you I
10  didn't look at this so I don't have that number.
11         MR. SARMASTI:  I think you're making a
12  mistake.  I'm just trying to understand.
13         THE WITNESS:  Okay.
14         MR. SARMASTI:  I'm not trying to lead
15  it anywhere.  Okay?  So if these individuals are
16  asked to leave you indicated that the staff on site
17  could make the decisions to ask them to leave;
18  right?
19         THE WITNESS:  Yeah.  The staff on site
20  would make the decision in the moment to ask them to
21  leave, yes.
22         MR. SARMASTI:  Okay.
23         THE WITNESS:  And those clients are
24  also in a treatment facility so there's a lot of
25  factors that go back and forth among the facility as

86

1  well.
2        MR. SARMASTI:  Right.  So you
3  testified a little earlier that if it doesn't
4  involve a medical emergency you would have to find
5  another facility for them; right?
6        THE WITNESS:  Right.
7        MR. SARMASTI:  The same staff that
8  asks them to leave, is that the staff that looks for
9  another facility for them or is that somebody else?
10        THE WITNESS:  Yes.  They would, yes.
11  We have referral sources that are facilities that
12  work with us that would, correct.
13        MR. SARMASTI:  Does that have to be
14  taken care of before the individual is asked to
15  leave?
16        THE WITNESS:  That gets taken care of
17  while the individual is being asked to leave
18  simultaneous.
19        MR. SARMASTI:  Okay.  And do you
20  recall in the five to 10 instances that you believe
21  residents have been asked to leave how many of those
22  instances involve taking those residents to the
23  hospital?
24        THE WITNESS:  Again, you're asking me
25  a number, not an incident by incident.  I don't

87

1  recall in that way you're asking me to give you a
2  how many have been taken to the hospital.  People do
3  get taken to the hospital, yes, when they relapse
4  and come home and they're belligerent or under the
5  influence and we have health concerns that that
6  would be the hospital scenario.  It does happen.  I
7  just couldn't tell you exactly to the T you're
8  asking me specifically for.
9        MR. SARMASTI:  And have there been
10  instances where an individual has relapsed, been
11  taken to the hospital but has not been asked to
12  leave the house?
13        THE WITNESS:  There is -- no, not in
14  the -- no.
15        MR. SARMASTI:  In the past six years
16  that has not occurred?
17        THE WITNESS:  Been brought to the
18  hospital, been discharged from our program and then
19  brought back to our program?  No.  If they spent
20  some time out of our program, like if they go to the
21  hospital, they're discharged and then they become --
22  they readmit into the program as a new client and a
23  new circumstance, we've had residents leave our
24  program for various reasons and then have another
25  chance as a resident in an entirely different set.

88

1        MR. SARMASTI:  Either I misunderstood
2  your answer or you might have misunderstood my
3  question.  My question is if an individual violates
4  the rules, in other words, uses drugs or alcohol,
5  and you indicated that one of the things that the
6  facility does is send that individual to the
7  hospital; right?
8        THE WITNESS:  Yes.
9        MR. SARMASTI:  Okay.  Have there been
10  instances where such an event has occurred, such an
11  occurrence has occurred and then you allowed that
12  resident to come back instead of asking them to
13  leave according to your own rules?
14        THE WITNESS:  Once they go to the
15  hospital they've already been asked to leave.
16        MR. SARMASTI:  Well, they're in the
17  hospital but what happens to that person's
18  belongings?
19        THE WITNESS:  It goes with them to the
20  hospital.  They're discharged from the program when
21  they take them to the hospital.  We will look for a
22  referral for them after the fact.  If they won't
23  take the referral directly we won't take them right
24  back.  If there are some things that happened in
25  their path and in a new experience they come back we

89

1  don't discriminate in that way depending on the
2  circumstance.  So if it's not -- if it's a minor
3  type of violation and they've had their experience
4  and they want to become a new client in the future
5  it's going to be new presenting circumstances in
6  that new set.
7        MR. SARMASTI:  So if I understand your
8  testimony accurately, there has never been an
9  instance, at this house at least, where an
10  individual has been asked to go to the hospital or
11  has been taken to the hospital and has been allowed
12  back?
13        THE WITNESS:  You're saying if the
14  client has been -- a resident has been discharged
15  from our program have we brought them directly back
16  into our program.  The answer is no.  If a client
17  has been -- a resident has been brought to the
18  hospital for some sort of hospital circumstance
19  that's non what you're asking because you're asking
20  very general questions about the hospital.  We have
21  residents that go to the hospital for something
22  that's going on with their health and come back and
23  other circumstance like that.
24        MR. SARMASTI:  I think you understand
25  my questions are focused on instances that involve

90

1  violation of the rules, not --
2        THE WITNESS:  Once a client is
3  discharged from our program they're not brought
4  right back into our program.
5        MR. SARMASTI:  So if a client is taken
6  to the hospital based on something that's perceived
7  as violation of the rules, either, you know,
8  inebriated, maybe alcohol, that automatically
9  translates to a discharge under your rules?
10        THE WITNESS:  The relapse does.  If
11  you're talking about alcohol and drug use, yes.
12        MR. SARMASTI:  So if that occurs --
13        THE WITNESS:  They get discharged to
14  the hospital, like I said, and they don't get right
15  back into our program.  Once they're discharged they
16  become a new opportunity, a new resident.  If they
17  come back in the future it will be as a new
18  resident, new environment, new presenting
19  circumstance, but it's not when they -- when they
20  get discharged they're discharge.
21        MR. SARMASTI:  Okay.  I understand.
22        MR. WILKES:  If I may, let me just
23  interject.  If I may, let me just ask a question.
24  Now, let's say you bring a person back into the
25  program.  That person has already been to the

91

1  Kinnelon house.  Does he have the opportunity to
2  come back into the Kinnelon house or is he banned
3  from the house altogether?
4        THE WITNESS:  There are circumstances
5  where they'd have the ability to come back.  So
6  just, for example, if a resident comes into the
7  house, let's just say they've been doing great.
8  They've been sober.  They've been there for three
9  weeks.  They've been doing good, whatever.  They go
10  on pass with family.  They come back.  They had a
11  drink and they fail a breathalyzer.  They are
12  getting discharged from our program for the failed,
13  the drinking part of it and there will be a period
14  of time that they're no longer in our program and
15  they take a referral, maybe they're in another
16  program, whatever it is.
17        If in the future they do come back to
18  us though, something like a one time drinking issue
19  one single time with various other factors, if they
20  were doing great up until then and other presenting
21  factors, they're also in a treatment center as well
22  and so there would be input from treatment center as
23  well relative to the resident's circumstance,
24  condition, etcetera.  So, no, it wouldn't be
25  necessarily an excluding factor in an absolute way.

92

1        MR. PURCELL:  Mr. Jonas, it's not like
2  a revolving door; right?
3        THE WITNESS:  Yeah.  Just to
4  reiterate, once we discharge a client from our
5  program for a violation in terms of a relapse they
6  are discharged from our program.  I can't be more
7  clear about that statement right there.  So there's
8  no one under the influence in our house.  No one's
9  allowed to stay under the influence in our house.
10  That's not allowed.
11        MS. MALETSKY:  Has there been an issue
12  where your staff is assessing this and decides that
13  someone really needs to leave the program at that
14  moment or there's a relapse or some sort of an
15  issue?  Is that handled by your staff or do call in
16  additional support?
17        THE WITNESS:  That's handled by the
18  staff.
19        MS. MALETSKY:  It's handled
20  exclusively by the staff?
21        THE WITNESS:  Yeah.  They're there
22  with the presentation situation.
23        MS. MALETSKY:  So with those two staff
24  members there those are the two people --
25        THE WITNESS:  Or three.

93

1        MS. MALETSKY:  But let's say it's
2  overnight or whatever.  You know, whatever.
3        THE WITNESS:  Lot less happens
4  overnight but yes.  No one's even out at that hour
5  so it's not like things are happening during
6  overnight.  Residents are home at 10 p.m.  There's
7  nothing other than awake or asleep in the house but
8  drugs and/or alcohol stuff, that's not an overnight
9  subject.  That's only 4 to 12.
10        MS. MALETSKY:  There haven't been any
11  issues where it was something that two staff members
12  could not handle.  They handle it on their own and
13  they handle that situation not calling any
14  additional staff or additional support?
15        THE WITNESS:  If, in fact, that comes
16  up, yes, they would handle it.  Two is actually
17  adequate relative to that.  One is handling whatever
18  their staff handles in the house.  The other one can
19  address the situation directly.
20        MR. SARMASTI:  May I?  So I think I
21  understand your testimony.  You're talking about
22  from a particular standpoint you consider that a
23  discharge.  I'm talking about from a practical
24  standpoint.  How many times has it occurred where a
25  resident was discharged the way you're testifying

94

1  about it but that resident, you know, a week later,
2  two weeks later, however long later was allowed to
3  return to the same house?
4          MR. PURCELL:  Mr. Jonas said that he
5  wasn't able to tell you how many people.  So I think
6  it will be difficult for him to then say of the
7  number he doesn't know what percentage came back.
8  So I think that's a question that we can hear you, I
9  can write it down and we get some information on
10  that but he can't answer that.
11         MR. SARMASTI:  I mean I would like for
12  to him to say he can't answer that.  That's fine.  I
13  appreciate your --
14         THE WITNESS:  Yeah.  Again, no
15  disrespect.  I just don't have that number off the
16  top of my head.  I didn't come prepared for that.
17  It wasn't part of what this entailed.
18         MR. SARMASTI:  And to be clear,
19  Counsel, my question I think, unless I misspoke, was
20  has that occurred, not how many times?
21         MR. PURCELL:  You asked how many
22  times.
23         MR. SARMASTI:  Well, I'll rephrase my
24  question.  Has there been any instances where a
25  resident has been discharged to the hospital but

95

1  allowed to return to that same house?
2          THE WITNESS:  In the future?
3          MR. SARMASTI:  Yes.
4          THE WITNESS:  That could happen, yeah.
5  It could and probably has happened, yes, and we can
6  get you a specific.
7          MR. SARMASTI:  Great.  Thank you.
8  Now, you indicated -- are the individuals allowed to
9  have visitors without your permission?
10         THE WITNESS:  No.
11         MR. SARMASTI:  Okay.  Are they allowed
12  to go for walks in the neighborhood?
13         THE WITNESS:  No, they're not.
14         MR. SARMASTI:  What happens if they
15  do?
16         THE WITNESS:  There could be
17  consequences of some sort.
18         MR. SARMASTI:  What are the
19  consequences?
20         THE WITNESS:  One of which might be
21  like an early curfew or they have extra chores.
22  There's various different, small uncomfortable type
23  of reprimands that we might do that aren't as
24  extreme as kicking someone out.  Really the major
25  things people get kicked out for, then there's other

96

1  forms of, you know, how you try to enforce the
2  rules.  You try to find some sort of balance.  It's
3  not like, you know, you're dealing with people.
4          MR. SARMASTI:  I understand.  So
5  taking from your testimony, you're dealing with
6  people and people don't always learn the first time
7  around.  What's the consequences if there's repeat
8  violations where they leave again?
9          THE WITNESS:  People can get
10  discharged from the program for blatant repetitive
11  violations for sure, yeah.  Every circumstance is
12  different, but, yes, if your question is could
13  people be discharged from the program as a result of
14  smaller rule violations that are repetitive things,
15  100 percent, absolutely.
16         MR. SARMASTI:  Okay.  What is the
17  address of the other house in Kinnelon?
18         THE WITNESS:  Mulberry.  I don't know
19  the number.
20         MR. PURCELL:  Five.
21         THE WITNESS:  5 Mulberry Trail.
22         MR. SARMASTI:  Is there any
23  coordination or transfer of residents between the
24  two addresses in Kinnelon?
25         THE WITNESS:  In what form are you

97

1  referring to?
2          MR. SARMASTI:  Let me rephrase my
3  question.
4          THE WITNESS:  Different from the
5  testimony in the question?
6          MR. SARMASTI:  Well, yes.  I'm trying
7  to find out do the residents or the individuals that
8  are in one house versus the other get transferred
9  between the houses or do they operate independently?
10         THE WITNESS:  The residents that live
11  in the house in question that we're talking about
12  now live in that residence.  They're not going to
13  the other residence like on a regular basis.  When
14  they leave this residence they might step down to
15  that residence in the future in like four to
16  six weeks let's just say, but that's the version of
17  how they go to that house.  They wouldn't, you know,
18  during the regular stay they're not going to and
19  from the other houses.
20         MR. SARMASTI:  Are the employees the
21  same for both houses?
22         THE WITNESS:  We have employees within
23  Palisades Properties that work all three of the
24  Palisades Properties homes.  They're all under
25  Palisades Properties homes.  It's one company.

98

1      MR. SARMASTI:  The other question I
2  have is what is the longest period of time that an
3  individual has been allowed to stay in the Kinnelon
4  house?
5      THE WITNESS:  I don't have the
6  exact --
7      MR. PURCELL:  In this Kinnelon house?
8      MR. SARMASTI:  Yes.
9      THE WITNESS:  I don't have the exact
10  answer to that but north of six weeks I could say
11  for sure.  We've had residents like have been there
12  longer than the six weeks that I said, but I
13  couldn't say off the top of my head right this
14  minute exactly the longest stay we've had.
15      MR. SARMASTI:  And what is the
16  shortest period generally?
17      THE WITNESS:  The shortest could be
18  like let's just say two weeks would be the shortest
19  that we would have someone stay there.
20      MR. SARMASTI:  What is typical?
21      THE WITNESS:  Four to six weeks like I
22  said.
23      MR. SARMASTI:  So two weeks is not the
24  norm?
25      THE WITNESS:  Four to weeks is the

99

1  norm.
2      MR. SARMASTI:  Okay.  That's all the
3  questions I have.  Thank you.
4      CHAIRMAN LOCKWOOD:  Thank you.  Any
5  other questions?
6      THE WITNESS:  Thank you.
7      CHAIRMAN LOCKWOOD:  Yes, sir.  Please
8  come up, state your name and address.
9      MR. ROSENWASSER:  Good evening,
10  everyone.  My name is Paul Rosenwasser.  I live at
11  39 Chilhowie Drive, Kinnelon, New Jersey.
12      And, Mr. Jonas, what type of training
13  do you give to your house staff?
14      THE WITNESS:  I can pull you up the
15  trainings that our staff have, some of which are
16  things like CPR, aggression control type of things,
17  conflict resolution.  I can get you a -- we could
18  definitely pull the specific trainings that our
19  staff has.
20      MR. ROSENWASSER:  Do you train them in
21  the immediate discharge process?
22      THE WITNESS:  We do.
23      MR. ROSENWASSER:  Can you give us a
24  copy of those training materials as well?
25      THE WITNESS:  I'm not sure what

100

1  material you're referring to specifically.
2      MR. ROSENWASSER:  Well, you have
3  training material for CPR, aggression control and
4  conflict.  Do you have training material for the
5  discharge process?
6      THE WITNESS:  Two different types of
7  things.  The training's not directly provided by us.
8  All those trainings I'm referring to are outside
9  training sources.  You're asking about a operational
10  process and procedure that is more so just taught
11  how to handle it in the moment type of thing, not a
12  -- we don't have like what you're asking for
13  specifically, like a training manual for how to
14  handle the discharge.
15      MR. PURCELL:  Could you define what
16  you mean by discharge exactly?
17      MR. ROSENWASSER:  I heard testimony
18  where it says, you know, that urinalysis is done at
19  21 Wood Chase Lane and if it comes up positive
20  that's grounds for immediate discharge.  So that's
21  the discharge policy that I'm referring to.
22      MR. PURCELL:  Okay.
23      MR. ROSENWASSER:  And what I heard in
24  the testimony is that there's a couple things that
25  can happen.  A person can be brought to the

101

1  hospital.  They can be referred to another program.
2  What happens if these two things don't happen?
3      THE WITNESS:  If those things don't
4  happen then there might be a time where police would
5  need to be called to take somebody off the premise.
6  It just hasn't happened but it could happen.  At a
7  certain point -- you can't control everything and at
8  a certain point if someone won't leave and, again,
9  if they're under the influence or belligerent or
10  whatever the case may be that's preventing them from
11  the barrier that they won't leave, yeah, you could
12  have to take that next step.  Again, we haven't had
13  situation yet in six years but it could happen.
14      MR. ROSENWASSER:  So if I understand
15  correctly, one option here is to have someone leave
16  voluntarily, walk off the property.  What does that
17  look like?
18      THE WITNESS:  I wouldn't call that an
19  option.  I mean if they're not going to take a
20  referral we are going to call the police.  So I mean
21  that's more of our having the police handle the
22  person once they're gone, but I mean we just haven't
23  had that situation like that to my knowledge.
24      MR. ROSENWASSER:  If they don't take
25  referral police get called?

102

1  THE WITNESS: A referral or won't go
2  to the hospital.
3  MR. ROSENWASSER: I heard testimony
4  that the majority of your clients at 21 Wood Chase
5  attend the New Jersey Recovery Center program. What
6  percentage of your clients attend an outpatient
7  program other than New Jersey Recovery Center
8  program in Fair Lawn?
9  THE WITNESS: Currently none of them.
10  They all attend North Jersey Recovery Center.
11  MR. ROSENWASSER: It's accurate to say
12  I understand that is zero percent?
13  THE WITNESS: Correct.
14  MR. ROSENWASSER: Has that been the
15  case in the last six years?
16  THE WITNESS: I couldn't say for sure.
17  MR. ROSENWASSER: Can you find out?
18  THE WITNESS: I certainly can try to
19  find out for you. I would say that if somebody
20  called us and was going to go to another treatment
21  facility and live in our sober living we would
22  absolutely accept them into our sober living.
23  MR. ROSENWASSER: Mr. Jonas, thank you
24  very much.
25  THE WITNESS: Thank you.

103

1  CHAIRMAN LOCKWOOD: Any other
2  questions from the public?
3  MR. KESH: Ajit Kesh. I live at 19
4  Wood Chase. Right next-door from them.
5  CHAIRMAN LOCKWOOD: Can you state your
6  name again?
7  MR. KESH: Ajit Kesh, K-E-S-H, 19
8  Wood Chase Lane. Two questions I have. Maybe I
9  have it wrong. He said he didn't have any occasions
10  where the residents over there, this house, had for
11  whatever reason they had to call the ambulance and
12  the police in the past six years. Am I right or --
13  MR. PURCELL: He said no major.
14  MR. KESH: What do you consider major?
15  Call the ambulance and police that's serious.
16  THE WITNESS: I mean there's times
17  where you could -- let's just say for argument's
18  sake you have a resident that says, you know, I'm
19  having trouble breathing right now. I'm having real
20  trouble breathing. My chest is real heavy right
21  now. There's a time where we might say we're going
22  to call an ambulance to come pick you up because we
23  don't want to risk bringing you to the hospital
24  ourselves and something happens to you while taking
25  you to the hospital. So there are situations where

104

1  they could come.
2  BY MR. PURCELL:
3  Q. So, Mr. Jonas, there haven't been any
4  police calls, let's say, for example, like a major
5  fight, people being injured because of physical
6  altercations, things like that? The police haven't
7  been called to those types of events?
8  A.  Correct.
9  Q. But there have been standard medical
10  emergencies that anybody could have?
11  A.  At any given time you could have six
12  to let's say 10 people in there and that's been for
13  six years. So all of the people that are in there
14  are in recovery and have had extensive histories,
15  and so could there be health things that come up in
16  the house and an ambulance would be called? 1,000
17  percent and it has happened. But this is a
18  different version of this -- this isn't a disruptive
19  call. This is a emergency to a health --
20  Q. But there's no emergent violent --
21  A.  No. Violent or aggressive, nothing.
22  MS. HERRINGTON: The emergency calls
23  you're talking about are more -- it could be
24  difficulty breathing, they were cooking and
25  accidentally cut their finger or --

105

1  THE WITNESS: All that stuff. All
2  like regular household situations.
3  MS. HERRINGTON: More medically based.
4  Not necessarily pertaining to a behavioral outburst
5  or something like that?
6  THE WITNESS: Literally exactly.
7  MS. CANALE: Specifically when an
8  ambulance comes the police could accompany them.
9  THE WITNESS: And in those
10  circumstances though, again, we're talking about
11  health related things which of course happen.
12  MR. KESH: Do you have records as to
13  how many times you had ambulance over there --
14  THE WITNESS: For a health --
15  MR. KESH: -- and how many times the
16  police showed up there? They probably -- police
17  probably has the records. I'm just wondering if you
18  have it.
19  THE WITNESS: We will definitely look
20  and see if we do. We will look and see if we do and
21  if we don't the police I assume would.
22  MR. KESH: All right. One other
23  observation I have -- I think the lady over there,
24  she asked you what made you apply for the variance
25  now, and I believe there was a letter from the

106

1   zoning board on October 1 of 2024 who has rejected
2   -- who has told you, notified you that you are no
3   longer allowed to operate there unless you apply for
4   variance.
5           MR. PURCELL:  That was the notice of
6   violation I referred to.
7           MR. KESH:  That was the reason you
8   guys chose to apply.
9           MR. PURCELL:  Correct.
10          MR. KESH:  I just want to make it
11  clear so that she knows.
12          CHAIRMAN LOCKWOOD:  Are you good?
13          MS. FEGAN:  I'm Nancy Fegan.  I'm
14  curious.
15          CHAIRMAN LOCKWOOD:  What's your
16  address, Ma'am?
17          MS. FEGAN:  Nancy Fegan, 20 Chilhowie
18  Drive.  I'm parallel to the street we're talking
19  about.
20          The person before you had asked if the
21  residents were allowed to go out of the house when
22  they're not in the van going to treatment and you
23  said absolutely not.  My concern is what happens to
24  that poor dog in the house?  Doesn't he ever get
25  out?

107

1           THE WITNESS:  So that's a fair
2   question.  That dog is not at the house anymore,
3   first of all, but in that circumstance I mean that
4   dog is with -- I mean we have a nice backyard at the
5   house so it's not like -- they are allowed outside
6   on the property, just not allowed to wander the
7   streets of Kinnelon and in the neighborhood.  And
8   the dog goes -- well, in this particular
9   circumstance obviously the dog would be with him
10  where he goes and so --
11          MS. FEGAN:  But there's no pets there
12  now?
13          THE WITNESS:  No.  And it's only the
14  specific type of service animal that you can't
15  discriminate against.
16          MS. FEGAN:  Also a concern because I
17  live parallel is we have a bar on the deck and I
18  know there's alcoholics that live in the house and
19  there's bars on the street, people have in their
20  backyard, like tiki bars.  I know there was a house
21  several years ago that was bought by a business and
22  they were turned down to be able to have the house
23  because there was a bar or like we have Kinnelon
24  Liquors less than a mile away from the house.  So
25  that was a concern I guess.

108

1           THE WITNESS:  I think it's reasonable.
2           MS. FEGAN:  There's alcoholics living
3   by a big bar and liquor store.
4           THE WITNESS:  One of the unfortunate
5   things about the choice of usage if it's alcohol is
6   that it's readily accessible and it's everywhere and
7   it's hard to avoid it, and that's part of the
8   process of recovery is learning how to cope with
9   that and be around it and still go through life.
10  And I would just in the six years we've been there
11  we haven't had any things like that the way you
12  described it.
13          MS. FEGAN:  But there are with -- like
14  we talked about delivery, food delivery, for
15  instance, however, there have been people that have
16  -- you said yourself that people have relapsed.  How
17  could they relapse if you have the people working
18  there, the three to five people who are also addicts
19  or not certified professionals and drugs gets into
20  the house so clearly drugs are getting into the
21  house.
22          THE WITNESS:  Like I said, we do
23  approve passes for our residents once in a.
24          MS. FEGAN:  Moon.  Let's just say a
25  resident's been there a couple weeks and they're

109

1   doing great and they want to go out with family,
2   whatever the case may be, we would approve the pass
3   if they leave the property with their approved pass.
4   When they're gone anything can happen.
5           MS. FEGAN:  Exactly.
6           THE WITNESS:  When they come back to
7   the house they get drug tested.  They get
8   breathalyzed.  We're going to know if something is
9   happening when they get back to the house.  Drugs
10  and alcohol cannot get brought into the home.
11          MS. FEGAN:  But they relapse.  But
12  they were in the house and had to be taken out
13  because they relapsed.  They relapsed while they
14  were under the roof.
15          THE WITNESS:  They relapsed on pass.
16          MS. FEGAN:  Just because it's a father
17  or mother or family member --
18          THE WITNESS:  They relapsed out.
19          MS. FEGAN:  They could be addicts,
20  too.  I mean could get drugs because clearly drugs
21  are getting in if people are relapsing there.
22          THE WITNESS:  I wouldn't define it as
23  that, clearly drugs are getting in.  I say drugs
24  don't get in.  I would say a resident could leave
25  the property and come back under the influence in

110

1  which case at the front door they're getting
2  addressed and there's nothing more happening there.
3  They're getting some sort of referral, whether it's
4  the hospital or another program.
5          There's a process to coming back from
6  pass than is generally where relapses occur.  In the
7  three houses we have the most minimum amount of
8  relapses happen at this house.  This house has three
9  staff members during the day, two at night
10  overnight.  It's rare that it happens so I don't
11  have the exact number to answer --
12          MS. FEGAN:  But it does happen.  It
13  can happen.  I mean look in jail, for example.  How
14  many people are in jail and they still get drugs.
15          THE WITNESS:  I would just say this is
16  a very controlled environment.  There's minimal
17  amount of things coming into the house.  When they
18  do they're all inspected by staff.
19  BY MR. PURCELL:
20      Q.  Jay, can you speak a little bit --
21  because I think that's a good question you asked and
22  I think it brings up a good point that, you know, on
23  one hand you're trying to provide a fair amount of
24  oversight here but on the other hand -- correct me
25  if I'm wrong and put this in your own words --

111

1  you're also trying to provide an environment where
2  individuals can sort of learn to be somewhat
3  independent and learn how to deal with living their
4  lives and going out in the world and is there always
5  a risk inherent they may relapse?  How does that all
6  work together?
7      A.  Yeah.  I think that part of sober
8  living is that relapses happen.  I mean this is the
9  main thing we're dealing with and relapse is part of
10  recovery.  There's no -- there are times where
11  people just get clean and there's never an issue
12  again but most times there's more than one issue.
13          I would just say that this environment
14  it could happen.  In the house we're talking about
15  they go out very minimal leaving the property on
16  their own and when they do there are some risks.
17  You can't control every single risk, but when it
18  happens and they show up at the front door you can
19  control how you respond to it and how we protect the
20  rest of the community which is what we do.  But to
21  answer the question directly, relapses are very
22  minimal in this particular property, especially
23  because it's the least freedom.
24          MS. FEGAN:  But this one has the least
25  freedom because there's the highest risk.  So the

112

1  highest risk is where would be the most need for
2  that, than would be my concern of why they wouldn't
3  have a professional working there.
4          I have to tell you I worked for a
5  program or I did before I retired and they had a lot
6  of homes and I've gone into many of these homes over
7  20 years and there's chairs throwing.  You're
8  talking about a picture that is a happy family.
9          THE WITNESS:  How many staff members
10  at the homes?
11          MS. FEGAN:  Three, five.  Same as with
12  your program.  I mean they're not happy families.
13  They're just, you know, a brother and sister
14  arguing.  These are complete strangers forced into
15  this house together.
16          THE WITNESS:  I wouldn't say forced.
17  They're voluntary.
18          MS. FEGAN:  They're throwing chairs at
19  each other.  I've seen it happen myself going in and
20  touring these homes over the years.
21          MR. PURCELL:  Is there a question?
22          MS. FEGAN:  Yeah.  That was my
23  question.  So anyhow, leading to why aren't you
24  there or some professional other than watching other
25  addicts watching the higher risk addicts?

113

1          THE WITNESS:  Me personally?
2          MS. FEGAN:  How much time do you
3  actually spend there?
4          THE WITNESS:  I'm a person in recovery
5  and I wouldn't define myself any different than the
6  people that work in the program in that way.
7  They're all responsible.  They're all in recovery
8  like me.  If you look at me and you see someone
9  responsible, presenting responsible, and you think I
10  contribute to society, whatever, you don't known me
11  but I think I present normal.  If that's the case
12  this is the same as our employees.  They're no
13  differ than me.  So if you use me as the example of
14  professional these are the same professionals as me.
15          MS. FEGAN:  Unless you went to get --
16  went on to college.  I mean you --
17          THE WITNESS:  Keep in mind all
18  residents --
19          MR. TOMBALAKIAN:  Guys, guys, guys.
20          (The court reporter asks for
21  clarification.)
22          THE WITNESS:  All of our residents are
23  off in treatment and we have a lot of professionals,
24  one of which is here.  So we do have professionals,
25  licensed professionals, that work with all of our

114

1 residents because they have a requirement to be in a
2 treatment facility.
3          MS. FEGAN:  And how often are the
4 residents with a professional?  Like when do they go
5 to the treatment?  How long is their treatment?
6          THE WITNESS:  Monday through Friday 9
7 to 4.
8          MS. FEGAN:  And then they see --
9 that's when they see -- what if there's crisis in --
10          THE WITNESS:  All day.
11          (The court reporter asks for
12 clarification.)
13          MR. TOMBALAKIAN:  Hold on.  Take your
14 time.  Let the man answer.
15          MS. FEGAN:  Okay.  What happens in the
16 evening after 4 o'clock?  Because there are crisis
17 that occur, especially at night when you have people
18 that are addicts that are highly agitated.  Like you
19 said, your words, they're stressed.  They're angry.
20 Their family gave up on them for the most part.
21 They cannot go back home.  That's why they're coming
22 to Kinnelon.  What happens?
23          THE WITNESS:  I want to make one
24 overlying statement.  Every single resident there is
25 voluntary.  They chose to be there.  Let's just

115

1 start with that fact.  They chose to be there.
2          I'm not sure what experience you have
3 with sober living homes in general but I would just
4 say to compare those staff members than sober living
5 to our sober living and our professionals, I would
6 say that's not a fair assessment.  It could be
7 similar, could not be.  I wouldn't know.  But I just
8 know that our professionals, we have three staff
9 members working during the hours you're referring to
10 and all of those staff members have training and
11 know what they're doing and have experience and have
12 done this before and I trust them handling the
13 situation.  I'm not sure if I can give you a better
14 answer than that, but I would just say that the way
15 you defined me as a professional they're the same as
16 me in that way.
17          MS. MALETSKY:  Can I ask you a
18 question?  The folks coming into this particular
19 property are coming out of inpatient rehab; correct?
20 That's not your inpatient rehab?  That's another --
21          THE WITNESS:  Correct.
22          MS. MALETSKY:  Do they have a choice
23 of where they're going?  How do they choose this
24 particular property from those rehab facilities?
25 And I'm guessing it's more than one that are

116

1 referring to your facility.  Is that correct?
2          THE WITNESS:  Yes.  That's correct.
3 And every --
4          MS. MALETSKY:  How are they choosing
5 or how are they being helped to choose, you know,
6 21, you know, Wood Chase Lane versus some other
7 facility somewhere else?
8          THE WITNESS:  So as far as the --
9 we're going into the treatment side of a
10 conversation right now.  We're kind of getting off
11 the sober living specific element here, but we as
12 North Jersey Recovery Center, the drug and alcohol
13 treatment facility, outpatient facility, has many
14 relationships with many detoxification or inpatient
15 providers.  All the private ones in the state we
16 work with.  Every single client for that version of
17 treatment, not residents for the houses but client
18 in the treatment, works with their therapist and
19 case manager at the treatment center they're in.
20          So I couldn't answer the question of
21 like exactly to a T, but I could just tell you that
22 their professionals they call us and say we know
23 what you guys provide at, basically at Wood Chase
24 Lane in theory, we're saying you know what --
25          MS. MALETSKY:  And do you have a bed

117

1 available?
2          THE WITNESS:  All that stuff.  They're
3 going to reach out to us.
4          MS. MALETSKY:  Like any other rehab?
5          THE WITNESS:  Yeah.  Most likely
6 what's going to happen is that the inpatient
7 facility is going to reach out to us.  It's going to
8 be some version of a case manager or therapist, and
9 they're basically going to go say to us, Hey, I have
10 so and so, they're looking for -- they need this
11 level of outpatient treatment.  They're stepping
12 down.  They need this level of outpatient treatment,
13 and they also need this version of house sober
14 living because this is their home environment, da,
15 da, da, da.
16          MS. MALETSKY:  Do you try to match up
17 with any age or any issues or anything like that or
18 you're just -- it's just a body coming to you, you
19 know, because you have a bed and a female and you
20 have the space for a female?
21          THE WITNESS:  Every single referral
22 that comes to us has decided for themselves that
23 they're fit for our program in that way, like from
24 an overall program standpoint, and if we have one
25 house for that level.  And so anyone suffering from

118

1 addictions who all suffer from the same thing. Age
2 wouldn't differentiate us.
3          MS. MALETSKY:  As far as that family
4 unit of trying to get people that would be
5 compatible within that situation, it's just more
6 that they have an addiction, they have a need and
7 you'll integrate them when they come?
8          THE WITNESS:  And he voluntarily wants
9 to be in that environment.  They're looking for that
10 community family environment themselves.  That's
11 their choice.  They're saying instead of going home
12 or going to this whatever service, I choose to live
13 in this style of -- because it's conducive to
14 recovery.  It's part of recovery and so yeah.
15          MS. MALETSKY:  Thank you.
16          MS. CANALE:  What is the age limit
17 starting and ending?
18          THE WITNESS:  18 and up.  And I mean
19 we've had people 60 plus at times.  You know,
20 listen, addiction and alcoholism does not
21 discriminate.  Doesn't matter what you do for a
22 living, color of your skin, age.  There's not one
23 thing that makes any difference to whether you're
24 going to be addicted or not addicted, and for us
25 we're not the ones who make that decision in that

119

1 way.  I mean if you're in recovery and you have
2 private insurance and you want the help and you're
3 willingly seeking help and you're asking to come to
4 our program and do the treatment and do the sober
5 living that's what we will facilitate.
6          CHAIRMAN LOCKWOOD:  Any other
7 questions, Ma'am?
8          MS. FEGAN:  I'm curious.  What reasons
9 were you not able to get the house near where your
10 treatment center is in Bergen County?  It just seems
11 like there's a lot more there for them to be able to
12 move into jobs, to be able to go to a Starbucks or
13 to be able go to a park and talk with other people.
14 All of this is about, you know, getting back into
15 society and becoming a functional member.  You would
16 want them to be able to go to a park, go to a
17 library.  Where they are now there's nothing that
18 they could go to that's close.  It's just a small
19 residential street.
20          THE WITNESS:  Yeah.  I would just say
21 that we have one house in Mahwah.  We diligently
22 looked for houses everywhere like I said.  We have
23 been turned down --
24          MS. FEGAN:  And why were you not
25 approved?  I know we talked earlier why you wouldn't

120

1 look for houses closer to where the actual treatment
2 takes place instead of doing that ride which at
3 5 o'clock traffic we know it's nuts.
4          THE WITNESS:  No.  Understood.  I
5 would say that we did look for houses in different
6 versions of towns, more so towns where you could get
7 bigger pieces of land with more privacy which is
8 more conducive to what we do.
9          MS. FEGAN:  So why were you turned
10 down?
11          THE WITNESS:  Well, renters are
12 discriminative.  Once you tell them you do a sober
13 living than you're going to have people with this
14 disorder they immediately just say no.  We don't
15 want those type of people in our house.  We don't
16 want to rent to you guys, da, da, da.  We face that
17 -- I can't even tell you the amount of houses that
18 we've experience that.  Most houses.
19          MS. FEGAN:  So the company rents those
20 houses.  They don't actually buy them and get money
21 from the State, like 70,000 a person that lives
22 there?  They must be paid for another way.  You're
23 not living off of $200 rent possibly.
24          THE WITNESS:  The sober living is
25 conducive to the recovery process.  The component is

121

1 vital to a person's recovery.  Our treatment center
2 is a for-profit center.  We take private insurance.
3 We take private pay.  Again, it's all voluntary.
4 It's all willing but that's kind of how it works.
5          MS. FEGAN:  Earlier we were talking
6 about the fence going all the way back to the
7 vehicles, three vans and talking about not having --
8 that if you have a van that's a commercial vehicle
9 you have to have a fence over and you talked about
10 putting a fence.  I was concerned more so and
11 questioning because that's a street that has no
12 sidewalks so there's many little kids that are
13 riding bikes up and down that street, especially in
14 summer now because they are not in school, with
15 traffic.  You said there's never more than a few
16 vehicles there, the three vans.  However, I went by
17 the house four or five times.  I saw just today five
18 vehicles there and then another one coming out.
19          MR. PURCELL:  What's the question?
20          MS. FEGAN:  The question is we're
21 talking about that you're saying that there's not
22 that many vehicles there.  I have a picture on my
23 phone, multiple, showing seven vehicles.  So the
24 question is why do you think these other vehicles
25 are there and if no certified professional is

122

1  overseeing that house on the day-to-day basis other
2  than those two to three other people that are what
3  you call professionals, but when I think of
4  professional I think of somebody with a degree like
5  a social worker or counselors, psychologists --
6           MR. PURCELL:  What's the question
7  again?
8           MS. FEGAN:  The question is where do
9  these other cars come from?  If you're not there
10 you're saying that you have all these rules and
11 policies but no one is there to oversee them.  So if
12 you're saying on one breath that there's three
13 vans --
14          MR. PURCELL:  Ask the question and
15 stop.  Ask the question and stop.
16          MS. FEGAN:  That's it.
17          THE WITNESS:  What is the question?
18          MS. FEGAN:  Why are there so many cars
19 and why is there nobody providing oversight?
20          THE WITNESS:  To my knowledge there's
21 not that much cars.
22          MS. FEGAN:  I could show you on my
23 phone.
24          MS. MALETSKY:  I can actually say I
25 was there yesterday and there were at least five

123

1  cars.  I parked on the street, but when I was there
2  a van had pulled in.  I asked them if I could look
3  around the property.
4           THE WITNESS:  So that would be news to
5  me.
6           MS. MALETSKY:  And there was another
7  one and then when I was leaving there were two more
8  and two others that were there and another one.
9           THE WITNESS:  Just to say this though,
10 we'll find out for sure.
11          MS. MALETSKY:  I mean there were a
12 number of cars.  I don't know how many should be
13 there or shouldn't be there.
14          THE WITNESS:  We will find out for
15 sure and if it is an issue we would remedy it.
16          MS. MALETSKY:  But I'm just saying so
17 we're not arguing the number of cars, I was there
18 myself yesterday and there were a number of cars.
19          MS. FEGAN:  I have pictures on my
20 phyone so I can tell you the plates.  So anyhow,
21 with all that traffic of all these cars I'm thinking
22 of the kids that are riding their bikes on this
23 street because there are no sidewalks.  That's why
24 people move to this area.
25          MR. PURCELL:  Mr. Chairman, this line

124

1  is really comments.  Can we sort of reel it in a
2  little bit?
3           MR. MONDELLO:  There will be an
4  opportunity for you to go on for as long as the
5  chairman allows.
6           MS. FEGAN:  No.  It's fine.
7           MS. MALETSKY:  The number of cars, it
8  sounds like that's it.
9           THE WITNESS:  Again, we will confirm
10 it and if there are it's an easy remedy.  It would
11 be no big deal to us in that way and we will enforce
12 that for sure.
13          MR. PURCELL:  I guess I'll just say,
14 again to follow up with what Jay just said, we'll
15 certainly find out what's going on there, the
16 correct number of cars, and then we would stipulate
17 to limits on that, a condition of approval which
18 would certainly be an effective tool to cure that
19 problem to the extent the Board feels there is a
20 problem.
21          MS. GILHOOLEY:  Just a quick follow-up
22 question.  Do you have any security cameras on the
23 property?
24          THE WITNESS:  We do.
25          MS. GILHOOLEY:  Okay.

125

1           THE WITNESS:  The house has cameras.
2           MS. GILHOOLEY:  Outside?
3           THE WITNESS:  Throughout the house.
4  Outside, inside.
5           MS. GILHOOLEY:  And where is that
6  monitored?
7           THE WITNESS:  When you say where is it
8  monitored, I mean I can look at it right now for
9  example.
10          MR. WILKES:  Is it connected to any
11 type of security service or --
12          THE WITNESS:  It's just a running
13 camera that our staff can monitor and see.  If I
14 wanted to live look in and say how are we doing at
15 the house or something, it's just so that there's
16 active --
17          MS. HERRINGTON:  It's not like
18 connected to like Slomin's or something where if
19 there's a break-in or something --
20          THE WITNESS:  Oh, no.  Not that type
21 of camera.  This is more of an operational camera
22 system.  I mean we have an alarm system in the
23 house.
24          MS. GILHOOLEY:  You just have like an
25 app or something that you could look at at any point

126

1  in time?  Okay.  And what about inside the house?

2          THE WITNESS:  It's both cameras inside

3  and outside.  It's not in bedrooms just to be clear.

4          MS. GILHOOLEY:  Right.  In the general

5  area?

6          THE WITNESS:  Yeah.  In the living

7  room and kitchen, things like that.

8          CHAIRMAN LOCKWOOD:  We're going to

9  take a --

10          MR. TOMBALAKIAN:  We're going to take

11  a five minute break.  I'm starting to pity her.

12          (Recess is taken at 9:11 p.m. and

13  resumed at 9:20 p.m.)

14          MR. TOMBALAKIAN:  Please state your

15  name and your address.

16          MR. VENKATARAO:  My name is Raj

17  Venkatarao.  My address is 23 Wood Chase.  Next-door

18  to the property there.

19          My question would be how many

20  residents in the last six years, right, came from

21  Kinnelon?  Because you would tend to think if a

22  place is called at home you would come to and go

23  back to the same setting.  Can they tell me how many

24  people/residents lived there in the last six years

25  came from Kinnelon because you would tend to think

127

1  if it's a home you would stay in the same place and

2  go back to similar place?

3          THE WITNESS:  I wish I could answer

4  that right now.  I'm just not sure how many --

5  specifically from the Town of Kinnelon you're

6  asking?

7          MR. VENKATARAO:  Yes.

8          THE WITNESS:  Specifically from

9  Kinnelon.  I just couldn't answer that right this

10  second.  I don't know.

11          CHAIRMAN LOCKWOOD:  Okay.  Any other

12  questions from the public?

13          MS. MOEHRLE:  Ariane Moehrle, 36

14  Highland.  I'm directly behind the property.

15          My question is your lease between the

16  homeowner, Sal Gargiulo, how is it a legal lease at

17  the moment when this is a rental property that

18  you're renting from him was my understanding for the

19  purpose of a cooperative sober living home without a

20  proper variance?

21          MR. PURCELL:  So I can answer that

22  question.  There's a valid lease between Sal

23  Gargiulo and Palisades Property.  You know, zoning

24  and requests for variances and reasonable

25  accommodations, that's a separate legal question

128

1  that doesn't have any bearing on the validity of the

2  lease.

3          MS. MOEHRLE:  Interesting.  If you

4  have two other properties, one is 5 Mulberry Trail

5  and this one and one in Mahwah that you've already

6  been through this whole zoning thing in Mahwah

7  according to the minutes back in 2021, why wouldn't

8  you expect any laws to be regarding the zoning here

9  in Kinnelon?

10          MR. PURCELL:  I think as has been

11  answered -- Mr. Jonas already answered it --

12          MS. MOEHRLE:  It took six years.

13          MR. PURCELL:  -- that there was a

14  notice of violation than spurred the filing.

15          MS. MOEHRLE:  Exactly.  I think you

16  want to be proactive than reactive, especially when

17  you're housing alcoholic and drug people.  Be

18  proactive than reactive.  Reactive, calling police.

19  Proactive, you know, having the proper measures.

20          The people that you hire on --

21          MR. PURCELL:  Stop, stop, stop, stop,

22  stop, stop, stop.

23          MS. MOEHRLE:  No.  I asked a question.

24  You answered.

25          MR. PURCELL:  So we're sort of, again,

129

1  there's comments and there's questions.

2          MS. MOEHRLE:  Okay.  You talked about

3  -- I already asked a question.

4          (The court reporter asks for

5  clarification.)

6          MR. TOMBALAKIAN:  One at a time.  Let

7  Mr. Purcell enter his objection and then you can

8  answer your question.

9          MR. PURCELL:  I just heard a

10  qualitative statement about the operation of the

11  house.  That wasn't a question.  That was a

12  statement.  So the Board --

13          (The court reporter asks for

14  clarification.)

15          MR. PURCELL:  I ask it not be

16  considered by the Board.  It's a comment that was

17  just made about the qualitative nature of the

18  operation here.  Thank you.

19          MS. MOEHRLE:  So being that this is a

20  business we all have to follow business rules.  I

21  run a business.  I have to follow business rules,

22  and I would think that you would have to do the

23  same.  Again, it's a comment.  If you're not happy

24  with it, the next thing is how --

25          MR. PURCELL:  Again, I'm objecting to

130

1  this. Can you at least try to ask questions?
2          MS. MOEHRLE:  I'm gonna.  How are
3  women safe with unlocked bedroom doors?
4          THE WITNESS:  Again, we have three
5  staff members during the 4 to 12 shift and two staff
6  members from 12 to 8 that are always on shift doing
7  checks and working.  Again, we don't allow men and
8  women to share bedrooms.  We have cameras within the
9  whole house.  We take measures to make sure that all
10  of our residents are safe.
11          MR. PURCELL:  I'll just say that the
12  CSLR regulations allow for cohabitation of men and
13  women in the same CSLR.  That's not a violation of
14  the CSLR.  And the CSLR regulations, in fact, state
15  that the bedrooms should not have locks.
16          MS. MOEHRLE:  The other question I
17  have is regarding the training or possible employee
18  that you have working in there.  I understand that
19  it is a recovered 30-day possibly person that's been
20  through the program for 30 days and now he can
21  become or she could become the head of the house.
22  How are they trained?  I know you spoke about CPR.
23  I also read as well as Narcan.  Are they trained in
24  Narcan as well?
25          MR. PURCELL:  So that question was

131

1  asked and partially answered.  The question on
2  Narcan is new.  Mr. Jonas, can you answer that
3  question?
4          THE WITNESS:  Yes.  Our staff are all
5  trained in using Narcan.  We have Narcan at the
6  houses.
7          MR. PURCELL:  The other comment I
8  think I'd like to correct, Mr. Jonas, there's a
9  comment that a person who went through the program
10  for 30 days could become an employee and manage the
11  house.
12          THE WITNESS:  That's not correct.
13  These are people in recovery, one year in recovery.
14  This is a different person.  That's a
15  mis-explanation of what type of -- what level --
16  when in the process we would be willing to hire
17  somebody.  We don't have anybody working there
18  that's 30 days through our program that became like
19  in that role like that.  That's not how we do it.
20  Just to directly answer that question so it's not
21  misled who and how we hire.
22          MS. MOEHRLE:  And do you have out
23  anything regarding potential hiring through the
24  property's LLC, the Palisades Property, regarding
25  first thing is a high school diploma, second

132

1  thing is CPR and the third thing is Narcan?  Do
2  you have that out as an ad in the paper regarding
3  any of that?
4          THE WITNESS:  What's the actual
5  question?
6          MS. MOEHRLE:  Do you have an ad in the
7  paper regarding --
8          THE WITNESS:  Like Indeed ad for
9  hires?
10          MS. MOEHRLE:  Yes.  Like Indeed.
11          THE WITNESS:  We hire people through
12  Indeed and through LinkedIn, yes.
13          MS. MOEHRLE:  And it states -- correct
14  me if I'm wrong.  I'll ask the question.  Do you
15  need only at this point the high school diploma is
16  number one on the ad, number two is CPR training and
17  number three was listed as Narcan?  That's one
18  question.
19          THE WITNESS:  All are good criteria,
20  yes.
21          MS. MOEHRLE:  Do you think a high
22  school diploma is equivalent to running a house?  If
23  there was two high school boys or girls running a
24  house of approximately 10 men at that time, do you
25  think that's a qualitative employment qualification?

133

1          THE WITNESS:  I can't even answer that
2  question in that way.  I don't know how to answer
3  that question.  I have people that I know that are
4  high school educated that are very successful and
5  have done great things in this world and great
6  contribution in this world and so to answer your
7  question I don't think I can answer such a
8  discriminative question.  It's hard to even answer.
9          MS. MOEHRLE:  Okay.  I would think
10  somebody would need to be qualified.  Maybe that's
11  the question I should ask.
12          MR. PURCELL:  I want to answer that
13  and I think Mr. Jonas answered that.  I'd like to
14  add some additional response to that.  I would say
15  that, you know, for example, some people, for
16  example, myself, I have a grandmother that had 10
17  children.  She had a high school education and she
18  ran that household quite well.  So I think as far as
19  the notion that a person with a high school degree
20  can't run a household is an offensive question.
21          MS. MOEHRLE:  I wasn't being offense
22  at all.  I was regarding my high school 18-year-old
23  that would be getting out of school and now going
24  into a home with 10 men possibly with drug
25  addiction.  So, no, I wasn't talking about your

134

1  80-year-old grandmother. Absolutely not.

2          The other thing is who pays for the
3  food? How do you get paid? Do you get paid from
4  the State? Who pays for the food? How do they go
5  food shopping? I know you spoke to about that but
6  like who brings them there? Who's paying for the
7  food?

8          THE WITNESS: We provide them money
9  weekly for food. We take them to the grocery store.
10  Sometimes we order directly. We'll have our staff
11  pick up the food. To answer that question, yes.

12          MS. MOEHRLE: And getting back to the
13  question about the training with the Narcan was one
14  of the things that I said, why would they need a
15  Narcan on the premises if there's no drugs and
16  alcohol happening there?

17          THE WITNESS: Again, like you said,
18  you would rather be prepared than not prepared for
19  something. If something did happen you want to be
20  able to be preventative. Right? And so we need
21  that there just in case. You just never know. If
22  someone got back from a pass and we were assessing
23  them and they're at the front door and something
24  happens, let's hope there's Narcan there in that
25  situation. If there's not we probably weren't

135

1  prepared for that possible situation. Anything can
2  happen.

3          MS. MOEHRLE: That will be it.

4          MR. TOMBALAKIAN: State your name and
5  address.

6          MS. TORSIELLO: I'm Dana Torsiello.
7  I'm at 22 Wood Chase Lane. So I'm directly across
8  the street and I do have a question for you. How
9  long have you had the permit for the septic that you
10  said you're going to start next week?

11          MR. PURCELL: Give me one second. I
12  have a copy of that.

13          MR. PETRESKI: I believe it's February
14  28th, 2025.

15          MR. PURCELL: Yeah. I have -- I know
16  there was an approval in February and then there was
17  a new application that was submitted in April
18  because there had to be a change to design and I
19  believe it was approved not long after it was
20  submitted on April 1st or there around. And the
21  delay has been because there was a need for
22  electrical permits from the township which they
23  weren't able to get.

24          MS. TORSIELLO: Because the last time
25  you applied for the permits we were all notified for

136

1  that permit from the --

2          MR. PURCELL: Housing?

3          MS. TORSIELLO: Yeah. So I was just
4  wondering. So with that, why haven't you had the
5  work done and then applied for the variance?
6  Wouldn't you think it would have to comply before
7  they can pass it?

8          MR. PURCELL: Well, again, that's a
9  legal question that has to be answered. It's kind
10  of two separate issues. I think certainly in order
11  to be in the house ultimately that septic needs to
12  be resolved and it is being resolved and will be
13  updated. As Mr. Jonas said, there hasn't been a
14  failure of the system so it's not an emergent
15  matter, but it is something that needs to be done.
16  Than issue about septic is regulated by the Board of
17  Health and then to the extent beyond the Board of
18  Health the New Jersey Department of Environmental
19  Protection.

20          Certainly I think it's a point of
21  discussion we can have with the Board. I think
22  where it ends is we would stipulate to get that
23  approval than we will comply with the applicable
24  Board of Health and DEP regulation.

25          MS. TORSIELLO: And will be in

137

1  compliance also with the Highlands Act? Because I
2  know directly behind me there's a lot of protected
3  land and, you know, the Highlands where -- I thought
4  the last time that it wasn't in compliance and it
5  was failing and, you know, we smelled it and we kept
6  calling.

7          MR. PURCELL: This at 21 Wood Chase?

8          MS. TORSIELLO: Correct. That was
9  right before this happened. I believe that is why
10  this happened.

11          MR. PURCELL: I don't -- well, I have
12  not heard that. Have you heard that, Jay, there
13  being any type of issue with smells or problems?

14          MS. TORSIELLO: We were calling the
15  health department and just asking, you know, why it
16  was --

17          THE WITNESS: Which house is it for?

18          MS. TORSIELLO: 21 Wood Chase. I have
19  the letter but that was just -- so I thought it was
20  not in compliance then and just wanted to make sure
21  that it's covered under the Highlands and you had
22  said it's accepted for the --

23          MR. PETRESKI: What I'm saying is that
24  there is a procedure in place for the Highlands for
25  them to apply for an exemption to prove to us that

138

1  it is exempted from the Highlands rules and I would
2  recommend that to be a condition of any approval,
3  exemption from the Highlands.
4          MR. PURCELL: We'll stipulate to
5  showing that.
6          MS. TORSIELLO: And just one quick
7  question about the vehicles. You had said are they
8  not allowed to drive the vehicles to work, their
9  own?
10         THE WITNESS: Yeah. We don't have
11  them drive their vehicles. Again, I'm going to look
12  into the issue being brought up.
13         MS. TORSIELLO: Yeah. Because there
14  are vehicles overnight, not -- just the vans, the
15  two vans and the one SUV I think it is are there a
16  lot but also even yesterday there was eight
17  vehicles.
18         THE WITNESS: Yeah. I realize that.
19         MS. TORSIELLO: You know, almost
20  always they're rushing to work at the business.
21         THE WITNESS: I can tell you --
22         MS. TORSIELLO: You can tell they're
23  late to work, and I walk my dog five times a day and
24  I'm always telling them to slow down, you know, I
25  know you're going to work but like that. So that

139

1  was my question.
2          THE WITNESS: But that's good to know
3  also. I'm going to be looking into it.
4          MS. TORSIELLO: Okay. Because my dad,
5  he used to have a business. I grew up here in
6  Kinnelon and his work vehicles were always in the
7  driveway on Miller Road and he was told at one point
8  he wasn't even allow to keep them there. He had to
9  move them to another location. You weren't at the
10  time allowed to have work vehicles and I think you
11  said they're supposed to be in a garage. Is that
12  correct? Someone said.
13         MR. TOMBALAKIAN: In the residential
14  zone in Kinnelon, it's in the ordinance.
15         MS. TORSIELLO: It is there. Okay.
16         MR. TOMBALAKIAN: It says that
17  commercial vehicles -- there's one allowed and it
18  has to be kept inside. It can't be kept outside.
19  So what Mr. Purcell said he wasn't aware of that.
20  The notice of violation never raised that issue. So
21  he's asking -- he amended the application this
22  evening to incorporate a request to allow outdoor
23  commercial vehicle parking and that's part of the
24  use variance that he's seeking now.
25         MS. TORSIELLO: Okay. Thank you.

140

1          MS. CANALE: Excuse me, Mr. Jonas.
2  Does the property have a generator?
3          THE WITNESS: We do have a, yeah.
4  Pretty sure we have -- yeah. Yeah, we do. Sorry.
5  We do. Every property of ours has a generator.
6  Maybe even two. We might have two at Kinnelon at
7  that house. We do though.
8          MR. PURCELL: We'll clarify.
9          MS. CANALE: I'm sure you do.
10         THE WITNESS: We definitely do.
11         CHAIRMAN LOCKWOOD: Any other
12  questions from the public?
13         Seeing none any other questions from
14  the Board?
15         Do you want to introduce your next
16  witness or do you want to --
17         MR. TOMBALAKIAN: It's 9:30.
18         CHAIRMAN LOCKWOOD: That means we got
19  to carry it.
20         MR. TOMBALAKIAN: If you want to start
21  your new witness.
22         MR. PURCELL: Let's do that. Let's
23  do. Let's just get her qualified.
24         THE WITNESS: Thank you.
25         MR. PURCELL: Thank you, Mr. Chairman.

141

1  This is Dr. Rachel Sugerman. Dr. Sugerman, can you
2  give your title --
3          MR. TOMBALAKIAN: Do you want to swear
4  her?
5          MR. PURCELL: Sorry. It's late.
6          MR. TOMBALAKIAN: Dr. Sugerman, can
7  you rase your right hand?
8  R A C H E L   S U G E R M A N, Ph.D., Sworn.
9          MR. TOMBALAKIAN: Please state and
10  spell your name for the record.
11         THE WITNESS: Rachel Sugerman.
12  R-A-C-H-E-L. Sugerman is S-U-G-E-R-M-A-N.
13         MR. TOMBALAKIAN: Thank you very much.
14  DIRECT EXAMINATION BY MR. PURCELL:
15
16         Q.   Dr. Sugerman, can you go over your
17  educational background or professional background
18  and what supports your qualification as an expert in
19  the field of mental health and addiction recovery?
20         A.   So I have a Bachelor's in
21  psychological from Ramapo College. I have two
22  Master's degrees. I have a Master's degree in
23  psychology from Fairleigh Dickinson University and a
24  Master's degree in clinical mental health counseling
25  from Montclair State University. I also have my

142

1  Ph.D. in counseling from Montclair State University.

2      Q.    And then professionally, your

3  professional experience?

4      A.    So I have worked as a clinician and

5  supervisor in mental health and addiction since

6  2011. I've worked in various different settings.

7  I've worked in inpatient psychiatric care, community

8  mental health, private practice. Currently I am the

9  clinical director and administrator at North Jersey

10  Recovery Center which is a treatment facility for

11  individuals in recovery from addiction and mental

12  health.

13      Q.    Now, Dr. Sugerman, this is your CV?

14      A.    Yes.

15      Q.    Let's mark this as Exhibit A-5.

16          (Curriculum Vitae marked A-5.)

17      Q.    Dr. Sugerman, can you give us some

18  perspective on the prevalence -- actually, I'm going

19  to say this. Mr. Chairman, did you accept her as

20  a --

21          CHAIRMAN LOCKWOOD: I was going to.

22          MR. PURCELL: I'm sorry.

23          CHAIRMAN LOCKWOOD: Any questions from

24  the Board? I'm going to accept her as an expert

25  witness. Accepted.

143

1      Q.    Accepted as an expert witness in the

2  field of mental health and addiction recovery.

3          Dr. Sugerman, can you give us a

4  perspective on the prevalence of substance abuse?

5      A.    Sure. So according to the 2023

6  National Survey on Drug Use and Health 48.5 million

7  Americans ages 12 and older -- that's 17.1 percent

8  of the population -- met diagnostic criteria for a

9  substance use disorder.

10          According to the CDC between 2021 and

11  2022 there were 3,576 deaths in New Jersey that

12  could be 100 percent attributed to alcohol, and then

13  between January and May of this year alone there

14  have been 475 suspected drug related deaths in

15  New Jersey according to the New Jersey Department of

16  Law and Public Safety.

17      Q.    And about how many people seek

18  substance abuse treatment?

19      A.    So according to the Department of

20  Human Services, Division of Mental Health and

21  Addiction Services there were a total 82,176

22  admissions for substance use treatment in New Jersey

23  in 2023. 1,745 of these admission were Morris

24  County residents.

25      Q.    Have you ever visited a sober living

144

1  home?

2      A.    Yes.

3      Q.    Have you ever visited a cooperative

4  sober living residence?

5      A.    Yes. That's a type of sober living

6  home.

7      Q.    And have you visited this particular

8  sober living home/CSLR?

9      A.    Yes, I have.

10      Q.    And does any treatment take place at

11  the sober living home?

12      A.    No.

13      Q.    What's sort of the purpose behind

14  sober living homes?

15      A.    So recovery housing is based on social

16  model recovery principles.

17      Q.    Recovery housing, is that kind of a

18  broader word for a sober living home?

19      A.    Correct, yes. So they are recommended

20  by the U.S. Department of Health and Human Services.

21  Substance Abuse and Mental Health Service

22  Administration, SAMSA. SAMSA basically leads public

23  health and service delivery efforts that promote

24  mental health, prevent substance misuse and provide

25  treatment and support to foster recovery. The

145

1  organization delineates that having a home or stable

2  and safe place to live is one of the major

3  dimensions of supporting a life in recovery.

4          Basically recovery housing is a safe

5  family-like, healthy, substance-free environment

6  that supports individuals in recovery from addiction

7  centered on pure support and connections that

8  promote long-term recovery and emphasizes the

9  importance of social, cultural and environmental

10  factors in the recovery process.

11      Q.    So if we talk a little bit about how

12  sober living homes is like a family, why and how

13  that impacts treatment.

14      A.    Sure. So sober living functions like

15  a family in a number of ways and we spoke about it a

16  little bit earlier, but first it offers strong

17  emotional bonds for residents so residents are able

18  to turn to each other in moments of struggle.

19  They're able to celebrate victories together. They

20  provide one another with empathy without judgment,

21  similar to how supportive family members would be.

22          Residents in sober living homes also

23  hold one another accountable and the environment

24  offers structure, support, routine and a sense of

25  shared responsibility as we mentioned earlier. Just

146

1  like in a family, everyone contributes to the
2  household.  They do chores.  They share meals
3  together.  They ensure that shared living spaces are
4  clean and kept in good order, and essentially all of
5  these things are important because what we do know
6  is that things like isolation, lack of structure,
7  loneliness and boredom can all contribute to
8  relapse.
9       Q.   So while there's really no treatment
10  taking place at the sober living home, just being
11  there, being around other people, you know, having
12  some support, you know, that's all beneficial to
13  recovery?
14       A.   Absolutely.  So the environment
15  functions as a therapy.
16       Q.   What are some benefits of sober living
17  homes that relate to society at large?
18       A.   So I think people typically think
19  about sober living homes as benefiting only
20  individuals in recovery but they also have a lot of
21  benefits to society at large.  For one thing they
22  reduce the burden on the public health system
23  because, as we know, addiction can lead to frequent
24  emergency room visits, hospitalizations and
25  emergency service utilization.

147

1            Sober livings are also instrumental in
2  helping people rebuild their lives.  So it
3  contributes to those individuals' ability to reenter
4  the workforce and contribute to the economy, and
5  then sober living homes also provide neutral support
6  and accountability.  They reduce stigma and
7  essentially will give strength to having other
8  people also seek treatment.
9       Q.   Is there anything else that's
10  important to understand about sober living homes?
11       A.   I think mostly the most important
12  thing is that sober living creates a sense of
13  community.  So having the maximum number of
14  residents that's allowed under the CSLR license is
15  important because it enables those individuals to
16  foster relationships and not isolate themselves.
17       Q.   What benefits does creating a sense of
18  community lead to?
19       A.   So mainly pure support and
20  accountability.  It increases the chances of
21  residents having an opportunity to identify with one
22  another through shared similar experiences.  There's
23  an increase in accountability.  Basically more eyes
24  on one another leads to, you know, enforcing house
25  rules and also maintaining sobriety.  It also, like

148

1  I mentioned before, reduces isolation, helps build
2  community, and then there's also less of an impact
3  on turnover.  So if one person leaves the house it
4  doesn't destabilize the whole community.
5       Q.   So if there was, for example, there
6  was an average of only four people in the house
7  would that have a negative impact with respect to a
8  person's sobriety and their ability to stay sober
9  and why?
10       A.   Four people in a home really would be
11  hard to describe as a community I think.  There is
12  not enough in terms of interaction to really foster
13  that community.
14       Q.   All right.  Thank you for that.
15  That's all I have for the doctor.
16            CHAIRMAN LOCKWOOD:  Any questions from
17  the Board?
18            MR. NICOSIA:  I have a question.  Go
19  ahead, Ron.
20            MR. MONDELLO:  So 30 days and the fact
21  that folks are, you know, leaving in certain time
22  periods, is that enough time to foster community,
23  foster relationships, help with accountability and
24  peer support?  You were in the audience.  I had
25  mentioned that it just sounds more like a short-term

149

1  hotel versus, you know, a family setting.
2            THE WITNESS:  I think that that's a
3  difficult assumption to make.  I think that people
4  can really change quite drastically within a short
5  period of time and we see that in therapeutic
6  relationships that are established quite quickly.
7  These are people that are experiencing probably one
8  of the hardest times of their lives and are really
9  able to connect with one another because they can
10  identify with one another's experience.
11            MR. MONDELLO:  But you just testified
12  that if there are only four people there there would
13  be difficulty with establishing community, peer
14  support, accountability.  It could possibly happen
15  within that 30 days that we're down to six, five,
16  four, maybe three.
17            THE WITNESS:  One of the things I
18  think is important to think about with this is that
19  not everybody is coming and going at the same time.
20  So residents that have been there for a longer
21  period of time can take on mentorship roles for
22  newer residents that are coming in and help them to
23  acclimate to the environment and to really set the
24  tone of what the culture of the house is like, just
25  like, you know, the culture of a family.

150

1        MR. MONDELLO: All right. Thank you.

2        MR. NICOSIA: Thank you. So a few

3 questions for Dr. Sugerman. I understand from your

4 resume you're the clinical director of North Jersey

5 Recovery Center. We learned earlier under the

6 umbrella of Palisades Property, correct, or no?

7        MR. PURCELL: Just to correct that,

8 it's a separate entity. They have same people own

9 both but it's a separate entity.

10        MR. NICOSIA: Thank you for that

11 clarification. So what involvement do you have if

12 any in sober homes?

13        THE WITNESS: It is separate. The

14 clinical services are separate from the sober

15 living.

16        MR. NICOSIA: You had mentioned that

17 you visited the property. What purpose were you

18 visiting the property?

19        THE WITNESS: So that I could become

20 familiar with it.

21        MR. NICOSIA: For this application or

22 in general?

23        THE WITNESS: Just in general. We

24 have residents that come to our facility so it was

25 good for me to understand what that environment was

151

1 like.

2        MR. NICOSIA: Understood. Thank you.

3        CHAIRMAN LOCKWOOD: Any other

4 questions from the Board?

5        MS. HERRINGTON: I have a question to

6 clarify. So then your employment is with the

7 treatment facility, not with the sober living home?

8        THE WITNESS: Correct.

9        MS. HERRINGTON: Are you part of the

10 team? I believe Jay had mentioned earlier that when

11 someone is going through a treatment when they're

12 deciding where to go for options for residential

13 component of it, are you part of the team that makes

14 those -- that has those discussions about the

15 options so you would be one of the ones that would

16 be presenting, Oh, this is another home that's

17 available and there's a bed available?

18        THE WITNESS: Are you saying if you

19 would refer somebody within our existing treatment

20 program to sober living? We could, yes.

21        MS. HERRINGTON: All right.

22        CHAIRMAN LOCKWOOD: Any other

23 questions?

24        MR. MONDELLO: So you see these

25 residents every day for the most part?

152

1        THE WITNESS: Yes.

2        MR. MONDELLO: Because they come from

3 Kinnelon. They go to Fair Lawn and you're the

4 director there so you see them for the most part.

5        THE WITNESS: Yes.

6        MR. MONDELLO: Thank you.

7        CHAIRMAN LOCKWOOD: Anything further

8 from the Board?

9        We'll open it up to the public. Any

10 questions from the public?

11        MS. FEGAN: I just have a few

12 questions.

13        CHAIRMAN LOCKWOOD: State your name --

14        MS. FEGAN: It's me again, Nancy

15 Fegan. I just have one question. You see them at

16 the treatment center. Are you actually working with

17 them or other people, you just see them because

18 you're the director?

19        THE WITNESS: Would I meet with them

20 individually is what you're asking? I could. I

21 could potentially meet with them.

22        MS. FEGAN: But do you?

23        THE WITNESS: Not every single

24 individual would I meet with but I serve as the

25 clinical director so I oversee all the clinical

153

1 services in the building so that is group therapy,

2 individual therapy, all of the clinical services.

3        MS. FEGAN: So you oversee the staff

4 that work with them?

5        THE WITNESS: Correct. And I also

6 would potentially meet with clients as well

7 basically.

8        MS. FEGAN: You may but not all of

9 them?

10        THE WITNESS: That's correct.

11        MS. FEGAN: And the staff that works

12 there, are they like social workers, clinical

13 psychologists as well or they are high school

14 students? I mean high school diploma.

15        THE WITNESS: Well, in order to

16 provide therapy in New Jersey you have to be

17 appropriately licensed so they're providing a

18 therapy service and they meet the requirements of

19 that.

20        MS. FEGAN: So what would their title

21 be?

22        THE WITNESS: For the --

23        MS. FEGAN: The ones working with the

24 residents, the ones that actually work with the

25 residents.

154

1    THE WITNESS:  We have a number of
2    different positions.  For anybody who's a licensed
3    clinician you would either be a licensed
4    professional counselor, a licensed clinical social
5    worker, licensed associate counselor, licensed
6    social worker, licensed clinical alcohol and drug
7    counselor.
8    MS. FEGAN:  Are those the people that
9    are meeting with the residents daily?
10    THE WITNESS:  For individual therapy
11    or for -- yes.
12    MS. FEGAN:  For individuals, they meet
13    with them and then when they do group therapy it's
14    people that are not licensed?
15    THE WITNESS:  The group, it depends on
16    the service.  So if it's a psychoeducational or
17    didactic group it could be somebody that is not a
18    licensed clinician.  If it's a therapy group then it
19    would be a licensed clinician.
20    MS. FEGAN:  How often would they see
21    somebody licensed?
22    THE WITNESS:  Individually at minimum
23    once a week.
24    MS. FEGAN:  One time a week for like
25    an hour, hour an half?

155

1    THE WITNESS:  An hour.
2    MS. FEGAN:  Okay.  Thanks.
3    MS. MALETSKY:  Maybe we can ask, you
4    know, the time that they're spending at the North
5    Jersey Recovery Center which I think they go to
6    every day; is that correct?
7    THE WITNESS:  Yes.
8    MS. MALETSKY:  So they're there from
9    like 9 to --
10    THE WITNESS:  9 to 3:30.
11    MS. MALETSKY:  9 to 3:30.  What would
12    that timeframe look like?  Could you just walk us
13    through that?
14    THE WITNESS:  Sure.  So the clients
15    will -- they're residents but our clients.  They
16    participate in a variety of different programming.
17    So they attend group therapy.  They meet with their
18    individual therapist.  They meet with a psychiatric
19    provider.  They meet with a physical health
20    provider, case management.  So their day is pretty
21    scheduled.
22    MS. MALETSKY:  But they're not doing
23    that every day because you said the therapist is
24    once a week.
25    THE WITNESS:  They meet for individual

156

1    therapy once a week.  Every day they attend group so
2    they attend group every day.  There are six groups
3    that they would attend throughout the day.
4    MS. MALETSKY:  And most of their
5    activities would be with their same residential
6    group or with other people coming in from other
7    areas?
8    THE WITNESS:  It's mixed.  It's mixed
9    because not everybody that is in that level of care
10    is in sober living.  Some people come from home so
11    in those cases, you know, it would be a mixture of
12    people.
13    MS. MALETSKY:  Are they often kind of
14    kept together to keep that community or that family
15    environment when they are doing their therapy or are
16    they usually going to different areas based on their
17    particular needs?
18    THE WITNESS:  We for the most part
19    have them together.  You know, it depends also on
20    what groups they might benefit more from.  You know,
21    more mental health group might be more appropriate.
22    They might send them to that group.  It depends.
23    MS. MALETSKY:  Thank you.
24    CHAIRMAN LOCKWOOD:  Any other
25    questions from the public?

157

1    MS. FEGAN:  What percent of the people
2    there are voluntary as opposed to like Court
3    ordered?
4    CHAIRMAN LOCKWOOD:  State your name.
5    MS. FEGAN:  Nancy Fegan.
6    THE WITNESS:  So 100 percent of our
7    clients are voluntary.  Everybody is there of their
8    own free will.  There is nobody there that -- we
9    don't work with recovery court so everybody is a
10    voluntary client.
11    MS. FEGAN:  And what areas do they --
12    they're not all Morris County.  Can they come from
13    all over New Jersey to be here?  I know one
14    gentleman asked are there any Kinnelon residents,
15    you know, to be close to home and have that family
16    community.
17    MR. PURCELL:  The question is at the
18    recovery center because I think Dr. Sugerman is
19    working at the recovery center.
20    MS. FEGAN:  Yes.
21    THE WITNESS:  You're asking about any
22    clients in our center?  We have clients from all
23    over the place.  We're in Bergen County so we, you
24    know, we have Bergen County residents.  We have
25    other clients that come from other areas of the

158

1  state.

2            MR. PURCELL:  Some can come from

3  Morris County?

4            THE WITNESS:  Yes.  We have clients

5  from Morris County, absolutely.

6            MS. FEGAN:  Would you be able to

7  answer about the house what percent of -- where they

8  would come from in the house?

9            THE WITNESS:  I don't work for the

10  house.

11            MS. FEGAN:  You only went to the house

12  once or twice?

13            THE WITNESS:  I was only there once.

14            CHAIRMAN LOCKWOOD:  Sir, in the back.

15  State your name again.

16            MR. ROSENWASSER:  Paul Rosenwasser,

17  39 Chilhowie Drive.

18            Yes.  Dr. Sugerman, when there is a

19  crisis potentially at North Jersey Recovery Centers

20  would you be more inclined to call the local police,

21  911 or 998?

22            MR. PURCELL:  So Dr. Sugerman really

23  -- she's not in charge of the staff operations at

24  Palisades.  She's here to talk about generally about

25  the recovery and the impact of sober living homes on

159

1  the recovery.  So that type of operational question

2  I think is more appropriate for Mr. --

3            MR. ROSENWASSER:  I thought she's a

4  director at North Jersey Recovery Center.

5            MR. PURCELL:  She is.  Oh, I'm sorry.

6  I thought you said the house.

7            MR. ROSENWASSER:  I understand.  It's

8  getting late, Counsel.

9            THE WITNESS:  I'm sorry.  Could you

10  repeat the question?

11            MR. ROSENWASSER:  If there's a crisis

12  at North Jersey Recovery Center that requires

13  external help would you be more inclined to call

14  911, 988 or the local police?

15            THE WITNESS:  So I think that

16  question, the answer is depends on the situation.

17  If it was a psychiatric crisis then we more likely

18  would be calling the designated screening center for

19  the county.  If it was a medical emergency obviously

20  we would call 911.  If it was a situation that could

21  be deescalated internally we would do that.

22            MR. ROSENWASSER:  Okay.  And do you

23  believe that the sober living house should have

24  these types of training to do this type of

25  delineation as to how they should escalate?

160

1            THE WITNESS:  I can't speak to what

2  their training is specifically but to my knowledge I

3  believe they would have training in how to handle

4  those types of situations.

5            MR. ROSENWASSER:  Now, when there's a

6  crisis at the sober living home is your staff ever

7  contacted, North Jersey Recovery Centers?

8            THE WITNESS:  If there is a crisis in

9  the sober living?  Only if it was something that was

10  of a clinical nature so that the clinical staff

11  could be made aware of.

12            MR. PURCELL:  Just feedback on that,

13  clarify, and the residents have signed waivers,

14  correct, allowing that information?

15            THE WITNESS:  They sign authorizations

16  for release of information.

17            MR. ROSENWASSER:  So would there ever

18  be any feedback or direction given from clinical

19  staff?

20            THE WITNESS:  In the moment?  I would

21  say probably not because the staff would be dealing

22  with it in the moment and then after the fact we

23  would, you know, collaborate with them.

24            MR. ROSENWASSER:  Gotcha.  What are

25  the recidivism rates after one year recovery?

161

1            THE WITNESS:  I don't know those

2  numbers off the top of my head.  I could find them

3  out for you.

4            MR. ROSENWASSER:  Yes, please.  'Cause

5  you knew a lot of other numbers.  If you could tell

6  me one year, two years and five years.  I'm curious

7  about that.

8            THE WITNESS:  Sure.

9            MR. ROSENWASSER:  And you mentioned

10  that four people in a community residence is not

11  enough interaction.  Are you citing studies there or

12  that opinion, is that --

13            THE WITNESS:  So there is limited

14  research about the specific number of people, but

15  there is some research that suggests that there are

16  operational benefits of having eight or more

17  residents.

18            MR. ROSENWASSER:  And what is that

19  research?

20            THE WITNESS:  They're some of the

21  things that I mentioned earlier in my testimony.

22            MR. ROSENWASSER:  What are the names

23  of the research?

24            THE WITNESS:  I actually do have some

25  of the specific research here.  So one of them was

162

1  from a Mericle, Mahoney, Korcha, Delucchi and Polcin
2  2019 article. The name of the article is, "Sober
3  living house characteristics: A multilevel analyses
4  of factors associated with improved outcomes."
5       MR. ROSENWASSER: And that one also
6  said people could change drastically in 30 days?
7       THE WITNESS: I'm sorry?
8       MR. ROSENWASSER: Did that one also
9  say people can change drastically in 30 days?
10       THE WITNESS: I don't think I said
11  that.
12       MR. PURCELL: You did. Going through
13  recovery that they can benefit greatly.
14       THE WITNESS: No, no, no. Did the
15  article mention that? No. The article did not.
16  And I believe what I said about the 30 days was that
17  people can form relationships within 30 days.
18       MR. ROSENWASSER: I understood that
19  differently. Okay. That's all I have. Thank you.
20       CHAIRMAN LOCKWOOD: Thanks. Any other
21  questions from the --
22       MS. RITACCO: I may have -- Jennifer
23  Ritacco, 11 Bent Tree Lane. Did I misunderstand?
24  Did you say that boredom is a trigger for relapse?
25       THE WITNESS: That's correct.

163

1       MS. RITACCO: I mean we all live in a
2  pretty boring town. I'm not saying that to be
3  silly. I mean it's incredibly boring. My street is
4  incredibly boring. That's not really resonating
5  with me that a trigger of boredom, put a house in a
6  very boring area --
7       MR. JONAS: Is that even a question?
8  Is that even a question that she's asking right now?
9       MS. RITACCO: I can phrase it as a
10  question.
11       MR. TOMBALAKIAN: What she's asking is
12  that is this an appropriate location for a sober
13  home if the boringness that's apparent in Kinnelon
14  could trigger relapse?
15       MR. JONAS: On a totally serious note
16  --
17       THE WITNESS: I can answer that
18  question. So one of the things that living in a
19  sober living allows people to do is to become
20  reacclimated to real life. Right? If they come
21  from a residential environment they're going into a
22  sober living before they're able to go back to their
23  home. Right? So one of the things that is helpful
24  is that they're able to deal with things that can be
25  triggering, which boredom is one of those things, in

164

1  an environment that's controlled that is safe for
2  them, that is stable for them to be able to do that
3  and navigate those experiences.
4       MS. RITACCO: So do you maintain any
5  metrics on success rate of, say, the Kinnelon house
6  verse the Mahwah house versus national average in
7  other types of areas? Is there -- do you maintain
8  success rates of your residents that come through
9  the Kinnelon house and how successful each person is
10  and for how long after they leave the house?
11       THE WITNESS: No. Because, as we said
12  before, the housing properties are separate from
13  North Jersey Recovery Centers so I wouldn't have
14  that data.
15       MR. NICOSIA: Can I interject? In
16  your professional knowledge do those statistics
17  exist?
18       THE WITNESS: Specific to these
19  houses?
20       MR. NICOSIA: In general.
21       THE WITNESS: But she's asking --
22  correct me if I'm wrong -- you're asking about these
23  specific houses, what the rates of recidivism are
24  for those individuals in those houses?
25       MS. RITACCO: I'm asking how -- yes.

165

1  Are the Kinnelon houses more successful, less
2  successful than the Mahwah house, than the --
3       THE WITNESS: I can't answer that
4  question.
5       MS. RITACCO: So when the patients
6  come through North Jersey Recovery Center do you
7  follow up with them after they leave the programs?
8       THE WITNESS: We do, yes. What I can
9  say is that there are absolutely data that show that
10  individuals who live in sober living have reduced
11  rates of return to substance abuse, reduced rates of
12  involvement with the legal system, reduced rates of
13  incarceration and better recovery outcomes overall.
14       MS. RITACCO: But you're saying based
15  off of studies, not based off the actual people that
16  have come through your facility?
17       THE WITNESS: I wouldn't have access
18  to that information because, like I said, it's
19  separate from North Jersey Recovery Center.
20       MS. RITACCO: Got it.
21       MS. MALETSKY: So as a company or I
22  guess, whatever, you don't track your clients or
23  your residents -- patients you call them -- you
24  don't track them to see what success you have?
25  Because I mean when you're promoting your program I

166

1  mean wouldn't somebody be looking for what is your
2  success rate for, you know, recovery and does that
3  follow the norm of what the average is throughout
4  the state or the country?
5          MR. NICOSIA:  That's what I was
6  getting at.  Thank you.
7          MS. MALETSKY:  I'm just wondering.
8  And then one thing other if I can just ask, I'm
9  sorry, I was under the impression that, you know,
10  the Kinnelon house that we're referring to right now
11  was like the first step coming out of inpatient
12  recovery and then they would then move to another
13  one of the facilities, maybe the other Kinnelon
14  house or the Mahwah house.  I was thinking there was
15  a certain stage thing.  You start here at 21.  Maybe
16  you move to 5 Mulberry.  Then maybe you move to
17  Mahwah and then you're out of the program, but is
18  that not the case or is it all individual
19  situations?
20          THE WITNESS:  Yeah.  It's an
21  individual case-by-case basis.
22          MS. MALETSKY:  You might go to 21, you
23  might go to five or you might go to Mahwah?
24          THE WITNESS:  Oh, no, no, no.  What I
25  was saying is that if you are in this house -- what

167

1  is the address?
2          MR. PURCELL:  21 Wood Chase.
3          THE WITNESS:  21 Wood Chase.  You may
4  go home back to your, you know, or you may go to
5  another sober living, whether that be one of these
6  Palisades properties or elsewhere.
7          MS. MALETSKY:  Okay.  And you don't
8  track those clients then to see what their progress
9  is or you don't have any data that you maintain
10  internally to see what your success rate is?
11          THE WITNESS:  From the residences?
12          MS. MALETSKY:  From your program.
13          THE WITNESS:  From our program we do
14  have an alumni network so we do keep in touch with
15  clients.  Not every client is involved in that.  So
16  we would know only outcomes based on the information
17  that we have.
18          MS. MALETSKY:  And the State or
19  anybody, they don't really ask you for what success
20  rates are or what the progress is?  I work for a
21  physician's office.  Like, you know, you botch a few
22  surgeries and you're kind of in trouble, but this is
23  kind of like you don't really have that kind of a
24  timeline.
25          THE WITNESS:  We don't have -- I mean

168

1  we don't have that longitudinal data at this point,
2  no.
3          MS. MALETSKY:  I wasn't sure.  Okay.
4          CHAIRMAN LOCKWOOD:  Any other
5  questions from the public?
6          MR. SARMASTI:  It's past 9:45.  Is
7  that okay?
8          CHAIRMAN LOCKWOOD:  Yeah.
9          MR. SARMASTI:  Vafa Sarmasti, 286
10  Brook Valley Road in Kinnelon.
11          Dr. Sugerman, I don't have a lot of
12  questions quite frankly.  You indicated you've been
13  to the house in Kinnelon one time only; correct?
14          THE WITNESS:  Yes.
15          MR SARMASTI:  When was that?
16          THE WITNESS:  I'm not sure.
17          MR. SARMASTI:  Was it this month, the
18  month before, last year?
19          THE WITNESS:  No.  It was -- so
20  actually now that I'm thinking about I was there
21  twice.  I'm sorry.  I was there once when I --
22  probably in 2023 and once more recently.
23          MR. SARMASTI:  And the recent instance
24  was this month?
25          THE WITNESS:  No.

169

1          MR. SARMASTI:  Or last month?  I'm
2  sorry.
3          THE WITNESS:  May, May.  April or May.
4          MR. SARMASTI:  And the instance that
5  you were there in 2023, what was the purpose of
6  that?
7          THE WITNESS:  Like I mentioned before,
8  it was when I was trying to understand the
9  experience of the clients that lived at that
10  residence.
11          MR. SARMASTI:  And what did you do in
12  order to get an understanding of that experience
13  when you were there in 2023?
14          THE WITNESS:  I just toured the house.
15          MR. SARMASTI:  And did you tour the
16  house in the evening, during the day?
17          THE WITNESS:  During the day.
18          MR. SARMASTI:  Were all the residents
19  at the facility getting treatment?
20          THE WITNESS:  They were.
21          MR. SARMASTI:  So when you went there
22  you didn't observe any of the residents or any of
23  the individuals and how they interact with one
24  another?
25          THE WITNESS:  That's correct.

170

1     MR. SARMASTI:  Then when you went
2  there in 2025 was it under similar circumstances?
3          THE WITNESS:  It was during the
4  daytime as well.
5          MR. SARMASTI:  When nobody was there.
6  Okay.  So is it fair to say you've never really
7  observed firsthand how these individuals interact
8  and whether their interactions are conducive or
9  helpful to their treatment in that house; correct?
10         THE WITNESS:  That's safe to say.
11         MR. SARMASTI:  Have you had that
12  experience in any other prior jobs?
13         THE WITNESS:  I have not.
14         MR. SARMASTI:  Okay.  And then there
15  was one other question I had.  I'm sorry.  It
16  slipped my mind.  I can't remember it.  I'm sorry.
17  That's all the questions I have.  Thank you.
18         MR. TOMBALAKIAN:  Thank you.
19         CHAIRMAN LOCKWOOD:  Any other
20  questions from the public?
21         Any other questions from the Board?
22  BY MR. PURCELL:
23     **Q.**  I'll just follow up.  The opinions
24  that you gave tonight, I know you referenced various
25  studies.  That was the basis for your opinions?

171

1     **A.**  **Again.  I'm sorry.  I didn't hear.**
2     **Q.**  The opinions that you gave tonight,
3  Dr. Sugerman, the basis for those opinions were
4  various studies; is that correct?
5     **A.**  **Yes.**
6     **Q.**  That you cited to?
7     **A.**  **Yes.**
8     **Q.**  Okay.  Thank you.
9          CHAIRMAN LOCKWOOD:  We're going to
10  carry this meeting over until the next date which is
11  August 5th.
12         MR. TOMBALAKIAN:  So the application
13  for Palisades Properties is being carried on notice
14  to the zoning board's next regularly scheduled
15  meeting which is Tuesday, August 5th, 7 p.m.  It
16  will be in this room.  There will be no further mail
17  or published notice.
18         MR. PURCELL:  I just have to check my
19  calendar.
20         August 5th works for me.
21         CHAIRMAN LOCKWOOD:  Thank you.
22         MR. PURCELL:  One more thing.  Are we
23  done with Dr. Sugerman?
24         MR. TOMBALAKIAN:  Yes.
25         MR. PURCELL:  Okay.  Thank you.

172

1     MR. TOMBALAKIAN:  If there's any
2  information she said she'd provide she could provide
3  it to you and -- any information that she used you
4  could --
5          MR. PURCELL:  Do it in writing.  All
6  right.
7          MR. ROSENWASSER:  Quick question.
8  When will all their supplied information be
9  available to the public?  Will I be able to get that
10  from Jennifer?
11         MR. TOMBALAKIAN:  Anything that they
12  filed is with Jennifer right now and these five
13  exhibits they are now with Jennifer and they'll be
14  part of the public record that's available for this
15  session.
16         MR. ROSENWASSER:  Okay.  Now, when
17  they're going to come back and have more testimony
18  and follow-up questions will I have an ability to
19  see them?
20         MR. TOMBALAKIAN:  See what?
21         MR. ROSENWASSER:  You know, the
22  training stuff, you know --
23         MR. TOMBALAKIAN:  Whatever Jennifer
24  has -- when Mr. Purcell, he's going to provide a
25  letter responding -- there's a couple of things that

173

1  they were going to look into.  He might prepare a
2  letter and send it in to Jennifer and that will be a
3  public record available for review.
4          MR. ROSENWASSER:  Thank you so much.
5          MS. MALETSKY:  And then this continues
6  next month.
7          (Hearing concluded at 10:10 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              C E R T I F I C A T E

 2

 3        I, PATRICE A. CASERTA, a Certified Court

 4   Reporter and Notary Public of the State of

 5   New Jersey, certify that the foregoing is a true

 6   and accurate transcript of the proceedings at the

 7   place and on the date hereinbefore set forth.

 8        I further certify that I am neither attorney

 9   nor counsel for, nor related to or employed by, any

10   of the parties in the action in which this

11   deposition was taken and further that I am not a

12   relative or employee of any attorney or counsel in

13   this case, nor am I financially interested in the

14   action.

15

16   NOTE:  THE CERTIFICATE APPENDED TO THIS TRANSCRIPT

17   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

18   ANY MEANS, UNLESS UNDER THE DIRECT CONTROL AND/OR

19   DIRECTION OF THE CERTIFYING COURT REPORTER.

20

21              /s/ Patrice A. Caserta

22              A Notary Public of the

                State of New Jersey

23

24   License No. XI 00130300

25
```

**$**

**$200** [2] - 45:14, 120:23

**1**

**1** [1] - 106:1
**1,000** [1] - 104:16
**1,000-gallon** [1] - 66:4
**1,745** [1] - 143:23
**1.39** [1] - 23:25
**1.393** [1] - 23:25
**10** [26] - 13:6, 15:4, 21:14, 29:22, 29:23, 30:3, 30:10, 33:4, 36:3, 36:23, 37:13, 37:15, 37:16, 60:24, 61:11, 68:6, 71:21, 82:15, 83:21, 86:20, 93:6, 104:12, 132:24, 133:16, 133:24
**100** [3] - 96:15, 143:12, 157:6
**10:10** [1] - 173:7
**11** [5] - 32:22, 33:5, 34:22, 67:16, 162:23
**11th** [2] - 32:23, 34:11
**12** [10] - 31:4, 31:6, 31:9, 32:11, 46:10, 79:13, 93:9, 130:5, 130:6, 143:7
**14** [2] - 51:23, 52:1
**14th** [1] - 23:3
**15** [1] - 68:7
**157121** [1] - 5:4
**17.1** [1] - 143:7
**18** [1] - 118:18
**18-year-old** [1] - 133:22
**19** [2] - 103:3, 103:7
**1st** [2] - 16:3, 135:20

**2**

**20** [4] - 13:6, 75:16, 106:17, 112:7
**2011** [1] - 142:6
**2019** [5] - 16:4, 16:21, 57:1, 162:2
**2021** [3] - 60:9, 128:7, 143:10
**2022** [1] - 143:11
**2023** [5] - 143:5, 143:23, 168:22, 169:5, 169:13

**2024** [1] - 106:1
**2025** [5] - 23:4, 60:14, 135:14, 170:2
**21** [14] - 7:6, 46:18, 67:24, 74:3, 74:15, 100:19, 102:4, 116:6, 137:7, 137:18, 166:15, 166:22, 167:2, 167:3
**22** [1] - 135:7
**23** [1] - 126:17
**24** [1] - 66:5
**25** [1] - 55:3
**28** [1] - 51:23
**286** [2] - 78:18, 168:9
**28th** [1] - 135:14

**3**

**3,576** [1] - 143:11
**30** [12] - 18:20, 50:15, 50:16, 130:20, 131:10, 131:18, 148:20, 149:15, 162:6, 162:9, 162:16, 162:17
**30-day** [1] - 130:19
**36** [1] - 127:13
**39** [2] - 99:11, 158:17
**3:30** [2] - 155:10, 155:11

**4**

**4** [12] - 31:2, 31:4, 31:10, 33:15, 34:1, 46:10, 77:11, 77:17, 93:9, 114:7, 114:16, 130:5
**4,372** [1] - 26:3
**4-ish** [1] - 31:2
**475** [1] - 143:14
**48.5** [1] - 143:6
**4th** [1] - 23:4

**5**

**5** [4] - 96:21, 120:3, 128:4, 166:16
**50** [3] - 15:2, 15:9, 31:16
**5th** [3] - 171:11, 171:15, 171:20

**6**

**6** [1] - 38:4

**60** [1] - 118:19

**7**

**7** [2] - 5:1, 171:15
**70,000** [1] - 120:21

**8**

**8** [10] - 31:6, 31:8, 31:9, 77:9, 77:11, 77:17, 77:21, 77:22, 79:14, 130:6
**80-year-old** [1] - 134:1
**82,176** [1] - 143:21

**9**

**9** [6] - 31:1, 66:5, 114:6, 155:9, 155:10, 155:11
**911** [3] - 158:21, 159:14, 159:20
**988** [1] - 159:14
**998** [1] - 158:21
**9:11** [1] - 126:12
**9:20** [1] - 126:13
**9:30** [1] - 140:17
**9:45** [3] - 66:19, 66:21, 168:6

**A**

**A-1** [2] - 20:16, 20:18
**A-2** [2] - 23:6, 23:7
**A-3** [2] - 23:17, 23:18
**A-4** [2] - 36:20, 36:21
**A-5** [2] - 142:15, 142:16
**a.m** [4] - 31:6, 31:8, 77:21, 77:22, 79:13, 79:14
**AA** [3] - 35:25, 43:1, 59:3
**ability** [6] - 22:20, 83:1, 91:5, 147:3, 148:8, 172:18
**able** [21] - 33:5, 56:16, 67:6, 75:12, 94:5, 107:22, 119:9, 119:11, 119:12, 119:13, 119:16, 134:20, 135:23, 145:17, 145:19, 149:9, 158:6, 163:22, 163:24, 164:2, 172:9

**absolute** [2] - 30:16, 91:25
**absolutely** [10] - 56:6, 72:6, 77:7, 96:15, 102:22, 106:23, 134:1, 146:14, 158:5, 165:9
**abstinence** [1] - 41:18
**Abuse** - 144:21
**abuse** [3] - 143:4, 143:18, 165:11
**accept** [6] - 5:25, 6:2, 81:11, 102:22, 142:19, 142:24
**accepted** [3] - 137:22, 142:25, 143:1
**access** [3] - 23:23, 28:7, 165:17
**accessible** [1] - 108:6
**accidentally** [1] - 104:25
**acclimate** [1] - 149:23
**accommodation** [7] - 7:3, 9:16, 9:21, 10:1, 11:14, 11:21, 62:6
**accommodations** [1] - 127:25
**accompany** [1] - 105:8
**according** [6] - 88:13, 128:7, 143:5, 143:10, 143:15, 143:19
**account** [2] - 72:11, 72:17
**accountability** [8] - 22:8, 38:1, 51:15, 147:6, 147:20, 147:23, 148:23, 149:14
**accountable** [1] - 145:23
**accounts** [1] - 72:23
**accurate** [2] - 74:8, 102:11
**accurately** [1] - 89:8
**acres** [1] - 23:25
**Act** [2] - 7:4, 137:1
**action** [2] - 49:4, 51:9
**actions** [2] - 50:24, 51:14
**active** [1] - 125:16
**actively** [1] - 18:10
**activities** [6] - 58:15, 58:16, 58:17, 59:7, 59:9, 156:5

**activity** [2] - 12:22, 26:25
**actual** [8] - 21:24, 34:18, 39:20, 42:20, 69:5, 120:1, 132:4, 165:15
**ad** [4] - 132:2, 132:6, 132:8, 132:16
**add** [4] - 12:20, 12:22, 41:23, 133:14
**addendum** [1] - 52:10
**addict** [1] - 8:2
**addicted** [5] - 7:13, 7:19, 7:25, 118:24
**Addiction** [1] - 143:21
**addiction** [18] - 7:13, 7:24, 8:22, 8:23, 14:2, 15:5, 17:23, 41:24, 71:13, 118:6, 118:20, 133:25, 141:19, 142:5, 142:11, 143:2, 145:6, 146:23
**addictions** [3] - 16:12, 19:11, 118:1
**addicts** [6] - 9:6, 108:18, 109:19, 112:25, 114:18
**addition** [1] - 11:15
**additional** [4] - 92:16, 93:14, 133:14
**address** [12] - 67:15, 69:1, 76:15, 78:16, 93:19, 96:17, 99:8, 106:16, 126:15, 126:17, 135:5, 167:1
**addressed** [1] - 110:2
**addresses** [1] - 96:24
**adequate** [1] - 93:17
**Administration** [1] - 144:22
**administrator** [1] - 142:9
**admission** [1] - 143:23
**admissions** [1] - 143:22
**adopt** [1] - 66:3
**advanced** [1] - 66:3
**advertising** [1] - 29:16
**Affairs** [1] - 11:3
**affects** [1] - 17:23
**afford** [2] - 9:17, 45:18
**age** [4] - 117:17, 118:1, 118:16, 118:22

**ages** [1] - 143:7
**aggression** [2] - 99:16, 100:3
**aggressive** [2] - 45:6, 104:21
**agitated** [1] - 114:18
**ago** [2] - 23:13, 107:21
**agree** [3] - 19:10, 43:24, 84:14
**ahead** [2] - 12:1, 148:19
**Ajit** [2] - 103:3, 103:7
**alarm** [1] - 125:22
**alcohol** [20] - 7:14, 7:20, 8:2, 14:25, 18:5, 18:14, 18:19, 31:17, 41:9, 42:2, 88:4, 90:8, 90:11, 93:8, 108:5, 109:10, 116:12, 134:16, 143:12, 154:6
**alcoholic** [1] - 128:17
**Alcoholics** [2] - 42:25, 59:4
**alcoholics** [2] - 107:18, 108:2
**alcoholism** [1] - 118:20
**allow** [9] - 12:18, 21:18, 43:10, 58:22, 59:1, 130:7, 130:12, 139:8, 139:22
**allowed** [23] - 12:13, 13:9, 26:16, 35:17, 39:7, 84:12, 88:11, 89:11, 92:9, 92:10, 94:2, 95:1, 95:8, 95:11, 98:3, 106:3, 106:21, 107:5, 107:6, 138:8, 139:10, 139:17, 147:14
**allowing** [2] - 67:2, 160:14
**allows** [2] - 124:5, 163:19
**almost** [4] - 50:16, 55:12, 73:18, 138:19
**alone** [1] - 143:13
**alteration** [1] - 10:7
**altercations** [1] - 104:6
**alternates** [1] - 39:2
**altogether** [1] - 91:3
**alumni** [1] - 167:14
**amazing** [1] - 56:19
**Amazon** [13] - 69:6, 69:10, 69:11, 70:19, 70:20, 70:22, 70:23, 72:11, 72:15, 72:17,

72:22
**ambulance** [6] - 103:11, 103:15, 103:22, 104:16, 105:8, 105:13
**amended** [1] - 139:21
**Amendments** [1] - 7:4
**Americans** [1] - 143:7
**amount** [8] - 48:12, 65:16, 67:25, 70:25, 110:7, 110:17, 110:23, 120:17
**analyses** [1] - 162:3
**angle** [2] - 25:1, 27:5
**angry** [1] - 114:19
**animal** [2] - 39:14, 107:14
**animals** [2] - 39:11, 40:5
**announcement** [1] - 64:23
**Anonymous** [3] - 42:25, 59:4, 59:5
**another's** [1] - 149:10
**answer** [44] - 12:21, 27:13, 40:21, 51:18, 53:10, 61:14, 61:25, 62:3, 62:7, 62:16, 62:18, 65:13, 68:9, 69:4, 69:15, 82:24, 84:1, 88:2, 89:16, 94:10, 94:12, 98:10, 110:11, 111:21, 114:14, 115:14, 116:20, 127:3, 127:9, 127:21, 129:8, 131:2, 131:20, 133:1, 133:2, 133:6, 133:7, 133:8, 133:12, 134:11, 158:7, 159:16, 163:17, 165:3
**answered** [9] - 55:17, 62:1, 78:22, 128:11, 128:24, 131:1, 133:13, 136:9
**anxiety** [1] - 18:8
**anyhow** [2] - 112:23, 123:20
**apartment** [1] - 50:17
**apologies** [1] - 64:6
**apologize** [1] - 79:23
**app** [1] - 125:25
**apparent** [1] - 163:13
**applicable** [2] - 65:15, 136:23

**applicant** [6] - 9:15, 13:12, 13:13, 75:15, 75:18, 75:19
**applicant's** [1] - 74:21
**applicants** [1] - 76:13
**application** [11] - 5:4, 5:15, 6:8, 10:25, 11:5, 52:10, 66:2, 135:17, 139:21, 150:21, 171:12
**applied** [2] - 135:25, 136:5
**apply** [4] - 105:24, 106:3, 106:8, 137:25
**appointment** [1] - 80:10
**appointments** [1] - 34:4
**appreciate** [2] - 84:4, 94:13
**approached** [2] - 60:1, 61:9
**appropriate** [3] - 156:21, 159:2, 163:12
**appropriately** [1] - 153:17
**approval** [6] - 13:13, 18:22, 124:17, 135:16, 136:23, 138:2
**approve** [3] - 36:2, 108:23, 109:2
**approved** [14] - 5:24, 3:11, 13:15, 35:19, 61:10, 66:6, 66:13, 66:18, 73:8, 73:9, 73:11, 109:3, 119:25, 135:19
**April** [3] - 135:17, 135:20, 169:3
**area** [5] - 29:8, 66:5, 123:24, 126:5, 163:6
**areas** [2] - 156:7, 156:16, 157:11, 157:25, 164:7
**argue** [1] - 40:25
**arguing** [2] - 112:14, 123:17
**argument** [1] - 7:8
**argument's** [2] - 35:19, 103:17
**arguments** [1] - 75:1
**Ariane** [1] - 127:13
**Army** [1] - 40:10
**arrangements** [1] - 35:1
**article** [4] - 162:2, 162:15
**asleep** [1] - 93:7

**asphalt** [1] - 29:14
**assembled** [1] - 38:25
**assessing** [2] - 92:12, 134:22
**assessment** [1] - 115:6
**assigned** [3] - 22:24, 35:10, 35:13
**associate** [1] - 154:5
**associated** [1] - 162:4
**assume** [2] - 52:7, 105:21
**assuming** [1] - 13:6
**assumption** [1] - 149:3
**attached** [1] - 60:17
**attend** [7] - 102:5, 102:6, 102:10, 155:17, 156:1, 156:2, 156:3
**attention** [2] - 60:25, 72:8
**attributed** [1] - 143:12
**audience** [1] - 148:24
**August** [3] - 171:11, 171:15, 171:20
**authorizations** [1] - 160:15
**automatically** [1] - 90:8
**availability** [1] - 30:1
**available** [6] - 117:1, 151:17, 172:9, 172:14, 173:3
**average** [13] - 29:24, 30:4, 30:6, 30:9, 30:13, 49:18, 53:8, 58:5, 69:15, 82:7, 148:6, 164:6, 166:3
**avoid** [1] - 108:7
**awake** [1] - 93:7
**aware** [8] - 40:15, 42:5, 62:17, 65:22, 65:23, 67:18, 139:19, 160:11

## B

**Bachelor's** [1] - 141:20
**background** [3] - 53:17, 141:17
**backgrounds** [1] - 53:15
**backyard** [10] -

24:21, 24:23, 24:25, 25:1, 25:18, 25:19, 56:6, 107:4, 107:20
**bad** [3] - 49:22, 56:21, 63:15
**balance** [1] - 96:2
**banned** [1] - 91:2
**bar** [3] - 107:17, 107:23, 108:3
**barking** [1] - 39:9
**barrier** [1] - 101:11
**bars** [2] - 107:19, 107:20
**based** [8] - 85:2, 90:6, 105:3, 144:15, 156:16, 165:14, 165:15, 167:16
**basement** [1] - 26:5
**basement/garage** [1] - 26:4
**basic** [1] - 19:18
**basis** [6] - 48:23, 97:13, 122:1, 166:21, 170:25, 171:3
**bath** [1] - 26:12
**bathroom** [2] - 26:1, 26:11
**bathrooms** [2] - 26:3, 26:13
**beacon** [1] - 54:14
**bearing** [2] - 62:4, 128:1
**beautiful** [2] - 56:6, 56:19
**became** [1] - 131:18
**become** [9] - 12:12, 87:21, 89:4, 90:16, 130:21, 131:10, 150:19, 163:19
**becoming** [1] - 119:15
**bed** [7] - 30:1, 32:23, 33:2, 34:11, 116:25, 117:19, 151:17
**bed-wise** [1] - 33:2
**bedroom** [2] - 26:9, 130:3
**bedrooms** [6] - 26:2, 26:13, 33:1, 126:3, 130:8, 130:15
**beds** [6] - 32:20, 32:22, 33:5, 34:18, 35:11
**begin** [1] - 75:20
**behalf** [2] - 5:13, 6:25
**behavioral** [1] - 105:4
**behind** [4] - 47:4, 127:14, 137:2, 144:13

**belligerent** [2] - 87:4, 101:9

**belongings** [1] - 88:18

**below** [1] - 65:18

**beneficial** [2] - 11:18, 146:12

**benefit** [4] - 19:20, 56:8, 156:20, 162:13

**benefiting** [1] - 146:19

**benefits** [4] - 146:16, 146:21, 147:17, 161:16

**Bent** [4] - 67:17, 67:23, 67:24, 162:23

**Bergen** [6] - 14:22, 14:23, 15:10, 119:10, 157:23, 157:24

**best** [3] - 53:25, 54:19, 83:1

**better** [3] - 25:1, 115:13, 165:13

**between** [9] - 31:10, 57:16, 77:17, 96:23, 97:9, 127:15, 127:22, 143:10, 143:13

**beyond** [1] - 136:17

**big** [7] - 8:17, 8:18, 31:20, 36:13, 80:5, 108:3, 124:11

**bigger** [2] - 32:8, 32:12, 120:7

**bikes** [2] - 121:13, 123:22

**biography** [1] - 14:19

**bit** [10] - 8:20, 24:4, 29:4, 42:16, 46:25, 47:12, 110:20, 124:2, 145:11, 145:16

**black** [3] - 63:15, 63:22, 80:13

**blah** [3] - 52:12

**blatant** [1] - 96:10

**block** [2] - 39:5, 70:23

**blowout** [1] - 65:21

**board** [7] - 6:5, 6:13, 8:25, 13:16, 29:8, 106:1

**Board** [19] - 9:25, 66:13, 66:18, 66:25, 67:3, 67:12, 124:19, 129:12, 129:16, 136:16, 136:17, 136:21, 136:24, 140:14, 142:24, 148:17, 151:4, 152:8, 170:21

**board's** [1] - 171:14

**board-on-board** [1] - 29:8

**boarding** [7] - 10:12, 10:13, 10:15, 11:1, 13:2, 13:4, 52:15

**body** [3] - 32:12, 41:5, 117:18

**bonds** [1] - 145:17

**bootstrap** [1] - 71:4

**boredom** [4] - 46:7, 162:24, 163:5, 163:25

**boring** [4] - 162:2, 163:3, 163:4, 163:6

**boringness** [1] - 163:13

**Borough** [1] - 51:20

**botch** [1] - 167:21

**bottom** [2] - 7:12, 25:9

**bought** [1] - 107:21

**boundaries** [1] - 74:17

**bowling** [1] - 59:8

**box** [1] - 73:13

**boxes** [2] - 49:5, 55:23

**boys** [1] - 132:23

**break** [3] - 81:12, 125:19, 126:11

**break-in** [1] - 125:19

**breaking** [1] - 81:15

**breaks** [1] - 36:7

**breath** [1] - 122:12

**breathalyzed** [1] - 109:8

**breathalyzer** [4] - 43:9, 43:13, 44:2, 91:11

**breathing** [3] - 103:19, 103:20, 104:24

**bridge** [1] - 19:14

**bridges** [3] - 19:12, 45:20, 49:22

**brief** [1] - 14:19

**briefly** [1] - 65:5

**bring** [5] - 59:2, 79:4, 81:3, 81:12, 90:24

**bringing** [1] - 103:23

**brings** [3] - 17:17, 110:22, 134:6

**broader** [1] - 144:18

**broken** [1] - 37:25

**Brook** [2] - 78:18, 168:10

**brother** [2] - 7:15, 112:13

**brought** [8] - 87:17, 87:19, 89:15, 89:17,

90:3, 100:25, 109:10, 138:12

**build** [1] - 148:1

**building** [1] - 153:1

**bunch** [1] - 10:16

**burden** [5] - 9:15, 9:19, 9:25, 10:3, 146:22

**burned** [3] - 19:12, 49:22, 50:8

**burnt** [1] - 45:20

**bus** [3] - 73:17, 73:19, 77:21

**business** [16] - 5:3, 13:8, 56:25, 60:7, 60:24, 61:8, 61:11, 63:17, 64:10, 107:21, 129:20, 129:21, 138:20, 139:5

**bussed** [1] - 31:23

**but..** [1] - 39:11

**buy** [1] - 120:20

**BY** [17] - 14:16, 17:20, 32:19, 34:24, 38:18, 41:15, 42:3, 43:22, 45:10, 46:21, 48:1, 54:4, 63:2, 104:2, 110:19, 141:14, 170:22

**Byram** [1] - 51:21

## C

**calendar** [1] - 171:19

**camera** [3] - 125:13, 125:21

**cameras** [4] - 124:22, 125:1, 126:2, 130:8

**CANALE** [22] - 14:4, 36:22, 40:1, 46:4, 47:16, 52:9, 53:11, 59:24, 60:4, 60:18, 61:6, 61:15, 61:22, 62:1, 62:9, 62:15, 63:1, 64:2, 105:7, 118:16, 140:1, 140:9

**cannot** [2] - 109:10, 114:21

**capable** [1] - 54:21

**capsulates** [1] - 41:1

**car** [7] - 24:3, 27:3, 27:7, 28:17, 28:18, 77:7, 77:24

**care** [9] - 46:13, 47:6, 48:8, 48:10, 48:15, 86:14, 86:16, 142:7, 156:9

**caring** [1] - 53:19

**carried** [2] - 75:17, 171:13

**carry** [3] - 66:21, 140:19, 171:10

**cars** [14] - 26:17, 28:11, 33:10, 76:25, 122:9, 122:18, 122:21, 123:1, 123:12, 123:17, 123:18, 123:21, 124:7, 124:16

**case** [23] - 7:10, 9:5, 11:4, 18:24, 45:7, 51:19, 51:22, 70:7, 75:20, 76:4, 77:6, 101:10, 102:15, 109:2, 110:1, 113:11, 116:19, 117:8, 134:21, 155:20, 166:18, 166:21

**case-by-case** [1] - 166:21

**cases** [1] - 156:11

**CDC** [1] - 143:10

**celebrate** [1] - 145:19

**census** [1] - 52:12

**center** [18] - 14:23, 31:18, 33:14, 42:23, 48:4, 48:6, 57:12, 91:21, 91:22, 116:19, 119:10, 121:1, 121:2, 152:16, 157:18, 157:19, 157:22, 159:18

**Center** [15] - 15:10, 15:11, 31:17, 42:21, 102:5, 102:7, 102:10, 116:12, 142:10, 150:5, 155:5, 159:4, 159:12, 165:6, 165:19

**center's** [1] - 28:1

**centered** [1] - 145:7

**Centers** [3] - 158:19, 160:7, 164:13

**centers** [2] - 48:7, 48:9

**certain** [6] - 70:25, 76:24, 101:7, 101:8, 148:21, 166:15

**certainly** [5] - 102:18, 124:15, 124:18, 136:10, 136:20

**certificate** [1] - 17:13

**certified** [2] - 108:19, 121:25

**chairman** [1] - 124:5

**CHAIRMAN** [48] - 5:3, 5:8, 5:19, 5:23,

6:4, 6:7, 6:12, 6:15, 12:1, 12:9, 12:17, 28:10, 28:13, 38:7, 52:6, 53:12, 64:20, 66:19, 67:11, 67:21, 78:15, 99:4, 99:7, 103:1, 103:5, 106:12, 106:15, 119:6, 126:8, 127:11, 140:11, 140:18, 142:21, 142:23, 148:16, 151:3, 151:22, 152:7, 152:13, 156:24, 157:4, 158:14, 162:20, 168:4, 168:8, 170:19, 171:9, 171:21

**Chairman** [11] - 20:15, 23:5, 36:18, 44:13, 46:3, 64:22, 65:4, 67:1, 123:25, 140:25, 142:19

**chairs** [2] - 112:7, 112:18

**chance** [4] - 6:19, 50:10, 54:18, 87:25

**chances** [2] - 75:17, 147:20

**change** [5] - 25:11, 135:18, 149:4, 162:6, 162:9

**changed** [1] - 70:15

**changes** [1] - 65:6

**changing** [1] - 12:15

**chaperone** [1] - 22:6

**characteristics** [1] - 162:3

**charge** [1] - 158:23

**Chase** [21] - 5:4, 7:6, 24:1, 24:9, 25:14, 46:18, 58:22, 74:3, 78:19, 100:19, 102:4, 103:4, 103:8, 116:6, 116:23, 126:17, 135:7, 137:7, 137:18, 167:2, 167:3

**check** [2] - 35:22, 171:18

**checked** [1] - 49:5

**checklist** [1] - 5:17

**checks** [5] - 49:4, 53:17, 54:3, 55:23, 130:7

**Cheryl's** [1] - 63:13

**chest** [1] - 103:20

**chief** [1] - 11:1

**child** [1] - 7:14

**children** [1] - 133:17

**Chilhowie** [1] - 99:11, 106:17, 158:17

**choice** [3] - 108:5,

115:22, 118:11
**choose** [5] - 81:21,
115:23, 116:5, 118:12
**choosing** [1] - 116:4
**chore** [1] - 39:2
**chores** [5] - 35:13,
39:3, 51:2, 95:21,
146:2
**chose** [4] - 13:3,
106:8, 114:25, 115:1
**circled** [1] - 25:19
**circumstance** [9] -
87:23, 89:2, 89:18,
89:23, 90:19, 91:23,
96:11, 107:3, 107:9
**circumstances** [6] -
22:15, 85:3, 89:5,
91:4, 105:10, 170:2
**citation** [1] - 66:1
**cited** [1] - 171:6
**citing** [1] - 161:11
**clarification** [5] -
113:21, 114:12,
129:5, 129:14, 150:11
**clarify** [6] - 12:5,
13:5, 43:23, 140:8,
151:6, 160:13
**classify** [2] - 12:11,
73:20
**clean** [3] - 49:5,
111:11, 146:4
**cleaned** [3] - 38:20,
38:21, 38:23
**cleaners** [1] - 38:24
**cleaning** [1] - 39:4
**clear** [7] - 29:11,
70:2, 81:9, 92:7,
94:18, 106:11, 126:3
**clearly** [4] - 10:9,
108:20, 109:20,
109:23
**client** [12] - 17:7,
87:22, 89:4, 89:14,
89:16, 90:2, 90:5,
92:4, 116:16, 116:17,
157:10, 167:15
**clients** [15] - 85:23,
102:4, 102:6, 153:6,
155:14, 155:15,
157:7, 157:22,
157:25, 158:4,
165:22, 167:8,
167:15, 169:9
**clinic** [2] - 18:25,
47:25
**clinical** [17] - 15:7,
15:8, 18:22, 48:15,
141:24, 142:9, 150:4,
150:14, 152:25,
153:2, 153:12, 154:4,

154:6, 160:10, 160:18
**clinician** [4] - 142:4,
154:3, 154:18, 154:19
**close** [3] - 72:8,
119:18, 157:15
**closed** [1] - 66:9
**closer** [2] - 55:6,
120:1
**CLR** [1] - 10:14
**CLR's** [1] - 10:12
**CLSR** [2] - 16:10,
69:2
**CLSR's** [2] - 9:10,
15:19
**Code** [1] - 17:3
**code** [2] - 12:25,
13:1
**cohabitation** [1] -
130:12
**cohesive** [1] - 16:13
**coincide** [1] - 52:18
**collaborate** [1] -
160:23
**college** [1] - 113:16
**College** [1] - 141:21
**colloquially** [1] - 7:5
**color** [1] - 118:22
**comfort** [1] - 72:7
**comfortably** [1] -
72:4
**coming** [20] - 34:5,
45:15, 47:4, 65:5,
65:9, 65:11, 70:19,
72:20, 73:24, 110:5,
110:17, 114:21,
115:18, 115:19,
117:18, 121:18,
149:19, 149:22,
156:6, 166:11
**commenced** [1] - 5:1
**comment** [5] - 75:20,
129:16, 129:23,
131:7, 131:9
**comments** [7] - 67:5,
70:15, 75:24, 76:3,
76:6, 124:1, 129:1
**commercial** [12] -
12:12, 12:15, 12:22,
12:23, 13:18, 29:17,
40:14, 71:25, 72:2,
121:8, 139:17, 139:23
**communal** [1] - 51:1
**community** [20] -
16:13, 19:16, 21:25,
51:3, 51:4, 111:20,
118:10, 142:7,
147:13, 147:18,
148:2, 148:4, 148:11,
148:13, 148:22,
149:13, 156:14,

157:16, 161:10
**Community** [1] -
11:2
**commute** [1] - 55:2
**company** [5] - 13:14,
54:2, 97:25, 120:19,
165:21
**company's** [1] - 41:8
**comparatively** [1] -
55:24
**compare** [1] - 115:4
**compatible** [1] -
118:5
**complete** [3] - 18:22,
35:14, 112:14
**completed** [5] - 5:22,
76:4
**completeness** [2] -
6:8, 6:10
**compliance** [3] -
137:1, 137:4, 137:20
**comply** [2] - 136:6,
136:23
**component** [2] -
120:25, 151:13
**concept** [2] - 42:2,
51:22
**concern** [5] - 60:23,
106:23, 107:16,
107:25, 112:2
**concerned** [4] - 60:6,
60:19, 83:10, 121:10
**concerning** [1] -
67:5
**concerns** [1] - 87:5
**concert** [1] - 65:2
**concluded** [1] -
173:7
**condition** [5] - 81:7,
81:10, 91:24, 124:17,
138:2
**conducive** [5] - 68:5,
118:13, 120:8,
120:25, 170:8
**confirm** [1] - 124:9
**confirmed** [5] -
35:21, 36:2, 37:8,
39:14, 42:22
**conflict** [2] - 99:17,
100:4
**conflicts** [1] - 19:22
**confused** [1] - 16:23
**confusion** [1] - 17:6
**Congress** [1] - 9:2
**Congressional** [1] -
9:3
**congruent** [1] -
65:15
**connect** [1] - 149:9
**connected** [2] -

125:10, 125:18
**connections** [1] -
145:7
**consequence** [1] -
37:21
**consequences** [3] -
95:17, 95:19, 96:7
**consider** [4] - 32:6,
48:17, 93:22, 103:14
**considered** [9] -
11:17, 13:2, 44:3,
44:8, 51:24, 52:2,
74:5, 81:10, 129:16
**considering** [1] -
66:11
**consistent** [2] - 50:5,
53:24
**Constitution** [1] -
52:23
**Construction** [1] -
17:3
**contacted** [1] - 160:7
**continues** [2] -
13:16, 173:5
**continuum** [1] - 19:1
**contribute** [3] -
113:10, 146:7, 147:4
**contributes** [2] -
146:1, 147:3
**contribution** [1] -
133:6
**control** [7] - 18:6,
99:16, 100:3, 101:7,
111:17, 111:19
**controlled** [2] -
110:16, 164:1
**conversation** [2] -
85:8, 116:10
**conveyed** [1] - 64:19
**cook** [7] - 35:4,
70:12, 70:14, 70:16,
71:3, 71:7
**cooking** [4] - 35:1,
70:6, 70:7, 104:24
**cooperate** [1] - 9:7
**cooperative** [5] -
8:10, 8:11, 16:6,
127:19, 144:3
**cooperatively** [1] -
10:23
**coordinating** [1] -
72:20
**coordination** [1] -
96:23
**cope** [1] - 108:8
**copies** [1] - 20:9
**copy** [5] - 11:4,
20:10, 36:15, 99:24,
135:12
**corner** [2] - 68:5,

78:19
**correct** [53] - 13:22,
16:7, 20:8, 20:21,
20:24, 20:25, 21:10,
23:1, 28:9, 31:12,
33:17, 44:6, 46:24,
57:3, 57:10, 57:21,
63:6, 65:19, 76:19,
76:22, 76:23, 81:17,
84:12, 84:13, 86:12,
102:13, 104:8, 106:9,
110:24, 115:19,
115:21, 116:1, 116:2,
124:16, 131:8,
131:12, 132:13,
137:8, 139:12,
144:19, 150:6, 150:7,
151:8, 153:5, 153:10,
155:6, 160:14,
162:25, 164:22,
163:8, 169:25,
170:9, 171:4
**correctly** [1] - 101:15
**Counsel** [2] - 94:19,
159:8
**counseling** [2] -
141:24, 142:1
**counselor** [3] -
154:4, 154:5, 154:7
**counselors** [1] -
122:5
**count** [1] - 50:4
**country** [1] - 166:4
**County** [10] - 11:4,
14:22, 14:23, 119:10,
143:24, 157:12,
157:23, 157:24,
158:3, 158:5
**county** [1] - 159:19
**couple** [9] - 7:24,
23:13, 30:1, 43:4,
71:9, 71:12, 100:24,
108:25, 172:25
**course** [2] - 36:4,
105:11
**Court** [2] - 51:24,
157:2
**court** [5] - 113:20,
114:11, 129:4,
129:13, 157:9
**covered** [1] - 137:21
**CPR** [5] - 99:16,
100:3, 130:22, 132:1,
132:16
**create** [3] - 19:16,
36:13, 50:13
**creates** [2] - 34:19,
147:12
**creating** [1] - 147:17
**criminality** [1] - 63:5

**crisis** [7] - 114:9, 114:16, 158:19, 159:11, 159:17, 160:6, 160:8
**criteria** [3] - 11:18, 132:19, 143:8
**cross** [1] - 74:22
**cross-examined** [1] - 74:22
**crossing** [1] - 74:16
**CSLR** [14] - 20:22, 21:13, 21:22, 23:10, 46:16, 55:25, 57:19, 65:14, 130:12, 130:13, 130:14, 147:14
**CSLR's** [3] - 9:20, 20:4, 21:21
**CSR** [1] - 9:11
**CSR's** [1] - 17:5
**cul** [2] - 68:5, 73:25
**cul-de-sac** [2] - 68:5, 73:25
**cultural** [1] - 145:9
**culture** [2] - 149:24, 149:25
**cure** [1] - 124:18
**curfew** [4] - 37:22, 38:2, 38:3, 95:21
**curious** [6] - 61:6, 61:15, 72:10, 106:14, 119:8, 161:6
**current** [1] - 36:15
**Curriculum** [1] - 142:16
**cut** [3] - 73:17, 80:13, 104:25
**CV** [1] - 142:13

**D**

**D-1** [6] - 7:1, 9:16, 61:12, 62:5, 63:20, 63:23
**d/b/a** [1] - 15:10
**dad** [1] - 139:4
**daily** [4] - 38:22, 69:3, 69:15, 154:9
**dan** [1] - 15:22
**Dana** [1] - 135:6
**dangerous** [1] - 73:6
**data** [4] - 164:14, 165:9, 167:9, 168:1
**date** [2] - 75:18, 171:10
**dated** [1] - 23:3
**dates** [4] - 60:6, 60:24, 61:8, 61:9
**day-to-day** [2] - 84:5,

122:1
**days** [16] - 8:15, 18:20, 48:13, 50:15, 50:16, 51:23, 52:1, 130:20, 131:10, 131:18, 148:20, 149:15, 162:6, 162:9, 162:16, 162:17
**daytime** [2] - 31:1, 170:4
**DCA** [6] - 10:11, 13:3, 16:6, 17:4, 17:13, 20:21
**de** [2] - 68:5, 73:25
**deal** [6] - 8:14, 8:15, 40:9, 111:3, 124:11, 163:24
**dealing** [4] - 96:3, 96:5, 111:9, 160:21
**deaths** [2] - 143:11, 143:14
**decided** [1] - 117:22
**decides** [1] - 92:12
**deciding** [1] - 151:12
**decision** [6] - 84:20, 84:21, 84:23, 85:2, 85:20, 118:25
**decisions** [3] - 48:19, 84:10, 85:17
**deck** [1] - 107:17
**deescalated** [1] - 159:21
**define** [3] - 100:15, 109:22, 113:5
**defined** [5] - 12:25, 13:1, 52:16, 52:19, 115:15
**definitely** [5] - 56:21, 69:13, 99:18, 105:19, 140:10
**definition** [2] - 12:24, 43:3
**degree** [4] - 122:4, 133:19, 141:22, 141:24
**degrees** [1] - 141:22
**delay** [1] - 135:21
**delineates** [1] - 145:1
**delineation** [1] - 159:25
**delineations** [1] - 5:21
**delivered** [2] - 38:13, 70:22
**deliveries** [7] - 68:2, 68:4, 69:1, 69:3, 69:13, 70:16, 70:18
**delivering** [1] - 70:21
**delivery** [6] - 38:12,

69:13, 69:24, 108:14, 144:23
**Delucchi** [1] - 162:1
**demands** [1] - 22:5
**demonstrated** [1] - 10:9
**demonstrates** [1] - 52:12
**denied** [1] - 44:2
**DEP** [1] - 136:24
**department** [1] - 137:15
**Department** [5] - 11:2, 136:18, 143:15, 143:19, 144:20
**depression** [1] - 18:8
**describe** [5] - 23:20, 25:22, 38:19, 67:17, 148:11
**described** [2] - 19:24, 108:12
**deserve** [1] - 56:14
**deserves** [1] - 54:17
**design** [2] - 50:13, 135:18
**designated** [1] - 159:18
**desirable** [1] - 56:20
**destabilize** [1] - 148:4
**determines** [1] - 47:16
**detoxification** [3] - 18:11, 18:16, 116:14
**diagnostic** [1] - 143:8
**Dickinson** [1] - 141:23
**didactic** [1] - 154:17
**differ** [1] - 113:13
**difference** [3] - 57:16, 71:2, 118:23
**different** [35] - 10:19, 34:2, 34:3, 35:7, 35:14, 39:3, 48:7, 48:24, 49:13, 49:20, 51:5, 52:21, 59:6, 60:23, 61:8, 61:9, 63:11, 65:16, 70:24, 80:8, 80:11, 80:12, 87:25, 95:22, 96:12, 97:4, 100:6, 104:18, 113:5, 120:5, 131:14, 142:6, 154:2, 155:16, 156:16
**differentiate** [1] - 118:2
**differently** [3] - 8:24, 66:14, 162:19
**difficult** [4] - 55:11,

55:19, 94:6, 149:3
**difficulty** [2] - 104:24, 149:13
**diligently** [1] - 119:21
**dimensions** [1] - 145:3
**dining** [1] - 26:8
**dinner** [1] - 51:3
**diploma** [4] - 131:25, 132:15, 132:22, 153:14
**DIRECT** [2] - 14:16, 141:14
**direct** [2] - 66:25, 75:19
**direction** [1] - 160:18
**directly** [13] - 25:8, 63:10, 68:10, 88:23, 89:15, 93:19, 100:7, 111:21, 127:14, 131:20, 134:10, 135:7, 137:2
**director** [6] - 142:9, 150:4, 152:4, 152:18, 152:25, 159:4
**disabused** [1] - 17:9
**discharge** [11] - 57:12, 90:9, 90:20, 92:4, 93:23, 99:21, 100:5, 100:14, 100:16, 100:20, 100:21
**discharged** [15] - 36:9, 87:18, 87:21, 88:20, 89:14, 90:3, 90:13, 90:15, 90:20, 91:12, 92:6, 93:25, 94:25, 96:10, 96:13
**discomfort** [1] - 71:15
**discriminate** [5] - 39:19, 62:21, 89:1, 107:15, 118:21
**discriminative** [2] - 120:12, 133:8
**discuss** [1] - 10:8
**discussed** [3] - 8:19, 10:24, 35:11
**discussing** [1] - 15:4
**discussion** [1] - 136:21
**discussions** [1] - 151:14
**disorder** [4] - 18:4, 18:5, 120:14, 143:9
**disposal** [1] - 66:5
**disrespect** [1] - 94:15
**disruptive** [1] -

104:18
**Division** [1] - 143:20
**doctor** [2] - 148:15
**documents** [1] - 83:9
**dog** [14] - 39:8, 39:17, 39:21, 39:24, 39:25, 40:2, 40:4, 40:12, 106:24, 107:2, 107:4, 107:8, 107:9, 138:23
**domicile** [2] - 51:25, 52:3
**done** [14] - 6:23, 43:10, 46:25, 63:19, 66:13, 67:3, 76:5, 78:12, 100:18, 115:12, 133:5, 136:5, 136:15, 171:23
**door** [10] - 10:17, 23:24, 72:3, 92:2, 103:4, 110:1, 111:18, 126:17, 134:23
**doors** [3] - 42:11, 42:13, 130:3
**down** [14] - 24:17, 25:4, 26:12, 55:13, 58:25, 94:9, 97:14, 107:22, 117:12, 119:23, 120:10, 121:13, 138:24, 149:15
**Dr** [15] - 14:1, 141:1, 141:6, 141:16, 142:13, 142:17, 143:3, 150:3, 157:18, 158:18, 158:22, 168:11, 171:3, 171:23
**drastically** [3] - 149:4, 162:6, 162:9
**drew** [2] - 54:25, 55:5
**drink** [1] - 91:11
**drinking** [4] - 36:6, 44:9, 91:13, 91:18
**drive** [6] - 31:14, 34:8, 54:2, 138:8, 138:11
**Drive** [3] - 99:11, 106:18, 158:17
**driver's** [1] - 54:2
**drives** [2] - 33:15, 77:23
**driveway** [10] - 23:25, 24:18, 25:4, 25:5, 25:8, 25:9, 29:7, 77:10, 77:25, 139:7
**driving** [1] - 36:24
**Drug** [1] - 143:6
**drug** [14] - 14:25, 18:19, 31:17, 41:16,

90:11, 109:7, 116:12, 128:17, 133:24, 143:14, 154:6

**drugs** [19] - 7:14, 7:19, 8:2, 18:5, 18:13, 36:6, 36:8, 44:9, 88:4, 93:8, 108:19, 108:20, 109:9, 109:20, 109:23, 110:14, 134:15

**dry** [1] - 80:13

**during** [17] - 8:15, 30:20, 30:22, 31:1, 39:3, 46:9, 58:23, 70:19, 93:5, 97:18, 110:9, 115:9, 130:5, 169:16, 169:17, 170:3

**dwelling** [2] - 9:19, 23:23

**D'Arminio** [2] - 5:12, 6:24

**E**

**early** [1] - 95:21
**easily** [1] - 9:19
**easy** [7] - 49:25, 50:3, 54:9, 54:10, 55:15, 64:10, 124:10
**eat** [4] - 10:18, 35:5, 35:7, 68:1
**eating** [5] - 35:1, 51:3, 70:9, 71:9, 71:18
**ebb** [1] - 71:17
**economy** [1] - 147:4
**Ed** [3] - 6:23, 64:12, 71:13
**edge** [1] - 24:22
**educate** [1] - 50:18
**educated** [1] - 133:4
**education** [1] - 133:17
**educational** [1] - 141:17
**Edward** [1] - 5:11
**effective** [1] - 124:18
**efforts** [1] - 144:23
**eight** [8] - 29:24, 30:4, 30:5, 30:9, 47:10, 50:15, 138:16, 161:16
**either** [6] - 55:10, 58:17, 62:5, 88:1, 90:7, 154:3
**elaborate** [1] - 65:7
**electrical** [1] - 135:22
**element** [1] - 116:11

**elevation** [1] - 25:12
**elsewhere** [1] - 167:6
**emergencies** [1] - 104:10
**emergency** [9] - 11:12, 81:8, 81:11, 86:4, 104:19, 104:22, 146:24, 146:25, 159:19
**emergent** [2] - 104:20, 136:14
**emotional** [5] - 40:1, 40:3, 40:5, 40:9, 145:17
**empathy** [1] - 145:20
**emphasizes** [1] - 145:8
**employee** [7] - 27:23, 73:17, 77:3, 79:5, 79:13, 130:17, 131:10
**employees** [13] - 30:18, 31:23, 53:15, 53:16, 53:19, 69:7, 76:22, 76:25, 79:9, 80:1, 97:20, 97:22, 113:12
**employment** [3] - 50:5, 132:25, 151:6
**enables** [1] - 147:15
**enacted** [1] - 44:19
**encapsulates** [1] - 41:19
**encourage** [6] - 35:8, 45:24, 46:4, 47:13, 51:2, 71:6
**encouraged** [1] - 35:4
**end** [1] - 25:17
**ending** [1] - 118:17
**ends** [2] - 39:15, 136:22
**enforce** [2] - 96:1, 124:11
**enforced** [1] - 35:2
**enforcement** [3] - 44:15, 44:16, 44:18
**enforcing** [1] - 147:24
**engage** [1] - 71:7
**engaging** [1] - 58:17
**Engineer** [1] - 66:13
**engineers** [1] - 5:24
**enjoy** [1] - 9:18
**ensure** [1] - 146:3
**entailed** [1] - 94:17
**enter** [3] - 16:2, 23:17, 129:7
**entered** [2] - 15:25,

16:3
**Enterprise** [1] - 15:10
**Enterprises** [1] - 51:20
**entirely** [1] - 87:25
**entity** [4] - 20:23, 48:18, 150:8, 150:9
**entrance** [2] - 26:4, 27:3
**entry** [1] - 45:14
**environment** [27] - 8:16, 16:13, 16:14, 19:17, 19:23, 19:24, 20:2, 22:1, 22:8, 22:9, 36:12, 51:8, 90:18, 110:16, 111:1, 111:13, 117:14, 118:9, 118:10, 145:5, 145:23, 146:14, 149:23, 150:25, 156:15, 163:21, 164:1
**Environmental** [1] - 136:18
**environmental** [1] - 145:9
**equal** [2] - 9:18, 9:23
**equivalent** [1] - 132:22
**errands** [1] - 34:3
**escalate** [1] - 159:25
**especially** [4] - 45:8, 111:22, 114:17, 121:13, 128:16
**essentially** [3] - 17:22, 146:4, 147:7
**established** [1] - 149:6
**establishing** [1] - 149:13
**establishment** [1] - 69:25
**etc** [1] - 35:23
**etcetera** [5] - 39:22, 41:12, 63:20, 63:21, 91:24
**evening** [7] - 5:6, 5:9, 13:19, 99:9, 114:16, 139:22, 169:16
**event** [1] - 88:10
**events** [2] - 51:4, 104:7
**eventually** [1] - 74:20
**everyday** [6] - 18:7, 19:6, 19:8, 19:15, 50:24, 69:14
**everywhere** [4] - 39:23, 39:24, 108:6,

119:22
**exact** [5] - 30:17, 74:7, 98:6, 98:9, 110:11
**exactly** [8] - 69:15, 87:7, 98:14, 100:16, 105:6, 109:5, 116:21, 128:15
**EXAMINATION** [2] - 14:16, 141:14
**examined** [1] - 74:22
**example** [15] - 28:1, 33:11, 34:6, 38:6, 44:24, 45:21, 74:24, 91:6, 104:4, 110:13, 113:13, 125:9, 133:15, 133:16, 148:5
**excellent** [2] - 6:22, 55:22
**exclude** [1] - 8:24
**excludes** [1] - 150:25
**excluding** [1] - 91:25
**exclusion** [1] - 9:4
**exclusively** [1] - 92:20
**excuse** [2] - 27:8, 140:1
**exempted** [1] - 138:1
**exemption** [2] - 137:25, 138:3
**exercise** [1] - 26:6
**Exhibit** [9] - 20:16, 20:18, 23:6, 23:7, 23:17, 23:18, 36:19, 36:21, 142:15
**exhibits** [2] - 23:16, 172:13
**exist** [2] - 62:24, 164:17
**existing** [2] - 20:10, 151:19
**exists** [5] - 7:16, 9:1, 54:16, 62:14, 63:1
**expect** [2] - 8:25, 128:8
**expected** [1] - 45:13
**experience** [24] - 7:17, 8:1, 38:16, 39:18, 48:17, 49:6, 49:19, 50:3, 56:15, 56:16, 63:17, 64:4, 64:5, 73:22, 88:25, 89:3, 115:2, 115:11, 120:18, 142:3, 149:10, 169:9, 169:12, 170:12
**experienced** [4] - 19:8, 19:10, 54:13, 54:14
**experiences** [2] -

147:22, 164:3
**experiencing** [3] - 47:24, 49:6, 149:7
**expert** [4] - 14:1, 141:18, 142:24, 143:1
**explain** [7] - 14:19, 16:9, 17:21, 26:14, 42:14, 74:19, 75:10
**explaining** [1] - 17:10
**explanation** [1] - 131:15
**Explorer** [1] - 80:7
**extended** [1] - 45:17
**extensive** [1] - 104:14
**extent** [5] - 40:24, 48:17, 62:17, 124:19, 136:17
**external** [1] - 159:13
**extra** [2] - 28:11, 95:21
**extreme** [1] - 95:24
**eyes** [1] - 147:23

**F**

**face** [1] - 120:16
**facilitate** [2] - 81:5, 119:5
**facilities** [5] - 57:15, 57:17, 86:11, 115:24, 166:13
**facility** [26] - 33:12, 49:1, 55:7, 57:16, 57:19, 65:16, 79:6, 80:20, 83:12, 85:24, 85:25, 86:5, 86:9, 88:6, 102:21, 114:2, 116:1, 116:7, 116:13, 117:7, 142:10, 150:24, 151:7, 165:16, 169:19
**facility's** [2] - 80:19, 80:21
**fact** [8] - 52:14, 84:1, 88:22, 93:15, 115:1, 130:14, 148:20, 160:22
**factor** [1] - 91:25
**factors** [8] - 10:10, 56:2, 56:20, 85:25, 91:19, 91:21, 145:10, 162:4
**facts** [1] - 7:8
**factual** [2] - 13:25, 68:23
**fail** [2] - 43:12, 91:11
**failed** [1] - 91:12

**failing** [1] - 137:5
**failure** [2] - 65:21, 136:14
**fair** [4] - 107:1, 110:23, 115:6, 170:6
**Fair** [7] - 7:3, 15:11, 31:19, 55:2, 55:4, 102:8, 152:3
**Fairleigh** [1] - 141:23
**familiar** [2] - 7:2, 150:20
**families** [4] - 8:3, 52:22, 62:21, 112:12
**family** [56] - 9:6, 9:11, 9:12, 11:22, 12:25, 13:1, 13:3, 19:3, 19:16, 20:2, 25:24, 35:20, 35:22, 37:6, 45:19, 47:3, 50:13, 50:17, 50:19, 50:21, 51:5, 51:8, 52:13, 52:16, 52:19, 52:24, 52:25, 53:1, 53:6, 53:8, 68:1, 68:2, 68:3, 68:6, 68:8, 68:11, 70:17, 71:4, 91:10, 109:1, 109:17, 112:8, 114:20, 118:3, 118:10, 145:5, 145:12, 145:15, 145:21, 146:1, 149:1, 149:25, 156:14, 157:15
**family-like** [2] - 19:16, 145:5
**far** [4] - 27:10, 116:8, 118:3, 133:18
**fashion** [1] - 84:2
**fast** [1] - 13:6
**fast-forward** [1] - 13:6
**father** [2] - 7:15, 109:16
**favor** [4] - 6:4, 6:5, 6:12, 6:13
**February** [2] - 135:13, 135:16
**federal** [1] - 41:17
**feedback** [2] - 160:12, 160:18
**feelings** [1] - 9:1
**feet** [4] - 26:4, 50:6, 66:5
**Fegan** [4] - 106:13, 106:17, 152:15, 157:5
**FEGAN** [53] - 28:16, 106:13, 106:17, 107:11, 107:16, 108:2, 108:13, 108:24, 109:5,

109:11, 109:16, 109:19, 110:12, 111:24, 112:11, 112:18, 112:22, 113:2, 113:15, 114:3, 114:8, 114:15, 119:8, 119:24, 120:9, 120:19, 121:5, 121:20, 122:8, 122:16, 122:18, 122:22, 123:19, 124:6, 152:11, 152:14, 152:22, 153:3, 153:8, 153:11, 153:20, 153:23, 154:8, 154:12, 154:20, 154:24, 155:2, 157:1, 157:5, 157:11, 157:20, 158:6, 158:11
**felons** [2] - 62:9, 62:22, 62:25
**female** [2] - 117:19, 117:20
**fence** [5] - 29:8, 29:12, 121:6, 121:9, 121:10
**few** [5] - 47:12, 121:15, 150:2, 152:11, 167:21
**FHAA** [9] - 7:4, 9:2, 9:3, 9:12, 9:14, 11:16, 52:4, 53:9, 62:7
**field** [4] - 15:5, 66:5, 141:19, 143:2
**fifth** [3] - 24:24, 34:13, 34:14
**fight** [1] - 104:5
**filed** [3] - 60:3, 66:2, 172:12
**filing** [1] - 128:14
**finances** [1] - 45:24
**financial** [2] - 10:3, 45:22
**fine** [3] - 65:12, 94:12, 124:6
**finger** [1] - 104:25
**finish** [4] - 60:19, 75:18, 75:19, 77:11
**first** [18] - 10:2, 13:24, 24:8, 26:7, 47:6, 47:17, 47:19, 48:4, 57:9, 58:14, 58:20, 96:6, 107:3, 131:25, 145:16, 166:11
**firsthand** [1] - 170:7
**fit** [2] - 40:18, 117:23
**fits** [2] - 18:1, 80:6
**five** [17] - 26:2,

29:12, 82:11, 82:13, 86:20, 96:20, 108:18, 112:11, 121:17, 122:25, 126:11, 138:23, 149:15, 161:6, 166:23, 172:12
**flashing** [1] - 73:18
**flexibility** [2] - 33:1, 33:3
**floor** [3] - 26:7, 26:10, 26:12
**floors** [1] - 35:15
**flow** [2] - 65:16, 71:17
**flushed** [1] - 47:5
**focus** [1] - 36:13
**focused** [1] - 89:25
**folks** [3] - 66:19, 115:18, 148:21
**follow** [11] - 44:14, 76:15, 78:24, 124:14, 124:21, 129:20, 129:21, 165:7, 166:3, 170:23, 172:18
**follow-up** [3] - 44:14, 124:21, 172:18
**following** [1] - 57:21
**food** [19] - 38:8, 38:12, 68:6, 68:7, 68:10, 69:13, 69:24, 70:3, 70:4, 70:5, 72:5, 108:14, 134:3, 134:4, 134:5, 134:7, 134:9, 134:11
**for-profit** [3] - 52:7, 56:14, 121:2
**forbid** [1] - 45:6
**forced** [2] - 112:14, 112:16
**forget** [1] - 59:19
**forgot** [1] - 78:19
**form** [9] - 5:22, 18:25, 22:8, 42:19, 45:22, 70:9, 83:16, 96:25, 162:17
**forms** [3] - 22:2, 38:1, 96:1
**forth** [2] - 52:11, 85:25
**forward** [1] - 13:6
**foster** [5] - 144:25, 147:16, 148:12, 148:22, 148:23
**four** [18] - 22:13, 26:3, 26:13, 34:12, 34:13, 47:9, 49:17, 52:11, 58:4, 97:15, 98:21, 98:25, 121:17, 148:6, 148:10, 149:12, 149:16,

161:10
**fourth** [2] - 24:20, 24:21
**frankly** [1] - 168:12
**free** [5] - 41:18, 58:18, 69:21, 145:5, 157:8
**free-for-all** [1] - 69:21
**freedom** [3] - 37:12, 111:23, 111:25
**freely** [1] - 50:22
**freezer** [1] - 71:24
**frequent** [1] - 146:23
**Friday** [2] - 59:2, 114:6
**fridge** [1] - 72:6
**fridges** [4] - 70:9, 70:10, 72:3
**friend** [1] - 7:14
**friendly** [1] - 39:10
**friends** [1] - 8:3
**front** [10] - 23:24, 24:1, 25:3, 43:17, 73:17, 74:14, 75:6, 110:1, 111:18, 134:23
**full** [3] - 26:11, 26:21, 45:16
**full-on** [1] - 45:16
**full-size** [1] - 26:21
**fully** [2] - 25:19, 47:14
**fun** [1] - 59:7
**function** [1] - 82:4
**functional** [1] - 119:15
**functions** [2] - 145:14, 146:15
**fundamental** [2] - 10:6
**future** [5] - 89:4, 90:17, 91:17, 95:2, 97:15

**G**

**gain** [1] - 19:17
**garage** [7] - 23:24, 24:3, 27:3, 27:5, 27:7, 40:18, 139:11
**garaged** [1] - 40:14
**garbage** [1] - 35:15
**Gargiulo** [3] - 21:1, 127:16, 127:23
**gather** [1] - 75:13
**general** [10] - 54:25, 55:9, 64:5, 85:7, 89:20, 115:3, 126:4, 150:22, 150:23,

164:20
**generally** [12] - 27:23, 30:4, 30:13, 35:17, 37:7, 39:12, 45:15, 45:17, 47:20, 98:16, 110:6, 158:24
**generator** [2] - 140:2, 140:5
**gentleman** [1] - 157:14
**geography** [1] - 67:18
**germane** [1] - 75:3
**GILHOOLEY** [28] - 11:25, 12:2, 12:14, 12:19, 13:5, 13:20, 16:20, 17:17, 30:18, 30:24, 31:10, 31:13, 31:19, 31:22, 32:14, 37:18, 41:4, 41:9, 41:20, 72:10, 72:16, 73:8, 124:21, 124:25, 125:2, 125:5, 125:24, 126:4
**girls** [1] - 132:23
**given** [6] - 30:19, 45:14, 60:11, 73:12, 104:11, 160:18
**glasses** [1] - 78:19
**God** [1] - 45:5
**gold** [1] - 78:7
**gonna** [1] - 130:2
**gotcha** [1] - 160:24
**governing** [1] - 41:5
**Government** [2] - 52:16, 52:20
**government** [1] - 52:24
**grandmother** [2] - 133:16, 134:1
**granted** [1] - 11:14
**grass** [1] - 29:13
**gray** [1] - 32:16
**great** [6] - 91:7, 91:20, 95:7, 109:1, 133:5
**greatly** [1] - 162:13
**grew** [2] - 14:22, 139:5
**groceries** [1] - 70:9
**grocery** [1] - 134:9
**ground** [1] - 50:10
**grounds** [1] - 100:20
**group** [13] - 58:18, 72:12, 153:1, 154:13, 154:15, 154:17, 154:18, 155:17, 156:1, 156:2, 156:6, 156:21, 156:22
**groups** [2] - 156:2,

**growth** [1] - 49:7
**Grygiel** [3] - 14:2, 23:13, 23:16
**guaranteed** [1] - 79:20
**guess** [9] - 13:8, 51:4, 53:18, 55:6, 72:13, 78:21, 107:25, 124:13, 165:22
**guessing** [1] - 115:25
**guests** [1] - 84:12
**guy** [1] - 63:15
**guys** [7] - 64:14, 106:8, 113:19, 116:23, 120:16

**H**

**half** [3] - 26:3, 26:12, 154:25
**hand** [8] - 14:9, 36:14, 47:23, 61:3, 110:23, 110:24, 141:7
**hand-in-hand** [1] - 47:23
**handicapped** [1] - 9:17
**handicaps** [1] - 9:5
**handle** [9] - 54:22, 93:12, 93:13, 93:16, 100:11, 100:14, 101:21, 160:3
**handled** [3] - 92:15, 92:17, 92:19
**handles** [2] - 17:14, 93:18
**handling** [2] - 93:17, 115:12
**hands** [1] - 65:1
**happy** [6] - 61:24, 62:3, 62:7, 112:8, 112:12, 129:23
**hard** [12] - 30:15, 37:8, 39:18, 40:17, 50:4, 50:5, 62:20, 70:24, 108:7, 133:8, 148:11
**hardest** [1] - 149:8
**hardship** [2] - 10:5, 45:22
**hat** [2] - 63:15, 63:22
**head** [4] - 94:16, 98:13, 130:21, 161:2
**health** [18] - 87:5, 89:22, 104:15, 104:19, 105:11, 105:14, 137:15,

141:19, 141:24, 142:5, 142:8, 142:12, 143:2, 144:23, 144:24, 146:22, 155:19, 156:21
**Health** [8] - 66:18, 136:17, 136:18, 136:24, 143:6, 143:20, 144:20, 144:21
**healthy** [1] - 145:5
**hear** [5] - 5:7, 7:23, 64:25, 94:8, 171:1
**heard** [7] - 11:8, 100:17, 100:23, 102:3, 129:9, 137:12
**Hearing** [1] - 173:7
**hearing** [2] - 61:17, 75:17
**heavily** [1] - 64:16
**heavy** [1] - 103:20
**help** [8] - 8:17, 49:23, 59:9, 119:2, 119:3, 148:23, 149:22, 159:13
**helped** [1] - 116:5
**helpful** [3] - 19:25, 163:23, 170:9
**helping** [1] - 147:2
**helps** [1] - 148:1
**HERRINGTON** [14] - 6:1, 6:11, 33:9, 33:18, 34:10, 34:21, 40:7, 53:14, 104:22, 105:3, 125:17, 151:5, 151:9, 151:21
**high** [12] - 14:25, 30:10, 131:25, 132:15, 132:21, 132:23, 133:4, 133:17, 133:19, 133:22, 153:13, 153:14
**higher** [1] - 112:25
**highest** [4] - 46:11, 48:15, 111:25, 112:1
**Highland** [1] - 127:14
**Highlands** [6] - 137:1, 137:3, 137:21, 137:24, 138:1, 138:3
**highly** [1] - 114:18
**hill** [1] - 24:5
**hire** [6] - 54:21, 54:22, 128:20, 131:16, 131:21, 132:11
**hires** [1] - 132:9
**hiring** [2] - 53:18, 131:23

**histories** [1] - 104:14
**history** [1] - 53:24
**hit** [1] - 73:18
**hold** [2] - 114:13, 145:23
**holding** [1] - 36:14
**holds** [1] - 72:4
**home** [105] - 7:6, 8:5, 8:8, 9:7, 9:12, 9:13, 10:21, 10:22, 11:1, 11:7, 11:9, 11:22, 11:23, 12:25, 15:3, 15:17, 16:5, 16:10, 16:11, 16:16, 16:19, 18:1, 18:23, 19:5, 19:20, 20:11, 22:9, 22:17, 22:18, 22:19, 25:22, 25:24, 26:2, 29:18, 29:21, 29:23, 30:22, 31:5, 31:9, 36:3, 36:23, 37:2, 37:12, 40:24, 41:22, 41:23, 45:25, 46:8, 46:11, 48:14, 49:10, 49:11, 49:17, 49:19, 49:21, 50:24, 50:25, 51:9, 51:10, 51:14, 52:1, 52:13, 52:14, 54:8, 55:16, 55:22, 56:1, 57:19, 58:14, 58:15, 59:24, 69:2, 69:9, 70:24, 71:2, 71:14, 73:24, 80:2, 87:4, 93:6, 109:10, 114:21, 117:14, 118:11, 126:22, 127:1, 127:19, 133:24, 144:1, 144:6, 144:11, 144:18, 145:1, 146:10, 148:10, 151:7, 151:16, 156:10, 157:15, 160:6, 163:13, 163:23, 167:4
**home/CSLR** [1] - 144:8
**homeowner** [1] - 127:16
**homes** [30] - 9:10, 9:11, 13:2, 13:4, 15:21, 33:24, 34:1, 46:14, 55:9, 57:20, 57:24, 58:7, 62:22, 62:25, 97:24, 97:25, 112:6, 112:10, 112:20, 115:3, 144:14, 145:12, 145:22, 146:17, 146:19, 147:5, 147:10, 150:12,

158:25
**hone** [1] - 46:5
**honest** [2] - 53:7, 54:23
**honesty** [1] - 55:21
**hope** [5] - 54:14, 64:14, 64:18, 70:14, 134:24
**hopefully** [1] - 47:11
**horseshoe** [1] - 67:19
**hospital** [31] - 74:3, 81:3, 81:7, 81:11, 81:13, 86:23, 87:2, 87:3, 87:6, 87:11, 87:18, 87:21, 88:7, 88:15, 88:17, 88:20, 88:21, 89:10, 89:11, 89:18, 89:20, 89:21, 90:6, 90:14, 94:25, 101:1, 102:2, 103:23, 103:25, 110:4
**hospitalizations** [1] - 146:24
**hotel** [1] - 149:1
**hour** [5] - 75:16, 93:4, 154:25, 155:1
**hours** [4] - 39:5, 48:12, 58:23, 115:9
**house** [150] - 10:13, 10:15, 10:20, 10:21, 21:25, 22:1, 22:24, 23:25, 24:4, 25:8, 28:3, 32:21, 32:22, 32:24, 33:16, 33:20, 33:22, 33:24, 34:17, 35:6, 35:15, 36:5, 36:15, 37:11, 38:4, 38:14, 38:15, 38:20, 38:25, 39:5, 41:8, 42:4, 42:7, 42:13, 43:5, 46:15, 46:18, 46:19, 47:11, 52:15, 53:20, 55:2, 55:21, 55:25, 56:5, 60:14, 62:10, 68:11, 68:16, 68:17, 69:11, 69:12, 70:11, 70:20, 71:23, 73:13, 73:14, 74:14, 77:17, 77:24, 81:15, 82:2, 84:12, 84:16, 84:21, 87:12, 89:9, 91:1, 91:2, 91:3, 91:7, 92:8, 92:9, 93:7, 93:18, 94:3, 95:1, 96:17, 97:8, 97:11, 97:17, 98:4, 98:7, 99:13, 103:10, 104:16, 106:21, 106:24, 107:2, 107:5,

107:18, 107:20, 107:22, 107:24, 108:20, 108:21, 109:7, 109:9, 109:12, 110:8, 110:17, 111:14, 112:15, 117:13, 117:25, 119:9, 119:21, 120:15, 121:17, 122:1, 125:1, 125:3, 125:15, 125:23, 126:1, 129:11, 130:9, 130:21, 131:11, 132:22, 132:24, 136:11, 137:17, 140:7, 147:24, 148:3, 148:6, 149:24, 158:7, 158:8, 158:10, 158:11, 159:6, 159:23, 162:3, 163:5, 164:5, 164:6, 164:9, 164:10, 165:2, 166:10, 166:14, 166:25, 168:13, 169:14, 169:16, 170:9
**House** [2] - 36:19, 36:21
**household** [4] - 105:2, 133:18, 133:20, 146:2
**housekeeping** [6] - 6:23, 10:14, 10:20, 10:24, 11:24, 53:3
**houses** [27] - 10:12, 34:3, 35:24, 37:10, 37:11, 37:13, 37:14, 46:19, 46:22, 46:24, 56:12, 97:9, 97:19, 97:21, 110:7, 116:17, 119:22, 120:1, 120:5, 120:17, 120:18, 120:20, 131:6, 164:19, 164:23, 164:24, 165:1
**Housing** [1] - 7:4
**housing** [9] - 7:18, 47:23, 49:9, 128:17, 136:2, 144:15, 144:17, 145:4, 164:12
**Human** [2] - 143:20, 144:20

**I**

**I.D** [1] - 35:22
**identify** [2] - 147:21, 149:10
**illegal** [1] - 36:6
**illegally** [2] - 61:23, 63:23

**imagine** [1] - 10:15
**immediate** [4] -
35:20, 35:22, 99:21,
100:20
**immediately** [2] -
36:8, 120:14
**impact** [4] - 56:7,
148:2, 148:7, 158:25
**impacts** [2] - 11:20,
145:13
**implement** [1] - 38:2
**importance** [1] -
145:9
**important** [9] - 8:12,
9:14, 56:11, 146:5,
147:10, 147:11,
147:15, 149:18
**imposes** [2] - 10:3,
10:4
**impression** [1] -
166:9
**improve** [1] - 66:2
**improved** [1] - 162:4
**incarceration** [1] -
165:13
**incident** [7] - 73:16,
73:20, 73:22, 74:5,
74:7, 86:25
**incidents** [4] - 42:6,
44:21, 60:11, 68:21
**inclined** [2] - 158:20,
159:13
**included** [1] - 17:7
**incorporate** [1] -
139:22
**increase** [2] - 66:4,
147:23
**increases** [1] -
147:20
**incredibly** [2] -
163:3, 163:4
**Indeed** [3] - 132:8,
132:10, 132:12
**independent** [1] -
111:3
**independently** [2] -
72:22, 97:9
**indicated** [4] - 85:16,
88:5, 95:8, 168:12
**indicating** [1] - 29:17
**individual** [18] -
10:16, 58:18, 72:22,
80:9, 86:14, 86:17,
87:10, 88:3, 88:6,
89:10, 98:3, 152:24,
153:2, 154:10,
155:18, 155:25,
166:18, 166:21
**individualized** [1] -
82:8

**individually** [4] -
69:18, 84:5, 152:20,
154:22
**individuals** [23] -
7:18, 8:5, 9:13, 9:23,
11:23, 51:23, 71:21,
80:1, 82:1, 83:11,
85:15, 95:8, 97:7,
111:2, 142:11, 145:6,
146:20, 147:15,
154:12, 164:24,
165:10, 169:23, 170:7
**individuals'** [1] -
147:3
**induce** [3] - 22:1,
22:7, 50:13
**inebriated** [1] - 90:8
**influence** [6] - 45:8,
87:5, 92:8, 92:9,
101:9, 109:25
**information** [19] -
59:22, 60:11, 61:2,
75:10, 82:24, 83:4,
83:5, 83:8, 83:10,
83:17, 94:9, 160:14,
160:16, 165:18,
167:16, 172:2, 172:3,
172:8
**inherent** [1] - 111:5
**inherently** [1] - 11:18
**injured** [1] - 104:5
**inner** [1] - 20:1
**inpatient** [14] -
18:12, 18:18, 18:19,
45:16, 47:21, 48:3,
57:8, 57:11, 115:19,
115:20, 116:14,
117:6, 142:7, 166:11
**input** [1] - 91:22
**inside** [5] - 11:23,
125:4, 126:1, 126:2,
139:18
**inspected** [5] -
38:10, 38:15, 73:11,
73:14, 110:18
**inspects** [1] - 20:4
**instance** [4] - 89:9,
108:15, 168:23, 169:4
**instances** [9] -
44:16, 83:22, 85:5,
86:20, 86:22, 87:10,
88:10, 89:25, 94:24
**instead** [3] - 88:12,
118:11, 120:2
**instrumental** [1] -
147:1
**insurance** [2] -
119:2, 121:2
**integrate** [5] - 19:5,
19:7, 19:14, 47:13,

118:7
**intensive** [2] - 18:21,
48:10
**intent** [1] - 21:25
**intentions** [1] - 56:21
**interact** [4] - 8:8,
19:22, 169:23, 170:7
**interaction** [4] -
48:20, 71:15, 148:12,
161:11
**interactions** [2] -
54:6, 170:8
**interesting** [1] -
128:3
**interject** [2] - 90:23,
164:15
**internally** [2] -
159:21, 167:10
**interpret** [1] - 63:12
**interview** [2] - 53:25,
54:1
**intricate** [1] - 84:15
**introduce** [1] -
140:15
**investigation** [1] -
63:19
**involve** [4] - 81:15,
86:4, 86:22, 89:25
**involved** [4] - 84:5,
84:7, 167:15
**involvement** [5] -
44:15, 84:15, 84:18,
150:11, 165:12
**involving** [1] - 44:16
**isolate** [2] - 71:16,
147:16
**isolated** [1] - 8:3
**isolating** [2] - 7:25,
71:13
**isolation** [2] - 146:6,
148:1
**issue** [15] - 37:21,
44:24, 62:14, 63:5,
66:9, 91:18, 92:11,
92:15, 111:11,
111:12, 123:15,
136:16, 137:13,
138:12, 139:20
**issued** [3] - 20:21,
61:19, 66:1
**issues** [12] - 6:21,
11:11, 18:14, 20:22,
42:9, 45:3, 56:23,
64:14, 75:4, 93:11,
117:17, 136:10
**item** [1] - 6:17
**itself** [2] - 52:14,
58:21

**J**

**J-O-N-A-S** [1] - 14:14
**jail** [2] - 110:13,
110:14
**January** [1] - 143:13
**Jay** [12] - 13:24,
14:13, 14:22, 20:19,
21:9, 22:25, 23:9,
56:5, 110:20, 124:14,
137:12, 151:10
**JAY** [1] - 14:13
**Jennifer** [7] - 67:16,
162:22, 172:10,
172:12, 172:13,
172:23, 173:2
**Jersey** [29] - 11:2,
15:10, 20:3, 21:13,
31:17, 42:21, 55:25,
99:11, 102:5, 102:7,
102:10, 116:12,
136:18, 142:9,
143:11, 143:15,
143:22, 150:4,
153:16, 155:5,
157:13, 158:19,
159:4, 159:12, 160:7,
164:13, 165:6, 165:19
**job** [5] - 46:5, 47:15,
53:25, 54:1, 77:5
**jobs** [3] - 45:24,
119:12, 170:12
**Jonas** [44] - 13:24,
14:13, 14:18, 14:22,
15:22, 17:21, 21:9,
23:19, 25:21, 28:23,
32:20, 34:25, 36:14,
36:22, 42:4, 43:7,
43:23, 45:11, 46:2,
50:12, 52:6, 52:9,
53:13, 54:24, 62:16,
63:3, 64:21, 65:19,
67:1, 67:2, 67:5,
68:25, 82:20, 92:1,
94:4, 99:12, 102:23,
104:3, 128:11, 131:2,
131:8, 133:13,
136:13, 140:1
**JONAS** [3] - 14:13,
163:7, 163:15
**Jonas'** [1] - 76:20
**judges** [1] - 55:14
**judgment** [2] - 55:13,
145:20
**June** [2] - 23:3, 23:4

**K**

**keep** [6] - 35:11,

82:19, 113:17, 139:8,
156:14, 167:14
**keepsakes** [2] -
22:23, 35:12
**kept** [5] - 137:5,
139:18, 146:4, 156:14
**KESH** [9] - 103:3,
103:7, 103:14,
105:12, 105:15,
105:22, 106:7, 106:10
**Kesh** [2] - 103:3,
103:7
**kick** [3] - 81:17,
81:19, 81:21
**kicked** [1] - 95:25
**kicking** [1] - 95:24
**kids** [3] - 62:22,
121:12, 123:22
**kind** [27] - 5:15, 7:8,
7:11, 19:18, 22:1,
22:5, 24:4, 26:9,
26:18, 29:5, 35:11,
35:15, 42:17, 47:23,
48:19, 51:6, 53:15,
54:6, 78:11, 116:10,
121:4, 136:9, 144:17,
156:13, 167:22,
167:23
**kinds** [1] - 59:9
**Kinnelon** [52] - 9:23,
15:3, 15:6, 15:15,
28:3, 34:8, 40:13,
55:1, 55:5, 55:21,
56:18, 57:8, 57:16,
57:21, 57:24, 58:1,
58:4, 58:14, 58:15,
59:25, 60:10, 60:12,
63:7, 63:9, 91:1, 91:2,
96:17, 96:24, 98:3,
98:7, 99:11, 107:7,
107:23, 114:22,
126:21, 126:25,
127:5, 127:9, 128:9,
139:6, 139:14, 140:6,
152:3, 157:14,
163:13, 164:5, 164:9,
165:1, 166:10,
166:13, 168:10,
168:13
**kitchen** [3] - 26:1,
26:7, 126:7
**knowing** [1] - 60:21
**knowledge** [5] -
77:13, 101:23,
122:20, 160:2, 164:16
**known** [1] - 113:10
**knows** [1] - 106:11
**Korcha** [1] - 162:1

## L

**lack** [1] - 146:6
**lady** [1] - 105:23
**Lakeside** [1] - 51:20
**land** [2] - 120:7, 137:3
**landscaping** [1] - 56:5
**Lane** [15] - 5:4, 7:6, 24:1, 24:9, 25:14, 67:17, 67:23, 67:24, 74:3, 100:19, 103:8, 116:6, 116:24, 135:7, 162:23
**language** [1] - 43:24
**large** [5] - 71:22, 72:2, 72:3, 146:17, 146:21
**last** [12] - 23:4, 25:15, 25:17, 30:1, 102:15, 126:20, 126:24, 135:24, 137:4, 168:18, 169:1
**late** [4] - 39:6, 138:23, 141:5, 159:8
**laundry** [2] - 26:11, 51:7
**Law** [3] - 76:14, 76:17, 143:16
**law** [3] - 44:14, 44:16, 44:17
**Lawn** [6] - 15:11, 31:19, 55:2, 55:4, 102:8, 152:3
**laws** [1] - 128:8
**layer** [1] - 51:15
**lead** [3] - 85:14, 146:23, 147:18
**leading** [3] - 85:7, 85:8, 112:23
**leads** [2] - 144:22, 147:24
**learn** [5] - 8:13, 8:14, 96:6, 111:2, 111:3
**learned** [1] - 150:5
**learning** [1] - 108:8
**lease** [9] - 16:1, 16:2, 57:4, 59:15, 59:18, 127:15, 127:16, 127:22, 128:2
**least** [6] - 79:1, 89:9, 111:23, 111:24, 122:25, 130:1
**leave** [30] - 43:20, 44:11, 45:7, 58:23, 80:20, 82:1, 83:12, 84:20, 85:16, 85:17, 85:21, 86:8, 86:15,

86:17, 86:21, 87:12, 87:23, 88:13, 88:15, 92:13, 96:8, 97:14, 101:8, 101:11, 101:15, 109:3, 109:24, 164:10, 165:7
**leaves** [1] - 148:3
**leaving** [3] - 111:15, 123:7, 148:21
**left** [3] - 47:4, 59:20
**legal** [5] - 51:18, 81:16, 127:16, 127:25, 136:9, 165:12
**legalities** [1] - 81:19
**legality** [2] - 41:14, 42:1
**length** [4] - 47:16, 50:23, 51:11, 59:18
**less** [9] - 30:7, 30:11, 30:12, 30:14, 46:16, 93:3, 107:24, 148:2, 165:1
**letter** [7] - 10:24, 52:12, 53:3, 105:25, 137:19, 172:25, 173:2
**level** [18] - 37:12, 41:17, 45:14, 46:11, 46:13, 47:6, 47:21, 47:22, 47:23, 48:15, 48:25, 49:8, 117:11, 117:12, 117:25, 131:15, 156:9
**levels** [1] - 48:7
**library** [1] - 119:17
**license** [6] - 21:4, 21:7, 21:10, 54:3, 61:1, 147:14
**licensed** [18] - 9:7, 9:10, 15:8, 16:5, 20:6, 52:15, 113:25, 153:17, 154:2, 154:3, 154:4, 154:5, 154:6, 154:14, 154:18, 154:19, 154:21
**licenses** [4] - 20:9, 20:10, 20:20, 20:21
**Licenses** [1] - 20:18
**licensing** [2] - 60:13, 61:10
**life** [11] - 17:23, 18:7, 19:8, 19:15, 19:17, 49:21, 62:25, 72:25, 108:9, 145:3, 163:20
**lights** [1] - 73:18
**likely** [5] - 31:25, 43:16, 73:5, 117:5, 159:17
**limit** [2] - 66:20, 118:16
**limited** [1] - 161:13

**limits** [1] - 124:17
**line** [1] - 123:25
**lining** [1] - 60:6
**LinkedIn** [1] - 132:12
**liquor** [1] - 108:3
**Liquors** [1] - 107:24
**list** [1] - 35:4
**listed** [1] - 132:17
**listen** [1] - 118:20
**literally** [1] - 105:6
**live** [38] - 8:6, 8:13, 9:13, 9:23, 10:18, 10:22, 10:23, 12:3, 16:13, 18:12, 19:6, 19:21, 19:22, 29:20, 29:23, 30:22, 43:5, 50:23, 52:13, 55:14, 56:7, 58:22, 62:22, 78:17, 97:10, 97:12, 99:10, 102:21, 103:3, 107:17, 107:18, 118:12, 125:14, 145:2, 163:1, 165:10
**lived** [2] - 126:24, 169:9
**lives** [6] - 51:5, 69:9, 111:4, 120:21, 147:2, 149:8
**living** [93] - 7:5, 7:6, 8:4, 8:7, 8:8, 8:11, 9:6, 9:7, 10:21, 11:6, 11:23, 14:24, 15:17, 15:21, 16:6, 16:10, 16:11, 16:19, 18:1, 19:15, 22:2, 22:17, 26:1, 29:18, 33:24, 33:25, 35:1, 36:9, 39:15, 40:23, 45:25, 46:5, 49:14, 49:16, 51:23, 52:1, 52:13, 54:8, 55:9, 55:14, 59:11, 59:12, 65:15, 76:16, 76:18, 102:21, 102:22, 108:2, 111:3, 111:8, 115:3, 115:4, 115:5, 116:11, 117:14, 118:22, 119:5, 120:13, 120:23, 120:24, 126:6, 127:19, 143:25, 144:4, 144:5, 144:8, 144:11, 144:14, 144:18, 145:12, 145:14, 145:22, 146:3, 146:10, 146:16, 146:19, 147:5, 147:10, 147:12, 150:15, 151:7, 151:20, 156:10,

158:25, 159:23, 160:6, 160:9, 162:3, 163:18, 163:19, 163:22, 165:10, 167:5
**livings** [3] - 55:24, 64:17, 147:1
**LLC** [4] - 5:5, 15:10, 21:6, 131:24
**LLC's** [1] - 14:20
**local** [3] - 17:8, 158:20, 159:14
**locally** [1] - 59:5
**located** [2] - 24:2, 57:25
**location** [9] - 15:7, 15:8, 15:13, 16:16, 16:22, 57:9, 84:6, 139:9, 163:12
**lock** [2] - 10:17, 42:10
**locks** [2] - 42:12, 130:15
**LOCKWOOD** [48] - 5:3, 5:8, 5:19, 5:23, 6:4, 6:7, 6:12, 6:15, 12:1, 12:9, 12:17, 28:10, 28:13, 38:7, 52:6, 53:12, 64:20, 66:19, 67:11, 67:21, 78:15, 99:4, 99:7, 103:1, 103:5, 106:12, 106:15, 119:6, 126:8, 127:11, 140:11, 140:18, 142:21, 142:23, 148:16, 151:3, 151:22, 152:7, 152:13, 156:24, 157:4, 158:14, 162:20, 168:4, 168:8, 170:19, 171:9, 171:21
**logos** [2] - 32:14, 32:15
**loneliness** [1] - 146:7
**long-term** [5] - 53:22, 53:23, 54:6, 59:14, 145:8
**longest** [2] - 98:2, 98:14
**longitudinal** [1] - 168:1
**look** [20] - 7:10, 53:18, 53:22, 54:5, 85:10, 88:21, 101:17, 105:19, 105:20, 110:13, 113:8, 120:1, 120:5, 123:2, 125:8, 125:14, 125:25, 138:11, 155:12, 173:1
**looked** [2] - 60:13,

119:22
**looking** [10] - 12:12, 24:17, 25:4, 25:7, 27:2, 56:12, 117:10, 118:9, 139:3, 166:1
**looks** [4] - 49:21, 86:8
**lost** [1] - 18:6
**loud** [1] - 65:1
**loved** [3] - 18:24, 19:3, 22:21
**lower** [2] - 40:9, 49:19

## M

**Ma'am** [2] - 106:16, 119:7
**Mahoney** [1] - 162:1
**Mahwah** [13] - 58:2, 60:8, 61:9, 63:8, 64:5, 119:21, 128:5, 128:6, 164:6, 165:2, 166:14, 166:17, 166:23
**mail** [2] - 22:16, 171:16
**main** [3] - 40:19, 80:5, 111:9
**mainstream** [1] - 9:5
**maintain** [3] - 164:4, 164:7, 167:9
**maintaining** [1] - 147:25
**maintenance** [1] - 5:21
**major** [10] - 42:6, 42:8, 44:16, 45:3, 56:23, 95:24, 103:13, 103:14, 104:4, 145:2
**majority** [1] - 102:4
**MALETSKY** [54] - 6:3, 6:9, 39:7, 39:21, 40:13, 56:24, 57:2, 57:7, 57:14, 57:20, 57:23, 58:3, 58:6, 58:13, 59:11, 59:14, 59:17, 59:23, 71:20, 75:22, 76:1, 92:11, 92:19, 92:23, 93:1, 93:10, 115:17, 115:22, 116:4, 116:25, 117:4, 117:16, 118:3, 118:15, 122:24, 123:6, 123:11, 123:16, 124:7, 155:3, 155:8, 155:11, 155:22, 156:4, 156:13, 156:23,

165:21, 166:7, 166:22, 167:7, 167:12, 167:18, 168:3, 173:5
**man** [4] - 33:6, 34:14, 34:15, 114:14
**manage** [2] - 54:11, 131:10
**manageability** [1] - 18:7
**management** [1] - 155:20
**manager** [3] - 46:15, 116:19, 117:8
**managing** [2] - 53:20, 72:22
**mandated** [1] - 41:5
**manual** [1] - 100:13
**map** [1] - 13:23
**March** [5] - 16:3, 16:21, 60:9, 60:14
**marijuana** [3] - 41:10, 41:13, 41:24
**mark** [5] - 20:16, 23:6, 23:8, 36:19, 142:15
**marked** [5] - 20:18, 23:7, 23:18, 36:21, 142:16
**Master's** [3] - 141:22, 141:24
**match** [2] - 33:2, 117:16
**material** [3] - 100:1, 100:3, 100:4
**materials** [1] - 99:24
**math** [1] - 79:2
**matter** [6] - 54:17, 71:8, 73:12, 73:15, 118:21, 136:15
**maximum** [7] - 21:12, 30:5, 30:7, 30:12, 30:14, 33:4, 147:13
**McDonald's** [1] - 13:17
**meals** [3] - 10:19, 35:5, 146:2
**mean** [47] - 7:15, 19:9, 36:10, 38:9, 38:22, 42:17, 42:18, 49:15, 50:19, 51:1, 51:11, 53:6, 53:25, 58:24, 59:8, 63:13, 63:16, 69:9, 70:18, 72:2, 74:10, 75:7, 75:14, 94:11, 100:16, 101:19, 101:20, 101:22, 103:16, 107:3, 107:4, 109:20,

110:13, 111:8, 112:12, 113:16, 118:18, 119:1, 123:11, 125:8, 125:22, 153:14, 163:1, 163:3, 165:25, 166:1, 167:25
**means** [3] - 12:7, 63:16, 140:18
**meant** [2] - 20:1, 22:7
**measures** [2] - 128:19, 130:9
**meat** [1] - 5:14
**mechanics** [1] - 9:14
**medical** [7] - 40:7, 81:7, 81:8, 81:10, 86:4, 104:9, 159:19
**medically** [1] - 105:3
**Meese** [2] - 5:12, 6:24
**meet** [11] - 28:24, 152:19, 152:21, 152:24, 153:6, 153:18, 154:12, 155:17, 155:18, 155:19, 155:25
**meeting** [8] - 26:24, 59:3, 59:4, 59:5, 66:22, 154:9, 171:10, 171:15
**meetings** [3] - 43:1, 43:2, 43:6
**meets** [1] - 29:13
**Megan's** [2] - 76:14, 76:17
**member** [5] - 27:17, 35:20, 35:22, 109:17, 119:15
**members** [17] - 6:5, 6:13, 31:5, 31:8, 46:8, 46:9, 64:15, 92:24, 93:11, 110:9, 112:9, 115:4, 115:9, 115:10, 130:5, 130:6, 145:21
**men** [8] - 21:15, 21:17, 32:24, 34:12, 130:7, 130:12, 132:24, 133:24
**mental** [8] - 141:19, 141:24, 142:5, 142:8, 142:11, 143:2, 144:24, 156:21
**Mental** [2] - 143:20, 144:21
**mention** [2] - 75:4, 162:15
**mentioned** [15] - 7:23, 38:8, 46:7, 57:7, 65:6, 72:11, 145:25,

148:1, 148:25, 150:16, 151:10, 161:9, 161:21, 169:7
**mentorship** [1] - 149:21
**Mericle** [1] - 162:1
**met** [5] - 9:20, 9:24, 10:10, 11:19, 143:8
**metrics** [1] - 164:5
**microphone** [1] - 67:14
**midnight** [5] - 31:11, 33:15, 33:18, 33:23, 34:2
**might** [17] - 34:7, 68:11, 73:4, 88:2, 95:20, 95:23, 97:14, 101:4, 103:21, 140:6, 156:20, 156:21, 156:22, 166:22, 166:23, 173:1
**mile** [1] - 107:24
**miles** [1] - 55:3
**Miller** [1] - 139:7
**million** [1] - 143:6
**mind** [4] - 38:7, 78:24, 113:17, 170:16
**minds** [1] - 56:1
**minimal** [4] - 11:20, 110:16, 111:15, 111:22
**minimum** [4] - 81:2, 81:3, 110:7, 154:22
**minivan** [3] - 26:21, 32:7, 80:8
**minor** [2] - 37:24, 89:2
**minute** [2] - 98:14, 126:11
**minutes** [3] - 60:9, 75:16, 128:7
**mis** [1] - 131:15
**mis-explanation** [1] - 131:15
**misleading** [1] - 84:1
**misled** [1] - 131:21
**mission** [1] - 14:20
**misspoke** [1] - 94:19
**mistake** [1] - 85:12
**misunderstand** [1] - 162:23
**misunderstanding** [1] - 70:3
**misunderstood** [3] - 79:24, 88:1, 88:2
**misuse** [1] - 144:24
**mix** [1] - 33:2
**mixed** [2] - 156:8
**mixture** [1] - 156:11
**model** [1] - 144:16

**MOEHRLE** [18] - 127:13, 128:3, 128:12, 128:15, 128:23, 129:2, 129:19, 130:2, 130:16, 131:22, 132:6, 132:10, 132:13, 132:21, 133:9, 133:21, 134:12, 135:3
**Moehrle** [1] - 127:13
**moment** [7] - 48:2, 85:20, 92:14, 100:11, 127:17, 160:20, 160:22
**moments** [1] - 145:18
**Monday** [4] - 59:1, 72:21, 114:6
**MONDELLO** [18] - 50:12, 51:17, 52:5, 54:24, 55:17, 61:20, 63:12, 64:22, 67:9, 70:12, 71:3, 124:3, 148:20, 149:11, 150:1, 151:24, 152:2, 152:6
**money** [2] - 120:20, 134:8
**monitor** [1] - 125:13
**monitored** [2] - 125:6, 125:8
**monitoring** [1] - 48:21
**Montclair** [2] - 141:25, 142:1
**month** [6] - 58:10, 168:17, 168:18, 168:24, 169:1, 173:6
**months** [2] - 58:11, 82:8
**months'** [1] - 49:15
**moon** [2] - 28:16, 108:24
**morning** [4] - 39:6, 77:9, 77:21
**Morris** [5] - 11:3, 143:23, 157:12, 158:3, 158:5
**most** [25] - 18:20, 22:22, 31:25, 42:20, 43:3, 43:16, 50:4, 54:20, 54:21, 54:22, 56:11, 70:1, 73:5, 83:19, 110:7, 111:12, 112:1, 114:20, 117:5, 120:18, 147:11, 151:25, 152:4, 156:4, 156:18
**mostly** [2] - 70:16,

147:11
**mother** [2] - 7:15, 109:17
**motion** [8] - 5:25, 6:1, 6:6, 6:8, 6:9, 6:14, 27:20, 34:5
**motions** [1] - 19:18
**move** [2] - 33:2, 48:24, 119:12, 123:24, 139:9, 166:12, 166:16
**movement** [1] - 29:25
**movies** [1] - 59:8
**moving** [4] - 32:25, 34:1, 34:2, 80:11
**MR** [317] - 5:6, 5:10, 5:20, 6:17, 6:20, 6:22, 12:20, 13:10, 13:22, 14:6, 14:7, 14:8, 14:9, 14:11, 14:13, 14:15, 14:16, 17:1, 17:19, 17:20, 20:15, 23:5, 23:15, 27:8, 27:21, 28:21, 32:6, 32:10, 32:13, 32:19, 34:24, 36:18, 38:18, 40:20, 41:15, 42:3, 43:7, 43:14, 43:22, 44:13, 45:9, 45:10, 46:21, 48:1, 50:12, 51:17, 51:18, 52:5, 52:21, 54:4, 54:24, 55:17, 56:4, 57:18, 59:21, 60:2, 60:16, 61:4, 61:13, 61:18, 61:20, 61:24, 62:3, 62:11, 62:16, 63:2, 63:12, 64:22, 65:3, 65:10, 65:12, 65:13, 65:25, 66:16, 66:17, 66:23, 67:9, 67:20, 68:22, 68:25, 69:18, 69:23, 70:12, 71:3, 71:25, 74:16, 74:19, 75:14, 75:25, 76:3, 76:10, 76:19, 77:18, 78:11, 78:13, 78:17, 79:8, 79:12, 79:15, 79:16, 79:23, 80:15, 80:18, 80:25, 81:6, 81:14, 81:24, 82:10, 82:14, 82:18, 82:20, 82:23, 83:4, 83:9, 83:18, 83:21, 84:4, 84:9, 84:14, 84:19, 84:24, 85:4, 85:11, 85:14, 85:22, 86:2, 86:7, 86:13, 86:19, 87:9, 87:15, 88:1, 88:9,

88:16, 89:7, 89:24, 90:5, 90:12, 90:21, 90:22, 92:1, 93:20, 94:4, 94:11, 94:18, 94:21, 94:23, 95:3, 95:7, 95:11, 95:14, 95:18, 96:4, 96:16, 96:20, 96:22, 97:2, 97:6, 97:20, 98:1, 98:7, 98:8, 98:15, 98:20, 98:23, 99:2, 99:9, 99:20, 99:23, 100:2, 100:15, 100:17, 100:22, 100:23, 101:14, 101:24, 102:3, 102:11, 102:14, 102:17, 102:23, 103:3, 103:7, 103:13, 103:14, 104:2, 105:12, 105:15, 105:22, 106:5, 106:7, 106:9, 106:10, 110:19, 112:21, 113:19, 114:13, 121:19, 122:6, 122:14, 123:25, 124:3, 124:13, 125:10, 126:10, 126:14, 126:16, 127:7, 127:21, 128:10, 128:13, 128:21, 128:25, 129:6, 129:9, 129:15, 129:25, 130:11, 130:25, 131:7, 133:12, 135:4, 135:11, 135:13, 135:15, 136:2, 136:8, 137:7, 137:11, 137:23, 138:4, 139:13, 139:16, 140:8, 140:17, 140:20, 140:22, 140:25, 141:3, 141:5, 141:6, 141:9, 141:13, 141:14, 142:22, 148:18, 148:20, 149:11, 150:1, 150:2, 150:7, 150:10, 150:16, 150:21, 151:2, 151:24, 152:2, 152:6, 157:17, 158:2, 158:16, 158:22, 159:3, 159:5, 159:7, 159:11, 159:22, 160:5, 160:12, 160:17, 160:24, 161:4, 161:9, 161:18, 161:22, 162:5, 162:8, 162:12, 162:18,

163:7, 163:11, 163:15, 164:15, 164:20, 166:5, 167:2, 168:6, 168:9, 168:15, 168:17, 168:23, 169:1, 169:4, 169:11, 169:15, 169:18, 169:21, 170:1, 170:5, 170:11, 170:14, 170:18, 170:22, 171:12, 171:18, 171:22, 171:24, 171:25, 172:1, 172:5, 172:7, 172:11, 172:16, 172:20, 172:21, 172:23, 173:4

**MS** [231] - 6:1, 6:3, 6:9, 6:11, 11:25, 12:2, 12:14, 12:19, 13:5, 13:20, 14:4, 16:20, 17:17, 28:16, 30:18, 30:24, 31:10, 31:13, 31:19, 31:22, 32:14, 33:9, 33:18, 34:10, 34:21, 36:22, 37:18, 39:7, 39:21, 40:1, 40:7, 40:13, 41:4, 41:9, 41:20, 46:4, 47:16, 52:9, 53:11, 53:14, 56:24, 57:2, 57:7, 57:14, 57:20, 57:23, 58:3, 58:6, 58:13, 59:11, 59:14, 59:17, 59:23, 59:24, 60:4, 60:18, 61:6, 61:15, 61:22, 62:1, 62:9, 62:15, 63:1, 64:2, 67:16, 67:23, 68:14, 68:17, 69:7, 71:20, 72:10, 72:16, 73:8, 73:16, 73:23, 74:9, 74:13, 74:18, 75:12, 75:22, 76:1, 76:8, 76:12, 76:24, 77:8, 77:14, 77:20, 78:3, 78:6, 78:9, 78:12, 92:11, 92:19, 92:23, 93:1, 93:10, 104:22, 105:3, 105:7, 106:13, 106:17, 107:11, 107:16, 108:2, 108:13, 108:24, 109:5, 109:11, 109:16, 109:19, 110:12, 111:24, 112:11, 112:18, 112:22, 113:2, 113:15, 114:3, 114:8, 114:15, 115:17, 115:22, 116:4, 116:25, 117:4,

117:16, 118:3, 118:15, 118:16, 119:8, 119:24, 120:9, 120:19, 121:5, 121:20, 122:8, 122:16, 122:18, 122:22, 122:24, 123:6, 123:11, 123:16, 123:19, 124:6, 124:7, 124:21, 124:25, 125:2, 125:5, 125:17, 125:24, 126:4, 127:13, 128:3, 128:12, 128:15, 128:23, 129:2, 129:19, 130:2, 130:16, 131:22, 132:6, 132:10, 132:13, 132:21, 133:9, 133:21, 134:12, 135:3, 135:6, 135:24, 136:3, 136:25, 137:8, 137:14, 137:18, 138:6, 138:13, 138:19, 138:22, 139:4, 139:15, 139:25, 140:1, 140:9, 151:5, 151:9, 151:21, 152:11, 152:14, 152:22, 153:3, 153:8, 153:11, 153:23, 154:8, 154:12, 154:20, 154:24, 155:2, 155:3, 155:8, 155:11, 155:22, 156:4, 156:13, 156:23, 157:1, 157:5, 157:11, 157:20, 158:6, 158:11, 162:22, 163:1, 163:9, 164:4, 164:25, 165:5, 165:14, 165:20, 165:21, 166:7, 166:22, 166:7, 167:12, 167:18, 168:3, 173:5

**Mulberry** [5] - 58:2, 96:18, 96:21, 128:4, 166:16

**multilevel** [1] - 162:3
**multiple** [2] - 70:10, 121:23
**municipalities** [1] - 55:6
**municipality** [2] - 10:4, 10:5
**must** [1] - 120:22

# N

**NA** [1] - 59:4
**name** [16] - 5:11, 14:12, 14:21, 67:15, 78:16, 99:8, 99:10, 103:6, 126:15, 126:16, 135:4, 141:10, 152:13, 157:4, 158:15, 162:2
**names** [1] - 161:22
**Nancy** [4] - 106:13, 106:17, 152:14, 157:5
**Narcan** [10] - 130:23, 130:24, 131:2, 131:5, 132:1, 132:17, 134:13, 134:15, 134:24
**Narcotics** [1] - 59:4
**National** [1] - 143:6
**national** [1] - 164:6
**nature** [3] - 10:7, 129:17, 160:10
**navigate** [1] - 164:3
**near** [1] - 119:9
**necessarily** [8] - 19:3, 19:7, 34:14, 42:1, 50:22, 69:14, 91:25, 105:4
**necessary** [3] - 9:4, 9:17, 9:22
**need** [25] - 5:18, 12:23, 14:24, 17:12, 28:1, 32:25, 50:10, 50:18, 60:21, 61:1, 72:5, 72:19, 73:2, 101:5, 112:1, 117:10, 117:12, 117:13, 118:6, 132:15, 133:10, 134:14, 134:20, 135:21
**needed** [2] - 39:25, 63:20
**needs** [6] - 40:25, 73:1, 92:13, 136:11, 136:15, 156:17
**negative** [2] - 11:20, 148:7
**neighborhood** [3] - 58:21, 95:12, 107:7
**neighbors** [1] - 36:5
**network** [1] - 167:14
**neutral** [1] - 147:5
**never** [12] - 28:18, 30:16, 33:6, 34:22, 63:9, 77:7, 89:8, 111:11, 121:15, 134:21, 139:20, 170:6
**New** [14] - 11:2, 20:3,

21:13, 55:25, 99:11, 102:5, 102:7, 136:18, 143:11, 143:15, 143:22, 153:16, 157:13
**new** [17] - 5:3, 33:13, 33:14, 87:22, 87:23, 88:25, 89:4, 89:5, 89:6, 90:16, 90:17, 90:18, 131:2, 135:17, 140:21
**newer** [1] - 149:22
**news** [1] - 123:4
**next** [16] - 19:1, 25:13, 46:19, 47:9, 49:8, 66:21, 75:16, 101:12, 103:4, 126:17, 129:24, 135:10, 140:15, 171:10, 171:14, 173:6
**next-door** [2] - 103:4, 126:17
**nice** [3] - 55:25, 56:15, 107:4
**nicest** [1] - 56:12
**NICOSIA** [17] - 32:6, 32:10, 32:13, 44:13, 45:9, 65:3, 65:12, 66:16, 148:18, 150:2, 150:10, 150:16, 150:21, 151:2, 164:15, 164:20, 166:5
**night** [4] - 59:1, 75:19, 110:9, 114:17
**nighttime** [1] - 37:16
**nobody** [5] - 38:4, 72:19, 122:19, 157:8, 170:5
**non** [1] - 89:19
**nondiscriminative** [1] - 56:16
**none** [3] - 10:9, 102:9, 140:13
**norm** [3] - 98:24, 99:1, 166:3
**normal** [2] - 69:2, 113:11
**North** [15] - 15:10, 31:17, 42:20, 102:10, 116:12, 142:9, 150:4, 155:4, 158:19, 159:4, 159:12, 160:7, 164:13, 165:6, 165:19
**north** [1] - 98:10
**note** [2] - 9:9, 163:15
**nothing** [8] - 29:19, 38:14, 42:8, 73:6, 93:7, 104:21, 110:2, 119:17
**notice** [10] - 6:18,

17:15, 40:22, 60:8, 61:19, 106:5, 128:14, 139:20, 171:13, 171:17
**noticed** [1] - 39:8
**notification** [1] - 44:18
**notified** [2] - 106:2, 135:25
**notion** [2] - 17:9, 133:19
**notwithstanding** [2] - 8:22, 52:14
**November** [3] - 16:4, 16:23, 57:1
**number** [30] - 5:4, 10:19, 17:2, 30:14, 30:16, 34:19, 44:17, 68:3, 69:5, 71:1, 84:2, 85:9, 85:10, 86:25, 94:7, 94:15, 96:19, 110:11, 123:12, 123:17, 123:18, 124:7, 124:16, 132:16, 132:17, 145:15, 147:13, 154:1, 161:14
**numbers** [2] - 161:2, 161:5
**nuts** [1] - 120:3

**O**

**o'clock** [5] - 77:9, 77:11, 114:16, 120:3
**object** [2] - 62:12, 68:23
**objecting** [1] - 129:25
**objection** [1] - 129:7
**obligation** [1] - 81:16
**observation** [2] - 48:20, 105:23
**observe** [1] - 169:22
**observed** [1] - 170:7
**obtained** [2] - 29:1, 40:25
**obtaining** [1] - 7:21
**obviously** [8] - 30:11, 35:6, 40:25, 41:13, 41:22, 45:5, 107:9, 159:19
**occasions** [1] - 103:9
**occupancy** [2] - 17:13, 21:12
**occur** [2] - 110:6, 114:17
**occurred** [7] - 81:25,

83:19, 87:16, 88:10, 88:11, 93:24, 94:20
**occurrence** [1] - 88:11
**occurs** [1] - 90:12
**October** [1] - 106:1
**odds** [1] - 43:19
**offense** [1] - 133:21
**offensive** [1] - 133:20
**offer** [2] - 76:6, 76:7
**offering** [1] - 8:10
**offers** [2] - 145:16, 145:24
**office** [3] - 26:10, 55:4, 167:21
**often** [7] - 44:19, 69:3, 82:5, 82:6, 114:3, 154:20, 156:13
**older** [1] - 143:7
**once** [19] - 9:24, 18:21, 28:15, 67:3, 68:3, 88:14, 90:2, 90:15, 92:4, 101:22, 108:23, 120:12, 154:23, 155:24, 156:1, 158:12, 158:13, 168:21, 168:22
**One** [1] - 34:17
**one** [138] - 7:22, 8:8, 10:14, 10:17, 10:23, 12:20, 12:21, 13:24, 18:24, 19:3, 20:22, 23:25, 25:13, 25:15, 25:17, 27:10, 27:11, 27:16, 32:3, 32:4, 32:9, 34:6, 34:15, 38:6, 40:5, 40:6, 40:9, 40:15, 40:25, 41:13, 41:16, 41:21, 46:19, 49:20, 49:21, 50:14, 50:15, 52:17, 53:14, 56:11, 56:12, 57:8, 58:1, 58:2, 58:14, 60:1, 62:19, 63:9, 65:3, 67:9, 68:10, 68:21, 70:19, 70:22, 71:23, 72:11, 73:4, 73:5, 75:16, 78:21, 79:5, 79:13, 80:4, 80:7, 80:10, 84:10, 88:5, 91:18, 91:19, 92:8, 93:17, 93:18, 95:20, 97:8, 97:25, 101:15, 105:22, 108:4, 110:23, 111:12, 111:24, 113:24, 114:23, 115:25, 117:24,

118:22, 119:21, 121:18, 122:11, 122:12, 123:7, 123:8, 128:4, 128:5, 129:6, 131:13, 132:16, 132:17, 134:13, 135:11, 138:6, 138:15, 139:7, 139:17, 145:2, 145:20, 145:23, 146:21, 147:21, 147:24, 148:3, 149:7, 149:9, 149:10, 149:17, 151:15, 152:15, 154:24, 157:13, 160:25, 161:6, 161:25, 162:5, 162:8, 163:18, 163:23, 163:25, 166:8, 166:13, 167:5, 168:13, 169:23, 170:15, 171:22
**one's** [2] - 92:8, 93:4
**ones** [7] - 22:21, 41:7, 116:15, 118:25, 151:15, 153:23, 153:24
**open** [5] - 26:4, 26:9, 67:4, 76:5, 152:9
**opened** [2] - 14:23, 73:14
**opening** [2] - 5:15, 55:9
**operate** [11] - 7:4, 10:12, 15:19, 17:8, 37:12, 46:14, 60:21, 68:1, 68:7, 97:9, 106:3
**operated** [1] - 17:12
**operates** [5] - 10:14, 11:7, 39:1, 48:19, 50:25
**operating** [6] - 13:15, 16:22, 16:24, 61:22, 63:14, 63:22
**operation** [14] - 11:11, 13:21, 15:19, 15:20, 17:15, 32:4, 40:23, 56:2, 61:16, 63:3, 73:1, 82:4, 129:10, 129:18
**operational** [7] - 11:10, 17:2, 42:5, 100:9, 125:21, 159:1, 161:16
**operationally** [1] - 72:5
**operations** [3] - 84:6, 84:15, 158:23
**operator** [2] - 20:24,

22:3
**operators** [2] - 17:6, 21:23
**opinion** [1] - 161:12
**opinions** [6] - 67:7, 76:7, 170:23, 170:25, 171:2, 171:3
**opportunities** [1] - 9:23
**opportunity** [8] - 9:18, 46:23, 64:24, 74:22, 90:16, 91:1, 124:4, 147:21
**opposed** [4] - 50:17, 55:1, 55:5, 157:2
**option** [2] - 101:15, 101:19
**options** [2] - 151:12, 151:15
**order** [23] - 9:22, 29:8, 68:3, 68:7, 68:10, 68:11, 68:12, 68:16, 69:9, 69:10, 69:12, 69:19, 69:22, 70:5, 72:25, 73:4, 134:10, 136:10, 146:4, 153:15, 169:12
**ordered** [3] - 69:11, 70:20, 157:3
**ordering** [4] - 35:6, 68:6, 72:15, 72:19
**orders** [4] - 68:7, 69:19, 69:21, 72:14
**ordinance** [2] - 41:2, 139:14
**organization** [2] - 52:7, 145:1
**ourselves** [1] - 103:24
**outburst** [1] - 105:4
**outcomes** [3] - 162:4, 165:13, 167:16
**outdoor** [2] - 58:15, 139:22
**outpatient** [14] - 8:6, 15:13, 18:25, 47:1, 48:6, 48:7, 48:8, 48:11, 48:25, 102:6, 116:13, 117:11, 117:12
**outside** [11] - 26:24, 43:5, 47:25, 49:4, 59:3, 100:8, 107:5, 125:2, 125:4, 126:3, 139:18
**overall** [2] - 117:24, 165:13
**overdose** [1] - 74:4
**overlying** [1] - 114:24

**overnight** [29] - 27:18, 28:17, 28:20, 31:6, 31:9, 32:3, 32:5, 33:22, 34:6, 46:9, 46:10, 64:15, 79:1, 79:2, 79:6, 79:7, 79:9, 79:10, 79:13, 79:17, 79:19, 79:20, 79:21, 93:2, 93:4, 93:6, 93:8, 110:10, 138:14
**oversee** [2] - 122:11, 152:25, 153:3
**overseeing** [1] - 122:1
**oversight** [5] - 21:20, 21:23, 21:24, 110:24, 122:19
**overstated** [1] - 69:17
**own** [22] - 15:23, 27:22, 35:12, 37:4, 38:16, 43:4, 48:19, 50:1, 58:24, 58:25, 72:15, 72:17, 72:18, 77:9, 78:7, 88:13, 93:12, 110:25, 111:16, 138:9, 150:8, 157:8
**owner** [9] - 13:7, 14:4, 15:2, 15:9, 20:22, 21:1, 31:16, 55:19, 60:14

**P**

**p.m** [11] - 5:1, 36:3, 36:23, 37:13, 38:3, 38:4, 93:6, 126:12, 126:13, 171:15, 173:7
**package** [1] - 72:20
**packaged** [1] - 70:18
**packages** [2] - 38:12, 70:21
**page** [1] - 52:11
**paid** [3] - 120:22, 134:3
**Palisade** [1] - 5:4
**Palisades** [31] - 5:13, 6:25, 7:1, 7:17, 13:13, 13:25, 14:19, 15:2, 15:18, 15:22, 15:25, 16:2, 21:6, 22:4, 26:19, 29:7, 32:17, 36:19, 43:12, 43:20, 44:11, 78:6, 97:23, 97:24, 97:25, 127:23, 131:24, 150:6, 158:24, 167:6, 171:13
**paper** [2] - 132:2, 132:7

**papers** [1] - 39:15

**parallel** [2] - 106:18, 107:17

**pardon** [1] - 57:20

**parent** [1] - 22:7

**parents** [2] - 18:24, 22:4

**park** [12] - 27:2, 27:6, 28:3, 28:5, 31:15, 31:18, 31:22, 76:25, 77:10, 77:24, 119:13, 119:16

**parked** [15] - 26:20, 27:17, 27:25, 28:18, 28:19, 29:6, 73:25, 78:5, 79:1, 79:2, 79:7, 79:10, 79:16, 79:18, 123:1

**parking** [6] - 26:14, 28:1, 31:21, 32:1, 77:3, 139:23

**part** [27] - 8:11, 12:13, 18:21, 22:22, 38:16, 41:25, 51:12, 69:2, 70:1, 82:4, 83:14, 91:13, 94:17, 108:7, 111:7, 111:9, 114:20, 118:14, 139:23, 151:9, 151:13, 151:25, 152:4, 156:18, 172:14

**partaking** [1] - 39:4

**partial** [2] - 48:9, 48:10

**partially** [1] - 131:1

**participate** [2] - 51:2, 155:16

**participates** [1] - 51:1

**particular** [17] - 37:2, 39:13, 39:24, 40:10, 40:12, 46:8, 52:18, 52:25, 55:21, 63:4, 93:22, 107:8, 111:22, 115:18, 115:24, 144:7, 156:17

**particularly** [1] - 38:5

**partner** [2] - 5:11, 6:24

**parts** [2] - 25:23, 35:14

**pass** [9] - 37:3, 37:14, 91:10, 109:2, 109:3, 109:15, 110:6, 134:22, 136:7

**passed** [2] - 9:2, 61:7

**passes** [2] - 47:12, 108:23

**past** [6] - 77:23, 81:24, 83:1, 87:15, 103:12, 168:6

**path** [2] - 67:24, 88:25

**Pathfinder** [1] - 78:7

**patient** [1] - 50:2

**patients** [2] - 165:5, 165:23

**patio** [1] - 24:2

**Paul** [3] - 14:2, 99:10, 158:16

**pause** [1] - 48:2

**pay** [5] - 45:12, 45:13, 45:22, 72:8, 121:3

**paying** [1] - 134:6

**pays** [2] - 134:2, 134:4

**peak** [1] - 30:16

**peer** [2] - 148:24, 149:13

**people** [105] - 7:25, 8:1, 8:2, 8:9, 8:13, 8:16, 8:22, 8:23, 9:4, 10:16, 10:22, 15:5, 16:12, 19:21, 29:25, 30:16, 32:25, 34:22, 35:24, 36:11, 41:22, 41:23, 49:14, 49:24, 50:4, 50:16, 51:25, 52:17, 53:4, 53:21, 53:23, 54:2, 54:5, 54:10, 54:11, 54:12, 54:20, 54:21, 55:12, 55:14, 56:7, 68:14, 71:18, 72:24, 83:2, 87:2, 92:24, 94:5, 95:25, 96:3, 96:6, 96:9, 96:13, 104:5, 104:12, 104:13, 107:19, 108:15, 108:16, 108:17, 108:18, 109:21, 110:14, 111:11, 113:6, 114:17, 118:4, 118:19, 119:13, 120:13, 120:15, 122:2, 123:24, 128:17, 128:20, 131:13, 132:11, 133:3, 133:15, 143:17, 146:11, 146:18, 147:2, 147:8, 148:6, 148:10, 149:3, 149:7, 149:12, 150:8, 152:17, 154:8, 154:14, 156:6, 156:10, 156:12, 157:1, 161:10,

161:14, 162:6, 162:9, 162:17, 163:19, 165:15

**people/residents** [1] - 126:24

**per** [2] - 48:12, 48:13

**perceived** [2] - 63:25, 90:6

**percent** [11] - 15:2, 15:9, 31:16, 96:15, 102:12, 104:17, 143:7, 143:12, 157:1, 157:6, 158:7

**percentage** [2] - 94:7, 102:6

**perception** [1] - 70:15

**perhaps** [1] - 55:1

**period** [6] - 52:2, 91:13, 98:2, 98:16, 149:5, 149:21

**periods** [1] - 148:22

**permanent** [1] - 77:2

**permission** [2] - 37:4, 95:9

**permit** [4] - 66:6, 66:12, 135:9, 136:1

**permits** [2] - 135:22, 135:25

**permitted** [4] - 9:20, 17:7, 21:13, 42:10

**permitting** [1] - 66:9

**person** [28] - 9:18, 17:22, 18:2, 18:4, 18:7, 19:4, 27:11, 40:10, 45:15, 53:25, 54:1, 69:9, 74:2, 74:15, 77:23, 90:24, 90:25, 100:25, 101:22, 106:20, 113:4, 120:21, 130:19, 131:9, 131:14, 133:19, 148:3, 164:9

**person's** [3] - 88:17, 121:1, 148:8

**personal** [7] - 22:23, 22:24, 28:17, 28:18, 78:2, 78:9

**personally** [5] - 15:4, 62:21, 73:21, 84:11, 113:1

**persons** [1] - 19:11

**perspective** [3] - 52:23, 142:18, 143:4

**pertaining** [1] - 105:4

**pet** [2] - 39:13

**PETRESKI** [3] - 66:17, 135:13, 137:23

**pets** [2] - 39:8, 107:11

**Ph.D** [2] - 141:8, 142:1

**phone** [4] - 47:2, 47:4, 121:23, 122:23

**photographs** [5] - 23:9, 23:12, 23:18, 23:20

**phrase** [1] - 163:9

**phyone** [1] - 123:20

**physical** [2] - 104:5, 155:19

**physician's** [1] - 167:21

**pick** [4] - 31:24, 34:7, 103:22, 134:11

**picture** [10] - 24:8, 24:14, 24:20, 24:22, 24:24, 25:18, 27:4, 29:12, 112:8, 121:22

**pictures** [4] - 22:21, 24:7, 55:22, 123:19

**pieces** [1] - 120:7

**pity** [1] - 126:11

**pizza** [3] - 69:11, 69:12, 73:13

**place** [21] - 8:5, 15:7, 15:14, 15:16, 16:12, 16:15, 16:16, 16:18, 49:25, 60:25, 65:7, 65:8, 120:2, 126:22, 127:1, 127:2, 137:24, 144:10, 145:2, 146:10, 157:23

**places** [2] - 80:12

**plan** [1] - 5:21

**planned** [1] - 65:8

**planning** [2] - 7:8, 14:3

**plates** [1] - 123:20

**pleasant** [1] - 56:15

**plus** [1] - 118:19

**point** [17] - 17:6, 19:3, 19:13, 30:19, 47:13, 60:20, 68:16, 72:13, 75:2, 101:7, 101:8, 110:22, 125:25, 132:15, 136:20, 139:7, 168:1

**pointing** [1] - 68:19

**points** [1] - 23:23

**Polcin** [1] - 162:1

**police** [26] - 11:12, 42:6, 44:22, 73:19, 74:1, 74:9, 74:10, 74:24, 75:3, 76:16, 76:18, 101:4, 101:20, 101:21, 101:25, 103:12, 103:15,

104:4, 104:6, 105:8, 105:16, 105:21, 128:18, 158:20, 159:14

**Police** [1] - 60:10

**policies** [1] - 122:11

**policy** [3] - 36:6, 81:20, 100:21

**poor** [1] - 106:24

**population** [1] - 143:8

**positions** [1] - 154:2

**positive** [5] - 11:18, 44:3, 49:6, 63:24, 100:19

**possible** [3] - 79:5, 130:17, 135:1

**possibly** [5] - 76:1, 120:23, 130:19, 133:24, 149:14

**potential** [1] - 131:23

**potentially** [3] - 152:21, 153:6, 158:19

**practical** [1] - 93:23

**practice** [1] - 142:8

**premise** [1] - 101:5

**premises** [3] - 28:5, 39:22, 134:15

**prepare** [1] - 173:1

**prepared** [6] - 23:3, 83:15, 94:16, 134:18, 135:1

**present** [3] - 74:23, 75:5, 113:11

**presentation** [1] - 92:22

**presentations** [1] - 76:6

**presenting** [6] - 85:2, 89:5, 90:18, 91:20, 113:9, 151:16

**presents** [1] - 75:9

**pretty** [7] - 8:12, 9:19, 32:18, 59:2, 140:4, 155:20, 163:2

**prevalence** [2] - 142:18, 143:4

**prevent** [1] - 144:24

**preventative** [1] - 134:20

**preventing** [1] - 101:10

**Price** [2] - 5:11, 6:24

**pride** [1] - 64:18

**primarily** [3] - 70:12, 70:14, 80:5

**primary** [3] - 36:9, 70:5, 70:9

**principals** [1] - 13:24

**principles** [1] -

144:16
  **priority** [1] - 72:7
  **privacy** [6] - 24:23, 25:1, 25:20, 55:23, 71:18, 120:7
  **private** [5] - 116:15, 119:2, 121:2, 121:3, 142:8
  **proactive** [3] - 128:16, 128:18, 128:19
  **problem** [3] - 63:9, 124:19, 124:20
  **problems** [3] - 47:3, 62:23, 137:13
  **procedure** [2] - 100:10, 137:24
  **Proceeding** [1] - 5:1
  **process** [24] - 17:24, 17:25, 18:1, 18:10, 37:4, 38:17, 38:19, 45:25, 46:1, 46:20, 47:18, 48:22, 49:11, 51:13, 55:9, 71:8, 99:21, 100:5, 100:10, 108:8, 110:5, 120:25, 131:16, 145:10
  **processes** [1] - 37:16
  **professional** [15] - 38:24, 65:5, 65:9, 65:10, 112:3, 112:24, 113:14, 114:4, 115:15, 121:25, 122:4, 141:17, 142:3, 154:4, 164:16
  **professionally** [1] - 142:2
  **professionals** [10] - 19:9, 108:19, 113:14, 113:23, 113:24, 113:25, 115:5, 115:8, 116:22, 122:3
  **profit** [3] - 52:7, 56:14, 121:2
  **program** [51] - 10:7, 18:11, 18:16, 18:18, 18:19, 36:1, 41:19, 42:20, 52:17, 81:4, 81:22, 87:18, 87:19, 87:20, 87:22, 87:24, 88:20, 89:15, 89:16, 90:3, 90:4, 90:15, 90:25, 91:12, 91:14, 91:16, 92:5, 92:6, 92:13, 96:10, 96:13, 101:1, 102:5, 102:7, 102:8, 110:4, 112:5, 112:12, 113:6, 117:23, 117:24,

119:4, 130:20, 131:9, 131:18, 151:20, 165:25, 166:17, 167:12, 167:13
  **programming** [1] - 155:16
  **programs** [3] - 56:10, 83:3, 165:7
  **progress** [2] - 167:8, 167:20
  **promote** [2] - 144:23, 145:8
  **promoting** [1] - 165:25
  **proof** [2] - 11:9, 64:12
  **proofs** [3] - 11:17, 62:5, 74:23
  **proper** [2] - 127:20, 128:19
  **Properties** [16] - 5:5, 5:13, 6:25, 7:18, 15:3, 15:23, 15:25, 21:6, 26:19, 32:17, 43:12, 43:20, 97:23, 97:24, 97:25, 171:13
  **properties** [3] - 128:4, 164:12, 167:6
  **property** [42] - 12:12, 14:5, 15:23, 16:1, 16:2, 20:23, 23:1, 23:20, 24:2, 26:15, 26:17, 28:8, 29:17, 36:16, 43:1, 43:3, 44:23, 45:3, 45:7, 59:15, 60:22, 61:17, 75:4, 101:16, 107:6, 109:3, 109:25, 111:15, 111:22, 115:19, 115:24, 123:3, 124:23, 126:18, 127:14, 127:17, 140:2, 140:5, 150:17, 150:18
  **Property** [8] - 13:13, 14:20, 36:19, 44:12, 78:7, 127:23, 131:24, 150:6
  **property's** [1] - 131:24
  **proposing** [2] - 10:11, 13:19
  **protect** [1] - 111:19
  **protected** [2] - 52:4, 137:2
  **protecting** [1] - 36:10
  **Protection** [1] - 136:19
  **protections** [1] -

53:9
  **prove** [3] - 45:23, 64:11, 137:25
  **provide** [22] - 8:5, 9:22, 11:19, 13:25, 14:25, 15:12, 15:13, 21:25, 50:11, 56:17, 59:22, 110:23, 111:1, 116:23, 134:8, 144:24, 145:20, 147:5, 153:16, 172:2, 172:24
  **provided** [4] - 10:25, 11:4, 79:11, 100:7
  **provider** [2] - 155:19, 155:20
  **providers** [1] - 116:15
  **provides** [2] - 7:18, 23:16
  **providing** [3] - 14:3, 122:19, 153:17
  **provision** [1] - 17:3
  **psychiatric** [3] - 142:7, 155:18, 159:17
  **psychoeducational** [1] - 154:16
  **psychological** [1] - 141:21
  **psychologists** [2] - 122:5, 153:13
  **psychology** [1] - 141:23
  **public** [20] - 64:23, 67:2, 67:4, 67:13, 74:22, 75:20, 76:6, 103:2, 127:12, 140:12, 144:22, 146:22, 152:9, 152:10, 156:25, 168:5, 170:20, 172:9, 172:14, 173:3
  **Public** [1] - 143:16
  **published** [1] - 171:17
  **pudding** [2] - 11:9, 64:12
  **pull** [3] - 32:1, 99:14, 99:18
  **pulled** [1] - 123:2
  **pulls** [1] - 77:22
  **pump** [1] - 66:4
  **PURCELL** [111] - 5:6, 5:10, 5:20, 6:17, 6:22, 12:20, 13:22, 14:6, 14:8, 14:16, 17:1, 17:19, 17:20, 20:15, 23:5, 23:15, 28:21, 32:19, 34:24, 36:18, 38:18, 40:20, 41:15,

42:3, 43:22, 45:10, 46:21, 48:1, 51:18, 52:21, 54:4, 56:4, 57:18, 59:21, 60:2, 60:16, 61:4, 61:13, 61:18, 61:24, 62:3, 62:11, 62:16, 63:2, 65:10, 65:13, 65:25, 67:20, 68:22, 74:16, 76:19, 77:18, 78:11, 82:20, 82:23, 92:1, 94:4, 94:21, 96:20, 98:7, 100:15, 100:22, 103:13, 104:2, 106:5, 106:9, 110:19, 112:21, 121:19, 122:6, 122:14, 123:25, 124:13, 127:21, 128:10, 128:13, 128:21, 128:25, 129:9, 129:15, 129:25, 130:11, 130:25, 131:7, 133:12, 135:11, 135:15, 136:2, 136:8, 137:7, 137:11, 138:4, 140:8, 140:22, 140:25, 141:5, 141:14, 142:22, 150:7, 157:17, 158:2, 158:22, 159:5, 160:12, 162:12, 167:2, 170:22, 171:18, 171:22, 171:25, 172:5
  **Purcell** [9] - 5:11, 6:16, 6:23, 12:11, 65:4, 76:4, 129:7, 139:19, 172:24
  **purchased** [1] - 68:17
  **purchases** [1] - 73:9
  **pure** [2] - 145:7, 147:19
  **purpose** [6] - 8:4, 36:10, 127:19, 144:13, 150:17, 169:5
  **purposely** [1] - 68:18
  **purposes** [3] - 38:3, 42:13, 53:9
  **push** [1] - 80:22
  **put** [9] - 11:16, 22:20, 22:22, 34:14, 38:3, 54:20, 54:23, 110:25, 163:5
  **putting** [2] - 59:13, 121:10

**Q**

  **qualification** [2] - 132:25, 141:18
  **qualified** [2] - 133:10, 140:23
  **qualify** [1] - 23:16
  **qualitative** [3] - 129:10, 129:17, 132:25
  **quality** [3] - 14:25, 56:9, 56:11
  **questioned** [1] - 74:21
  **questioning** [1] - 121:11
  **questions** [49] - 28:22, 53:13, 60:5, 64:21, 64:24, 67:1, 67:2, 67:4, 67:5, 67:7, 67:8, 67:10, 67:12, 67:14, 68:24, 74:17, 75:22, 76:11, 78:14, 78:21, 78:22, 89:20, 89:25, 99:3, 99:5, 103:2, 103:8, 119:7, 127:12, 129:1, 130:1, 140:12, 140:13, 142:23, 148:16, 150:3, 151:4, 151:23, 152:10, 152:12, 156:25, 162:21, 168:5, 168:12, 170:17, 170:20, 170:21, 172:18
  **quick** [2] - 124:21, 138:6, 172:7
  **quickly** [1] - 149:6
  **quite** [5] - 19:4, 133:18, 149:4, 149:6, 168:12

**R**

  **R-A-C-H-E-L** [1] - 141:12
  **Rachel** [3] - 14:1, 141:1, 141:11
  **raise** [1] - 14:9
  **raised** [3] - 40:21, 40:22, 139:20
  **Raj** [1] - 126:16
  **Ramapo** [1] - 141:21
  **ran** [1] - 133:18
  **random** [1] - 43:24
  **range** [2] - 22:12, 30:9
  **rare** [1] - 110:10
  **rase** [1] - 141:7

**rate** [3] - 164:5, 166:2, 167:10
**rates** [7] - 160:25, 164:8, 164:23, 165:11, 165:12, 167:20
**rather** [1] - 134:18
**Raywood** [2] - 11:1, 53:2
**Raywood's** [1] - 52:12
**reacclimated** [1] - 163:20
**reach** [3] - 45:4, 117:3, 117:7
**reactive** [3] - 128:16, 128:18
**read** [1] - 130:23
**readily** [1] - 108:6
**readmit** [1] - 87:22
**ready** [4] - 14:7, 19:4, 19:7, 47:8
**real** [7] - 40:8, 45:4, 62:24, 72:25, 103:19, 103:20, 163:20
**reality** [1] - 8:21
**realize** [1] - 138:18
**really** [24] - 10:10, 10:12, 11:10, 11:22, 33:5, 40:19, 52:23, 54:19, 66:10, 80:4, 92:13, 95:24, 124:1, 146:9, 148:10, 148:12, 149:4, 149:8, 149:23, 158:22, 163:4, 167:19, 167:23, 170:6
**reason** [7] - 12:4, 12:23, 32:23, 49:8, 56:13, 103:11, 106:7
**reasonable** [6] - 7:3, 11:13, 11:22, 62:6, 108:1, 127:24
**reasons** [5] - 11:21, 45:4, 83:3, 87:24, 119:8
**rebuild** [1] - 147:2
**rec** [1] - 26:8
**recall** [5] - 82:19, 83:18, 83:23, 86:20, 87:1
**receive** [3] - 18:13, 65:14, 69:3
**received** [1] - 17:15
**receiving** [1] - 8:6
**recent** [2] - 83:19, 168:23
**recently** [1] - 168:22
**recess** [1] - 126:12
**recidivism** [2] -

160:25, 164:23
**recommend** [1] - 138:2
**recommendations** [1] - 48:16
**recommended** [1] - 144:19
**reconsider** [1] - 66:14
**record** [6] - 9:4, 14:12, 74:9, 141:10, 172:14, 173:3
**records** [2] - 105:12, 105:17
**recover** [2] - 16:12, 54:17
**recovered** [1] - 130:19
**recovering** [2] - 9:6, 41:25
**Recovery** [17] - 15:11, 31:17, 42:21, 102:5, 102:7, 102:10, 116:12, 142:10, 150:5, 155:5, 158:19, 159:4, 159:12, 160:7, 164:13, 165:6, 165:19
**recovery** [54] - 7:19, 7:20, 8:18, 14:2, 15:5, 17:22, 17:24, 18:1, 18:2, 18:9, 35:25, 41:12, 53:22, 53:23, 54:6, 54:9, 54:10, 54:11, 104:14, 108:8, 111:10, 113:4, 113:7, 118:14, 119:1, 120:25, 121:1, 131:13, 141:19, 142:11, 143:2, 144:15, 144:16, 144:17, 144:25, 145:3, 145:4, 145:6, 145:8, 145:10, 146:13, 146:20, 157:9, 157:18, 157:19, 158:25, 159:1, 160:25, 162:13, 165:13, 166:2, 166:12
**reduce** [2] - 146:22, 147:6
**reduced** [3] - 165:10, 165:11, 165:12
**reduces** [1] - 148:1
**reel** [1] - 124:1
**reenter** [1] - 147:3
**refer** [2] - 81:22, 151:19
**reference** [1] - 44:17
**referenced** [1] -

170:24
**referencing** [1] - 44:14
**referral** [10] - 81:4, 86:11, 88:22, 88:23, 91:15, 101:20, 101:25, 102:1, 110:3, 117:21
**referred** [3] - 83:2, 101:1, 106:6
**referring** [7] - 97:1, 100:1, 100:8, 100:21, 115:9, 116:1, 166:10
**refrigerators** [2] - 71:20, 71:23
**refusal** [1] - 43:16
**refusals** [1] - 43:15
**refuse** [2] - 43:9, 43:14
**refuses** [1] - 44:7
**refusing** [2] - 43:19, 43:21
**regard** [1] - 60:11
**regarding** [8] - 53:15, 128:8, 130:17, 131:23, 131:24, 132:2, 132:7, 133:22
**regardless** [1] - 54:16
**registry** [1] - 76:14
**regular** [4] - 32:4, 97:13, 97:18, 105:2
**regularly** [2] - 38:20, 171:14
**regulate** [1] - 13:3
**regulated** [1] - 136:16
**regulates** [4] - 10:11, 17:4, 17:5, 20:3
**regulation** [1] - 136:24
**regulations** [2] - 130:12, 130:14
**rehab** [6] - 47:18, 57:9, 115:19, 115:20, 115:24, 117:4
**reiterate** [1] - 92:4
**rejected** [1] - 106:1
**relapse** [11] - 87:3, 90:10, 92:5, 92:14, 108:17, 109:11, 111:5, 111:9, 146:8, 162:24, 163:14
**relapsed** [6] - 87:10, 108:16, 109:13, 109:15, 109:18
**relapses** [4] - 110:6, 110:8, 111:8, 111:21
**relapsing** [1] - 109:21

**relatable** [2] - 54:12, 54:20
**relate** [2] - 54:10, 146:17
**related** [4] - 52:17, 78:23, 105:11, 143:14
**relationships** [5] - 116:14, 147:16, 148:23, 149:6, 162:17
**relative** [7] - 38:25, 48:22, 51:13, 56:2, 58:21, 91:23, 93:17
**relatively** [1] - 84:7
**release** [1] - 160:16
**relocation** [1] - 80:21
**remain** [1] - 30:15
**remarks** [1] - 5:15
**remedy** [2] - 123:15, 124:10
**remember** [1] - 170:16
**remove** [1] - 44:23
**rent** [7] - 15:23, 15:24, 45:14, 55:11, 55:16, 120:16, 120:23
**rental** [1] - 127:17
**renters** [1] - 120:11
**renting** [3] - 16:21, 20:23, 127:18
**rents** [1] - 120:19
**repeat** [2] - 96:7, 159:10
**repetitive** [3] - 48:23, 96:10, 96:14
**rephrase** [2] - 94:23, 97:2
**replicate** [1] - 20:1
**report** [2] - 76:15, 85:4
**reported** [1] - 85:6
**reporter** [4] - 113:20, 114:11, 129:4, 129:13
**reports** [2] - 74:24, 75:3
**representative** [1] - 49:1
**represents** [1] - 62:13
**reprimands** [1] - 95:23
**request** [1] - 139:22
**requested** [6] - 5:17, 9:16, 10:1, 11:13, 28:25, 43:25
**requests** [1] - 127:24
**require** [1] - 39:16
**required** [5] - 30:21, 36:23, 42:6, 42:18, 65:17
**requirement** [2] -

9:24, 114:1
**requirements** [3] - 28:24, 41:2, 153:18
**requires** [4] - 10:6, 21:22, 40:14, 159:12
**research** [5] - 161:14, 161:15, 161:19, 161:23, 161:25
**reserve** [1] - 45:5
**residence** [23] - 7:5, 8:11, 9:8, 12:6, 12:8, 12:13, 15:6, 16:6, 20:6, 21:18, 27:18, 55:15, 58:23, 74:12, 77:1, 77:4, 97:12, 97:13, 97:14, 97:15, 144:4, 161:10, 169:10
**residences** [3] - 13:4, 57:3, 167:11
**resident** [32] - 18:12, 18:17, 18:23, 19:6, 19:14, 22:12, 35:4, 36:7, 39:1, 39:24, 46:25, 47:17, 48:21, 70:4, 72:14, 73:12, 80:9, 80:19, 84:20, 87:25, 88:12, 89:14, 89:17, 90:16, 90:18, 91:6, 93:25, 94:1, 94:25, 103:18, 109:24, 114:24
**resident's** [3] - 48:16, 91:23, 108:25
**residential** [11] - 12:3, 12:15, 18:18, 45:16, 46:13, 47:7, 119:19, 139:13, 151:12, 156:5, 163:21
**residents** [105] - 19:17, 21:14, 21:15, 22:13, 22:16, 22:20, 22:22, 26:16, 26:23, 29:20, 29:22, 29:23, 29:24, 30:9, 30:21, 33:4, 33:12, 33:16, 34:4, 35:10, 35:13, 35:17, 36:3, 36:4, 36:6, 36:11, 36:23, 37:1, 37:2, 38:9, 42:10, 42:14, 42:18, 42:20, 43:4, 43:24, 45:12, 45:13, 46:16, 50:3, 50:14, 52:3, 52:13, 54:7, 54:9, 54:12, 54:13, 54:22, 56:14, 56:15, 58:21, 63:5, 70:3, 71:1, 71:3, 72:8, 76:21, 77:19, 79:4, 80:6, 82:1,

83:11, 84:11, 86:21, 86:22, 87:23, 89:21, 93:6, 96:23, 97:7, 97:10, 98:11, 103:10, 106:21, 108:23, 113:18, 113:22, 114:1, 114:4, 116:17, 126:20, 130:10, 143:24, 145:17, 145:22, 147:14, 147:21, 149:20, 149:22, 150:24, 151:25, 153:24, 153:25, 154:9, 155:15, 157:14, 157:24, 160:13, 161:17, 164:8, 165:23, 169:18, 169:22

**resistant** [1] - 45:6
**resolution** [1] - 99:17
**resolved** [2] - 136:12
**resonating** [1] - 163:4
**Resort** [1] - 51:20
**resources** [1] - 50:9
**respect** [6] - 10:10, 13:22, 29:5, 62:5, 65:20, 148:7
**respectful** [1] - 36:4
**respond** [1] - 111:19
**responding** [1] - 172:25
**response** [2] - 66:1, 133:14
**responsibility** [4] - 80:19, 80:22, 81:1, 145:25
**responsible** [5] - 72:17, 72:18, 113:7, 113:9
**rest** [1] - 111:20
**restate** [1] - 61:5
**restrictive** [1] - 46:16
**result** [4] - 14:24, 53:5, 63:10, 96:13
**resume** [2] - 53:24, 150:4
**resumed** [1] - 126:13
**retaining** [1] - 24:1
**retired** [1] - 112:5
**return** [3] - 94:3, 95:1, 165:11
**review** [4] - 6:19, 83:5, 83:7, 173:3
**reviewed** [2] - 66:17, 83:25
**revised** [1] - 23:4
**revolving** [1] - 92:2

**ride** [1] - 120:2
**riding** [2] - 121:13, 123:22
**risk** [6] - 103:23, 111:5, 111:17, 111:25, 112:1, 112:25
**risks** [1] - 111:16
RITACCO [29] - 67:16, 67:23, 68:14, 68:17, 69:7, 73:16, 73:23, 74:9, 74:13, 74:18, 75:12, 76:8, 76:12, 76:24, 77:8, 77:14, 77:20, 78:3, 78:6, 78:9, 78:12, 162:22, 163:1, 163:9, 164:4, 164:25, 165:5, 165:14, 165:20
**Ritacco** [2] - 67:16, 162:23
**road** [3] - 8:18, 13:23, 24:16
**Road** [3] - 78:18, 139:7, 168:10
**role** [2] - 5:2, 131:19
**roles** [1] - 149:21
**Ron** [1] - 148:19
**roof** [2] - 51:6, 109:14
**room** [14] - 26:1, 26:6, 26:8, 26:11, 33:8, 34:15, 34:17, 126:7, 146:24, 171:16
**rooms** [3] - 10:17, 21:19, 26:9
ROSENWASSER [32] - 99:9, 99:20, 99:23, 100:2, 100:17, 100:23, 101:14, 101:24, 102:3, 102:11, 102:14, 102:17, 102:23, 158:16, 159:3, 159:7, 159:11, 159:22, 160:5, 160:17, 160:24, 161:4, 161:9, 161:18, 161:22, 162:5, 162:8, 162:18, 172:7, 172:16, 172:21, 173:4
**Rosenwasser** [2] - 99:10, 158:16
**rotated** [1] - 79:25
**roughly** [1] - 49:18
**routine** [1] - 145:24
**rule** [4] - 37:13, 80:20, 83:12, 96:14
**rules** [27] - 35:2, 36:15, 37:11, 37:24, 37:25, 41:4, 41:6,

41:8, 43:8, 44:8, 44:14, 44:17, 44:19, 46:15, 65:15, 81:15, 88:4, 88:13, 90:1, 90:7, 90:9, 96:2, 122:10, 129:20, 129:21, 138:1, 147:25
**Rules** [2] - 36:19, 36:21
**run** [5] - 34:3, 56:1, 76:2, 129:21, 133:20
**running** [3] - 125:12, 132:22, 132:23
**rushing** [1] - 138:20

## S

S-U-G-E-R-M-A-N [1] - 141:12
**sac** [2] - 68:5, 73:25
**safe** [8] - 16:12, 36:12, 130:3, 130:10, 145:2, 145:4, 164:1, 170:10
**safety** [2] - 18:14, 42:13
**Safety** [1] - 143:16
**sake** [2] - 35:20, 103:18
**Sal** [3] - 21:1, 127:16, 127:22
**SAMSA** [1] - 144:22
**SARMASTI** [77] - 78:13, 78:17, 79:12, 79:16, 79:23, 80:15, 80:18, 80:25, 81:6, 81:14, 81:24, 82:10, 82:14, 82:18, 83:4, 83:9, 83:18, 83:21, 84:4, 84:9, 84:14, 84:19, 84:24, 85:4, 85:11, 85:14, 85:22, 86:2, 86:7, 86:13, 86:19, 87:9, 87:15, 88:1, 88:9, 88:16, 89:7, 89:24, 90:5, 90:12, 90:21, 93:20, 94:11, 94:18, 94:23, 95:3, 95:7, 95:11, 95:14, 95:18, 96:4, 96:16, 96:22, 97:2, 97:6, 97:20, 98:1, 98:8, 98:15, 98:20, 98:23, 99:2, 168:6, 168:9, 168:15, 168:17, 168:23, 169:1, 169:4, 169:11, 169:15, 169:18, 169:21, 170:1, 170:5, 170:11, 170:14

**Sarmasti** [2] - 78:17, 168:9
**Saturday** [1] - 37:5
**saw** [1] - 121:17
**scenario** [1] - 87:6
**schedule** [1] - 41:16
**scheduled** [2] - 155:21, 171:14
**school** [12] - 121:14, 131:25, 132:15, 132:22, 132:23, 133:4, 133:17, 133:19, 133:22, 133:23, 153:13, 153:14
**screen** [2] - 29:8, 76:13
**screened** [1] - 76:14
**screening** [2] - 24:11, 159:18
**screens** [2] - 76:21
**seats** [2] - 32:10, 32:11
**second** [9] - 6:3, 6:11, 6:17, 10:4, 26:12, 59:24, 127:10, 131:25, 135:11
**section** [1] - 11:2
**security** [2] - 124:22, 125:11
**see** [28] - 24:6, 24:11, 25:11, 27:5, 28:18, 48:22, 49:7, 55:21, 64:14, 65:1, 77:22, 105:20, 113:8, 114:8, 114:9, 125:13, 149:5, 151:24, 152:4, 152:15, 152:17, 154:20, 165:24, 167:8, 167:10, 172:19, 172:20
**seeing** [2] - 61:11, 140:13
**seek** [2] - 143:17, 147:8
**seeking** [3] - 7:20, 119:3, 139:24
**seem** [1] - 79:3
**sell** [2] - 13:8, 13:14
**send** [3] - 88:6, 156:22, 173:2
**sense** [6] - 22:4, 41:14, 78:23, 145:24, 147:12, 147:17
**sentence** [1] - 52:11
**separate** [11] - 16:16, 48:18, 71:24, 127:25, 136:10, 150:8, 150:9, 150:13, 150:14, 164:12, 165:19

**Sarmasti** [2] - 78:17, 168:9
**Saturday** [1] - 37:5
**saw** [1] - 121:17
**separately** [4] - 41:2, 68:12, 68:13, 68:16
**septic** [9] - 28:23, 65:6, 65:20, 65:21, 66:2, 66:17, 135:9, 136:11, 136:16
**serious** [2] - 103:15, 163:15
**serve** [1] - 152:24
**served** [1] - 63:10
**Service** [1] - 144:21
**service** [15] - 39:14, 39:20, 40:2, 40:4, 40:5, 107:14, 118:12, 125:11, 144:23, 146:25, 153:18, 154:16
**services** [5] - 15:13, 18:13, 150:14, 153:1, 153:2
**Services** [3] - 143:20, 143:21, 144:20
**session** [1] - 172:15
**set** [7] - 5:16, 7:9, 46:15, 52:11, 87:25, 89:6, 149:23
**setting** [8] - 18:12, 50:14, 50:18, 50:19, 50:21, 55:1, 126:23, 149:1
**settings** [1] - 142:6
**setup** [3] - 40:18, 50:1, 56:1
**setups** [1] - 35:12
**seven** [1] - 121:23
**seventh** [1] - 25:6
**several** [2] - 78:22, 107:21
**sex** [1] - 33:8
**shape** [1] - 83:16
**share** [2] - 130:8, 146:2
**shared** [3] - 145:25, 146:3, 147:22
**sharing** [1] - 21:18
**shift** [9] - 31:4, 31:7, 31:8, 33:15, 33:19, 34:9, 77:11, 130:5, 130:6
**shifts** [1] - 9:25
**shop** [1] - 70:3
**shopping** [2] - 80:3, 134:5
**shops** [1] - 70:4
**short** [4] - 49:16, 50:17, 148:25, 149:4
**short-term** [2] - 50:17, 148:25
**shorter** [1] - 22:14

**shortest** [5] - 58:14, 67:24, 98:16, 98:17, 98:18

**show** [6] - 9:15, 9:25, 74:25, 111:18, 122:22, 165:9

**showed** [1] - 105:16

**showing** [3] - 25:19, 121:23, 138:5

**shows** [3] - 24:22, 24:25, 33:13

**Shulman** [2] - 5:12, 6:24

**sick** [2] - 30:23, 31:3

**side** [8] - 9:9, 32:17, 39:16, 49:4, 51:9, 54:15, 56:3, 116:9

**sidewalks** [2] - 121:12, 123:23

**sign** [1] - 160:15

**signed** [1] - 160:13

**signs** [2] - 29:16, 29:17

**silly** [1] - 163:3

**similar** [12] - 51:15, 57:5, 58:7, 58:8, 63:7, 81:22, 115:7, 127:2, 145:21, 147:22, 170:2

**simultaneous** [1] - 86:18

**single** [16] - 9:6, 9:11, 9:12, 11:22, 11:24, 12:25, 25:24, 38:23, 49:12, 70:4, 91:19, 111:17, 114:24, 116:16, 117:21, 152:23

**single-family** [6] - 9:6, 9:11, 9:12, 11:22, 12:25, 25:24

**sister** [2] - 7:15, 112:13

**site** [4] - 84:22, 85:1, 85:16, 85:19

**sits** [1] - 24:4

**sitting** [3] - 27:18, 72:19, 77:20

**situation** [20] - 26:15, 39:19, 40:12, 49:13, 52:25, 63:11, 73:24, 74:5, 74:7, 92:22, 93:13, 93:19, 101:13, 101:23, 115:13, 118:5, 134:25, 135:1, 159:16, 159:20

**situations** [4] - 103:25, 105:2, 160:4, 166:19

**six** [39] - 11:10,

13:21, 15:21, 22:14, 30:6, 30:9, 42:5, 45:2, 47:10, 49:15, 49:17, 56:23, 58:4, 61:11, 61:16, 61:21, 63:4, 63:8, 63:14, 63:23, 64:13, 81:24, 82:12, 87:15, 97:16, 98:10, 98:12, 98:21, 101:13, 102:15, 103:12, 104:11, 104:13, 108:10, 126:20, 126:24, 128:12, 149:15, 156:2

**sixth** [1] - 25:2

**size** [2] - 26:21, 28:24, 34:18

**skills** [1] - 19:18

**skin** [1] - 118:22

**skipping** [1] - 29:5

**sleep** [1] - 51:5

**slightly** [1] - 65:18

**slipped** [1] - 170:16

**Slomin's** [1] - 125:18

**slow** [1] - 138:24

**small** [2] - 95:22, 119:18

**smaller** [2] - 80:10, 96:14

**smelled** [1] - 137:5

**smells** [1] - 137:13

**so..** [2] - 26:17, 28:4

**Sober** [1] - 162:2

**sober** [79] - 7:5, 7:6, 8:4, 8:7, 8:10, 8:16, 9:7, 10:21, 11:6, 14:24, 15:17, 15:21, 16:6, 16:9, 16:11, 16:18, 18:1, 19:15, 22:17, 29:17, 33:24, 33:25, 36:9, 37:7, 37:9, 39:15, 40:23, 49:14, 49:16, 52:13, 54:8, 55:9, 55:24, 64:17, 91:8, 102:21, 102:22, 111:7, 115:3, 115:4, 115:5, 116:11, 117:13, 119:4, 120:12, 120:24, 127:19, 143:25, 144:4, 144:5, 144:8, 144:11, 144:14, 144:18, 145:12, 145:14, 145:22, 146:10, 146:16, 146:19, 147:1, 147:5, 147:10, 147:12, 148:8, 150:12, 150:14, 151:7, 151:20, 156:10,

158:25, 159:23, 160:6, 160:9, 163:12, 163:19, 163:22, 165:10, 167:5

**sobriety** [7] - 36:7, 36:11, 45:25, 81:12, 81:16, 147:25, 148:8

**social** [6] - 122:5, 144:15, 145:9, 153:12, 154:4, 154:6

**society** [6] - 8:4, 47:14, 113:10, 119:15, 146:17, 146:21

**solely** [2] - 17:4, 17:5

**solo** [1] - 71:18

**someone** [18] - 30:23, 31:2, 31:3, 44:7, 45:21, 47:20, 66:11, 73:25, 77:5, 92:13, 95:24, 98:19, 101:8, 101:15, 113:8, 134:22, 139:12, 151:11

**someplace** [1] - 31:14

**sometime** [1] - 29:2

**sometimes** [8] - 26:24, 27:15, 27:25, 37:1, 45:19, 68:12, 71:19, 134:10

**somewhat** [2] - 51:15, 111:2

**somewhere** [2] - 28:5, 116:7

**son** [1] - 73:18

**sorry** [13] - 80:1, 140:4, 141:5, 142:22, 159:5, 159:9, 162:7, 166:9, 168:21, 169:2, 170:15, 170:16, 171:1

**sort** [21] - 13:8, 17:11, 19:21, 22:4, 26:25, 29:12, 37:7, 37:21, 37:22, 37:23, 71:4, 74:4, 89:18, 92:14, 95:17, 96:2, 110:3, 111:2, 124:1, 128:25, 144:13

**sorts** [1] - 52:22

**sounds** [2] - 124:8, 148:25

**sources** [2] - 86:11, 100:9

**space** [6] - 22:23, 22:24, 26:5, 29:22, 30:3, 117:20

**spaces** [2] - 30:2, 146:3

**speaking** [8] - 27:24,

37:7, 45:15, 45:17, 47:20, 50:21, 56:10, 74:7

**speaks** [1] - 51:21

**specific** [19] - 13:11, 13:18, 39:2, 41:6, 49:17, 62:19, 73:3, 82:6, 84:2, 85:9, 95:6, 99:18, 107:14, 116:11, 161:14, 161:25, 164:18, 164:23

**specifically** [10] - 38:15, 62:19, 82:22, 87:8, 100:1, 100:13, 105:7, 127:5, 127:8, 160:2

**speeches** [1] - 67:7

**speed** [1] - 68:5

**spell** [2] - 14:12, 141:10

**spend** [3] - 58:3, 58:6, 113:3

**spending** [1] - 155:4

**spent** [1] - 87:19

**sponsor** [3] - 36:1, 36:2, 37:8

**spot** [1] - 38:12

**sprinter** [1] - 32:12

**spurred** [1] - 128:14

**square** [1] - 26:3

**stable** [2] - 145:1, 164:2

**staff** [60] - 26:10, 27:10, 27:11, 27:17, 28:2, 28:16, 28:19, 31:4, 31:8, 31:15, 33:13, 33:14, 33:19, 35:8, 43:17, 46:8, 46:9, 54:11, 64:15, 64:16, 64:17, 71:7, 73:2, 73:5, 84:22, 85:1, 85:16, 85:19, 86:7, 86:8, 92:12, 92:15, 92:18, 92:20, 92:23, 93:11, 93:14, 93:18, 99:13, 99:15, 99:19, 110:9, 110:18, 112:9, 115:4, 115:8, 115:10, 125:13, 130:5, 131:4, 134:10, 153:3, 153:11, 158:23, 160:6, 160:10, 160:19, 160:21

**staffing** [1] - 21:24

**stage** [2] - 17:25, 166:15

**standard** [3] - 11:16, 25:23, 104:9

**standpoint** [4] - 34:18, 93:22, 93:24, 117:24

**Starbucks** [1] - 119:12

**start** [10] - 14:21, 18:10, 23:21, 29:2, 34:8, 34:9, 115:1, 135:10, 140:20, 166:15

**started** [1] - 16:4

**starting** [4] - 50:9, 66:7, 118:17, 126:11

**starts** [1] - 17:24

**State** [8] - 20:3, 21:13, 21:22, 120:21, 134:4, 141:25, 142:1, 167:18

**state** [18] - 14:11, 20:7, 67:15, 67:25, 68:20, 78:15, 99:8, 103:5, 116:15, 126:14, 130:14, 133:4, 141:9, 152:13, 157:4, 158:1, 158:15, 166:4

**statement** [8] - 52:19, 60:10, 68:23, 74:17, 92:7, 114:24, 129:10, 129:12

**states** [1] - 132:13

**stating** [2] - 43:8, 80:14

**statistics** [1] - 164:16

**stay** [18] - 22:13, 22:14, 31:1, 31:3, 45:12, 45:17, 47:17, 50:15, 57:21, 57:23, 92:9, 97:18, 98:3, 98:14, 98:19, 127:1, 148:8

**staying** [1] - 34:22, 49:2

**stays** [1] - 22:12

**step** [10] - 8:18, 19:1, 47:17, 47:22, 48:4, 67:14, 78:15, 97:14, 101:12, 166:11

**stepping** [1] - 46:20, 117:11

**stickers** [1] - 20:17

**stigma** [5] - 8:21, 54:16, 55:15, 62:13, 147:6

**still** [3] - 41:16, 108:9, 110:14

**stipulate** [1] - 29:7, 124:16, 136:22, 138:4

**stipulation** [1] -

76:17

**stone** [2] - 23:22, 24:1

**stop** [13] - 28:16, 60:22, 77:3, 77:21, 122:15, 128:21, 128:22

**store** [2] - 108:3, 134:9

**stormwater** [2] - 5:21, 5:22

**story** [1] - 23:22

**straight** [3] - 19:5, 19:7, 46:12

**strangers** [1] - 112:14

**street** [24] - 24:5, 25:7, 25:10, 25:13, 25:14, 29:9, 58:24, 58:25, 67:18, 68:18, 77:22, 80:23, 81:17, 81:20, 81:21, 106:18, 107:19, 119:19, 121:11, 121:13, 123:1, 123:23, 135:8, 163:3

**streets** [2] - 58:16, 107:7

**strength** [1] - 147:7

**stress** [1] - 74:1

**stressed** [1] - 114:19

**stressors** [1] - 8:14

**strict** [1] - 36:5

**strong** [1] - 145:16

**structure** [2] - 145:24, 146:6

**structured** [1] - 33:1

**struggle** [1] - 145:18

**stucco** [1] - 23:23

**students** [1] - 153:14

**studies** [4] - 161:11, 165:15, 170:25, 171:4

**stuff** [8] - 6:23, 47:5, 72:9, 93:8, 105:1, 117:2, 172:22

**style** [6] - 18:18, 19:24, 22:2, 46:15, 51:4, 118:13

**subject** [8] - 15:23, 16:5, 22:25, 23:10, 36:15, 48:14, 48:20, 93:9

**submit** [2] - 74:24

**submitted** [6] - 37:25, 41:7, 66:9, 66:12, 135:17, 135:20

**substance** [9] - 18:4, 143:4, 143:9, 143:18, 143:22, 144:21, 144:24, 145:5, 165:11

substance-free [1] - 145:5

**substances** [2] - 18:15, 41:19

**substantively** [1] - 10:13

**subtle** [1] - 32:18

**success** [6] - 164:5, 164:8, 165:24, 166:2, 167:10, 167:19

**successful** [4] - 133:4, 164:9, 165:1, 165:2

**suffer** [1] - 118:1

**suffering** [2] - 41:24, 117:25

**suffers** [1] - 18:3

**Sugerman** [17] - 14:1, 141:1, 141:6, 141:11, 141:12, 141:16, 142:13, 142:17, 143:3, 150:3, 157:18, 158:18, 158:22, 168:11, 171:3, 171:23

**suggesting** [1] - 63:21

**suggests** [1] - 161:15

**sum** [1] - 11:12

**summary** [1] - 5:22

**summer** [1] - 121:14

**summons** [1] - 65:25

**Sunday** [2] - 37:5, 39:4

**supervision** [1] - 46:11

**supervisor** [1] - 142:5

**Supervisors** [1] - 51:21

**supplied** [1] - 172:8

**supplies** [1] - 69:24

**support** [16] - 8:16, 10:17, 37:7, 45:19, 53:4, 75:1, 92:16, 93:14, 144:25, 145:7, 145:24, 146:12, 147:5, 147:19, 148:24, 149:14

**supporting** [1] - 145:3

**supportive** [1] - 145:21

**supports** [3] - 37:9, 141:18, 145:6

**supposed** [2] - 29:2, 139:11

**surgeries** [1] - 167:22

**surprised** [2] - 55:10, 55:11

**Surtech** [1] - 23:3

**Survey** [1] - 143:6

**survey** [5] - 22:25, 23:7, 23:20, 23:21, 27:3

**suspect** [1] - 44:15

**suspected** [1] - 143:14

**suspicion** [1] - 43:18

**SUV** [4] - 26:22, 32:7, 34:7, 138:15

**swear** [1] - 141:3

**Sworn** [2] - 14:10, 141:8

**system** [7] - 28:23, 66:3, 125:22, 136:14, 146:22, 165:12

## T

**table** [2] - 5:16, 7:9

**takeout** [1] - 38:9

**talks** [1] - 17:4

**tank** [2] - 66:3, 66:4

**taught** [1] - 100:10

**team** [2] - 151:10, 151:13

**temporaries** [1] - 78:20

**tend** [2] - 126:21, 126:25

**tendency** [2] - 71:14, 71:15

**term** [8] - 50:17, 52:15, 53:22, 53:23, 54:6, 59:14, 145:8, 148:25

**terms** [8] - 21:24, 34:11, 46:17, 56:1, 59:17, 81:19, 92:5, 148:12

**test** [6] - 43:9, 43:25, 44:2, 44:3, 44:7

**tested** [1] - 109:7

**testified** [3] - 84:9, 86:3, 149:11

**testify** [2] - 66:11, 76:20

**testifying** [1] - 93:25

**testimony** [27] - 7:7, 10:8, 11:19, 13:25, 23:17, 66:25, 67:6, 74:23, 76:11, 76:12, 76:20, 78:25, 79:3, 79:11, 79:12, 79:24, 80:16, 83:6, 89:8, 93:21, 96:5, 97:5,

100:17, 100:24, 102:3, 161:21, 172:17

**THE** [296] - 27:23, 28:12, 28:15, 30:20, 30:25, 31:12, 31:15, 31:20, 31:24, 32:8, 32:11, 32:15, 33:17, 33:21, 34:23, 36:25, 37:20, 38:11, 39:12, 39:23, 40:3, 40:8, 40:17, 41:6, 41:11, 41:21, 43:11, 43:15, 44:20, 46:7, 47:19, 50:20, 52:8, 53:21, 55:8, 55:20, 57:1, 57:5, 57:11, 57:22, 58:1, 58:5, 58:8, 58:20, 59:12, 59:16, 59:19, 62:18, 63:25, 64:3, 65:23, 68:9, 68:15, 69:4, 69:8, 69:20, 70:1, 70:13, 71:6, 71:22, 72:1, 72:13, 72:24, 73:10, 73:21, 74:6, 74:11, 76:23, 77:2, 77:13, 77:16, 77:19, 78:1, 78:4, 78:8, 79:18, 80:4, 80:17, 80:24, 81:2, 81:9, 81:18, 82:3, 82:12, 82:16, 82:21, 82:25, 83:7, 83:14, 83:20, 83:24, 84:7, 84:13, 84:17, 84:22, 85:1, 85:6, 85:13, 85:19, 85:23, 86:6, 86:10, 86:16, 86:24, 87:13, 87:17, 88:8, 88:14, 88:19, 89:13, 90:2, 90:10, 90:13, 91:4, 92:3, 92:17, 92:21, 92:25, 93:3, 93:15, 94:14, 95:2, 95:4, 95:10, 95:13, 95:16, 95:20, 96:9, 96:18, 96:21, 96:25, 97:4, 97:10, 97:22, 98:5, 98:9, 98:17, 98:21, 98:25, 99:6, 99:14, 99:22, 99:25, 100:6, 101:3, 101:18, 102:1, 102:9, 102:13, 102:16, 102:18, 102:25, 103:16, 105:1, 105:6, 105:9, 105:14, 105:19, 107:1, 107:13, 108:1, 108:4, 108:22, 109:6, 109:15, 109:18, 109:22, 110:15,

112:9, 112:16, 113:1, 113:4, 113:17, 113:22, 114:6, 114:10, 114:23, 115:11, 116:2, 116:8, 117:2, 117:5, 117:21, 118:8, 118:18, 119:20, 120:4, 120:11, 120:24, 122:17, 122:20, 123:4, 123:9, 123:14, 124:9, 124:24, 125:1, 125:5, 125:7, 125:12, 125:20, 126:2, 126:6, 127:3, 127:8, 130:4, 131:4, 131:12, 132:4, 132:8, 132:11, 132:19, 133:1, 134:8, 134:17, 137:17, 138:10, 138:18, 138:21, 139:2, 140:3, 140:10, 140:24, 141:11, 149:2, 149:17, 150:13, 150:19, 150:23, 151:8, 151:18, 152:1, 152:5, 152:19, 152:23, 153:5, 153:10, 153:15, 153:22, 154:1, 154:10, 154:15, 154:22, 155:1, 155:7, 155:10, 155:14, 155:25, 156:8, 156:18, 157:6, 157:21, 158:4, 158:9, 158:13, 159:9, 159:15, 160:1, 160:8, 160:15, 160:20, 161:1, 161:8, 161:13, 161:20, 161:24, 162:7, 162:10, 162:14, 162:25, 163:17, 164:11, 164:18, 164:21, 165:3, 165:8, 165:17, 166:20, 166:24, 167:3, 167:11, 167:13, 167:25, 168:14, 168:16, 168:19, 168:25, 169:3, 169:7, 169:14, 169:17, 169:20, 169:25, 170:3, 170:10, 170:13

**thee** [1] - 50:25

**themselves** [3] - 117:22, 118:10, 147:16

**theoretically** [1] - 34:16

**theory** [2] - 18:23, 116:24

**therapeutic** [3] - 19:20, 19:24, 149:5

**therapist** [4] - 116:18, 117:8, 155:18, 155:23

**therapy** [11] - 146:15, 153:1, 153:2, 153:16, 153:18, 154:10, 154:13, 154:18, 155:17, 156:1, 156:15

**they've** [9] - 17:1, 17:8, 54:14, 88:15, 89:3, 91:7, 91:8, 91:9

**thinking** [3] - 123:21, 166:14, 168:20

**third** [5] - 10:5, 24:17, 25:18, 72:6, 132:1

**thoroughfare** [2] - 68:18, 68:19

**thoroughly** [1] - 38:23

**three** [50] - 5:23, 10:2, 13:23, 15:21, 20:20, 20:21, 23:23, 24:3, 26:9, 26:13, 26:19, 27:3, 27:7, 27:9, 27:11, 27:19, 28:14, 31:4, 31:10, 32:2, 32:5, 33:11, 33:19, 33:23, 33:24, 34:16, 34:18, 46:8, 57:3, 64:15, 79:6, 79:16, 79:19, 79:21, 91:8, 92:25, 97:23, 108:18, 110:7, 110:8, 112:11, 115:8, 121:7, 121:16, 122:2, 122:12, 130:4, 132:17, 149:16

**three-car** [3] - 24:3, 27:3, 27:7

**throughout** [3] - 125:3, 156:3, 166:3

**throwing** [2] - 112:7, 112:18

**tidied** [1] - 38:22

**tied** [1] - 50:22

**tiki** [1] - 107:20

**timeframe** [1] - 155:12

**timeframes** [1] - 57:6

**timeline** [1] - 167:24

**timing** [1] - 60:20

**title** [2] - 141:2, 153:20

**today** [1] - 121:17

**together** [24] - 8:13, 8:14, 10:18, 10:19, 10:22, 11:23, 32:3, 35:5, 35:8, 35:15, 43:4, 51:3, 51:23, 68:7, 68:10, 71:4, 71:7, 71:9, 111:6, 112:15, 145:19, 146:3, 156:14, 156:19

**Tombalakian** [1] - 6:18

**TOMBALAKIAN** [37] - 6:20, 13:10, 14:7, 14:9, 14:11, 14:15, 66:23, 68:25, 74:19, 75:14, 75:25, 76:3, 76:10, 79:8, 79:15, 113:19, 114:13, 126:10, 126:14, 129:6, 135:4, 139:13, 139:16, 140:17, 140:20, 141:3, 141:6, 141:9, 141:13, 163:11, 170:18, 171:12, 171:24, 172:1, 172:11, 172:20, 172:23

**tone** [1] - 149:24

**tonight** [11] - 5:12, 7:23, 8:19, 13:23, 14:5, 75:23, 75:25, 76:1, 83:6, 170:24, 171:2

**took** [1] - 128:12

**tool** [1] - 124:18

**top** [8] - 7:11, 25:3, 25:4, 27:5, 29:7, 94:16, 98:13, 161:2

**topic** [2] - 11:3, 48:8

**TORSIELLO** [14] - 135:6, 135:24, 136:3, 136:25, 137:8, 137:14, 137:18, 138:6, 138:13, 138:19, 138:22, 139:4, 139:15, 139:25

**Torsiello** [1] - 135:6

**total** [3] - 32:22, 55:20, 143:21

**totally** [3] - 48:18, 64:3, 163:15

**touch** [1] - 167:14

**touched** [1] - 42:17

**tour** [1] - 169:15

**toured** [1] - 169:14

**touring** [1] - 112:20

**town** [6] - 17:13, 56:19, 56:20, 62:24, 163:2

**Town** [2] - 63:8,

127:5

**towns** [5] - 59:6, 63:18, 64:4, 120:6

**Township** [3] - 51:21, 60:8, 61:8

**township** [4] - 9:21, 17:10, 28:25, 135:22

**track** [3] - 165:22, 165:24, 167:8

**traffic** [4] - 67:25, 120:3, 121:15, 123:21

**Trail** [2] - 96:21, 128:4

**train** [1] - 99:20

**trained** [3] - 130:22, 130:23, 131:5

**training** [14] - 99:12, 99:24, 100:3, 100:4, 100:9, 100:13, 115:10, 130:17, 132:16, 134:13, 159:24, 160:2, 160:3, 172:22

**training's** [1] - 100:7

**trainings** [3] - 99:15, 99:18, 100:8

**transfer** [2] - 81:5, 96:23

**transferred** [1] - 97:8

**transit** [1] - 80:6

**transition** [2] - 49:8, 57:14

**translates** [1] - 90:9

**transport** [5] - 26:22, 28:2, 33:11, 42:24, 80:5

**transported** [1] - 42:15

**treat** [1] - 8:23

**treatment** [90] - 7:21, 8:7, 14:23, 14:25, 15:6, 15:7, 15:12, 15:14, 15:16, 16:15, 16:18, 18:19, 18:21, 18:25, 19:1, 19:19, 26:23, 27:25, 30:22, 31:7, 31:18, 33:12, 33:13, 33:14, 39:16, 39:22, 41:12, 42:15, 42:19, 42:22, 42:23, 42:24, 45:16, 47:1, 47:21, 47:24, 48:4, 48:6, 48:7, 48:9, 48:10, 48:11, 48:25, 51:12, 55:7, 57:12, 58:19, 60:5, 66:3, 80:2, 85:24, 91:21, 91:22, 102:20, 106:22, 113:23, 114:2, 114:5, 116:9,

116:13, 116:17, 116:18, 116:19, 117:11, 117:12, 119:4, 119:10, 120:1, 121:1, 142:10, 143:18, 143:22, 144:10, 144:25, 145:13, 146:9, 147:8, 151:7, 151:11, 151:19, 152:16, 169:19, 170:9

**Tree** [4] - 67:17, 67:23, 67:24, 162:23

**trees** [1] - 24:12

**tremendous** [1] - 67:25

**trigger** [3] - 162:24, 163:5, 163:14

**triggering** [1] - 163:25

**trip** [1] - 70:22

**trouble** [3] - 103:19, 103:20, 167:22

**truck** [2] - 69:24, 70:19

**true** [1] - 74:8

**trust** [2] - 54:13, 115:12

**trusting** [1] - 75:7

**truth** [1] - 75:8

**try** [13] - 8:24, 38:2, 50:2, 50:11, 53:11, 59:6, 71:15, 74:25, 96:1, 96:2, 102:18, 117:16, 130:1

**trying** [13] - 36:12, 50:13, 64:9, 64:11, 80:16, 84:2, 85:12, 85:14, 97:6, 110:23, 111:1, 118:4, 169:8

**Tuesday** [1] - 171:15

**turn** [4] - 13:16, 68:4, 145:18

**turned** [3] - 107:22, 119:23, 120:9

**turning** [1] - 50:16

**turnover** [3] - 29:25, 30:4, 148:3

**turns** [1] - 55:12

**TV** [1] - 26:8

**twice** [2] - 158:12, 168:21

**two** [46] - 23:22, 27:17, 30:6, 31:8, 37:10, 37:11, 39:5, 40:4, 40:10, 46:9, 46:14, 46:19, 58:11, 59:20, 64:15, 68:10, 68:14, 71:22, 72:3, 79:9, 79:15, 92:23,

92:24, 93:11, 93:16, 94:2, 96:24, 98:18, 98:23, 100:6, 101:2, 103:8, 110:9, 122:2, 123:7, 123:8, 128:4, 130:5, 132:16, 132:23, 136:10, 138:15, 140:6, 141:21, 161:6

**two-door** [1] - 72:3

**two-story** [1] - 23:22

**type** [27] - 17:12, 17:22, 22:7, 32:12, 35:25, 39:16, 39:25, 42:2, 42:8, 62:24, 72:9, 80:6, 89:3, 95:22, 99:12, 99:16, 100:11, 107:14, 120:15, 125:11, 125:20, 131:15, 137:13, 144:5, 159:1, 159:24

**types** [8] - 40:4, 41:1, 62:25, 100:6, 104:7, 159:24, 160:4, 164:7

**typical** [1] - 98:20

**typically** [3] - 84:25, 85:1, 146:18

**U**

**U-turn** [1] - 68:4

**U.S** [3] - 52:16, 52:19, 144:20

**UA** [1] - 43:25

**ultimately** [2] - 8:17, 136:11

**umbrella** [1] - 150:6

**uncomfortable** [2] - 62:14, 95:22

**under** [20] - 7:3, 43:18, 45:8, 51:6, 62:6, 65:14, 74:1, 87:4, 90:9, 92:8, 92:9, 97:24, 101:9, 109:14, 109:25, 137:21, 147:14, 150:5, 166:9, 170:2

**understandable** [1] - 64:3

**understood** [5] - 64:7, 78:25, 120:4, 151:2, 162:18

**undue** [2] - 10:3, 10:5

**unfortunate** [1] - 108:4

**Uniform** [1] - 17:3

unique [4] - 39:18, 41:13, 41:21, 77:4
unit [7] - 10:14, 10:24, 11:24, 35:16, 53:3, 68:8, 118:4
units [1] - 10:20
University [3] - 141:23, 141:25, 142:1
unless [4] - 75:15, 94:19, 106:3, 113:15
unlocked [1] - 130:3
unreasonable [2] - 10:1, 10:2
up [48] - 14:22, 18:17, 19:12, 22:21, 24:4, 25:7, 26:20, 27:5, 27:6, 31:24, 33:13, 34:5, 34:7, 38:22, 44:14, 49:10, 52:23, 55:1, 60:7, 67:14, 76:5, 76:15, 78:15, 78:24, 79:21, 91:20, 93:16, 99:8, 99:14, 100:19, 103:22, 104:15, 105:16, 110:22, 111:18, 114:20, 117:16, 118:18, 121:13, 124:14, 124:21, 134:11, 138:12, 139:5, 152:9, 165:7, 170:23, 172:18
updated [1] - 136:13
upgrade [2] - 29:1, 66:4
upgraded [1] - 28:24
urinalysis [2] - 43:25, 100:18
urines [1] - 49:5
usage [1] - 108:5
useful [1] - 7:10
user [1] - 13:18
uses [2] - 18:5, 88:4
utility [1] - 26:6
utilization [1] - 146:25

**V**

Vafa [2] - 78:17, 168:9
valid [1] - 127:22
validity [1] - 128:1
Valley [2] - 78:18, 168:10
van [16] - 26:21, 28:7, 31:25, 32:7, 32:8, 32:12, 32:17, 34:7, 80:4, 80:5, 80:6,

80:7, 106:22, 121:8, 123:2
vans [19] - 27:9, 27:25, 32:2, 32:15, 33:15, 33:19, 33:25, 78:23, 79:1, 79:3, 79:7, 79:16, 79:19, 79:24, 121:7, 121:16, 122:13, 138:14, 138:15
variance [24] - 7:2, 9:17, 9:22, 11:13, 11:17, 12:7, 12:10, 12:18, 12:24, 13:11, 16:25, 41:1, 60:1, 60:21, 61:1, 61:12, 62:6, 63:20, 63:23, 105:24, 106:4, 127:20, 136:5, 139:24
variances [1] - 127:24
variety [1] - 155:16
various [11] - 22:2, 25:23, 38:1, 49:14, 83:3, 87:24, 91:19, 95:22, 142:6, 170:24, 171:4
vary [1] - 48:12
vehicle [8] - 27:22, 77:3, 77:9, 77:10, 78:2, 78:10, 121:8, 139:23
vehicles [31] - 26:18, 26:20, 26:22, 27:1, 27:14, 27:15, 28:19, 29:6, 29:9, 32:2, 33:11, 40:14, 40:18, 42:23, 54:2, 79:10, 79:22, 121:7, 121:16, 121:18, 121:22, 121:23, 121:24, 138:7, 138:8, 138:11, 138:14, 138:17, 139:6, 139:10, 139:17
VENKATARAO [2] - 126:16, 127:7
Venkatarao [1] - 126:17
verse [1] - 164:6
version [10] - 40:9, 41:12, 49:20, 49:21, 73:3, 97:16, 104:18, 116:16, 117:8, 117:13
versions [3] - 35:7, 49:14, 120:6
versus [5] - 74:17, 97:8, 116:6, 149:1, 164:6
veteran [1] - 40:11
victories [1] - 145:19

view [2] - 24:8, 25:14
violate [1] - 81:14
violates [1] - 88:3
violation [13] - 17:15, 40:23, 61:19, 80:20, 83:13, 89:3, 90:1, 90:7, 92:5, 106:6, 128:14, 130:13, 139:20
violations [3] - 96:8, 96:11, 96:14
violent [2] - 104:20, 104:21
visible [1] - 29:6
visibly [2] - 43:18, 49:7
visit [1] - 39:9
visited [4] - 143:25, 144:3, 144:7, 150:17
visiting [1] - 150:18
visitor [1] - 35:18
visitors [3] - 35:18, 69:7, 95:9
visits [1] - 146:24
Vitae [1] - 142:16
vital [1] - 121:1
voluntarily [2] - 101:16, 118:8
voluntary [6] - 112:17, 114:25, 121:3, 157:2, 157:7, 157:10
vote [3] - 5:18, 6:5, 6:13

**W**

waiting [2] - 74:2, 74:15
waivers [5] - 5:16, 5:24, 5:25, 6:2, 160:13
walk [6] - 26:5, 58:24, 58:25, 101:16, 138:23, 155:12
walking [1] - 58:16
walks [1] - 95:12
wall [1] - 24:1
wander [1] - 107:6
wants [2] - 38:4, 118:8
warehouse [1] - 13:17
watching [2] - 112:24, 112:25
waving [1] - 65:1
ways [2] - 10:2, 145:15
week [13] - 29:3,

31:6, 38:23, 48:13, 66:7, 70:4, 70:19, 94:1, 135:10, 154:23, 154:24, 155:24, 156:1
weekend [1] - 26:25
weekends [3] - 37:5, 39:3, 59:6
weekly [2] - 35:14, 134:9
weeks [17] - 22:14, 23:13, 47:9, 47:10, 49:17, 58:4, 91:9, 94:2, 97:16, 98:10, 98:12, 98:18, 98:21, 98:23, 98:25, 108:25
wetlands [1] - 5:20
whatnot [1] - 71:11
whatsoever [1] - 43:6
white [1] - 80:13
whole [6] - 10:14, 69:25, 70:22, 128:6, 130:9, 148:4
wife [1] - 68:12
WILKES [9] - 27:8, 27:21, 43:7, 43:14, 69:18, 69:23, 71:25, 90:22, 125:10
willing [4] - 55:18, 81:4, 121:4, 131:16
willingly [1] - 119:3
wind [1] - 49:10
winds [1] - 18:17
wise [1] - 33:2
wish [1] - 127:3
withdrawal [1] - 18:15
witness [6] - 66:24, 76:11, 140:16, 140:21, 142:25, 143:1
WITNESS [297] - 27:23, 28:12, 28:15, 30:20, 30:25, 31:12, 31:15, 31:20, 31:24, 32:8, 32:11, 32:15, 33:17, 33:21, 34:17, 34:23, 36:25, 37:20, 38:11, 39:12, 39:23, 40:3, 40:8, 40:17, 41:6, 41:11, 41:21, 43:11, 43:15, 44:20, 46:7, 47:19, 50:20, 52:8, 53:21, 55:8, 55:20, 57:1, 57:5, 57:11, 57:22, 58:1, 58:5, 58:8, 58:20, 59:12, 59:16, 59:19, 62:18, 63:25, 64:3, 65:23, 68:9, 68:15, 69:4, 69:8, 69:20,

70:1, 70:13, 71:6, 71:22, 72:1, 72:13, 72:24, 73:10, 73:21, 74:6, 74:11, 76:23, 77:2, 77:13, 77:16, 77:19, 78:1, 78:4, 78:8, 79:18, 80:4, 80:17, 80:24, 81:2, 81:9, 81:18, 82:3, 82:12, 82:16, 82:21, 82:25, 83:7, 83:14, 83:20, 83:24, 84:7, 84:13, 84:17, 84:22, 85:1, 85:6, 85:13, 85:19, 85:23, 86:6, 86:10, 86:16, 86:24, 87:13, 87:17, 88:8, 88:14, 88:19, 89:13, 90:2, 90:10, 90:13, 91:4, 92:3, 92:17, 92:21, 92:25, 93:3, 93:15, 94:14, 95:2, 95:4, 95:10, 95:13, 95:16, 95:20, 96:9, 96:18, 96:21, 96:25, 97:4, 97:10, 97:22, 98:5, 98:9, 98:17, 98:21, 98:25, 99:6, 99:14, 99:22, 99:25, 100:6, 101:3, 101:18, 102:1, 102:9, 102:13, 102:16, 102:18, 102:25, 103:16, 105:1, 105:6, 105:9, 105:14, 105:19, 107:1, 107:13, 108:1, 108:4, 108:22, 109:6, 109:15, 109:18, 109:22, 110:15, 112:9, 112:16, 113:1, 113:4, 113:17, 113:22, 114:6, 114:10, 114:23, 115:21, 116:2, 116:8, 117:2, 117:5, 117:21, 118:8, 118:18, 119:20, 120:4, 120:11, 120:24, 122:17, 122:20, 123:4, 123:9, 123:14, 124:9, 124:24, 125:1, 125:3, 125:7, 125:12, 125:20, 126:2, 126:6, 127:3, 127:8, 130:4, 131:4, 131:12, 132:4, 132:8, 132:11, 132:19, 133:1, 134:8, 134:17, 137:17, 138:10, 138:18, 138:21, 139:2, 140:3, 140:10, 140:24,

141:11, 149:2, 149:17, 150:13, 150:19, 150:23, 151:8, 151:18, 152:1, 152:5, 152:19, 152:23, 153:5, 153:10, 153:15, 153:22, 154:1, 154:10, 154:15, 154:22, 155:1, 155:7, 155:10, 155:14, 155:25, 156:8, 156:18, 157:6, 157:21, 158:4, 158:9, 158:13, 159:9, 159:15, 160:1, 160:8, 160:15, 160:20, 161:1, 161:8, 161:13, 161:20, 161:24, 162:7, 162:10, 162:14, 162:25, 163:17, 164:11, 164:18, 164:21, 165:3, 165:8, 165:17, 166:20, 166:24, 167:3, 167:11, 167:13, 167:25, 168:14, 168:16, 168:19, 168:25, 169:3, 169:7, 169:14, 169:17, 169:20, 169:25, 170:3, 170:10, 170:13

**witnesses** [4] - 13:23, 66:20, 74:21, 75:16

**woman** [3] - 33:6, 34:13, 34:15

**women** [8] - 21:15, 21:17, 32:24, 34:13, 34:16, 130:3, 130:8, 130:13

**wondering** - 41:20, 105:17, 136:4, 166:7

**Wood** [21] - 5:4, 7:6, 24:1, 24:9, 25:14, 46:18, 58:22, 74:3, 78:19, 100:19, 102:4, 103:4, 103:8, 116:6, 116:23, 126:17, 135:7, 137:7, 137:18, 167:2, 167:3

**word** [4] - 13:1, 57:18, 75:7, 144:18

**words** [4] - 80:21, 88:4, 110:25, 114:19

**worker** [4] - 77:21, 122:5, 154:5, 154:6

**workers** [1] - 153:12

**workforce** [1] - 147:4

**workings** [1] - 20:1

**works** [9] - 30:16, 35:2, 66:24, 74:20, 75:21, 116:18, 121:4, 153:11, 171:20

**world** [5] - 12:3, 52:22, 111:4, 133:5, 133:6

**worth** [2] - 49:15, 53:11

**write** [1] - 94:9

**writing** [1] - 172:5

## Y

**year** [6] - 59:20, 131:13, 143:13, 160:25, 161:6, 168:18

**years** [38] - 11:10, 13:6, 13:21, 15:4, 15:18, 15:21, 17:2, 42:5, 45:2, 56:23, 60:24, 61:11, 61:12, 61:16, 61:21, 63:4, 63:9, 63:14, 63:23, 64:13, 81:25, 82:12, 83:1, 87:15, 101:13, 102:15, 103:12, 104:13, 107:21, 108:10, 112:7, 112:20, 126:20, 126:24, 128:12, 161:6

**yesterday** [4] - 28:14, 122:25, 123:18, 138:16

**yourself** [3] - 14:19, 60:14, 108:16

## Z

**zero** [2] - 50:10, 102:12

**zone** [2] - 9:21, 139:14

**zoned** [2] - 12:5, 12:7

**zoning** [8] - 10:7, 12:4, 17:8, 106:1, 127:23, 128:6, 128:8, 171:14

1

```
 1                    BOROUGH OF KINNELON
                      BOARD OF ADJUSTMENT
 2                      AUGUST 5, 2025
                     COMMENCING AT 7 P.M.
 3         --------------------------
           IN RE:                    :
 4         Application No. #1571     :
           21 Wood Chase Lane        :
 5         Palisade Properties, LLC  :
           --------------------------
 6         B E F O R E: KINNELON BOARD OF ADJUSTMENT, THERE
           BEING PRESENT:
 7
           TIM LOCKWOOD, CHAIRPERSON
 8
           MIKE NICOSIA, VICE CHAIRMAN
 9
           FRAN MALETSKY, MEMBER (ABSENT)
10
           CHERYL CANALE, MEMBER
11
           GENE PASSALACQUA, MEMBER
12
           RACHEL HERRINGTON, MEMBER
13
           MORGAN WILKES, MEMBER
14
           RONALD MONDELLO, ALTERNATE MEMBER #1
15
           OLGA GILHOOLEY, ALTERNATE MEMBER #2
16

17

18

19

20

21

22                  Quick Court Reporting, LLC
23                       47 Brian Road
                 West Caldwell, New Jersey 07006
24                       (973) 618-0872
                   Office@quickreporters.com
25
```

2

```
 1  A P P E A R A N C E S:

 2  WEINER LAW GROUP
    BY:  STEVEN R. TOMBALAKIAN, ESQUIRE
 3  629 Parsippany Road
    Parsippany, New Jersey  07054
 4  Attorney to the Board

 5  PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
    BY:  EDWARD W. PURCELL, ESQUIRE
 6  50 Tice Boulevard, Suite 380
    Woodcliff Lake, New Jersey  07677
 7  Attorney for the Applicant, Palisade Properties, LLC.

 8
    A L S O   P R E S E N T:
 9
    JENNIFER HIGHERS, Board Secretary
10
    ALEX PETRESKI, P.E., Darmofalski Engineering, Town
11  Engineer

12  ALISON KOPSCO, P.P., AICP, J. Caldwell & Associates,
    Professional Planner
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                      I N D E X
    WITNESS               SWORN        PAGE
 2
    JAY JONAS               8
 3  Direct Examination by Mr. Purcell       9
    Board/Professional Questions
 4  Ms. Gilhooley                  12, 19,
                                           42
 5  Chairman Lockwood               16, 54
    Mr. Nicosia             16
 6  Mr. Passalacqua         18
    Ms. Canale              20
 7  Public Questions
    Jen Ritacco             21
 8  11 Bent Tree Lane
    Joseph DeFalco          28
 9  15 Bent Tree Lane
    Paul Rosenwasser        32
10  39 Chilhowie Drive
    Nancy Fegan             45
11  20 Chilhowie Drive

12  PAUL GRYGIEL, AICP, PP    59
    Voir Dire Examination by Mr. Purcell    59
13  Direct Examination by Mr. Purcell       61
    Board/Professional Questions
14  Mr. Mondello            69
    Chairman Lockwood              91, 104
15  Ms. Herrington          95
    Ms. Canale              100
16  Mr. Mondello            106
    Ms. Gilhooley           116
17  Mr. Passalacqua         118
    Mr. Nicosia
18  Public Questions
    Paul Rosenwasser               122
19  39 Chilhowie Drive
    Joseph DeFalco                 134
20  15 Bent Tree Lane
    Nancy Fegan                    134
21  20 Chilhowie Drive
    Sreepadraj Venkatarao          136
22  122 Wood Chase Lane
    Jen Ritacco                    141
23  11 Bent Tree Lane

24  ALISON KOPSCO, P.P., AICP       91

25
```

4

```
 1          I N D E X (Continued)

 2  PUBLIC COMMENT                     PAGE

 3  Marie DeFalco                      144
    15 Bent Tree Lane
 4
    Joseph DeFalco                     152
 5  15 Bent Tree Lane

 6  Paul Rosenwasser                   158
    39 Chilhowie Drive
 7
    Sreepadraj Venkatarao              159
 8  122 Wood Chase Lane

 9  Dana Torsiello                     159
    22 Wood Chase Lane
10
    Jen Ritacco                        163
11  11 Bent Tree Lane

12

13

14

15
               E X H I B I T S
16
    NO.    DESCRIPTION             IDENT/EVID
17
    A-6    Letter from Dr. Sugarman
18         Dated July 25, 2025           7

19  A-7    Employee Training Course
           Description List              12
20
    A-8    Borough of Kinnelon Fire Safety
21         Certificate Issued on August 27,
           2024                          15
22
    A-9    SKIPPED
23
    A-10   Evaluation Report of DCA
24         Dated July 11, 2025           27
25
```

5

1    CHAIRMAN LOCKWOOD:  New business.
2  Application 1571, 21 Wood Chase Lane, Palisades
3  Properties, LLC.
4    Mr. Purcell?
5    MR. PURCELL:  Good evening,
6  Mr. Chairman, Members of the Board, Can you hear me?
7    CHAIRMAN LOCKWOOD:  Yes.
8    MR. PURCELL:  Thank you.
9    Before I get started tonight, I just
10  have a couple housekeeping items.
11    So with respect to members of the
12  board, I don't believe Mr. Nicosia was at the last
13  meeting, so he's -- were you there?
14    MR. NICOSIA:  I was there.
15    MR. PURCELL:  He was here?
16    MR. PASSALACQUA:  He was here.
17    MR. PURCELL:  Oh, you're over there.
18    I'm sorry.
19    MR. TOMBALAKIAN:  Mr. Passalacqua
20  signed a certification that he reviewed the
21  transcript.
22    MR. PURCELL:  Okay.  All right.
23    Thank you.
24    And then, just I noticed with respect
25  to the agenda that Palisades, the name of the

6

1  applicant is incorrect.
2    There's an "S" at the end, so
3  Palisades.
4    Just to correct that for the record.
5    I do have a letter I want to enter into
6  the record.  This was sent to the board this past
7  week.
8    Dr. Sugarman, as requested by the
9  Chairman, had sent a letter out.
10    I just want to, you know, submit that
11  for the record.
12    That's a letter dated July 25, 2025.
13    I'll mark that as A-6 and just place
14  that in the record.
15    MR. MONDELLO:  Mr. Purcell, before you
16  do that, I know that the doctor was responding to, I
17  guess, some questions from residents.
18    How do they cross-examine that letter
19  if they want to?
20    MR. PURCELL:  Well, I mean, there was a
21  request that -- we did discuss that at the time.
22    The Chairman had directed us to do it
23  that way, I think, in order to, you know, save time.
24    If the Chairman would like Dr. Sugarman
25  to come back, we certainly can do that.

7

1    It seemed like they were just more
2  direct questions that could be answered.
3    MR. MONDELLO:  I'm not objecting.
4    I'm asking --
5    MR. PURCELL:  The strict rules of
6  evidence don't apply.
7    CHAIRMAN LOCKWOOD:  I think it's fine.
8    MR. PURCELL:  It's more just kind of
9  correcting or answering some questions that were
10  relatively simple and straightforward.
11    MR. TOMBALAKIAN:  Mr. Purcell, if -- to
12  the extent the public reviews the letter and has
13  questions and wants to ask Dr. Sugarman questions, in
14  that event, would you be available to bring her back
15  for questions.
16    MR. PURCELL:  Yes, we would.
17    MR. TOMBALAKIAN:  Okay.
18    MR. PURCELL:  Yeah, I think you all
19  have a copy of this, right?
20    (Whereupon, Letter from Dr. Sugarman
21    Dated July 25, 2025 is marked as Exhibit A-6
22    for identification.)
23    MR. PURCELL:  The other thing I just
24  wanted to say before we get started is just to give
25  you an update with respect to the septic.

8

1    Subsequently to the last meeting, the
2  Department of Health reached out to Palisades'
3  engineers, Jeff Houser, just to ask that -- just to
4  say that there was a typographical error with respect
5  to the permit application.
6    So that's in the process of being fixed
7  to be submitted.  So that is something that is
8  happening.
9    But, you know, I just wanted to explain
10  that at the top of the meeting just to correct that
11  fact as well.
12    CHAIRMAN LOCKWOOD:  Thank you.
13    MR. PURCELL:  So with that, I'll just
14  bring Jay Jonas back.
15    There were a couple of other additional
16  questions from the last meeting that he wanted to
17  answer and clarify a few things.
18    Then we'll take it from there.
19    MR. TOMBALAKIAN:  Mr. Jonas, do you
20  acknowledge you remain under oath from the prior
21  hearing?
22    MR. JONAS:  Yes.
23  J A Y   J O N A S,
24    1582 John Street, Fort Lee, New Jersey, having
25    been duly sworn, testifies as follows:

9

1    MR. TOMBALAKIAN:  Thank you.

2    DIRECT EXAMINATION

3    BY MR. PURCELL:

4        Q.    Mr. Jonas, can you please correct the

5    record with respect to the parking of employees for

6    this property?

7        A.    Yeah.

8              First, I just want to apologize.  I'm

9    not frequent in these type of environments.

10             I misspoke and got a little nervous.

11             We do have the commercial vehicles that

12    park there.

13             But, in addition, we have staff members

14    that park their cars at the residence, which I triple

15    checked on to get, you know, everything.

16       Q.    Is Palisades willing to stipulate to

17    anything regarding to the use of vehicles on the

18    property?

19       A.    Yeah.

20             We would be looking to have the two

21    commercial vehicles in the garage and three personal

22    vehicles in the -- in the driveway at any given time.

23    No more than three vehicles.

24       Q.    So you would stipulate to exclusive of

25    changeover in the employees change, that there be no

10

1    more than three private vehicles on the property?

2        A.    Yeah.

3              For any sustained period of time.

4        Q.    Then with respect to the commercial

5    vehicles, there would just be two commercial

6    vehicles; they would be placed in the garage.

7              Is that right?

8        A.    Two commercial vehicles, both would be

9    placed in the garage.

10       Q.    And then the larger 12-person vehicle,

11    that will not stay there on a permanent basis, is

12    that correct?

13       A.    Correct.

14       Q.    That will just come and drop people

15    off; people often leave and won't stay?

16       A.    Yeah.

17             The most they would be there is ten, 15

18    at most minutes, depending, but in and in out.

19       Q.    Mr. Jonas, there was a question with

20    respect to how much time was left on the lease for

21    the property owner.

22             Can you just clarify that?

23       A.    Yeah.

24             So the lease, it runs through 2028.

25       Q.    And there was another question.

11

1              How many residents have been asked to

2    leave the subject CSR since it began operations?

3        A.    We estimate that about six people --

4    yeah, roughly, I'd say maybe ten people in the time

5    we've been there.

6              We've been there six years.  Maybe less

7    than a dozen, maybe ten, something like that.

8              There's no way to say for sure the

9    exact number.  We don't track it, but...

10       Q.    Mr. Jonas, how many residents been you

11    been readmitted after being asked to the leave?

12       A.    We can't recall any specifically that

13    have been readmitted.

14       Q.    Mr. Jonas, what type of trainings do

15    Palisades employees obtain?

16       A.    So Palisades employees have -- we do

17    receive the certification, which I believe we have

18    the list that we'll provide.

19       Q.    So there's a bunch of different types

20    of trainings here.  CPR, is that right?  Who does the

21    CPR course?

22       A.    The American Red Cross comes in and

23    does CPR.

24       Q.    And then the balance of these courses

25    -- there's 13 courses.  There's 13 courses here.

12

1              So the other 12, those are done by who?

2        A.    I think it's a company called CU - CU

3    Credits, CE Credits.

4        Q.    Okay.  That provides -- they provide

5    continuing education for those that work in recovery?

6        A.    Correct.

7        Q.    This is a correct list of those

8    courses?

9        A.    Yes.

10       Q.    Then this is also a correct list of the

11    course descriptions from CE?

12       A.    Course descriptions, yes.

13       MR. PURCELL:  Mr. Chairman, I'll mark

14    this as Exhibit A-7.

15       MR. TOMBALAKIAN:  We'll call that --

16    what are we calling that document.

17       MR. PURCELL:  Employee Trainings.

18       MR. TOMBALAKIAN:  Thank you.

19       (Whereupon, Employee Training Course

20    Description List is marked as Exhibit A-7 for

21    identification.)

22       MS. GILHOOLEY:  Mr. Chairman, when are

23    we allowed to ask clarifying questions as we're

24    getting this?  Okay.

25       So could you refresh my memory

13

1  regarding the 6 to 10 people; what was the question
2  that you were answering?
3         MR. JONAS:  How many people that we
4  have discharged from the program, you're asking?
5         MS. GILHOOLEY:  Oh, okay.
6         And did you look into, like, what
7  actually led -- you have asked them in this case to
8  leave the program.
9         MR. JONAS:  In the last six years, yes,
10  that's what I'm referring to.
11        And we're just giving an estimate
12  because we don't track that directly in that way.
13        So I'm just giving the best estimate
14  that I can per the question that someone had asked.
15        MS. GILHOOLEY:  Okay.
16  BY MR. PURCELL:
17    Q.    Mr. Jonas, I'm just going to list these
18  trainings, and you just tell me if this is correct.
19        This is the trainings you received from
20  CE trainings with respect to your employees.
21        One, first is CPR.
22        Second is Ethics Boundary Problems and
23  Sexual Misconduct.
24        3, The Confidentiality of Alcohol and
25  Drug Abuse Patient Records Regulation and the HIPAA

14

1  Privacy Rules, Implication for Alcohol and Substance
2  Abuse Programs.
3         4, Risk Management for Recovery
4  Administrators.
5         5, Aggression Control Recognition,
6  Corrective Approaches and Defusion.
7         6, Co-morbidity Addiction and Other
8  Mental Illness.
9         7, Developing a Recovery and Wellness
10  Lifestyle.
11        8, Produce and Identify Physical Risks
12  and Personal Safety Planning.
13        9, Suicide Prevention.
14        10, Domestic Violence, the Basic.
15        11, Opiate Overdose Tool Kit by SAMHSA.
16        12, Health and Safety Practices,
17  First-Aid.
18        And 13, Fire Safety Course.
19    A.    Yes.
20    Q.    So those are the trainings?
21    A.    Yeah.
22    Q.    Mr. Jonas, an additional question I had
23  is, the subject home has been inspected by the
24  Borough of Kinnelon with respect to fire safety, is
25  that correct?

15

1    A.    Yes.
2    Q.    And that certificate was issued on
3  August 27, 2024, and it's good until the end of this
4  month, is that correct?
5    A.    Yes.
6    Q.    And that's this certificate right here?
7    A.    Yes.
8         MR. PURCELL:  Okay.  Mr. Chairman, I'll
9  mark that as Exhibit A-8.
10        (Whereupon, Borough of Kinnelon Fire
11        Safety Certificate Issued on August 27, 2024,
12        is marked as Exhibit A-8 for identification.)
13  BY MR. PURCELL:
14    Q.    And, lastly, Mr. Jonas, with respect to
15  any type of serious incidents that have taken place
16  at the home, have there been any deaths, overdoses or
17  assaults at the home?
18    A.    No.
19        MR. PURCELL:  Thank you.
20        That's all I have.
21        CHAIRMAN LOCKWOOD:  Any other what
22  we'll classify as serious incidents besides what
23  Mr. Purcell said.
24        MR. PURCELL:  How would you classify
25  serious incident?

16

1         CHAIRMAN LOCKWOOD:  Requiring, you
2  know, paramedics or fire, police.
3         MR. JONAS:  We've had -- we've had
4  emergency services at the house.
5         Is that the question, in general?
6         CHAIRMAN LOCKWOOD:  Yeah.
7         MR. JONAS:  Just for, like, client
8  situations?
9         Yes.  We have, yes, for medical-related
10  situations for the people who live in the house.
11        For the residents, yes.
12        CHAIRMAN LOCKWOOD:  Okay, thank you.
13        I have one other question for you,
14  you're a business, we already recognize that, right?
15        How is this business inherently
16  beneficial to our community?
17        MR. PURCELL:  So that's a question I
18  think Mr. Grygiel can answer.
19        I think, you know, Dr. Sugarman spoke
20  in general about that, the benefits.
21        But I think I'd ask you to direct that
22  question to Mr. Grygiel.
23        CHAIRMAN LOCKWOOD:  No problem.
24        MR. NICOSIA:  Chairman, regarding the
25  training, can you just go over for the record the

17

1  format the trainings are offered in.
2        MR. JONAS:  Yeah.
3            So each training, it's either --
4  there's either, like, a video that you watch, it
5  could be, like, 20 minutes to, like, let's just say
6  an hour, depending on the training.
7            And then you take, like, a multiple
8  choice type of test after the video.
9            And then some of them are slides.  So
10  instead of the video it's just slides that you go
11  through.
12            And then when you get to the end of the
13  slides, you have to take the multiple choice test.
14        MR. NICOSIA:  And is this done
15  typically as part of, like, an on-boarding process
16  for an employee.
17        MR. JONAS:  Yes.
18        MR. NICOSIA:  And then refreshers are
19  done?
20            I'm sorry.
21        MR. JONAS:  Annually.
22        MR. NICOSIA:  Annually a refresher is
23  done.
24            Then how is compliance monitored.
25        MR. JONAS:  Well, I mean, I'm always --

18

1  we're always checking to make sure that they're all
2  done.
3            Everyone is complaint.
4            I mean, yeah.  I mean, we always make
5  sure.
6            Upon hire everyone is going to get
7  these trainings.
8            And then it's just about making sure
9  that they get them at their annual, which we have a
10  pretty good system of, you know, when it's done.
11        CHAIRMAN LOCKWOOD:  Any other questions
12  from the board?
13        MR. PASSALACQUA:  Yeah, I have a
14  question.
15            Relating back to you stated earlier
16  about the commercial vehicles.  You said the two
17  commercial vehicles would be on the site.  They would
18  park indoors.
19            And the third vehicle, you said that
20  would be used for picking up and dropping off the
21  residents.
22            How -- is there any type of protocol
23  that would manage, like, waiting time so the vehicles
24  would be outside idling?
25            Typically during --

19

1        MR. JONAS:  Probably about ten tops.
2  Like, ten, fifteen minutes, just gathering and
3  getting everybody out of the house and in the van.
4  That would be probably the most.
5        MR. PASSALACQUA:  And do all the
6  residents leave at the same time?
7        MR. JONAS:  Yeah, yeah.
8        MR. PASSALACQUA:  And the frequency of
9  that occurrence would be?
10        MR. JONAS:  Generally speaking, twice a
11  day to and from.
12        MR. PASSALACQUA:  So you say about a
13  ten-minute wait time?
14        MR. JONAS:  Yeah.
15            Ten, fifteen minutes tops, just
16  depending on the circumstance.
17            It could be five minutes.
18        MR. PASSALACQUA:  Okay.
19        MS. GILHOOLEY:  What type of vehicles
20  will be parked in the garage?
21        MR. JONAS:  I believe it's a -- I could
22  check.
23            I think it's a small -- what do they
24  call it -- like a hybrid.
25            It's an Explorer and a hybrid type of

20

1  smaller compact vehicle.
2        MR. PURCELL:  It's a smaller type of
3  van, correct?
4        MR. JONAS:  Yeah, it's small.
5        MR. PURCELL:  There's a very large
6  12-person van that wouldn't fit in the garage.
7        MR. JONAS:  No.
8            These vehicles are small, like, car
9  size.  They fit both of them comfortably in the
10  garage.
11            And it's, like, a hatchback type of
12  van.  I could double check.
13        MS. GILHOOLEY:  And Explorer is usually
14  -- that's an SUV.  I have an Explorer.
15        MR. JONAS:  Yeah, an SUV.  That one is
16  an SUV.
17        MS. GILHOOLEY:  Okay.  And this is --
18  it's a two-car garage home.
19        MR. JONAS:  It's a three.
20            Actually, it's a three-car garage.
21        CHAIRMAN LOCKWOOD:  Any other questions
22  from the board?
23        MS. CANALE:  I have a question.
24            Who is the business owner, William
25  Ennis?

21

1  MR. JONAS:  That's my partner, yes.
2  MS. CANALE:  So is there a Certificate
3  of Inspection prior to August 2024?
4  MR. PURCELL:  For the fire.
5  MS. CANALE:  It's done annually.
6  MR. PURCELL:  Yes, it's done annually.
7  So an annual inspection, you know, what
8  the DCA regulations say is that -- you know, the DCA
9  regulates all -- the issuance of construction
10  permits, electrical permits for these CSLRs.
11  But there is local permitting for fire
12  inspections.
13  MS. CANALE:  On an annual basis.
14  MR. PURCELL:  On an annual basis.
15  MS. CANALE:  Thank you.
16  CHAIRMAN LOCKWOOD:  Any other questions
17  from the board?
18  (No Response.)
19  CHAIRMAN LOCKWOOD:  I'd like to open it
20  up to public, anyone from the public who would like
21  to speak with Mr. Jonas?
22  MR. TOMBALAKIAN:  It's asking questions
23  based on his testimony this evening.
24  State your name and address, please.
25  MS. RITACCO:  Jen Ritacco, 11 Bent Tree

22

1  Lane.
2  The handout about the training, is
3  there lists of all employees and the dates that they
4  had the training?
5  Can you just -- is there a date, the
6  most recent date of any training that was taken?
7  MR. TOMBALAKIAN:  This is just a
8  summary of the classes.  Do you want to see the
9  document?
10  MS. RITACCO:  There's no dates that
11  show when each employee was trained.
12  MR. TOMBALAKIAN:  No.
13  You don't understand.
14  This is just an identification of the
15  various training classes, courses, that the employees
16  take.
17  MS. RITACCO:  So no proof that every
18  employee is in compliance and up-to-date.
19  MR. TOMBALAKIAN:  Just the testimony of
20  Mr. Jonas.
21  MS. RITACCO:  Okay.
22  You asked about emergency visits and
23  you didn't mention anything about the electrical fire
24  that took place on July 5th, was it?
25  And you showed a fire certificate that

23

1  was from last August.
2  What was the outcome of the electrical
3  fire?
4  Have things been reinspected?  Have
5  things been resolved?
6  MR. JONAS:  Yeah.
7  The panel was smoking.  And the fire
8  came out and they took care of the issue at hand.
9  And then we replaced the panel.
10  So the panel is in place and everything
11  is in good working order now.
12  MS. RITACCO:  So is there any
13  documentation of that?
14  MR. PURCELL:  Yes.
15  We have certificates.  We have the
16  permit application to the DCA for the replacement
17  breaker box.
18  Would you like us to provide that?
19  MS. RITACCO:  I mean, I think it needs
20  to be shown that there was a fire.
21  I mean, there was police and fire
22  trucks going up the street at all hours of the night.
23  And it sounded pretty serious.
24  MR. PURCELL:  Okay.
25  We're happy to provide that information

24

1  to you and to the board.
2  So, Mr. Jonas, this is the code -- the
3  permit application that was submitted to the DCA for
4  the breaker box replacement for the home, is that
5  correct?
6  MR. JONAS:  Yes.
7  MR. PURCELL:  The breaker box has been
8  replaced.
9  MR. JONAS:  Yes.
10  MR. PURCELL:  It was replaced on an
11  emergency basis, and then this was pursuant to the
12  rules filed afterwards.
13  MR. JONAS:  Yes.
14  MR. TOMBALAKIAN:  What is the date of
15  that?
16  MR. PURCELL:  That is submitted --
17  well, it was submitted.
18  This is the submitted application.
19  MR. TOMBALAKIAN:  That's fine.
20  MR. PURCELL:  I don't have a date on
21  it.
22  But it's signed by electrician Martin
23  Franzoi for the replacement of a 100 amp subpanel.
24  MR. TOMBALAKIAN:  Was it July 2024.
25  MR. PURCELL:  It would be July 2024 --

25

1   or 2025.  I'm sorry.
2                MR. TOMBALAKIAN:  Thank you.
3                MR. PURCELL:  Yeah.
4                MS. RITACCO:  So with something like
5   that being done, doesn't that require a follow-up
6   inspection by the...
7                MR. PURCELL:  So that's a legal
8   question.
9                I'm happy to answer it.  So the answer
10  is -- the answer is yes.
11               So that permit was filed with the New
12  Jersey Department of Community Affairs.
13               They have jurisdiction over the home.
14  So they will be coming and inspecting the breaker
15  panel to sign off on it.
16               Has that happened yet, Jay; do you
17  know?
18               MR. JONAS:  No, I don't know.
19               MS. RITACCO:  The DCA was there just a
20  few weeks ago.
21               MR. PURCELL:  That was a different
22  provision of the DCA.  That was the boardinghouse
23  section.
24               So, you know, because this was a major
25  -- because that was an event that took place, we did

26

1   contact -- Palisades did contact the DCA and there
2   was a report with respect to that fire.  I'm happy to
3   --
4                MS. RITACCO:  So I'm the one that
5   called the DCA and asked them about the results of
6   the fire.
7                And they knew nothing about it.  And he
8   said I will be sending someone out to do an
9   inspection.  I would like to see the results of that
10  inspection.
11               MR. PURCELL:  Okay.
12               So that's a report dated July 11, 2025.
13  It's a document entitled "Evaluation Report" and
14  orders.
15               Is this the correct document,
16  Mr. Jonas.
17               MR. JONAS:  Yes.
18               MR. PURCELL:  That was issued by the
19  DCA.
20               We'll mark that as A-10.
21               CHAIRMAN LOCKWOOD:  Mr. Jonas, what was
22  the date of the event?
23               MR. JONAS:  I don't recall.
24               I'd have to look specifically.
25               MS. RITACCO:  July 5th.

27

1                CHAIRMAN LOCKWOOD:  July 5th.
2                MS. RITACCO:  July 6, 4 a.m.
3                MR. JONAS:  July 6th, yes.
4                MR. TOMBALAKIAN:  Mr. Purcell, how
5   would you best describe Exhibit A-10 so I can put it
6   down.
7                MR. PURCELL:  Evaluation Report.
8   Evaluation Report by the DCA.
9                MR. TOMBALAKIAN:  Thank you.
10               (Whereupon, Evaluation Report of DCA
11      Dated July 11, 2025 is marked as Exhibit A-10
12      for identification.)
13               MS. RITACCO:  That's all I have.
14               Thank you.
15               AUDIENCE MEMBER:  Can you speak into
16  the mic, Chairman?
17               We cannot hear you.
18               To the extent you can, please.
19               MR. TOMBALAKIAN:  They're asking if you
20  can speak into the mic.
21               CHAIRMAN LOCKWOOD:  Mr. Jonas, did
22  anyone from Kinnelon Township inspect the home?
23               MR. PURCELL:  So as I was stating a
24  moment ago, that's just -- the fire inspection is
25  done by the Borough of Kinnelon.

28

1                CHAIRMAN LOCKWOOD:  And they were
2   there?
3                MR. PURCELL:  Correct.
4                CHAIRMAN LOCKWOOD:  Anyone else?
5                Yes, sir.
6                Your name and address, please.
7                MR. DeFALCO:  Joe DeFalco, 15 Bent Tree
8   Lane, Kinnelon.
9                Is your client an actual person?
10               MR. PURCELL:  The client is an LLC.
11               MR. DeFALCO:  Not an actual person.
12               MR. PURCELL:  That's correct.
13               MR. DeFALCO:  Are you aware that the
14  property is located within the Highlands Commission?
15               MR. PURCELL:  We are.
16               And we stipulated that this -- by the
17  way, I'll just say, we stipulated to complying with
18  the Highlands at the last meeting.
19               MR. DeFALCO:  Did you make an
20  application to their board of adjustment for
21  permission to operate in the Highlands Commission
22  territory?
23               MR. PURCELL:  All right.
24               I'm going to answer that question.
25  There was no development on the site.

29

1 Nothing has been changed. It was a
2 single-family home before Palisades Properties began
3 to use it. It's a single-family home now.
4 So there was no application for
5 development that would require Highlands approval.
6 MR. PURCELL: That's an opinion.
7 MR. PURCELL: That's the answer.
8 MR. DeFALCO: I appreciate the opinion.
9 MR. PURCELL: So I'll just answer that
10 question.
11 Do you have anything to ask with
12 respect to Mr. Jonas' testimony that he just gave.
13 MR. DeFALCO: We're talking about the
14 application in its entirety.
15 MR. PURCELL: No.
16 We're talking about Mr. Jonas'
17 testimony.
18 MR. DeFALCO: Mr. Jonas, have you made
19 application to the State, not just through DCA, but
20 to the Master Plan Commission of the State?
21 MR. PURCELL: So that's a legal
22 question.
23 MR. DeFALCO: Yes, it is.
24 MR. PURCELL: I would say, the answer
25 is no. No.

30

1 That's not required.
2 MR. DeFALCO: You are in the Highlands,
3 and there's a difference of opinion there, sir.
4 The difference of opinion is, the
5 Highlands requires you to get permission from the
6 State Master Plan to operate within the Highlands
7 territory.
8 Apparently that hasn't been done.
9 I would submit that this board has no
10 jurisdiction to do anything until they comply with
11 both the State Master Plan and the Highlands
12 Commission's Master Plan, neither of which is before
13 this board.
14 MR. TOMBALAKIAN: Sir, at this point
15 we're asking questions of Mr. Jonas.
16 MR. DeFALCO: I understand.
17 MR. TOMBALAKIAN: There will be an
18 opportunity for comments, for legal arguments.
19 But now is the time to ask questions of
20 Mr. Jonas.
21 That's the process.
22 MR. DeFALCO: Thank you.
23 So, Mr. Jonas, your client is not an
24 actual person; therefore, they are not married.
25 Therefore, they do not have children.

31

1 MR. PURCELL: Is that a question?
2 MR. DeFALCO: It is a question.
3 Would you agree that those --
4 MR. PURCELL: You know, at a certain
5 point this becomes a little bit ridiculous.
6 I think if you want to make these
7 arguments to the board at the appropriate time,
8 you're more than welcome to do that.
9 But I don't think it's appropriate at
10 this point to try to make statements and, you know,
11 put a question mark at the end of it and try to
12 phrase it as a question to Mr. Jonas whether it's
13 clear or not.
14 MR. DeFALCO: Fair enough.
15 Fair enough.
16 MR. PURCELL: That's the process the
17 board follows, right?
18 MR. DeFALCO: Has the septic system
19 been redesigned.
20 MR. PURCELL: The answer is yes, it has
21 been redesigned.
22 MR. DeFALCO: Who inspected the
23 redesign?
24 MR. PURCELL: It was submitted to the
25 board -- to the Board of Health.

32

1 And it's being -- it was approved.
2 There's going to be a revised
3 application submitted, as I stated at the outset of
4 the hearing.
5 MR. DeFALCO: So at this point in time
6 the question is, is the septic system approved?
7 MR. PURCELL: Yes.
8 There is an approved plan for the
9 septic system.
10 MR. DeFALCO: Even the redesign?
11 MR. PURCELL: Not the redesign.
12 But the original plan has been
13 approved. It hasn't -- work has not commenced yet
14 because of that issue, but there is an approved
15 design.
16 MR. DeFALCO: Very good.
17 I'll wait until the next section.
18 CHAIRMAN LOCKWOOD: Any other folks
19 from the -- yes, sir. Your name and address, please.
20 MR. ROSENWASSER: Sure.
21 Hi, everyone. My name is Paul
22 Rosenwasser. I live at 39 Chilhowie Drive.
23 CHAIRMAN LOCKWOOD: How do you spell
24 that?
25 MR. ROSENWASSER: C-H-I-L-H-O-W-I-E.

33

1    CHAIRMAN LOCKWOOD:  Just like it
2    sounds.
3        MR. ROSENWASSER:  It means many deer in
4    Indian.
5        It's an Indian language.
6        Yes, Mr. Jonas, your new testimony
7    states that six people to ten people, or less than a
8    dozen, were asked to leave the CSLR.
9        And can you describe the process for
10   these people leaving the CSLR?
11       I know you kind of gave us a general
12   way, but how did these people leave?
13       MR. JONAS:  On the specifics, I can't
14   really speak to the specifics of each situation.
15       Just that there's about, you know, a
16   little under a half dozen probably in the six years
17   that been asked to leave.
18       MR. ROSENWASSER:  So when they were
19   asked to leave, you don't know if they just walked
20   out the front door, got an Uber; you don't know.
21       MR. JONAS:  I mean, we have our
22   process.
23       I'm just saying on the specifics to
24   your question of each individual's case.
25       MR. PURCELL:  Mr. Jonas, I think we are

34

1    aware of one individual leaving by themselves, is
2    that correct?
3        MR. JONAS:  Yeah.
4        There was the one that walked off.
5        MR. PURCELL:  And they're able to do
6    that because they can leave --
7        MR. JONAS:  Well, it's not a prison,
8    yeah.  It's not a prison.
9        MR. PURCELL:  Right.
10       But when you remove someone and they
11   are -- they are -- it's the goal of Palisades to get
12   them a ride or get them moved off the property so
13   they're not leaving --
14       MR. JONAS:  Always.
15       MR. PURCELL:  This person wanted to
16   leave on their own.
17       MR. JONAS:  Always.
18       MR. PURCELL:  And they can do that.
19       MR. JONAS:  And they can, yeah.
20       MR. ROSENWASSER:  Have any of these
21   people failed a urine analysis and left the property
22   on their own?
23       MR. JONAS:  The specifics of these
24   specific cases, I could not -- I just couldn't answer
25   that.

35

1    I couldn't tell you exactly.
2        MR. ROSENWASSER:  Great.
3        Thank you so much.
4        In any of those places -- those
5    situations, were the police called?
6        MR. JONAS:  I couldn't say
7    specifically.
8        But -- I couldn't speak on the -- those
9    specific ones.
10       MR. ROSENWASSER:  I heard that there's
11   going to be three cars there, two commercial in the
12   garage and one out on the driveway.
13       That's ten residences that need to get
14   treatment.
15       Do both these cars go to the treatment
16   center each day?
17       MR. JONAS:  The two that are kept in
18   the garage?
19       MR. ROSENWASSER:  Yeah.
20       MR. JONAS:  Some, depending on the
21   need.
22       The van is the primary source of
23   transportation that will pick them and bring them to
24   and from.
25       MR. ROSENWASSER:  Oh, okay.

36

1    So the van is not kept onsite.
2        MR. JONAS:  But not kept onsite,
3    correct.
4        MR. ROSENWASSER:  Great.
5        And is there an employee there 24 hours
6    a day more or less.
7        MR. JONAS:  Yes.
8        MR. ROSENWASSER:  Okay, great.
9        Thank you so much.
10       One of my follow-up questions in our
11   last discussion was that, how many people at
12   Palisades Properties, the property at 21 Wood Chase,
13   attend the North Jersey Recovery Center?
14       And your testimony was currently all of
15   them did, and that none of them attend an outpatient
16   program, other than North Jersey Recovery Center.
17       I asked you if that has been the case
18   for the last six years.
19       You told me you couldn't say for sure.
20       I asked you if you could find out.
21       And you said you can certainly try to
22   find out.
23       Have you been able to find out what
24   percentage of people in the last six years have
25   attended an outpatient program other than North

37

1  Jersey Recovery?

2          MR. JONAS:  I can't recall any.

3          MR. ROSENWASSER:  Okay.

4          So can I take that as zero percent have

5  attended an outpatient program other than North

6  Jersey Recovery?

7          MR. PURCELL:  He answered that he can't

8  recall any.

9          MR. ROSENWASSER:  Okay.

10         Mr. Jonas, who pays for the

11 transportation to the North Jersey Recovery Center?

12         MR. JONAS:  When you say who pays for

13 transportation, Palisades staff brings them to and

14 from.

15         It's a Palisades van.

16         MR. ROSENWASSER:  So that Palisades

17 van, is that van owned by Palisades Properties.

18         MR. JONAS:  Yes.

19         MR. ROSENWASSER:  And is that a part of

20 the agreement that if one attends this sober living

21 home, that they will be driven to North Jersey

22 Recovery Center?

23         MR. JONAS:  Can you repeat the

24 question?

25         MR. ROSENWASSER:  The question is, I

38

1  understand that it's one of the Palisades Properties'

2  vans that drives the client to the North Jersey

3  Recovery Center.

4          Is that part of the agreement of

5  staying at Palisades Properties, 21 Wood Chase, that

6  transportation will be provided to the North Jersey

7  Recovery Center?

8          MR. PURCELL:  The agreement between

9  Palisades and the resident.

10         MR. ROSENWASSER:  Yeah.

11         MR. PURCELL:  Okay.

12         MR. JONAS:  All of our residents, they

13 must -- they're required to be in treatment.

14         And so part of the operation is getting

15 them to the treatment.  They don't have their own

16 vehicles.

17         MR. ROSENWASSER:  So, again, to answer

18 the question, is that something that -- the agreement

19 is that Palisades Properties will provide the

20 transportation to a treatment center, is what you

21 want to say, a treatment center.

22         MR. PURCELL:  Well, I mean, all the

23 residents go to North Jersey Recovery Center so --

24         MR. JONAS:  It's a function of the

25 operation.

39

1          MR. PURCELL:  -- they're all

2  transported there, right?

3          MR. JONAS:  It's a function of the

4  operation, yeah.

5          Like I said, it's a requirement to be

6  in treatment.  And a function of getting them to

7  treatment with no vehicles is the transportation

8  aspect.

9          MR. ROSENWASSER:  Okay.

10         So that's included?  And everyone who

11 is there has been transported to the North Jersey

12 Recovery Center.

13         MR. JONAS:  Yes.

14         MR. ROSENWASSER:  Okay.  And how is the

15 attendance at the North Jersey Recovery Center

16 verified by the house manager?

17         MR. JONAS:  When you say how is it

18 verified, what are you asking specifically?

19         We take attendance at North Jersey

20 Recovery Center to ensure that all clients are in

21 attendance.

22         MR. ROSENWASSER:  And does North Jersey

23 Recovery Center report back to Palisades Properties,

24 21 Wood Chase, that all the people are there?

25         MR. JONAS:  Well, in effect, everybody

40

1  gets dropped off and attendance is taken.

2          So we keep -- you know, like I said, at

3  North Jersey Recovery Center, we keep the attendance

4  of all the attending clients.

5          MR. ROSENWASSER:  You keep the

6  attendance and the compliance for Palisades

7  Properties sober living residents at 21 Wood Chase

8  Lane.

9          MR. JONAS:  Yeah.

10         North Jersey Recovery Center takes the

11 attendance of all the clients that come into the

12 center.

13         And those clients are transported

14 directly from Palisades, so we have a good count on

15 and keep track of who is -- no one is left over at

16 the house in that sense.

17         MR. ROSENWASSER:  Is there any

18 verification sent to the residents?

19         MR. JONAS:  What are you asking?

20         MR. PURCELL:  What is the question?

21         MR. ROSENWASSER:  To 21 Wood Chase.

22         Is there any verification, or is it

23 just assumed?

24         MR. PURCELL:  It's Palisades that's

25 transporting them to the recovery center.

41

1    So your question is, how do they know
2 they're at the recovery center?
3    Because Palisades is transporting them
4 to the recovery center.
5    MR. ROSENWASSER:  Does the driver walk
6 in with them?
7    MR. JONAS:  Usually, yeah.  Yes,
8 usually.
9    MR. ROSENWASSER:  So the driver -- the
10 driver, if there was an issue -- I mean, how does it
11 work.
12    MR. JONAS:  Yeah.
13    There's cross-communication.
14    MR. PURCELL:  I'm happy to talk about
15 -- you know, Mr. Jonas testified with respect to the
16 vehicles and the parking and he discussed that as
17 part of this.
18    And I think that was topical to what
19 you're talking about.
20    I think with respect to the general
21 operations of the sober living home, you know, that
22 wasn't something he testified to tonight.
23    You know, the questions would generally
24 have to be with respect to his testimony.
25    MR. ROSENWASSER:  It was a follow-up

42

1 question about people who attend an outpatient
2 program other than North Jersey Recovery.
3    So I'm trying to understand the nature
4 of attending North Jersey Recovery.  That's why.
5 It's related to my follow-up question.
6    It's not really related to any other
7 testimony.
8    MR. PURCELL:  Okay.
9    But the questions have to relate to his
10 testimony tonight.
11    MS. GILHOOLEY:  So when would the
12 resident be able to have these other types of
13 questions heard, if not tonight?
14    CHAIRMAN LOCKWOOD:  At the end.
15    MS. GILHOOLEY:  At the end of this
16 session?
17    MR. ROSENWASSER:  At the end of this
18 session I could -- I could cross-examine Mr. Jonas
19 again.
20    MS. GILHOOLEY:  You could ask him -- I
21 think the right way to say it is, you could ask him
22 any types of questions that are not --
23    MR. TOMBALAKIAN:  Now is time to
24 cross-examine him on the subject matter of his
25 testimony.

43

1    After his cross-examination is
2 complete, he's done.
3    MR. ROSENWASSER:  Yeah.
4    MR. TOMBALAKIAN:  There's no further --
5 there's no further questions.
6    MR. PURCELL:  I guess my point is to
7 say that I'm fine talking about his testimony
8 tonight.  We had the opportunity to cross-examine on
9 his testimony last month.
10    But again, you know, ask your question
11 again.
12    I'm trying to see how it pertains to
13 his testimony tonight.
14    MR. ROSENWASSER:  No.
15    The question -- the question has to do
16 with my follow-up question that Mr. Jonas was
17 supposed to find out for me, the percentage of people
18 who attend the treatment center other than North
19 Jersey Recovery.
20    MR. PURCELL:  His answer was he
21 couldn't recall any.
22    MR. ROSENWASSER:  He couldn't recall
23 any.
24    MR. PURCELL:  Right.
25    MR. ROSENWASSER:  Right.

44

1    So, you know, if he would have recalled
2 some, I would have asked questions about what is --
3 how -- where does the line start and end between the
4 sober living home and the treatment center?
5    So I think my -- the fact that this was
6 kind of tabled in the last round of testimony, it's
7 valid to continue in this line of questioning because
8 it was tabled, you know.  Because I would have a
9 different line of questioning based on if there was
10 --
11    MR. PURCELL:  Mr. Chairman, would you
12 like us to continue with this line?
13    CHAIRMAN LOCKWOOD:  Please.
14    MR. PURCELL:  Okay.
15    MR. ROSENWASSER:  Okay.
16    MR. JONAS:  Can I just answer one
17 question, just on your question?
18    So when all those residents, those
19 residents in particular, any of the attendants at
20 North Jersey come in, if anybody is absent from the
21 expected North Jersey -- this is on North Jersey.
22 I'm speaking on North Jersey Recovery Center.
23    If anybody is absent that's expected at
24 treatment, wherever that resident or client at the
25 treatment center comes from, the staff at North

45

1  Jersey Recovery Center has to -- they make sure that
2  they go find where those clients that are supposed to
3  be in treatment that day are, if any aren't.
4         Palisades, because you have both, it's
5  easier to communicate for us internally in that way
6  amongst our different staffs at the different
7  companies.
8         But I hope that answers your question
9  relative to attendance-wise.
10        MR. ROSENWASSER:  Okay.
11        You know, it just sounds like there's a
12 lot of internal communication there.
13        And I thank you for your testimony.
14        I have no further questions.
15        CHAIRMAN LOCKWOOD:  Thank you.
16        Anyone else from the public?
17        MS. FEGAN:  I have question.
18        CHAIRMAN LOCKWOOD:  Just one quick
19 thing before you come up.
20        I just want to remind everyone that we
21 won't be taking any testimony or public comment after
22 9:45.
23        MS. FEGAN:  Hi.
24        I'm Nancy Fegan.  I live on the same
25 street, Chilhowie.

46

1         I'm at 20 Chilhowie.
2         I have a question regarding the
3  training of the staff.
4         And you talked about a couple of
5  classes that they get through the year that last 20
6  minutes to maybe an hour with the multiple choice,
7  and that covers, like, CPR, first-aid, things like
8  that?
9         Is there anyone there that has some
10 sort of degree in handling people that can be in
11 crisis that have attention and physical violence or
12 aggression?
13        Is there anyone that can handle that,
14 if the only other people there are addicts that have
15 been a year sober?
16        And we know that this can go on for
17 years.  Anyone to help them there.
18        MR. PURCELL:  So there are a couple
19 things there, a couple statements and a couple
20 questions.
21        The first question was, do you have a
22 question as to who was providing the training?
23        MS. FEGAN:  No, no.
24        Because those trainings, they're like
25 the 20-minute to an hour.

47

1         Is there anyone there that's, like, a
2  social worker, a counselor, somebody with a higher
3  education degree that will be there to support these
4  -- the addicts that are there other than other
5  addicts?
6         MR. JONAS:  All of our residents are
7  required to be in treatment, so there are -- they
8  have their own therapist in treatment that they have
9  as their resources for what you're referring to for,
10 like, social work and therapy.
11        MS. FEGAN:  Like that doctor that was
12 here last time, she's not at the house.
13        She doesn't come to the house.
14        MR. JONAS:  She's our clinical director
15 at the treatment center where all of our residents
16 receive their actual treatment.
17        MS. FEGAN:  Right.
18        But that's only, like, an hour a week
19 she said for each one.
20        Is there anybody actually in the house
21 that can support or help them in times of crisis?
22        MR. PURCELL:  Well, the house -- and I
23 think -- you know, your question is actually a good
24 question in a way because, you know, the house is a
25 residence.

48

1         There's no treatment there.
2         So to a certain extent it would be
3  inappropriate to have those type of people at a place
4  where no treatment is taking place.
5         Treatment takes place at the recovery
6  center where there are those types of individuals.
7         You know, the house is meant to be a
8  residence.  There's supervision.  There's training
9  provided and adequate supervision.
10        MR. JONAS:  And residents are in
11 treatment so they have, again, therapists, licensed
12 clinicians, who are their therapists assigned to
13 them, and caseworkers assigned to them.
14        And they can call them.
15        MR. PURCELL:  So if those therapists
16 were at the house, that wouldn't be a CSLR anymore,
17 that would be a different application.
18        MS. FEGAN:  But it's not a really homey
19 home.  It's a house that has people in crisis.
20        MR. PURCELL:  Well, it's a housekeeping
21 unit.
22        You know, I asked -- there was a
23 question last time about this.
24        You know, there's different types of
25 families.

49

1    I know it's not the normal type of
2  family.  I know it's not like your family or my
3  family.
4           But, you know, as Dr. Sugarman, there's
5  an emotional connection that these residents get to
6  one another which is helpful in their recovery
7  generally.
8           So while again it's not your type of
9  family or my type of family, it's still a type of
10 family.
11          MS. FEGAN:  How many hours a day is a
12 person -- is one of the people that live in the house
13 in the house as opposed to being in Fair Lawn?
14          Like, because I know on the weekend
15 they can go out.
16          But, like, on a Tuesday, let's say,
17 what would, like, a day look like to a resident?
18          MR. JONAS:  They get home around, I
19 want to say, like, 4:30-ish.
20          So they're in treatment from --
21          MS. FEGAN:  So what time -- they would
22 get up, have breakfast and leave at.
23          MR. PURCELL:  So, Mr. Chairman, this is
24 going beyond the scope of his testimony tonight.
25          Is that acceptable?

50

1           CHAIRMAN LOCKWOOD:  I agree.
2           MR. PURCELL:  Go ahead.
3           MR. JONAS:  So around, like, 7:30, I
4  want to say, 8:00, they probably gearing up to leave.
5           Then they head over to the clinical
6  building.
7           Then around 3:30-ish, 3:45, 4:00
8  around, they leave the clinical and they go back to
9  Kinnelon.
10          So they're there until the end of the
11 night.
12          MS. FEGAN:  So that's quite a long time
13 from 5 o'clock dinnertime until 7 o'clock in the next
14 morning.
15          MR. JONAS:  What.
16          MS. FEGAN:  I'm just saying that's
17 quite a long stretch.
18          MR. PURCELL:  That's normally when
19 people are home from work, right, until the morning.
20          MS. FEGAN:  It kind of leads to my last
21 question, when he was asking, and some other people,
22 about some records.
23          It was very wishy-washy as far as,
24 like, are there police records?
25          Is there any, like, statistics, any

51

1  data on the success of, like, the sober home?
2           And from the last meeting, the answer
3  was I don't know or we don't really have data, we
4  don't keep police records, we don't -- there was not
5  really any statistics or data or anything to justify
6  the success of these homes --
7           MR. PURCELL:  So I'll just answer.
8           MS. FEGAN:  -- and how they answer.
9           MR. PURCELL:  Dr. Sugarman responded to
10 that question that you had asked -- that you had
11 asked or somebody else.
12          She says -- remember, this is coming
13 from her July 28, 2025 letter.  It says:
14          "A member of public requested
15 information regarding relapse rates for
16 individuals in treatment for drug and alcohol
17 addiction.  My answer is as follows.
18 Individual rates of relapse vary depending
19 substance type, physical health, status,
20 presence and co-occurring mental health
21 disorder, access to medication, assistive
22 treatment, and various environmental and
23 psychosocial factors.  Because addiction is a
24 chronic condition, it often requires long-term
25 management and multiple attempts by

52

1  individuals of substance use disorders to
2  achieve sustained recovery.  The National
3  Institute on Drug Abuse estimates that
4  40 percent to 60 percent of individuals
5  undergoing treatment for substance use
6  disorders will experience relapse.
7           "Note that these rates are compatible
8  to the relapse rates for other chronic
9  illnesses that also require long-term
10 management, such as hypertension, diabetes and
11 asthma.
12          "Addiction treatment is not a cure.
13 Rather, it is a means for managing a chronic
14 condition.  Like other chronic conditions,
15 individuals who do not follow their medical
16 treatment plan, are likely to relapse."
17          MS. FEGAN:  So Dr. Silverman's [sic]
18 letter was a general response -- general, not really
19 related to the Palisades, the house at Woodcliff --
20 Wood Chase, I mean?
21          So that's what we were looking at,
22 specifically related to Wood Chase.
23          MR. PURCELL:  Well, Wood Chase --
24          MS. FEGAN:  It doesn't seem like
25 there's any documents.

  
53

```
 1    MR. PURCELL:  There's a treatment
 2  center that exists.
 3         And then there's Palisades Properties
 4  which operates a sober living home.
 5         I think, if I recall the testimony,
 6  Dr. Sugarman said that, you know, they really weren't
 7  able to keep statistics with respect to the treatment
 8  center.
 9         I think -- and I think -- Jay, I think
10  the answer is, I mean, Palisades doesn't keep
11  statistics with respect --
12         MR. JONAS:  It doesn't.
13         MR. PURCELL:  Nor is it required to.
14         MR. JONAS:  It's not required to keep
15  them.
16         MR. PURCELL:  It tries to, to the best
17  of its ability, help people to be able to live in
18  sobriety while they receive treatment so that at
19  least some of them are able to maintain their
20  sobriety.
21         MS. FEGAN:  So the state doesn't have
22  to have any requirements on Palisade or any sober
23  houses.
24         MR. PURCELL:  For a CSLR, no, it does
25  not.
```

54

```
 1         MS. FEGAN:  And do they do any -- come
 2  in for, like, an investigation or just to make sure
 3  that the house is safe for the people that are there.
 4         MR. PURCELL:  They do annual
 5  inspections.
 6         MS. FEGAN:  Annual inspections.
 7         Thank you.
 8         MR. PURCELL:  And that's in addition to
 9  the fire inspection the Borough of Kinnelon has.
10         MS. FEGAN:  And what they do during the
11  annual inspection.
12         MR. PURCELL:  Jay.
13         I mean, my understanding is that they
14  inspect the house for compliance with the applicable
15  regulations in the Administrative Code.
16         Jay, do you have anything to add?
17         MR. JONAS:  That's really what -- yeah,
18  that's what it is.
19         They want to make sure you have all
20  your stuff from, like, the fire and whatever, yeah.
21         MS. FEGAN:  Okay, thank you.
22         CHAIRMAN LOCKWOOD:  Any other questions
23  from the public?
24         (No Response.)
25         CHAIRMAN LOCKWOOD:  Mr. Purcell, I have
```

55

```
 1  a question, a few minutes ago you said that 21 Wood
 2  Chase is considered a single-family home.
 3         In my mind, it's a business.
 4         I understand what you're trying to say,
 5  but I don't charge my family to stay with me and to
 6  get treatment.  I wish I could.  I guess -- I guess
 7  I'm struggling a little bit with understanding why
 8  this is a family unit, given the fact that this is a
 9  business looking to operate in a residential
10  community for profit.
11         MR. PURCELL:  Well, I think -- I think
12  the answer to that speaks to the way that the State
13  has looked at that particular use.
14         So I said a couple times that the way
15  that the DCA interprets its regulations is that this
16  CSLR can really only take place in a single-family
17  home.
18         So that's one answer, is that, you
19  know, this must be in a single-family home.
20         And the other answer is, you know, with
21  respect to my application, or attached to my
22  application, there was a letter from the -- from the
23  Boarding Home -- Boarding House Division, effectively
24  the director of that.
25         And he said -- you know, there's
```

56

```
 1  discussion in there to the fact that these are
 2  individuals who are living cooperatively with each
 3  other to support one another, that, you know, there
 4  is a family-like atmosphere.
 5         And that testimony was the same that
 6  Dr. Sugarman gave, that Jay gave.
 7         So while there is a for-profit entity
 8  managing the home, it still operates like a home.
 9  You know, people have responsibilities.  They eat
10  meals together.
11         I too have a bunch of kids in my house,
12  maybe a little younger than yours perhaps.
13         CHAIRMAN LOCKWOOD:  Thanks.
14         MR. PURCELL:  I wish they could -- I
15  wish they could do the -- you know, do more chores
16  than they do.
17         But they all have -- you know, we have
18  a chore wheel at home.  You know, at this home, every
19  week when you look at the house rules, one of the
20  rules is that everyone has to clean the house every
21  week.
22         So I think if we're -- if you want to
23  be -- if you're looking at the qualitative nature,
24  the substance of how the home operates, the CSLR, I
25  think that it does operate like a single-family home,
```

57

1 notwithstanding maybe exactly like your single-family
2 home or my single-family home, but it does -- it does
3 operate that way.
4         And, you know, even with respect to the
5 fire inspection, you know, the DCA issued a
6 memorandum dated July 28, 2022 [sic] to all local
7 enforcing agency fire officials about cooperative
8 sober living residences.
9         And it says here in part:
10        "Based on the above, local enforcement
11 agency fire officials are required to perform
12 inspection of CSLR homes.  It is important to
13 remember when performing these inspections
14 that CSLRs are designated as either an R-3 use
15 or R-5 use."
16        So just by way of background, R-5 uses
17 are single-family homes under the -- under the
18 rehabilitation code.
19        Then the letter continues:
20        "Accordingly, Subchapter 4 violations
21 of the fire code cannot be cited.
22        "N.J.A.C. 5:70-4.1 states one- and
23 two-family or attached single-family
24 structures used exclusively for dwelling
25 purposes shall be not subject to any of these

58

1 subchapter requirements other than
2 N.J.A.C. 5:70-4.19."
3         So 4.19, that's the regulations that
4 applies to single-family homes.
5         So in a roundabout way, again they're
6 saying here -- the DCA is saying that these are
7 single-family homes.
8         So I'm saying, substantively, I think
9 they operate like single-family homes,
10 notwithstanding the fact that they're managed by
11 Palisades Properties.
12        I'd say that DCA looks at it similarly
13 within its regulatory framework.
14        And I'd say that also, you know, the
15 for-profit nature of this does not inhibit or impact
16 or prohibit the fact that this is an inherently
17 beneficial use.
18        Mr. Grygiel is going to talk about that
19 when he gets up.  I think you're going to have some
20 questions for him.
21        CHAIRMAN LOCKWOOD:  All right.  Thank
22 you.  Okay.
23        Any other questions from the board?
24        (No Response.)
25        CHAIRMAN LOCKWOOD:  Would you like to

59

1 move on, Mr. Purcell?
2         MR. PURCELL:  I'd like to call up Paul
3 Grygiel.
4         MR. GRYGIEL:  Thank you.
5         MR. TOMBALAKIAN:  I'll swear in
6 Mr. Grygiel.
7         Mr. Grygiel, do you swear or affirm
8 that any testimony you provide before the board this
9 evening will be the truth?
10        MR. GRYGIEL:  I do.
11 P A U L   G R Y G I E L, AICP, PP
12     70 Hudson Street, Suite 5B, Hoboken, New Jersey,
13     having been duly sworn, testifies as follows:
14        MR. TOMBALAKIAN:  Please identify
15 yourself for the record.
16        MR. GRYGIEL:  Yes.
17        Good evening.  My name is Paul, last
18 name Grygiel, G-R-Y-G-I-E-I.
19 VOIR DIRE EXAMINATION
20 BY MR. PURCELL:
21     Q.     Paul, can you just go over your
22 educational background and your professional
23 affiliations?
24     A.     Yes.
25        I'm a licensed Professional Planner in

60

1 the state of New Jersey.  I have been since 1999.
2         I actually started my career 29 years
3 ago today around the corner on Route 23 in Butler as
4 a planner at Michael F. Kauker Associates.
5         So I've been at this business for some
6 time, and have subsequently left from there to be a
7 principal at Phillips, Preiss, Grygiel, Leheny,
8 Keller in Hoboken.
9         In terms of my educational background,
10 I have a Master's degree in Regional Planning from
11 the University of North Carolina at Chapel Hill, a
12 Bachelor of Arts in Urban Studies from Rutgers
13 University.
14        And, as I mentioned, I was licensed in
15 1999.
16        And since that time, I have represented
17 over 150 applicants and others before boards
18 throughout the state of New Jersey as well as
19 representing multiple municipalities as a municipal
20 planner.
21        So I review applications on behalf of
22 boards.
23        MR. PURCELL:  Mr. Chairman, I would
24 just ask that Mr. Grygiel be accepted as an expert in
25 planning.

61

1    CHAIRMAN LOCKWOOD:  Accepted.
2    MR. GRYGIEL:  Thank you.
3  DIRECT EXAMINATION
4  BY MR. PURCELL:
5    Q.    Mr. Grygiel, can you just provide your
6  thoughts and analysis with respect to the subject
7  application?
8    Although, I think, before we do that, I
9  think we want to quantify some photos you took that
10  were submitted by Mr. Jonas as Exhibit A-3?
11    A.    Yes, that would be great.
12    Q.    So Mr. Jonas -- we entered into
13  evidence certain photos that were marked as Exhibit
14  A-3.
15    What day did you take those photos and
16  what time?
17    A.    Around noon on Tuesday, June 10th,
18  2025.
19    Q.    Okay.  All right.
20    Now you can go into your analysis?
21    A.    Sure.  Thank you.
22    They're submitted already just as A-3.
23    Q.    Yeah.
24    A.    Thank you.
25    So the photos in Exhibit A-3 show what

62

1  the subject property looked like on that day.
2    The board has heard a lot of testimony
3  and is familiar with the property, but just some very
4  basic facts to put into the record as predicate for
5  my testimony.
6    We're dealing with a lot that's just
7  under 1.4 acres in size.
8    It currently has a two-story
9  single-family home on it.
10    Some pertinent facts with regard to the
11  property and its setting.
12    There's significant natural screening
13  and landscaping along the frontage.
14    There's also a grade change between
15  Wood Chase Lane and where the house is located.
16  That's important in terms of separating the driveway
17  where cars are parked, and more activity takes place
18  on the site from the street.
19    The property is in a single-family
20  residential area.  There is -- again, it's typical of
21  Kinnelon of having open space in the vicinity as well
22  as a number of residences nearby.
23    In terms of the application that the
24  board is hearing this evening, the applicant is
25  seeking approval to continue to operate the

63

1  Cooperative Sober Living Residence that's been there
2  for almost six years.
3    The property was issued a Class F
4  license by the State DCA for this purpose.
5    Currently, as we've seen from the
6  photos and as is clear, the property exists, and it
7  has for some time.
8    No changes are proposed in terms of
9  this particular application.
10    Again, we've heard that the septic tank
11  and some other minor changes have taken place.
12    But overall, we have a dwelling that
13  remains in place as it's been for some time.
14    The issue, as the Chairman was starting
15  to allude to and the board is well aware, is the
16  residential zone permits various types of uses,
17  including single-family homes as well as community
18  residences and shelters for developmentally disabled,
19  victims of domestic violence, terminally ill and
20  persons with head injuries, among other uses, as well
21  as various other public uses, such as parks and
22  schools and playgrounds, farming, that type of thing.
23    There are some conditional uses
24  permitted as well, including offices for registered
25  professionals, churches and cemeteries, hospitals,

64

1  medical centers and nursing homes, central telephone
2  exchange buildings and private schools and day
3  nurseries.
4    However, the list of permitted uses
5  does not include sober living residences, not in this
6  zone nor any zone within the Borough of Kinnelon.
7    Since it's not explicitly permitted,
8  it's a use variance that we're seeking to allow this
9  use.
10    And again, nowhere in the municipality
11  is it permitted as-of-right.
12    So with that in mind, the applicant is
13  requesting D variance approval for a use variance to
14  allow the proposed use to continue to exist.
15    This board has probably heard it
16  before, but we have a lot of members of the public
17  and a record to be made.
18    So just for the record, the applicant
19  needs to demonstrate both what's called the positive
20  and negative criteria for granting a use variance.
21    It's outlined in the State Municipal
22  Land Use Law.  And there's different types of ways
23  that this can be demonstrated.
24    In the case of a use variance, one of
25  them is that a property -- excuse me -- a use is

65

1  inherently beneficial.
2          There's also particular suitability of
3  a property as well as a hardship argument.
4          In this instance, we are proposing
5  first that the use is considered an inherently
6  beneficial use.
7          But in the alternative, we will provide
8  testimony regarding the suitability of the property
9  as well.
10         We also need to address what's called
11 the negative criteria, that there's no substantial
12 detriment to the public good or to the master plan or
13 zoning ordinance of the municipality, as well the
14 so-called _Medici_ reconciliation, essentially
15 demonstrating that the use not be permitted can be
16 reconciled with that omission from the zoning
17 ordinance.
18         So, in my opinion, both the positive
19 and negative criteria can be met for the following
20 reasons:
21         First, as we've heard through testimony
22 previously, cooperative sober living residence, or
23 CSLRs, we'll say, are defined by the State
24 N.J.A.C. 5:27-2.1 as a residential setting that
25 serves solely as a home for individuals who are

66

1  recovering from drug or alcohol addiction and is
2  intended to provide an environment where the
3  residents can support each other's sobriety and
4  recovery.
5          The New Jersey DCA also in additional
6  documentation talked about CSLRs filling an important
7  niche that should be encouraged.
8      Q.     That was in the rule-making, right,
9  Paul?
10         When the rules were adopted, that was
11 the comment made by the DCA?
12     A.     Yes.
13         When there were some changes to the
14 rules most recently, we can provide a
15 citation on that, 49:N.J.R-1276A.
16         So this CSLR has to comply with all
17 State requirements to provide a safe, functional and
18 supportive environment for the recovery of
19 individuals struggling with alcohol and drug abuse.
20         In this case, we have the house rules
21 that have been discussed, including a resident curfew
22 of 10 p.m.
23         Permitting a CSLR will also represent
24 what's called a reasonable accommodation as supported
25 by federal law.

67

1          It's for disabled residents of a CSLR
2  that are trying to recover from their substance abuse
3  addictions in a group living arrangement.
4          The issue comes down municipalities can
5  not discriminate against individuals that are
6  handicapped in this regard, or any regard, by making
7  -- by refusing to make reasonable accommodations,
8  rules, policies, practices or services when such
9  accommodations may be necessary to afford such
10 persons equal opportunity to use and enjoy a
11 dwelling.
12         So, essentially, in this case, as
13 Kinnelon does not permit this type of residence
14 anywhere in the municipality, we're trying to prove
15 that this is a site that can accommodate it and it's
16 not unreasonable for the municipality to allow it.
17     Q.     Paul, with this accommodation, you
18 know, there's three different ways that this could be
19 unreasonable.
20         Just if you could, you know, tell me
21 why you think this accommodation would be
22 unreasonable and the basis?
23         Is there an undue financial or
24 administrative burden?  That's number one.
25         Is there an undue hardship upon the

68

1  municipality, or is there an alteration in the nature
2  of the zoning program?
3      A.     In this instance, I don't think any of
4  those would be met as far as that criteria.
5          And I'll go through the reasons why I
6  believe that.
7          So beyond -- so, again, that's just
8  dealing with the reasonable accommodations through
9  federal law, that I believe that the zoning
10 regulations need to provide equal access for housing
11 for disabled individuals.
12         Essentially we're trying to prevent
13 discrimination against disabled residents.
14         Furthermore though, with regard to the
15 State law, the positive criteria we're dealing with,
16 the inherently beneficial use aspect is a concept
17 that's been around for some time.
18         It was only codified by the State
19 Municipal Land Use Law in 2009 when a definition was
20 added, which says the inherently beneficial use is
21 one that is universally considered of value to the
22 community because it fundamentally serves the public
23 good and promotes the general welfare.
24         Such a use includes, but is not limited
25 to a hospital, school, childcare center, group home,

69

1 or a wind, solar or photovoltaic energy facility or
2 structure.
3      Q.      Paul, does that definition have
4 anything in there that would make it seem that only
5 not-for-profits could be inherently beneficial uses?
6      A.      There is no wording in the definition
7 about that.
8      Q.      In fact, are there some for-profit uses
9 in there?
10     A.      That's correct.
11          Both the definition -- and the term is
12 used more generally because it's just examples
13 provided there -- often includes for-profit uses that
14 provide a use that is again serving the public good.
15     Q.      Solar, photovoltaic activities, those
16 are probably for profit, correct?
17     A.      Yes.
18          That would generally be as well.
19          MR. MONDELLO:  So, Mr. Grygiel, while
20 you're on that particular statute, I know that it
21 doesn't make mention of Cooperative Sober Living
22 Residences.
23          However -- I can't put my finger on the
24 date -- but Senate Bill 1096 proposed to change that
25 statute, that definition, and include Cooperative

70

1 Sober Living Residences defined by the DCA.
2          It never passed.
3          MR. PURCELL:  Well, I would say --
4          MR. MONDELLO:  As a planner, I think he
5 could give his opinion as to --
6          MR. PURCELL:  Well, I think there's a
7 legal question there.
8          Then I'll let Paul give his planning
9 opinion.
10          I think your legal implication is
11 you're saying because that legislation was proposed,
12 does that indicate that right now CSLRs are not
13 inherently beneficial uses.
14          And my answer would be that that is not
15 the case, that I think that under the existing case
16 law, that it would be an inherently beneficial use.
17          And Paul can speak to that.  I think
18 what that legislation is trying to do is maybe make
19 Paul's life a little easier instead of having to
20 spend a great deal of time talking about why it's an
21 inherently beneficial use, he can just point to the
22 statute.  Because things are inherently beneficial
23 uses that aren't in the statute.
24          MR. MONDELLO:  I don't disagree with
25 you, Mr. Purcell, but it didn't pass.

71

1          So perhaps it was not the legislative
2 intent to include that definition as group homes.
3          MR. GRYGIEL:  Well, what I can say to
4 that is that if I didn't mention in my
5 qualifications, I'm a member of the New Jersey
6 Planning Officials Board of Planning Advisors.
7          And as such, we regularly review the
8 legislative committee from League of Municipalities,
9 which monitors land use -- potential land use actions
10 and laws.
11          MR. MONDELLO:  I go every year for the
12 last 40 years.
13          MR. GRYGIEL:  Sure.
14          So I see that list every few months.
15 There's a lot of laws -- there's a lot of proposed
16 laws that don't pass.
17          So, respectfully, just because one
18 particular law didn't make it through, there's many
19 reasons for that.
20          I agree that it's not in the law
21 currently.  But I wouldn't say that necessarily
22 implies that the legislature didn't mean to include
23 that.  There's a lot of worthy causes out there that
24 don't always get passed into law right away.
25          MR. MONDELLO:  So we don't know whether

72

1 the legislative intent was not to include it or to
2 include it.
3          MR. GRYGIEL:  I think that's fair.
4          MR. MONDELLO:  You're just saying if it
5 didn't pass, it didn't pass.
6          MR. GRYGIEL:  Right.
7          MR. MONDELLO:  But they specifically
8 put that language in a proposed bill and it just
9 didn't go anywhere.
10          I get it.
11          Thank you.
12          MR. GRYGIEL:  Right.
13          No problem.
14          And maybe next year it will, maybe it
15 won't.
16          But to that point, though.  Yeah.
17          MR. TOMBALAKIAN:  Mr. Purcell, a moment
18 ago you mentioned there was case law.
19          Can you cite case law that where a CSLR
20 was deemed inherently beneficial by a court or
21 accepted?  Because you said there was case law.
22          MR. PURCELL:  Well, I'm saying that
23 there was -- I guess what I'm saying is that legally
24 speaking, just speaking of the statute, itself, is
25 that there is no prohibition of a for-profit activity

73

1 from being an inherently beneficial use.
2          So I can't -- as far as a case for a
3 CSLR where that's been decided by a court, it hasn't.
4          Primarily there's been cases about the
5 Fair Housing Amendments Act for CSLRs.  You know,
6 that was the federal case that I submitted in the
7 packet to my application.
8          MR. TOMBALAKIAN:  But if you are
9 familiar with a case, you know a case, please share
10 it.  Because I'm not -- I'm not familiar with any.
11          MR. PURCELL:  Okay.
12          MR. GRYGIEL:  Let me get back on track
13 with regard to the testimony.
14          Just with regard the case law as well,
15 my point was before that definition was put into
16 place, it was up to the courts to decide.
17          So many of those uses mentioned in the
18 other ones were sometimes deemed inherently
19 beneficial.  Other times the court said they're not.
20          In this case, again there's nothing
21 controlling in that says so.
22          One thing I will point out, the term
23 "group home" is listed in that list of potential use
24 of example uses.
25          It's not defined in the MLUL, but there

74

1 is a communal or cooperative element of this type of
2 living that exists in the CSLR.
3          The MLUL also views homes -- as I
4 mentioned before, community residences for adults
5 with physical disabilities are permitted as-of-right
6 in all residential districts.
7          MR. MONDELLO:  Paul, there is a
8 definition of group home in the land use law.
9          MR. GRYGIEL:  It's community
10 residences.
11          MR. MONDELLO:  It's 40:55D-66(C).  It
12 refers to group home.
13          And it talks about the placement of
14 children, no more than 12 children.
15          MR. GRYGIEL:  That's a type of group
16 homes.  Yes.
17          There's other types of group homes for
18 --
19          MR. MONDELLO:  It specifically says
20 that group home means and includes, it's in that
21 section of the Land Use Law.
22          MR. PURCELL:  I think what you're
23 trying to say is that --
24          MR. MONDELLO:  You said there's no
25 definition of group home.

75

1          MR. PURCELL:  Okay.  I think, Paul,
2 what you're trying to say is that it's not -- group
3 homes are inherently beneficial uses; this use is
4 akin to a group home.
5          MR. GRYGIEL:  Yes.
6          Well, there's also -- the fact that the
7 definition is for -- again, for a certain type of
8 group home, I think that section of the Land Use Law
9 is dealing with that.  There are other group homes
10 for adults with brain injuries or other types of
11 issues as well.
12          That is characterized differently.  But
13 it's in the same general -- you know, the same
14 general -- the point being, as Ed was saying though,
15 I think it fits into that same overall set of
16 categories that are permitted generally in
17 residential zones.
18          So if it's a specific, you know,
19 definition as a group home there, I stand corrected.
20          But it's again in that same realm of
21 those types of facilities that are permitted.
22 Anywhere in Kinnelon or any other municipality in a
23 single-family zone, you can have that type of group
24 home.
25          It would look very similar.  You could

76

1 have a community residence, whether it's for adults
2 with disabilities or others would be permitted
3 as-of-right and look the same way.
4          MR. MONDELLO:  Thank you.
5          MR. GRYGIEL:  Sure.
6          Thank you.
7          So again, that's, I think, one of the
8 main points here with regard to -- finishing up on
9 the inherently beneficial aspect -- is that we have a
10 dwelling that whatever you're going to call it or how
11 you're going to classify it from the outside, looks
12 the same.  It has a driveway.  It has a garage.  It
13 has bedrooms.  It has other facilities that are in a
14 single-family home.
15          Beyond that, assuming that -- you know,
16 our opinion is that it's inherently beneficial.  I'll
17 go through the proofs briefly with regard to that.
18 Then we'll continue with additional proofs for the
19 suitability.
20          There's a four-part test out of a case,
21 the Sica case, which outlines four different steps to
22 evaluate such uses.
23          So we'll just go through those briefly.
24 BY MR. PURCELL:
25      Q.  Actually, Paul, the case of Sica, that

77

1 was a for-profit use, was it not?

2 **A.**    Yes.

3 **Q.**    Sica, it was for an individual --

4 certain types of catastrophic injuries but, you know,

5 the plaintiff Sica was proposing a for-profit

6 activity?

7 **A.**    That's my understanding of the case, I

8 wasn't involved personally.

9          But yes, that's my reading of that

10 case.

11       So the first aspect is determining the

12 public interest at stake and how the use rates on the

13 scale of such uses.

14          In this case, it's our opinion that the

15 applicant's use promotes public health and the

16 general welfare by providing a safe and nurturing

17 environment for men and women with alcohol dependency

18 and drug dependency issues.

19       We had statistics provided already by

20 Dr. Sugarman, so I'm not going to repeat all of them.

21       But, essentially, the CDC has pointed

22 out that in the last few years there's been an

23 increase in the annual number of deaths due to

24 excessive alcohol use.

25          There was an increase of 29.3 percent

78

1 from 2016/2017 to 2020/2021.

2          So again, I can give you the detailed

3 numbers.

4          But, essentially, there was a

5 significant increase during that time, partially due

6 to the COVID-19 pandemic as well as enhanced access

7 to alcohol overall, lack of medical health and

8 increased stress and other factors.

9          So that's just one of the factors that

10 points to an increasing need for facilities of this

11 type.

12       More specifically to New Jersey, in

13 2023, over 82,000 New Jersey residents were admitted

14 for substance abuse treatments, according to state

15 records.

16          Just over 50 percent of substance abuse

17 admissions in 2023 for Morris County residents were

18 attributed to alcohol per NJ Department of Health &

19 Human -- Department of Human Services.

20       So, again, there's a need for this type

21 of facility. The applicant's sober living residence

22 helps fulfill this need as a part of the spectrum of

23 care that's been discussed by other witnesses.

24       Also, I think, again we can consider

25 the CSLR in the realm of group homes in terms of

79

1 inherently beneficial uses.

2          The second step on the Sica test is to

3 determine the potentially harmful impacts from the

4 grant of the variance.

5          In this case, I don't believe there

6 would be any substantial impacts from this use on the

7 surrounding area and the zone plan.

8          The home looks as it does -- has for

9 many years. It would look similar if it was occupied

10 by other permitted uses, such as the group homes

11 we've talked about, or other types of facilities

12 permitted in a single-family residence.

13       The property actually in this case has

14 appropriate screening, has a good setback from the

15 street, has the visibility limited through the change

16 in grade as well as the landscaping, as well as

17 substantial buffers from adjacent properties.

18          In sum, I think it fits into the

19 character of the neighborhood.

20          Despite the use being different inside,

21 we're not providing for something that's dramatically

22 different in terms of how it appears and how it's

23 viewed from the outside.

24          Furthermore, the DCA, as we talked

25 about, says the CSLRs have to be in a single-family

80

1 home. It's a residential setting that serves as a

2 home for individuals recovering from drug or alcohol

3 addiction.

4          So I think, again, from that point of

5 view, there's nothing substantially different that

6 would undermine the surrounding area or have any

7 harmful impacts on the area.

8          Third, we have to determine if there

9 are conditions that can be imposed to ameliorate or

10 limit any of these harmful impacts.

11          Again, I don't think there is anything

12 substantial that needs to be addressed.

13          But the applicant has put forth some

14 proposals, such as providing a fence and screening

15 for the driveway that was talked about at the last

16 meeting to screen the two vehicles -- well, excuse

17 me.

18          Now it would be the van coming and

19 going as well as staff vehicles.

20          But the other vehicles would be

21 provided in the garage.

22          You know, any other conditions the

23 board may impose that are related can be imposed as

24 well if there's a need for them.

25          But again, that's something for the

81

1  board to decide if it were to approve the
2  application.
3           Lastly, the fourth part of the Sica
4  test is to weigh the positives.
5           That's the public interest at stake
6  against the potential harmful impacts, assuming
7  conditions are imposed, as we just discussed.
8           I think the positives here outweigh the
9  detriments, that we're providing a reasonable
10  accommodation under the law.
11           And the Fair Housing Act prohibits
12  discrimination throughout, you know, the entire
13  country but certainly in this municipality and others
14  where zoning does not permit this use to try to find
15  places where it actually makes sense to do so.
16           So I think -- again, we talked about
17  the reasonable accommodation factors, the undue
18  financial or administrative burden on the
19  municipality, undue hardship on the municipality, or
20  it would require fundamental alternation of the zone
21  plan or ordinance.  I don't think any of those would
22  be applicable here.
23           So that concludes the testimony with
24  regard to the positive criteria on the inherently
25  beneficial aspect.

82

1           Just briefly on the suitability of the
2  site.
3           Even if it was not to be a considered
4  inherently beneficial, I think this is a
5  particularly suitable site to accommodate a CSLR.
6           One aspect of this is what Mr. Jonas
7  discussed last time, the difficulty in finding a
8  willing landlord for this use, you know, quite
9  frankly.
10           It's not something that landlords are
11  willing to rent out on a regular basis.
12           In this case, you have one.  You have a
13  house that is actual appropriate and can fit the use
14  on it in terms of the property.  You know, touring
15  the inside of the home, it looks to me like a lovely
16  single-family home in terms of the bedrooms, the
17  common areas, everything else.
18           It's very typical of houses you would
19  find in the area.  And the size of the driveway and
20  the property can accommodate with no substantial
21  impacts on the neighboring properties.
22           You know, really it just comes down to
23  the fact that we're dealing with a family that has a
24  different type of definition here.
25           Families come in different shapes and

83

1  sizes.  We got into some back-and-forth with
2  responses to some questions on this previously.
3           Here we have a number of residents that
4  are the functional equivalent to the family in terms
5  of the chores that are being done, in terms of
6  assisting each other in their recovery, that type of
7  thing, providing a mutual supportive -- emotionally
8  supportive environment for recovery.
9           The residents -- in fact, the length of
10  stay varies, as we've heard.  It depends on their
11  individual condition.
12           So it may be again something that may
13  differ from, as Ed keeps saying, my house or your
14  house or your family or my family.
15           But there's no way -- you know, to
16  limit.  The ordinance doesn't limit the number of
17  household members, the age of the household members
18  and any other family.
19           So in this case, it's something that's
20  just a different -- a different type of single-family
21  residential household.
22           So for those reasons, I do believe that
23  the particular -- the property is particularly
24  suitable to accommodate this use and would further
25  the purposes of the Municipal Land Use Law, primarily

84

1  Purpose A, the public health, safety and general
2  welfare by providing for a group recovery from
3  alcoholism and substance abuse in response to a need
4  for such services in an appropriate setting within
5  the municipality, and again one that I think is well
6  suited in the context of the neighborhood and the
7  town overall.
8           Lastly, addressing the negative
9  criteria.  There's two aspects, no substantial
10  detriment to the public good and to the master plan
11  and zoning ordinance.
12           I think we have touched a lot on the
13  public good, so I won't belabor it for the board and
14  the public's sake.
15           Again, the property, itself, and the
16  way it's laid out, the fact that residents are not
17  allowed to have cars of their own but have to rely
18  upon vehicles provided by the applicant.
19           We do have sufficient space for the
20  parking on the property.  And it's even going to be
21  better in terms of putting some vehicles in the
22  garage going forward and limiting the number of
23  vehicles on the site.
24           Just touching on what I was starting to
25  allude to before.  Zoning does not regulate the

85

1 number of members of households or their relatives.
2 You know, oftentimes you have multigenerational
3 households.
4          Sometimes you have multiple drivers.
5 Other times there's multiple adults.  And this does
6 change throughout the year if kids come and go from
7 college, an adult household member moves back into
8 the home with children or others, elderly relatives.
9          Again, there's many circumstances that
10 single-family homes don't all look like it's just one
11 or two parents and, you know, one or two children or
12 everyone more children.
13          It might be, again, multiple ages,
14 multiple different people living in a setting such as
15 this.
16          So I think in that context, we're
17 looking at just a different variant of a household in
18 a property that is clearly a single-family home in
19 terms of its arrangement, its appearance, and how it
20 fits into the neighborhood.
21          With regard to the master plan and
22 zoning ordinance, I don't think there's any
23 substantial impacts with regard to this use, given
24 that, first of all, we're dealing with one that's not
25 permitted, so we acknowledge that off the bat.

86

1          But it's something that's a use that
2 has not been around for a terribly long time.
3          So in terms of reconciling it with the
4 omission from the master plan and zoning ordinance --
5 again, as I mentioned, I've been at this 20-plus
6 years.
7          And I don't recall seeing a master plan
8 or zoning ordinance talking about, but certainly none
9 that I've written that talk about this type of use
10 being permitted.
11          It's something that in the last few
12 years boards have been having to deal on the front
13 lines as applicants either voluntarily or otherwise
14 come before them for approvals.
15          Kinnelon's Master Plan has been
16 re-examined a number of times over the years.  It
17 does talk about essentially some general goals and
18 objectives regarding residential character and
19 maintaining, you know, the quality of life in the
20 municipality.
21          In this case, we're dealing with -- you
22 know, one of the issues is dealing with continued
23 population and school enrollment growth due to
24 additional housing construction.
25          In this case, we're not dealing with a

87

1 household that generates school children.
2          We're in fact dealing with a different
3 type of use that's providing a service that fits in
4 well within the setting and provides something of a
5 different type of household environment within the
6 municipality.
7          Beyond that, just the master plan,
8 itself, again we're trying to reconcile that the
9 general objectives of providing for a variety of
10 household types and arrangements within the
11 municipality.
12          I think in this case since it's not
13 addressed in the master plan or zoning ordinance, we
14 need to look at it on a site specific basis to see
15 where it fits in.
16          The municipality can't just outlaw this
17 type of use or other types of uses us altogether.
18          But in this case we have the particular
19 property and location that would be appropriate to
20 allow for it.
21          So I think in that regard we can
22 reconcile the omission of a town-wide permission for
23 CSLRs to exist with regard to the specifics of this
24 particular property and setting.
25          Any more on the use variance to

88

1 address?
2     Q.      Yeah.
3          I guess with respect -- actually, a
4 question with respect to reasonable accommodation?
5 I just want you to maybe focus maybe on the types of
6 factors for determination of what a type of
7 accommodation is unreasonable and kind of discuss the
8 facts here.
9          I just want you to hit those two
10 things, if you wouldn't mind.
11     A.      Referring to the three...
12     Q.      Yeah.
13          So that's undue -- an undue financial
14 or administrative on the municipality, undue hardship
15 on the municipality that would require fundamental
16 alteration of the zone plan or ordinance?
17     A.      Again, this is just a use -- part of it
18 is the fact that it's been existing for six years
19 now.
20          And it was acknowledged there's been
21 from time to time emergency calls or issues.
22          Respectfully, an electrical panel
23 having an issue is not something that -- I don't
24 believe -- you know, it's not for me to say, but it
25 typically happens in all types of facilities or

89

1 houses, for that matter.
2         It's not something related directly to
3 the use.
4         Beyond that, you have a residence that
5 most of the time has people coming and going, in the
6 morning leaving to go, in this case, not to work but
7 to a treatment center, and coming back in the
8 evening.
9         It's, again, occupying a single-family
10 residence that appears as all others or most other
11 single-family residences appear throughout the
12 community in terms of its appearance, its arrangement
13 on the property, the types of things that are on the
14 property, the types of accessory uses.
15         And I don't think there would be a
16 fundamental alteration to the zone plan or zoning
17 ordinance for allowing this in this particularly, you
18 know, good setting for this type of use for it to
19 continue to exist.
20     Q.    Your negative criteria analysis, I
21 think, would probably cover that factor?
22     A.    I think so, yes.
23     Q.    Okay.
24         Can you provide your analysis with
25 respect to the variance that we're requesting for

90

1 commercial vehicle storage?
2     A.    Yeah.
3         Just briefly on that.  There was a
4 question when looking at the residential zone
5 requirements of limiting a commercial vehicle to one
6 for an occupant of a dwelling that it has stored in a
7 garage anyway.
8         And it's supposed to be for someone
9 going to and from work with it.
10         So we're in a sense not meeting that
11 standard because these are two commercial vehicles
12 that are utilized by the overall facility.
13         A couple things.  One, I think it can
14 be subsumed within the use variance because again the
15 fact that they're being utilized for the service of
16 this particular property and its use that's on there,
17 but also they would be stored within the garage
18 anyway.
19         So it meets the intention of having
20 these vehicles stored within the garage.  They are
21 standard sized vehicles.  We're not talking about
22 work trucks or larger vans.  The one larger van that
23 would come and go -- as we heard new testimony, would
24 be coming and going once a day in the morning and in
25 the evening.

91

1         So I think that in this case, if we
2 need to have a variance from that requirement, it
3 could be granted under -- subsumed within the use
4 variance and granted under the appropriate
5 C criteria, the C(2) criteria.
6         MR. PURCELL:  Mr. Chairman, that's all
7 I have for Mr. Grygiel.
8         CHAIRMAN LOCKWOOD:  Thank you.
9         So are you acknowledging that this
10 particular application is not consistent with our
11 Master Plan?
12         MR. GRYGIEL:  There's nothing -- yeah.
13 The short answer is yes because there's specifically
14 talking about it.
15         So master plans are generally broader
16 policy documents.
17         And I wasn't able to find any
18 discussion of the CSLR directly in there.
19         CHAIRMAN LOCKWOOD:  Ms. Kopsco, would
20 you acknowledge that?
21         MS. KOPSCO:  Yes, I would agree with
22 that.
23         CHAIRMAN LOCKWOOD:  Thank you.
24         If this something that the township was
25 amenable to, wouldn't the Council have brought this

92

1 up as maybe to create a new ordinance for this?
2         So I guess what I'm asking is, are you
3 asking us to usurp what the local government has
4 chosen?
5         MR. PURCELL:  You answer.
6         MR. GRYGIEL:  In this case, we're
7 asking it because the Mayor & Council has left no
8 choice, but to do so since it's not permitted.
9         That's the whole basis of requesting a
10 use variance, yes.
11         MR. TOMBALAKIAN:  Was there any effort
12 made by the property owner to petition the Mayor &
13 Council to zone for it.
14         MR. GRYGIEL:  I'm not aware of that.
15         I was only involved in the application.
16         MR. PURCELL:  That wasn't -- that
17 wasn't done.
18         And nor did it have to be done, you
19 know.
20         That question, I think another flavor
21 I'll just respond to with that question has to do
22 with the Fair Housing Amendments Act.  So you're
23 saying, are you usurping -- are you usurping the
24 local governing body?
25         You know, my answer to that is no.

93

1    What you're doing here is complying
2    with the borough's obligations under the Fair Housing
3    Amendments Act.
4    So this is permitted nowhere in the
5    borough.  Ergo, you know, what we need is -- what is
6    needed is a reasonable accommodation -- an
7    accommodation to have this use.
8    And, you know, with that point, you
9    know, the burden falls on the board to state that
10   it's unreasonable for the reasons that I went over
11   with Paul.
12   So it's not really a matter, in my
13   mind, of kind of the board usurping the governing
14   body.  It's more what we're asking is that the board
15   comply with its obligations under the Fair Housing
16   Amendments Act, in addition to what it would
17   otherwise be required to do under the Municipal Land
18   Use Law.
19   CHAIRMAN LOCKWOOD:  So if the Council
20   was not in favor of this and we overruled that,
21   that's not usurping the Council.
22   MR. PURCELL:  Well, the Council could
23   have permitted --
24   CHAIRMAN LOCKWOOD:  Again, I'm not
25   saying that's the case.

94

1    MR. PURCELL:  I mean, I'm saying that
2    the Council -- this law has been around since -- for
3    quite a long while, the Fair Housing Amendments Act.
4    The CSLR has been around since 2018.
5    That's not too long ago.
6    The Council may want to consider doing
7    that.
8    But, you know, this method here
9    requesting a variance is our means under the FHAA and
10   the MLUL to get that reasonable accommodation.
11   CHAIRMAN LOCKWOOD:  But doesn't the
12   MLUL prefer that things be done via ordinance rather
13   than variance.
14   MR. PURCELL:  You know, again, you
15   know, I think to get into the inherently beneficial
16   use, I think there's proofs under there that more
17   than adequately support the grant of a variance here.
18   That's the whole point of inherently beneficial uses.
19   But I'll say just on the federal law
20   issue, I think that an accommodation is certainly
21   warranted under this -- under that particular
22   statute.
23   So I guess what I'm saying is, I think
24   that the MLUL would require a variance because of the
25   inherently beneficial nature of the application of

95

1    this use.
2    But even if you disagree with me on
3    that, what I'm saying is in addition the federal law
4    exists, and that pretty clearly requires this
5    accommodation.
6    CHAIRMAN LOCKWOOD:  Okay.
7    MS. HERRINGTON:  I have a question
8    about the...  You had -- sorry.  You had mentioned
9    that you, I guess, look at this as a similar to a
10   group home.
11   In terms of a group home, typically
12   when you're looking at a group home even for
13   individuals over the youth age, which would typically
14   be under the department or Division of developmental
15   Disabilities, that's 21 and up.
16   But that isn't a short-term type of
17   group home.  They're long-term.  They're looking for
18   residents to find permanent living homes.
19   What I have a hard time with is
20   wrapping my head around that this is a -- for lack of
21   a better phrase, almost like a revolving door of
22   people coming through, not necessarily establishing a
23   home.
24   So I'm just having a hard time making a
25   connection of a group home and this being similar to

96

1    that.
2    MR. GRYGIEL:  Sure.
3    It's a fair question.
4    That's understandable.  My point with
5    regard to that comparison was that the residential
6    zone of Kinnelon, like many residential zones, allow
7    -- actually, statewide there are certain types of
8    group homes that are required to be permitted in any
9    residential zone.
10   And in terms of appearance and
11   functionality, they're essentially the same.
12   I've seen group homes, you know, that
13   are newly built.  I've seen them occupying
14   hundred-plus-year-old residences.
15   So the point is that from the
16   appearance in a residential area, it would look the
17   same.
18   The fact that there may be different
19   residents that change maybe more -- sometimes more
20   frequently here than in some other instances.
21   And there may be group homes of
22   different types.  I'm aware of -- we talked about
23   different types of group homes, some that are shorter
24   term.
25   That was my point, is that it's not

97

1  that -- there's no limit on the number of them.
2      So theoretically you could have group
3  homes serving different types of populations
4  throughout the municipality that would all appear
5  like single-family homes.
6      So I'm just putting it in that context
7  that this is just another flavor of it, if you will,
8  or a different type of facility within a
9  single-family residence.
10     MS. HERRINGTON:  I can agree on the
11  appearance you're saying.
12     But the functionality to me just seems
13  inherently different.
14     In essence, to me it's a -- you're
15  allowing, like -- yeah.
16     I was going to say like boarding rooms.
17  But they're -- they're almost in a way renting a
18  bedroom.
19     And that doesn't necessarily jibe with
20  me in terms of what a group home is.
21     A group home -- you know, in my field I
22  work with group homes, so I understand the group home
23  piece.  I see what they do and how they establish
24  their living space.  I mean, the residents of group
25  homes truly make it their home for more permanent

98

1  living, where, you know, they do have pictures of
2  family and it becomes their space.
3      And this just seems more like very
4  short term, so it's not really -- it doesn't
5  really... that's what I really --
6      MR. PURCELL:  Let me just interject
7  here for just a moment.
8      So with respect to the nature of the
9  group home, certainly this is -- the individuals are
10  staying there, their home, their domicile.  You know,
11  this isn't a hotel or airbnb.  You know, they may not
12  be there for a year.
13     It may be, you know, shorter than
14  perhaps a group home you're familiar with, but it's
15  still a domicile.
16     As you recall, Mr. Jonas testified to,
17  these people that stay there bring pictures of their
18  family, getting mail.  They treat it -- they treat it
19  as their home.
20     There's also a case that I provided, I
21  reference a few times, the Morristown case, the
22  federal case, which speaks to the idea that a CSLR is
23  one housekeeping unit.
24     You said something very interesting.
25  You said this is like a boarding home where people go

99

1  to their homes.
2      You know, what's so interesting is in
3  that case, what the court said is that it's not like
4  that.  A normal boarding house, you're right,
5  everybody goes to their room.  There's ten people or
6  15 people that live in the boarding house.
7      That's 15 different housekeeping units.
8      What they're saying here and what's
9  true with this type of use with a CSLR, is that
10  there's one housekeeping unit.  And that's accounted
11  for because of the cooperative nature of the CSLR.
12  So that's just, you know, from my perspective.
13     And I'll just say also, the question
14  with respect to the timing, also a very good
15  question.  That, you know, you were indicating that
16  you don't think this feels like a home or that people
17  aren't there long enough.
18     Under the Fair Housing Amendments Act,
19  there is a case -- I think I referenced this to a
20  question asked by Mr. Mondello at the last meeting --
21  called Lakeside Resort Enterprise v. The Borough of
22  Supervisors Palmyra Township.
23     In that case, you know, a municipality
24  made a similar argument to say that a treatment
25  center where people only stay for 14 days, how does

100

1  that have the benefit of the Fair Housing Amendments
2  Act?
3      That's not really a home.
4      And what the court said is, is that 14
5  days is enough to create a domicile, and that this is
6  a place where people live, like in our home, have
7  pictures of their families, they get mail.
8      So, you know, I hear what you're
9  saying.  And those are very good questions.  And I
10  think we have very good answers to respond to them.
11     MS. CANALE:  I have a question.
12     Thank you.
13     You keep mentioning the Fair Housing
14  Act, yet at the same time, I've heard the same
15  statement saying landlords will not rent their
16  properties to you, thus you have reached out to not
17  purchase, but I guess lease these homes for the
18  business.
19     Can you please explain that to me.
20     MR. PURCELL:  So the question is, why
21  haven't we sued any landlords in different towns?
22     Is that your question?
23     MS. CANALE:  How is it that they can
24  get to say no?
25     MR. PURCELL:  Well, you know, that's a

101

1   good -- that is a good question.
2          I think as far as -- you know,
3   obviously it's up to the -- it's up to Palisades to
4   determine, you know, how it spends its money on
5   litigation and otherwise.
6          I have, you know, more experience in
7   the land use context of the Fair Housing Amendments
8   Act.  I can't speak to the ins and outs of litigating
9   against a landlord.
10          What I can just say is, you know, it
11  certainly is -- it certainly is a costly endeavor to
12  do that.
13          And, you know, certainly Palisades has
14  -- you know, went to a number of landlords and were
15  rebuffed, but did find one landlord here.
16          So I guess if your request is we should
17  have sued someone else, I don't know if that's
18  unreasonable.
19          MS. CANALE:  No.
20          I didn't mention a lawsuit at all.  I
21  was just curious because it was mentioned a few times
22  how the ability to find a place to house these
23  individuals has been usurped by landlords.
24          Yet you have obviously -- so you have
25  turned -- you've changed your modus operandi and

102

1   looked for private homes that are on the market, I'm
2   assuming, that would be willing to be used for this
3   purpose, because they typically are -- and correct me
4   if I'm wrong -- private homes versus apartment
5   buildings.
6          MR. PURCELL:  Yeah, they have to be.
7   They have to be.
8          The DCA would not license them if they
9   were not single-family homes.
10          MS. CANALE:  So my last question would
11  be -- just I'm trying to understand what the process
12  is.  Why would you choose one of these homes versus
13  going to something like a Betty Ford clinic?
14          MR. PURCELL:  Again, that's Mr. Jonas'
15  comments.
16          But I think he did respond.  He spoke
17  to that a little bit.
18          You know, there's a continuum of care.
19  You know and there's in-patient treatment centers.
20  And there's outpatient treatment centers.
21          And when someone leaves an in-patient
22  treatment center, if they're going to continue to
23  receive treatment -- Dr. Sugarman talked about how
24  people have to get treatment for their addiction the
25  same way a diabetic has to get treatment for their

103

1   diabetes.
2          You know, the next step would be an
3   outpatient treatment facility.  And in those
4   situations, you know, they don't sleep there.  It's
5   not in-patient, right, so you have to find somewhere
6   to live.
7          And that's an important aspect of this,
8   as testified by Dr. Sugarman and by Mr. Jonas,
9   because -- because what happens is that if people are
10  by themselves and alone and not supported by people
11  around them, they're more likely to start using
12  again.
13          So what this home does is it provides a
14  cooperative residence in the name for these
15  individuals to live together, to support one another.
16  It's in the rulemaking also.
17          So that sort of -- you know, that's why
18  this -- that is sort of the whole basis of this
19  operation.  I'm sorry, I got kind of -- did I answer
20  your question?
21          MS. CANALE:  Well, no, I think some of
22  those facilities also do house individuals.
23          So I think it's just a matter of choice
24  of where someone chooses to go essentially.
25          MR. PURCELL:  Well, I think -- I think

104

1   ultimately, you know, as provided in the testimony,
2   the purpose of this home is to provide a place to
3   live for people who are receiving outpatient
4   treatment.
5          There was also testimony that set forth
6   that that's an important factor in maintaining these
7   individuals' sobriety, is living in a home like this
8   with support.
9          MS. CANALE:  Thank you.
10          CHAIRMAN LOCKWOOD:  Mr. Grygiel, when
11  you talked about suitability of the property, you
12  said that this property is particularly well-suited,
13  right?
14          MR. GRYGIEL:  Yes.
15          CHAIRMAN LOCKWOOD:  In my mind, you
16  know, based on what Mr. Jonas was sharing before, you
17  were going to try to get a house anywhere you could
18  find a house because all of the other people that you
19  tried to get would not accept it.
20          So you took this one because they took
21  it.
22          How does that make it well-suited?
23          MR. GRYGIEL:  Well, I can't speak to
24  the exact efforts that have been done.
25          What I'm evaluating is the property

105

1  that has been selected and where the operation has
2  been existing.
3          Just to be clear, on particular
4  suitability, it doesn't have to be the only property.
5  There's case law out of Union City.
6          I'm forgetting the case name now,
7  basically there may be multiple properties that can
8  be considered suitable.
9          In this case, it's because of the
10  setting of the dwelling up on the hill, you know,
11  that has some separation from the street, having
12  adequate buffering from neighboring properties and
13  landscaping and such.
14          Again, I know that would qualify a lot
15  of properties in Kinnelon.
16  I acknowledge that.
17          But in this particular case, it's a
18  street that -- you know, in terms of the concern
19  emergency service access, for example, the road width
20  is excessively -- you know, it certainly meets
21  standards.
22          There's nothing that looks like it's
23  out of sync with requirements for the width of the
24  road to be able to access it.
25          The driveway is accessible.  The house,

106

1  itself, you know, having toured the inside and
2  exterior of the property, it has inside and outside
3  space that is private and available for the
4  residents.
5          It has a sizable kitchen, family room,
6  that type of thing.
7          So I think there's certainly particular
8  suitability in that regard.
9          Again, I'm not trying to say it's the
10  only house.
11          It may be one of many that may fit in
12  with suitability in Kinnelon.
13          CHAIRMAN LOCKWOOD:  Any other questions
14  from the board?
15          MR. MONDELLO:  Yeah.
16          Thanks, Paul, I appreciate the
17  alternative testimony on the special reasons and the
18  suitability, because I'm still wrestling with the
19  inherently beneficial use aspect.
20          How many CSLRs are there in Kinnelon?
21          MR. PURCELL:  Well, I can answer that
22  question.
23          MR. MONDELLO:  Well, let's see if the
24  planner can first.
25          MR. GRYGIEL:  Well, I'm aware of two

107

1  from this particular applicant.
2          I do not know -- I did not investigate
3  whether there are others existing currently.
4          MR. MONDELLO:  Okay.
5          So you wouldn't know whether or not
6  there are others in the neighboring or adjoining
7  towns?
8          MR. GRYGIEL:  I certainly did not do
9  that exercise.
10          I'm familiar with some facilities in
11  other municipalities, but I did not do an exhaustive
12  search to determine the inventory currently in
13  Kinnelon and, say, all the neighboring towns or a
14  five-mile radius or anything along those lines.
15          MR. MONDELLO:  So we don't know if this
16  use is saturated.
17          MR. GRYGIEL:  I personally do not know
18  that, no.
19          MR. MONDELLO:  I mean, if you have six
20  hospitals in one town, it's probably not inherently
21  beneficial.
22          But we have no idea whether there is --
23          MR. PURCELL:  Well, I would say that --
24          MR. MONDELLO:  Can I get the planner to
25  answer first.

108

1          MR. PURCELL:  Sure.
2          MR. GRYGIEL:  Yeah, that's fine.
3          No.  The inherently beneficial use
4  aspect doesn't speak directly to the amount of them.
5          But, I mean, at some point a board can
6  consider that.  Like you said, that's a great point
7  to say an extreme example six hospitals or, you know,
8  whether it's other types of facilities that were
9  mentioned, childcare, et cetera, you know, there's no
10  limit on them, but at some point you might say, well,
11  gee, there's enough of this already.
12          I think in this case it's not that
13  prevalent.
14          Again, it's not existing in the zoning
15  ordinance here.  In my experience, doing planning
16  throughout the surrounding area, it's not a use that
17  is generally permitted at all.  I can't speak to
18  every 565 towns in the state.
19          Again, it's a relatively new use so
20  it's not permitted.
21          But that said, you know, I don't have a
22  factual basis to say the population is served by ten
23  homes, or 20 homes, or only two within the
24  municipality.
25          CHAIRMAN LOCKWOOD:  How long have CSLRs

109

1  been around.
2       MR. GRYGIEL:  I'm only aware -- again,
3  2018 was the year, I believe, that the definition --
4  or the regulations came into place.
5       CHAIRMAN LOCKWOOD:  And no town in New
6  Jersey has added this.
7       MR. GRYGIEL:  I can't say none.
8       I can say just from my experience as a
9  planner --
10      MR. MONDELLO:  Oh, there's plenty that
11 have.
12      MR. GRYGIEL:  There may be.
13      I'm a planner for seven municipalities
14 currently where I write the zoning or review the
15 zoning and it's not a permitted use in any of those.
16      I've appeared before boards in a couple
17 of other towns and represent applicants for this type
18 of use in a few other towns where it was not
19 permitted.
20      So I'm not saying it's an exhaustive
21 search if they have not been added.
22      But it's something that -- kind of like
23 assisted living was back when I was early in my
24 career, it was a brand-new thing, we always had to
25 get use variances.

110

1       Over time they get permitted.
2       It's something, Chairman, to your
3  point, that maybe in time as master plans are
4  re-examined and zoning ordinances are updated will
5  become more common.
6       MR. MONDELLO:  Morristown has a great
7  ordinance.
8       You gave me a case.  Now I'm going to
9  give you one, if you don't.
10      MR. GRYGIEL:  Fair enough.
11      That's a good point.
12      MR. MONDELLO:  So Jewish Family
13 Services vs. Bergenfield.
14      It's not on point.
15      MR. PURCELL:  I'm familiar with that
16 case.
17      MR. MONDELLO:  Yeah.
18      That's where the Jewish Family Services
19 wanted to have a group home for male orthodox Jewish
20 --
21      MR. PURCELL:  Is that a reported case?
22      MR. MONDELLO:  It's unreported, yeah.
23      So the facts are that -- that was Mikey
24 Kates' case.
25      But that's where the Appellate Division

111

1  said that it was not inherently beneficial.
2       But I'll give you, the facts are not
3  the same.  That target market was specifically male
4  orthodox Jews that were addicted, period, where this
5  is obviously much broader.
6       MR. PURCELL:  I'm glad I was familiar
7  with that case, so that's good.
8       But I think I agree with you, it is a
9  different.  The facts are different.  I'd also say --
10 because by its own terms, that was a much more narrow
11 type of facility or type of home.
12      MR. MONDELLO:  It definitely was.
13      MR. PURCELL:  What I'll also say is it
14 was also an unreported case that I do kind of have
15 some issue with.
16      But it is unreported and certainly and
17 --
18      MR. MONDELLO:  But you've got to give
19 me some credit, though.
20      CHAIRMAN LOCKWOOD:  Mr. Grygiel, you're
21 saying that seven years is not a particularly long
22 amount of time.
23      MR. GRYGIEL:  In the scheme of the way
24 planning and zoning works in New Jersey, no.
25      Partly because the requirement for

112

1  re-exam of a master plan is a ten-year period.
2       So strictly speaking, if a town even
3  adopted a master plan in 2025 could still be in
4  compliance with that.
5       Yeah.  Again, these things take -- it's
6  not that -- new uses can pop up.
7       As a planner again, if I was working
8  for your municipality as your planner, you might --
9  you try to identify these things and, hopefully,
10 you'll hit on a few of them, but you might miss a
11 few.
12      CHAIRMAN LOCKWOOD:  I think we just did
13 a re-exam, didn't we?
14      MR. GRYGIEL:  2022, I believe.
15      CHAIRMAN LOCKWOOD:  So that would have
16 been within the seven years, right.
17      MR. GRYGIEL:  Yes.
18      But again, this is something that at
19 the time may or may not have been apparent to, you
20 know, the folks preparing it.
21      CHAIRMAN LOCKWOOD:  I think I've
22 already made this clear.
23      The part I'm struggling with is you're
24 asking us to make a decision that the township and
25 the elected officials have not made.

113

1    Is that a fair way to say that.
2    MR. GRYGIEL:  Again, it comes back to
3  -- and I'll answer as a planner.
4    The whole point of a board of
5  adjustment is to be allowed to grant -- to adjust the
6  ordinance as need be.
7    There was an earlier question about
8  whether the MLUL favors acting by zoning and said
9  variance.
10    I don't know if the MLUL explicitly
11  says that, but certainly some case law talks to that.
12    Generally, that's the preferred way to
13  go.  But there are some instances where certain uses
14  again that weren't considered or just have other
15  reasons that warrant, you know, the board's
16  consideration in taking into account the case law and
17  Municipal Land Use Law to grant them.
18    CHAIRMAN LOCKWOOD:  I was just going to
19  say, and you're stating that this is an inherently
20  beneficial thing for Kinnelon.
21    MR. GRYGIEL:  In my opinion, in review
22  of the facts of the type of use and how it compares
23  to other inherently beneficial uses, I do believe so.
24    Not just for Kinnelon but, generally,
25  across the state, this is a use that can be

114

1  considered under that category.
2    CHAIRMAN LOCKWOOD:  Do you feel there's
3  a need for sober living facilities in Kinnelon.
4    MR. GRYGIEL:  Based upon the -- well,
5  the testimony that was provided in this hearing as
6  well as my understanding through other applications,
7  there's a significant problem with regard to
8  substance abuse in New Jersey and beyond.
9    The Morris County statistics were
10  provided.
11    Again, it's something that is not
12  necessarily limited to the borders of a town.
13    It does serve a broader need.  We
14  acknowledge that.
15    We're not going -- as we said, it's not
16  only going to be residents of Kinnelon necessarily.
17    CHAIRMAN LOCKWOOD:  So Kinnelon are
18  residents of Kinnelon.
19    MR. GRYGIEL:  Right.
20    But the point being --
21    MR. PURCELL:  There's no -- well,
22  they're residing in Kinnelon.
23    When they're here they're residents of
24  Kinnelon.
25    MR. GRYGIEL:  Yeah.

115

1    CHAIRMAN LOCKWOOD:  You're saying
2  Kinnelon residents, Kinnelon --
3    MR. PURCELL:  Prior to them moving into
4  the house they were not residents.
5    CHAIRMAN LOCKWOOD:  Correct.
6    MR. PURCELL:  Paul, just a question.
7  You know, it seems to me -- so the way the Fair
8  Housing Amendments Act works is if the town does not
9  permit the use that we're requesting here, the CSLR,
10  in any zone, then the town, you know, has to grant a
11  reasonable accommodation.
12    Is that correct?
13    MR. GRYGIEL:  That's the understanding,
14  yes.  That's how it's laid out.
15    MR. PURCELL:  So in this situation, if
16  Kinnelon had permitted this in a particular zone, we
17  wouldn't have the ability to use the Fair Housing
18  Amendments Act for this particular case?
19    So if it was permitted in a separate
20  zone from where we are, then, you know, the FHAA
21  wouldn't apply, right, because it would be permitted
22  somewhere else.
23    MR. GRYGIEL:  That's my understanding.
24  The facts would be a lot different if there was the
25  ability to satisfy that need or demand in a different

116

1  location.
2    MR. PURCELL:  So do you think that
3  Kinnelon -- knowing that basically by not permitting
4  it in one zone it effectively mandated that there be
5  a reasonable accommodation in every zone for this
6  use, does that indicate that Kinnelon was probably
7  aware or unaware that these existed when they did
8  their master plan and examination report?
9    MR. GRYGIEL:  I don't want to speculate
10  as to whether they acknowledged their existence or
11  not.
12    That's difficult for me to say whether
13  it was well, we know these are here, let's just leave
14  it to applicants to come in and choose.  I can't say
15  that.
16    MR. PURCELL:  Okay.
17    MR. MONDELLO:  Just like the Senate
18  Bill.
19    MR. GRYGIEL:  Exactly.
20    Listen, there's... Yes.
21    CHAIRMAN LOCKWOOD:  Any other questions
22  from the board?
23    MS. GILHOOLEY:  Yeah, I do.
24    I heard you ask a question about the
25  overall benefits and I've heard your testimony about

117

1  that.

2          Specifically, though, what do you see

3  as approval of this for the benefit of Kinnelon?

4          MR. GRYGIEL:  Providing for housing

5  types that would serve a need in the community.

6          Again, whether it's, you know,

7  residents currently or from outside the borders, it's

8  a facility that would provide for this type of

9  service.

10          MS. GILHOOLEY:  Okay.  No.  I heard

11  that part.

12          I was just curious, because when you

13  mentioned a benefit for Kinnelon, I just was

14  wondering, are there any plans to make some sort of

15  donations or contribute to the community?

16          MR. GRYGIEL:  Well, I think providing

17  the service is a contribution.

18          But beyond that specifically, I

19  wouldn't -- I can't -- I can't speak to that.

20          MS. GILHOOLEY:  No.

21          Because we have a lot of programs in

22  town that are specifically aimed for education as it

23  pertains to drug and alcohol use.

24          And I just was wondering if that's part

25  of the plan.

118

1          MR. GRYGIEL:  I can't speak to that

2  directly.

3          MR. PURCELL:  That hasn't been

4  something discussed.

5          Do you mean, like, going to schools and

6  talking to school children --

7          MS. GILHOOLEY:  Sure.

8          MR. PURCELL:  -- and things like that.

9          MS. GILHOOLEY:  Or contributing to that

10  education, yes.

11          MR. PURCELL:  You know, that's

12  something that hasn't been --

13          MS. GILHOOLEY:  Okay.  I just was

14  curious because I heard Kinnelon specific benefits,

15  so I was just wondering whether that was part of the

16  plan.

17          Okay.

18          Thank you.

19          CHAIRMAN LOCKWOOD:  Any other questions

20  from the board?

21          MR. PASSALACQUA:  Yeah, I have a

22  question.

23          We talked a lot about -- in your

24  testimony, we talked a lot about the positive

25  criteria that satisfies for the issuance of a

119

1  variance.

2          The negative criteria, I'd like to hear

3  a little bit more information regarding how this

4  could not provide any substantial detriment to the

5  public safety, public good, traffic, so on and so

6  forth.

7          MR. GRYGIEL:  Sure.

8          I'd be happy to do so.  I did mention

9  something on direct, so I apologize if it wasn't as

10  thorough as it could be.

11          With regard to impacts on the public

12  good, it generally talks about the surrounding area

13  where a use is located as well as the town more

14  broadly.

15          In this case, again I'll point back to

16  the -- starting at the property, itself, and the

17  house, itself.

18          Where it's situated on the property, it

19  has substantial setbacks from the street, over

20  60 feet from the street frontage.

21          Also, limited visibility due to the

22  grade separation from the street, as well as then

23  around the property in the back it goes up even

24  higher and you have a lot of landscaping.

25          As far as other impacts, typically

120

1  traffic is a big one.

2          Residents are not allowed to have their

3  own cars.  So compared to this house being occupied

4  by a different type of household where you have

5  multiple drivers in it, there would be fewer cars in

6  that regard.

7          We acknowledge we'll have some staff,

8  up to three cars at one time as well as the vehicles

9  for the facility.

10          But it would not be a coming and going

11  thing because the staff is literally coming there to

12  work a shift and to leave at a different time.

13          So it actually, I think, has less

14  traffic than a permitted or a more standard, if you

15  will, single-family residence would have.

16          As far as other potential impacts in

17  terms of lighting, noise, that type of thing, nothing

18  jumps out, you know, from my understanding of the

19  type of use and viewing this particular property of

20  having any more impacts as substantial in terms

21  of, you know, people congregating, causing

22  disturbances, that type of thing.  There are some

23  emergency service calls.

24          But that happens in other types of

25  residences, so maybe that's the one aspect where it's

121

1  slightly different.
2         But over the years, it's my
3  understanding the numbers are not extremely high.
4         MR. PASSALACQUA:  I thought there was
5  some comment about erecting stockade fencing.
6         MR. GRYGIEL:  Well, that was to try to
7  ameliorate a concern about, you know, the appearance
8  of having vehicles.
9         And I think that's been addressed since
10 the last time, because the concern was -- we
11 clarified that there are staff that park vehicles
12 there, and there's a van that comes and goes.
13        So we said maybe at the top of the --
14 before you get to the driveway, if you picture -- I'm
15 showing it this way, but it's shown in the photos.
16 The driveway is sort of a plateau.
17        To say well, there's a little bit of
18 landscaping there now, maybe add additional
19 landscaping and a 4-foot fence so there's even less
20 visibility of the vehicles in the outside part of the
21 driveway.
22        And then two other ones, we put inside
23 the garage so they wouldn't be noticed anyway.
24        So we're trying to really -- that was
25 more of a concession -- an offering to try to head

122

1  off any concerns about the vehicles being visible.
2         MR. NICOSIA:  As a follow-up because
3  you just mentioned emergency services.
4         As part of your preparation for your
5  testimony, did you look at any of the data on this
6  house in particular in emergency service calls.
7         MR. GRYGIEL:  No, not in preparation
8  for the meeting, I did not.
9         CHAIRMAN LOCKWOOD:  Anyone else?
10        We're going to take a five-minute
11 break.
12        We will come back here at 8:55 and
13 resume.
14        (Whereupon, a brief recess is held.)
15        CHAIRMAN LOCKWOOD:  If there's no more
16 questions from the board, I would like to open up to
17 the public.
18        Again, that's to ask Mr. Grygiel
19 questions relative to his planning testimony.  There
20 will be an opportunity for public comment after.
21        State your name and address, please?
22        MR. ROSENWASSER:  Hi, everyone, my name
23 is Paul Rosenwasser, 39 Chilhowie Drive.
24        And so I get the planner's name
25 correctly, it is Mr. Grygiel?

123

1         MR. GRYGIEL:  Close.
2  Grygiel, it's pronounced.
3         MR. ROSENWASSER:  Grygiel.
4         MR. GRYGIEL:  Grygiel.
5         MR. ROSENWASSER:  Thank you so much.
6         MR. GRYGIEL:  You're welcome.
7         MR. ROSENWASSER:  Mr. Grygiel, I heard
8  testimony to the nature that the purpose of the
9  master plan is to maintain the quality of life and a
10 neighborhood.  Is that the accurate?
11        MR. GRYGIEL:  There are multiple
12 purposes.
13        That's one of the general ones that's
14 in the master plan, that's correct.
15        MR. ROSENWASSER:  Yes.
16        Does increased traffic volume on
17 streets impact the quality of life in a neighborhood?
18        MR. GRYGIEL:  You have to define how
19 much the increase is.  Because it's acknowledged that
20 there's going to be traffic.
21        It's a matter of, you know, magnitude.
22        MR. ROSENWASSER:  So we can say that
23 possibly an increased magnitude could negatively
24 impact the quality of life?
25        MR. GRYGIEL:  Again, I think we're

124

1  speaking in broad terms here.
2         So to say an increase in traffic, if
3  it's, you know, one car per hour, one car per day, if
4  it's 50 vehicles -- you know, there's a very -- I
5  don't think it's a simple question that I can even
6  answer as a planner with regard to that without
7  quantify, you know, the amount of traffic we're
8  talking about.
9         MR. PURCELL:  I think what Mr. Grygiel
10 is saying is, certainly we have to qualify --
11 quantity the number that you're asking about.
12        MR. ROSENWASSER:  Okay.
13        Do increased deliveries going to a home
14 impact the quality of life in the sense that now
15 we're increasing traffic on the roads in the street,
16 impact the quality of life in a neighborhood.
17        MR. GRYGIEL:  Well, if that's the case,
18 in my neighborhood and many others in the last five
19 years -- you know, I'm not making light of this --
20 there has been increased deliveries -- there's been a
21 significant amount of increase in deliveries.
22        So I don't know if that would be one
23 reason to single out a particular property or use for
24 that.
25        MR. ROSENWASSER:  The question was,

125

1  does it impact the quality of life in a neighborhood?
2           MR. GRYGIEL:  Well, if we're talking
3  generally about more deliveries, I think it's adding
4  traffic, yes.
5           But again, I would put that in the
6  context of, are we talking about this particular
7  property and its impacts versus more broadly more
8  deliveries since COVID and the advent of online
9  shopping and shipping, that type of thing.
10          MR. ROSENWASSER:  Is that a negative or
11  positive impact?
12          MR. GRYGIEL:  If we're talking
13  generally as far as -- there's certainly positives to
14  more deliveries overall.
15          I think we're getting beyond the scope
16  of this particular application.
17          If we're focusing just one
18  single-family residence and the amount of deliveries,
19  I think it's negligible.
20          Even different sized households may
21  have more deliveries than others.
22          My neighbor gets more deliveries than I
23  do, for example.
24          I don't think that you can quantify the
25  impact on a master plan on town-wide zoning based on

126

1  something along those lines.
2           MR. PURCELL:  Mr. Rosenwasser, do you
3  have a number to give, like, a certain particular
4  amount of increase, a percentage?
5           MR. ROSENWASSER:  No, no, no.
6  I'm going to get to that.
7           MR. GRYGIEL:  Okay.
8           MR. ROSENWASSER:  Do deliveries going
9  to the wrong home impact the quality of life in a
10  neighborhood where a stranger just could show up at
11  your door for a wrong address?
12          MR. GRYGIEL:  That's nothing, frankly,
13  that planning -- master plans typically would deal
14  with, because that's a factor of -- fact of life type
15  of issue more than a planning issue.
16          MR. ROSENWASSER:  Okay.  And if there
17  was an increased amount of them, it's just a factor
18  of life, it's not a quality of life thing.
19          MR. GRYGIEL:  Well, I don't know how
20  you can see if a delivery service is going to the
21  wrong address what that has to do with this
22  particular application.
23          MR. ROSENWASSER:  Okay.  That sounds
24  interesting.
25          Do odors from septic systems impact the

127

1  quality of life in a neighborhood?
2           MR. GRYGIEL:  Again, we're talking
3  about -- you have to quantify somewhat because you
4  may have a single septic system that has been not
5  cleaned over time, or it might be multiple ones.
6  Yeah.  I don't think it's something that's ongoing.
7  If it's on an ongoing basis, potentially.  But if
8  it's something that's an isolated incident, no.
9           MR. ROSENWASSER:  Okay.
10          Does a higher cost of living in a
11  neighborhood impact the quality of life.
12          MR. PURCELL:  I'm sorry.
13          Can you explain on what basis that has
14  to do with this application, how that ties into the
15  subject CSLR?
16          MR. ROSENWASSER:  Okay.  So I'll ask
17  the next one and then I'll -- I'll come back to it.
18          Do timely EMS services impact the
19  quality of life in a neighborhood?
20          MR. PURCELL:  Can you explain also how
21  that -- how that ties into a CSLR.
22          MR. ROSENWASSER:  I'd be giving
23  testimony if I explained it.
24          MR. PURCELL:  But I think there's no --
25  I don't understand the basis of your question.

128

1           MR. ROSENWASSER:  I heard testimony
2  that the CSLR required some EMS services.
3           So I imagine that's using resources
4  from the town.  It can impact other people's EMS
5  services.
6           So my question is, does timely EMS
7  services impact the quality of life?
8           And then if we have a shortage of EMS
9  services in this neighborhood and we have to pay for
10  EMS services from the hospital instead of getting
11  volunteer EMS services from Tri-Boro Ambulance, does
12  that impact the quality of life?  That's a cost of
13  living issue.
14          MR. GRYGIEL:  Okay.  Well, to tie it
15  back to the overall question and the scope of the
16  municipality and its overall services, I would find
17  it nearly impossible to say that one residence would
18  have such an impact to negatively impact the overall
19  quality of life.
20          Even if there were -- even if it were
21  demonstrated that there was more emergency services
22  calls, that's not been put on the record.
23          And, again, I think in the context of
24  an overall municipality, that's not the case.
25          MR. ROSENWASSER:  Are you aware that

129

1  this particular CSLR has been in operation since
2  2019.
3          MR. GRYGIEL:  Yes.
4          MR. ROSENWASSER:  In your analysis,
5  have you spoken with the people on Wood Chase Lane
6  about the issues with traffic volume increasing on
7  their street since the CSLR has been operational at
8  21 Wood Chase Lane?
9          MR. GRYGIEL:  I have not, no.
10          MR. ROSENWASSER:  Okay.
11          In your analysis, have you spoken with
12  the people on Wood Chase Lane about issues with
13  increasing -- vehicles with increasing speed due to
14  the CSLR at 21 Wood Chase Lane?
15          MR. GRYGIEL:  The short answer is going
16  to be no.
17          I would just put it this way that I
18  don't know if there's any way -- if there's any
19  correlation or factual predicate for a direct
20  correlation from a CSLR and the increase in speeds
21  and/or volume of traffic.
22          There's been nothing put on the record
23  with regard to that.  And I'm finding it hard to
24  believe that there's that substantial of a change.
25          MR. ROSENWASSER:  But you declined to

130

1  ask the people about it.
2          In your analysis, you spoke with people
3  -- have you spoken with people about issues with
4  increasing deliveries going to the wrong homes due to
5  the CSLR at 21 Wood Chase Lane?
6          MR. GRYGIEL:  No.
7          MR. ROSENWASSER:  In your analysis,
8  have you spoken with people on Wood Chase Lane about
9  the issues with increasing -- increasing employees
10  going to the wrong homes due to the CSLR at 21 Wood
11  Chase Lane?
12          MR. GRYGIEL:  No.
13          MR. ROSENWASSER:  Okay.
14          In your analysis, have you spoken with
15  the people on Wood Chase Lane about the issues they
16  have experienced with septic system odors coming from
17  the CSLR at 21 Wood Chase Lane?
18          MR. GRYGIEL:  No.
19          MR. ROSENWASSER:  Okay.
20          Have you asked the people on Wood Chase
21  Lane anything about how they have been impacted
22  negatively or positively by the CSLR at 21 Wood Chase
23  Lane?
24          MR. GRYGIEL:  The short answer will be
25  no.  The follow-up answer is, in doing these type of

131

1  applications, I don't believe it's ever a common
2  practice to go out and talk to residences of a
3  surrounding area prior to testifying before a board.
4          It's not a commonly in the scope of
5  work scope of services for preparing this type of
6  application.
7          CHAIRMAN LOCKWOOD:  But, Mr. Grygiel,
8  typically when you go for a use variance, the use is
9  not yet in operation, so you wouldn't have any
10  real-life data as to the operations within a
11  particular neighborhood similar to the property here.
12          This use has been in operation for over
13  five years.  And if your testimony is that there was
14  no substantial detriment to the neighborhood, why
15  wouldn't that be something that a planner would
16  endeavor to survey to find out real-life experiences
17  from the neighborhood?
18          MR. GRYGIEL:  Well, I based it upon my
19  discussion with the applicant and the history that
20  the applicant has here, the review of, you know, the
21  types of calls, the amount of calls that have been
22  provided to emergency services, that type of thing.
23          Beyond that, it was just not something
24  that occurred to undertake that type of examination.
25          I mean, a couple things.  Also, it

132

1  would be quite an undertaking to go to all neighbors.
2  I suppose I could have an open house stand or
3  something that says come tell me things about the
4  neighborhood.
5          But respectfully, in the scope of
6  services of this type of work, it sounds like a bit
7  of a detailed undertaking to go through to try to
8  figure that information out.
9          MR. ROSENWASSER:  Okay.  Is the water
10  supply important to a community's orderly
11  development.
12          MR. GRYGIEL:  It typically is, yes.
13          MR. ROSENWASSER:  Okay.
14          Is the cost of the water important to
15  the community's quality of life?
16          MR. GRYGIEL:  We're getting well beyond
17  the scope of this application.
18          But the cost of water is something that
19  has many factors.
20          Again, I wouldn't tie it directly to
21  the quality of life because there's different reasons
22  for costs changing.
23          MR. ROSENWASSER:  Have you looked into
24  what water company serves 21 Wood Chase Lane.
25          MR. GRYGIEL:  I have not.

133

1 MR. ROSENWASSER: Have you looked into
2 how large of an area that water company serves?
3 I know the answer is no. Okeydokey.
4 Have you looked into what makes this
5 water source and service area unique in this area?
6 MR. GRYGIEL: You said water sauce.
7 MR. PURCELL: Say that again.
8 MR. ROSENWASSER: Have you looked into
9 what makes the water source in this area unique and
10 how that impacts the rates?
11 MR. PURCELL: Of what.
12 MR. ROSENWASSER: Of the community.
13 MR. PURCELL: The rates of what?
14 MR. ROSENWASSER: Water.
15 MR. GRYGIEL: Again, this is all well
16 beyond the scope of a typical application in a
17 residential neighborhood where you have services
18 provided for the entire neighborhood and community.
19 We don't typically look into the
20 details of this type of information.
21 MR. ROSENWASSER: Are you aware that
22 this property is in the Highlands Reserve.
23 MR. GRYGIEL: It's in the Highlands --
24 overall Highlands area, yes.
25 MR. ROSENWASSER: Okay. What

134

1 percentage of Kinnelon is forested?
2 MR. GRYGIEL: I don't have that
3 statistic at my fingertips.
4 MR. ROSENWASSER: Okeydokey.
5 Those are all the questions I have.
6 MR. GRYGIEL: Thank you.
7 CHAIRMAN LOCKWOOD: Thank you.
8 Anyone else from the public?
9 State your name and address, please.
10 MR. DeFALCO: Joe DeFalco, 15 Bent Tree
11 Lane.
12 In preparing for this testimony, did
13 either of you review the deed for the property that
14 you are renting?
15 MR. PURCELL: Yes.
16 MR. GRYGIEL: I did not.
17 MR. DeFALCO: Thank you.
18 CHAIRMAN LOCKWOOD: Anyone else from
19 the public?
20 MS. FEGAN: I do.
21 CHAIRMAN LOCKWOOD: State your name and
22 address, please.
23 MS. FEGAN: Nancy Fegan, 21 Chilhowie
24 Drive, Kinnelon.
25 You were just saying about the cars and

135

1 not being able to prove how many Amazon trucks and
2 UPS trucks.
3 I have on my phone a picture first off
4 of seven vehicles in the driveway.
5 And we are getting with ten people that
6 aren't really a family, there are people that can't
7 get out of their house that live there, that stay
8 there.
9 So everybody is ordering Uber for
10 dinner at different places, different times, so it's
11 much, much more than anywhere else in our
12 neighborhood as a result of this house.
13 MR. TOMBALAKIAN: You'll be able to
14 provide that testimony and comment in the next stage
15 of this hearing.
16 Right now this is still questions for
17 Mr. Grygiel relevant to his planning testimony. I
18 mean, you'll have a fair opportunity to give
19 testimony on all that.
20 MS. FEGAN: Okay.
21 MR. TOMBALAKIAN: And offer documents,
22 pictures, whatever you want.
23 One thing, if you can, if you have
24 pictures on your phone, unless you want to submit
25 your phone into evidence and lose your phone --

136

1 MS. FEGAN: I'll print them out.
2 Yeah, that's true.
3 CHAIRMAN LOCKWOOD: Any other
4 questions?
5 Sir, state your name and address,
6 please.
7 DR. VENKATARAO: My name is Sreepadraj
8 Venkatarao.
9 The address is 122 Wood Chase Lane.
10 MR. TOMBALAKIAN: Please just spell
11 your name for the court reporter.
12 DR. VENKATARAO: It's
13 S-R-E-E-P-A-D-R-A-J. The last name is
14 V-E-N-K-A-T-A-R-A-O.
15 You testified that the property is on a
16 hill and separated basically.
17 Being on a hill behind 60 feet from the
18 street, that makes it much more suitable why?
19 MR. GRYGIEL: In terms of the potential
20 concerns we've heard about with regard to viewing
21 vehicles and such, you have separation of the grade
22 from the street up to the driveway as well as again
23 room for landscaping.
24 And, as we proposed, additional fencing
25 potentially next to the driveway as well to screen

137

1  from any visual impacts of the vehicles that would be
2  parked at the top of the driveway.
3          DR. VENKATARAO:  Another question is,
4  on a continuum where you have a typical family, like
5  many others in this place, okay, whether it's people
6  living there, a father, a mother, whatever is there
7  is okay, children and so forth.  Okay.
8          And the other end of the continuum,
9  let's say, it's a college or something like that.
10  Which one is this specifically closer to?
11          To a typical family like mine or to a
12  college dorm which is a commercial facility?
13          Do you understand the question.
14          MR. GRYGIEL:  I understand what you're
15  saying.
16          I take exception to typical family in
17  this day and age.
18          DR. VENKATARAO:  It doesn't matter.
19  What I said is a typical family as opposed to a
20  college dorm where people come in and pay to stay
21  there, okay, they stay there and they go to college,
22  come back to the room, that kind of scenario where
23  you have a much more compact -- what I can say --
24  smaller rooms basically, a lot more people for the
25  same area as opposed to a typical family.

138

1          MR. GRYGIEL:  I'm looking at it.
2          And I visited and I'm familiar with
3  this being a single-family house with a kitchen,
4  living room, additional sun room or family room,
5  bedrooms.
6          There's a driveway, a three-car garage.
7  So that is certainly different than, to use your
8  example of a continuum of a college dorm, which is a
9  much larger facility.
10          DR. VENKATARAO:  A college dorm is more
11  --
12          MR. GRYGIEL:  I'm trying to answer the
13  question, please.
14          DR. VENKATARAO:  Sure.
15          MR. GRYGIEL:  Thank you.
16          So I think the comparison is off base
17  for a few reasons.  I said with regard to that aspect
18  of it, but also that different types of households or
19  housekeeping units can vary in size and makeup.
20          As I mentioned, some examples include
21  multigenerational families.  I use my personal is my
22  neighborhood.
23          But we've got -- I can point to
24  examples where we have one person living in a house,
25  six people, eight people.

139

1          Sometimes there's many adults.
2  Sometime there's kids.  Sometimes more drivers than
3  others.
4          So to just say there's a spectrum or
5  continuum is -- I don't think it's that easy to put
6  it into that --
7          DR. VENKATARAO:  The continuum is
8  obviously one -- you have one end and you have the
9  other end.  Two extremes, actually.
10          To me, this is more of a commercial
11  enterprise.  And it's an inherently beneficial thing.
12  If anything is incident to the whole thing.
13          To me, the commercial part is more
14  primary, which is closer to a college dorm as opposed
15  to a typical family.
16          MR. PURCELL:  Paul, I guess a way to
17  look at it is -- and this goes to that Morristown
18  case I've been talking about.
19          In a dorm, the students kind of live
20  separately, right?  I mean, they have their own
21  rooms?
22          They go to eat somewhere else.  You
23  know, each room is sort of its own housekeeping unit,
24  is that correct, in a certain sense.
25          MR. GRYGIEL:  Yeah.

140

1          Well, that's the difference between --
2  there's different types of housing, whether its
3  rooming or boarding houses where you have doors that
4  lock, that type of thing, individually.
5          We don't have doors -- locks on the
6  bedroom individual doors in this instance, for
7  example, so...
8          MR. PURCELL:  But this house is more --
9  you know, it's one housekeeping unit versus in a dorm
10  multiple housekeeping units, is that a way to look at
11  it.
12          MR. GRYGIEL:  Yeah.
13          Again, that's the whole point of it.
14  The whole regulations and the idea behind the CSLR is
15  the housekeeping unit might be different than what
16  one might call typical, but you have residents living
17  there who share common meals, you know, have the same
18  entertainment or, you know, facilities in the house.
19          It's not individual doors and rooms are
20  locked up with little kitchens in them.  They are
21  individual bedrooms that are unlocked and part of a
22  larger house.
23          DR. VENKATARAO:  Thank you.
24          CHAIRMAN LOCKWOOD:  Okay.
25          Any other questions from the public?

141

1      Please state your name and address.
2      MS. RITACCO:  Jenn Ritacco, 11 Bent
3  Tree Lane.
4      You said several times throughout your
5  testimony about dealing with this upfront.  I don't
6  think that waiting six years to deal with this is
7  upfront and --
8      CHAIRMAN LOCKWOOD:  Is that a question?
9      MS. RITACCO:  The question is, why
10  wasn't this handled in 2019 so that the town can have
11  the opportunity to evaluate the water usage and the
12  septic system to ensure that it's up to par to handle
13  this number of residents.
14      MR. PURCELL:  So that's not a question
15  for our planner.
16      He didn't testify with respect to that
17  particular -- that's not --
18      MR. TOMBALAKIAN:  The question really
19  should be relevant to what he testified to, which his
20  field of expertise is planning, review of zoning,
21  master plan re-exams, the legal standards, Sica.
22      MS. RITACCO:  Doesn't the septic fall
23  into that?
24      MR. TOMBALAKIAN:  No.
25      That's more of an engineering type

142

1  thing.
2      And I believe Mr. Jonas had testified
3  as to the reasons why, was that they weren't aware
4  that there was a need for a zoning approval.
5      MS. RITACCO:  Well, they got one in
6  Mahwah in 2020, so they were aware.
7      CHAIRMAN LOCKWOOD:  His testimony was
8  he wasn't aware.
9      MS. RITACCO:  Well, they were both
10  involved in that.
11      MR. TOMBALAKIAN:  That's what his
12  testimony was.
13      MS. RITACCO:  So they were aware.
14      MR. TOMBALAKIAN:  Again, whether you
15  believe him or not, that was his testimony.
16      MS. RITACCO:  Okay.
17      CHAIRMAN LOCKWOOD:  Any other questions
18  from the public?
19      (No Response.)
20      CHAIRMAN LOCKWOOD:  Seeing none, I turn
21  it back to you, Mr. Purcell.
22      MR. PURCELL:  Well, I guess I don't
23  really have anything else for Mr. Grygiel.
24      If you want to move on to the public
25  comment.

143

1      CHAIRMAN LOCKWOOD:  Very well.
2      MR. TOMBALAKIAN:  So this is the time
3  that you've all been waiting for.  This is public
4  comment.  I.
5      Know you have been waiting.  So when
6  you get up -- I mean, if you want -- if you want to
7  testify, like, get under oath and give us facts that
8  you want the board to consider, that's fine.
9      If you just comment, offer us your
10  opinion, that's fine too.  You don't have to get
11  sworn in for that.  It's up to you.
12      If you want to submit documents as
13  evidence, share them with Mr. Purcell, let him take a
14  look and then we'll mark them and review them, it's
15  up to you.
16      But if you -- again, this is your time
17  to offer comment.  You can put on a case, give us
18  your opinions.
19      You know, again, we only have about a
20  half-hour left this evening.
21      So depending how much you want to
22  offer, we may need to carry.
23      But, believe me, everyone will have an
24  opportunity.  You've all been waiting patiently.  So
25  who wants to be first up?

144

1      MS. DeFALCO:  Marie DeFalco, 15 Bent
2  Tree Lane.
3      My husband and I are the -- I don't
4  want to say oldest, but we're the longest residents
5  on the Bent Tree-Wood Chase Lane horseshoe.
6      I don't know if anybody's even -- if
7  the board is completely aware.  It is just a
8  horseshoe.  It's not like Boonton Avenue.  It's not
9  facing Lakes Road.  Traffic is us.  It's the
10  residents, unless someone makes a wrong turn.  But
11  basically it's just the residents.
12      Since this home has been there six
13  years ago -- and I resent being always accused like
14  we're being prejudiced against what they're doing.
15  I'm not, not at all.
16      I resent that our water system -- I'm
17  there 40 -- over 40 years.
18      I've never had to redo my septic
19  system.  And I've had in-laws live with me.  I've had
20  huge parties as daughters got engaged and a son got
21  married, and in-laws, like I said, and my kids coming
22  back from college with their spouses and everything.
23      So I've had plenty of people at my
24  home.  I never had to redo my septic system.  They
25  were there not two years and they had to completely

145

1  redo the septic system.

2         It's too many people.  We had to deal

3  with septic overflowing on the street.

4         We have to deal with an enormous amount

5  of garage.

6         We've had kids -- I have a

7  ten-month-old grandson that I am really afraid to

8  walk my beautiful block because there are Uber

9  drivers that go fast as hell on that road.

10        Not that long -- well, it was a while

11 ago.  We had -- we finally got a sign that says 25

12 miles an hour on our road.  It's a joke.  Van?

13        Since our last meeting, that first week

14 -- you can ask every one of us that is a resident

15 there.  All of a sudden that van disappeared.

16        It wasn't around.  Now it's back again.

17        But they know they're wrong.  And

18 they've been operating illegally for six years,

19 because they -- and saying that they didn't know

20 about it.  I'm sorry, I don't buy it.

21        But traffic has been impacted.  I feel

22 like our water system has been impacted.  The usage

23 that they're using.  We have Fayson Lake Water.  It's

24 a well.

25        I'm really upset.  I really -- I moved

146

1  to this town over 40 years ago to a neighborhood that

2  I thought was so beautiful, wooded, single-family

3  homes.

4         I was the second one on Bent Tree Lane.

5  My brother-in-law was the first.  They put the road

6  in so that we could build our home.

7         And I know it's set in the back.  I

8  have -- we have restricted deeds there.

9         They can't put fences up because we

10 have so much wildlife there.  And that was the point,

11 to have that beauty, the bears, the wolves, the fox.

12 I want that.  That's why I came here.  I didn't come

13 here so that I can't walk my ten-month-old grandson

14 down the street for fear that I will be hit by a car.

15        Thank you.

16        MR. MONDELLO:  Sorry.

17        How was -- I'm sorry, Ed.

18        How was the water affected.

19        I don't understand that.

20        MS. DeFALCO:  Well, there's a running

21 stream.

22        There's property on Bent Tree Lane,

23 between Bent Tree, between Bent Tree and Wood Chase,

24 we have a running stream there.

25        MR. MONDELLO:  You misunderstood.

147

1  Maybe I'm --

2         MS. DeFALCO:  The sewer -- when their

3  septic went, it was going into the street.

4         Don't tell me that didn't go into our

5  water.  We provide water for all of the -- we're the

6  Highlands.

7         We provide water for all of northern

8  Jersey.

9         MR. MONDELLO:  Okay, I understand now.

10        You didn't say your water was affected.

11 I thought that maybe the pressure in the shower --

12        MS. DeFALCO:  No, no, no.

13        What I'm saying is the amount.

14        MR. MONDELLO:  Can I finish?  Let me

15 finish.

16        She can only take one voice at a time.

17        So now I understand.

18        You think that it's not the amount of

19 the water.  It had to do with sewage overflow.  You

20 think that seeped into your water system.

21        MS. DeFALCO:  I'm sure it did.

22        MR. MONDELLO:  Is there any other way

23 that your water has been affected?

24        MR. DeFALCO:  All I can say is, I get

25 my from Fayson Lake Water.

148

1         And I know their usage is extremely

2  high.

3         MR. MONDELLO:  Okay, thank you.

4         MR. PURCELL:  I have some questions.

5         I have some questions, if you don't

6  mind.

7         So with respect to the septic overflow,

8  what date did that happen?

9         When did that happen?

10        MS. DeFALCO:  That was I think two --

11 two years after they showed up, two or three years

12 after they were there.

13        MR. PURCELL:  So that was before the

14 work was done in 2022 or after?

15        You said there was some septic work

16 done in 2022.

17        Was it done before that work or after?

18        MS. DeFALCO:  That was before.

19        MR. PURCELL:  Before, okay.

20        MS. DeFALCO:  That's why they had to do

21 the septic.  They had to redo it.

22        MR. PURCELL:  Did you have -- did see

23 septic falling into the street.

24        MS. DeFALCO:  The smell was certainly

25 there.

149

1    MR. PURCELL:  But did you see septic
2  going into the street.
3    MS. DeFALCO:  There was -- it was wet,
4  yes.
5    MR. PURCELL:  You saw septic falling
6  into the street?
7    Yes, you did.
8    MR. DeFALCO:  No, I'm not going to say
9  that I did.  I'm telling you that it was a horrible
10  smell.
11    MR. PURCELL:  So you didn't see it.
12    MS. DeFALCO:  No.  Correct.
13    I don't walk around smelling the
14  ground.
15    MR. PURCELL:  No, no.
16    Again, I'm just trying to understand
17  your comments.  You commented -- okay.
18    Has there been any septic overflow
19  since the upgrade in 2022, that you're aware of.
20    MS. DeFALCO:  I haven't seen any.
21    I don't like the idea that a commercial
22  system is going in.
23    MR. PURCELL:  How do you know it's a
24  commercial system?
25    MS. DeFALCO:  That's what was

150

1  testified.
2    MR. PURCELL:  It was testified that it
3  was congregant living as a residential.
4    MS. DeFALCO:  And doesn't that need to
5  be a commercial system, though.
6    MR. PURCELL:  I don't want to --
7    MS. DeFALCO:  It's a much bigger --
8    MR. PURCELL:  With respect to the
9  septic, has there -- so just to make sure I'm clear.
10  There was an upgrade in 2022.
11    There's an upgrade pending, but have
12  you smelled anything or seen anything since that time
13  before the 2022?
14    MS. DeFALCO:  No, I have not.
15    MR. PURCELL:  No, okay.
16    You mentioned garbage, can you -- is
17  that garbage that you saw in front of 21 Wood Chase.
18    MS. DeFALCO:  Yes.  Like bins the size
19  of the table here.
20    MR. PURCELL:  Okay.  Garbage bins.
21    Is it garbage outside of the bins.
22    MS. DeFALCO:  Yes.
23    MR. PURCELL:  Okay.  Is it because --
24  is that weekly?
25    How often have you seen that?

151

1    MS. DeFALCO:  I wasn't aware that I'm
2  being...
3    MR. TOMBALAKIAN:  You offered -- you
4  didn't testimony.  You offered comment.
5    You're free not to answer the
6  questions.
7    MS. DeFALCO:  I don't want to answer
8  your questions.
9    I don't like anything that any of you
10  have had to say.  I'll be dammed if I'll sit and --
11    MR. TOMBALAKIAN:  You're not under
12  oath.
13    You offered comments.  You raised
14  points about septic odor, garbage.
15    The applicant is questioning you about
16  that because he wants to probe about, because you
17  said --
18    MS. DeFALCO:  So it could change all
19  tomorrow?
20    All of a sudden the garbage will be
21  nice and neat tomorrow.  It's a joke.  It's an
22  absolute joke.
23    MR. TOMBALAKIAN:  Again, if you don't
24  want to answer his questions, we're not here to force
25  you.

152

1    MS. DeFALCO:  I'm not answering his
2  questions.
3    MR. TOMBALAKIAN:  Remember, you're not
4  testifying.  You're just offering comments.
5    MS. DeFALCO:  Right.
6    I'm just offering my comments, my
7  personal comments.
8    MR. TOMBALAKIAN:  Okay.
9    That's fine.
10    But we're treating it as your opinion.
11  If you want to offer facts, then we really should
12  swear you in so that, you know, you're obliged by the
13  law to tell the truth.  Which is fine.
14    If you want to offer comments, if you
15  want to testify.  Testimony is given more weight than
16  a comment.
17    MS. DeFALCO:  I understand that.
18    But I've sat here long enough through
19  two meetings, and I just want to comment.
20    MR. TOMBALAKIAN:  That's fine.
21    CHAIRMAN LOCKWOOD:  Anyone else from
22  the public?
23    State your name and address, please.
24    MR. DeFALCO:  Joe DeFalco, 15 Bent Tree
25  Lane.

153

1    A few comments on this for the property
2  itself.  We are talking about a piece of property
3  that was known as Crispin Woods.
4        It was approximately 50 acres under one
5  deed.  This board in 1979, 1980 roughly allowed a
6  major subdivision.  That subdivision came with an
7  array of restrictions.
8        I invite the board to go back
9  historically and pull it out and see what they did.
10        This land was so environmentally
11  sensitive that for the first time in Kinnelon they
12  required -- there was no option that you must put in
13  a jet system on your septic with two distinct fields.
14  There has to be a pump that alternates every 500
15  gallons, one to one field, one to the other.
16        There is a deed restriction that says
17  -- the subdivision was under the name Revkell,
18  R-E-V-K-E-L-L, maybe one L.
19        All of those lots -- there are
20  approximately 37 -- are restricted by the predecessor
21  to this board.
22        Those restrictions prevent fencing for
23  what Marie had mentioned, the movement of the
24  animals, a continuous forest canopy, and the
25  sensitivity to all flowing water that is there.

154

1  There are streams.
2        There is the Boonton Reservoir
3  literally across Boonton Avenue with a spill dam.
4        And to come back to Mr. Mondello's
5  question, the water.  We are one of, I believe, two
6  in the state private water companies.
7        Fayson Lake Water Company is a private
8  company.  Essentially it is a community well, period.
9  They are restricted.  Their wellhead discharge can
10  only go so far.
11        I invite the board to get the usage
12  from Fayson Lake -- which they must provide -- of the
13  amount of water that this particular use sucks out of
14  the system, thereby depriving the balance of us from
15  having the amount of water, the quantity of clean
16  pumped water that we would normally get.
17        Before I go any further, let me say,
18  their actions, what they're trying to do, the goal is
19  noble and worthy and should be applauded.
20        We are here because of health, safety
21  and welfare issues, period.
22        This particular piece of property in
23  this particular location is not the place to have 20,
24  15, 10 people, whatever you want.
25        And to that end, I invite you all again

155

1  to look if there was a family in Smoke Rise or around
2  it, and there were 12 people there, and that septic
3  continually boiled over and spilled onto the
4  surrounding properties, you bet that the borough
5  would be there and tell them to do something about
6  that, not just to repair the septic.
7        They would say, if you can't -- and, by
8  the way, in Crispen Woods you cannot, you cannot
9  expand the field.  It is virtually impossible unless
10  you want to blast and wait two years for the ground
11  to settle.  You cannot physically do it.
12        They can produce an engineer who might
13  say maybe I can do it.  I doubt it.
14        Since you can't do that, this house,
15  the best they could hope for is to say, we will limit
16  the number of people to what our septic system can
17  handle.  That's the best they can ever hope for.
18  That septic system can handle -- because we were all
19  there.  Believe me, I've been in every single house
20  on that horseshoe, before it was built and after it's
21  been built and know the septics.  We had to go
22  through hell.
23        Charlie Jones, for those who might be
24  old enough to remember the name, Charlie Jones was
25  the inspector at the time.  Perhaps it's in the

156

1  record.  I'm not sure.
2        But he made us go through hell.  We had
3  actually had to redraw our property line because the
4  major subdivision said this land is so sensitive that
5  no single-family -- no single house can be built
6  unless every lot that touches it is perc-able.
7        By that code, when we had bought the
8  initial lot, we couldn't get a perc.  Hardly anybody
9  really could.  There are three or four lots there --
10  at least three that are dedicated because they just
11  will not perc.  It's either too much rock, or on the
12  low end, too much water promptly.
13        One of those restrictions -- so this is
14  something for you to take into consideration.
15  Revkell said that nothing except a single-family
16  home, period, occupied as a single-family can be
17  built or used.  No commercial use of any kind.
18        And it says that the successors to
19  Revkell have to be in agreement if something like
20  that is to be changed.
21        I am the successor of Revkell, one of
22  them.  Many of the people here are also successors.
23  I did not give my permission for a commercial use.
24        I did not give my permission for a
25  fence.  I did not give my permission for driveways to

157

1  be parked with commercial vehicles. No one has asked
2  me either.
3        Look this stuff up, fellas, ladies.
4  Look it up.
5        MR. TOMBALAKIAN: Sir, can I stop right
6  there?
7        One of things the Zoning Board does is
8  we review information. The applicant submits an
9  application. They have witnesses. They testify.
10 They produce reports.
11       The board is not in the position to go
12 research these things.
13       It's really incumbent upon you as the
14 public, interested parties, if you have deeds you
15 think are relevant --
16       MR. DeFALCO: I understand that.
17       And I was -- if I presented it, it
18 would then be an individual presenting it.
19       It was my presumption that the board
20 would be better satisfied having found this
21 information on their own.
22       MR. TOMBALAKIAN: That's not how --
23 unfortunately that's not how it works.
24       You present it.
25       I mean, we review everything that's --

158

1  right now the applicant submitted a lot of stuff, a
2  lot of paper, a lot of witnesses, a lot of testimony,
3  a lot of reports.
4        You also have the right to present
5  documents. Because right now you're saying well, the
6  deed says. We don't have it.
7        Can you bring it? Explain it to us.
8  And then that would really kind of help explain what
9  your -- because right now, I mean, that's what you're
10 saying, you're commenting.
11       But if you want it to really mean
12 anything, you kind of have to back it up.
13       MR. DeFALCO: Not a problem.
14       I'd be happy to do that.
15       Thank you.
16       CHAIRMAN LOCKWOOD: Thank you.
17       Anyone else from the public?
18       MR. ROSENWASSER: My testimony is
19 longer than ten minutes.
20       And I don't know if you really want to
21 extend the meeting or not or defer my testimony to
22 the next month.
23       MR. TOMBALAKIAN: There's only about,
24 like, 12 minutes left.
25       If you're going to going for a

159

1  distance, maybe it doesn't make sense for you to
2  start tonight and then stop.
3        Are there other people that maybe want
4  to offer comment and use these 12 minutes
5  productively.
6        DR. VENKATARAO: Not today.
7        Can I submit documents?
8        MR. TOMBALAKIAN: When you say
9  "submit," if you're going to submit them, you can
10 submit them in advance.
11       Share them with Mr. Purcell.
12       But then you're going to have to be
13 here to introduce them, authenticate them, all the
14 things, just so it's fair. Okay?
15       But the sooner you can submit --
16 anything you submit to the board, copy Mr. Purcell.
17       So it's fair to his application, he
18 should at least have a copy of it.
19       DR. VENKATARAO: Thanks.
20       CHAIRMAN LOCKWOOD: Anyone else from
21 the public?
22       State your name and address, please.
23       MS. TORSIELLO: I'm Dana Torsiello.
24 I'm at 22 Wood Chase Lane.
25       I just wanted to really back up.

160

1        THE COURT REPORTER: Can you speak into
2  the microphone?
3        MS. TORSIELLO: I'm sorry. Start over?
4  Can you hear me?
5        THE COURT REPORTER: Yes.
6        MS. TORSIELLO: So I just wanted to
7  just back up the testimony about when he went over
8  the negatives, the negatives for living across the
9  street, you were saying how it's raised up high on
10 the hill, so, therefore, the negative for me living
11 across the street, especially with septic -- are we
12 allowed to say that now -- the septic when it was
13 having problems, the water was in the street, I also
14 -- my property is downhill from that.
15       So it concerns me in the future again
16 if this were to happen for my septic, my water, my
17 property, my health.
18       So it's just a big concern health-wise
19 living across the street or on the same cul-de-sac as
20 -- not cul-de-sac or the same street as this
21 property.
22       And the other thing is, yes, traffic.
23 My husband and I noticed it almost immediately before
24 we knew what was going on that something was going
25 on. So the traffic has definitely been an uptake for

161

1  six years.
2           Garbage.  I walk the dog a few times a
3  day, so I'm constantly just picking up garbage,
4  putting it back in their garbage can.  Sometimes the
5  garbage people, you know, make a mess.
6           They dump it and don't pick up what
7  falls.  As a resident, you usually do.
8           But I find myself doing it for them.
9  Because it's a business.  It's run like a business,
10  you know, where there's trash bins outside and left
11  overfill a lot of times.
12           They leave that stuff.  I have pictures
13  if you want them, if you want me to print it out and
14  show you.
15           Those are some of the things.  And she
16  also had mentioned the water.  And not so much this
17  year because it's been a wetter summer, but last
18  year.  We're on Fayson Lake Water.  So I don't know
19  if many of you understand Fayson Lake Water, but
20  there's a lot of restrictions, especially when it
21  gets hot and dry.
22           And their sprinklers were going all
23  summer last year.  You know, and that's usage of our
24  well possibly going into some kind of a crisis, which
25  has never happened.

162

1           But again, they are using a lot of
2  water in this residence.
3           And then even just the change of
4  shifts.  There's been late night change of shifts and
5  cars going into the wrong neighbor's house looking --
6  I guess it was a new resident -- new worker.
7           But again, just you can feel the
8  temperature of that it's a business being run, not so
9  much feels like another residence living across the
10  street.
11           There's no one really to say, oh, hey,
12  you know, your package was left on my front door.
13  Like, it's just, you know, really -- there's no one
14  to really to talk to.
15           So that was just my feeling on the
16  whole thing.
17           That was it.
18           MR. PURCELL:  Have you tried to talk to
19  anybody.
20           MS. TORSIELLO:  I have.
21           I actually have gotten packages before
22  and gone and knocked on the door and said, hey, I
23  have this.  You know, one time I didn't even realize
24  it was for that home.  It was a prescription.  I
25  wound up calling the pharmacy.

163

1           Whoever it was for, the girl said she
2  was living there.
3           But I already had, like, FedEx or
4  something pick it up.  And this is years of this
5  going on, not just recently.
6           But I think at least, I would say, four
7  or five times.  I have a few pictures of packages
8  from over the years.
9           But, yes, I have gone and knocked on
10  the door.
11           But again, like someone will answer,
12  oh, I'll let them know.
13           But there's not really any, like,
14  neighborly relationship where I can say, hey, Joe,
15  text him or call him and say...  It's very different.
16           That's it.  Thank you.
17           CHAIRMAN LOCKWOOD:  Anyone else from
18  the public?
19           MS. RITACCO:  Jenn Ritacco, 11 Bent
20  Tree Lane.
21           I just wanted to follow up because it
22  was me three or four nights ago.  I don't even know.
23  Or maybe last week.  I did call the police twice.
24           I filed two police reports, because the
25  workers at midnight came all the way up my driveway,

164

1  a very long driveway, sat in front of my garage, then
2  turned around, went back down my driveway, backed up
3  my driveway.
4           The following night the same thing
5  happened, up my driveway, down my driveway, sat in my
6  cul-de-sac.
7           The police came, pulled up, spoke to
8  them, found out it was somebody looking to get to
9  their job.  Two nights in a row, can't figure out how
10  to get there.
11           This is the kind of stuff I deal with
12  so often because I'm in the cul-de-sac.
13           And it's like -- it's like a meeting
14  place.  It's a spot.  I have had somebody in the car
15  that was having an overdose in front of my house.
16  Like, this is literally in front of my house in the
17  cul-de-sac.
18           I have had, you know, just countless,
19  countless cars up and down, turning around, making a
20  U-turn, going back, back and forth.  I mean, it is
21  nonstop.  I have camera at the bottom of my driveway.
22  They are going off incessantly all day long.  This
23  has never been like this before.  It's not -- you
24  know, there is no other cause of it besides this
25  house.

165

1      When the cars go by, I know who it is.
2  I recognize the car.  It's constantly back and forth
3  unrecognizable vehicles, vehicles I've never seen
4  before, vehicles I see three days a day.  Whatever.
5  It's all day long.
6      And on top of it, it is a business now.
7  And they're going to have to get the treatment of any
8  other business in terms of snow removal.  I mean, I
9  have to imagine we're one of the last on the list
10  because we're a small street.  It makes sense.  We
11  don't -- you know, nobody goes anywhere when there's
12  a huge snowstorm.
13      But you have workers now that have to
14  leave at 8 a.m.  And so an overnight snowstorm, a
15  neighbor got his mailbox taken out because he left
16  before the street -- before the roads were plowed.
17  They have no choice.  They have to leave.  Their
18  shift is over.
19      So now we have to re-evaluate the snow
20  removal schedule and have this house plowed earlier
21  -- our street plowed earlier than it normally would
22  be.
23      We're going to have paving issues.  The
24  road is going to erode much quicker with these huge
25  vans up and down the street multiple times a day.

166

1      I mean, we're already looking like
2  we're in need of a repavement, and we have been done
3  not too long ago.
4      So we're now on this schedule of a
5  business.  Like, we're like Boonton Avenue, Kinnelon
6  Road, Fayson Lake.  Like, we're -- we need to be
7  re-evaluated.  If this is going to be approved, we
8  need to be re-evaluated for every service that the
9  town offers that they do for businesses.  Because
10  it's -- you know, we can't have our mailboxes taken
11  out because somebody has to leave at 8 a.m.  They
12  have no choice but to leave at 8 a.m.  They can't
13  wait for the plows to come at 10 a.m.
14      This is what we're dealing with as a
15  neighborhood from people that bought a house
16  specifically on a street that we knew would never
17  become a cut-through street, we knew would never have
18  this amount of traffic.  It has now escalated into,
19  you know, 50 times the amount of traffic that we've
20  ever had on our street before.  It's not minor.
21      It's not what they explained one day
22  in, you know, twice a day.  It's all day long.
23  Whatever it is, vans, workers, deliveries, whatever
24  it is, it's all day long.
25      And it has only been like this for six

167

1  years.  It has not been like this for the 25 whatever
2  or however long I've lived here.  It hasn't been like
3  this for 20-plus years.
4      It's been like this for six years.
5      And we're setting -- if we issue this
6  variance, we're setting precedence to issue this
7  variance to anybody else that applies for one.
8      And we are a school district of 1,600
9  kids, give or take.  You have five houses, six
10  houses, that could -- that could have potentially
11  three to four school-aged children in each house.
12  That's a classroom in this town.  That's one single
13  classroom.  You take away one, two, three, four
14  classrooms, you're shutting down the school, just
15  like Jefferson did.
16      So we've got to -- like, we cannot set
17  this precedence to allow businesses, full-blown
18  businesses, to operate on a residential street.  It's
19  a business.  It's got the traffic of a business.
20  It's got the residence -- the amount of people living
21  in it as a business.  It's funded as a business.
22  It's profitable as a business.  It's 100 percent a
23  business operating illegally without the proper
24  variances for six years in a residential
25  neighborhood.

168

1      CHAIRMAN LOCKWOOD:  Given that we have
2  reached our time limit, we will carry this over until
3  next month, which is September 2nd.
4      MR. TOMBALAKIAN:  So, you know, since
5  you're all here for the Palisades Properties
6  application, this application is being carried on
7  notice to the board's next regularly scheduled
8  meeting, which is Tuesday evening, 7 p.m.,
9  September 2nd, 2025 in this room.
10      There will be no further mail or
11  published notice.
12      And we'll continue at that point with
13  public comment.
14      Again, if you have materials you want
15  to submit, we can't really distribute them.  You can
16  submit them, but give a copy to Mr. Purcell.
17      So because he may object.  He may have
18  reasons why he may not want them to be marked in
19  evidence.
20      But if you're going to submit
21  something, you're going to have to bring sufficient
22  copies to distribute them.
23      And then we'll have to determine
24  whether to introduce them.
25      MR. DeFALCO:  Where do we bring the

169

1    copies, to here to you.
2              MR. TOMBALAKIAN:  Yeah.
3              I mean, if you have them well in
4    advance, you can -- I hate to dump things on Jenn.
5    You can bring them to Jenn.  She's the board
6    secretary.
7              But again, they're not going to be
8    marked into evidence or even considered until they're
9    introduced by a human being and authenticated to find
10   out what they are.
11             Again, if Mr. Purcell takes objection
12   to them, we have to hear his objection.
13             Again, it's his application, so he has
14   rights greater than the average person.
15             (Whereupon, this matter is continuing
16        at a future date.  Time noted:  9:45 p.m.)
17
18
19
20
21
22
23
24
25

170

1         C E R T I F I C A T E
2
3         I, RONDA L. REINSTEIN, a Certified Court
4    Reporter of the State of New Jersey, authorized to
5    administer oaths pursuant to R.S.41:2-2, do hereby
6    certify that the foregoing is a true and accurate
7    transcript of the testimony as taken stenographically
8    by and before me at the time, place and on the date
9    herein before set forth, to the best of my ability.
10        I DO FURTHER CERTIFY that I am neither a
11   relative nor employee nor attorney nor counsel of any
12   of the parties to this action, and that I am neither
13   a relative nor employee of such attorney or counsel,
14   and that I am not financially interested in the
15   action.
16
17
18
19
20
21
22
23   *Ronda L. Reinstein*
24   -------------------------------------------------
     RONDA L. REINSTEIN, CCR No. 30X100217800
25

# #

**#1571** [1] - 1:4

# 0

**07006** [1] - 1:23
**07054** [1] - 2:3
**07677** [1] - 2:6

# 1

**1** [1] - 1:14
**1,600** [1] - 167:8
**1.4** [1] - 62:7
**10** [5] - 13:1, 14:14, 66:22, 154:24, 166:13
**100** [3] - 3:15, 24:23, 167:22
**104** [1] - 3:14
**106** [1] - 3:16
**1096** [1] - 69:24
**10th** [1] - 61:17
**11** [10] - 3:8, 3:23, 4:11, 4:24, 14:15, 21:25, 26:12, 27:11, 141:2, 163:19
**116** [1] - 3:16
**118** [1] - 3:17
**12** [8] - 3:4, 4:19, 12:1, 14:16, 74:14, 155:2, 158:24, 159:4
**12-person** [2] - 10:10, 20:6
**122** [4] - 3:18, 3:22, 4:8, 136:9
**13** [3] - 11:25, 14:18
**134** [2] - 3:19, 3:20
**136** [1] - 3:21
**14** [2] - 99:25, 100:4
**141** [1] - 3:22
**144** [1] - 4:3
**15** [13] - 3:9, 3:20, 4:3, 4:5, 4:21, 10:17, 28:7, 99:6, 99:7, 134:10, 144:1, 152:24, 154:24
**150** [1] - 60:17
**152** [1] - 4:4
**1571** [1] - 5:3
**158** [1] - 4:6
**1582** [1] - 8:24
**159** [2] - 4:7, 4:9
**16** [2] - 3:5, 3:5
**163** [1] - 4:10
**18** [1] - 3:6
**19** [1] - 3:4
**1979** [1] - 153:5
**1980** [1] - 153:5

**1999** [2] - 60:1, 60:15

# 2

**2** [1] - 1:15
**20** [8] - 3:6, 3:11, 3:21, 17:5, 46:1, 46:5, 108:23, 154:23
**20-minute** [1] - 46:25
**20-plus** [2] - 86:5, 167:3
**2009** [1] - 68:19
**2016/2017** [1] - 78:1
**2018** [2] - 94:4, 109:3
**2019** [2] - 129:2, 141:10
**2020** [1] - 142:6
**2020/2021** [1] - 78:1
**2022** [7] - 57:6, 112:14, 148:14, 148:16, 148:19, 150:10, 150:13
**2023** [2] - 78:13, 78:17
**2024** [6] - 4:21, 15:3, 15:11, 21:3, 24:24, 24:25
**2025** [12] - 1:2, 4:18, 4:24, 6:12, 7:21, 25:1, 26:12, 27:11, 51:13, 61:18, 112:3, 168:9
**2028** [1] - 10:24
**21** [19] - 1:4, 3:7, 5:2, 36:12, 38:5, 39:24, 40:7, 40:21, 55:1, 95:15, 129:8, 129:14, 130:5, 130:10, 130:17, 130:22, 132:24, 134:23, 150:17
**22** [2] - 4:9, 159:24
**23** [1] - 60:3
**24** [1] - 36:5
**25** [5] - 4:18, 6:12, 7:21, 145:11, 167:1
**27** [4] - 4:21, 4:24, 15:3, 15:11
**28** [3] - 3:8, 51:13, 57:6
**29** [1] - 60:2
**29.3** [1] - 77:25
**2nd** [2] - 168:3, 168:9

# 3

**3** [1] - 13:24
**30X100217800** [1] - 170:24
**32** [1] - 3:9
**37** [1] - 153:20

**380** [1] - 2:6
**39** [5] - 3:10, 3:19, 4:6, 32:22, 122:23
**3:30-ish** [1] - 50:7
**3:45** [1] - 50:7

# 4

**4** [3] - 14:3, 27:2, 57:20
**4-foot** [1] - 121:19
**4.19** [1] - 58:3
**40** [5] - 52:4, 71:12, 144:17, 146:1
**40:55D-66(C)** [1] - 74:11
**42** [1] - 3:4
**45** [1] - 3:10
**47** [1] - 1:23
**49:N.J.R-1276A** [1] - 66:15
**4:00** [1] - 50:7
**4:30-ish** [1] - 49:19

# 5

**5** [3] - 1:2, 14:5, 50:13
**50** [5] - 2:6, 78:16, 124:4, 153:4, 166:19
**500** [1] - 153:14
**54** [1] - 3:5
**565** [1] - 108:18
**59** [2] - 3:12, 3:12
**5:27-2.1** [1] - 65:24
**5:70-4.1** [1] - 57:22
**5:70-4.19** [1] - 58:2
**5B** [1] - 59:12
**5th** [3] - 22:24, 26:25, 27:1

# 6

**6** [3] - 13:1, 14:7, 27:2
**60** [3] - 52:4, 119:20, 136:17
**61** [1] - 3:13
**618-0872** [1] - 1:24
**629** [1] - 2:3
**69** [1] - 3:14
**6th** [1] - 27:3

# 7

**7** [5] - 1:2, 4:18, 14:9, 50:13, 168:8
**70** [1] - 59:12
**7:30** [1] - 50:3

# 8

**8** [5] - 3:2, 14:11, 165:14, 166:11, 166:12
**82,000** [1] - 78:13
**8:00** [1] - 50:4
**8:55** [1] - 122:12

# 9

**9** [2] - 3:3, 14:13
**91** [2] - 3:14, 3:24
**95** [1] - 3:15
**973** [1] - 1:24
**9:45** [2] - 45:22, 169:16

# A

**A-10** [4] - 4:23, 26:20, 27:5, 27:11
**A-3** [4] - 61:10, 61:14, 61:22, 61:25
**A-6** [3] - 4:17, 6:13, 7:21
**A-7** [3] - 4:19, 12:14, 12:20
**A-8** [3] - 4:20, 15:9, 15:12
**A-9** [1] - 4:22
**a.m** [5] - 27:2, 165:14, 166:11, 166:12, 166:13
**ability** [5] - 53:17, 101:22, 115:17, 115:25, 170:9
**able** [11] - 34:5, 36:23, 42:12, 53:7, 53:17, 53:19, 91:17, 105:24, 135:1, 135:13, 156:6
**absent** [2] - 44:20, 44:23
**ABSENT** [1] - 1:9
**absolute** [1] - 151:22
**abuse** [6] - 66:19, 67:2, 78:14, 78:16, 84:3, 114:8
**Abuse** [3] - 13:25, 14:2, 52:3
**accept** [1] - 104:19
**acceptable** [1] - 49:25
**accepted** [2] - 60:24, 72:21
**Accepted** [1] - 61:1
**access** [5] - 51:21, 68:10, 78:6, 105:19, 105:24
**accessible** [1] -

105:25
**accessory** [1] - 89:14
**accommodate** [4] - 67:15, 82:5, 82:20, 83:24
**accommodation** [14] - 66:24, 67:17, 67:21, 81:10, 81:17, 88:4, 88:7, 93:6, 93:7, 94:10, 94:20, 95:5, 115:11, 116:5
**accommodations** [3] - 67:7, 67:9, 68:8
**according** [1] - 78:14
**Accordingly** [1] - 57:20
**account** [1] - 113:16
**accounted** [1] - 99:10
**accurate** [2] - 123:10, 170:6
**accused** [1] - 144:13
**achieve** [1] - 52:2
**acknowledge** [6] - 8:20, 85:25, 91:20, 105:16, 114:14, 120:7
**acknowledged** [3] - 88:20, 116:10, 123:19
**acknowledging** [1] - 91:9
**acres** [2] - 62:7, 153:4
**Act** [12] - 73:5, 81:11, 92:22, 93:3, 93:16, 94:3, 99:18, 100:2, 100:14, 101:8, 115:8, 115:18
**acting** [1] - 113:8
**action** [2] - 170:12, 170:15
**actions** [2] - 71:9, 154:18
**activities** [1] - 69:15
**activity** [3] - 62:17, 72:25, 77:6
**actual** [5] - 28:9, 28:11, 30:24, 47:16, 82:13
**add** [2] - 54:16, 121:18
**added** [3] - 68:20, 109:6, 109:21
**addicted** [1] - 111:4
**addiction** [5] - 51:17, 51:23, 66:1, 80:3, 102:24
**Addiction** [2] - 14:7, 52:12
**addictions** [1] - 67:3
**addicts** [3] - 46:14, 47:4, 47:5

**adding** [1] - 125:3
**addition** [4] - 9:13, 54:8, 93:16, 95:3
**additional** [8] - 8:15, 14:22, 66:5, 76:18, 86:24, 121:18, 136:24, 138:4
**address** [15] - 21:24, 28:6, 32:19, 65:10, 88:1, 122:21, 126:11, 126:21, 134:9, 134:22, 136:5, 136:9, 141:1, 152:23, 159:22
**addressed** [3] - 80:12, 87:13, 121:9
**addressing** [1] - 84:8
**adequate** [2] - 48:9, 105:12
**adequately** [1] - 94:17
**adjacent** [1] - 79:17
**adjoining** [1] - 107:6
**adjust** [1] - 113:5
**ADJUSTMENT** [2] - 1:1, 1:6
**adjustment** [2] - 28:20, 113:5
**administer** [1] - 170:5
**Administrative** [1] - 54:15
**administrative** [3] - 67:24, 81:18, 88:14
**Administrators** [1] - 14:4
**admissions** [1] - 78:17
**admitted** [1] - 78:13
**adopted** [2] - 66:10, 112:3
**adult** [1] - 85:7
**adults** [5] - 74:4, 75:10, 76:1, 85:5, 139:1
**advance** [2] - 159:10, 169:4
**advent** [1] - 125:8
**Advisors** [1] - 71:6
**Affairs** [1] - 25:12
**affected** [3] - 146:18, 147:10, 147:23
**affiliations** [1] - 59:23
**affirm** [1] - 59:7
**afford** [1] - 67:9
**afraid** [1] - 145:7
**afterwards** [1] - 24:12
**age** [2] - 83:17, 95:13, 137:17
**aged** [1] - 167:11
**agency** [2] - 57:7, 57:11

**agenda** [1] - 5:25
**ages** [1] - 85:13
**Aggression** [1] - 14:5
**aggression** [1] - 46:12
**ago** [11] - 25:20, 27:24, 55:1, 60:3, 72:18, 94:5, 144:13, 145:11, 146:1, 163:22, 166:3
**agree** [6] - 31:3, 50:1, 71:20, 91:21, 97:10, 111:8
**agreement** [5] - 37:20, 38:4, 38:8, 38:18, 156:19
**ahead** [1] - 50:2
**AICP** [4] - 2:12, 3:12, 3:24, 59:11
**Aid** [1] - 14:17
**aid** [1] - 46:7
**aimed** [1] - 117:22
**airbnb** [1] - 98:11
**akin** [1] - 75:4
**Alcohol** [2] - 13:24, 14:1
**alcohol** [9] - 51:16, 66:1, 66:19, 77:17, 77:24, 78:7, 78:18, 80:2, 117:23
**alcoholism** [1] - 84:3
**ALEX** [1] - 2:10
**ALISON** [2] - 2:12, 3:24
**allow** [6] - 64:8, 64:14, 67:16, 87:20, 96:6, 167:17
**allowed** [6] - 12:23, 84:17, 113:5, 120:2, 153:5, 160:12
**allowing** [2] - 89:17, 97:15
**allude** [2] - 63:15, 84:25
**almost** [4] - 63:2, 95:21, 97:17, 160:23
**alone** [1] - 103:10
**alteration** [3] - 68:1, 88:16, 89:16
**ALTERNATE** [2] - 1:14, 1:15
**alternates** [1] - 153:14
**alternation** [1] - 81:20
**alternative** [2] - 65:7, 106:17
**altogether** [1] - 87:17
**Amazon** [1] - 135:1
**Ambulance** [1] - 128:11
**ameliorate** [2] - 80:9, 121:7

**amenable** [1] - 91:25
**Amendments** [10] - 73:5, 92:22, 93:3, 93:16, 94:3, 99:18, 100:1, 101:7, 115:8, 115:18
**American** [1] - 11:22
**amount** [16] - 108:4, 111:22, 124:7, 124:21, 125:18, 126:4, 126:17, 131:21, 145:4, 147:13, 147:18, 154:13, 154:15, 166:18, 166:19, 167:20
**amp** [1] - 24:23
**analysis** [10] - 34:21, 61:6, 61:20, 89:20, 89:24, 129:4, 129:11, 130:2, 130:7, 130:14
**animals** [1] - 153:24
**annual** [7] - 18:9, 21:7, 21:13, 21:14, 54:4, 54:11, 77:23
**Annual** [1] - 54:6
**Annually** [2] - 17:21, 17:22
**annually** [2] - 21:5, 21:6
**answer** [40] - 8:17, 16:18, 25:9, 25:10, 28:24, 29:7, 29:9, 29:24, 31:20, 34:24, 38:17, 43:20, 44:16, 51:2, 51:7, 51:8, 51:17, 53:10, 55:12, 55:18, 55:20, 70:14, 91:13, 92:5, 92:25, 103:19, 106:21, 107:25, 113:3, 124:6, 129:15, 130:24, 130:25, 133:3, 138:12, 151:5, 151:7, 151:24, 163:11
**answered** [2] - 7:2, 37:7
**answering** [3] - 7:9, 13:2, 152:1
**answers** [2] - 45:8, 100:10
**anyway** [3] - 90:7, 90:18, 121:23
**apartment** [1] - 102:4
**apologize** [2] - 9:8, 119:9
**apparent** [1] - 112:19
**appear** [2] - 89:11,

97:4
**appearance** [6] - 85:19, 89:12, 96:10, 96:16, 97:11, 121:7
**appeared** [1] - 109:16
**Appellate** [1] - 110:25
**applauded** [1] - 154:19
**applicable** [2] - 54:14, 81:22
**Applicant** [1] - 2:7
**applicant** [12] - 6:1, 62:24, 64:12, 64:18, 80:13, 84:18, 107:1, 131:19, 131:20, 151:15, 157:8, 158:1
**applicant's** [2] - 77:15, 78:21
**applicants** [4] - 60:17, 86:13, 109:17, 116:14
**application** [31] - 8:5, 23:16, 24:3, 24:18, 28:20, 29:4, 29:14, 29:19, 32:3, 48:17, 55:21, 55:22, 61:7, 62:23, 63:9, 73:7, 81:2, 91:10, 92:15, 94:25, 125:16, 126:22, 127:14, 131:6, 132:17, 133:16, 157:9, 159:17, 168:6, 169:13
**Application** [2] - 1:4, 5:2
**applications** [3] - 60:21, 114:6, 131:1
**applies** [2] - 58:4, 167:7
**apply** [2] - 7:6, 115:21
**appreciate** [2] - 29:8, 106:16
**Approaches** [1] - 14:6
**appropriate** [7] - 31:7, 31:9, 79:14, 82:13, 84:4, 87:19, 91:4
**approval** [5] - 29:5, 62:25, 64:13, 117:3, 142:4
**approvals** [1] - 86:14
**approve** [1] - 81:1
**approved** [6] - 32:1, 32:6, 32:8, 32:13, 32:14, 166:7
**area** [62] - 20:20, 79:7, 80:6, 80:7, 82:19, 96:16, 108:16, 119:12, 131:3, 133:2, 133:5, 133:9,

133:24, 137:25
**areas** [1] - 82:17
**argument** [2] - 65:3, 99:24
**arguments** [2] - 30:18, 31:7
**arrangement** [3] - 67:3, 85:19, 89:12
**arrangements** [1] - 87:10
**array** [1] - 153:7
**Arts** [1] - 60:12
**as-of-right** [3] - 64:11, 74:5, 76:3
**aspect** [11] - 39:8, 68:16, 76:9, 77:11, 81:25, 82:6, 103:7, 106:19, 108:4, 120:25, 138:17
**aspects** [1] - 84:9
**assaults** [1] - 15:17
**assigned** [2] - 48:12, 48:13
**assisted** [1] - 109:23
**assisting** [1] - 83:6
**assistive** [1] - 51:21
**Associates** [2] - 2:12, 60:4
**assumed** [1] - 40:23
**assuming** [3] - 76:15, 81:6, 102:2
**asthma** [1] - 52:11
**AT** [1] - 1:2
**atmosphere** [1] - 56:4
**attached** [2] - 55:21, 57:23
**attempts** [1] - 51:25
**attend** [4] - 36:13, 36:15, 42:1, 43:18
**attendance** [8] - 39:15, 39:19, 39:21, 40:1, 40:3, 40:6, 40:11, 45:9
**attendance-wise** [1] - 45:9
**attendants** [1] - 44:19
**attended** [2] - 36:25, 37:5
**attending** [2] - 40:4, 42:4
**attends** [1] - 37:20
**attention** [1] - 46:11
**Attorney** [2] - 2:4, 2:7
**attorney** [2] - 170:11, 170:13
**attributed** [1] - 78:18
**AUDIENCE** [1] - 27:15
**AUGUST** [1] - 1:2
**August** [5] - 4:21, 15:3, 15:11, 21:3,

23:1
**authenticate** [1] - 159:13
**authenticated** [1] - 169:9
**authorized** [1] - 170:4
**available** [2] - 7:14, 106:3
**Avenue** [3] - 144:8, 154:3, 166:5
**average** [1] - 169:14
**aware** [17] - 28:13, 34:1, 63:15, 92:14, 96:22, 106:25, 109:2, 116:7, 128:25, 133:21, 142:3, 142:6, 142:8, 142:13, 144:7, 149:19, 151:1

## B

**Bachelor** [1] - 60:12
**back-and-forth** [1] - 83:1
**backed** [1] - 164:2
**background** [3] - 57:16, 59:22, 60:9
**balance** [2] - 11:24, 154:14
**base** [1] - 138:16
**Based** [2] - 57:10, 114:4
**based** [5] - 21:23, 44:9, 104:16, 125:25, 131:18
**Basic** [1] - 14:14
**basic** [1] - 62:4
**basis** [13] - 10:11, 21:13, 21:14, 24:11, 67:22, 82:11, 87:14, 92:9, 103:18, 108:22, 127:7, 127:13, 127:25
**bat** [1] - 85:25
**bears** [1] - 146:11
**beautiful** [2] - 145:8, 146:2
**beauty** [1] - 146:11
**become** [2] - 110:5, 166:17
**becomes** [2] - 31:5, 98:2
**bedroom** [2] - 97:18, 140:6
**bedrooms** [4] - 76:13, 82:16, 138:5, 140:21
**began** [2] - 11:2, 29:2
**behalf** [1] - 60:21
**behind** [2] - 136:17,

140:14
**BEING** [1] - 1:6
**being..** [1] - 151:2
**belabor** [1] - 84:13
**beneficial** [30] - 16:16, 58:17, 65:1, 65:6, 68:16, 68:20, 69:5, 70:13, 70:16, 70:21, 70:22, 72:20, 73:1, 73:19, 75:3, 76:9, 76:16, 79:1, 81:25, 82:4, 94:15, 94:18, 94:25, 106:19, 107:21, 108:3, 111:1, 113:20, 113:23, 139:11
**benefit** [3] - 100:1, 117:3, 117:13
**benefits** [3] - 16:20, 116:25, 118:14
**Bent** [19] - 3:8, 3:9, 3:20, 3:23, 4:3, 4:5, 4:11, 21:25, 28:7, 134:10, 141:2, 144:1, 144:5, 146:4, 146:22, 146:23, 152:24, 163:19
**Bergenfield** [1] - 110:13
**best** [6] - 13:13, 27:5, 53:16, 155:15, 155:17, 170:9
**bet** [1] - 155:4
**better** [3] - 84:21, 95:21, 157:20
**Betty** [1] - 102:13
**between** [6] - 38:8, 44:3, 62:14, 140:1, 146:23
**Beyond** [4] - 76:15, 87:7, 89:4, 131:23
**beyond** [7] - 49:24, 68:7, 114:8, 117:18, 125:15, 132:16, 133:16
**big** [2] - 120:1, 160:18
**bigger** [1] - 150:7
**Bill** [2] - 69:24, 116:18
**bill** [1] - 72:8
**bins** [4] - 150:18, 150:20, 150:21, 161:10
**bit** [6] - 31:5, 55:7, 102:17, 119:3, 121:17, 132:6
**blast** [1] - 155:10
**block** [1] - 145:8
**blown** [1] - 167:17
**Board** [6] - 2:4, 2:9, 5:6, 31:25, 71:6,

157:7
**board** [42] - 5:12, 6:6, 18:12, 20:22, 21:17, 24:1, 28:20, 30:9, 30:13, 31:7, 31:17, 31:25, 58:23, 59:8, 62:2, 62:24, 63:15, 64:15, 80:23, 81:1, 84:13, 93:9, 93:13, 93:14, 106:14, 108:5, 113:4, 116:22, 118:20, 122:16, 131:3, 143:8, 144:7, 153:1, 153:5, 153:8, 153:21, 154:11, 157:11, 157:19, 159:16, 169:5
**BOARD** [2] - 1:1, 1:6
**board's** [2] - 113:15, 168:7
**Board/Professional** [2] - 3:3, 3:13
**boarding** [6] - 17:15, 97:16, 98:25, 99:4, 99:6, 140:3
**Boarding** [2] - 55:23
**boardinghouse** [1] - 25:22
**boards** [4] - 60:17, 60:22, 86:12, 109:16
**body** [2] - 92:24, 93:14
**boiled** [1] - 155:3
**Boonton** [4] - 144:8, 154:2, 154:3, 166:5
**borders** [2] - 114:12, 117:7
**Boro** [1] - 128:11
**Borough** [7] - 4:20, 14:24, 15:10, 27:25, 54:9, 64:6, 99:21
**borough** [2] - 93:5, 155:4
**BOROUGH** [1] - 1:1
**borough's** [1] - 93:2
**bottom** [1] - 164:21
**bought** [2] - 156:7, 166:15
**Boulevard** [1] - 2:6
**Boundary** [1] - 13:22
**box** [3] - 23:17, 24:4, 24:7
**brain** [1] - 75:10
**brand** [1] - 109:24
**brand-new** [1] - 109:24
**break** [1] - 122:11
**breaker** [4] - 23:17, 24:4, 24:7, 25:14
**breakfast** [1] - 49:22

**Brian** [1] - 1:23
**brief** [1] - 122:14
**briefly** [4] - 76:17, 76:23, 82:1, 90:3
**bring** [8] - 7:14, 8:14, 35:23, 98:17, 158:7, 168:21, 168:25, 169:5
**brings** [1] - 37:13
**broad** [1] - 124:1
**broader** [3] - 91:15, 111:5, 114:13
**broadly** [2] - 119:14, 125:7
**brother** [1] - 146:5
**brother-in-law** [1] - 146:5
**brought** [1] - 91:25
**buffering** [1] - 105:12
**buffers** [1] - 79:17
**build** [1] - 146:6
**building** [1] - 50:6
**buildings** [2] - 64:2, 102:5
**built** [5] - 96:13, 155:20, 155:21, 156:5, 156:17
**bunch** [2] - 11:19, 56:11
**burden** [3] - 67:24, 81:18, 93:9
**business** [20] - 5:1, 16:14, 16:15, 20:24, 55:3, 55:9, 60:5, 100:18, 161:9, 162:8, 165:6, 165:8, 166:5, 167:19, 167:21, 167:22, 167:23
**businesses** [3] - 166:9, 167:17, 167:18
**but..** [1] - 11:9
**Butler** [1] - 60:3
**buy** [1] - 145:20
**BY** [8] - 2:2, 2:5, 9:3, 13:16, 15:13, 59:20, 61:4, 76:24

## C

**C(2** [1] - 91:5
**C-H-I-L-H-O-W-I-E** [1] - 32:25
**Caldwell** [2] - 1:23, 2:12
**camera** [1] - 164:21
**Canale** [2] - 3:6, 3:15
**CANALE** [12] - 1:10, 20:23, 21:2, 21:5,

21:13, 21:15, 100:11, 100:23, 101:19, 102:10, 103:21, 104:9
**cannot** [6] - 27:17, 57:21, 155:8, 155:11, 167:16
**canopy** [1] - 153:24
**car** [9] - 20:8, 20:18, 20:20, 124:3, 138:6, 146:14, 164:14, 165:2
**care** [3] - 23:8, 78:23, 102:18
**career** [2] - 60:2, 109:24
**Carolina** [1] - 60:11
**carried** [1] - 168:6
**carry** [2] - 143:22, 168:2
**cars** [12] - 9:14, 35:11, 35:15, 62:17, 84:17, 120:3, 120:5, 120:8, 134:25, 162:5, 164:19, 165:1
**case** [60] - 13:7, 33:24, 36:17, 64:24, 66:20, 67:12, 70:15, 72:18, 72:19, 72:21, 73:2, 73:6, 73:9, 73:14, 73:20, 76:20, 76:21, 76:25, 77:7, 77:10, 77:14, 79:5, 79:13, 82:12, 83:19, 86:21, 86:25, 87:12, 87:18, 89:6, 91:1, 92:6, 93:25, 98:20, 98:21, 98:22, 99:3, 99:19, 99:23, 105:5, 105:6, 105:9, 105:17, 108:12, 110:8, 110:16, 110:21, 110:24, 111:7, 111:14, 113:11, 113:16, 115:18, 119:15, 124:17, 128:24, 139:18, 143:17
**cases** [2] - 34:24, 73:4
**caseworkers** [1] - 48:13
**catastrophic** [1] - 77:4
**categories** [1] - 75:16
**category** [1] - 114:1
**causes** [1] - 71:23
**causing** [1] - 120:21
**CCR** [1] - 170:24
**CDC** [1] - 77:21
**CE** [3] - 12:3, 12:11, 13:20

**cemeteries** [1] - 63:25
**center** [18] - 35:16, 38:20, 38:21, 40:12, 40:25, 41:2, 41:4, 43:18, 44:4, 44:25, 47:15, 48:6, 53:2, 53:8, 68:25, 89:7, 99:25, 102:22
**Center** [15] - 36:13, 36:16, 37:11, 37:22, 38:3, 38:7, 38:23, 39:12, 39:15, 39:20, 39:23, 40:3, 40:10, 44:22, 45:1
**centers** [3] - 64:1, 102:19, 102:20
**central** [1] - 64:1
**certain** [9] - 31:4, 48:2, 61:13, 75:7, 77:4, 96:7, 113:13, 126:3, 139:24
**certainly** [18] - 6:25, 36:21, 81:13, 86:8, 94:20, 98:9, 101:11, 101:13, 105:20, 106:7, 107:8, 111:16, 113:11, 124:10, 125:13, 138:7, 148:24
**Certificate** [4] - 4:21, 15:11, 21:2
**certificate** [3] - 15:2, 15:6, 22:25
**certificates** [1] - 23:15
**certification** [2] - 5:20, 11:17
**Certified** [1] - 170:3
**certify** [1] - 170:6
**CERTIFY** [1] - 170:10
**cetera** [1] - 108:9
**CHAIRMAN** [74] - 1:8, 5:1, 5:7, 7:7, 8:12, 15:21, 16:1, 16:6, 16:12, 16:23, 18:11, 20:21, 21:16, 21:19, 26:21, 27:1, 27:21, 28:1, 28:4, 32:18, 32:23, 33:1, 42:14, 44:13, 45:15, 45:18, 50:1, 54:22, 54:25, 56:13, 58:21, 58:25, 61:1, 91:8, 91:19, 91:23, 93:19, 93:24, 94:11, 95:6, 104:10, 104:15, 106:13, 108:25, 109:5, 111:20, 112:12, 112:15, 112:21, 113:18, 114:2, 114:17, 115:1,

115:5, 116:21, 118:19, 122:9, 122:15, 131:7, 134:7, 134:18, 134:21, 136:3, 140:24, 141:8, 142:7, 142:17, 142:20, 143:1, 152:21, 158:16, 159:20, 163:17, 168:1
**Chairman** [17] - 3:5, 3:14, 5:6, 6:9, 6:22, 6:24, 12:13, 12:22, 15:8, 16:24, 27:16, 44:11, 49:23, 60:23, 63:14, 91:6, 91:6, 110:2
**CHAIRPERSON** [1] - 1:7
**change** [10] - 9:25, 62:14, 69:24, 79:15, 85:6, 96:19, 129:24, 151:18, 162:3, 162:4
**changed** [3] - 29:1, 101:25, 156:20
**changeover** [1] - 9:25
**changes** [3] - 63:8, 63:11, 66:13
**changing** [1] - 132:22
**Chapel** [1] - 60:11
**character** [2] - 79:19, 86:18
**characterized** [1] - 75:12
**charge** [1] - 55:5
**Charlie** [2] - 155:23, 155:24
**Chase** [32] - 1:4, 3:22, 4:8, 4:9, 5:2, 36:12, 38:5, 39:24, 40:7, 40:21, 52:20, 52:22, 52:23, 55:2, 62:15, 129:5, 129:8, 129:12, 129:14, 130:5, 130:8, 130:11, 130:15, 130:17, 130:20, 130:22, 132:24, 136:9, 144:5, 146:23, 150:17, 159:24
**check** [2] - 19:22, 20:12
**checked** [1] - 9:15
**checking** [1] - 18:1
**CHERYL** [1] - 1:10
**childcare** [2] - 68:25, 108:9
**children** [10] - 30:25, 74:14, 85:8, 85:11,

85:12, 87:1, 118:6, 137:7, 167:11
**Chilhowie** [10] - 3:10, 3:11, 3:19, 3:21, 4:6, 32:22, 45:25, 46:1, 122:23, 134:23
**choice** [7] - 17:8, 17:13, 46:6, 92:8, 103:23, 165:17, 166:12
**choose** [2] - 102:12, 116:14
**chooses** [1] - 103:24
**chore** [1] - 56:18
**chores** [2] - 56:15, 83:5
**chosen** [1] - 92:4
**chronic** [4] - 51:24, 52:8, 52:13, 52:14
**churches** [1] - 63:25
**circumstance** [1] - 19:16
**circumstances** [1] - 85:9
**citation** [1] - 66:15
**cite** [1] - 72:19
**cited** [1] - 57:21
**City** [1] - 105:5
**clarified** [1] - 121:11
**clarify** [2] - 8:17, 10:22
**clarifying** [1] - 12:23
**Class** [1] - 63:3
**classes** [3] - 22:8, 22:15, 46:5
**classify** [3] - 15:22, 15:24, 76:11
**classroom** [2] - 167:12, 167:13
**classrooms** [1] - 167:14
**clean** [2] - 56:20, 154:15
**cleaned** [1] - 127:5
**clear** [5] - 31:13, 63:6, 105:3, 112:22, 150:9
**clearly** [2] - 85:18, 95:4
**client** [6] - 16:7, 28:9, 28:10, 30:23, 38:2, 44:24
**clients** [5] - 39:20, 40:4, 40:11, 40:13, 45:2
**clinic** [1] - 102:13
**clinical** [3] - 47:14, 50:5, 50:8
**clinicians** [1] - 48:12
**Close** [1] - 123:1
**closer** [2] - 137:10, 139:14

**Co** [1] - 14:7
**co** [1] - 51:20
**Co-morbidity** [1] - 14:7
**co-occurring** [1] - 51:20
**code** [4] - 24:2, 57:18, 57:21, 156:7
**Code** [1] - 54:15
**codified** [1] - 68:18
**college** [9] - 85:7, 137:9, 137:12, 137:20, 137:21, 138:8, 138:10, 139:14, 144:22
**comfortably** [1] - 20:9
**coming** [11] - 25:14, 51:12, 80:18, 89:5, 89:7, 90:24, 95:22, 120:10, 120:11, 130:16, 144:21
**commenced** [1] - 32:13
**COMMENCING** [1] - 1:2
**comment** [14] - 45:21, 66:11, 121:5, 122:20, 135:14, 142:25, 143:4, 143:9, 143:17, 151:4, 152:16, 152:19, 159:4, 168:13
**COMMENT** [1] - 4:2
**commented** [1] - 149:17
**commenting** [1] - 158:10
**comments** [9] - 30:18, 102:15, 149:17, 151:13, 152:4, 152:6, 152:7, 152:14, 153:1
**commercial** [20] - 9:11, 9:21, 10:4, 10:5, 10:8, 18:16, 18:17, 35:11, 90:1, 90:5, 90:11, 137:12, 139:10, 139:13, 149:21, 149:24, 150:5, 156:17, 156:23, 157:1
**Commission** [3] - 28:14, 28:21, 29:20
**Commission's** [1] - 30:12
**committee** [1] - 71:8
**common** [4] - 82:17, 110:5, 131:1, 140:17
**commonly** [1] - 131:4

**communal** [1] - 74:1
**communicate** [1] - 45:5
**communication** [2] - 41:13, 45:12
**community** [13] - 16:16, 55:10, 63:17, 68:22, 74:4, 74:9, 76:1, 89:12, 117:5, 117:15, 133:12, 133:18, 154:8
**Community** [1] - 25:12
**community's** [2] - 132:10, 132:15
**compact** [2] - 20:1, 137:23
**companies** [2] - 45:7, 154:6
**company** [4] - 12:2, 132:24, 133:2, 154:8
**Company** [1] - 154:7
**compared** [1] - 120:3
**compares** [1] - 113:22
**comparison** [2] - 96:5, 138:16
**compatible** [1] - 52:7
**complaint** [1] - 18:3
**complete** [1] - 43:2
**completely** [2] - 144:7, 144:25
**compliance** [5] - 17:24, 22:18, 40:6, 54:14, 112:4
**comply** [3] - 30:10, 66:16, 93:15
**complying** [2] - 28:17, 93:1
**concept** [1] - 68:16
**concern** [4] - 105:18, 121:7, 121:10, 160:18
**concerns** [3] - 122:1, 136:20, 160:15
**concession** [1] - 121:25
**concludes** [1] - 81:23
**condition** [3] - 51:24, 52:14, 83:11
**conditional** [1] - 63:23
**conditions** [4] - 52:14, 80:9, 80:22, 81:7
**Confidentiality** [1] - 13:24
**congregant** [1] - 150:3
**congregating** [1] - 120:21
**connection** [2] - 49:5, 95:25

**consider** [4] - 78:24, 94:6, 108:6, 143:8
**consideration** [2] - 113:16, 156:14
**considered** [8] - 55:2, 65:5, 68:21, 82:3, 105:8, 113:14, 114:1, 169:8
**consistent** [1] - 91:10
**constantly** [2] - 161:3, 165:2
**construction** [2] - 21:9, 86:24
**contact** [2] - 26:1
**context** [6] - 84:6, 85:16, 97:6, 101:7, 125:6, 128:23
**continually** [1] - 155:3
**continue** [8] - 44:7, 44:12, 62:25, 64:14, 76:18, 89:19, 102:22, 168:12
**Continued** [1] - 4:1
**continued** [1] - 86:22
**continues** [1] - 57:19
**continuing** [2] - 12:5, 169:15
**continuous** [1] - 153:24
**continuum** [6] - 102:18, 137:4, 137:8, 138:8, 139:5, 139:7
**contribute** [1] - 117:15
**contributing** [1] - 118:9
**contribution** [1] - 117:17
**Control** [1] - 14:5
**controlling** [1] - 73:21
**cooperative** [5] - 57:7, 65:22, 74:1, 99:11, 103:14
**Cooperative** [3] - 63:1, 69:21, 69:25
**cooperatively** [1] - 56:2
**copies** [2] - 168:22, 169:1
**copy** [4] - 7:19, 159:16, 159:18, 168:16
**corner** [1] - 60:3
**Correct** [5] - 10:13, 12:6, 28:3, 115:5, 149:12
**correct** [21] - 6:4, 8:10, 9:4, 10:12, 12:7, 12:10, 13:18,

14:25, 15:4, 20:3, 24:5, 26:15, 28:12, 34:2, 36:3, 69:10, 69:16, 102:3, 115:12, 123:14, 139:24
**corrected** [1] - 75:19
**correcting** [1] - 7:9
**Corrective** [1] - 14:6
**correctly** [1] - 122:25
**correlation** [2] - 129:19, 129:20
**cost** [4] - 127:10, 128:12, 132:14, 132:18
**costly** [1] - 101:11
**costs** [1] - 132:22
**Council** [2] - 91:25, 92:7, 92:13, 93:19, 93:21, 93:22, 94:2, 94:6
**counsel** [2] - 170:11, 170:13
**counselor** [1] - 47:2
**count** [1] - 40:14
**countless** [2] - 164:18, 164:19
**country** [1] - 81:13
**County** [2] - 78:17, 114:9
**couple** [10] - 5:10, 8:15, 46:4, 46:18, 46:19, 55:14, 90:13, 109:16, 131:25
**course** [2] - 11:21, 12:11
**Course** [4] - 4:19, 12:12, 12:19, 14:18
**courses** [5] - 11:24, 11:25, 12:8, 22:15
**Court** [2] - 1:22, 170:3
**COURT** [2] - 160:1, 160:5
**court** [6] - 72:20, 73:3, 73:19, 99:3, 100:4, 136:11
**courts** [1] - 73:16
**cover** [1] - 89:21
**covers** [1] - 46:7
**COVID** [1] - 125:8
**COVID-19** [1] - 78:6
**CPR** [5] - 11:20, 11:21, 11:23, 13:21, 46:7
**create** [2] - 92:1, 100:5
**credit** [1] - 111:19
**Credits** [1] - 12:3
**crisis** [4] - 46:11, 47:21, 48:19, 161:24
**Crispen** [1] - 155:8

**Crispin** [1] - 153:3
**criteria** [2] - 64:20, 65:11, 65:19, 68:4, 68:15, 81:24, 84:9, 89:20, 91:5, 118:25, 119:2
**Cross** [1] - 11:22
**cross** [6] - 6:18, 41:13, 42:18, 42:24, 43:1, 43:8
**cross-communication** [1] - 41:13
**cross-examination** [1] - 43:1
**cross-examine** [4] - 6:18, 42:18, 42:24, 43:8
**CSLR** [33] - 33:8, 33:10, 48:16, 53:24, 55:16, 56:24, 57:12, 66:16, 66:23, 67:1, 72:19, 73:3, 74:2, 78:25, 82:5, 91:18, 94:4, 98:22, 99:9, 99:11, 115:9, 127:15, 127:21, 128:2, 129:1, 129:7, 129:14, 129:20, 130:5, 130:10, 130:17, 130:22, 140:14
**CSLRs** [10] - 21:10, 57:14, 65:23, 66:6, 70:12, 73:5, 79:25, 87:23, 106:20, 108:25
**CSR** [1] - 11:2
**CU** [2] - 12:2
**cul** [5] - 160:19, 160:20, 164:6, 164:12, 164:17
**cul-de-sac** [5] - 160:19, 160:20, 164:6, 164:12, 164:17
**cure** [1] - 52:12
**curfew** [1] - 66:21
**curious** [3] - 101:21, 117:12, 118:14
**cut** [1] - 166:17
**cut-through** [1] - 166:17

**D**

**dam** [1] - 154:3
**dammed** [1] - 151:10
**Dana** [2] - 4:9, 159:23
**Darmofalski** [1] - 2:10

**data** [5] - 51:1, 51:3, 51:5, 122:5, 131:10
**date** [10] - 22:5, 22:6, 22:18, 24:14, 24:20, 26:22, 69:24, 148:8, 169:16, 170:8
**dated** [3] - 6:12, 26:12, 57:6
**Dated** [4] - 4:18, 4:24, 7:21, 27:11
**dates** [2] - 22:3, 22:10
**daughters** [1] - 144:20
**days** [3] - 99:25, 100:5, 165:4
**DCA** [23] - 4:23, 21:8, 23:16, 24:3, 25:19, 25:22, 26:1, 26:5, 26:19, 27:8, 27:10, 29:19, 55:15, 57:5, 58:6, 58:12, 63:4, 66:5, 66:11, 70:1, 79:24, 102:8
**de** [5] - 160:19, 160:20, 164:6, 164:12, 164:17
**deal** [7] - 70:20, 86:12, 126:13, 141:6, 145:2, 145:4, 164:11
**dealing** [12] - 62:6, 68:8, 68:15, 75:9, 82:23, 85:24, 86:21, 86:22, 86:25, 87:2, 141:5, 166:14
**deaths** [2] - 15:16, 77:23
**decide** [2] - 73:16, 81:1
**decided** [1] - 73:3
**decision** [1] - 112:24
**declined** [1] - 129:25
**dedicated** [1] - 156:10
**deed** [4] - 134:13, 153:5, 153:16, 158:6
**deeds** [2] - 146:8, 157:14
**deemed** [2] - 72:20, 73:18
**deer** [1] - 33:3
**DeFalco** [59] - 3:8, 3:19, 4:3, 4:4, 28:7, 28:11, 28:13, 28:19, 29:6, 29:8, 29:13, 29:18, 29:23, 30:2, 30:16, 30:22, 31:2, 32:5, 32:10, 32:16, 134:10, 134:17, 144:1, 146:20, 147:2, 147:12, 147:21, 147:24,

148:10, 148:18, 148:20, 148:24, 149:3, 149:8, 149:12, 149:20, 149:25, 150:4, 150:7, 150:14, 150:18, 150:22, 151:1, 151:7, 151:18, 152:1, 152:5, 152:17, 152:24, 157:16, 158:13, 168:25
**defer** [1] - 158:21
**define** [1] - 123:18
**defined** [2] - 65:23, 70:1, 73:25
**definitely** [2] - 111:12, 160:25
**definition** [13] - 68:19, 69:3, 69:6, 69:11, 69:25, 71:2, 73:15, 74:8, 74:25, 75:7, 75:19, 82:24, 109:3
**Defusion** [1] - 14:6
**degree** [3] - 46:10, 47:3, 60:10
**deliveries** [12] - 124:13, 124:20, 124:21, 125:3, 125:8, 125:14, 125:18, 125:21, 125:22, 126:8, 130:4, 166:23
**delivery** [1] - 126:20
**demand** [1] - 115:25
**demonstrate** [1] - 64:19
**demonstrated** [2] - 64:23, 128:21
**demonstrating** [1] - 65:15
**department** [1] - 95:14
**Department** [4] - 8:2, 25:12, 78:18, 78:19
**dependency** [2] - 77:17, 77:18
**depriving** [1] - 154:14
**describe** [2] - 27:5, 33:9
**DESCRIPTION** [1] - 4:16
**Description** [2] - 4:19, 12:20
**descriptions** [2] - 12:11, 12:12
**design** [1] - 32:15
**designated** [1] - 57:14
**Despite** [1] - 79:20
**detailed** [2] - 78:2, 132:7

**details** [1] - 133:20
**determination** [1] - 88:6
**determine** [5] - 79:3, 80:8, 101:4, 107:12, 168:23
**determining** [1] - 77:11
**detriment** [4] - 65:12, 84:10, 119:4, 131:14
**detriments** [1] - 81:9
**Developing** [1] - 14:9
**development** [3] - 28:25, 29:5, 132:11
**developmental** [1] - 95:14
**developmentally** [1] - 63:18
**diabetes** [2] - 52:10, 103:1
**diabetic** [1] - 102:25
**differ** [1] - 83:13
**difference** [3] - 30:3, 30:4, 140:1
**different** [45] - 11:19, 25:21, 44:9, 45:6, 48:17, 48:24, 64:22, 67:18, 76:21, 79:20, 79:22, 80:5, 82:24, 82:25, 83:20, 85:14, 85:17, 87:2, 87:5, 96:18, 96:22, 96:23, 97:3, 97:8, 97:13, 99:7, 100:21, 111:9, 115:24, 115:25, 120:4, 120:12, 121:1, 125:20, 132:21, 135:10, 138:7, 138:18, 140:2, 140:15, 163:15
**differently** [1] - 75:12
**difficult** [1] - 116:12
**difficulty** [1] - 82:7
**dinner** [1] - 135:10
**dinnertime** [1] - 50:13
**DIRE** [1] - 59:19
**Dire** [1] - 3:12
**Direct** [2] - 3:3, 3:13
**direct** [4] - 7:2, 16:21, 119:9, 129:19
**DIRECT** [2] - 9:2, 61:3
**directed** [1] - 6:22
**directly** [7] - 13:12, 40:14, 89:2, 91:18, 108:4, 118:2, 132:20
**director** [2] - 47:14, 55:24
**disabilities** [2] - 74:5, 76:2

**Disabilities** [1] - 95:15
**disabled** [4] - 63:18, 67:1, 68:11, 68:13
**disagree** [2] - 70:24, 95:2
**disappeared** [1] - 145:15
**discharge** [1] - 154:9
**discharged** [1] - 13:4
**discriminate** [1] - 67:5
**discrimination** [2] - 68:13, 81:12
**discuss** [2] - 6:21, 88:7
**discussed** [6] - 41:16, 66:21, 78:23, 81:7, 82:7, 118:4
**discussion** [4] - 36:11, 56:1, 91:18, 131:19
**disorder** [1] - 51:21
**disorders** [2] - 52:1, 52:6
**distance** [1] - 159:1
**distinct** [1] - 153:13
**distribute** [2] - 168:15, 168:22
**district** [1] - 167:8
**districts** [1] - 74:6
**disturbances** [1] - 120:22
**Division** [3] - 55:23, 95:14, 110:25
**DO** [1] - 170:10
**doctor** [2] - 6:16, 47:11
**document** [4] - 12:16, 22:9, 26:13, 26:15
**documentation** [2] - 23:13, 66:6
**documents** [6] - 52:25, 91:16, 135:21, 143:12, 158:5, 159:7
**dog** [1] - 161:2
**Domestic** [1] - 14:14
**domestic** [1] - 63:19
**domicile** [3] - 98:10, 98:15, 100:5
**donations** [1] - 117:15
**done** [21] - 12:1, 17:14, 17:19, 17:23, 18:2, 18:10, 21:5, 21:6, 25:5, 27:25, 30:8, 43:2, 83:5, 92:17, 92:18, 94:12, 104:24, 148:14, 148:16, 148:17, 166:2
**door** [6] - 33:20,

95:21, 126:11, 162:12, 162:22, 163:10
**doors** [4] - 140:3, 140:5, 140:6, 140:19
**dorm** [7] - 137:12, 137:20, 138:8, 138:10, 139:14, 139:19, 140:9
**double** [1] - 20:12
**doubt** [1] - 155:13
**down** [9] - 27:6, 67:4, 82:22, 146:14, 164:2, 164:5, 164:19, 165:25, 167:14
**downhill** [1] - 160:14
**dozen** [3] - 11:7, 33:8, 33:16
**DR** [10] - 136:7, 136:12, 137:3, 137:18, 138:10, 138:14, 139:7, 140:23, 159:6, 159:19
**Dr** [14] - 4:17, 6:8, 6:24, 7:13, 7:20, 16:19, 49:4, 51:9, 52:17, 53:6, 56:6, 77:20, 102:23, 103:8
**dramatically** [1] - 79:21
**Drive** [8] - 3:10, 3:11, 3:19, 3:21, 4:6, 32:22, 122:23, 134:24
**driven** [1] - 37:21
**driver** [3] - 41:5, 41:9, 41:10
**drivers** [4] - 85:4, 120:5, 139:2, 145:9
**drives** [1] - 38:2
**driveway** [22] - 9:22, 35:12, 62:16, 76:12, 80:15, 82:19, 105:25, 121:14, 121:16, 121:21, 135:4, 136:22, 136:25, 137:2, 138:6, 163:25, 164:1, 164:2, 164:3, 164:5, 164:21
**driveways** [1] - 156:25
**drop** [1] - 10:14
**dropped** [1] - 40:1
**dropping** [1] - 18:20
**Drug** [2] - 13:25, 52:3
**drug** [6] - 51:16, 66:1, 66:19, 77:18, 80:2, 117:23

**dry** [1] - 161:21
**due** [7] - 77:23, 78:5, 86:23, 119:21, 129:13, 130:4, 130:10
**duly** [2] - 8:25, 59:13
**dump** [2] - 161:6, 169:4
**during** [3] - 18:25, 54:10, 78:5
**dwelling** [6] - 57:24, 63:12, 67:11, 76:10, 90:6, 105:10
**D'ARMINIO** [1] - 2:5

**E**

**early** [1] - 109:23
**easier** [2] - 45:5, 70:19
**easy** [1] - 139:5
**eat** [2] - 56:9, 139:22
**Ed** [3] - 75:14, 83:13, 146:17
**education** [4] - 12:5, 47:3, 117:22, 118:10
**educational** [2] - 59:22, 60:9
**EDWARD** [1] - 2:5
**effect** [1] - 39:25
**effectively** [2] - 55:23, 116:4
**effort** [1] - 92:11
**efforts** [1] - 104:24
**eight** [1] - 138:25
**either** [7] - 17:3, 17:4, 57:14, 86:13, 134:13, 156:11, 157:2
**elderly** [1] - 85:8
**elected** [1] - 112:25
**electrical** [4] - 21:10, 22:23, 23:2, 88:22
**electrician** [1] - 24:22
**element** [1] - 74:1
**emergency** [10] - 16:4, 22:22, 24:11, 88:21, 105:19, 120:23, 122:3, 122:6, 128:21, 131:22
**emotional** [1] - 49:5
**emotionally** [1] - 83:7
**Employee** [3] - 4:19, 12:17, 12:19
**employee** [6] - 17:16, 22:11, 22:18, 36:5, 170:11, 170:13
**employees** [8] - 9:5, 9:25, 11:15, 11:16, 13:20, 22:3, 22:15, 130:9

**EMS** [7] - 127:18, 128:2, 128:4, 128:6, 128:8, 128:10, 128:11
**encouraged** [1] - 66:7
**end** [14] - 6:2, 15:3, 17:12, 31:11, 42:14, 42:15, 42:17, 44:3, 50:10, 137:8, 139:8, 139:9, 154:25, 156:12
**endeavor** [2] - 101:11, 131:16
**energy** [1] - 69:1
**enforcement** [1] - 57:10
**enforcing** [1] - 57:7
**engaged** [1] - 144:20
**engineer** [1] - 155:12
**Engineer** [1] - 2:11
**engineering** [1] - 141:25
**Engineering** [1] - 2:10
**engineers** [1] - 8:3
**enhanced** [1] - 78:6
**enjoy** [1] - 67:10
**Ennis** [1] - 20:25
**enormous** [1] - 145:4
**enrollment** [1] - 86:23
**ensure** [2] - 39:20, 141:12
**enter** [1] - 6:5
**entered** [1] - 61:12
**Enterprise** [1] - 99:21
**enterprise** [1] - 139:11
**entertainment** [1] - 140:18
**entire** [2] - 81:12, 133:18
**entirety** [1] - 29:14
**entitled** [1] - 26:13
**entity** [1] - 56:7
**environment** [5] - 66:2, 66:18, 77:17, 83:8, 87:5
**environmental** [1] - 51:22
**environmentally** [1] - 153:10
**environments** [1] - 9:9
**equal** [2] - 67:10, 68:10
**equivalent** [1] - 83:4
**erecting** [1] - 121:5
**Ergo** [1] - 93:5
**erode** [1] - 165:24
**error** [1] - 8:4
**escalated** [1] - 166:18
**especially** [2] - 160:11, 161:20

**ESQUIRE** [2] - 2:2, 2:5
**essence** [1] - 97:14
**essentially** [7] - 65:14, 67:12, 77:21, 78:4, 86:17, 96:11, 103:24
**Essentially** [2] - 68:12, 154:8
**establish** [1] - 97:23
**establishing** [1] - 95:22
**estimate** [3] - 11:3, 13:11, 13:13
**estimates** [1] - 52:3
**et** [1] - 108:9
**Ethics** [1] - 13:22
**evaluate** [3] - 76:22, 141:11, 165:19
**evaluated** [2] - 166:7, 166:8
**evaluating** [1] - 104:25
**Evaluation** [5] - 4:23, 26:13, 27:7, 27:8, 27:10
**evening** [9] - 5:5, 21:23, 59:9, 59:17, 62:24, 89:8, 90:25, 143:20, 168:8
**event** [3] - 7:14, 25:25, 26:22
**evidence** [6] - 7:6, 61:13, 135:25, 143:13, 168:19, 169:8
**exact** [2] - 11:9, 104:24
**Exactly** [1] - 116:19
**exactly** [2] - 35:1, 57:1
**exam** [2] - 112:1, 112:13
**Examination** [3] - 3:3, 3:12, 3:13
**EXAMINATION** [3] - 9:2, 59:19, 61:3
**examination** [3] - 43:1, 116:8, 131:24
**examine** [4] - 6:18, 42:18, 42:24, 43:8
**examined** [2] - 86:16, 110:4
**example** [6] - 73:24, 105:19, 108:7, 125:23, 138:8, 140:7
**examples** [3] - 69:12, 138:20, 138:24
**exams** [1] - 141:21
**except** [1] - 156:15
**exception** [1] - 137:16
**excessive** [1] - 77:24
**excessively** [1] -

105:20
**exchange** [1] - 64:2
**exclusive** [1] - 9:24
**exclusively** [1] - 57:24
**excuse** [2] - 64:25, 80:16
**exercise** [1] - 107:9
**exhaustive** [2] - 107:11, 109:20
**Exhibit** [10] - 7:21, 12:14, 12:20, 15:9, 15:12, 27:5, 27:11, 61:10, 61:13, 61:25
**exist** [3] - 64:14, 87:23, 89:19
**existed** [1] - 116:7
**existence** [1] - 116:10
**existing** [5] - 70:15, 88:18, 105:2, 107:3, 108:14
**exists** [4] - 53:2, 63:6, 74:2, 95:4
**expand** [1] - 155:9
**expected** [2] - 44:21, 44:23
**experience** [4] - 52:6, 101:6, 108:15, 109:8
**experienced** [1] - 130:16
**experiences** [1] - 131:16
**expert** [1] - 60:24
**expertise** [1] - 141:20
**Explain** [1] - 158:7
**explain** [5] - 8:9, 100:19, 127:13, 127:20, 158:8
**explained** [2] - 127:23, 166:21
**explicitly** [2] - 64:7, 113:10
**Explorer** [3] - 19:25, 20:13, 20:14
**extend** [1] - 158:21
**extent** [3] - 7:12, 27:18, 48:2
**exterior** [1] - 106:2
**extreme** [1] - 108:7
**extremely** [2] - 121:3, 148:1
**extremes** [1] - 139:9

# F

**facilities** [10] - 75:21, 76:13, 78:10, 79:11, 88:25, 103:22, 107:10, 108:8, 114:3, 140:18
**facility** [10] - 69:1,

78:21, 90:12, 97:8, 103:3, 111:11, 117:8, 120:9, 137:12, 138:9
**facing** [1] - 144:9
**fact** [16] - 8:11, 44:5, 55:8, 56:1, 58:10, 58:16, 69:8, 75:6, 82:23, 83:9, 84:16, 87:2, 88:18, 90:15, 96:18, 126:14
**factor** [4] - 89:21, 104:6, 126:14, 126:17
**factors** [6] - 51:23, 78:8, 78:9, 81:17, 88:6, 132:19
**facts** [10] - 62:4, 62:10, 88:8, 110:23, 111:2, 111:9, 113:22, 115:24, 143:7, 152:11
**factual** [2] - 108:22, 129:19
**failed** [1] - 34:21
**Fair** [16] - 31:14, 31:15, 49:13, 73:5, 81:11, 92:22, 93:2, 93:15, 94:3, 99:18, 100:1, 100:13, 101:7, 110:10, 115:7, 115:17
**fair** [6] - 72:3, 96:3, 113:1, 135:18, 159:14, 159:17
**fall** [1] - 141:22
**falling** [2] - 148:23, 149:5
**falls** [2] - 93:9, 161:7
**familiar** [8] - 62:3, 73:9, 73:10, 98:14, 107:10, 110:15, 116:6, 138:2
**families** [3] - 48:25, 100:7, 138:21
**Families** [1] - 82:25
**family** [63] - 29:2, 29:3, 49:2, 49:3, 49:9, 49:10, 55:2, 55:5, 55:8, 55:16, 55:19, 56:4, 56:25, 57:1, 57:2, 57:17, 57:23, 58:4, 58:7, 58:9, 62:9, 62:19, 63:17, 75:23, 76:14, 79:12, 79:25, 82:16, 82:23, 83:4, 83:14, 83:18, 83:20, 85:10, 85:18, 89:9, 89:11, 97:5, 97:9, 98:2,

98:18, 102:9, 106:5, 120:15, 125:18, 135:6, 137:4, 137:11, 137:16, 137:19, 137:25, 138:3, 138:4, 139:15, 146:2, 155:1, 156:5, 156:15, 156:16
**Family** [2] - 110:12, 110:18
**family-like** [1] - 56:4
**far** [6] - 50:23, 68:4, 73:2, 101:2, 119:25, 120:16, 125:13, 154:10
**farming** [1] - 63:22
**fast** [1] - 145:9
**father** [1] - 137:6
**favor** [1] - 93:20
**favors** [1] - 113:8
**Fayson** [7] - 145:23, 147:25, 154:7, 154:12, 161:18, 161:19, 166:6
**fear** [1] - 146:14
**federal** [6] - 66:25, 68:9, 73:6, 94:19, 95:3, 98:22
**FedEx** [1] - 163:3
**feet** [2] - 119:20, 136:17
**Fegan** [4] - 3:10, 3:20, 45:24, 134:23
**FEGAN** [23] - 45:17, 45:23, 46:23, 47:11, 47:17, 48:18, 49:11, 49:21, 50:12, 50:16, 50:20, 51:8, 52:17, 52:24, 53:21, 54:1, 54:6, 54:10, 54:21, 134:20, 134:23, 135:20, 136:1
**fellas** [1] - 157:3
**fence** [3] - 80:14, 121:19, 156:25
**fences** [1] - 146:9
**fencing** [3] - 121:5, 136:24, 153:22
**few** [15] - 8:17, 25:20, 55:1, 71:14, 77:22, 86:11, 98:21, 101:21, 109:18, 112:10, 112:11, 138:17, 153:1, 161:2, 163:7
**fewer** [1] - 120:5
**FHAA** [2] - 94:9, 115:20
**field** [4] - 97:21,

141:20, 153:15, 155:9
**fields** [1] - 153:13
**fifteen** [2] - 19:2, 19:15
**figure** [2] - 132:8, 164:9
**filed** [3] - 24:12, 25:11, 163:24
**filling** [1] - 66:6
**finally** [1] - 145:11
**financial** [3] - 67:23, 81:18, 88:13
**financially** [1] - 170:14
**fine** [9] - 7:7, 24:19, 43:7, 108:2, 143:8, 143:10, 152:9, 152:13, 152:20
**finger** [1] - 69:23
**fingertips** [1] - 134:3
**finish** [2] - 147:14, 147:15
**finishing** [1] - 76:8
**fire** [19] - 14:24, 16:2, 21:4, 21:11, 22:23, 22:25, 23:3, 23:7, 23:20, 23:21, 26:2, 26:6, 27:24, 54:9, 54:20, 57:5, 57:7, 57:11, 57:21
**Fire** [3] - 4:20, 14:18, 15:10
**First** [3] - 9:8, 14:17, 65:21
**first** [13] - 13:21, 46:7, 46:21, 65:5, 77:11, 85:24, 106:24, 107:25, 135:3, 143:25, 145:13, 146:5, 153:11
**first-aid** [1] - 46:7
**First-Aid** [1] - 14:17
**fit** [4] - 20:6, 20:9, 82:13, 106:11
**fits** [5] - 75:15, 79:18, 85:20, 87:3, 87:15
**five** [7] - 19:17, 107:14, 122:10, 124:18, 131:13, 163:7, 167:9
**five-mile** [1] - 107:14
**five-minute** [1] - 122:10
**fixed** [1] - 8:6
**flavor** [2] - 92:20, 97:7
**flowing** [1] - 153:25
**focus** [1] - 88:5
**focusing** [1] - 125:17
**folks** [2] - 32:18, 112:20

**follow** [9] - 25:5, 36:10, 41:25, 42:5, 43:16, 52:15, 122:2, 130:25, 163:21
**follow-up** [7] - 25:5, 36:10, 41:25, 42:5, 43:16, 122:2, 130:25
**following** [2] - 65:19, 164:4
**follows** [4] - 8:25, 31:17, 51:17, 59:13
**for-profit** [8] - 56:7, 58:15, 69:8, 69:13, 69:16, 72:25, 77:1, 77:5
**force** [1] - 151:24
**Ford** [1] - 102:13
**foregoing** [1] - 170:6
**forest** [1] - 153:24
**forested** [1] - 134:1
**forgetting** [1] - 105:6
**format** [1] - 17:1
**Fort** [1] - 8:24
**forth** [8] - 80:13, 83:1, 104:5, 119:6, 137:7, 164:20, 165:2, 170:9
**forward** [1] - 84:22
**four** [7] - 76:20, 76:21, 156:9, 163:6, 163:22, 167:11, 167:13
**four-part** [1] - 76:20
**fourth** [1] - 81:3
**fox** [1] - 146:11
**framework** [1] - 58:13
**FRAN** [1] - 1:9
**frankly** [2] - 82:9, 126:12
**Franzoi** [1] - 24:23
**free** [1] - 151:5
**frequency** [1] - 19:8
**frequent** [1] - 9:9
**frequently** [1] - 96:20
**front** [7] - 33:20, 86:12, 150:17, 162:12, 164:1, 164:15, 164:16
**frontage** [2] - 62:13, 119:20
**fulfill** [1] - 78:22
**full** [1] - 167:17
**full-blown** [1] - 167:17
**function** [3] - 38:24, 39:3, 39:6
**functional** [2] - 66:17, 83:4
**functionality** [2] - 96:11, 97:12
**fundamental** [3] - 81:20, 88:15, 89:16

**fundamentally** [1] - 68:22
**funded** [1] - 167:21
**FURTHER** [1] - 170:10
**Furthermore** [2] - 68:14, 79:24
**future** [2] - 160:15, 169:16

# G

**G-R-Y-G-I-E-I** [1] - 59:18
**gallons** [1] - 153:15
**garage** [20] - 9:21, 10:6, 10:9, 19:20, 20:6, 20:10, 20:18, 20:20, 35:12, 35:18, 76:12, 80:21, 84:22, 90:7, 90:17, 90:20, 121:23, 138:6, 145:5, 164:1
**garbage** [8] - 150:16, 150:17, 150:21, 151:14, 151:20, 161:3, 161:4, 161:5
**Garbage** [2] - 150:20, 161:2
**gathering** [1] - 19:2
**gearing** [1] - 50:4
**gee** [1] - 108:11
**GENE** [1] - 1:11
**general** [14] - 16:5, 16:20, 33:11, 41:20, 52:18, 68:23, 75:13, 75:14, 77:16, 84:1, 86:17, 87:9, 123:13
**generally** [11] - 41:23, 49:7, 69:12, 69:18, 75:16, 91:15, 108:17, 113:24, 119:12, 125:3, 125:13
**Generally** [2] - 19:10, 113:12
**generates** [1] - 87:1
**GILHOOLEY** [16] - 1:15, 12:22, 13:5, 13:15, 19:19, 20:13, 20:17, 42:11, 42:15, 42:20, 116:23, 117:10, 117:20, 118:7, 118:9, 118:13
**Gilhooley** [2] - 3:4, 3:16
**girl** [1] - 163:1
**Given** [1] - 168:1
**given** [4] - 9:22, 55:8, 85:23, 152:15
**glad** [1] - 111:6

**goal** [2] - 34:11, 154:18
**goals** [1] - 86:17
**governing** [2] - 92:24, 93:13
**government** [1] - 92:3
**grade** [4] - 62:14, 79:16, 119:22, 136:21
**grandson** [2] - 145:7, 146:13
**grant** [5] - 79:4, 94:17, 113:5, 113:17, 115:10
**granted** [2] - 91:3, 91:4
**granting** [1] - 64:20
**Great** [2] - 35:2, 36:4
**great** [5] - 36:8, 61:11, 70:20, 108:6, 110:6
**greater** [1] - 169:14
**ground** [2] - 149:14, 155:10
**GROUP** [1] - 2:2
**group** [37] - 67:3, 68:25, 71:2, 73:23, 74:8, 74:12, 74:15, 74:17, 74:20, 74:25, 75:2, 75:4, 75:8, 75:9, 75:19, 75:23, 78:25, 79:10, 84:2, 95:10, 95:11, 95:12, 95:17, 95:25, 96:8, 96:12, 96:21, 96:23, 97:2, 97:20, 97:21, 97:22, 97:24, 98:9, 98:14, 110:19
**growth** [1] - 86:23
**GRYGIEL** [85] - 3:12, 59:4, 59:10, 59:16, 61:2, 71:3, 71:13, 72:3, 72:6, 72:12, 73:12, 74:9, 74:15, 75:5, 76:5, 91:12, 92:6, 92:14, 96:2, 104:14, 104:23, 106:25, 107:8, 107:17, 108:2, 109:2, 109:7, 109:12, 110:10, 111:23, 112:14, 112:17, 113:2, 113:21, 114:4, 114:19, 114:25, 115:13, 115:23, 116:9, 116:19, 117:4, 117:16, 118:1, 119:7, 121:6, 122:7, 123:1, 123:4, 123:6, 123:11,

123:18, 123:25, 124:17, 125:2, 125:12, 126:7, 126:12, 126:19, 127:2, 128:14, 129:3, 129:9, 129:15, 130:6, 130:12, 130:18, 130:24, 131:18, 132:12, 132:16, 132:25, 133:6, 133:15, 133:23, 134:2, 134:6, 134:16, 136:19, 137:14, 138:1, 138:12, 138:15, 139:25, 140:12
**Grygiel** [24] - 16:18, 16:22, 58:18, 59:3, 59:6, 59:7, 59:18, 60:7, 60:24, 61:5, 69:19, 91:7, 104:10, 111:20, 122:18, 122:25, 123:2, 123:3, 123:4, 123:7, 124:9, 131:7, 135:17, 142:23
**guess** [14] - 6:17, 43:6, 55:6, 72:23, 88:3, 92:2, 94:23, 95:9, 100:17, 101:16, 139:16, 142:22, 162:6

# H

**half** [2] - 33:16, 143:20
**half-hour** [1] - 143:20
**hand** [1] - 23:8
**handicapped** [1] - 67:6
**handle** [4] - 46:13, 141:12, 155:17, 155:18
**handled** [1] - 141:10
**handling** [1] - 46:10
**handout** [1] - 22:2
**happy** [6] - 23:25, 25:9, 26:2, 41:14, 119:8, 158:14
**hard** [3] - 95:19, 95:24, 129:23
**Hardly** [1] - 156:8
**hardship** [4] - 65:3, 67:25, 81:19, 88:14
**harmful** [4] - 79:3, 80:7, 80:10, 81:6
**hatchback** [1] - 20:11
**hate** [1] - 169:4
**head** [4] - 50:5, 63:20,

95:20, 121:25
**Health** [4] - 8:2, 14:16, 31:25, 78:18
**health** [8] - 51:19, 51:20, 77:15, 78:7, 84:1, 154:20, 160:17, 160:18
**health-wise** [1] - 160:18
**hear** [6] - 5:6, 27:17, 100:8, 119:2, 160:4, 169:12
**heard** [16] - 35:10, 42:13, 62:2, 63:10, 64:15, 65:21, 83:10, 90:23, 100:14, 116:24, 116:25, 117:10, 118:14, 123:7, 128:1, 136:20
**hearing** [5] - 8:21, 32:4, 62:24, 114:5, 135:15
**held** [1] - 122:14
**hell** [3] - 145:9, 155:22, 156:2
**help** [4] - 46:17, 47:21, 53:17, 158:8
**helpful** [1] - 49:6
**helps** [1] - 78:22
**hereby** [1] - 170:5
**herein** [1] - 170:9
**HERRINGTON** [3] - 1:12, 95:7, 97:10
**Herrington** [1] - 3:15
**Hi** [3] - 32:21, 45:23, 122:22
**high** [3] - 121:3, 148:2, 160:9
**higher** [3] - 47:2, 119:24, 127:10
**HIGHERS** [1] - 2:9
**Highlands** [12] - 28:14, 28:18, 28:21, 29:5, 30:2, 30:5, 30:6, 30:11, 133:22, 133:23, 133:24, 147:6
**hill** [4] - 105:10, 136:16, 136:17, 160:10
**Hill** [1] - 60:11
**HIPAA** [1] - 13:25
**hire** [1] - 18:6
**historically** [1] - 153:9
**history** [1] - 131:19
**hit** [3] - 88:9, 112:10, 146:14
**Hoboken** [2] - 59:12, 60:8
**home** [78] - 14:23,

15:16, 15:17, 20:18, 24:4, 25:13, 27:22, 29:2, 29:3, 37:21, 41:21, 44:4, 48:19, 49:18, 50:19, 51:1, 53:4, 55:2, 55:17, 55:19, 56:8, 56:18, 56:24, 56:25, 57:2, 62:9, 65:25, 68:25, 73:23, 74:8, 74:12, 74:20, 74:25, 75:4, 75:8, 75:19, 75:24, 76:14, 79:8, 80:1, 80:2, 82:15, 82:16, 85:8, 85:18, 95:10, 95:11, 95:12, 95:17, 95:23, 95:25, 97:20, 97:21, 97:22, 97:25, 98:9, 98:10, 98:14, 98:19, 98:25, 99:16, 100:3, 100:6, 103:13, 104:2, 104:7, 110:19, 111:11, 124:13, 126:9, 144:12, 144:24, 146:6, 156:16, 162:24
**Home** [1] - 55:23
**homes** [37] - 51:6, 57:12, 57:17, 58:4, 58:7, 58:9, 63:17, 64:1, 71:2, 74:3, 74:16, 74:17, 75:3, 75:9, 78:25, 79:10, 85:10, 95:18, 96:8, 96:12, 96:21, 96:23, 97:3, 97:5, 97:22, 97:25, 99:1, 100:17, 102:1, 102:4, 102:9, 102:12, 108:23, 130:4, 130:10, 146:3
**homey** [1] - 48:18
**hope** [3] - 45:8, 155:15, 155:17
**hopefully** [1] - 112:9
**horrible** [1] - 149:9
**horseshoe** [3] - 144:5, 144:8, 155:20
**hospital** [2] - 68:25, 128:10
**hospitals** [3] - 63:25, 107:20, 108:7
**hot** [1] - 161:21
**hotel** [1] - 98:11
**hour** [7] - 17:6, 46:6, 46:25, 47:18, 124:3, 143:20, 145:12
**hours** [3] - 23:22, 36:5, 49:11
**House** [1] - 55:23

**house** [56] - 16:4, 16:10, 19:3, 39:16, 40:16, 47:12, 47:13, 47:20, 47:22, 47:24, 48:7, 48:16, 48:19, 49:12, 49:13, 52:19, 54:3, 54:14, 56:11, 56:19, 56:20, 62:15, 66:20, 82:13, 83:13, 83:14, 99:4, 99:6, 101:22, 103:22, 104:17, 104:18, 105:25, 106:10, 115:4, 119:17, 120:3, 122:6, 132:2, 135:7, 135:12, 138:3, 138:24, 140:8, 140:18, 140:22, 155:14, 155:19, 156:5, 162:5, 164:15, 164:16, 164:25, 165:20, 166:15, 167:11
**household** [9] - 83:17, 83:21, 85:7, 85:17, 87:1, 87:5, 87:10, 120:4
**households** [4] - 85:1, 85:3, 125:20, 138:18
**housekeeping** [10] - 5:10, 48:20, 98:23, 99:7, 99:10, 138:19, 139:23, 140:9, 140:10, 140:15
**Houser** [1] - 8:3
**houses** [6] - 53:23, 82:18, 89:1, 140:3, 167:9, 167:10
**housing** [4] - 68:10, 86:24, 117:4, 140:2
**Housing** [12] - 73:5, 81:11, 92:22, 93:2, 93:15, 94:3, 99:18, 100:1, 100:13, 101:7, 115:8, 115:17
**Hudson** [1] - 59:12
**huge** [3] - 144:20, 165:12, 165:24
**Human** [2] - 78:19
**human** [1] - 169:9
**hundred** [1] - 96:14
**hundred-plus-year-old** [1] - 96:14
**husband** [2] - 144:3, 160:23
**hybrid** [2] - 19:24, 19:25
**hypertension** [1] - 52:10

**I**

**idea** [4] - 98:22, 107:22, 140:14, 149:21
**IDENT/EVID** [1] - 4:16
**identification** [5] - 7:22, 12:21, 15:12, 22:14, 27:12
**identify** [2] - 59:14, 112:9
**Identify** [1] - 14:11
**idling** [1] - 18:24
**ill** [1] - 63:19
**illegally** [2] - 145:18, 167:23
**Illness** [1] - 14:8
**illnesses** [1] - 52:9
**imagine** [2] - 128:3, 165:9
**immediately** [1] - 160:23
**impact** [17] - 58:15, 123:17, 123:24, 124:14, 124:16, 125:1, 125:11, 125:25, 126:9, 126:25, 127:11, 127:18, 128:4, 128:7, 128:12, 128:18
**impacted** [3] - 130:21, 145:21, 145:22
**impacts** [14] - 79:3, 79:6, 80:7, 80:10, 81:6, 82:21, 85:23, 119:11, 119:25, 120:16, 120:20, 125:7, 133:10, 137:1
**implication** [1] - 70:10
**Implication** [1] - 14:1
**implies** [1] - 71:22
**important** [7] - 57:12, 62:16, 66:6, 103:7, 104:6, 132:10, 132:14
**impose** [1] - 80:23
**imposed** [3] - 80:9, 80:23, 81:7
**impossible** [2] - 128:17, 155:9
**IN** [1] - 1:3
**in-laws** [1] - 144:19, 144:21
**in-patient** [3] - 102:19, 102:21, 103:5
**inappropriate** [1] - 48:3
**incessantly** [1] - 164:22

**incident** [3] - 15:25, 127:8, 139:12
**incidents** [2] - 15:15, 15:22
**include** [7] - 64:5, 69:25, 71:2, 71:22, 72:1, 72:2, 138:20
**included** [1] - 39:10
**includes** [2] - 68:24, 69:13, 74:20
**including** [3] - 63:17, 63:24, 66:21
**incorrect** [1] - 6:1
**increase** [8] - 77:23, 77:25, 78:5, 123:19, 124:2, 124:21, 126:4, 129:20
**increased** [6] - 78:8, 123:16, 123:23, 124:13, 124:20, 126:17
**increasing** [8] - 78:10, 124:15, 129:6, 129:13, 130:4, 130:9
**incumbent** [1] - 157:13
**Indian** [2] - 33:4, 33:5
**indicate** [2] - 70:12, 116:6
**indicating** [1] - 99:15
**individual** [7] - 34:1, 77:3, 83:11, 140:6, 140:19, 140:21, 157:18
**Individual** [1] - 51:18
**individual's** [1] - 33:24
**individually** [1] - 140:4
**individuals** [16] - 48:6, 51:16, 52:1, 52:4, 52:15, 56:2, 65:25, 66:19, 67:5, 68:11, 80:2, 95:13, 98:9, 101:23, 103:15, 103:22
**individuals'** [1] - 104:7
**indoors** [1] - 18:18
**information** [7] - 23:25, 51:15, 119:3, 132:8, 133:20, 157:8, 157:21
**inherently** [31] - 16:15, 58:16, 65:1, 65:5, 68:16, 68:20, 69:5, 70:13, 70:16, 70:21, 70:22, 72:20, 73:1, 73:18, 75:3, 76:9, 76:16, 79:1,

81:24, 82:4, 94:15, 94:18, 94:25, 97:13, 106:19, 107:20, 108:3, 111:1, 113:19, 113:23, 139:11
**inhibit** [1] - 58:15
**initial** [1] - 156:8
**injuries** [3] - 63:20, 75:10, 77:4
**inside** [5] - 79:20, 82:15, 106:1, 106:2, 121:22
**inspect** [2] - 27:22, 54:14
**inspected** [2] - 14:23, 31:22
**inspecting** [1] - 25:14
**Inspection** [1] - 21:3
**inspection** [9] - 21:7, 25:6, 26:9, 26:10, 27:24, 54:9, 54:11, 57:5, 57:12
**inspections** [4] - 21:12, 54:5, 54:6, 57:13
**inspector** [1] - 155:25
**instance** [2] - 65:4, 68:3, 140:6
**instances** [2] - 96:20, 113:13
**instead** [3] - 17:10, 70:19, 128:10
**Institute** [1] - 52:3
**intended** [1] - 160:6
**intent** [2] - 71:2, 72:1
**intention** [1] - 90:19
**interest** [2] - 77:12, 81:5
**interested** [2] - 157:14, 170:14
**interesting** [3] - 98:24, 99:2, 126:24
**interject** [1] - 98:6
**internal** [1] - 45:12
**internally** [1] - 45:5
**interprets** [1] - 55:15
**introduce** [2] - 159:13, 168:24
**introduced** [1] - 169:9
**inventory** [1] - 107:12
**investigate** [1] - 107:2
**investigation** [1] - 54:2
**invite** [3] - 153:8, 154:11, 154:25
**involved** [3] - 77:8, 92:15, 142:10
**isolated** [1] - 127:8
**issuance** [2] - 21:9,

118:25
**issue** [13] - 23:8, 32:14, 41:10, 63:14, 67:4, 88:23, 94:20, 111:15, 126:15, 128:13, 167:5, 167:6
**Issued** [2] - 4:21, 15:11
**issued** [4] - 15:2, 26:18, 57:5, 63:3
**issues** [11] - 75:11, 77:18, 86:22, 88:21, 129:6, 129:12, 130:3, 130:9, 130:15, 154:21, 165:23
**items** [1] - 5:10
**itself** [7] - 72:24, 84:15, 87:8, 106:1, 119:16, 119:17, 153:2

## J

**JAY** [1] - 3:2
**Jay** [6] - 8:14, 25:16, 53:9, 54:12, 54:16, 56:6
**Jeff** [1] - 8:3
**Jefferson** [1] - 167:15
**Jen** [4] - 3:7, 3:22, 4:10, 21:25
**Jenn** [4] - 141:2, 163:19, 169:4, 169:5
**JENNIFER** [1] - 2:9
**Jersey** [40] - 1:23, 2:3, 2:6, 8:24, 25:12, 36:13, 36:16, 37:1, 37:6, 37:11, 37:21, 38:2, 38:6, 38:23, 39:11, 39:15, 39:19, 39:22, 40:3, 40:10, 42:2, 42:4, 43:19, 44:20, 44:21, 44:22, 45:1, 59:12, 60:1, 60:18, 66:5, 71:5, 78:12, 78:13, 109:6, 111:24, 114:8, 147:8, 170:4
**jet** [1] - 153:13
**Jewish** [3] - 110:12, 110:18, 110:19
**Jews** [1] - 111:4
**jibe** [1] - 97:19
**job** [1] - 164:9
**Joe** [4] - 28:7, 134:10, 152:24, 163:14
**John** [1] - 8:24
**joke** [3] - 145:12, 151:21, 151:22

**Jonas** [33] - 8:14, 8:19, 9:4, 10:19, 11:10, 11:14, 13:17, 14:22, 15:14, 21:21, 22:20, 24:2, 26:16, 26:21, 27:21, 29:18, 30:15, 30:20, 30:23, 31:12, 33:6, 33:25, 37:10, 41:15, 42:18, 43:16, 61:10, 61:12, 82:6, 98:16, 103:8, 104:16, 142:2
**JONAS** [65] - 3:2, 8:22, 13:3, 13:9, 16:3, 16:7, 17:2, 17:17, 17:21, 17:25, 19:1, 19:7, 19:10, 19:14, 19:21, 20:4, 20:7, 20:15, 20:19, 21:1, 23:6, 24:6, 24:9, 24:13, 25:18, 26:17, 26:23, 27:3, 33:13, 33:21, 34:3, 34:7, 34:14, 34:17, 34:19, 34:23, 35:6, 35:17, 35:20, 36:2, 36:7, 37:2, 37:12, 37:18, 37:23, 38:12, 38:24, 39:3, 39:13, 39:17, 39:25, 40:9, 40:19, 41:7, 41:12, 44:16, 47:6, 47:14, 48:10, 49:18, 50:3, 50:15, 53:12, 53:14, 54:17
**Jonas'** [3] - 29:12, 29:16, 102:14
**Jones** [2] - 155:23, 155:24
**Joseph** [3] - 3:8, 3:19, 4:4
**July** [15] - 4:18, 4:24, 6:12, 7:21, 22:24, 24:24, 24:25, 26:12, 26:25, 27:1, 27:2, 27:3, 27:11, 51:13, 57:6
**jumps** [1] - 120:18
**June** [1] - 61:17
**jurisdiction** [2] - 25:13, 30:10
**justify** [1] - 51:5

## K

**Kates'** [1] - 110:24
**Kauker** [1] - 60:4
**keep** [9] - 40:2, 40:3, 40:5, 40:15, 51:4, 53:7, 53:10, 53:14,

100:13
**keeps** [1] - 83:13
**Keller** [1] - 60:8
**kept** [3] - 35:17, 36:1, 36:2
**kids** [6] - 56:11, 85:6, 139:2, 144:21, 145:6, 167:9
**kind** [16] - 7:8, 33:11, 44:6, 50:20, 88:7, 93:13, 103:19, 109:22, 111:14, 137:22, 139:19, 156:17, 158:8, 158:12, 161:24, 164:11
**Kinnelon** [37] - 4:20, 14:24, 15:10, 27:22, 27:25, 28:8, 50:9, 54:9, 62:21, 64:6, 67:13, 75:22, 96:6, 105:15, 106:12, 106:20, 107:13, 113:20, 113:24, 114:3, 114:16, 114:17, 114:18, 114:22, 114:24, 115:2, 115:16, 116:3, 116:6, 117:3, 117:13, 118:14, 134:1, 134:24, 153:11, 166:5
**KINNELON** [2] - 1:1, 1:6
**Kinnelon's** [1] - 86:15
**Kit** [1] - 14:15
**kitchen** [2] - 106:5, 138:3
**kitchens** [1] - 140:20
**knocked** [2] - 162:22, 163:9
**knowing** [1] - 116:3
**known** [1] - 153:3
**KOPSCO** [3] - 2:12, 3:24, 91:21
**Kopsco** [1] - 91:19

## L

**lack** [2] - 78:7, 95:20
**ladies** [1] - 157:3
**laid** [2] - 84:16, 115:14
**Lake** [8] - 2:6, 145:23, 147:25, 154:7, 154:12, 161:18, 161:19, 166:6
**Lakes** [1] - 144:9
**Lakeside** [1] - 99:21
**Land** [7] - 64:22, 68:19, 74:21, 75:8,

83:25, 93:17, 113:17
**land** [6] - 71:9, 74:8, 101:7, 153:10, 156:4
**landlord** [3] - 82:8, 101:9, 101:15
**landlords** [5] - 82:10, 100:15, 100:21, 101:14, 101:23
**landscaping** [7] - 62:13, 79:16, 105:13, 119:24, 121:18, 121:19, 136:23
**Lane** [38] - 1:4, 3:8, 3:9, 3:20, 3:22, 3:23, 4:3, 4:5, 4:8, 4:9, 4:11, 5:2, 22:1, 28:8, 40:8, 62:15, 129:5, 129:8, 129:12, 129:14, 130:5, 130:8, 130:11, 130:15, 130:17, 130:21, 130:23, 132:24, 134:11, 136:9, 141:3, 144:2, 144:5, 146:4, 146:22, 152:25, 159:24, 163:20
**language** [2] - 33:5, 72:8
**large** [2] - 20:5, 133:2
**larger** [5] - 10:10, 90:22, 138:9, 140:22
**last** [32] - 5:12, 8:1, 8:16, 13:9, 23:1, 28:18, 36:11, 36:18, 36:24, 43:9, 44:6, 46:5, 47:12, 48:23, 50:20, 51:2, 59:17, 71:12, 77:22, 80:15, 82:7, 86:11, 99:20, 102:10, 121:10, 124:18, 136:13, 145:13, 161:17, 161:23, 163:23, 165:9
**lastly** [1] - 15:14
**Lastly** [2] - 81:3, 84:8
**late** [1] - 162:4
**Law** [7] - 64:22, 68:19, 74:21, 75:8, 83:25, 93:18, 113:17
**LAW** [1] - 2:2
**law** [21] - 66:25, 68:9, 68:15, 70:16, 71:18, 71:20, 71:24, 72:18, 72:19, 72:21, 73:14, 74:8, 81:10, 94:2, 94:19, 95:3, 105:5, 113:11, 113:16,

146:5, 152:13
**Lawn** [1] - 49:13
**laws** [5] - 71:10, 71:15, 71:16, 144:19, 144:21
**lawsuit** [1] - 101:20
**leads** [1] - 50:20
**League** [1] - 71:8
**lease** [3] - 10:20, 10:24, 100:17
**least** [4] - 53:19, 156:10, 159:18, 163:6
**leave** [21] - 10:15, 11:2, 11:11, 13:8, 19:6, 33:8, 33:12, 33:17, 33:19, 34:6, 34:16, 49:22, 50:4, 50:8, 116:13, 120:12, 161:12, 165:14, 165:17, 166:11, 166:12
**leaves** [1] - 102:21
**leaving** [4] - 33:10, 34:1, 34:13, 89:6
**led** [1] - 13:7
**Lee** [1] - 8:24
**left** [10] - 10:20, 34:21, 40:15, 60:6, 92:7, 143:20, 158:24, 161:10, 162:12, 165:15
**legal** [6] - 25:7, 29:21, 30:18, 70:7, 70:10, 141:21
**legally** [1] - 72:23
**legislation** [2] - 70:11, 70:18
**legislative** [3] - 71:1, 71:8, 72:1
**legislature** [1] - 71:22
**Leheny** [1] - 60:7
**length** [1] - 83:9
**less** [5] - 11:6, 33:7, 36:6, 120:13, 121:19
**Letter** [2] - 4:17, 7:20
**letter** [9] - 6:5, 6:9, 6:12, 6:18, 7:12, 51:13, 52:18, 55:22, 57:19
**license** [2] - 63:4, 102:8
**licensed** [3] - 48:11, 95:25, 60:14
**life** [22] - 70:19, 86:19, 123:9, 123:17, 123:24, 124:14, 124:16, 125:1, 126:9, 126:14, 126:18, 127:1,

127:11, 127:19,
128:7, 128:12,
128:19, 131:10,
131:16, 132:15,
132:21
**Lifestyle** [1] - 14:10
**light** [1] - 124:19
**lighting** [1] - 120:17
**likely** [2] - 52:16,
103:11
**limit** [7] - 80:10, 83:16,
97:1, 108:10,
155:15, 168:2
**limited** [4] - 68:24,
79:15, 114:12,
119:21
**limiting** [2] - 84:22,
90:5
**line** [5] - 44:3, 44:7,
44:9, 44:12, 156:3
**lines** [3] - 86:13,
107:14, 126:1
**List** [2] - 4:19, 12:20
**list** [8] - 11:18, 12:7,
12:10, 13:17, 64:4,
71:14, 73:23, 165:9
**listed** [1] - 73:23
**Listen** [1] - 116:20
**lists** [1] - 22:3
**literally** [3] - 120:11,
154:3, 164:16
**litigating** [1] - 101:8
**litigation** [1] - 101:5
**live** [13] - 16:10, 32:22,
45:24, 49:12, 53:17,
99:6, 100:6, 103:6,
103:15, 104:3,
135:7, 139:19,
144:19
**lived** [1] - 167:2
**Living** [3] - 63:1,
69:21, 70:1
**living** [32] - 37:20,
40:7, 41:21, 44:4,
53:4, 56:2, 57:8,
64:5, 65:22, 67:3,
74:2, 78:21, 85:14,
95:18, 97:24, 98:1,
104:7, 109:23,
114:3, 127:10,
128:13, 137:6,
138:4, 138:24,
140:16, 150:3,
160:8, 160:10,
160:19, 162:9,
163:2, 167:20
**LLC** [5] - 1:5, 1:22,
2:7, 5:3, 28:10
**local** [5] - 21:11, 57:6,
57:10, 92:3, 92:24

**located** [3] - 28:14,
62:15, 119:13
**location** [3] - 87:19,
116:1, 154:23
**lock** [1] - 140:4
**locked** [1] - 140:20
**locks** [1] - 140:5
**Lockwood** [2] - 3:5,
3:14
**LOCKWOOD** [74] -
1:7, 5:1, 5:7, 7:7,
8:12, 15:21, 16:1,
16:6, 16:12, 16:23,
18:11, 20:21, 21:16,
21:19, 26:21, 27:1,
27:21, 28:1, 28:4,
32:18, 32:23, 33:1,
42:14, 44:13, 45:15,
45:18, 50:1, 54:22,
54:25, 56:13, 58:21,
58:25, 61:1, 91:8,
91:19, 91:23, 93:19,
93:24, 94:11, 95:6,
104:10, 104:15,
106:13, 108:25,
109:5, 111:20,
112:12, 112:15,
112:21, 113:18,
114:2, 114:17,
115:1, 115:5,
116:21, 118:19,
122:9, 122:15,
131:7, 134:7,
134:18, 134:21,
136:3, 140:24,
141:8, 142:7,
142:17, 142:20,
143:1, 152:21,
158:16, 159:20,
163:17, 168:1
**long-term** [3] - 51:24,
52:9, 95:17
**longest** [1] - 144:4
**Look** [2] - 157:3,
157:4
**look** [17] - 13:6, 26:24,
49:17, 56:19, 75:25,
76:3, 79:9, 85:10,
87:14, 95:9, 96:16,
122:5, 133:19,
139:17, 140:10,
143:14, 155:1
**looked** [7] - 55:13,
62:1, 102:1, 132:23,
133:1, 133:4, 133:8
**looking** [12] - 9:20,
52:21, 55:9, 56:23,
85:17, 90:4, 95:12,
95:17, 138:1, 162:5,
164:8, 166:1

**looks** [5] - 58:12,
76:11, 79:8, 82:15,
105:22
**lose** [1] - 135:25
**lovely** [1] - 82:15
**low** [1] - 156:12

**M**

**magnitude** [2] -
123:21, 123:23
**Mahwah** [1] - 142:6
**mail** [3] - 98:18, 100:7,
168:10
**mailbox** [1] - 165:15
**mailboxes** [1] -
166:10
**main** [1] - 76:8
**maintain** [2] - 53:19,
123:9
**maintaining** [2] -
86:19, 104:6
**major** [3] - 25:24,
153:6, 156:4
**makeup** [1] - 138:19
**male** [2] - 110:19,
111:3
**MALETSKY** [1] - 1:9
**manage** [1] - 18:23
**managed** [1] - 58:10
**management** [2] -
51:25, 52:10
**Management** [1] -
14:3
**manager** [1] - 39:16
**managing** [2] - 52:13,
56:8
**mandated** [1] - 116:4
**Marie** [3] - 4:3, 144:1,
153:23
**mark** [6] - 6:13, 12:13,
15:9, 26:20, 31:11,
143:14
**marked** [7] - 7:21,
12:20, 15:12, 27:11,
61:13, 168:18, 169:8
**market** [2] - 102:1,
111:3
**married** [2] - 30:24,
144:21
**Martin** [1] - 24:22
**master** [17] - 65:12,
84:10, 85:21, 86:4,
86:7, 87:7, 87:13,
91:15, 110:3, 112:1,
112:3, 116:8, 123:9,
123:14, 125:25,
126:13, 141:21
**Master** [6] - 29:20,
30:6, 30:11, 30:12,

86:15, 91:11
**Master's** [1] - 60:10
**materials** [1] - 168:14
**matter** [7] - 42:24,
89:1, 93:12, 103:23,
123:21, 137:18,
169:15
**Mayor** [2] - 92:7, 92:12
**meals** [2] - 56:10,
140:17
**mean** [29] - 6:20,
17:25, 18:4, 23:19,
23:21, 33:21, 38:22,
41:10, 52:20, 53:10,
54:13, 71:22, 94:1,
97:24, 107:19,
108:5, 118:5,
131:25, 135:18,
139:20, 143:6,
157:25, 158:9,
158:11, 164:20,
165:8, 166:1, 169:3
**means** [4] - 33:3,
52:13, 74:20, 94:9
**meant** [1] - 48:7
**medical** [4] - 16:9,
52:15, 64:1, 78:7
**medical-related** [1] -
16:9
**medication** [1] - 51:21
**Medici** [1] - 65:14
**MEESE** [1] - 2:5
**meeting** [14] - 5:13,
8:1, 8:10, 8:16,
28:18, 51:2, 80:16,
90:10, 99:20, 122:8,
145:13, 158:21,
164:13, 168:8
**meetings** [1] - 152:19
**meets** [2] - 90:19,
105:20
**MEMBER** [8] - 1:9,
1:10, 1:11, 1:12,
1:13, 1:14, 1:15,
27:15
**member** [3] - 51:14,
71:5, 85:7
**Members** [1] - 5:6
**members** [6] - 5:11,
9:13, 64:16, 83:17,
85:1
**memorandum** [1] -
57:6
**memory** [1] - 12:25
**men** [1] - 77:17
**mental** [1] - 51:20
**Mental** [1] - 14:8
**mention** [5] - 22:23,
69:21, 71:4, 101:20,
119:8

**mentioned** [14] -
60:14, 72:18, 73:17,
74:4, 86:5, 95:8,
101:21, 108:9,
117:13, 122:3,
138:20, 150:16,
153:23, 161:16
**mentioning** [1] -
100:13
**mess** [1] - 161:5
**met** [2] - 65:19, 68:4
**method** [1] - 94:8
**mic** [2] - 27:16, 27:20
**Michael** [1] - 60:4
**microphone** [1] -
160:2
**midnight** [1] - 163:25
**might** [9] - 85:13,
108:10, 112:8,
112:10, 127:5,
140:15, 140:16,
155:12, 155:23
**MIKE** [1] - 1:8
**Mikey** [1] - 110:23
**mile** [1] - 107:14
**miles** [1] - 145:12
**mind** [6] - 55:3, 64:12,
88:10, 93:13,
104:15, 148:6
**mine** [1] - 137:11
**minor** [2] - 63:11,
166:20
**minute** [2] - 19:13,
122:10
**minutes** [10] - 10:18,
17:5, 19:2, 19:15,
19:17, 46:6, 55:1,
158:19, 158:24,
159:4
**Misconduct** [1] -
13:23
**miss** [1] - 112:10
**misspoke** [1] - 9:10
**misunderstood** [1] -
146:25
**MLUL** [7] - 73:25,
74:3, 94:10, 94:12,
94:24, 113:8, 113:10
**modus** [1] - 101:25
**moment** [3] - 27:24,
72:17, 98:7
**MONDELLO** [35] -
1:14, 6:15, 7:3,
69:19, 70:4, 70:24,
71:11, 71:25, 72:4,
72:7, 74:7, 74:11,
74:19, 74:24, 76:4,
106:15, 106:23,
107:4, 107:15,
107:19, 107:24,

109:10, 110:6,
110:12, 110:17,
110:22, 111:12,
111:18, 116:17,
146:16, 146:25,
147:9, 147:14,
147:22, 148:3
**Mondello** [3] - 3:14,
3:16, 99:20
**Mondello's** [1] - 154:4
**money** [1] - 101:4
**monitored** [1] - 17:24
**monitors** [1] - 71:9
**month** [6] - 15:4, 43:9,
145:7, 146:13,
158:22, 168:3
**months** [1] - 71:14
**morbidity** [1] - 14:7
**MORGAN** [1] - 1:13
**morning** [4] - 50:14,
50:19, 89:6, 90:24
**Morris** [2] - 78:17,
114:9
**Morristown** [3] -
98:21, 110:6, 139:17
**most** [7] - 10:17,
10:18, 19:4, 22:6,
66:14, 89:5, 89:10
**mother** [1] - 137:6
**move** [2] - 59:1,
142:24
**moved** [2] - 34:12,
145:25
**movement** [1] -
153:23
**moves** [1] - 85:7
**moving** [1] - 115:3
**MR** [502] - 5:5, 5:8,
5:14, 5:15, 5:16,
5:17, 5:19, 5:22,
6:15, 6:20, 7:3, 7:5,
7:8, 7:11, 7:16, 7:17,
7:18, 7:23, 8:13,
8:19, 8:22, 9:1, 9:3,
12:13, 12:15, 12:17,
12:18, 13:3, 13:9,
13:16, 15:8, 15:13,
15:19, 15:24, 16:3,
16:7, 16:17, 16:24,
17:2, 17:14, 17:17,
17:18, 17:21, 17:22,
17:25, 18:13, 19:1,
19:5, 19:7, 19:8,
19:10, 19:12, 19:14,
19:18, 19:21, 20:2,
20:4, 20:5, 20:7,
20:15, 20:19, 21:1,
21:4, 21:6, 21:14,
21:22, 22:7, 22:12,
22:19, 23:6, 23:14,

23:24, 24:6, 24:7,
24:9, 24:10, 24:13,
24:14, 24:16, 24:19,
24:20, 24:24, 24:25,
25:2, 25:3, 25:7,
25:18, 25:21, 26:11,
26:17, 26:18, 26:23,
27:3, 27:4, 27:7,
27:9, 27:19, 27:23,
28:3, 28:7, 28:10,
28:11, 28:12, 28:13,
28:15, 28:19, 28:23,
29:6, 29:7, 29:8,
29:9, 29:13, 29:15,
29:18, 29:21, 29:23,
29:24, 30:2, 30:14,
30:16, 30:17, 30:22,
31:1, 31:2, 31:4,
31:14, 31:16, 31:18,
31:20, 31:22, 31:24,
32:5, 32:7, 32:10,
32:11, 32:16, 32:20,
32:25, 33:3, 33:13,
33:18, 33:21, 33:25,
34:3, 34:5, 34:7,
34:9, 34:14, 34:15,
34:17, 34:18, 34:19,
34:20, 34:23, 35:2,
35:6, 35:10, 35:17,
35:19, 35:20, 35:25,
36:2, 36:4, 36:7,
36:8, 37:2, 37:3,
37:7, 37:9, 37:12,
37:16, 37:18, 37:19,
37:23, 37:25, 38:8,
38:10, 38:11, 38:12,
38:17, 38:22, 38:24,
39:1, 39:3, 39:9,
39:13, 39:14, 39:17,
39:22, 39:25, 40:5,
40:9, 40:17, 40:19,
40:20, 40:21, 40:24,
41:5, 41:7, 41:9,
41:12, 41:14, 41:25,
42:8, 42:17, 42:23,
43:3, 43:4, 43:6,
43:14, 43:20, 43:22,
43:24, 43:25, 44:11,
44:14, 44:15, 44:16,
45:10, 46:18, 47:6,
47:14, 47:22, 48:10,
48:15, 48:20, 49:18,
49:23, 50:2, 50:3,
50:15, 50:18, 51:7,
51:9, 52:23, 53:1,
53:12, 53:13, 53:14,
53:16, 53:24, 54:4,
54:8, 54:12, 54:17,
55:11, 56:14, 59:2,
59:4, 59:5, 59:10,
59:14, 59:16, 59:20,

60:23, 61:2, 61:4,
69:19, 70:3, 70:4,
70:6, 70:24, 71:3,
71:11, 71:13, 71:25,
72:3, 72:4, 72:6,
72:7, 72:12, 72:17,
72:22, 73:8, 73:11,
73:12, 74:7, 74:9,
74:11, 74:15, 74:19,
74:22, 74:24, 75:1,
75:5, 76:4, 76:5,
76:24, 91:6, 91:12,
92:5, 92:6, 92:11,
92:14, 92:16, 93:22,
94:1, 94:14, 96:2,
98:6, 100:20,
100:25, 102:6,
102:14, 103:25,
104:14, 104:23,
106:15, 106:21,
106:23, 106:25,
107:4, 107:8,
107:15, 107:17,
107:19, 107:23,
107:24, 108:1,
108:2, 109:2, 109:7,
109:10, 109:12,
110:6, 110:10,
110:12, 110:15,
110:17, 110:21,
110:22, 111:6,
111:12, 111:13,
111:18, 111:23,
112:14, 112:17,
113:2, 113:21,
114:4, 114:19,
114:21, 114:25,
115:3, 115:6,
115:13, 115:15,
115:23, 116:2,
116:9, 116:16,
116:17, 116:19,
117:4, 117:16,
118:1, 118:3, 118:8,
118:11, 118:21,
119:7, 121:4, 121:6,
122:2, 122:7,
122:22, 123:1,
123:3, 123:4, 123:5,
123:6, 123:7,
123:11, 123:15,
123:18, 123:22,
123:25, 124:9,
124:12, 124:17,
124:25, 125:2,
125:10, 125:12,
126:2, 126:5, 126:7,
126:8, 126:12,
126:16, 126:19,
126:23, 127:2,
127:9, 127:12,

127:16, 127:20,
127:22, 127:24,
128:1, 128:14,
128:25, 129:3,
129:4, 129:9,
129:10, 129:15,
129:25, 130:6,
130:7, 130:12,
130:13, 130:18,
130:19, 130:24,
131:18, 132:9,
132:12, 132:13,
132:16, 132:23,
132:25, 133:1,
133:6, 133:7, 133:8,
133:11, 133:12,
133:13, 133:14,
133:15, 133:21,
133:23, 133:25,
134:2, 134:4, 134:6,
134:10, 134:15,
134:16, 134:17,
135:13, 135:21,
136:10, 136:19,
137:14, 138:1,
138:12, 138:15,
139:16, 139:25,
140:8, 140:12,
141:14, 141:18,
141:24, 142:11,
142:14, 142:22,
143:2, 146:16,
146:25, 147:9,
147:14, 147:22,
147:24, 148:3,
148:4, 148:13,
148:19, 148:22,
149:1, 149:5, 149:8,
149:11, 149:15,
149:23, 150:2,
150:6, 150:8,
150:15, 150:20,
150:23, 151:3,
151:11, 151:23,
152:3, 152:8,
152:20, 152:24,
157:5, 157:16,
157:22, 158:13,
158:18, 158:23,
159:8, 162:18,
168:4, 168:25, 169:2
**MS** [100] - 12:22, 13:5,
13:15, 19:19, 20:13,
20:17, 20:23, 21:2,
21:5, 21:13, 21:15,
21:25, 22:10, 22:17,
22:21, 23:12, 23:19,
25:4, 25:19, 26:4,
26:25, 27:2, 27:13,
42:11, 42:15, 42:20,
45:17, 45:23, 46:23,

47:11, 47:17, 48:18,
49:11, 49:21, 50:12,
50:16, 50:20, 51:8,
52:17, 52:24, 53:21,
54:1, 54:6, 54:10,
54:21, 91:21, 95:7,
97:10, 100:11,
100:23, 101:19,
102:10, 103:21,
104:9, 116:23,
117:10, 117:20,
118:7, 118:9,
118:13, 134:20,
134:23, 135:20,
136:1, 141:2, 141:9,
141:22, 142:5,
142:9, 142:13,
142:16, 144:1,
146:20, 147:2,
147:12, 147:21,
148:10, 148:18,
148:20, 148:24,
149:3, 149:12,
149:20, 149:25,
150:4, 150:7,
150:14, 150:18,
150:22, 151:1,
151:7, 151:18,
152:1, 152:5,
152:17, 159:23,
160:3, 160:6,
162:20, 163:19
**multigenerational** [2]
- 85:2, 138:21
**multiple** [15] - 17:7,
17:13, 46:6, 51:25,
60:19, 85:4, 85:5,
85:13, 85:14, 105:7,
120:5, 123:11,
127:5, 140:10,
165:25
**Municipal** [5] - 64:21,
68:19, 83:25, 93:17,
113:17
**municipal** [1] - 60:19
**Municipalities** [1] -
71:8
**municipalities** [4] -
60:19, 67:4, 107:11,
109:13
**municipality** [22] -
64:10, 65:13, 67:14,
67:16, 68:1, 75:22,
81:13, 81:19, 84:5,
86:20, 87:6, 87:11,
87:16, 88:14, 88:15,
97:4, 99:23, 108:24,
112:8, 128:16,
128:24
**must** [4] - 38:13,

55:19, 153:12,
154:12
**mutual** [1] - 83:7

## N

**N.J.A.C** [3] - 57:22,
58:2, 65:24
**name** [23] - 5:25,
21:24, 28:6, 32:19,
32:21, 59:17, 59:18,
103:14, 105:6,
122:21, 122:22,
122:24, 134:9,
134:21, 136:5,
136:7, 136:11,
136:13, 141:1,
152:23, 153:17,
155:24, 159:22
**Nancy** [4] - 3:10, 3:20,
45:24, 134:23
**narrow** [1] - 111:10
**National** [1] - 52:2
**natural** [1] - 62:12
**nature** [8] - 42:3,
56:23, 58:15, 68:1,
94:25, 98:8, 99:11,
123:8
**nearby** [1] - 62:22
**nearly** [1] - 128:17
**neat** [1] - 151:21
**necessarily** [5] -
71:21, 95:22, 97:19,
114:12, 114:16
**necessary** [1] - 67:9
**need** [23] - 35:13,
35:21, 65:10, 68:10,
78:10, 78:20, 78:22,
80:24, 84:3, 87:14,
91:2, 93:5, 113:6,
114:3, 114:13,
115:25, 117:5,
142:4, 143:22,
150:4, 166:2, 166:6,
166:8
**needed** [1] - 93:6
**needs** [3] - 23:19,
64:19, 80:12
**negative** [8] - 64:20,
65:11, 65:19, 84:8,
89:20, 119:2,
125:10, 160:10
**negatively** [3] -
123:23, 128:18,
130:22
**negatives** [2] - 160:8
**negligible** [1] - 125:19
**neighbor** [2] - 125:22,
165:15
**neighbor's** [1] - 162:5

**neighborhood** [24] -
79:19, 84:6, 85:20,
123:10, 123:17,
124:16, 124:18,
125:1, 126:10,
127:1, 127:11,
127:19, 128:9,
131:11, 131:14,
131:17, 132:4,
133:17, 133:18,
135:12, 138:22,
146:1, 166:15,
167:25
**neighboring** [4] -
82:21, 105:12,
107:6, 107:13
**neighborly** [1] -
163:14
**neighbors** [1] - 132:1
**nervous** [1] - 9:10
**never** [8] - 70:2,
144:18, 144:24,
161:25, 164:23,
165:3, 166:16,
166:17
**New** [17] - 1:23, 2:3,
2:6, 5:1, 8:24, 25:11,
59:12, 60:1, 60:18,
66:5, 71:5, 78:12,
78:13, 109:5,
111:24, 114:8, 170:4
**new** [8] - 33:6, 90:23,
92:1, 108:19,
109:24, 112:6, 162:6
**newly** [1] - 96:13
**next** [10] - 32:17,
50:13, 72:14, 103:2,
127:17, 135:14,
136:25, 158:22,
168:3, 168:7
**nice** [1] - 151:21
**niche** [1] - 66:7
**Nicosia** [3] - 3:5, 3:17,
5:12
**NICOSIA** [7] - 1:8,
5:14, 16:24, 17:14,
17:18, 17:22, 122:2
**night** [4] - 23:22,
50:11, 162:4, 164:4
**nights** [2] - 163:22,
164:9
**NJ** [1] - 78:18
**NO** [1] - 4:16
**noble** [1] - 154:19
**nobody** [1] - 165:11
**noise** [1] - 120:17
**none** [4] - 36:15, 86:8,
109:7, 142:20
**nonstop** [1] - 164:21
**noon** [1] - 61:17

**normal** [2] - 49:1, 99:4
**normally** [2] - 50:18,
154:16, 165:21
**North** [24] - 36:13,
36:16, 36:25, 37:5,
37:11, 37:21, 38:2,
38:6, 38:23, 39:11,
39:15, 39:19, 39:22,
40:3, 40:10, 42:2,
42:4, 43:18, 44:20,
44:21, 44:22, 44:25,
60:11
**northern** [1] - 147:7
**not-for-profits** [1] -
69:5
**Note** [1] - 52:7
**noted** [1] - 169:16
**nothing** [9] - 26:7,
73:20, 80:5, 91:12,
105:22, 120:17,
126:12, 129:22,
156:15
**Nothing** [1] - 29:1
**notice** [2] - 168:7,
168:11
**noticed** [3] - 5:24,
121:23, 160:23
**notwithstanding** [2] -
57:1, 58:10
**nowhere** [2] - 64:10,
93:4
**number** [15] - 11:9,
62:22, 67:24, 77:23,
83:3, 83:16, 84:22,
85:1, 86:16, 97:1,
101:14, 124:11,
126:3, 141:13,
155:16
**numbers** [2] - 78:3,
121:3
**nurseries** [1] - 64:3
**nursing** [1] - 64:1
**nurturing** [1] - 77:16

## O

**o'clock** [2] - 50:13
**oath** [3] - 8:20, 143:7,
151:12
**oaths** [1] - 170:5
**object** [1] - 168:17
**objecting** [1] - 7:3
**objection** [2] - 169:11,
169:12
**objectives** [2] - 86:18,
87:9
**obligations** [2] - 93:2,
93:15
**obliged** [1] - 152:12
**obtain** [1] - 11:15

**obviously** [4] - 101:3,
101:24, 111:5, 139:8
**occupant** [1] - 90:6
**occupied** [3] - 79:9,
120:3, 156:16
**occupying** [2] - 89:9,
96:13
**occurred** [1] - 131:24
**occurrence** [1] - 19:9
**occurring** [1] - 51:20
**odor** [1] - 151:14
**odors** [2] - 126:25,
130:16
**OF** [3] - 1:1, 1:1, 1:6
**offer** [7] - 135:21,
143:9, 143:17,
143:22, 152:11,
152:14, 159:4
**offered** [4] - 17:1,
151:3, 151:4, 151:13
**offering** [3] - 121:25,
152:4, 152:6
**offers** [1] - 166:9
Office@
quickreporters.
com [1] - 1:24
**offices** [1] - 63:24
**Officials** [1] - 71:6
**officials** [3] - 57:7,
57:11, 112:25
**often** [5] - 10:15,
51:24, 69:13,
150:25, 164:12
**oftentimes** [1] - 85:2
**Okeydokey** [2] -
133:3, 134:4
**old** [4] - 96:14, 145:7,
146:13, 155:24
**oldest** [1] - 144:4
**OLGA** [1] - 1:15
**omission** [3] - 65:16,
86:4, 87:22
**on-boarding** [1] -
17:15
**once** [1] - 90:24
**One** [8] - 13:21, 36:10,
73:22, 82:6, 90:13,
135:23, 156:13,
157:7
**one** [79] - 16:13,
20:15, 26:4, 34:1,
34:4, 35:12, 37:20,
38:1, 40:15, 44:16,
45:18, 47:19, 49:6,
49:12, 55:18, 56:3,
56:19, 57:22, 64:24,
67:24, 68:21, 71:17,
76:7, 78:9, 82:12,
84:5, 85:10, 85:11,
85:24, 86:22, 89:17,

90:5, 90:22, 98:23,
99:10, 101:15,
102:12, 103:15,
104:20, 106:11,
107:20, 110:9,
116:4, 120:1, 120:8,
120:25, 123:13,
124:3, 124:22,
125:17, 127:17,
128:17, 137:10,
138:24, 139:8,
140:9, 140:16,
142:5, 145:14,
146:4, 147:16,
153:4, 153:15,
153:18, 154:5,
156:21, 157:1,
162:11, 162:13,
162:23, 165:9,
166:21, 167:7,
167:12, 167:13
**ones** [5] - 35:9, 73:18,
121:22, 123:13,
127:5
**ongoing** [2] - 127:6,
127:7
**online** [1] - 125:8
**onsite** [2] - 36:1, 36:2
**open** [4] - 21:19,
62:21, 122:16, 132:2
**operandi** [1] - 101:25
**operate** [8] - 28:21,
30:6, 55:9, 56:25,
57:3, 58:9, 62:25,
167:18
**operates** [3] - 53:4,
56:8, 56:24
**operating** [2] - 145:18,
167:23
**operation** [8] - 38:14,
38:25, 39:4, 103:19,
105:1, 129:1, 131:9,
131:12
**operational** [1] - 129:7
**operations** [3] - 11:2,
41:21, 131:10
**Opiate** [1] - 14:15
**opinion** [12] - 29:6,
29:8, 30:3, 30:4,
65:18, 70:5, 70:9,
76:16, 77:14,
113:21, 143:10,
152:10
**opinions** [1] - 143:18
**opportunity** [7] -
30:18, 43:8, 67:10,
122:20, 135:18,
141:11, 143:24
**opposed** [4] - 49:13,
137:19, 137:25,

139:14
**option** [1] - 153:12
**order** [2] - 6:23, 23:11
**ordering** [1] - 135:9
**orderly** [1] - 132:10
**orders** [1] - 26:14
**ordinance** [16] -
    65:13, 65:17, 81:21,
    83:16, 84:11, 85:22,
    86:4, 86:8, 87:13,
    88:16, 89:17, 92:1,
    94:12, 108:15,
    110:7, 113:6
**ordinances** [1] - 110:4
**original** [1] - 32:12
**orthodox** [2] - 110:19,
    111:4
**otherwise** [3] - 86:13,
    93:17, 101:5
**outcome** [1] - 23:2
**outlaw** [1] - 87:16
**outlined** [1] - 64:21
**outlines** [1] - 76:21
**outpatient** [7] - 36:15,
    36:25, 37:5, 42:1,
    102:20, 103:3, 104:3
**outs** [1] - 101:8
**outset** [1] - 32:3
**outside** [8] - 18:24,
    76:11, 79:23, 106:2,
    117:7, 121:20,
    150:21, 161:10
**outweigh** [1] - 81:8
**overall** [12] - 63:12,
    75:15, 78:7, 84:7,
    90:12, 116:25,
    125:14, 128:15,
    128:16, 128:18,
    128:24, 133:24
**overdose** [1] - 164:15
**Overdose** [1] - 14:15
**overdoses** [1] - 15:16
**overfill** [1] - 161:11
**overflow** [3] - 147:19,
    148:7, 149:18
**overflowing** [1] -
    145:3
**overnight** [1] - 165:14
**overruled** [1] - 93:20
**own** [10] - 34:16,
    34:22, 38:15, 47:8,
    84:17, 111:10,
    120:3, 139:20,
    139:23, 157:21
**owned** [1] - 37:17
**owner** [3] - 10:21,
    20:24, 92:12

**P**

**P.C** [1] - 2:5
**P.E** [1] - 2:10
**P.M** [1] - 1:2
**p.m** [3] - 66:22, 168:8,
    169:16
**P.P** [2] - 2:12, 3:24
**package** [1] - 162:12
**packages** [2] - 162:21,
    163:7
**packet** [1] - 73:7
**PAGE** [2] - 3:1, 4:2
**Palisade** [3] - 1:5, 2:7,
    53:22
**Palisades** [31] - 5:2,
    5:25, 6:3, 9:16,
    11:15, 11:16, 26:1,
    29:2, 34:11, 36:12,
    37:13, 37:15, 37:16,
    37:17, 38:1, 38:5,
    38:9, 38:19, 39:23,
    40:6, 40:14, 40:24,
    41:3, 45:4, 52:19,
    53:3, 53:10, 58:11,
    101:3, 101:13, 168:5
**Palisades'** [1] - 8:2
**Palmyra** [1] - 99:22
**pandemic** [1] - 78:6
**panel** [6] - 23:7, 23:9,
    23:10, 25:15, 88:22
**paper** [1] - 158:2
**par** [1] - 141:12
**paramedics** [1] - 16:2
**parents** [1] - 85:11
**park** [4] - 9:12, 9:14,
    18:18, 121:11
**parked** [4] - 19:20,
    62:17, 137:2, 157:1
**parking** [3] - 9:5,
    41:16, 84:20
**parks** [1] - 63:21
**Parsippany** [2] - 2:3,
    2:3
**part** [18] - 17:15,
    37:19, 38:4, 38:14,
    41:17, 57:9, 76:20,
    78:22, 81:3, 88:17,
    112:23, 117:11,
    117:24, 118:15,
    121:20, 122:4,
    139:13, 140:21
**partially** [1] - 78:5
**particular** [31] - 44:19,
    55:13, 63:9, 65:2,
    69:20, 71:18, 83:23,
    87:18, 87:24, 90:16,
    91:10, 94:21, 105:3,
    105:17, 106:7,
    107:1, 115:16,

115:18, 120:19,
    122:6, 124:23,
    125:6, 125:16,
    126:3, 126:22,
    129:1, 131:11,
    141:17, 154:13,
    154:22, 154:23
**particularly** [5] - 82:5,
    83:23, 89:17,
    104:12, 111:21
**parties** [3] - 144:20,
    157:14, 170:12
**Partly** [1] - 111:25
**partner** [1] - 21:1
**pass** [4] - 70:25,
    71:16, 72:5
**Passalacqua** [3] - 3:6,
    3:17, 5:19
**PASSALACQUA** [9] -
    1:11, 5:16, 18:13,
    19:5, 19:8, 19:12,
    19:18, 118:21, 121:4
**passed** [2] - 70:2,
    71:24
**past** [1] - 6:6
**patient** [3] - 102:19,
    102:21, 103:5
**Patient** [1] - 13:25
**patiently** [1] - 143:24
**Paul** [20] - 3:9, 3:18,
    4:6, 32:21, 59:2,
    59:17, 59:21, 66:9,
    67:17, 69:3, 70:8,
    70:17, 74:7, 75:1,
    76:25, 93:11,
    106:16, 115:6,
    122:23, 139:16
**PAUL** [1] - 3:12
**Paul's** [1] - 70:19
**paving** [1] - 165:23
**pay** [2] - 128:9, 137:20
**pays** [2] - 37:10, 37:12
**pending** [1] - 150:11
**people** [68] - 10:14,
    10:15, 11:3, 11:4,
    13:1, 13:3, 16:10,
    33:7, 33:10, 33:12,
    34:21, 36:11, 36:24,
    39:24, 42:1, 43:17,
    46:10, 46:14, 48:3,
    48:19, 49:12, 50:19,
    50:21, 53:17, 54:3,
    56:9, 85:14, 89:5,
    95:22, 98:17, 98:25,
    99:5, 99:6, 99:16,
    99:25, 100:6,
    102:24, 103:9,
    103:10, 104:3,
    104:18, 120:21,
    129:5, 129:12,

130:1, 130:2, 130:3,
    130:8, 130:15,
    130:20, 135:5,
    135:6, 137:5,
    137:20, 137:24,
    138:25, 144:23,
    145:2, 154:24,
    155:2, 155:16,
    156:22, 159:3,
    161:5, 166:15,
    167:20
**people's** [1] - 128:4
**per** [4] - 13:14, 78:18,
    124:3
**perc** [2] - 156:6,
    156:8, 156:11
**perc-able** [1] - 156:6
**percent** [6] - 37:4,
    52:4, 77:25, 78:16,
    167:22
**percentage** [4] -
    36:24, 43:17, 126:4,
    134:1
**perform** [1] - 57:11
**performing** [1] - 57:13
**Perhaps** [1] - 155:25
**perhaps** [3] - 56:12,
    71:1, 98:14
**period** [6] - 10:3,
    111:4, 112:1, 154:8,
    154:21, 156:16
**permanent** [3] - 10:11,
    95:18, 97:25
**permission** [6] -
    28:21, 30:5, 87:22,
    156:23, 156:24,
    156:25
**permit** [7] - 8:5, 23:16,
    24:3, 25:11, 67:13,
    81:14, 115:9
**permits** [2] - 21:10,
    63:16
**permitted** [26] - 63:24,
    64:4, 64:7, 64:11,
    65:15, 74:5, 75:16,
    75:21, 76:2, 79:10,
    79:12, 85:25, 86:10,
    92:8, 93:4, 93:23,
    96:8, 108:17,
    108:20, 109:15,
    109:19, 110:1,
    115:16, 115:19,
    115:21, 120:14
**Permitting** [1] - 66:23
**permitting** [2] - 21:11,
    116:3
**person** [7] - 28:9,
    28:11, 30:24, 34:15,
    49:12, 138:24,
    169:14

**Personal** [1] - 14:12
**personal** [3] - 9:21,
    138:21, 152:7
**personally** [2] - 77:8,
    107:17
**persons** [2] - 63:20,
    67:10
**perspective** [1] -
    99:12
**pertains** [2] - 43:12,
    117:23
**pertinent** [1] - 62:10
**petition** [1] - 92:12
**PETRESKI** [1] - 2:10
**pharmacy** [1] - 162:25
**Phillips** [1] - 60:7
**phone** [4] - 135:3,
    135:24, 135:25
**photos** [6] - 61:9,
    61:13, 61:15, 61:25,
    63:6, 121:15
**photovoltaic** [2] -
    69:1, 69:15
**phrase** [2] - 31:12,
    95:21
**physical** [3] - 46:11,
    51:19, 74:5
**Physical** [1] - 14:11
**physically** [1] - 155:11
**pick** [3] - 35:23, 161:6,
    163:4
**picking** [2] - 18:20,
    161:3
**picture** [2] - 121:14,
    135:3
**pictures** [7] - 98:1,
    98:17, 100:7,
    135:22, 135:24,
    161:12, 163:7
**piece** [3] - 97:23,
    153:2, 154:22
**place** [21] - 6:13,
    15:15, 22:24, 23:10,
    25:25, 48:3, 48:4,
    48:5, 55:16, 62:17,
    63:11, 63:13, 73:16,
    100:6, 101:22,
    104:2, 109:4, 137:5,
    154:23, 164:14,
    170:8
**placed** [2] - 10:6, 10:9
**placement** [1] - 74:13
**places** [3] - 35:4,
    81:15, 135:10
**plaintiff** [1] - 77:5
**plan** [23] - 32:8, 32:12,
    52:16, 65:12, 79:7,
    81:21, 84:10, 85:21,
    86:4, 86:7, 87:7,
    87:13, 88:16, 89:16,

112:1, 112:3, 116:8, 117:25, 118:16, 123:9, 123:14, 125:25, 141:21
**Plan** [6] - 29:20, 30:6, 30:11, 30:12, 86:15, 91:11
**Planner** [2] - 2:12, 59:25
**planner** [13] - 60:4, 60:20, 70:4, 106:24, 107:24, 109:9, 109:13, 112:7, 112:8, 113:3, 124:6, 131:15, 141:15
**planner's** [1] - 122:24
**planning** [9] - 60:25, 70:8, 108:15, 111:24, 122:19, 126:13, 126:15, 135:17, 141:20
**Planning** [4] - 14:12, 60:10, 71:6
**plans** [4] - 91:15, 110:3, 117:14, 126:13
**plateau** [1] - 121:16
**playgrounds** [1] - 63:22
**plenty** [2] - 109:10, 144:23
**plowed** [3] - 165:16, 165:20, 165:21
**plows** [1] - 166:13
**plus** [1] - 96:14
**point** [29] - 30:14, 31:5, 31:10, 32:5, 43:6, 70:21, 72:16, 73:15, 73:22, 75:14, 80:4, 93:8, 94:18, 96:4, 96:15, 96:25, 108:5, 108:6, 108:10, 110:3, 110:11, 110:14, 113:4, 114:20, 119:15, 138:23, 140:13, 146:10, 168:12
**pointed** [1] - 77:21
**points** [3] - 76:8, 78:10, 151:14
**police** [8] - 16:2, 23:21, 35:5, 50:24, 51:4, 163:23, 163:24, 164:7
**policies** [1] - 67:8
**policy** [1] - 91:16
**pop** [1] - 112:6
**population** [2] - 86:23, 108:22

**populations** [1] - 97:3
**position** [1] - 157:11
**positive** [6] - 64:19, 65:18, 68:15, 81:24, 118:24, 125:11
**positively** [1] - 130:22
**positives** [3] - 81:4, 81:8, 125:13
**possibly** [2] - 123:23, 161:24
**potential** [5] - 71:9, 73:23, 81:6, 120:16, 136:19
**potentially** [4] - 79:3, 127:7, 136:25, 167:10
**PP** [2] - 3:12, 59:11
**practice** [1] - 131:2
**Practices** [1] - 14:16
**practices** [1] - 67:8
**precedence** [2] - 167:6, 167:17
**predecessor** [1] - 153:20
**predicate** [2] - 62:4, 129:19
**prefer** [1] - 94:12
**preferred** [1] - 113:12
**Preiss** [1] - 60:7
**prejudiced** [1] - 144:14
**preparation** [2] - 122:4, 122:7
**preparing** [3] - 112:20, 131:5, 134:12
**prescription** [1] - 162:24
**presence** [1] - 51:20
**present** [2] - 157:24, 158:4
**PRESENT** [1] - 1:6
**presented** [1] - 157:17
**presenting** [1] - 157:18
**pressure** [1] - 147:11
**presumption** [1] - 157:19
**pretty** [3] - 18:10, 23:23, 95:4
**prevalent** [1] - 108:13
**prevent** [2] - 68:12, 153:22
**Prevention** [1] - 14:13
**previously** [2] - 65:22, 83:2
**PRICE** [1] - 2:5
**primarily** [1] - 83:25
**Primarily** [1] - 73:4
**primary** [2] - 35:22,

139:14
**principal** [1] - 60:7
**print** [2] - 136:1, 161:13
**prison** [2] - 34:7, 34:8
**Privacy** [1] - 14:1
**private** [7] - 10:1, 64:2, 102:1, 102:4, 106:3, 154:6, 154:7
**probe** [1] - 151:16
**problem** [4] - 16:23, 72:13, 114:7, 158:13
**problems** [1] - 160:13
**Problems** [1] - 13:22
**process** [7] - 8:6, 17:15, 30:21, 31:16, 33:9, 33:22, 102:11
**produce** [2] - 155:12, 157:10
**Produce** [1] - 14:11
**productively** [1] - 159:5
**Professional** [2] - 2:12, 59:25
**professional** [1] - 59:22
**professionals** [1] - 63:25
**profit** [9] - 55:10, 56:7, 58:15, 69:8, 69:13, 69:16, 72:25, 77:1, 77:5
**profitable** [1] - 167:22
**profits** [1] - 69:5
**program** [7] - 13:4, 13:8, 36:16, 36:25, 37:5, 42:2, 68:2
**programs** [1] - 117:21
**Programs** [1] - 14:2
**prohibit** [1] - 58:16
**prohibition** [1] - 72:25
**prohibits** [1] - 81:11
**promotes** [2] - 68:23, 77:15
**promptly** [1] - 156:12
**pronounced** [1] - 123:2
**proof** [1] - 22:17
**proofs** [3] - 76:17, 76:18, 94:16
**proper** [1] - 167:23
**properties** [7] - 79:17, 82:21, 100:16, 105:7, 105:12, 105:15, 154:4
**Properties** [13] - 1:5, 2:7, 5:3, 29:2, 36:12, 37:17, 38:5, 38:19, 39:23, 40:7, 53:3, 58:11, 168:5

**Properties'** [1] - 38:1
**property** [52] - 9:6, 9:18, 10:1, 10:21, 28:14, 34:12, 34:21, 36:12, 62:1, 62:3, 62:11, 62:19, 63:3, 63:6, 64:25, 65:3, 65:8, 79:13, 82:14, 82:20, 83:23, 84:15, 84:20, 85:18, 87:19, 87:24, 89:13, 89:14, 90:16, 92:12, 104:11, 104:12, 104:25, 105:4, 106:2, 119:16, 119:18, 119:23, 120:19, 124:23, 125:7, 131:11, 133:22, 134:13, 136:15, 146:22, 153:2, 154:22, 156:3, 160:14, 160:17, 160:21
**proposals** [1] - 80:14
**proposed** [7] - 63:8, 64:14, 69:24, 70:11, 71:15, 72:8, 136:24
**proposing** [2] - 65:4, 77:5
**protocol** [1] - 18:22
**prove** [2] - 67:14, 135:1
**provide** [21] - 11:18, 12:4, 23:18, 23:25, 38:19, 59:8, 61:5, 65:7, 66:2, 66:14, 66:17, 68:10, 69:14, 89:24, 104:2, 117:8, 119:4, 135:14, 147:5, 147:7, 154:12
**provided** [12] - 38:6, 48:9, 69:13, 77:19, 80:21, 84:18, 98:20, 104:1, 114:5, 114:10, 131:22, 133:18
**provides** [3] - 12:4, 87:4, 103:13
**Providing** [1] - 117:4
**providing** [10] - 46:22, 77:16, 79:21, 80:14, 81:9, 83:7, 84:2, 87:3, 87:9, 117:16
**provision** [1] - 25:22
**psychosocial** [1] - 51:23
**Public** [2] - 3:7, 3:18
**public** [35] - 7:12, 21:20, 45:16, 45:21, 51:14, 54:23, 63:21,

64:16, 65:12, 68:22, 69:14, 77:12, 77:15, 81:5, 84:1, 84:10, 84:13, 119:5, 119:11, 122:17, 122:20, 134:8, 134:19, 140:25, 142:18, 142:24, 143:3, 152:22, 157:14, 158:17, 159:21, 163:18, 168:13
**PUBLIC** [1] - 4:2
**public's** [1] - 84:14
**published** [1] - 168:11
**pull** [1] - 153:9
**pulled** [1] - 164:7
**pump** [1] - 153:14
**pumped** [1] - 154:16
**PURCELL** [164] - 2:5, 5:5, 5:8, 5:15, 5:17, 5:22, 6:20, 7:5, 7:8, 7:16, 7:18, 7:23, 8:13, 9:3, 12:13, 12:17, 13:16, 15:8, 15:13, 15:19, 15:24, 16:17, 20:2, 20:5, 21:4, 21:6, 21:14, 23:14, 23:24, 24:7, 24:10, 24:16, 24:20, 24:25, 25:3, 25:7, 25:21, 26:11, 26:18, 27:7, 27:23, 28:3, 28:10, 28:12, 28:15, 28:23, 29:7, 29:9, 29:15, 29:21, 29:24, 31:1, 31:4, 31:16, 31:20, 31:24, 32:7, 32:11, 33:25, 34:5, 34:9, 34:15, 34:18, 37:7, 38:8, 38:11, 38:22, 39:1, 40:20, 40:24, 41:14, 42:8, 43:6, 43:20, 43:24, 44:11, 44:14, 46:18, 47:22, 48:15, 48:20, 49:23, 50:2, 50:18, 51:7, 51:9, 52:23, 53:1, 53:13, 53:16, 53:24, 54:4, 54:8, 54:12, 55:11, 56:14, 59:2, 59:20, 60:23, 61:4, 70:3, 70:6, 72:22, 73:11, 74:22, 75:1, 76:24, 91:6, 92:5, 92:16, 93:22, 94:1, 94:14, 98:6, 100:20, 100:25, 102:6, 102:14, 103:25, 106:21,

107:23, 108:1, 110:15, 110:21, 111:6, 111:13, 114:21, 115:3, 115:6, 115:15, 116:2, 116:16, 118:3, 118:8, 118:11, 124:9, 126:2, 127:12, 127:20, 127:24, 133:7, 133:11, 133:13, 134:15, 139:16, 140:8, 141:14, 142:22, 148:4, 148:13, 148:19, 148:22, 149:1, 149:5, 149:11, 149:15, 149:23, 150:2, 150:6, 150:8, 150:15, 150:20, 150:23, 162:18

**Purcell** [18] - 3:3, 3:12, 3:13, 5:4, 6:15, 7:11, 15:23, 27:4, 54:25, 59:1, 70:25, 72:17, 142:21, 143:13, 159:11, 159:16, 168:16, 169:11

**purchase** [1] - 100:17
**purpose** [4] - 63:4, 102:3, 104:2, 123:8
**Purpose** [1] - 84:1
**purposes** [3] - 57:25, 83:25, 123:12
**pursuant** [2] - 24:11, 170:5
**put** [17] - 27:5, 31:11, 62:4, 69:23, 72:8, 73:15, 80:13, 121:22, 125:5, 128:22, 129:17, 129:22, 139:5, 143:17, 146:5, 146:9, 153:12
**putting** [3] - 84:21, 97:6, 161:4

## Q

**qualifications** [1] - 71:5
**qualify** [2] - 105:14, 124:10
**qualitative** [1] - 56:23
**quality** [17] - 86:19, 123:9, 123:17, 123:24, 124:14, 124:16, 125:1, 126:9, 126:18,

127:1, 127:11, 127:19, 128:7, 128:12, 128:19, 132:15, 132:21
**quantify** [4] - 61:9, 124:7, 125:24, 127:3
**quantity** [2] - 124:11, 154:15
**questioning** [3] - 44:7, 44:9, 151:15
**Questions** [4] - 3:3, 3:7, 3:13, 3:18
**questions** [44] - 6:17, 7:2, 7:9, 7:13, 7:15, 8:16, 12:23, 18:11, 20:21, 21:16, 21:22, 30:15, 30:19, 36:10, 41:23, 42:9, 42:13, 42:22, 43:5, 44:2, 45:14, 46:20, 54:22, 58:20, 58:23, 83:2, 100:9, 106:13, 116:21, 118:19, 122:16, 122:19, 134:5, 135:16, 136:4, 140:25, 142:17, 148:4, 148:5, 151:6, 151:8, 151:24, 152:2
**quick** [2] - 1:22, 45:18
**quicker** [1] - 165:24
**quite** [5] - 50:12, 50:17, 82:8, 94:3, 132:1

## R

**R-3** [1] - 57:14
**R-5** [2] - 57:15, 57:16
**R.S.41:2-2** [1] - 170:5
**RACHEL** [1] - 1:12
**radius** [1] - 107:14
**raised** [2] - 151:13, 160:9
**rates** [7] - 51:15, 51:18, 52:7, 52:8, 77:12, 133:10, 133:13
**rather** [1] - 94:12
**Rather** [1] - 52:13
**RE** [1] - 1:3
**re** [8] - 86:16, 110:4, 112:1, 112:13, 141:21, 165:19, 166:7, 166:8
**re-evaluate** [1] - 165:19
**re-evaluated** [2] - 166:7, 166:8
**re-exam** [2] - 112:1,

112:13
**re-examined** [2] - 86:16, 110:4
**re-exams** [1] - 141:21
**reached** [3] - 8:2, 100:16, 168:2
**reading** [1] - 77:9
**readmitted** [2] - 11:11, 11:13
**real** [2] - 131:10, 131:16
**real-life** [2] - 131:10, 131:16
**realize** [1] - 162:23
**really** [33] - 33:14, 42:6, 48:18, 51:3, 51:5, 52:18, 53:6, 54:17, 55:16, 82:22, 93:12, 98:4, 98:5, 100:3, 121:24, 135:6, 141:18, 142:23, 145:7, 145:25, 152:11, 156:9, 157:13, 158:8, 158:11, 158:20, 159:25, 162:11, 162:13, 162:14, 163:13, 168:15
**really..** [1] - 98:5
**realm** [2] - 75:20, 78:25
**reason** [1] - 124:23
**reasonable** [10] - 66:24, 67:7, 68:8, 81:9, 81:17, 88:4, 93:6, 94:10, 115:11, 116:5
**reasons** [11] - 65:20, 68:5, 71:19, 83:22, 93:10, 106:17, 113:15, 132:21, 138:17, 142:3, 168:18
**rebuffed** [1] - 101:15
**recalled** [1] - 44:1
**receive** [4] - 11:17, 47:16, 53:18, 102:23
**received** [1] - 13:19
**receiving** [1] - 104:3
**recent** [1] - 22:6
**recently** [2] - 66:14, 163:5
**recess** [1] - 122:14
**Recognition** [1] - 14:5
**recognize** [2] - 16:14, 165:2
**reconcile** [2] - 87:8, 87:22
**reconciled** [1] - 65:16

**reconciliation** [1] - 65:14
**reconciling** [1] - 86:3
**record** [13] - 6:4, 6:6, 6:11, 6:14, 9:5, 16:25, 59:15, 62:4, 64:17, 64:18, 128:22, 129:22, 156:1
**records** [4] - 50:22, 50:24, 51:4, 78:15
**Records** [1] - 13:25
**recover** [1] - 67:2
**recovering** [2] - 66:1, 80:2
**Recovery** [22] - 14:3, 14:9, 36:13, 36:16, 37:1, 37:6, 37:11, 37:22, 38:3, 38:7, 38:23, 39:12, 39:15, 39:20, 39:23, 40:3, 40:10, 42:2, 42:4, 43:19, 44:22, 45:1
**recovery** [12] - 12:5, 40:25, 41:2, 41:4, 48:5, 49:6, 52:2, 66:4, 66:18, 83:6, 83:8, 84:2
**Red** [1] - 11:22
**redesign** [3] - 31:23, 32:10, 32:11
**redesigned** [2] - 31:19, 31:21
**redo** [4] - 144:18, 144:24, 145:1, 148:21
**redraw** [1] - 156:3
**reference** [1] - 98:21
**referenced** [1] - 99:19
**Referring** [1] - 88:11
**referring** [2] - 13:10, 47:9
**refers** [1] - 74:12
**refresh** [1] - 12:25
**refresher** [1] - 17:22
**refreshers** [1] - 17:18
**refusing** [1] - 67:7
**regard** [22] - 62:10, 67:6, 68:14, 73:13, 73:14, 76:8, 76:17, 81:24, 85:21, 85:23, 87:21, 87:23, 96:5, 106:8, 114:7, 119:11, 120:6, 124:6, 129:23, 136:20, 138:17
**regarding** [8] - 9:17, 13:1, 16:24, 46:2, 51:15, 65:8, 86:18, 119:3

**Regional** [1] - 60:10
**registered** [1] - 63:24
**regular** [1] - 82:11
**regularly** [2] - 71:7, 168:7
**regulate** [1] - 84:25
**regulates** [1] - 21:9
**Regulation** [1] - 13:25
**regulations** [7] - 21:8, 54:15, 55:15, 58:3, 68:10, 109:4, 140:14
**regulatory** [1] - 58:13
**rehabilitation** [1] - 57:18
**reinspected** [1] - 23:4
**REINSTEIN** [2] - 170:3, 170:24
**relapse** [5] - 51:15, 51:18, 52:6, 52:8, 52:16
**relate** [1] - 42:9
**related** [7] - 16:9, 42:5, 42:6, 52:19, 52:22, 80:23, 89:2
**Relating** [1] - 18:15
**relationship** [1] - 163:14
**relative** [4] - 45:9, 122:19, 170:11, 170:13
**relatively** [2] - 7:10, 108:19
**relatives** [2] - 85:1, 85:8
**relevant** [3] - 135:17, 141:19, 157:15
**rely** [1] - 84:17
**remain** [1] - 8:20
**remains** [1] - 63:13
**remember** [3] - 51:12, 57:13, 155:24
**Remember** [1] - 152:3
**remind** [1] - 45:20
**removal** [2] - 165:8, 165:20
**remove** [1] - 34:10
**rent** [2] - 82:11, 100:15
**renting** [2] - 97:17, 134:14
**repair** [1] - 155:6
**repavement** [1] - 166:2
**repeat** [2] - 37:23, 77:20
**replaced** [3] - 23:9, 24:8, 24:10
**replacement** [3] - 23:16, 24:4, 24:23
**report** [4] - 26:2,

26:12, 39:23, 116:8
**Report** [5] - 4:23,
26:13, 27:7, 27:8,
27:10
**reported** [1] - 110:21
**REPORTER** [2] -
160:1, 160:5
**reporter** [1] - 136:11
**Reporter** [1] - 170:4
**Reporting** [1] - 1:22
**reports** [3] - 157:10,
158:3, 163:24
**represent** [2] - 66:23,
109:17
**represented** [1] -
60:16
**representing** [1] -
60:19
**request** [2] - 6:21,
101:16
**requested** [2] - 6:8,
51:14
**requesting** [5] - 64:13,
89:25, 92:9, 94:9,
115:9
**require** [6] - 25:5,
29:5, 52:9, 81:20,
88:15, 94:24
**required** [10] - 30:1,
38:13, 47:7, 53:13,
53:14, 57:11, 93:17,
96:8, 128:2, 153:12
**requirement** [3] -
39:5, 91:2, 111:25
**requirements** [5] -
53:22, 58:1, 66:17,
90:5, 105:23
**requires** [3] - 30:5,
51:24, 95:4
**Requiring** [1] - 16:1
**research** [1] - 157:12
**resent** [2] - 144:13,
144:16
**Reserve** [1] - 133:22
**Reservoir** [1] - 154:2
**residence** [18] - 9:14,
47:25, 48:8, 65:22,
67:13, 76:1, 78:21,
79:12, 89:4, 89:10,
97:9, 103:14,
120:15, 125:18,
128:17, 162:2,
162:9, 167:20
**Residence** [1] - 63:1
**Residences** [2] -
69:22, 70:1
**residences** [11] -
35:13, 57:8, 62:22,
63:18, 64:5, 74:4,
74:10, 89:11, 96:14,

120:25, 131:2
**resident** [8] - 38:9,
42:12, 44:24, 49:17,
66:21, 145:14,
161:7, 162:6
**residential** [18] - 55:9,
62:20, 63:16, 65:24,
74:6, 75:17, 80:1,
83:21, 86:18, 90:4,
96:5, 96:6, 96:9,
96:16, 133:17,
150:3, 167:18,
167:24
**Residents** [1] - 120:2
**residents** [39] - 6:17,
11:1, 11:10, 16:11,
18:21, 19:6, 38:12,
38:23, 40:7, 40:18,
44:18, 44:19, 47:6,
47:15, 48:10, 49:5,
66:3, 67:1, 68:13,
78:13, 78:17, 83:3,
83:9, 84:16, 95:18,
96:19, 97:24, 106:4,
114:16, 114:18,
114:23, 115:2,
115:4, 117:7,
140:16, 141:13,
144:4, 144:10,
144:11
**residing** [1] - 114:22
**resolved** [1] - 23:5
**Resort** [1] - 99:21
**resources** [2] - 47:9,
128:3
**respect** [28] - 5:11,
5:24, 7:25, 8:4, 9:5,
10:4, 10:20, 13:20,
14:24, 15:14, 26:2,
29:12, 41:15, 41:20,
41:24, 53:7, 53:11,
55:21, 57:4, 61:6,
88:3, 88:4, 89:25,
98:8, 99:14, 141:16,
148:7, 150:8
**respectfully** [2] -
71:17, 132:5
**Respectfully** [1] -
88:22
**respond** [3] - 92:21,
100:10, 102:16
**responded** [1] - 51:9
**responding** [1] - 6:16
**Response** [4] - 21:18,
54:24, 58:24, 142:19
**response** [2] - 52:18,
84:3
**responses** [1] - 83:2
**responsibilities** [1] -
56:9

**restricted** [3] - 146:8,
153:20, 154:9
**restriction** [1] - 153:16
**restrictions** [4] -
153:7, 153:22,
156:13, 161:20
**result** [1] - 135:12
**results** [2] - 26:5, 26:9
**resume** [1] - 122:13
**review** [10] - 60:21,
71:7, 109:14,
113:21, 131:20,
134:13, 141:20,
143:14, 157:8,
157:25
**reviewed** [1] - 5:20
**reviews** [1] - 7:12
**revised** [1] - 32:2
**Revkell** [4] - 153:17,
156:15, 156:19,
156:21
**REVKELL** [1] - 153:18
**revolving** [1] - 95:21
**ride** [1] - 34:12
**ridiculous** [1] - 31:5
**rights** [1] - 169:14
**Rise** [1] - 155:1
**Risk** [1] - 14:3
**Risks** [1] - 14:11
**RITACCO** [20] - 21:25,
22:10, 22:17, 22:21,
23:12, 23:19, 25:4,
25:19, 26:4, 26:25,
27:2, 27:13, 141:2,
141:9, 141:22,
142:5, 142:9,
142:13, 142:16,
163:19
**Ritacco** [6] - 3:7, 3:22,
4:10, 21:25, 141:2,
163:19
**road** [6] - 105:19,
105:24, 145:9,
145:12, 146:5,
165:24
**Road** [4] - 1:23, 2:3,
144:9, 166:6
**roads** [2] - 124:15,
165:16
**rock** [1] - 156:11
**RONALD** [1] - 1:14
**RONDA** [2] - 170:3,
170:24
**room** [9] - 99:5, 106:5,
136:23, 137:22,
138:4, 139:23, 168:5
**rooming** [1] - 140:3
**rooms** [4] - 97:16,
137:24, 139:21,
140:19

**ROSENWASSER** [69]
- 32:20, 32:25, 33:3,
33:18, 34:20, 35:2,
35:10, 35:19, 35:25,
36:4, 36:8, 37:3,
37:9, 37:16, 37:19,
37:25, 38:10, 38:17,
39:9, 39:14, 39:22,
40:5, 40:17, 40:21,
41:5, 41:9, 41:25,
42:17, 43:3, 43:14,
43:22, 43:25, 44:15,
45:10, 122:22,
123:3, 123:5, 123:7,
123:15, 123:22,
124:12, 124:25,
125:10, 126:5,
126:8, 126:16,
126:23, 127:9,
127:16, 127:22,
128:1, 128:25,
129:4, 129:10,
129:25, 130:7,
130:13, 130:19,
132:9, 132:13,
132:23, 133:1,
133:8, 133:12,
133:14, 133:21,
133:25, 134:4,
158:18
**Rosenwasser** [6] -
3:9, 3:18, 4:6, 32:22,
122:23, 126:2
**roughly** [2] - 11:4,
153:5
**round** [1] - 44:6
**roundabout** [1] - 58:5
**Route** [1] - 60:3
**row** [1] - 164:9
**rule** [1] - 66:8
**rule-making** [1] - 66:8
**rulemaking** [1] -
103:16
**rules** [8] - 7:5, 24:12,
56:19, 56:20, 66:10,
66:14, 66:20, 67:8
**Rules** [1] - 14:1
**run** [2] - 161:9, 162:8
**running** [2] - 146:20,
146:24
**runs** [1] - 10:24
**Rutgers** [1] - 60:12

**S**

**S-R-E-E-P-A-D-R-A-J**
[1] - 136:13
**sac** [5] - 160:19,
160:20, 164:6,
164:12, 164:17

**safe** [3] - 54:3, 66:17,
77:16
**safety** [4] - 14:24,
84:1, 119:5, 154:20
**Safety** [4] - 4:20,
14:12, 14:16, 14:18,
15:11
**sake** [1] - 84:14
**SAMHSA** [1] - 14:15
**sat** [3] - 152:18, 164:1,
164:5
**satisfied** [1] - 157:20
**satisfies** [1] - 118:25
**satisfy** [1] - 115:25
**saturated** [1] - 107:16
**sauce** [1] - 133:6
**save** [1] - 6:23
**saw** [2] - 149:5,
150:17
**say..** [1] - 163:15
**scale** [1] - 77:13
**scenario** [1] - 137:22
**schedule** [2] - 165:20,
166:4
**scheduled** [1] - 168:7
**scheme** [1] - 111:23
**school** [7] - 68:25,
86:23, 87:1, 118:6,
167:8, 167:11,
167:14
**school-aged** [1] -
167:11
**schools** [3] - 63:22,
64:2, 118:5
**scope** [8] - 49:24,
125:15, 128:15,
131:4, 131:5, 132:5,
132:17, 133:16
**screen** [2] - 80:16,
136:25
**screening** [3] - 62:12,
79:14, 80:14
**search** [2] - 107:12,
109:21
**second** [2] - 79:2,
146:4
**Second** [1] - 13:22
**secretary** [1] - 169:6
**Secretary** [1] - 2:9
**section** [4] - 25:23,
32:17, 74:21, 75:8
**see** [14] - 22:8, 26:9,
43:12, 71:14, 87:14,
97:23, 106:23,
117:2, 126:20,
148:22, 149:1,
149:11, 153:9, 165:4
**seeing** [1] - 86:7
**Seeing** [1] - 142:20
**seeking** [2] - 62:25,

64:8
**seem** [2] - 52:24, 69:4
**seeped** [1] - 147:20
**selected** [1] - 105:1
**Senate** [2] - 69:24, 116:17
**sending** [1] - 26:8
**sense** [7] - 40:16, 81:15, 90:10, 124:14, 139:24, 159:1, 165:10
**sensitive** [1] - 153:11, 156:4
**sensitivity** [1] - 153:25
**sent** [3] - 6:6, 6:9, 40:18
**separate** [1] - 115:19
**separated** [1] - 136:16
**separately** [1] - 139:20
**separating** [1] - 62:16
**separation** [3] - 105:11, 119:22, 136:21
**September** [2] - 168:3, 168:9
**septic** [32] - 7:25, 31:18, 32:6, 32:9, 63:10, 126:25, 127:4, 130:16, 141:12, 141:22, 144:18, 144:24, 145:1, 145:3, 147:3, 148:7, 148:15, 148:21, 148:23, 149:1, 149:5, 149:18, 150:9, 151:14, 153:13, 155:2, 155:6, 155:16, 155:18, 160:11, 160:12, 160:16
**septics** [1] - 155:21
**serious** [4] - 15:15, 15:22, 15:25, 23:23
**serve** [2] - 114:13, 117:5
**served** [1] - 108:22
**serves** [5] - 65:25, 68:22, 80:1, 132:24, 133:2
**service** [10] - 87:3, 90:15, 105:19, 117:9, 117:17, 120:23, 122:6, 126:20, 133:5, 166:8
**services** [17] - 16:4, 67:8, 84:4, 122:3, 127:18, 128:2, 128:5, 128:7, 128:9,

128:10, 128:11, 128:16, 128:21, 131:5, 131:22, 132:6, 133:17
**Services** [2] - 78:19, 110:13, 110:18
**serving** [2] - 69:14, 97:3
**session** [2] - 42:16, 42:18
**set** [5] - 75:15, 104:5, 146:7, 167:16, 170:9
**setback** [1] - 79:14
**setbacks** [1] - 119:19
**setting** [1] - 62:11, 65:24, 80:1, 84:4, 85:14, 87:4, 87:24, 89:18, 105:10, 167:5, 167:6
**settle** [1] - 155:11
**seven** [4] - 109:13, 111:21, 112:16, 135:4
**several** [1] - 141:4
**sewage** [1] - 147:19
**sewer** [1] - 147:2
**Sexual** [1] - 13:23
**shall** [1] - 57:25
**shapes** [1] - 82:25
**Share** [1] - 159:11
**share** [3] - 73:9, 140:17, 143:13
**sharing** [1] - 104:16
**shelters** [1] - 63:18
**shift** [2] - 120:12, 165:18
**shifts** [2] - 162:4
**shipping** [1] - 125:9
**shopping** [1] - 125:9
**short** [5] - 91:13, 95:16, 98:4, 129:15, 130:24
**short-term** [1] - 95:16
**shortage** [1] - 128:8
**shorter** [2] - 96:23, 98:13
**show** [4] - 22:11, 61:25, 126:10, 161:14
**showed** [2] - 22:25, 148:11
**shower** [1] - 147:11
**showing** [1] - 121:15
**shown** [2] - 23:20, 121:15
**SHULMAN** [1] - 2:5
**shutting** [1] - 167:14
**sic** [2] - 52:17, 57:6
**Sica** [7] - 76:21, 76:25, 77:3, 77:5, 79:2,

81:3, 141:21
**sign** [2] - 25:15, 145:11
**signed** [2] - 5:20, 24:22
**significant** [4] - 62:12, 78:5, 114:7, 124:21
**Silverman's** [1] - 52:17
**similar** [6] - 75:25, 79:9, 95:9, 95:25, 99:24, 131:11
**similarly** [1] - 58:12
**simple** [2] - 7:10, 124:5
**single** [41] - 29:2, 29:3, 55:2, 55:16, 55:19, 56:25, 57:1, 57:2, 57:17, 57:23, 58:4, 58:7, 58:9, 62:9, 62:19, 63:17, 75:23, 76:14, 79:12, 79:25, 82:16, 83:20, 85:10, 85:18, 89:9, 89:11, 97:5, 97:9, 102:9, 120:15, 124:23, 125:18, 127:4, 138:3, 146:2, 155:19, 156:5, 156:15, 156:16, 167:12
**single-family** [36] - 29:2, 29:3, 55:2, 55:16, 55:19, 56:25, 57:1, 57:2, 57:17, 57:23, 58:4, 58:7, 58:9, 62:9, 62:19, 63:17, 75:23, 76:14, 79:12, 79:25, 82:16, 83:20, 85:10, 85:18, 89:9, 89:11, 97:5, 97:9, 102:9, 120:15, 125:18, 138:3, 146:2, 156:5, 156:15, 156:16
**sit** [1] - 151:10
**site** [8] - 18:17, 28:25, 62:18, 67:15, 82:2, 82:5, 84:23, 87:14
**situated** [1] - 119:18
**situation** [2] - 33:14, 115:15
**situations** [4] - 16:8, 16:10, 35:5, 103:4
**six** [20] - 11:3, 11:6, 13:9, 33:7, 33:16, 36:18, 36:24, 63:2, 88:18, 107:19, 108:7, 138:25, 141:6, 144:12,

145:18, 161:1, 166:25, 167:4, 167:9, 167:24
**sizable** [1] - 106:5
**size** [5] - 20:9, 62:7, 82:19, 138:19, 150:18
**sized** [2] - 90:21, 125:20
**sizes** [1] - 83:1
**SKIPPED** [1] - 4:22
**sleep** [1] - 103:4
**slides** [3] - 17:9, 17:10, 17:13
**slightly** [1] - 121:1
**small** [4] - 19:23, 20:4, 20:8, 165:10
**smaller** [3] - 20:1, 20:2, 137:24
**smell** [2] - 148:24, 149:10
**smelled** [1] - 150:12
**smelling** [1] - 149:13
**Smoke** [1] - 155:1
**smoking** [1] - 23:7
**snow** [2] - 165:8, 165:19
**snowstorm** [2] - 165:12, 165:14
**so-called** [1] - 65:14
**so..** [1] - 140:7
**sober** [13] - 37:20, 40:7, 41:21, 44:4, 46:15, 51:1, 53:4, 53:22, 57:8, 64:5, 65:22, 78:21, 114:3
**Sober** [3] - 63:1, 69:21, 70:1
**sobriety** [4] - 53:18, 53:20, 66:3, 104:7
**social** [2] - 47:2, 47:10
**solar** [1] - 69:1
**Solar** [1] - 69:15
**solely** [1] - 65:25
**someone** [9] - 13:14, 26:8, 34:10, 90:8, 101:17, 102:21, 103:24, 144:10, 163:11
**Sometime** [1] - 139:2
**Sometimes** [4] - 85:4, 139:1, 139:2, 161:4
**sometimes** [2] - 73:18, 96:19
**somewhat** [1] - 127:3
**somewhere** [3] - 103:5, 115:22, 139:22
**son** [1] - 144:20
**sooner** [1] - 159:15

**sorry** [9] - 5:18, 17:20, 25:1, 95:8, 103:19, 127:12, 145:20, 146:17, 160:3
**Sorry** [1] - 146:16
**sort** [6] - 46:10, 103:17, 103:18, 117:14, 121:16, 139:23
**sounded** [1] - 23:23
**sounds** [4] - 33:2, 45:11, 126:23, 132:6
**source** [3] - 35:22, 133:5, 133:9
**space** [5] - 62:21, 84:19, 97:24, 98:2, 106:3
**speaking** [6] - 19:10, 44:22, 72:24, 112:2, 124:1
**speaks** [2] - 55:12, 98:22
**special** [1] - 106:17
**specific** [5] - 34:24, 35:9, 75:18, 87:14, 118:14
**Specifically** [1] - 117:2
**specifically** [14] - 11:12, 26:24, 35:7, 39:18, 52:22, 72:7, 74:19, 78:12, 91:13, 111:3, 117:18, 117:22, 137:10, 166:16
**specifics** [5] - 33:13, 33:14, 33:23, 34:23, 87:23
**spectrum** [2] - 78:22, 139:4
**speculate** [1] - 116:9
**speed** [1] - 129:13
**speeds** [1] - 129:20
**spell** [2] - 32:23, 136:10
**spend** [1] - 70:20
**spends** [1] - 101:4
**spill** [1] - 154:3
**spilled** [1] - 155:3
**spoken** [5] - 129:5, 129:11, 130:3, 130:8, 130:14
**spot** [1] - 164:14
**spouses** [1] - 144:22
**sprinklers** [1] - 161:22
**Sreepadraj** [3] - 3:21, 4:7, 136:7
**staff** [8] - 9:13, 37:13, 44:25, 46:3, 80:19, 120:7, 120:11,

121:11
**staffs** [1] - 45:6
**stage** [1] - 135:14
**stake** [2] - 77:12, 81:5
**stand** [2] - 75:19, 132:2
**standard** [3] - 90:11, 90:21, 120:14
**standards** [2] - 105:21, 141:21
**start** [3] - 44:3, 103:11, 159:2
**Start** [1] - 160:3
**started** [3] - 5:9, 7:24, 60:2
**starting** [2] - 63:14, 84:24, 119:16
**state** [10] - 53:21, 60:1, 60:18, 78:14, 93:9, 108:18, 113:25, 136:5, 141:1, 154:6
**State** [18] - 21:24, 29:19, 29:20, 30:6, 30:11, 55:12, 63:4, 64:21, 65:23, 66:17, 68:15, 68:18, 122:21, 134:9, 134:21, 152:23, 159:22, 170:4
**statement** [1] - 100:15
**statements** [2] - 31:10, 46:19
**states** [2] - 33:7, 57:22
**statewide** [1] - 96:7
**stating** [2] - 27:23, 113:19
**statistic** [1] - 134:3
**statistics** [6] - 50:25, 51:5, 53:7, 53:11, 77:19, 114:9
**status** [1] - 51:19
**statute** [6] - 69:20, 69:25, 70:22, 70:23, 72:24, 94:22
**stay** [9] - 10:11, 10:15, 55:5, 83:10, 98:17, 99:25, 135:7, 137:20, 137:21
**staying** [3] - 38:5, 98:10, 99:17
**stenographically** [1] - 170:7
**step** [2] - 79:2, 103:2
**steps** [1] - 76:21
**STEVEN** [1] - 2:2
**still** [6] - 49:9, 56:8, 98:15, 106:18, 112:3, 135:16
**stipulate** [2] - 9:16,

9:24
**stipulated** [2] - 28:16, 28:17
**stockade** [1] - 121:5
**stop** [2] - 157:5, 159:2
**storage** [1] - 90:1
**stored** [3] - 90:6, 90:17, 90:20
**story** [1] - 62:8
**straightforward** [1] - 7:10
**stranger** [1] - 126:10
**stream** [2] - 146:21, 146:24
**streams** [1] - 154:1
**street** [33] - 23:22, 45:25, 62:18, 79:15, 105:11, 105:18, 119:19, 119:20, 119:22, 124:15, 129:7, 136:18, 136:22, 145:3, 146:14, 147:3, 148:23, 149:2, 149:6, 160:9, 160:11, 160:13, 160:19, 160:20, 162:10, 165:10, 165:16, 165:21, 165:25, 166:16, 166:17, 166:20, 167:18
**Street** [2] - 8:24, 59:12
**streets** [1] - 123:17
**stress** [1] - 78:8
**stretch** [1] - 50:17
**strict** [1] - 7:5
**strictly** [1] - 112:2
**structure** [1] - 69:2
**structures** [1] - 57:24
**struggling** [3] - 55:7, 66:19, 112:23
**students** [1] - 139:19
**Studies** [1] - 60:12
**stuff** [5] - 54:20, 157:3, 158:1, 161:12, 164:11
**Subchapter** [1] - 57:20
**subchapter** [1] - 58:1
**subdivision** [4] - 153:6, 153:17, 156:4
**subject** [7] - 11:2, 14:23, 42:24, 57:25, 61:6, 62:1, 127:15
**submit** [13] - 6:10, 30:9, 135:24, 143:12, 159:7, 159:9, 159:10, 159:15, 159:16,

168:15, 168:16, 168:20
**submits** [1] - 157:8
**submitted** [11] - 8:7, 24:3, 24:16, 24:17, 24:18, 31:24, 32:3, 61:10, 61:22, 73:6, 158:1
**subpanel** [1] - 24:23
**subsequently** [1] - 60:6
**Subsequently** [1] - 8:1
**substance** [9] - 51:19, 52:1, 52:5, 56:24, 67:2, 78:14, 78:16, 84:3, 114:8
**Substance** [1] - 14:1
**substantial** [12] - 65:11, 79:6, 79:17, 80:12, 82:20, 84:9, 85:23, 119:4, 119:19, 120:20, 129:24, 131:14
**substantially** [1] - 80:5
**substantively** [1] - 58:8
**subsumed** [2] - 90:14, 91:3
**success** [2] - 51:1, 51:6
**successor** [1] - 156:21
**successors** [2] - 156:18, 156:22
**sucks** [1] - 154:13
**sudden** [2] - 145:15, 151:20
**sued** [2] - 100:21, 101:17
**sufficient** [2] - 84:19, 168:21
**Sugarman** [13] - 4:17, 6:8, 6:24, 7:13, 7:20, 16:19, 49:4, 51:9, 53:6, 56:6, 77:20, 102:23, 103:8
**Suicide** [1] - 14:13
**suitability** [9] - 65:2, 65:8, 76:19, 82:1, 104:11, 105:4, 106:8, 106:12, 106:18
**suitable** [4] - 82:5, 83:24, 105:8, 136:18
**Suite** [2] - 2:6, 59:12
**suited** [3] - 84:6, 104:12, 104:22
**sum** [1] - 79:18

**summary** [1] - 22:8
**summer** [2] - 161:17, 161:23
**sun** [1] - 138:4
**supervision** [2] - 48:8, 48:9
**Supervisors** [1] - 99:22
**supply** [1] - 132:10
**support** [7] - 47:3, 47:21, 56:3, 66:3, 94:17, 103:15, 104:8
**supported** [2] - 66:24, 103:10
**supportive** [3] - 66:18, 83:7, 83:8
**suppose** [1] - 132:2
**supposed** [3] - 43:17, 45:2, 90:8
**surrounding** [6] - 79:7, 80:6, 108:16, 119:12, 131:3, 155:4
**survey** [1] - 131:16
**sustained** [2] - 10:3, 52:2
**SUV** [3] - 20:14, 20:15, 20:16
**swear** [3] - 59:5, 59:7, 152:12
**SWORN** [1] - 3:1
**sworn** [3] - 8:25, 59:13, 143:11
**sync** [1] - 105:23
**system** [20] - 18:10, 31:18, 32:6, 32:9, 127:4, 130:16, 141:12, 144:16, 144:19, 144:24, 145:1, 145:22, 147:20, 149:22, 149:24, 150:5, 153:13, 154:14, 155:16, 155:18
**systems** [1] - 126:25

**T**

**table** [1] - 150:19
**tabled** [2] - 44:6, 44:8
**talks** [3] - 74:13, 113:11, 119:12
**tank** [1] - 63:10
**target** [1] - 111:3
**telephone** [1] - 64:1
**temperature** [1] - 162:8
**Ten** [1] - 19:15
**ten** [15] - 10:17, 11:4, 11:7, 19:1, 19:2, 19:13, 33:7, 35:13,

99:5, 108:22, 112:1, 135:5, 145:7, 146:13, 158:19
**ten-minute** [1] - 19:13
**ten-month-old** [2] - 145:7, 146:13
**ten-year** [1] - 112:1
**term** [8] - 51:24, 52:9, 69:11, 73:22, 95:16, 95:17, 96:24, 98:4
**terminally** [1] - 63:19
**terms** [24] - 60:9, 62:16, 62:23, 63:8, 78:25, 79:22, 82:14, 82:16, 83:4, 83:5, 84:21, 85:19, 86:3, 89:12, 95:11, 96:10, 97:20, 105:18, 111:10, 120:17, 120:20, 124:1, 136:19, 165:8
**terribly** [1] - 86:2
**territory** [2] - 28:22, 30:7
**test** [5] - 17:8, 17:13, 76:20, 79:2, 81:4
**testified** [9] - 41:15, 41:22, 98:16, 103:8, 136:15, 141:19, 142:2, 150:1, 150:2
**testifies** [2] - 8:25, 59:13
**testify** [4] - 141:16, 143:7, 152:15, 157:9
**testifying** [2] - 131:3, 152:4
**testimony** [53] - 21:23, 22:19, 29:12, 29:17, 33:6, 36:14, 41:24, 42:7, 42:10, 42:25, 43:7, 43:9, 43:13, 44:6, 45:13, 45:21, 49:24, 53:5, 56:5, 59:8, 62:2, 62:5, 65:8, 65:21, 73:13, 81:23, 90:23, 104:1, 104:5, 106:17, 114:5, 116:25, 118:24, 122:5, 122:19, 123:8, 127:23, 128:1, 131:13, 134:12, 135:14, 135:17, 135:19, 141:5, 142:7, 142:12, 142:15, 151:4, 158:2, 158:18, 158:21, 160:7, 170:7
**Testimony** [1] - 152:15

**text** [1] - 163:15
**THE** [2] - 160:1, 160:5
**the..** [2] - 25:6, 95:8
**themselves** [2] - 34:1, 103:10
**theoretically** [1] - 97:2
**therapist** [1] - 47:8
**therapists** [3] - 48:11, 48:12, 48:15
**therapy** [1] - 47:10
**THERE** [1] - 1:6
**there's..** [1] - 116:20
**thereby** [1] - 154:14
**therefore** [2] - 30:24, 160:10
**Therefore** [1] - 30:25
**they've** [1] - 145:18
**Third** [1] - 80:8
**third** [1] - 18:19
**thorough** [1] - 119:10
**thoughts** [1] - 61:6
**three** [16] - 9:21, 9:23, 10:1, 20:19, 20:20, 35:11, 67:18, 120:8, 138:6, 148:11, 156:9, 156:10, 163:22, 165:4, 167:11, 167:13
**three-car** [2] - 20:20, 138:6
**three..** [1] - 88:11
**throughout** [7] - 60:18, 81:12, 85:6, 89:11, 97:4, 108:16, 141:4
**Tice** [1] - 2:6
**tie** [2] - 128:14, 132:20
**ties** [2] - 127:14, 127:21
**TIM** [1] - 1:7
**timely** [2] - 127:18, 128:6
**timing** [1] - 99:14
**today** [2] - 60:3, 159:6
**together** [2] - 56:10, 103:15
**TOMBALAKIAN** [48] - 2:2, 5:19, 7:11, 7:17, 8:19, 9:1, 12:15, 12:18, 21:22, 22:7, 22:12, 22:19, 24:14, 24:19, 24:24, 25:2, 27:4, 27:9, 27:19, 30:14, 30:17, 42:23, 43:4, 59:5, 59:14, 72:17, 73:8, 92:11, 135:13, 135:21, 136:10, 141:18, 141:24, 142:11, 142:14, 143:2,

151:3, 151:11, 151:23, 152:3, 152:8, 152:20, 157:5, 157:22, 158:23, 159:8, 168:4, 169:2
**tomorrow** [2] - 151:19, 151:21
**tonight** [8] - 5:9, 41:22, 42:10, 42:13, 43:8, 43:13, 49:24, 159:2
**took** [6] - 22:24, 23:8, 25:25, 61:9, 104:20
**Tool** [1] - 14:15
**top** [4] - 8:10, 121:13, 137:2, 165:6
**topical** [1] - 41:18
**tops** [2] - 19:1, 19:15
**Torsiello** [2] - 4:9, 159:23
**TORSIELLO** [4] - 159:23, 160:3, 160:6, 162:20
**touched** [1] - 84:12
**touches** [1] - 156:6
**touching** [1] - 84:24
**toured** [1] - 106:1
**touring** [1] - 82:14
**town** [16] - 84:7, 87:22, 107:20, 109:5, 112:2, 114:12, 115:8, 115:10, 117:22, 119:13, 125:25, 128:4, 141:10, 146:1, 166:9, 167:12
**Town** [1] - 2:10
**town-wide** [2] - 87:22, 125:25
**towns** [6] - 100:21, 107:7, 107:13, 108:18, 109:17, 109:18
**Township** [2] - 27:22, 99:22
**township** [1] - 91:24, 112:12
**track** [4] - 11:9, 13:12, 40:15, 73:12
**traffic** [17] - 119:5, 120:1, 120:14, 123:16, 123:20, 124:2, 124:7, 124:15, 125:4, 129:6, 129:21, 145:21, 160:22, 160:25, 166:18, 166:19, 167:19
**Traffic** [1] - 144:9

**trained** [1] - 22:11
**Training** [2] - 4:19, 12:19
**training** [10] - 16:25, 17:3, 17:6, 22:2, 22:4, 22:6, 22:15, 46:3, 46:22, 48:8
**trainings** [9] - 11:14, 11:20, 13:18, 13:19, 13:20, 14:20, 17:1, 18:7, 46:24
**Trainings** [1] - 12:17
**transcript** [2] - 5:21, 170:7
**transportation** [6] - 35:23, 37:11, 37:13, 38:6, 38:20, 39:7
**transported** [3] - 39:2, 39:11, 40:13
**transporting** [2] - 40:25, 41:3
**trash** [1] - 161:10
**treat** [2] - 98:18
**treating** [1] - 152:10
**Treatment** [1] - 48:5
**treatment** [41] - 35:14, 35:15, 38:13, 38:15, 38:20, 38:21, 39:6, 39:7, 43:18, 44:4, 44:24, 44:25, 45:3, 47:7, 47:8, 47:15, 47:16, 48:1, 48:4, 48:11, 49:20, 51:16, 51:22, 52:5, 52:12, 52:16, 53:1, 53:7, 53:18, 55:6, 89:7, 99:24, 102:19, 102:20, 102:22, 102:23, 102:24, 102:25, 103:3, 104:4, 165:7
**treatments** [1] - 78:14
**Tree** [19] - 3:8, 3:9, 3:20, 3:23, 4:3, 4:5, 4:11, 21:25, 28:7, 134:10, 141:3, 144:2, 144:5, 146:4, 146:22, 146:23, 152:24, 163:20
**Tree-Wood** [1] - 144:5
**Tri** [1] - 128:11
**Tri-Boro** [1] - 128:11
**tried** [2] - 104:19, 162:18
**tries** [1] - 53:16
**triple** [1] - 9:14
**trucks** [4] - 23:22, 90:22, 135:1, 135:2
**true** [3] - 99:9, 136:2, 170:6

**truly** [1] - 97:25
**truth** [2] - 59:9, 152:13
**try** [9] - 31:10, 31:11, 36:21, 81:14, 104:17, 112:9, 121:6, 121:25, 132:7
**trying** [16] - 42:3, 43:12, 55:4, 67:2, 67:14, 68:12, 70:18, 74:23, 75:2, 87:8, 102:11, 106:9, 121:24, 138:12, 149:16, 154:18
**Tuesday** [3] - 49:16, 61:17, 168:8
**turn** [2] - 142:20, 144:10, 164:20
**turned** [2] - 101:25, 164:2
**turning** [1] - 164:19
**twice** [3] - 19:10, 163:23, 166:22
**two** [27] - 9:20, 10:5, 18:16, 20:18, 35:11, 35:17, 57:23, 62:8, 80:16, 84:9, 85:11, 88:9, 90:11, 106:25, 108:23, 121:22, 144:25, 148:10, 148:11, 152:19, 153:13, 154:5, 155:10, 163:24, 167:13
**Two** [3] - 10:8, 139:9, 164:9
**two-car** [1] - 20:18
**two-family** [1] - 57:23
**two-story** [1] - 62:8
**type** [55] - 9:9, 11:14, 15:15, 17:8, 18:22, 19:19, 19:25, 20:2, 20:11, 48:3, 49:1, 49:8, 49:9, 51:19, 63:22, 67:13, 74:1, 74:15, 75:7, 75:23, 78:11, 78:20, 82:24, 83:6, 83:20, 86:9, 87:3, 87:5, 87:17, 88:6, 89:18, 95:16, 97:8, 99:9, 106:6, 109:17, 111:11, 113:22, 117:8, 120:4, 120:17, 120:19, 120:22, 125:9, 126:14, 130:25, 131:5, 131:22, 131:24, 132:6, 133:20, 140:4, 141:25
**types** [28] - 11:19,

42:12, 42:22, 48:6, 48:24, 63:16, 64:22, 74:17, 75:10, 75:21, 77:4, 79:11, 87:10, 87:17, 88:5, 88:25, 89:13, 89:14, 96:7, 96:22, 96:23, 97:3, 108:8, 117:5, 120:24, 131:21, 138:18, 140:2
**typical** [10] - 62:20, 82:18, 133:16, 137:4, 137:11, 137:16, 137:19, 137:25, 139:15, 140:16
**typically** [10] - 17:15, 88:25, 95:11, 95:13, 102:3, 119:25, 126:13, 131:8, 132:12, 133:19
**Typically** [1] - 18:25
**typographical** [1] - 8:4

**U**

**U-turn** [1] - 164:20
**Uber** [3] - 33:20, 135:9, 145:8
**ultimately** [1] - 104:1
**unaware** [1] - 116:7
**under** [22] - 8:20, 33:16, 57:17, 62:7, 70:15, 81:10, 91:3, 91:4, 93:2, 93:15, 93:17, 94:9, 94:16, 94:21, 95:14, 114:1, 143:7, 151:11, 153:4, 153:17
**Under** [1] - 99:18
**undergoing** [1] - 52:5
**undermine** [1] - 80:6
**understandable** [1] - 96:4
**undertake** [1] - 131:24
**undertaking** [2] - 132:1, 132:7
**undue** [7] - 67:23, 67:25, 81:17, 81:19, 88:13, 88:14
**unfortunately** [1] - 157:23
**Union** [1] - 105:5
**unique** [2] - 133:5, 133:9
**unit** [7] - 48:21, 55:8, 98:23, 99:10, 139:23, 140:9, 140:15

units [3] - 99:7, 138:19, 140:10
universally [1] - 68:21
University [2] - 60:11, 60:13
unless [4] - 135:24, 144:10, 155:9, 156:6
unlocked [1] - 140:21
unreasonable [6] - 67:16, 67:19, 67:22, 88:7, 93:10, 101:18
unrecognizable [1] - 165:3
unreported [3] - 110:22, 111:14, 111:16
up [54] - 18:20, 21:20, 22:18, 23:22, 25:5, 36:10, 41:25, 42:5, 43:16, 45:19, 49:22, 50:4, 58:19, 59:2, 73:16, 76:8, 92:1, 95:15, 101:3, 105:10, 112:6, 119:23, 120:8, 122:2, 122:16, 126:10, 130:25, 136:22, 140:20, 141:12, 143:6, 143:11, 143:15, 143:25, 146:9, 148:11, 157:3, 157:4, 158:12, 159:25, 160:7, 160:9, 161:3, 161:6, 162:25, 163:4, 163:21, 163:25, 164:2, 164:5, 164:7, 164:19, 165:25
up-to-date [1] - 22:18
update [1] - 7:25
updated [1] - 110:4
upfront [2] - 141:5, 141:7
upgrade [3] - 149:19, 150:10, 150:11
UPS [1] - 135:2
upset [1] - 145:25
uptake [1] - 160:25
Urban [1] - 60:12
urine [1] - 34:21
usage [5] - 141:11, 145:22, 148:1, 154:11, 161:23
uses [24] - 57:16, 63:16, 63:20, 63:21, 63:23, 64:4, 69:5, 69:8, 69:13, 70:13, 70:23, 73:17, 73:24, 75:3, 76:22, 77:13,

79:1, 79:10, 87:17, 89:14, 94:18, 112:6, 113:13, 113:23
usurp [1] - 92:3
usurped [1] - 101:23
usurping [4] - 92:23, 93:13, 93:21
utilized [2] - 90:12, 90:15

V

V-E-N-K-A-T-A-R-A-O [1] - 136:14
valid [1] - 44:7
value [1] - 68:21
Van [1] - 145:12
van [13] - 19:3, 20:3, 20:6, 20:12, 35:22, 36:1, 37:15, 37:17, 80:18, 90:22, 121:12, 145:15
vans [4] - 38:2, 90:22, 165:25, 166:23
variance [21] - 64:8, 64:13, 64:20, 64:24, 79:4, 87:25, 89:25, 90:14, 91:2, 91:4, 92:10, 94:9, 94:13, 94:17, 94:24, 113:9, 119:1, 131:8, 167:6, 167:7
variances [2] - 109:25, 167:24
variant [1] - 85:17
varies [1] - 83:10
variety [1] - 87:9
various [4] - 22:15, 51:22, 63:16, 63:21
vary [2] - 51:18, 138:19
vehicle [5] - 10:10, 18:19, 20:1, 90:1, 90:5
vehicles [40] - 9:11, 9:17, 9:21, 9:22, 9:23, 10:1, 10:5, 10:6, 10:8, 18:16, 18:17, 18:23, 19:19, 20:8, 38:16, 39:7, 41:16, 80:16, 80:19, 80:20, 84:18, 84:21, 84:23, 90:11, 90:20, 90:21, 120:8, 121:8, 121:11, 121:20, 122:1, 124:4, 129:13, 135:4, 136:21, 137:1, 157:1, 165:3, 165:4
Venkatarao [3] - 3:21,

4:7, 136:8
VENKATARAO [10] - 136:7, 136:12, 137:3, 137:18, 138:10, 138:14, 139:7, 140:23, 159:6, 159:19
verification [2] - 40:18, 40:22
verified [2] - 39:16, 39:18
versus [4] - 102:4, 102:12, 125:7, 140:9
via [1] - 94:12
VICE [1] - 1:8
vicinity [1] - 62:21
victims [1] - 63:19
video [3] - 17:4, 17:8, 17:10
view [1] - 80:5
viewed [1] - 79:23
viewing [2] - 120:19, 136:20
views [1] - 74:3
violations [1] - 57:20
violence [2] - 46:11, 63:19
Violence [1] - 14:14
virtually [1] - 155:9
visibility [3] - 79:15, 119:21, 121:20
visible [1] - 122:1
visited [1] - 138:2
visits [1] - 22:22
visual [1] - 137:1
voice [1] - 147:16
VOIR [1] - 59:19
Voir [1] - 3:12
volume [3] - 123:16, 129:6, 129:21
voluntarily [1] - 86:13
volunteer [1] - 128:11
vs [1] - 110:13

W

wait [4] - 19:13, 32:17, 155:10, 166:13
waiting [5] - 18:23, 141:6, 143:3, 143:5, 143:24
walk [5] - 41:5, 145:8, 146:13, 149:13, 161:2
walked [2] - 33:19, 34:4
wants [3] - 7:13, 143:25, 151:16
warrant [1] - 113:15
warranted [1] - 94:21

washy [1] - 50:23
watch [1] - 17:4
water [30] - 132:9, 132:14, 132:18, 132:24, 133:2, 133:5, 133:6, 133:9, 141:11, 144:16, 145:22, 146:18, 147:5, 147:7, 147:10, 147:19, 147:20, 147:23, 153:25, 154:5, 154:6, 154:13, 154:15, 154:16, 156:12, 160:13, 160:16, 161:16, 162:2
Water [6] - 133:14, 145:23, 147:25, 154:7, 161:18, 161:19
ways [2] - 64:22, 67:18
week [6] - 6:7, 47:18, 56:19, 56:21, 145:13, 163:23
weekend [1] - 49:14
weekly [1] - 150:24
weeks [1] - 25:20
weigh [1] - 81:4
weight [1] - 152:15
WEINER [1] - 2:2
welcome [2] - 31:8, 123:6
welfare [4] - 68:23, 77:16, 84:2, 154:21
well-suited [2] - 104:12, 104:22
wellhead [1] - 154:9
Wellness [1] - 14:9
West [1] - 1:23
wet [1] - 149:3
wetter [1] - 161:17
wheel [1] - 56:18
whole [8] - 92:9, 94:18, 103:18, 113:4, 139:12, 140:13, 140:14, 162:16
wide [2] - 87:22, 125:25
width [2] - 105:19, 105:23
wildlife [1] - 146:10
WILKES [1] - 1:13
William [1] - 1:10
willing [4] - 9:16, 82:8, 82:11, 102:2
wind [1] - 69:1
wise [2] - 45:9, 160:18

wish [3] - 55:6, 56:14, 56:15
wishy [1] - 50:23
wishy-washy [1] - 50:23
WITNESS [1] - 3:1
witnesses [2] - 78:23, 157:9, 158:2
wolves [1] - 146:11
women [1] - 77:17
wondering [3] - 117:14, 117:24, 118:15
Wood [32] - 1:4, 3:22, 4:8, 4:9, 5:2, 36:12, 38:5, 39:24, 40:7, 40:21, 52:20, 52:22, 52:23, 55:1, 62:15, 129:5, 129:8, 129:12, 129:14, 130:5, 130:8, 130:10, 130:15, 130:17, 130:20, 130:22, 132:24, 136:9, 144:5, 146:23, 150:17, 159:24
Woodcliff [2] - 2:6, 52:19
wooded [1] - 146:2
Woods [2] - 153:3, 155:8
wording [1] - 69:6
worker [2] - 47:2, 162:6
workers [2] - 163:25, 165:13, 166:23
works [3] - 111:24, 115:8, 157:23
worthy [2] - 71:23, 154:19
wound [1] - 162:25
wrapping [1] - 95:20
wrestling [1] - 106:18
write [1] - 109:14
written [1] - 86:9

Y

year [12] - 46:5, 46:15, 71:11, 72:14, 85:6, 96:14, 98:12, 109:3, 112:1, 161:17, 161:18, 161:23
years [36] - 11:6, 13:9, 33:16, 36:18, 36:24, 46:17, 60:2, 63:2, 71:12, 77:22, 79:9, 86:6, 86:12, 86:16, 88:18, 111:21,

112:16, 121:2,
124:19, 131:13,
141:6, 144:13,
144:17, 144:25,
145:18, 146:1,
148:11, 155:10,
161:1, 163:4, 163:8,
167:1, 167:3, 167:4,
167:24
**younger** [1] - 56:12
**yourself** [1] - 59:15
**youth** [1] - 95:13

## Z

**zero** [1] - 37:4
**zone** [17] - 63:16,
64:6, 75:23, 79:7,
81:20, 88:16, 89:16,
90:4, 92:13, 96:6,
96:9, 115:10,
115:16, 115:20,
116:4, 116:5
**zones** [2] - 75:17, 96:6
**Zoning** [2] - 84:25,
157:7
**zoning** [20] - 65:13,
65:16, 68:2, 68:9,
81:14, 84:11, 85:22,
86:4, 86:8, 87:13,
89:16, 108:14,
109:14, 109:15,
110:4, 111:24,
113:8, 125:25,
141:20, 142:4

1

```
 1                    BOROUGH OF KINNELON
                      BOARD OF ADJUSTMENT
 2                     SEPTEMBER 2, 2025
                    COMMENCING AT 7 P.M.
 3      --------------------------
        IN RE:                      :
 4      Application No. #1571       :
        21 Wood Chase Lane          :
 5      Palisade Properties, LLC    :
        --------------------------
 6      B E F O R E: KINNELON BOARD OF ADJUSTMENT, THERE
        BEING PRESENT:
 7
        TIM LOCKWOOD, CHAIRPERSON
 8
        MIKE NICOSIA, VICE CHAIRMAN
 9
        FRAN MALETSKY, MEMBER (ABSENT)
10
        CHERYL CANALE, MEMBER
11
        GENE PASSALACQUA, MEMBER
12
        RACHEL HERRINGTON, MEMBER
13
        MORGAN WILKES, MEMBER
14
        RONALD MONDELLO, ALTERNATE MEMBER #1
15
        OLGA GILHOOLEY, ALTERNATE MEMBER #2
16

17

18

19

20

21

22
                  Quick Court Reporting, LLC
23                     47 Brian Road
                West Caldwell, New Jersey 07006
24                     (973) 618-0872
                 Office@quickreporters.com
25
```

2

```
 1    A P P E A R A N C E S:

 2    WEINER LAW GROUP
      BY:  STEVEN R. TOMBALAKIAN, ESQUIRE
 3    629 Parsippany Road
      Parsippany, New Jersey  07054
 4    Attorney to the Board

 5    PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
      BY:  EDWARD W. PURCELL, ESQUIRE
 6    50 Tice Boulevard, Suite 380
      Woodcliff Lake, New Jersey  07677
 7    Attorney for the Applicant, Palisade Properties, LLC.

 8
      A L S O    P R E S E N T:
 9
      JENNIFER HIGHERS, Board Secretary
10
      ALEX PETRESKI, P.E., Darmofalski Engineering, Town
11    Engineer

12    JESSICA CALDWELL, P.P., AICP, J. Caldwell &
      Associates, Professional Planner
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X
      PUBLIC COMMENT          SWORN    PAGE
 2
      Paul Rosenwasser          13       8
 3    39 Chilhowie Drive

 4    Michael Gilhooley                  65
      15 Wood Chase Lane
 5
      Joseph DeFalco                     72
 6    15 Bent Tree Lane

 7    Deborah Gilhooley                  77
      15 Wood Chase Lane
 8
      JESSICA CALDWELL, P.P., AICP          28, 87
 9
```

4

```
 1                 I N D E X (Continued)

 2                  E X H I B I T S

 3    NO.    DESCRIPTION                IDENT/EVID

 4    O-1    Printout from Palisades         10
             Properties Website
 5
      O-2    Printout of North Jersey Recovery
 6           Center Website, 12 Pages        11

 7    O-3    Printout of North Jersey Recovery
             Center Programs Page           15
 8
      O-4    Printout of North Jersey Recovery
 9           Center, "Our Treatment Facilities,"
             Three Pages                    18
10
      O-5    Printout of North Jersey Recovery
11           Center, Insurance Pages, Two Pages  20

12    O-6    Printout of North Jersey Recovery
             Center, "Sober Living Site,"
13           Five Pages                     21

14    O-7    Not identified

15    O-8    Psychology Today Listing       25

16    O-9    Bill A-3973                    29

17    O-10   Bill A-3974                    30

18    O-11   Sober Living Homes and Related  37
             Facilities in North Jersey,
19           Seven Pages

20    O-12   Printout of DB House Website,   40
             "About the Founder"
21
      O-13   Septic Application             43
22

23

24
25              CHAIRMAN LOCKWOOD:  Application 1571,
```

5

1  21 Wood Chase Lane, Palisades Properties.  Thank you
2  for your understanding, Mr. Purcell.
3        MR. PURCELL:  Yeah, no problem.
4        CHAIRMAN LOCKWOOD:  Mr. Purcell, if
5  you'd like to recap kind of where we're at, we can
6  get back to the comments, if you like.
7        MR. PURCELL:  Sure.
8        I'm happy to do that, Mr. Chairman.
9        As I understood it, I think where we
10  were was we were still in the midst of public
11  comment.  So I think that's where we would continue.
12  We were starting to wind down a little bit, but we'll
13  see where we get to tonight.
14        I just have a housekeeping item to
15  raise. There was a comment at the last meeting with
16  respect to a title issue with respect to fences not
17  being permitted.  I did look at that and that was
18  correct.
19        So rather than fences, what we're going
20  to propose by way of a condition of the approval
21  would be to install arborvitae in the location we
22  were discussing.  That's the top area near the
23  parking garage, the parking area, to screen that.  So
24  that's what we would proposing in lieu of a fence.
25        CHAIRMAN LOCKWOOD:  Okay.

6

1        MR. PURCELL:  Then as far as if we do
2  get a vote tonight, I think we are down one board
3  member, correct.
4        CHAIRMAN LOCKWOOD:  We have seven.
5        MS. HIGHERS:  We have seven.
6        MR. PURCELL:  Right.  There is one
7  regular member who is not here.
8        CHAIRMAN LOCKWOOD:  Correct.
9        MR. PURCELL:  So we'll have one of the
10  alternates.
11        CHAIRMAN LOCKWOOD:  Right.
12        MR. PURCELL:  All right.
13        MR. TOMBALAKIAN:  Just to confirm.  I
14  don't believe the board received -- remember, at the
15  last meeting we asked if any of the interested
16  neighbors were to submit anything if they could
17  submit it in advance.  We didn't receive anything.
18        MR. PURCELL:  I didn't receive
19  anything.
20        MR. TOMBALAKIAN:  Did the board receive
21  anything.
22        MS. HIGHERS:  No.
23        MR. PURCELL:  I mean, I looked at it on
24  my own because obviously I was concerned about those
25  comments but...

7

1        MR. TOMBALAKIAN:  That's fine.  I just
2  wanted to make sure that we're not missing some
3  document.
4        CHAIRMAN LOCKWOOD:  Okay.  We'll return
5  to public comment on this application.  Is there
6  anyone from the public who would like to come
7  forward?
8        MR. ROSENWASSER:  I guess I'm on.  Good
9  evening.
10        CHAIRMAN LOCKWOOD:  Good evening.
11  State your name and address, please.
12        MR. ROSENWASSER:  Sure.
13        My name is Paul Rosenwasser at 39
14  Chilhowie Drive.  I've been a resident of Kinnelon
15  for nearly 32 years.  I have background in math,
16  science and business, in which I have excelled.
17  Unfortunately, I have serious cardiac, pulmonary and
18  neurologic problems.
19        I still have my basic mind, so I please
20  apologize for any slowness or difficulties I have.
21  Please be patient with me and respect my perspective.
22  It's taken quite a lot of bit of time and struggle
23  and help from others to communicate this testimony.
24        First I'd like to thank the board for
25  their years of dedicated service in protecting my

8

1  property rights and the community.  I would also like
2  to the express my thanks to the applicant, Mr. Jones,
3  for his effort -- Jonas -- for his effort in helping
4  people recover.  I'm all too familiar with the
5  devastation of substance use disorder.  I'm very
6  familiar with how recovery can help people turn their
7  lives around.
8        The nature of my testimony is to raise
9  fact-based points regarding legal concerns and the
10  negative impacts to granting the applicant a D(1) use
11  variance.
12        We have heard testimony from Mr. Jonas
13  indicating that since its inception in November 2019,
14  100 percent of the residence at 21 Wood Chase Lane
15  attended a single treatment program, the North Jersey
16  Recovery Center, of which he is a 50-percent owner.
17  This leads me to believe that the CSLR is functioning
18  as a dedicated housing facility for his commercial
19  treatment center.
20        Let me show you evidence that supports
21  the concern that 21 Wood Chase Lane is being
22  presented as part of North Jersey Recovery.  I'd like
23  to introduce my first bit of evidence.  I don't know
24  how you guys mark it.
25        MR. TOMBALAKIAN:  We'll mark them like

9

1  O-1, O-2. Should we do that? If you have a copy,
2  please share it with Mr. Purcell. He may object to
3  it. And then if you have multiple copies, if you can
4  distribute it to the board. If there's only one,
5  we'll just share it.
6         MR. ROSENWASSER: Sure. Oh, I brought
7  copies for everyone.
8         MR. TOMBALAKIAN: Give one to
9  Mr. Purcell.
10         MR. ROSENWASSER: Sure, of course.
11         MR. TOMBALAKIAN: Thank you. And if
12  you could describe -- mark that as O-1. If you could
13  describe what it is.
14         MR. ROSENWASSER: It is a screen print
15  -- printout of Palisades Properties' website showing
16  what 21 Wood Chase Lane looks like.
17         MR. TOMBALAKIAN: Is there a date on
18  there.
19         MR. ROSENWASSER: Yes. These are all
20  printed with Google Chrome. And the date on these is
21  -- I think it's for the last hearing, so it would be
22  sometime in July.
23         But what I did is I reviewed their
24  website. I have not seen any marked up differences
25  this time.

10

1         MR. TOMBALAKIAN: So what's been marked
2  as O-1 is a series of printouts from the
3  PalisadesProperties.com website. It's 5 pages, black
4  and white.
5         (Whereupon, Printout from Palisades
6         Properties Website is marked as Exhibit O-1
7         for identification.)
8         MR. ROSENWASSER: Yeah.
9         And just the exhibits are in black and
10  white, in the interest of saving money. They were
11  very expensive to print.
12         And also in the interest of time, any
13  web pages that I have eliminated at the end contain
14  relevant information, again in the interest of cost.
15  And this goes for all of the websites I'm going to
16  present here.
17         This printout here with picture of
18  Palisades Properties known as 21 Wood Chase Lane is a
19  property for which the D(1) variance is being
20  requested. The purpose of this exhibit is to provide
21  a baseline visual representation of what 21 Wood
22  Chase Lane looks like. Please look through it,
23  because there are about 16 pictures in total. Some
24  may be duplicates or near duplicates.
25         The first page of the -- is the

11

1  homepage. It's a screen print of a video of 21 Wood
2  Chase Lane. The subsequent pages are the housing
3  tabs.
4         The next piece of evidence I have is
5  the homepage of the North Jersey Recovery Center. I
6  don't know how you'd like to mark that.
7         MR. TOMBALAKIAN: We'll mark that as
8  O-2. It's the same thing? It's a printout from the
9  North Jersey Recovery Center website.
10         MR. ROSENWASSER: Yes.
11         MR. TOMBALAKIAN: Can you recall when
12  you printed that out.
13         MR. ROSENWASSER: The same time. There
14  are actual dates on it. If you were to break the
15  staples you would see. Oh, here's a copy for the
16  public.
17         (Whereupon, Printout of North Jersey
18         Recovery Center Website, 12 Pages is marked
19         as Exhibit O-2 for identification.)
20         MR. ROSENWASSER: Unfortunately, this
21  one doesn't have a date. But I can attest that I
22  printed this out in July.
23         Oh, am I under oath? I really want to
24  give testimony.
25         MR. TOMBALAKIAN: We don't swear you

12

1  in.
2         MR. ROSENWASSER: Huh.
3         MR. TOMBALAKIAN: Usually we don't
4  swear in members of the public. If you want to been
5  sworn in, we'll swear you in.
6         MR. ROSENWASSER: Yes. I would like to
7  swear in, yes.
8         MR. TOMBALAKIAN: As soon as we have
9  that, we'll swear you in.
10         MR. ROSENWASSER: I'm sorry, what was
11  that.
12         MR. TOMBALAKIAN: As soon as you're
13  done handing that out we'll swear you in.
14         MR. ROSENWASSER: Thank you. Thank
15  you.
16         CHAIRMAN LOCKWOOD: Just as a reminder,
17  we won't be taking any testimony or comment past
18  9:45. I say that every time.
19         MR. ROSENWASSER: I promise I'll finish
20  up by then.
21         CHAIRMAN LOCKWOOD: Thank you.
22         MR. TOMBALAKIAN: So what's been marked
23  as exhibit O-2 is a series of screen pictures from
24  the North Jersey Recovery Center website, printed
25  approximately the same time as Exhibit O-1. I think

13

1  I counted 11 pages -- 12 pages.
2      All right.  Mr. Rosenwasser, do you
3  want to swear you in?
4      MR. ROSENWASSER:  Yes.
5      MR. TOMBALAKIAN:  Do you want to stand
6  up?  Raise your right hand, sir.  Do you swear or
7  affirm that any testimony you provide before the
8  board this evening is the truth?
9      MR. ROSENWASSER:  Yes.
10  P A U L  R O S E N W A S S E R,
11      39 Chilhowie Drive, Kinnelon, New Jersey, having
12      been duly sworn, testifies as follows:
13      MR. TOMBALAKIAN:  Would you please just
14  for the record state and spell your name for the
15  court reporter.
16      MR. ROSENWASSER:  Sure.  My name is
17  Paul Rosenwasser.  It's P-A-U-L.  Last name
18  Rosenwasser, R-O-S-E-N-W-A-S-S-E-R.
19      MR. TOMBALAKIAN:  Thank you very much.
20      MR. ROSENWASSER:  Okay.  So what I'd
21  like you to do is look through the homepage of North
22  Jersey Recovery Center.  And in that you will see 6
23  pictures of the CSLR on their CSLR property that
24  they're applying for the variance actually on their
25  treatment center's web page.

14

1      To me, this is evidence that shows that
2  21 Wood Chase Lane is being presented as part of
3  North Jersey Recovery Center.
4      If you look at the third page here, "We
5  treat substance abuse."  And you'll see 21 Wood Chase
6  Lane on North Jersey Recovery Center's web page right
7  here.
8      To our facilities -- if you look at two
9  of our facilities, there's another five pictures of
10  Wood Chase Lane in that printout there, I believe.
11  The first one being the staircase, which I imagine is
12  Wood Chase Lane.  It correlates back to the other
13  printout.  There is a living room there with a
14  television.  Another living room.  I don't know if
15  the workout room is part of it.  There is a backyard.
16  Another front shot, two of our facilities.  So here
17  -- and again duplicate pictures.
18      So you see 21 Wood Chase Lane being
19  presented as part of North Jersey Recovery Center
20  right on their website.
21      Okay.  Exhibit 3, North Jersey Recovery
22  Center's programs page.
23      MR. TOMBALAKIAN:  We'll mark that as
24  O-3.
25      (Whereupon, Printout of North Jersey

15

1      Recovery Center Programs Page is marked as
2      Exhibit O-3 for identification.)
3      MR. ROSENWASSER:  And as you'll see, in
4  there at the bottom of the first column it says,
5  "Sober Living" under their programs.
6      CHAIRMAN LOCKWOOD:  Thank you.
7      MR. MONDELLO:  So, Mr. Rosenwasser, may
8  I.
9      MR. ROSENWASSER:  Sure.
10      MR. MONDELLO:  So I've actually seen
11  what you have already admitted into evidence.  I saw
12  it on the website as well.
13      I guess the proposition that you're
14  putting forth is that Palisades Properties is a
15  housing facility for North Jersey Recovery Center.
16  So explain to me how that is a negative.  Or you are
17  obviously viewing it as some type of a detriment,
18  some type of a negative aspect, a negative factor.
19  I'm just trying to get my arms around it.
20      MR. ROSENWASSER:  Yeah.  Sure, sure.
21  It's a very valid question.  You know, my
22  understanding of the CSLR statutes is it's to serve
23  the recovery community.  And this over here is
24  serving a treatment center.
25      MR. MONDELLO:  So what you're saying is

16

1  everybody that stays at -- I'm sorry, forgive me --
2  21 Wood Chase Lane must go to the North Jersey
3  Recovery Center?  It's a pipeline is what you're
4  suggesting.
5      MR. ROSENWASSER:  Right.  Well, we've
6  heard evidence that nobody has attended there and not
7  gone there.
8      MR. MONDELLO:  I recall.
9      MR. ROSENWASSER:  And now we're seeing
10  evidence that these are two separate corporations.
11  And pictures of the sober living home is listed on
12  the treatment center's website.  You know, they're
13  really supposed to be two separate corporations.  Now
14  they're being -- they're being presented together.
15      MR. MONDELLO:  And your view would be
16  different if Palisades Properties housed folks that
17  were going all over the place for different recovery
18  programs, is that...
19      MR. ROSENWASSER:  Well, my view on this
20  matter would be different.  But my view of this, it's
21  a detriment to the community the way it's operating,
22  you know, would be secondary to that.  I'm going to
23  make a bunch of points.
24      But yes, regarding this point here is
25  that yes, is -- for me, I question whether this is in

17

1 line with the why requirements of the CSLR --  CSLR
2 statutes, not just 5-72 but the why statutes where,
3 you know, patients have options.  They shouldn't be
4 steered into a certain place.  There shouldn't be any
5 type of, you know, financial benefit between, you
6 know, different levels of treatment, so on and so
7 forth.
8         But that's just a bigger question
9 outside of a zoning board.  But, you know, here we
10 see something really impacting the community, as
11 we've heard testimony already about the nature and
12 its impact to the community.  And what I'm showing
13 here is, like, this is really functioning as a
14 corporation.
15         MR. MONDELLO:  So I think there was
16 some testimony that, you know, rent may be $200 a
17 month, something like that.  So I think what you're
18 also suggesting is because every single resident of
19 21 Wood Chase Lane has to go to North Jersey Recovery
20 and the insurance company pays North Jersey Recovery
21 Center, so we don't care about the $200 a month or --
22 is that...
23         MR. ROSENWASSER:  No, no, no.  I'm not
24 saying anything like that.  What I'm just saying is
25 that it's really a commercial business.

18

1         MR. MONDELLO:  Well, that's how it
2 operates, then.  You wouldn't be able to operate for
3 $200 a month per person, right?  They'd have to have
4 some other mechanism.  And what you're suggesting is
5 the mechanism is North Jersey Recovery Center, I
6 guess has some insurance.
7         MR. ROSENWASSER:  My understanding of
8 the testimony is $200 a week.  That's my
9 understanding.
10         MR. MONDELLO:  Oh, okay.  I probably
11 misheard.  So I with withdraw that.  I'm sorry.  But
12 I understand.  I understand now.  Thank you.
13         MR. ROSENWASSER:  Yeah.  Okay.  Next is
14 a picture of the web pages of the North Jersey
15 Recovery Center's facilities pages.
16         MR. TOMBALAKIAN:  So we'll mark that
17 package as O-4.
18         (Whereupon, Printout of North Jersey
19     Recovery Center, "Our Treatment Facilities,"
20     Three Pages is marked as Exhibit O-4 for
21     identification.)
22         MR. ROSENWASSER:  And this one has, I
23 think, 8-3 on it.  Excuse me.  The dates on these
24 things are 8-3.  That's what they really are.
25 Counsel.  Because I was supposed to give testimony

19

1 last month.
2         MR. TOMBALAKIAN:  So what's been marked
3 as O-4, which is 4 pages, is a printout from the
4 North Jersey Recovery Center website showing pictures
5 labeled "Our Treatment Facilities."  Actually, it's
6 only 3 pages.
7         CHAIRMAN LOCKWOOD:  Sir, are any of
8 these pictures from something other than 21 Wood
9 Chase; do we know?
10         MR. ROSENWASSER:  I believe that they
11 are probably from their treatment facility.  They're
12 actual, you know, places in Fair Lawn.  And they have
13 another -- they have another location.  And then
14 there's probably stock pictures of people shaking
15 hands and being friendly and so on and so forth.
16 That's my guess.  I'm not a -- I didn't design their
17 website.  But I can clearly see what 21 Wood Chase
18 Lane is.
19         So on the treatments facilities page --
20 web page, if you look at that, there's 6 pictures of
21 21 Wood Chase Lane, the treatment facility.  Again,
22 to me this is just lots of evidence that shows 21
23 Wood Chase Lane is being presented as part of North
24 Jersey Recovery Center right on that.  Okay.
25         The next one is their insurance page.

20

1 I'm doing this because it's random, you know.  I'm
2 just driving the point home.
3         MR. TOMBALAKIAN:  Thank you.
4         We'll mark this one as O-5.  It's two
5 pages from the website focusing on insurance.
6         (Whereupon, Printout of North Jersey
7     Recovery Center Insurance Pages, Two Pages is
8     marked as Exhibit O-5 for identification.)
9         MR. ROSENWASSER:  Did I get you guys?
10 MR. PASSALACQUA:  No.
11         MR. ROSENWASSER:  Oh, sorry.  Okay.  So
12 here again, so here's pictures.
13         And there's about 5 pictures of the
14 North Jersey Recovery Center.  And again, you know,
15 my understanding is that they're supposed to be
16 totally separate, totally separate businesses.  And
17 there's supposed to be no, you know, commingling, you
18 know.  The thing is, 21 Wood Chase Lane is supposed
19 to be a standalone CSLR.  It's not supposed to be
20 part of a treatment center.  And here we are seeing
21 it right on their website.
22         Now, here's the one of the sober living
23 page.
24         MR. TOMBALAKIAN:  We'll mark this as
25 Exhibit O-6.

21

1          (Whereupon, Printout of North Jersey
2  Recovery Center, "Sober Living Site," Five
3  Pages is marked as Exhibit O-6 for
4  identification.)
5         MR. TOMBALAKIAN:  It's a five-page
6  handout from the website under -- the first page says
7  "Sober Living Homes in North Jersey."
8         MR. ROSENWASSER:  And I'd like you to
9  turn to the statement on the end of the last page.
10  Al the way -- oh, no.  It's at the end of page 5.
11  It's the last page on this thing.  It says:
12        "While North Jersey Recovery Center
13     does not provide sober living programs, we
14     have a partnership with sober living
15     facilities that we will gladly facilitate
16     admission into for those who need it."
17     You know, so for me, this shows a
18  mechanism that they're using for facilitating housing
19  at 21 Wood Chase right through their recovery center.
20  It's direct evidence that that is, you know, part of
21  their operation there and how these things are
22  joined.
23         MR. MONDELLO:  And you're suggesting
24  that's improper or illegal and it doesn't comply with
25  the state statutes.

22

1         MR. ROSENWASSER:  I'm not suggesting
2  that, yes, it's a possibility that there's -- that
3  something is deeply wrong here, you know.  And I will
4  go into some new statutes that were just passed that
5  clearly try to address this -- these issues here that
6  I'm showing.
7     And to say the other -- the next two
8  exhibits are regarding North Jersey, how it
9  represents itself on a website called Psychology
10  Today.  And that's an industry website where people
11  go and look to find help.  And the first thing I'm
12  going to give you is their About page.
13         AUDIENCE MEMBER:  Can I help you give
14  those out.
15         MR. ROSENWASSER:  I'd rather give them
16  out.  But thank you so much.
17     Here you go.  This is what Psychology
18  Today is.  It's about explaining how it's a renowned
19  industry website.
20         MR. TOMBALAKIAN:  We'll mark this as
21  O-7.
22         MR. PURCELL:  Well, I'd like to have a
23  little more information as to what this pertains to
24  and how it's applicable.  And how is this relevant?
25  I'm not quite seeing it.  First, can you provide a

23

1  foundation for this?
2         MR. ROSENWASSER:  You want me to.
3         MR. PURCELL:  I'd like you to provide a
4  foundation for why this is relevant.
5         MR. ROSENWASSER:  Well, can I give out
6  just the next exhibit.
7         MR. TOMBALAKIAN:  We'll talk about this
8  one first.  Mr. Purcell has objected to it because he
9  wants to know why this is being introduced and
10  marked. Is there a reference to Palisades Properties
11  or.
12         MR. ROSENWASSER:  Well, testimony was
13  given that there's no treatment going on in the CSLR,
14  that anyone can attend but it's never happened.  And
15  that's critical testimony.  This CSLR is supposed to
16  be open to the public.
17     So my question, if we're going to grant
18  a variance to it, you know, is it really operating
19  according to the statutes?  You know, and that's what
20  I'm trying to bring attention here.  And to me, this
21  is just obvious that there's an intermingling here of
22  the CSLR with the treatment center.  And this is a
23  commercial operation here that's beyond the CSLR.
24  It's part of the treatment center.
25         MR. PURCELL:  So Palisades Properties

24

1  provided an expert in sober living and treatment
2  services to come and provide testimony with respect
3  to what role sober living plays in the treatment
4  process and discuss sort of how they're related but
5  it's also separate.  That was a person that could be
6  asked -- people could ask questions of.  She was
7  accepted as an expert in that field by this board.
8  You know, a piece of paper here from a website that's
9  not an expert is nothing that I can question, that I
10  can probe.  I object to the providing of this exhibit
11  on that basis.
12         MR. TOMBALAKIAN:  Mr. Rosenwasser,
13  where -- in these two pages where does it mention --
14         MR. ROSENWASSER:  That's the next --
15  the next exhibit has -- that's explaining it.  The
16  next exhibit is Palisades Properties -- is North
17  Jersey Recovery's page with all pictures of Palisades
18  Properties on it.
19         MR. TOMBALAKIAN:  So you're saying that
20  there's more -- that this is just a portion.
21         MR. ROSENWASSER:  Yes.  That's why I
22  wanted to give out two exhibits.
23         MR. TOMBALAKIAN:  All right.  We'll
24  consider Mr. Purcell's objection after you talk about
25  your next document.

25

1    MR. ROSENWASSER:  And then I'll start
2  going into statute.  So this is Palisades Properties
3  -- I mean, this is North Jersey Recovery Center's web
4  page on -- a listing on Psychology Today.  And you'll
5  see a bunch of pictures of again the CSLR, 21 Wood
6  Chase Lane, on that listing.
7    MR. TOMBALAKIAN:  So we'll mark this as
8  Exhibit O-8.
9    (Whereupon, Psychology Today Listing,
10    is marked as Exhibit O-8 for identification.)
11    MR. PURCELL:  To the extent that all
12  that the objector wishes to put into evidence is just
13  more pictures of the house that happen to be on this
14  --
15    MR. ROSENWASSER:  That happen to be?  I
16  mean, you know...
17    MR. PURCELL:  -- this website, I'm
18  going to object to it.
19    MR. ROSENWASSER:  His witness is
20  allowed to happen to say stuff.
21    MR. TOMBALAKIAN:  Are you objecting or
22  not objecting.
23    MR. PURCELL:  I'm not.  I'm withdrawing
24  it.
25    MR. TOMBALAKIAN:  He's not objecting to

26

1  it.
2    MR. ROSENWASSER:  Oh, sorry, Counsel.
3    So again, here we see four pictures of
4  the CSLR property on Psychology Today's website under
5  the name of North Jersey Recovery Center.
6    So my thing is, I heard all this
7  testimony, but I'm showing stuff counter to it that
8  shows that there's possibly something different going
9  on there between these two, that they're really not
10  separate entities, that they function very tight
11  together and the CSLR serves the treatment center.
12  And to me, that's not what a CSLR is supposed to be.
13  And it's putting a true business, not a CSLR as a
14  business, but a part of a treatment facility in a
15  residential neighborhood.  That's my argument.  And
16  this is proof of the fact that they're very much
17  connected.
18    CHAIRMAN LOCKWOOD:  You're saying that
19  that's illegal.
20    MR. ROSENWASSER:  I believe that
21  there's a good chance that that's inviolate to the
22  order of the CSLR statutes.  I'd like to go into that
23  if this is where we want to go with it.
24    CHAIRMAN LOCKWOOD:  Well, can I ask
25  Mr. Purcell his thoughts on what you just stated?

27

1  Because I'd like to know if that's the legal.
2    MR. PURCELL:  I'm not aware of any of
3  regulations that would indicate that to me.  At the
4  end of the day, what -- I can actually quote what the
5  CSLR regulations say here.  It's the regulations
6  defining a CSLR.  It's a residential setting solely
7  at a home for individuals who are recovering from
8  drug and alcohol addiction to recover or intend to
9  provide an environment where residents can support
10  each other's sobriety and recovery.
11    That's N.J.S.A. 5:27-8.1.
12    You know, there is a relationship
13  between Palisades Properties and North Jersey
14  Recovery.  You know, we've discussed that.  You know,
15  there's nothing that I'm aware of with respect to
16  regulations that would make that unlawful or in
17  violation of those regulations.
18    CHAIRMAN LOCKWOOD:  Thank you.
19    MR. ROSENWASSER:  So standalone,
20  according to 5:27, which just says what a CSLR is, I
21  don't disagree with that.  But it's the broader
22  healthcare regulations, you know, and separation of
23  treatment center and CSLR which I believe they're in
24  violation of -- or excuse me -- which I am concerned
25  that they may be in violation of.  And I've been

28

1  seeing evidence here, you know, of connection that is
2  very concerning.  They're supposed to be separate.
3  And why is there -- why is the CSLR all over their
4  treatment center site?
5    CHAIRMAN LOCKWOOD:  Do you know of a
6  regulation that prohibits what they're doing.
7    MR. ROSENWASSER:  Well, I'm going to go
8  into -- I've got some stuff to read.
9    MS. CALDWELL:  Mr. Chair, if I could
10  just add one thing.
11    Later on in the definition that
12  Mr. Purcell was just reading it does say that no
13  provision of onsite counseling, therapy, clinical
14  treatment or alcohol and/or drug services by the
15  licensee, and also no onsite counseling, therapy,
16  clinical treatment or other personal services by the
17  licensee --
18    MR. PURCELL:  I agree with that.
19    MS. CALDWELL:  -- are part of the CSLR.
20    MR. PURCELL:  And I agree with that
21  definition.  That is true.  That's perfectly fine
22  because none of those services take place at the
23  property.
24    MS. CALDWELL:  It sounds like maybe
25  he's alleging there is.

29

1  MR. PURCELL:  Well, we can talk about
2  that on cross-examination.
3          MR. ROSENWASSER:  But, you know, I
4  didn't say any of that.  I didn't allege any of that.
5  Okay.
6          So the next piece of evidence is a new
7  law that was signed in.  And it's the law concerning
8  patient referrals to substance use treatment
9  facilities, recovery residences and clinical
10  laboratories.  That's Bill A-3973.  And it was signed
11  into law on August 11th.
12          And this is the broader statutes.  It's
13  not -- we're not just looking at a house that houses
14  recovery people.  There's a lot of statutes that
15  protect these people.
16          MR. TOMBALAKIAN:  So we'll mark Bill
17  A-3973 as O-9.
18          (Whereupon, Bill A-3973 is marked as
19          Exhibit O-9 for identification.)
20          CHAIRMAN LOCKWOOD:  Thank you.
21          MR. ROSENWASSER:  And this is just a
22  revision to the existing ones.  They're not brand-new
23  laws.
24          Here's the second bill that was signed
25  into law.  And again it just enhances existing laws.

30

1  And this prohibits the use of deceptive marketing
2  practices by substance use disorder treatment
3  providers.
4          MR. TOMBALAKIAN:  So we're going to
5  mark as O-10, Bill A-3974, approved into law on
6  August 11th, 2025.
7          (Whereupon, Bill A-3974 is marked as
8          Exhibit O-10 for identification.)
9          MR. ROSENWASSER:  I'll be honest with
10  you, I didn't want the testimony to go there, you
11  know.  I didn't want the testimony to go here.  But
12  I'm forced.
13          Okay.  So if we look at Bill 3973,
14  let's turn to page 4, starting on line 5 through 26.
15          CHAIRMAN LOCKWOOD:  So is that the
16  first page of the act?  What are we referring to.
17          MR. ROSENWASSER:  Yes.  Well, it's --
18  yeah, it's -- if you look at the -- if go into Bill
19  3974 and you go to the fourth page.
20          CHAIRMAN LOCKWOOD:  74 or 73.
21          MR. ROSENWASSER:  74.
22          MR. PURCELL:  Excuse me.  I just have a
23  question.  The bill you have here, Bill A-3974, has a
24  certain page.  It says A-3973.
25          MR. ROSENWASSER:  Oh, did I give you

31

1  the wrong one.
2          MR. PURCELL:  Did you give us the same
3  bill twice.
4          CHAIRMAN LOCKWOOD:  Yeah, I don't have
5  that issue.  Mine is correct.
6          MR. PURCELL:  Both of my -- both of my
7  documents say...
8          MR. ROSENWASSER:  So it says in here:
9          "Any marketing or advertising material
10  published or disseminated by the treatment
11  provider shall provide accurate and complete
12  information in plain language and shall
13  include the types of methods and services
14  provided, information about the location in
15  which they provide it, the treatment provider
16  or recovery residence, name, brand, phone
17  number" -- and so forth.
18          "It shall be unlawful to practice
19  pursuant to P. L. 1960, CC 39 C56-8-1, et seq.
20  For treatment providers or recovery residences
21  as applicable to make false or misleading
22  statements time about the treatment providers
23  or recovery resident status in-network or
24  out-of-network provider, provider direct, any
25  other person or entity to provide false or

32

1  misleading information about the identity of"
2  -- identity of "or contact information for any
3  treatment provider or recovery residence,
4  include false or misleading information about
5  the internet address of any treatment
6  providers or recovery residence website to
7  surreptitiously direct or redirect the person
8  to another website, suggest or imply that a
9  relationship on affiliation with another
10  treatment provider or residence exists unless
11  the other treatment provide or recovery
12  resident has provided express written consent
13  to indicate that relationship, make false or
14  misleading statements about the substance use
15  disorder treatment service, the provider or
16  recovery the residence provides, makes false
17  or misleading statements about the geographic
18  location of treatment provider or recovery
19  residence of the geographic location in which
20  the treatment provider or recovery residence
21  provides substance use disorder treatment.
22          "Any provider who violates the
23  provisions" of the section -- "of this
24  subsection shall be liable for civil penalty
25  of no more than $20,000.00 for each

33

1  violation."  The civil -- "the penalty
2  collected shall be pursuant to the penalty of
3  enforcement of law."
4           Anyone suffering damages, blah blah
5  blah.
6           You know, so for me, I, you know,
7  believe that there is, you know, misleading
8  information about the location of the CSLR, you know,
9  that it's being represented as a facility of North
10 Jersey Recovery Center with no address on it.  It's
11 being misrepresented as part of North Jersey Recovery
12 Center.
13          So there's a lot of misleading stuff
14 here.  And, you know, for me as a citizen of this
15 town, you know, I say to myself, how could we approve
16 this if there's a question in their operation and in
17 their business practice that's potentially in
18 violation of the broader statute, not in 5-27, the
19 CSLR does this and doesn't do that and it's all good?
20          You know, there's something bigger here
21 than just that building on a piece of land looking
22 for a D variance.
23          I'd like to continue on to present
24 3973. And I'll just read it.
25          "Any person, including but not limited

34

1  to a healthcare facility, is guilty of a crime
2  in the 4th degree either directly or
3  indirectly in kind soliciting offers or
4  receiving payment or furnishing or otherwise
5  solicit or offer any fee, commission, kickback
6  or rebate to any person in connection with
7  referral of patients to in exchange for a
8  patient's use of service.
9          "A facility is licensed according to
10 Section 8 of P. L. 1975, C305 C26-2B-14 for
11 substance use disorder treatment services.
12 Substance use treatment facility is issued
13 certificate of approval pursuant to
14 P. L. 1970, C334, C26-2G-21, recovery
15 residents or clinical lab.  Notwithstanding
16 the provisions, a person convicted of this
17 offense shall be sentenced to make restitution
18 or pay a fine of $50,000."
19          That's all the fine stuff but...
20          Oh, that's a shame.  A whole bunch of
21 this is cut off.  Shoot.  I only have four pages here
22 of 373.
23          MR. TOMBALAKIAN:  Our version of O-9,
24 which is A-3973, has the cover page.  It looks like
25 it's the full three pages of the act.

35

1          MR. ROSENWASSER:  Yeah, okay.  I've
2  just got to find out --
3          MR. TOMBALAKIAN:  It ends with, you
4  know, "This act shall take effect immediately" is
5  usually the last line.
6          MR. ROSENWASSER:  Right, right.
7          MR. TOMBALAKIAN:  You think a portion
8  of this is missing.
9          MR. ROSENWASSER:  No, no, no.  It's
10 here. It's here.
11          So, you know, my concern is, you know,
12 there is either directly or indirectly, overtly or
13 covertly, you know, takes cash -- cash or kind, you
14 know, there's a financial, you know, relationship
15 here that the CSLR benefits from the treatment center
16 and the treatment center benefits from the CSLR.  So
17 there's all kinds of in good -- an in kind
18 relationship going back and forth here.  And to tell
19 you the truth, I just don't know if it's -- you know,
20 I question its compliance with these -- with these
21 statutes and the Board of Healthcare statutes.  And,
22 you know, patients are not to be steered or
23 influenced.  They're supposed to be given freedom of
24 choice.  There's all kinds of statutes for patient
25 choice.

36

1          So what I see here is a treatment
2  center steering people into the CSLRs.  And we're
3  supposed to host this type of CSLR.  I just don't
4  feel comfortable hosting this type of, you know,
5  business in our community.  That's where I'm going
6  with this.
7          Are you ready for me to continue my
8  testimony?
9          CHAIRMAN LOCKWOOD:  Are you done.
10          MR. ROSENWASSER:  No.  I've got more.
11          CHAIRMAN LOCKWOOD:  Okay.
12          MR. ROSENWASSER:  Okay.  So here's my
13 next exhibit.  These are sober living homes near
14 North Jersey Recovery Center.  Remember, Mr. Jonas
15 went on a journey to find the place where he could
16 find a home.  A lot of places rejected him.
17          MR. PURCELL:  Are these -- are these
18 CSLRs, or are these Oxford Houses.
19          MR. ROSENWASSER:  Half of them are
20 CSLRs and half of them Oxford.  Half of them are
21 sober living houses and half of them are Oxford.
22          MR. PURCELL:  Do you mean CSLRs?  Sober
23 living houses or CSLRs.
24          MR. ROSENWASSER:  Sober living
25 residences.

37

1     MR. TOMBALAKIAN:  So what we're going
2  to mark as O-12 is one, two, three, four, five, six
3  -- I'm up to 12 -- no, I'm sorry, O-11.  O-11 is -- I
4  lost my page -- is a seven-page handout regarding
5  sober living homes and related facilities located in
6  North Jersey.
7          (Whereupon, Sober Living Homes and
8          Related Facilities in North Jersey, Seven
9          Pages is marked as Exhibit O-11 for
10         identification.)
11     MR. ROSENWASSER:  Okay.  So the first
12  page here is Google Maps.  And I basically did a
13  finding the direction and finding the distance, the
14  driving distance, between North Jersey Recovery
15  Center and 21 Wood Chase Lane.  It's 21 miles.
16          So I pulled up -- I looked on the
17  internet.  I looked at homes that were -- didn't have
18  a minimum stay, because who knows how long an
19  outpatient program could be.  Yeah.  Oh, and had
20  openings.  And they didn't have -- you didn't have to
21  go a specific treatment center.  So I kind of took a
22  look at what, you know, the functional requirements
23  were for somebody needing to live in a sober home.
24  In these cases, these place required sobriety, drug
25  tests, attendance at 12-step meetings.  And they had

38

1  a whole bunch of house rules.  You had to do cleaning
2  and all that stuff.
3          I found this place call DB House.
4  That's on the second page here.  It actually has --
5  you know, and here's an explanation.  Oh, it's a
6  sober living and it's group of Class F license, male
7  and female sober living homes in Bergen and Passaic,
8  you know.  And it has a capacity of 100 men and 7 --
9  24 women.
10          If you look on the one, two, three,
11  fourth page, it lists seven locations there.  There
12  are seven locations.  And it shows what the capacity
13  is at each location.
14          And I spoke with actually the owner.
15  And he said that, you know, they always -- there's
16  always openings.  They could always get someone in.
17  Sometimes they're more full than other.  But they can
18  always get someone in.
19          Then I went to the Oxford Houses
20  website.  And I just took a look at houses which were
21  -- their website uses the distance of as a crow
22  flies.  It's not driving miles.  And I just used 66
23  percent of it and ran a quick check.  And there was
24  95 beds available -- bed capacity with -- hold on a
25  second -- with six openings.  And that was -- and if

39

1  you see the date on it, that's today.
2          So, you know, this idea that, you know,
3  North Jersey Recovery Center needs 21 Wood Chase to
4  serve the recovery community, I'm showing here
5  resources that it does not need, you know, a
6  dedicated home in Kinnelon to serve its recovery
7  community, to serve its business model.
8          The thing that I will go out on a limb
9  here and say is that, that beautiful home looks
10  really nice on that website.  And maybe what
11  distinguishes North Jersey Recovery Center from, say,
12  another recovery center is a high-end luxury home,
13  you know.  So but that's not what sober living
14  residences are about.  They're about serving the
15  recovery community.  They're not about serving a
16  recovery center's treatment model, you know.
17          So, you know, and the other thing is,
18  you know, the founders's story here is mixed pieces
19  of information I'd like to submit about DB Houses.
20  It's not as exciting as engineering.
21     MR. PETRESKI:  It's not.
22     MR. TOMBALAKIAN:  So we're going to
23  mark as Exhibit O-12 a printout from the DB House
24  website, a page entitled "About the Founder" web
25  page.

40

1          (Whereupon, Printout of DB House
2          Website, "About the Founder," is marked as
3          Exhibit O-12 for identification.)
4     MR. ROSENWASSER:  And we see on here on
5  the second paragraph, on January 20, 2019, the
6  founder's fathers passed away.
7          And it goes on to say that he had --
8  and being a hard worker, was smart, smart with his
9  earnings, he left and his siblings some inheritance
10  which allowed him to start DB -- DB House. And we
11  heard testimony that a house couldn't be found closer
12  than Kinnelon.  And here's a guy who started in 2019
13  and found seven houses close to Kinnelon.
14          So, you know, to me I'm not seeing the
15  need for this other than to serve some type of
16  business model and not to really establish a CSLR to
17  serve an inherently beneficial need to the recovery
18  community.
19     MR. PURCELL:  I'm going to make an
20  objection to Mr. Rosenwasser -- is that right.
21     MR. ROSENWASSER:  You got it.
22     MR. PURCELL:  -- Mr. Rosenwasser's
23  statements with respect to blanket statements with
24  respect to need for these facilities.
25          Mr. Rosenwasser has not been qualified

41

1  as an expert in this area.  He is providing
2  cherry-picked information that he's seeking to use to
3  accentuate his point.
4          But I take issue and I object to those
5  statements.
6          CHAIRMAN LOCKWOOD:  Okay.
7          MR. ROSENWASSER:  Well, I would just
8  like to say that I am entitled to my opinion.  And
9  I'm not -- I wasn't sworn in as an expert.  And I
10  believe that Counsel can give counter points, you
11  know, and that would be the appropriate thing.  He
12  could discard my testimony.  But my testimony, I am
13  not claiming to speak -- to speak here as an expert,
14  so I really shouldn't be judged as an expert and
15  disqualified.  My voice matters and my opinions
16  matter.
17          CHAIRMAN LOCKWOOD:  How do you feel
18  about cross-examination bringing up those points.
19          MR. PURCELL:  Yeah, sure.
20          CHAIRMAN LOCKWOOD:  Okay.
21          MR. ROSENWASSER:  All right.  Okay.
22  Moving right along.  It's the home stretch.
23          MR. MONDELLO:  Paul, I had asked
24  Mr. Jonas that question about Fair Lawn.  I said,
25  wouldn't it be -- and he didn't say that there wasn't

42

1  anything available.  He said it was difficult to find
2  a homeowner who would agree to rent to, I guess,
3  addicts.
4          That's what I recall the testimony.
5          MR. ROSENWASSER:  Right, right.
6  Whatever it was, this guy --
7          MR. MONDELLO:  There wasn't any
8  evidence, but that was his testimony.
9          MR. ROSENWASSER:  Right.  This fellow
10  found seven.
11          CHAIRMAN LOCKWOOD:  Did DB House
12  purchase those homes, or did he rent them.
13          MR. ROSENWASSER:  See, I can't give
14  testimony to that.  And that's just where I would
15  say, I don't know.  According to the website, he
16  started in 2019.  I don't know if they were existing
17  homes.  I really don't know.  And I'm aware of the
18  weakness of my point there.  I'm just saying that
19  someone was able to do something.  You know, if this
20  gentleman found seven homes and they worked for his
21  -- and he owns -- he owns a treatment center.
22  There's a treatment center associated with these too.
23  They work for him, you know, closer to his treatment
24  center.
25          And that's true testimony.  That's

43

1  something -- well, I had a conversation with him.  He
2  said yes, we have a treatment -- I own a treatment
3  center.  And you could come here and go to our
4  outpatient facility, you know, so on and so forth, or
5  someone can.
6          Anyway, this one is lengthy.  So a
7  picture of the septic application.
8          MR. TOMBALAKIAN:  So we're going to
9  mark as Exhibit O-13 a copy of the application.  What
10  is this application, Mr. Rosenwasser.
11          MR. ROSENWASSER:  I'm sorry, what is
12  that.
13          MR. TOMBALAKIAN:  Is this the septic
14  application.
15          MR. ROSENWASSER:  Yes, the septic
16  application.
17          (Whereupon, Septic Application is
18          marked as Exhibit O-13 for identification.)
19          MR. ROSENWASSER:  And I believe there
20  will be more testimony about the septic.  I'm just
21  going to speak to a little part of it.  That's all.
22          MR. TOMBALAKIAN:  Okay.
23          MR. ROSENWASSER:  So commentary was
24  made that this septic was a commercial type of unit.
25  And Counsel questioned that, whether it was or not.

44

1  And the application here, if you look on page 1, line
2  item 6, Type of Facility:  Commercial, Industrial.
3          And then if you look on page 9 -- it
4  might be page 8, okay, Volume of Sewage.  And on line
5  1 there it says, "Commercial, Institutional."
6          So, you know, this isn't a residential
7  septic.  And this is evidence that shows that.
8  They're installing some commercial in a residential
9  neighborhood.
10          The other thing here is there's
11  actually an error in the gallons -- sewage gallons
12  per day.  In the calculation there's a mathematical
13  error.  If you add all of this stuff up, it's greater
14  than 1,027.5.
15          MR. PETRESKI:  What page is that.
16          MR. ROSENWASSER:  The top of page 8.
17  If you add them all up, it's 650 to 25 is 695 plus
18  332.  Oh, 45.  So that's 695.  But do you see the 50
19  percent of the daily volume, do you see that it's 665
20  there? That should really be 695.  Do you follow me?
21  Because that daily volume is not 665; it's 695.
22          CHAIRMAN LOCKWOOD:  Where is that, sir.
23  I don't -- oh, okay, yeah, yeah.
24          MR. ROSENWASSER:  Yeah.  Do you see 5
25  units times 150 gallons per day, 650; 3 employees,

45

1  45; laundry 50 percent of that. And the gallons per
2  day should really be 695 times 50 percent, not -- not
3  665 times 50 percent. So the system isn't even
4  specked correctly.
5          The next thing I'd like to show you is
6  -- the second page from the end is a picture of the
7  septic system. And if you look over here, there's a
8  little line that says W in there. It's like a
9  squiggly line from the street. And it zigzags -- it
10 zigzags up and down here. Can you see that? That's
11 the water line. And what this shows is the water
12 line going right into the disposal head.
13         Now, if you turn to next page, here's
14 the New Jersey regs that say the minimum distance
15 requirements for a water line in service to a septic
16 tank is 10 feet. There is no resolution or
17 indication in this drawing of how they're going to
18 meet that requirement. So to me the issues with the
19 septic line aren't resolved.
20         CHAIRMAN LOCKWOOD: So you're saying
21 that the water service line has to be 10 feet from
22 the septic tank, right.
23         MR. ROSENWASSER: Well, the regs are
24 saying that. I'm just quoting the regs.
25         CHAIRMAN LOCKWOOD: Yeah. When I look

46

1  at line W -- and I'm not an expert at this. I really
2  don't know. Is the circle up here the septic tank.
3          MR. ROSENWASSER: I'm not exactly sure.
4  But it has to go within --
5          CHAIRMAN LOCKWOOD: This is just --
6          AUDIENCE MEMBER: I'm going to explain
7  that in my... I'm going to come up next and explain
8  what's going on.
9          CHAIRMAN LOCKWOOD: Okay.
10         MR. PETRESKI: So there's that
11 rectangular area that's in the dashed lines. That's
12 the existing septic system. Adjacent to it is that
13 circle. That's the pump tank. As you go further up
14 on the other side of the stone wall, that is -- it
15 appears that's a pretreatment unit. And then up
16 above that is the septic line. So there seems to be
17 a tank, pretreatment unit, and then that pressure
18 tank. And then that goes out to the disposal field.
19         Then in the solid black lines, you see
20 that extension being proposed to this disposal field.
21 And then with the cross-hatch in gray, you see that
22 is a reserved area. So you're allowed to take credit
23 if you're using pretreatment or if you're using a
24 pressure field. But I think you still have to have
25 enough reserve area if so in the future you don't

47

1  have a pretreatment tank or your system changes, you
2  have enough room to extend it. What I'm seeing here.
3          What I'm seeing here is based on the
4  survey. There's a curb box. If you look, there's a
5  double solid line. That is the curb along Wood Chase
6  Lane. About a foot behind it is WV. It means Water
7  Valve. That's your curb box. That's where you can
8  shut off your water at the street.
9          And then you can see coming off of that
10 in the zigzag pattern, you see a water line. And
11 then it terminates somewhere in this drawing. And
12 I'm preserving that the surveyor was unable to -- I
13 mean, they probably called for a markup before doing
14 their survey and they weren't able to locate where it
15 finished. I'm presuming it goes up and then turns
16 left toward the house. I'm only presuming.
17         Yeah, there are regulations on
18 separation from water lines. And the health
19 department would have to take a second look at this.
20         MR. ROSENWASSER: Thank you.
21         So I was going to say, these are my
22 exhibits but not my testimony.
23         In closing, I want to say that we live
24 in a rural community, and having this CSLR here has
25 just been a detriment to the people living around it.

48

1  And I would like to just give some of my own
2  testimony.
3          I could, you know, empathize with
4  Ms. Ritacco who gave testimony about the cars -- the
5  employees pulling up on her driveway. That, you
6  know, I had someone come to my house and try to gain
7  entry while I was there because it was the wrong
8  home. It turned out it was my neighbor's elderly
9  relative, and they mistook the house. And I have
10 latches that turn. So they were trying to get into my
11 house and yelling let me in and banging. And I
12 called the police.
13         And in this community, what separates
14 us from, say, a suburban community or a fully rural
15 community is that people kind of mistake houses, you
16 know. And, you know, for me, when my cameras go off
17 and I don't know there's a delivery coming, it's
18 very, you know, stressful. So, you know -- and I
19 don't believe there's a remedy for this. You know,
20 we've got this, you know, history -- and we're going
21 to hear more about it -- of how the disruptive the
22 CSLR to the community. And, you know, I don't think
23 there's a reasonable accommodation that can be made
24 for that disruption.
25         So, anyway, and I'm very, you know,

49

1  attuned to it, you know. And again, I respect the
2  recovery community and the need for recovery
3  residences, but this isn't the good fit for it, you
4  know. And, you know, that's basically my testimony.
5         MR. MONDELLO: Real quick, Paul, if I
6  might. I know that you've got some data here about
7  Elmwood Park. Do you have any data as to the CSLRs,
8  sober homes or Oxford homes in Kinnelon, surrounding
9  towns.
10        MR. ROSENWASSER: If you look at that
11  list, it would tell you the -- it goes into the CSLRs
12  within the vicinity of Fair Lawn. And you can
13  probably interpolate what -- you know, what might be
14  Morris County. There are a couple in Morris County.
15  But I don't have that off the back of --
16        MR. MONDELLO: That's okay.
17        Thank you.
18        MR. ROSENWASSER: You know, but it is
19  -- you can infer something from -- from that -- from
20  that information there. You have to go to their
21  website and type in "Kinnelon" to get... Yeah.
22        It's interesting. Like, the Oxford
23  House has a very good finder. But finding CSLRs is
24  very difficult. Sober living is very difficult.
25  It's very hard to find Palisades Properties website,

50

1  you know. The only one that was really easy to find
2  was DB House, you know.
3         MR. MONDELLO: Thank you.
4         CHAIRMAN LOCKWOOD: Any other questions
5  for Mr. Rosenwasser?
6         Mr. Purcell?
7         MR. PURCELL: Yeah. Just a few things.
8  I'm not going to take that long.
9         Mr. Rosenwasser, with respect to
10  Exhibit O-3, you listed a number of -- that's the
11  website NorthJerseyRecovery.com. I think it's the
12  Program Services tab.
13        MR. ROSENWASSER: Yes.
14        MR. PURCELL: Now, the provision of
15  intervention, therapy services and in- and outpatient
16  services, do you understand that to be part of the
17  treatment center operation.
18        MR. ROSENWASSER: Do I understand that
19  to be part of a treatment center operation? Usual
20  therapy group setting? Here the way I perceive this
21  is this is what North Jersey Recovery Center is
22  listing as their therapeutic services and their
23  programs. So for me to say do I perceive that as
24  part of -- the way I perceive this is I perceive this
25  as part of North Jersey Recovery's therapeutic

51

1  services. That's how I perceive it.
2         MR. PURCELL: Is North Jersey Recovery
3  Center a treatment center.
4         MR. ROSENWASSER: That's what I've been
5  -- I believe it's a treatment center.
6         MR. PURCELL: And a treatment center
7  provides recovery services.
8         MR. ROSENWASSER: Well, it's North
9  Jersey Recovery Center. I believe it provides
10  recovery services, yes.
11        MR. PURCELL: And I think you've, you
12  know, stipulated to this or stated this. I just want
13  to double check. Do you have any evidence that any
14  of these services, intervention, therapy service,
15  outpatient program, medication, assisted treatment,
16  evening intensive outpatient treatment, outpatient
17  program, partial care program, rehab for men, relapse
18  prevention program, holistic, parents of addicts,
19  individual therapy, group therapy, family therapy,
20  cognitive behavioral therapy, behavioral modification
21  therapy, dialectical behavioral therapy, do you have
22  any evidence that any of those activities take place
23  at the sober living home at 21 Wood Chase Lane?
24        MR. ROSENWASSER: I have never
25  attended --

52

1         MR. PURCELL: Yes or no.
2         MR. ROSENWASSER: I have never attended
3  a treatment there, so I wouldn't know.
4         MR. PURCELL: That's a yes-or-no
5  question. Do you have any evidence that any of these
6  --
7         MR. ROSENWASSER: Well, the answer is
8  based on the fact that I've never attended treatment
9  there. I don't know.
10        MR. PURCELL: So the answer is no.
11        MR. ROSENWASSER: Can you repeat the
12  question.
13        MR. PURCELL: Do you have any evidence
14  that any of these treatment services are taking place
15  at 21 Wood Chase Lane.
16        MR. ROSENWASSER: No, I don't have any
17  evidence.
18        MR. PURCELL: Thank you.
19        MR. ROSENWASSER: Am I free to go.
20        MR. PURCELL: No. No, you're not.
21        CHAIRMAN LOCKWOOD: Wait. I'm sorry.
22        MR. PURCELL: Have you -- I know you
23  called the number -- or you contacted DB Recovery
24  House. How many other CSLRs did you contact.
25        MR. ROSENWASSER: Well, again you're

53

1 asking specifically CSLRs. And the word is, I looked
2 for sober living places. And I saw one other place.
3 And in the interest of time, I didn't put it on the
4 website.
5          MR. PURCELL: You looked at one other
6 place. What other place did you look at.
7          MR. ROSENWASSER: I don't recall its
8 name. But it was a very small facility. And it was
9 full.
10          MR. PURCELL: So when you say -- when I
11 say "CSLR," I mean cooperative sober living
12 residence. That's what you're using the word sober
13 living home.
14          MR. ROSENWASSER: No. I don't -- I
15 don't -- I don't distinguish between them. You know,
16 I'm looking at it from a point of view as a consumer.
17 You know, a CSLR is a legal term. When somebody is,
18 you know -- you know, I look at the North Jersey
19 website and it says, you know, sober living. It
20 doesn't say cooperative sober living. I look at
21 Palisades Properties, and it doesn't say cooperative
22 sober living. People look for sober living. They
23 don't look for cooperative sober living.
24          MR. PURCELL: So you include in that
25 term an Oxford House in sober living.

54

1          MR. ROSENWASSER: No. I clearly -- I
2 clearly distinguished it. In the regs there's a
3 clear distinction between Oxford Houses and CSLRs,
4 right. So clearly with the Oxford House, I, you
5 know, clearly identify that as an Oxford House. And
6 CSLR, I didn't necessarily look for that because it's
7 -- you know, to go into an outpatient program, one
8 doesn't require, you know, being in a CSLR, you know.
9          MR. PURCELL: Okay.
10          MR. ROSENWASSER: As far as I know.
11          MR. PURCELL: Um-hmm. So your comment
12 with respect to -- let's just focus on the DB
13 Recovery Center. If I can just go to something else.
14          Do you have any information to state
15 whether or not it's unusual if a CSLR has an
16 affiliation with a treatment center?
17          MR. ROSENWASSER: Do I have any what?
18          MR. PURCELL: Do you know if it's
19 unusual -- any study that's studied whether or not
20 it's unusual if a CSLR is affiliated with a treatment
21 center?
22          MR. ROSENWASSER: Do you think it's
23 unusual?
24          MR. PURCELL: No. Have you looked at
25 that question.

55

1          MR. ROSENWASSER: I haven't studied any
2 -- how would you say? What's the word? I haven't
3 looked at any scholarly articles, any such articles.
4          MR. PURCELL: You just called up one
5 CSLR? You called up the DB House.
6          MR. ROSENWASSER: That was the only one
7 I could find. Everything else was basically a
8 treatment center with dedicated beds. Which, you
9 know, I just found North Jersey Recovery Center is,
10 you know, using that CSLR as dedicated beds.
11          MR. PURCELL: When you say you can't
12 find, you couldn't find any information about CSLRs,
13 you didn't go to the DCA's website for a list of
14 CSLRs on DCA's website.
15          MR. ROSENWASSER: I have no idea what
16 that is.
17          MR. PURCELL: New Jersey Department of
18 Community Affairs' website.
19          MR. ROSENWASSER: No. Well, thank you.
20 I'll know for the future.
21          MR. PURCELL: Yeah, no, that's fine.
22          With respect to DB Recovery Center,
23 just to confirm your testimony, you -- well,
24 actually, when you called them up, did you say that
25 you were looking for information about CSLRs for the

56

1 purposes of providing testimony at a zoning board
2 hearing?
3          MR. ROSENWASSER: No. I had a
4 situation that's personal where someone might need
5 the service, so I told them about that situation.
6          MR. PURCELL: Okay. And then -- but
7 the other benefit of it was that you were looking for
8 information for the purpose of the hearing.
9          MR. ROSENWASSER: Yes.
10          MR. PURCELL: With respect to DB
11 Recovery Center, the owner stated that -- the DB
12 Recovery -- the DB Home or DB House is affiliated
13 with a recovery center, correct?
14          MR. ROSENWASSER: Yes. But he said you
15 could go to any -- any -- any recovery recenter.
16          MR. PURCELL: Okay. You talked about
17 Oxford Houses. How many Oxford House are there in
18 Morris County.
19          MR. ROSENWASSER: That, I don't know.
20          MR. PURCELL: That's Exhibit O-11.
21          MR. ROSENWASSER: That wasn't the
22 purpose of that exhibit. Oxford House is the first
23 in proximity to the North Jersey Recovery Center.
24          MR. PURCELL: Is this not a list of all
25 of them in the state, or is this just what --

57

1 MR. ROSENWASSER: Those are a list --
2 if you take a look at the top, there's a search
3 criteria by ZIP code. And then it goes by distance
4 from that ZIP code. That's all it is. So it's
5 distance from North Jersey Recovery Center.
6 MR. PURCELL: And what's the distance.
7 MR. ROSENWASSER: Of.
8 MR. PURCELL: It's 3.1 miles, 4.1
9 miles.
10 MR. ROSENWASSER: Yeah. Those are, you
11 know, as the crow flies.
12 MR. NICOSIA: Mr. Purcell, for the sake
13 of the board, can you clarify what an Oxford House
14 is.
15 MR. PURCELL: Sure.
16 So an Oxford House, just to -- an
17 Oxford House is a home that's owned by -- I think
18 it's owned by non-for-profit. But it is -- it's
19 lived in by people who are in recovery. They
20 have kind of a democratic process that they live
21 together. There's no -- there's no oversight except
22 for the oversight they give themselves.
23 I'll just say that in the CSLR
24 regulations when they were adopted, they did make a
25 point to say that CSLRs have more oversight than an

58

1 Oxford House, and that's a good thing.
2 MR. NICOSIA: Thank you for that
3 clarification.
4 MR. PURCELL: Okay. So these are
5 basically all Oxford Houses within a certain
6 parameter of the North Jersey Recovery Center. But
7 this does not indicate all of the Oxford Houses in
8 the state of New Jersey or all of the Oxford Houses
9 in Morris County?
10 MR. ROSENWASSER: Correct.
11 MR. PURCELL: Correct, okay.
12 MR. ROSENWASSER: I'd just like to say,
13 Oxford Houses don't have the overhead of the CSLR so
14 they tend to be cheaper to stay at, you know.
15 Because otherwise you've got to pay for a house
16 manager. And the CSLR statute, unfortunately, is
17 denying people access to sober to housing.
18 MR. PURCELL: I'm sorry. This is the
19 time for us to ask you questions, sir.
20 With respect to these Oxford Houses
21 that you provided, how many vacant beds are there?
22 MR. ROSENWASSER: I believe if you
23 count the ones in the reasonable distance, the
24 similar driving distance as it would be to Kinnelon,
25 there are 6 out of 95 vacant beds as of today.

59

1 MR. PURCELL: So 6 out of 95 vacant
2 beds. So I know you're a mathematics person. What is
3 that percentage, 6 out of 95.
4 MR. ROSENWASSER: I guess it's
5 somewhere around 7 percent.
6 MR. PURCELL: So there's a 7 percent
7 vacancy of Oxford Houses.
8 MR. ROSENWASSER: Yeah.
9 MR. PURCELL: I know that you're not an
10 expert on these -- on these matters, but I know you
11 were making a non -- giving nonexpert opinions, but
12 does that percentage, you know, 6 or 7 percent,
13 indicate that there's a glut of available beds in
14 these homes?
15 MR. ROSENWASSER: That's an opinion.
16 That's subjective. I can't give you --
17 MR. PURCELL: Well, I know. But give
18 -- is that -- what is your opinion.
19 MR. ROSENWASSER: Well, I'm thinking,
20 does North Jersey Recovery Center, I mean, people who
21 want treatment today? You know, I mean, my gut
22 feeling is they could probably -- they could probably
23 find places for their population, you know. And
24 especially DB House, you know, they said they can --
25 they can likely make room for people. They could

60

1 always find space for somebody.
2 MR. PURCELL: All right. And then with
3 respect -- to the bounce around a little bit. With
4 respect to the septic application, were you aware
5 that the applicant had submitted a revised septic
6 application to the town.
7 MR. ROSENWASSER: As of when.
8 MR. PURCELL: As of maybe two or three
9 weeks ago.
10 MR. ROSENWASSER: Do you have a
11 specific date.
12 MR. PURCELL: Are you aware that there
13 was a revised -- are you aware that there was a
14 revised septic application submitted?
15 MR. ROSENWASSER: Well, if it's --
16 you've got to tell me the date. You know, if it's --
17 you know, I don't -- I don't know mine is, you know,
18 current or not.
19 MR. PURCELL: Well, it would have been
20 after April of 2024. Are you aware that there was a
21 revised septic application submitted after April of
22 2024 with respect to 21 Wood Chase Lane.
23 MR. ROSENWASSER: This was picked up in
24 July from the Board of Health. So was there a
25 revised septic application after July.

61

1  MR. PURCELL: Yeah, I'm asking the
2  question. Are you aware that there was a revised
3  septic application submitted; yes or no.
4       MR. ROSENWASSER: Oh, yeah. I've heard
5  that -- I've heard that in here.
6       MR. PURCELL: Okay. Have you seen it.
7       MR. PURCELL: I picked this up from
8  the board, so I can't tell if this is the revised
9  septic application or not.
10      MR. PURCELL: Well, you have seen the
11 septic application that is not dated from April 2024.
12 There is a newer septic application.
13      MR. ROSENWASSER: Yeah. This one says
14 4-8-2025.
15      MR. PURCELL: I'm sorry. I'm
16 misstating. April of 2025. Are you aware there was
17 an application submitted after April 2025.
18      MR. ROSENWASSER: No, I haven't.
19      MR. PURCELL: Thank you.
20      MR. ROSENWASSER: Does one exist.
21      MR. PURCELL: With respect to these
22 statutes, were these in effect at the time that the
23 subject application was filed last November.
24      MR. ROSENWASSER: Those revisions
25 weren't in effect, but there were statutes that were

62

1  in effect.
2       MR. PURCELL: These particular chapter
3  laws, were they in effect.
4       MR. ROSENWASSER: No, those weren't.
5       MR. PURCELL: Okay. With respect to
6  A-3973, do you have any evidence of any kickbacks or
7  bribes between North Jersey Recovery Center and
8  Palisades Properties.
9       MR. ROSENWASSER: Well, I'm hearing
10 there's a financial relationship between them.
11      MR. PURCELL: Do you have any evidence
12 of any kickbacks or bribes.
13      MR. ROSENWASSER: Oh, no kickbacks or
14 bribes. But do I have evidence --
15      MR. PURCELL: Is that a yes or no? Do
16 you have any evidence of kickbacks or bribes.
17      MR. ROSENWASSER: I have no specific
18 evidence.
19      MR. PURCELL: Do you have any evidence
20 of Palisades Properties or North Jersey Recover
21 Center -- this I'm speaking about -- I guess it's
22 still A-3973 -- receiving any fee, commission or
23 rebate based on referrals to Palisades Properties?
24      MR. ROSENWASSER: No. But I --
25      MR. PURCELL: Thank you. Thank you.

63

1       MR. ROSENWASSER: Okay.
2       MR. PURCELL: With respect to A-3974,
3  do you have any evidence to suggest or imply that
4  there is not some sort of express written consent
5  indicating the affiliation between North Jersey
6  Recovery Center and Palisades Properties?
7       MR. ROSENWASSER: Can you repeat that
8  question.
9       MR. PURCELL: Do you have any evidence
10 that is -- there is there is not -- there is no
11 express written consent indicating a consent to the
12 affiliation -- an advertising of the affiliation
13 between North Jersey Recovery Center and Palisades
14 Properties?
15      MR. ROSENWASSER: No. I have no
16 evidence of that.
17      MR. PURCELL: Is the Zoning Board of
18 Adjustment the entity tasked with enforcing these two
19 chapter laws that you have submitted.
20      MR. ROSENWASSER: Oh, no. And I'll be
21 researching that.
22      MR. PURCELL: Okay. Are you aware of
23 any investigation or charges that were -- well, let
24 me start off. Are you aware of any investigations of
25 Palisades Properties by the New Jersey Department of

64

1  Health with respect to any of its existing statutes
2  that existed before these laws went into effect and
3  that they exist now.
4       MR. ROSENWASSER: I'll have to research
5  it.
6       MR. PURCELL: Are you aware of any
7  investigations by the New Jersey Department of Health
8  with respect to North Jersey Recovery Center with
9  respect to these statutes as they existed before
10 these chapter laws were enacted and after they were
11 enacted.
12      MR. ROSENWASSER: No. I didn't
13 research it.
14      MR. PURCELL: So you're not aware of
15 any.
16      MR. ROSENWASSER: No.
17      MR. PURCELL: Okay. That's all I have.
18      MR. ROSENWASSER: Thank you.
19      CHAIRMAN LOCKWOOD: Thank you. We'll
20 continue to keep it open to the public.
21      MR. GILHOOLEY: Hi. Good evening.
22      MR. TOMBALAKIAN: Sir, we'll give you
23 the same courtesy.
24      Do you want to be sworn in? You're
25 just offering comment.

65

1        MR. GILHOOLEY:  No thanks.
2        My name is Mike Gilhooley.  I live at
3  15 Wood Chase Lane.  I've lived there for 31 years.
4        I wanted to get back to where we left
5  off on the septic and some of the numbers on there.
6  So if you use the math that Paul gave you -- so the
7  water line goes from the street and it approaches the
8  front of the bend.  In order to get to the house, it
9  looks like it must proceed through that bend.
10        CHAIRMAN LOCKWOOD:  Can you remind
11  which? Because we have 13 exhibits.
12        MR. GILHOOLEY:  So it's the page I have
13  the drawing.
14        CHAIRMAN LOCKWOOD:  Thank you.  I'm
15  sorry.
16        MR. GILHOOLEY:  Then the water company,
17  Fayson Lakes Water Company, came out and did a
18  mark-out.  And they show the water line going
19  directly through the center of that bend.  That water
20  line is there.
21        The other part that's missing is where
22  the water line goes after the bend.  So how do we
23  know if it approaches any of the septic tanks out
24  there? There is no designation on the map where that
25  line goes after the septic bed and how it goes to the

66

1  house.  So there could be further violations up at
2  the top if it approaches those within 10 feet of
3  this.
4        So there's missing information, yet
5  these plans were approved by our Board of Health.
6        MR. TOMBALAKIAN:  I just want to point
7  out that the Zoning Board has planning and zoning
8  community impacts.  These are septic issues that the
9  Board of Health -- that's within their purview.  So
10  this board, we don't know hear -- first, I mean,
11  hears a lot about septics, but the board as a body
12  doesn't really -- that's something that we can trust
13  that our sister Board of Health will enforce septic
14  rules and regulations.  So I understand the point
15  you're making, but it's kind of beyond what this
16  board does.
17        MR. GILHOOLEY:  But as part of their
18  application -- as part of their application, don't
19  they have to prove that they're able to handle that
20  amount of people being in a house with a septic?
21        MR. TOMBALAKIAN:  Yes, to a point.  But
22  what this board -- since this board, we don't
23  regulate septic, we don't know septics, if anything
24  if this application is going to be approved, it will
25  be conditioned on getting the appropriate septic

67

1  approvals from whatever agency is responsible for
2  issuing them.
3        It's just beyond -- we deal with
4  setbacks, and uses, and master plans and that sort of
5  stuff.  And when you start talking about whether a
6  water line encroaches within a certain limits of a
7  leach field, it's really not a Board of Adjustment
8  issue.
9        MR. GILHOOLEY:  Where I want to go then
10  next is what the problem is with a water line running
11  through a septic bed.  Okay?  Is that applicable.
12        MR. TOMBALAKIAN:  You can comment on
13  it. I'm just saying that when it gets into the
14  minutia of septic regs, the Board of Health kind of
15  -- they're responsible.
16        MR. GILHOOLEY:  Okay.  I'm going to go
17  towards the impact on the environment.
18        MR. TOMBALAKIAN:  That's fine.
19        MR. GILHOOLEY:  Okay.  So when you have
20  a water line running through your septic bed, it's
21  defeating the purpose of a septic bed.  So when you
22  dig out a septic bed, you put it up 4 feet of special
23  fill that the water is supposed to drain through.
24  That's like the final step of purification.
25        So the difference between a sewer

68

1  system and a septic tank.  A sewer system is a closed
2  system. It goes down a drain.  It goes to the sewer
3  pipe.  It goes to the treatment center.  The site is
4  all closed.
5        With a septic system, mother earth is
6  the last step with cleaning.  So if there's anything
7  that goes wrong, we pay the price environmentally.
8        So in this case, instead of the water
9  draining downward, it can leave through a side exit
10  where the pipe comes in.  It's called leaching.  That
11  water is not fully purified yet.  It runs along that
12  pipe to the street, gets into the groundwater.
13  Across the street there's wetlands.  Wetlands feed
14  little streams, brooks, ponds, reservoirs.  So
15  anything any impurity that comes out that system
16  effectively could affect any wildlife, could affect
17  our own reservoir.
18        Let me get back the beginning.
19  Kinnelon is in the Highlands region of New Jersey.
20  From the New Jersey State website, 70 percent of the
21  state's water in whole or part comes from the
22  Highlands region of New Jersey.  70 percent of the
23  entire state gets their water from this region in
24  part or in full.
25        That's important because the Highlands

69

1  region is like a conservation area to protect
2  wildlife, protect water areas.  So there's a lot of
3  conservation.
4         So I wanted to go through a little
5  scenario where I show where these numbers matter.  So
6  two sides of Wood Chase Lane.
7         We have 21 Wood Chase applying for a
8  variance to house 10 people, 2 employees, 12 people
9  producing over 1,000 gallons of wastewater a day,
10  according to their application.  All of this on an
11  acre and a half of property.
12        Let's look at another house.  Two
13  people, 2 residents producing, say, 100 gallons per
14  person, 200 gallons of wastewater a day.  So in that
15  case you would see that the volume matters, from
16  1,000 gallons of wastewater going through an acre and
17  a half versus 200 gallons going through an acre and a
18  half.  So it's all about dilution, right?  So we have
19  1,000 gallons in a acre and a half or you have 200
20  gallons in an acre and a half.  Which one is getting
21  a better purification, right?
22        So with conservation, the model is less
23  is more.  Less people, more space, equals a better
24  environment.  I think that's a standard we have to go
25  by.

70

1         Another example I want to show is on
2  our side of Wood Chase Lane, I know of at least six
3  households that have only two full-time residents.
4  This is where the picture gets bigger.  So picture
5  this, 12 people, 1,000 gallons of wastewater on an
6  acre and a half.  On the other side of Wood Chase, we
7  have 12 people, 1,000 galloons on wastewater over
8  9 acres.  That's 6 lots at an acre and a half each.
9  That's a significant difference of contamination
10  difference between one side of Wood Chase and the
11  other side of Wood Chase.
12        Lastly, I just wanted to go through --
13  oh, another reason why numbers sort of matter.  So
14  let's say two systems on Wood Chase Lane had a septic
15  system capable of bringing down the contaminants to
16  1 percent.  So if you have one house producing 1,200
17  gallons of wastewater, 1 percent of that would be
18  somewhere around, let's say, 12 grams of
19  contaminants.  You look at a person -- a household
20  that has 2 persons in it, and you would have only 2
21  grams of wastewater.
22        So 2 systems working at the equal 1
23  percent purity rate have two different values in the
24  end of impurities just by the number of people in the
25  house.

71

1         So this is why having 12 people in one
2  household on Wood Chase Lane is bad for the
3  environment.
4         That's all.
5         MR. TOMBALAKIAN:  Thank you.
6         MR. PURCELL:  My only question was with
7  respect to the -- what plans are you looking at?
8  What is the date on the plans of the application.
9         MR. GILHOOLEY:  The numbers wouldn't
10  change so...
11        MR. PURCELL:  What's the date of the --
12  what's the date of application.
13        MR. GILHOOLEY:  The application that
14  Paul had I believe is 4-8.
15        MR. PURCELL:  April 2025.
16        MR. GILHOOLEY:  Yeah.
17        MR. PURCELL:  Are you aware of a newer
18  application that's been submitted to the Department
19  of Health.
20        MR. GILHOOLEY:  No.  Because the things
21  on there would not change.
22        MR. PURCELL:  Are you aware of a design
23  change with respect to the -- to the water line.
24        MR. GILHOOLEY:  Again, the things I
25  spoke about would not change in any revision.

72

1         MR. PURCELL:  But are you aware of it.
2  Are you aware of that submission?
3         MR. GILHOOLEY:  No.  Do you have a copy
4  for me.
5         MR. PURCELL:  I don't.  I should have
6  brought them, actually.  But I don't.  Okay.  That's
7  all I have.
8         MR. GILHOOLEY:  Okay.
9         CHAIRMAN LOCKWOOD:  Any questions from
10  the board before you go?  Thank you.
11        Anyone else from the public?  All
12  right. We're going to take a five-minute break.
13  We'll start up again at 8:55.
14        (Whereupon, a brief recess is held.)
15        CHAIRMAN LOCKWOOD:  All right.  Let's
16  continue.  Any other residents want to come up and
17  speak?  State your name and address.
18        MR. DeFALCO:  Joe DeFalco, 15 Bent Tree
19  Lane, Kinnelon.  Hopefully I can be fairly brief
20  here.
21        Last week through the agency of Land of
22  Freedom we had a Zoom conference with the Highlands,
23  the Highlands Commission.  And I would take issue
24  with Counsel's statement that you shouldn't been
25  concerned about some of these other things.

73

1  The Highlands Commission, according to
2  them, according to the people at the Commission, has
3  an overlay over 97 percent of Kinnelon.  Anything
4  that's going to take place in Kinnelon has to meet
5  their requirements.  Neither this board nor the
6  planning board can simply do whatever you want to or
7  whatever you think.
8  That portion of independence is now
9  subject to the Highlands Commission's review.  There
10  are two things that are automatic triggers.  One is
11  if you want a septic system 2,000 gallons or more,
12  automatically it has to go to the Highlands
13  Commission.
14  The second is disturbance of a quarter
15  acre other more.  That one is going open for
16  discussion.  What is the definition of disturbing a
17  quarter acre?  And how big exactly is it?  A
18  builder's acre, 60,000 feet would only be 15,000
19  feet.  Actually, you'll be slightly different.
20  I know want to go to something that
21  should all be in the filing because I believe it's
22  the basis of this application.  And that was from the
23  Board of Health, who is jointly with Pequannock --
24  handles both Kinnelon and Pequannock.  Get the name
25  for you.  Thomas Cantisano.  This is a letter from

74

1  Mr. Cantisano to Sal Gargiulo.  Sal Gargiulo is the
2  actual owner of this single-family.  It's a
3  three-page letter.  And the most important part is:
4  "Under these circumstances, the use of
5  the property for congregant living activities
6  constitutes a violation of the following
7  section, N.J.A.C. 7-9A."
8  Okay?
9  So it's fairly simple.  What they want
10  to do with this piece of property is officially not
11  allowed, period.
12  Is there a cure?  I think that's the
13  question before the board more than anything.  Is
14  there some kind of a cure?  According to the
15  Highlands Commission, it's possible to expand the
16  septic system.  But under their rules -- and their
17  rules began August 10th, 2004.
18  Essentially what they told us was,
19  anything that existed prior to August 10, 2004 -- and
20  this building did -- is okay.  If you touch it, if
21  you try to make it something that it's not already,
22  you need to go to them.
23  A couple of comments.  I'm trying to
24  keep it brief so we can all get out of here.  The
25  application here -- and thanks to Counsel I'm aware

75

1  that there's another one.  But I'm going to point out
2  a couple of questions here that just simply don't
3  make any sense at all.  I want to refer to the soil
4  permeability.
5  CHAIRMAN LOCKWOOD:  What page is that,
6  sir.
7  MR. DeFALCO:  I believe it's page 7.  I
8  think it's also going to -- yeah, page 7.
9  MR. PURCELL:  Page 7 of what.
10  MS. GILHOOLEY:  7 of 9.
11  MR. PURCELL:  What exhibit.
12  CHAIRMAN LOCKWOOD:  13.
13  MR. DeFALCO:  And if you look down at
14  soil permeability Number 11, so the samples that were
15  taken for perc-ability, the passage of water through
16  the material that's there, somehow in Kinnelon where
17  we sit upon 4 miles of bedrock, they found 60 percent
18  sand.  Unless it's the material bleeding from the
19  septic that already exists or that the pit was dug so
20  close that the material bled out, there is no way
21  you're finding 4 feet of sand in Kinnelon.
22  There are a few other things, but again
23  in the interest of time, whatever may happen here, I
24  would hope the board would consider that your actions
25  really can't take hold until you have a clearance

76

1  from the Highlands Commission.
2  Again -- oh, we are -- there's three
3  areas in the Highlands Commission.  We are in the
4  most restricted area.  97 percent of Kinnelon is.  We
5  can't do these things.  This is a very simple matter.
6  What they want to do has already proven to be
7  untenable, unfunctionable on this piece of property.
8  You can't have 12 adults living there, flushing
9  toilets, taking showers, cooking.  It just won't
10  work, period.
11  Again, what's the solution?  The
12  solution has to be approved by the Highlands
13  Commission.  This thing should be suspend and
14  referred directly to the Highlands Commission, and
15  let them give you some guidance as to what can be
16  done and what cannot be done.  That's it.
17  CHAIRMAN LOCKWOOD:  Any questions from
18  the board?  Mr. Purcell.
19  MR. PURCELL:  I don't -- I don't have
20  any questions.  Just to make a, you know, legal
21  statement that, you know, we don't fit in the
22  definition of the Major Highlands Commission under
23  the 7:38-1.4; therefore, you know, the Highlands
24  really should not apply.
25  Having said that, the applicant will

77

1  stipulate to obtaining a Highlands determination as a
2  condition of approval.
3           CHAIRMAN LOCKWOOD:  Good.
4  Thank you.
5           MR. DeFALCO:  Thank you.
6           CHAIRMAN LOCKWOOD:  Any other folks
7  from the public?
8           Come on up.
9           MS. GILHOOLEY:  Good evening.
10          CHAIRMAN LOCKWOOD:  Good evening.
11          MS. GILHOOLEY:  My name is Debbie
12 Gilhooley.  I live at 15 Wood Chase.
13          And during the testimony of Paul,
14 Mr. Purcell was kind of drilling him, does he have
15 any evidence that drug treatment is going on?  In the
16 picture of this brochure, it shows -- and if you
17 drive by --
18          MR. PURCELL:  What exhibit are you
19 looking at.
20          MS. GILHOOLEY:  This picture right here
21 of your North Jersey.
22          MR. PURCELL:  What is it?
23          MS. GILHOOLEY:  You have it right.
24 That's 21 Wood Chase.
25          MR. PURCELL:  O-2.  Okay, this is

78

1  Exhibit O-2.
2           CHAIRMAN LOCKWOOD:  What page.
3           MS. GILHOOLEY:  The third page.  That's
4  a picture of 21 Wood Chase Lane.  You can see right
5  on the front steps -- I brought this concern up
6  before -- there's a large black box that's locked.
7  It started out with one smaller one on the right-hand
8  side, which is still there.  And now we have the
9  larger one to the left-hand side that's being used
10 for pharmaceutical deliveries.
11          I'm just wondering, if you're saying
12 there's no treatment going on, what are all those
13 deliveries being made and who is administering those?
14          MR. PURCELL:  Are you asking me
15 questions.
16          MS. GILHOOLEY:  No.  I'm just making a
17 statement because you were asking Paul if he had any
18 evidence.  On the picture, there shows a large black
19 drug box.  And there's actually two on the front
20 steps now, one smaller one and one larger one.
21          MR. PURCELL:  So you're saying -- so
22 you're testifying that this box is used to provide
23 drugs.
24          MS. GILHOOLEY:  It's a concern of mine.
25 I live in the neighborhood.  I'm just wondering, what

79

1  is in there, and who's administering these if they're
2  pharmaceuticals?
3           MR. PURCELL:  So it's pharmaceuticals?
4  You're saying that there's a box here that is meant
5  to deliver pharmaceuticals.
6           MS. GILHOOLEY:  Well, I see the
7  pharmacy delivery.  I'm asking.  I'm not stating.
8  I'm not assuming.  You asked for evidence.  I was
9  just bringing this point up.  So what are these large
10 black boxes under lock and key on the front steps?
11          MR. PURCELL:  And do you have any more
12 testimony.
13          MS. GILHOOLEY:  No.  I'm just bringing
14 the point up directly.  You're asking for some
15 evidence.  I'm just bringing it up to attention what
16 those are.
17          MR. PURCELL:  Are you aware -- I'm
18 sorry. I'm sorry.  Are we done?  Are you done.
19          MS. GILHOOLEY:  I'm just making a
20 statement to bring it to the board's attention.
21          CHAIRMAN LOCKWOOD:  Is there anything
22 else.
23          MS. GILHOOLEY:  No.  That was it about
24 the large delivery boxes.  It started as one and now
25 it's two.

80

1           That's all.
2           MR. PURCELL:  For the purposes of
3  argument's sake -- and I personally don't know, you
4  know, what those boxes are.  You're saying they are
5  for delivery of pharmaceutical medication.  Do people
6  in their homes take medications?
7           MS. GILHOOLEY:  Oh, I'm sure they do.
8  But do they get such a quantity that they need a
9  large black box to have for ten boarders at the
10 house?
11          MR. PURCELL:  But that wasn't my
12 question.  For people that live --
13          MS. GILHOOLEY:  I'm not going to answer
14 questions.  I just brought a point up.
15          MR. PURCELL:  Well, you have to.  You
16 don't have to answer --
17          MS. GILHOOLEY:  I just brought a point
18 up to the board --
19          MR. PURCELL:  Okay.
20          MS. GILHOOLEY:  -- that treatment or
21 whatever, there's two large secured black boxes.  It
22 started as one and now we're up two in the
23 neighborhood.  Is that something that is safe in the
24 neighborhood setting to keep going on?  What, are we
25 going to do three and four, and we're just going to

81

1 continue to add boxes that they're getting deliveries
2 to and allow that in our town? They're not secured.
3 They could be stolen. Children can get into them.
4           MR. PURCELL: How do you know they're
5 not secured.
6           MS. GILHOOLEY: I'm just talking to the
7 board up here.
8           MR. PURCELL: I can ask you questions.
9 How do you know it's not secured?
10          MS. GILHOOLEY: I'm not going to answer
11 any questions. I'm just making a statement to the
12 board to be careful of what we're allowing in, to
13 look carefully at all the things that are actually
14 happening in the neighborhood. Okay?
15          CHAIRMAN LOCKWOOD: Thank you.
16          MS. GILHOOLEY: Thank you.
17          CHAIRMAN LOCKWOOD: Anyone else from
18 the public care to speak?
19          (No Response.)
20          MR. TOMBALAKIAN: Going once? All
21 right.
22          CHAIRMAN LOCKWOOD: Before we move on.
23          MR. TOMBALAKIAN: I guess we're going
24 to close the public comment portion.
25          CHAIRMAN LOCKWOOD: Yeah, let's do that

82

1 first.
2           MR. TOMBALAKIAN: And see if Ed wants
3 to do any summary.
4           CHAIRMAN LOCKWOOD: Mr. Purcell.
5           MR. PURCELL: Yeah. So the public
6 comment portion is formally closed.
7           CHAIRMAN LOCKWOOD: The public comment
8 portion is closed.
9           MR. PURCELL: All right. So thank you
10 for the -- thank you to the board for taking the
11 time. You know, we've had a long hearing process.
12 And I thank the public for coming out and, you know,
13 speaking and participating. And it's all been very
14 helpful in a certain sense.
15          But I just want to start out by really
16 talking about something that we talked about at the
17 beginning of this application, which is the Fair
18 Housing Amendments Act. And I want to talk about the
19 FHAA from a kind of 1,000-foot perspective. Because
20 in preparing for tonight, I reread it, the law. And
21 the introductory section of the statutes say the
22 FHAA, the purpose of it was to end the unnecessary
23 exclusion of people with handicaps from the
24 mainstream. And what that was meant to do was to
25 essentially stop in its tracks any argument to say,

83

1 you know, don't put this here; put it somewhere else.
2 Right? These people, they'd be better in another
3 type of zone, in another town. We don't want it.
4           Because, you know, at the end of the
5 day, what the congress decided -- and it was a good
6 decision -- was that people with disabilities are
7 entitled to live like the rest of us. Right? I live
8 in a single-family home. I suspect that a lot of the
9 board members here also live in single-family homes.
10 And people with disabilities should also be allowed
11 to live in single-family homes. And in New Jersey,
12 cooperative sober living residences must be
13 single-family homes under the existing regulations.
14          So I think that, you know, getting more
15 into the munition here, I think this is an easy case
16 for approval. I think the law is clear. I think
17 that this is an inherently beneficial use. I think
18 Mr. Grygiel provided adequate testimony on that. The
19 applicant has also met its burden under the standard
20 Medici D(1) use variance test.
21          And then, you know, with the FHAA, going
22 back to that, going to the detail here, the applicant
23 has shown that these residents are handicapped under
24 the FHAA. And that currently in Kinnelon, CSLRs are
25 not permitted in any zone.

84

1           So what does that mean? Well, that
2 means that the applicant has sort of met its burden.
3 Now the burden shifts to the board to be able to take
4 the position or to argue that the application -- that
5 the combination that we're requesting is
6 unreasonable. It's not our burden anymore. Just to
7 be clear -- I want to be clear about that -- it's the
8 board's purview.
9           And I would respectfully state that
10 that burden can't be met, that you cannot reasonably
11 show, or you can't really show that accommodation
12 that we're requesting is unreasonable. There is no
13 undue financial or administrative burden to the
14 municipality. There's no undue hardship upon the
15 municipality. There's no fundamental alternation of
16 the nature of the zoning program.
17          You know, there's a case that I
18 mentioned in passing, Hoffman V. Township of Brick,
19 that's a Third Circuit case. In that case, the Third
20 Circuit permitted a 210-bed nursing home in a
21 residential zone. They said that was not an
22 unreasonable accommodation.
23          So if that was not an unreasonable
24 accommodation, how could this be? Right? Just a
25 single-family home with people living in it. A

85

1   single housekeeping unit, right?  There's been no
2   testimony provided to change that basic fact.  I
3   think that we demonstrated that this is a single
4   housekeeping unit.  This is not 10 people living
5   separately in their rooms like a normal boarding
6   house.  This is different.  This is a single
7   housekeeping unit.  People live cooperatively.  It's
8   in the name, cooperative sober living residence.
9           So I think that -- and also I attached
10  the Morristown case, which shows the fact that CSLRs
11  are single housekeeping units.  There's also that
12  letter which provided -- was provided from the DCA
13  that also speaks to what a CSLR is.
14          I'm not going to bother kind of going
15  over the -- you know, the ins and the outs of the
16  Sica test.  I think that, you know, this has been
17  adequately stated.  I'll just make a couple points.
18  You know, I think that at the end of the day, the DCA
19  acknowledged in their rulemaking for CSLRs, that
20  CSLRs are really important, right?  They said this
21  fulfills an important niche in a laudable public
22  purpose.  Laudable, right?  And I think that's an
23  important factor that needs to be weighed in.  I
24  think that really provides weight to the interest
25  here that the applicant is effectuating.

86

1           So I guess in summation, I'll just say
2   that, you know, the applicant's use is inherently
3   beneficial.  The variance represents a reasonable
4   accommodation which the board must grant under the
5   FHAA.
6           It's your burden now.  You have to show
7   that it's not -- that it is unreasonable in the
8   construct of the FHAA as it exists.  And I would
9   submit that that's not the case.  You know,
10  ultimately if this goes to Federal Court, attorney's
11  fees can be awarded to the successful plaintiff.  So
12  it's going to be, you know, a very expensive
13  undertaking, just FYI.
14          So I'd ask the board to not decide that
15  just for practical reasons.  I'd ask the board not to
16  accept arguments that would unlawfully segregate
17  people with disabilities from the mainstream and from
18  society, because the purpose of the FHAA is to do the
19  exact opposite.
20          Thank you.
21          CHAIRMAN LOCKWOOD:  Thank you,
22  Mr. Purcell.
23          If you're okay, Ms. Caldwell, since
24  this involves a D(1) use variance, can you summarize
25  the legal standards the board needs to be consider

87

1   prior to voting?
2           MS. CALDWELL:  Yes, absolutely,
3   Mr. Chair.  Jessica Caldwell.  I'm the planner for
4   the board.
5           So the board is being asked to consider
6   a D(1) use variance for a property of a sober living
7   residence.  In the R Residence zone.  So that's a use
8   not permitted in the zone, requiring a D(1) use
9   variance.
10          They are proposing that it's an
11  inherently beneficial use.  That is something for the
12  board to decide, because it's not listed in the
13  Municipal Land Use Law or determined by the courts to
14  be an inherently beneficial.
15          So there are two standards under the
16  D(1) use variance criteria, depending on whether or
17  not the board determines that it's an inherently
18  beneficial use.
19          Under a noninherently beneficial use,
20  the board has the power to grant use variances for
21  particular cases and for special reasons, so that's
22  the positive criteria of a D(1) use variance.  And
23  under that positive criteria, the Medici case law
24  says that developing a piece of property that's
25  particularly suited to the use meets the Purpose A or

88

1   general welfare clause of the Municipal Land Use Law.
2           So under that case, the board would
3   look to say, what is special about this property in
4   particular?  It doesn't have to be unique.  It
5   doesn't have to be the only piece of property in
6   town.  But there should be something, and I would say
7   more than one thing, but a series of findings by the
8   board that shows that there is a particular reason
9   that this single-family residence in this
10  neighborhood is particularly suited to this
11  cooperative sober living residence.
12          And part of that reason for that site
13  suitability is that if every single-family residence
14  in that neighborhood were to be suitable for a
15  cooperative sober living residence, then this is
16  something that the courts have said really should be
17  done through zoning.  So a particular case in part is
18  showing that you have a reason for this particular
19  piece of property to be granted this variance.
20          Also, under Section D(2) of Municipal
21  Land Use Law are other purposes of the Municipal Land
22  Use Law that you would look to be forwarded by this
23  application in addition to the general welfare
24  clause.
25          And then every application needs to be

89

1  meet the negative criteria. And that's no
2  substantial detriment to the public good -- that's
3  the neighborhood -- and no substantial impairment to
4  the intent and purpose of the master plan and zoning
5  ordinance, meaning that it would be so contrary to
6  the master plan or the ordinance that it would have a
7  negative impact on those documents.
8        If in the alternative the board
9  determines that this is an inherently beneficial use,
10  as the applicant's planner testified to, there is a
11  balancing test called the Sica balancing test. And
12  with an inherently beneficial use, it's determined to
13  automatically meet that positive criteria, those
14  special reasons.
15        But the Sica court case found that
16  there was still some aspect of the positive criteria
17  that needed to be addressed. And that's found under
18  the first prong of the Sica balancing test where you
19  identify the public interest at stake. And so that
20  is recognizing that some inherently beneficial uses
21  are more compelling than others. Say, for instance,
22  an inherently beneficial use is a hospital. However,
23  if you already have a hospital in your community
24  that's serving all of the community needs, the second
25  hospital being proposed doesn't have the same

90

1  compelling interest as the first.
2        Second, we look to identify detrimental
3  effects that will ensue or may ensue due to the grant
4  of the variance.
5        And then thirdly, determine if there
6  are legitimate ways to try to reduce those negative
7  impacts by imposing reasonable conditions. So
8  looking for ways to try to ameliorate any impact that
9  might come from the granting of the variance.
10        And then lastly, there's a balancing of
11  the positive and the negative criteria. And
12  importantly, even inherently beneficial uses have to
13  meet the negative criteria, meaning no substantial
14  detriment to the public good and no substantial
15  impairment to the intent and purpose of the zone
16  plan, which is the master plan and the ordinances.
17        So it's important for the board to also
18  determine that through that Sica balancing test, if
19  the board determines that it's an inherently
20  beneficial use, that through that balancing test that
21  the negative criteria can be ameliorated through
22  conditions of approval which would limit the impacts
23  of the development such that they wouldn't be a
24  substantial detriment to the public good or
25  substantial impairments to the zone plan and the

91

1  master plan.
2        And additionally under the negative
3  criteria for a noninherently beneficial use there's
4  that heightened criteria that it's to say why hasn't
5  this use been considered under the traditional master
6  plan update, the traditional zoning ordinance? So
7  there's a heightened reason of why it hasn't been
8  considered.
9        And that is essentially a summary of
10  what the board needs to consider. I understand that
11  there's an additional variance for commercial
12  vehicles in a residential zone, which the applicant
13  asked to be subsumed into the D(1) overall criteria.
14        As far as the Fair Housing Act goes, I
15  don't see that as something that's on the table for
16  the board to consider. These are the criteria under
17  the Municipal Land Use Law that's under your purview.
18  But I would defer to our board attorney to go into
19  that aspect of the case.
20        MR. TOMBALAKIAN: I think when the
21  board deliberates -- thank you, Jessica, for the
22  summary. I think when the board deliberates, one of
23  the first threshold issues is to determine what is
24  this use.
25        Does the board agree with the applicant

92

1  that it's inherently beneficial or not? Because if
2  you decide that it's inherently beneficial, the law
3  requires you to do a certain analysis which includes
4  the Sica balancing test.
5        If the board determines that it's not
6  inherently beneficial, then to establish positive
7  criteria and special reasons, you do it by particular
8  site suitability, which is a whole different thing.
9  Then you get into the negative criteria which applies
10  to both.
11        So this is an application for a CSLR in
12  a residential neighborhood. You've heard testimony
13  that it's a commercial use that in and of itself
14  triggers the Medici standard that Jessica elaborated
15  on. So you have to determine, you know, again what
16  the use is, what type of use it is, what the legal
17  standard is, whether this is a residence or whether
18  this is a commercial use. Is it a hybrid? What is
19  -- and you really have to kind of delve into, does
20  the zoning allow a family to live in this house? Of
21  course it does. Does it allow a business to operate
22  in this house? That's up to this board to decide
23  whether that is a commercial use requiring a D(1).
24  Because CSLRs are not specifically permitted within
25  Kinnelon's R zone. So it really needs a D(1)

93

1  variance nonetheless.
2          The question is, if it's a commercial
3  use variance, it triggers the Medici, the enhanced
4  burden of proof. If it's a residential use, then the
5  Medici argument doesn't apply. I think the
6  applicant's planner and our own planner agreed -- are
7  in agreement that Medici applies, so that suggests
8  strongly that this is a commercial use.
9          So that's something this board should
10 think about and weigh upon when deciding -- again,
11 figure out what it is. Is it inherently beneficial?
12 Is it not? Then deliberate on the positives and the
13 negatives accordingly. So a lot of work for the
14 board. It's 9:20. If the board has the energy, have
15 at it.
16         CHAIRMAN LOCKWOOD: I think so. Would
17 anyone like to begin deliberating. Does anyone want
18 to start?
19         MS. HERRINGTON: I can kind of jump in.
20 I think in the last meeting the concern that I
21 brought up that testimony was -- it was explained
22 that this is operating similar to a group home. And
23 I don't see how this is similar. A group home with
24 individuals who are disabled live there. They're
25 looking for a stable long-term home. So they live

94

1  there. They move in. It is their residence. Yes,
2  they put their pictures. Their mail gets delivered
3  there. That's the purpose of it.
4          This doesn't sound -- I know you said
5  they can change their mail and they can put their
6  pictures. But it doesn't sound like that's
7  happening. This sounds like it is short-term. It's
8  two weeks, four weeks, six weeks. It's not a
9  long-term.
10         And I know that there was -- Counsel
11 brought up that this was determined that this is
12 considered a -- yeah, housekeeping unit. But I still
13 am not 100 percent convinced that I feel that this is
14 that type of use. So that's where my concern still
15 lies.
16         CHAIRMAN LOCKWOOD: Anyone else?
17 I'm sorry, Rachel. Are you done?
18 MS. HERRINGTON: Yes.
19         CHAIRMAN LOCKWOOD: Thank you.
20 Anyone else?
21         (No Response.)
22         CHAIRMAN LOCKWOOD: I think -- from my
23 perspective, I think it has been determined that this
24 is a commercial use. It's in your application for
25 the septic. At the first meeting I asked you if it

95

1  was a for-profit organization. You said yes. In my
2  mind, that's a business.
3          And I don't think it's this board's
4  responsibility to grant a D(1) variance when it's not
5  part of the master plan and the town has not passed
6  ordinances in support of it. That's kind of how I
7  feel about this.
8          Does anyone else want to comment?
9  Okay. Can I get a -- are we ready to make a motion?
10         MS. HERRINGTON: I'm going to make a
11 motion to deny the D(1) variance.
12         CHAIRMAN LOCKWOOD: Is there a second?
13         MR. PASSALACQUA: I second.
14         CHAIRMAN LOCKWOOD: Okay. So if you
15 vote yes, you are in support of denying the
16 application.
17         If you vote no, then you are not in
18 support of denying the application. Okay.
19         MS. HIGHERS: So, Ms. Herrington?
20         MS. HERRINGTON: Yes. Denying yes.
21         MS. HIGHERS: Mr. Wilkes?
22         MR. WILKES: Yes.
23         MS. HIGHERS: Mr. Nicosia?
24         MR. NICOSIA: Yes.
25         MS. HIGHERS: Mr. Mondello?

96

1          MR. MONDELLO: This is going to take
2  some time.
3          So, first of all, I think you did a
4  bang-up job. It was very professional. You were
5  more often patient than not, and certainly
6  respectful. You did your client a good service.
7          With respect to the public, they did a
8  good job as well. Not once did I hear anyone say I
9  don't want those kinds of people on my block. So to
10 infer that those folks are prejudice because they're
11 addicts would really be bordering on the ridiculous,
12 in my opinion. And I'm someone who has represented
13 addicts for 33 years, every make, model and
14 variation.
15         Having said that, the public needs to
16 know that we act as judges here. We can't vote
17 because we want to make Mr. Jonas happy. We can't
18 vote because we want to make you happy. We have to
19 weigh the facts, balance it against the law and
20 follow the law. We act as -- and the term is
21 quasi-judicial members.
22         Having said that, I still have a lot of
23 questions. I am struggling as to whether or not this
24 is an inherently beneficial use. The applicant's
25 planner had no idea -- he thought there were three in

97

1  Kinnelon. I don't know if that's accurate. He had
2  no idea if there were any of these homes in the
3  surrounding areas. We did not hear from -- we didn't
4  get any testimony from the board's planner as to what
5  their opinion might be. We did hear from Paul, who
6  gave some examples about Elmwood Park. So is it
7  saturated in this area? Is the regional need being
8  met? I don't know. I haven't gotten enough answers
9  to my questions.
10       As far as this particular location
11  being particularly suitable or particularly fitted,
12  the general welfare is served because that use is
13  fitted to that particular location. And I'm trying
14  to say, well, what makes this location, the unique
15  characteristics of this site itself appropriate?
16       From the public I have heard that there
17  are problems with refuse, there are problems with
18  traffic, there's problems with neighborhood
19  compatibility, quality of the life, overflow to
20  adjoining properties. I haven't seen any documentary
21  evidence. They said the police were called. I don't
22  see any reports.
23       I need more in order to make a
24  decision. I mean, I get it. But I'd like an answer
25  from somebody, was Wood Chase designed to accommodate

98

1  12 people at this house?
2       I did a quick Google search. The
3  average family size in Kinnelon is three. If I were
4  to take a conservative viewpoint and take that up to
5  five, was this street designed to accommodate the
6  Ubers, the Uber Eats, the Amazon, the daily ingress
7  and egress, the visitors? Is this street too small?
8  I don't know. I really don't know.
9       And again, I'll harp on this. Meet the
10  current needs of the surrounding towns. I'm sorry.
11  I made some notes here.
12       So we heard a lot of testimony. And I
13  would always prefer that people get sworn in so I can
14  rely on what they're saying. But we've heard
15  testimony and comments as to the septic system. I
16  really don't know if it works or it does not. But
17  that's not my purview. That's not this board's
18  purview. But I'm not comfortable approving something
19  if I really have no idea whether or not you are going
20  to be able to put the system in. I didn't hear any
21  engineering testimony that this will absolutely work
22  and there are no issues, as previously commented to.
23  I haven't heard any of that.
24       So I'm sorry. I have more questions
25  than I have answers. I am abstaining.

99

1       MS. HIGHERS: Ms. Gilhooley?
2       MS. GILHOOLEY: In addition to what Ron
3  said, Mr. Mondello, the thing that stood out to me on
4  top of all the questions that we heard the fellow
5  board members talk about is that most of the time the
6  testimony that we heard from Mr. Jonas always led me
7  to feel that the business is managed in a very
8  reactive type of fashion versus proactively.
9  Understanding what the impacts are to the community,
10  what type of experiences are being -- are taking
11  place, from the number of vehicles that are
12  constantly being parked there, and then, you know,
13  the next time we get together it's like oh those
14  vehicles have been reduced, in terms of understanding
15  the residents and how many are being dismissed, and a
16  lot of just lack of what I would consider basic
17  expectations for managing a business. And that
18  concerns -- that only echos some of the concerns that
19  I heard from the community, where if you are going to
20  be a responsible part of a community, then I think
21  taking that responsibility and being proactively
22  managing the establishment is key.
23       And that's again on top of a couple of
24  the other points that have already been made. This
25  was just something that I haven't heard and wanted to

100

1  express as well. For that reason I vote yes to deny.
2       MS. HIGHERS: Mr. Lockwood.
3       CHAIRMAN LOCKWOOD: Yes.
4       MR. TOMBALAKIAN: We have two more
5  votes.
6       MS. HIGHERS: I did them all. Morgan,
7  did you vote.
8       MR. WILKES: Yes.
9       CHAIRMAN LOCKWOOD: Six against one
10  abstention.
11       MS. HIGHERS: Yes.
12       CHAIRMAN LOCKWOOD: Application 1571
13  fails.
14       MR. PURCELL: Thank you.
15       CHAIRMAN LOCKWOOD: Thank you.
16       (Whereupon, this matter is concluded.
17  Time noted: 9:36 p.m.)
18
19
20
21
22
23
24
25

1          C E R T I F I C A T E

2

3          I, RONDA L. REINSTEIN, a Certified Court

4     Reporter of the State of New Jersey, authorized to

5     administer oaths pursuant to R.S.41:2-2, do hereby

6     certify that the foregoing is a true and accurate

7     transcript of the testimony as taken stenographically

8     by and before me at the time, place and on the date

9     herein before set forth, to the best of my ability.

10         I DO FURTHER CERTIFY that I am neither a

11    relative nor employee nor attorney nor counsel of any

12    of the parties to this action, and that I am neither

13    a relative nor employee of such attorney or counsel,

14    and that I am not financially interested in the

15    action.

16

17

18

19

20

21

22

23    *Ronda L. Reinstein*

24    ------------------------------------------------

      RONDA L. REINSTEIN, CCR No. 30X100217800

25

**#**

**#1571** [1] - 1:4

**$**

**$20,000.00** [1] - 32:25
**$200** [4] - 17:16, 17:21, 18:3, 18:8
**$50,000** [1] - 34:18

**0**

**07006** [1] - 1:23
**07054** [1] - 2:3
**07677** [1] - 2:6

**1**

**1** [6] - 1:14, 44:1, 44:5, 70:16, 70:17, 70:22
**1,000** [5] - 69:9, 69:16, 69:19, 70:5, 70:7
**1,000-foot** [1] - 82:19
**1,027.5** [1] - 44:14
**1,200** [1] - 70:16
**10** [7] - 4:4, 45:16, 45:21, 66:2, 69:8, 74:19, 85:4
**100** [4] - 8:14, 38:8, 69:13, 94:13
**10th** [1] - 74:17
**11** [3] - 4:6, 13:1, 75:14
**11th** [2] - 29:11, 30:6
**12** [11] - 4:6, 11:18, 13:1, 37:3, 69:8, 70:5, 70:7, 70:18, 71:1, 76:8, 98:1
**12-step** [1] - 37:25
**13** [3] - 3:2, 65:11, 75:12
**15** [7] - 3:4, 3:6, 3:7, 4:7, 65:3, 72:18, 77:12
**15,000** [1] - 73:18
**150** [1] - 44:25
**1571** [2] - 4:25, 100:12
**16** [1] - 10:23
**18** [1] - 4:9
**1960** [1] - 31:19
**1970** [1] - 34:14
**1975** [1] - 34:10

**2**

**2** [7] - 1:2, 1:15, 69:8, 69:13, 70:20, 70:22
**2,000** [1] - 73:11
**20** [2] - 4:11, 40:5

**200** [3] - 69:14, 69:17, 69:19
**2004** [2] - 74:17, 74:19
**2019** [4] - 8:13, 40:5, 40:12, 42:16
**2024** [3] - 60:20, 60:22, 61:11
**2025** [5] - 1:2, 30:6, 61:16, 61:17, 71:15
**21** [30] - 1:4, 4:13, 5:1, 8:14, 8:21, 9:16, 10:18, 10:21, 11:1, 14:2, 14:5, 14:18, 16:2, 17:19, 19:8, 19:17, 19:21, 19:22, 20:18, 21:19, 25:5, 37:15, 39:3, 51:23, 52:15, 60:22, 69:7, 77:24, 78:4
**210-bed** [1] - 84:20
**24** [1] - 38:9
**25** [2] - 4:15, 44:17
**26** [1] - 30:14
**28** [1] - 3:8
**29** [1] - 4:16

**3**

**3** [3] - 14:21, 19:6, 44:25
**3.1** [1] - 57:8
**30** [1] - 4:17
**30X100217800** [1] - 101:24
**31** [1] - 65:3
**32** [1] - 7:15
**33** [1] - 96:13
**332** [1] - 44:18
**37** [1] - 4:18
**373** [1] - 34:22
**380** [1] - 2:6
**39** [4] - 3:3, 7:13, 13:11, 31:19
**3973** [2] - 30:13, 33:24
**3974** [1] - 30:19

**4**

**4** [5] - 19:3, 30:14, 67:22, 75:17, 75:21
**4-8** [1] - 71:14
**4-8-2025** [1] - 61:14
**4.1** [1] - 57:8
**40** [1] - 4:20
**43** [1] - 4:21
**45** [2] - 44:18, 45:1
**47** [1] - 1:23
**4th** [1] - 34:2

**5**

**5** [5] - 10:3, 20:13, 21:10, 30:14, 44:24
**5-27** [1] - 33:18
**5-72** [1] - 17:2
**50** [5] - 2:6, 44:18, 45:1, 45:2, 45:3
**50-percent** [1] - 8:16
**5:27** [1] - 27:20
**5:27-8.1** [1] - 27:11

**6**

**6** [9] - 13:22, 19:20, 44:2, 58:25, 59:1, 59:3, 59:12, 59:20, 70:8
**60** [1] - 75:17
**60,000** [1] - 73:18
**618-0872** [1] - 1:24
**629** [1] - 2:3
**65** [1] - 3:4
**650** [2] - 44:17, 44:25
**66** [1] - 38:22
**665** [3] - 44:19, 44:21, 45:3
**695** [5] - 44:17, 44:18, 44:20, 44:21, 45:2

**7**

**7** [9] - 1:2, 38:8, 59:5, 59:6, 59:12, 75:7, 75:8, 75:9, 75:10
**7-9A** [1] - 74:7
**70** [2] - 68:20, 68:22
**72** [1] - 3:5
**73** [1] - 30:20
**74** [2] - 30:20, 30:21
**77** [1] - 3:7
**7:38-1.4** [1] - 76:23

**8**

**8** [4] - 3:2, 34:10, 44:4, 44:16
**8-3** [2] - 18:23, 18:24
**87** [1] - 3:8
**8:55** [1] - 72:13

**9**

**9** [3] - 44:3, 70:8, 75:10
**95** [4] - 38:24, 58:25, 59:1, 59:3
**97** [2] - 73:3, 76:4
**973** [1] - 1:24
**9:20** [1] - 93:14

**9:36** [1] - 100:17
**9:45** [1] - 12:18

**A**

**A-3973** [8] - 4:16, 29:10, 29:17, 29:18, 30:24, 34:24, 62:6, 62:22
**A-3974** [5] - 4:17, 30:5, 30:7, 30:23, 63:2
**ability** [2] - 75:15, 101:9
**able** [6] - 18:2, 42:19, 47:14, 66:19, 84:3, 98:20
**ABSENT** [1] - 1:9
**absolutely** [2] - 87:2, 98:21
**abstaining** [1] - 98:25
**abstention** [1] - 100:10
**abuse** [1] - 14:5
**accentuate** [1] - 41:3
**accept** [1] - 86:16
**accepted** [1] - 24:7
**access** [1] - 58:17
**accommodate** [2] - 97:25, 98:5
**accommodation** [5] - 48:23, 84:11, 84:22, 84:24, 86:4
**according** [6] - 23:19, 27:20, 34:9, 69:10, 73:1, 73:2
**According** [2] - 42:15, 74:14
**accordingly** [1] - 93:13
**accurate** [3] - 31:11, 97:1, 101:6
**acknowledged** [1] - 85:19
**acre** [10] - 69:11, 69:16, 69:17, 69:19, 69:20, 70:6, 70:8, 73:15, 73:17, 73:18
**acres** [1] - 70:8
**Act** [2] - 82:18, 91:14
**act** [5] - 30:16, 34:25, 35:4, 96:16, 96:20
**action** [2] - 101:12, 101:15
**actions** [1] - 75:24
**activities** [2] - 51:22, 74:5
**actual** [3] - 11:14, 19:12, 74:2
**add** [2] - 28:10, 44:13,

44:17, 81:1
**addiction** [1] - 27:8
**addicts** [4] - 42:3, 51:18, 96:11, 96:13
**addition** [2] - 88:23, 99:2
**additional** [1] - 91:11
**additionally** [1] - 91:2
**address** [5] - 7:11, 22:5, 32:5, 33:10, 72:17
**addressed** [1] - 89:17
**adequate** [1] - 83:18
**adequately** [1] - 85:17
**Adjacent** [1] - 46:12
**adjoining** [1] - 97:20
**Adjustment** [2] - 63:18, 67:7
**ADJUSTMENT** [2] - 1:1, 1:6
**administer** [1] - 101:5
**administering** [2] - 78:13, 79:1
**administrative** [1] - 84:13
**admission** [1] - 21:16
**admitted** [1] - 15:11
**adopted** [1] - 57:24
**adults** [1] - 76:8
**advance** [1] - 6:17
**advertising** [2] - 31:9, 63:12
**Affairs'** [1] - 55:18
**affect** [1] - 68:16
**affiliated** [2] - 54:20, 56:12
**affiliation** [5] - 32:9, 54:16, 63:5, 63:12
**affirm** [1] - 13:7
**agency** [2] - 67:1, 72:21
**ago** [1] - 60:9
**agree** [4] - 28:18, 28:20, 42:2, 91:25
**agreed** [1] - 93:6
**agreement** [1] - 93:7
**AICP** [2] - 2:12, 3:8
**AI** [1] - 21:10
**alcohol** [2] - 27:8, 28:14
**ALEX** [1] - 2:10
**allege** [1] - 29:4
**alleging** [1] - 28:25
**allow** [3] - 81:2, 92:20, 92:21
**allowed** [5] - 25:20, 40:10, 46:22, 74:11, 83:10
**allowing** [1] - 81:12

**ALTERNATE** [2] - 1:14, 1:15
**alternates** [1] - 6:10
**alternation** [1] - 84:15
**alternative** [1] - 89:8
**Amazon** [1] - 98:6
**ameliorate** [1] - 90:8
**ameliorated** [1] - 90:21
**Amendments** [1] - 82:18
**amount** [1] - 66:20
**analysis** [1] - 92:3
**answer** [6] - 52:7, 52:10, 80:13, 80:16, 81:10, 97:24
**answers** [2] - 97:8, 98:25
**anyway** [1] - 48:25
**Anyway** [1] - 43:6
**apologize** [1] - 7:20
**applicable** [3] - 22:24, 31:21, 67:11
**Applicant** [1] - 2:7
**applicant** [10] - 8:2, 8:10, 60:5, 76:25, 83:19, 83:22, 84:2, 85:25, 91:12, 91:25
**applicant's** [4] - 86:2, 89:10, 93:6, 96:24
**Application** [5] - 1:4, 4:21, 4:25, 43:17, 100:12
**application** [36] - 7:5, 43:7, 43:9, 43:10, 43:14, 43:16, 44:1, 60:4, 60:6, 60:14, 60:21, 60:25, 61:3, 61:9, 61:11, 61:12, 61:17, 61:23, 66:18, 66:24, 69:10, 71:8, 71:12, 71:13, 71:18, 73:22, 74:25, 82:17, 84:4, 88:23, 88:25, 92:11, 94:24, 95:16, 95:18
**applies** [2] - 92:9, 93:3
**apply** [2] - 76:24, 93:5
**applying** [2] - 13:24, 69:7
**approaches** [3] - 65:7, 65:23, 66:2
**appropriate** [3] - 41:11, 66:25, 97:15
**approval** [5] - 5:20, 34:13, 77:2, 83:16, 90:22
**approvals** [1] - 67:1
**approve** [1] - 33:15
**approved** [4] - 30:5,

66:5, 66:24, 76:12
**approving** [1] - 98:18
**April** [6] - 60:20, 60:21, 61:11, 61:16, 61:17, 71:15
**arborvitae** [1] - 5:21
**area** [9] - 5:22, 5:23, 41:1, 46:11, 46:22, 46:25, 69:1, 76:4, 97:7
**areas** [3] - 69:2, 76:3, 97:3
**argue** [1] - 84:4
**argument** [3] - 26:15, 82:25, 93:5
**argument's** [1] - 80:3
**arguments** [1] - 86:16
**arms** [1] - 15:19
**articles** [2] - 55:3
**aspect** [3] - 15:18, 89:16, 91:19
**assisted** [1] - 51:15
**associated** [1] - 42:22
**Associates** [1] - 2:12
**assuming** [1] - 79:8
**AT** [1] - 1:2
**attached** [1] - 85:9
**attend** [1] - 23:14
**attendance** [1] - 37:25
**attended** [5] - 8:15, 16:6, 51:25, 52:2, 52:8
**attention** [3] - 23:20, 79:15, 79:20
**attest** [1] - 11:21
**Attorney** [2] - 2:4, 2:7
**attorney** [3] - 91:18, 101:11, 101:13
**attorney's** [1] - 86:10
**attuned** [1] - 49:1
**AUDIENCE** [2] - 22:13, 46:6
**August** [4] - 29:11, 30:6, 74:17, 74:19
**authorized** [1] - 101:4
**automatic** [1] - 73:10
**automatically** [2] - 73:12, 89:13
**available** [3] - 38:24, 42:1, 59:13
**average** [1] - 98:3
**awarded** [1] - 86:11
**aware** [19] - 27:2, 27:15, 42:17, 60:4, 60:12, 60:13, 60:20, 61:2, 61:16, 63:22, 63:24, 64:6, 64:14, 71:17, 71:22, 72:1, 72:2, 74:25, 79:17

## B

**background** [1] - 7:15
**backyard** [1] - 14:15
**bad** [1] - 71:2
**balance** [1] - 96:19
**balancing** [7] - 89:11, 89:18, 90:10, 90:18, 90:20, 92:4
**bang** [1] - 96:4
**bang-up** [1] - 96:4
**banging** [1] - 48:11
**based** [4] - 8:9, 47:3, 52:8, 62:23
**baseline** [1] - 10:21
**basic** [3] - 7:19, 85:2, 99:16
**basis** [2] - 24:11, 73:22
**beautiful** [1] - 39:9
**bed** [6] - 38:24, 65:25, 67:11, 67:20, 67:21, 67:22
**bedrock** [1] - 75:17
**beds** [7] - 38:24, 55:8, 55:10, 58:21, 58:25, 59:2, 59:13
**began** [1] - 74:17
**begin** [1] - 93:17
**beginning** [2] - 68:18, 82:17
**behavioral** [3] - 51:20, 51:21
**behind** [1] - 47:6
**BEING** [1] - 1:6
**bend** [4] - 65:8, 65:9, 65:19, 65:22
**beneficial** [19] - 40:17, 83:17, 86:3, 87:11, 87:14, 87:18, 87:19, 89:9, 89:12, 89:20, 89:22, 90:12, 90:20, 91:3, 92:1, 92:2, 92:6, 93:11, 96:24
**benefit** [2] - 17:5, 56:7
**benefits** [2] - 35:15, 35:16
**Bent** [2] - 3:6, 72:18
**Bergen** [1] - 38:7
**best** [1] - 101:9
**better** [3] - 69:21, 69:23, 83:2
**between** [12] - 17:5, 26:9, 27:13, 37:14, 53:15, 54:3, 62:7, 62:10, 63:5, 63:13, 67:25, 70:10
**beyond** [3] - 23:23, 66:15, 67:3
**big** [1] - 73:17

**bigger** [3] - 17:8, 33:20, 70:4
**bill** [3] - 29:24, 30:23, 31:3
**Bill** [10] - 4:16, 4:17, 29:10, 29:16, 29:18, 30:5, 30:7, 30:13, 30:18, 30:23
**bit** [4] - 5:12, 7:22, 8:23, 60:3
**black** [8] - 10:3, 10:9, 46:19, 78:6, 78:18, 79:10, 80:9, 80:21
**blah** [3] - 33:4, 33:5
**blanket** [1] - 40:23
**bled** [1] - 75:20
**bleeding** [1] - 75:18
**block** [1] - 96:9
**BOARD** [2] - 1:1, 1:6
**Board** [12] - 2:4, 2:9, 35:21, 60:24, 63:17, 66:5, 66:7, 66:9, 66:13, 67:7, 67:14, 73:23
**board** [54] - 6:2, 6:14, 6:20, 7:24, 9:4, 13:8, 17:9, 24:7, 56:1, 57:13, 61:8, 66:10, 66:11, 66:16, 66:22, 72:10, 73:5, 73:6, 74:13, 75:24, 76:18, 80:18, 81:7, 81:12, 82:10, 83:9, 84:3, 86:4, 86:14, 86:15, 86:25, 87:4, 87:5, 87:12, 87:17, 87:20, 88:2, 88:8, 89:8, 90:17, 90:19, 91:10, 91:16, 91:18, 91:21, 91:22, 91:25, 92:5, 92:22, 93:9, 93:14, 99:5
**board's** [5] - 79:20, 84:8, 95:3, 97:4, 98:17
**boarders** [1] - 80:9
**boarding** [1] - 85:5
**body** [1] - 66:11
**bordering** [1] - 96:11
**BOROUGH** [1] - 1:1
**bother** [1] - 85:14
**bottom** [1] - 15:4
**Boulevard** [1] - 1:6
**bounce** [1] - 60:3
**box** [7] - 47:4, 47:7, 78:6, 78:19, 78:22, 79:4, 80:9
**boxes** [5] - 79:10, 79:24, 80:4, 80:21, 81:1

**brand** [2] - 29:22, 31:16
**brand-new** [1] - 29:22
**break** [2] - 11:14, 72:12
**Brian** [1] - 1:23
**bribes** [4] - 62:7, 62:12, 62:14, 62:16
**Brick** [1] - 84:18
**brief** [3] - 72:14, 72:19, 74:24
**bring** [2] - 23:20, 79:20
**bringing** [5] - 41:18, 70:15, 79:9, 79:13, 79:15
**broader** [3] - 27:21, 29:12, 33:18
**brochure** [1] - 77:16
**brooks** [1] - 68:14
**brought** [7] - 9:6, 72:6, 78:5, 80:14, 80:17, 93:21, 94:11
**builder's** [1] - 73:18
**building** [2] - 33:21, 74:20
**bunch** [4] - 16:23, 25:5, 34:20, 38:1
**burden** [6] - 83:19, 84:2, 84:3, 84:6, 84:10, 84:13, 86:6, 93:4
**business** [12] - 7:16, 17:25, 26:13, 26:14, 33:17, 36:5, 39:7, 40:16, 92:21, 95:2, 99:7, 99:17
**businesses** [1] - 20:16
**but..** [2] - 6:25, 34:19
**BY** [2] - 2:2, 2:5

## C

**C26-2B-14** [1] - 34:10
**C26-2G-21** [1] - 34:14
**C305** [1] - 34:10
**C334** [1] - 34:14
**C56-8-1** [1] - 31:19
**calculation** [1] - 44:12
**Caldwell** [4] - 1:23, 2:12, 86:23, 87:3
**CALDWELL** [6] - 2:12, 3:8, 28:9, 28:19, 28:24, 87:2
**cameras** [1] - 48:16
**CANALE** [1] - 1:10
**cannot** [2] - 76:16, 84:10
**Cantisano** [2] - 73:25,

74:1
**capable** [1] - 70:15
**capacity** [3] - 38:8, 38:12, 38:24
**cardiac** [1] - 7:17
**care** [3] - 17:21, 51:17, 81:18
**careful** [1] - 81:12
**carefully** [1] - 81:13
**cars** [1] - 48:4
**case** [13] - 68:8, 69:15, 83:15, 84:17, 84:19, 85:10, 86:9, 87:23, 88:2, 88:17, 89:15, 91:19
**cases** [2] - 37:24, 87:21
**cash** [2] - 35:13
**CC** [1] - 31:19
**CCR** [1] - 101:24
**Center** [48] - 4:6, 4:7, 4:9, 4:11, 4:12, 8:16, 11:5, 11:9, 11:18, 12:24, 13:22, 14:3, 14:19, 15:1, 15:15, 16:3, 17:21, 18:5, 18:19, 19:4, 19:24, 20:7, 20:14, 21:2, 21:12, 26:5, 33:10, 33:12, 36:14, 37:15, 39:3, 39:11, 50:21, 51:3, 51:9, 54:13, 55:9, 55:22, 56:11, 56:23, 57:5, 58:6, 59:20, 62:7, 62:21, 63:6, 63:13, 64:8
**center** [29] - 8:19, 15:24, 20:20, 21:19, 23:22, 23:24, 26:11, 27:23, 28:4, 35:15, 35:16, 36:2, 37:21, 39:12, 42:21, 42:22, 42:24, 43:3, 50:17, 50:19, 51:3, 51:5, 51:6, 54:16, 54:21, 55:8, 56:13, 65:19, 68:3
**center's** [3] - 13:25, 16:12, 39:16
**Center's** [4] - 14:6, 14:22, 18:15, 25:3
**certain** [6] - 17:4, 30:24, 58:5, 67:6, 82:14, 92:3
**certainly** [1] - 96:5
**certificate** [1] - 34:13
**Certified** [1] - 101:3
**certify** [1] - 101:6
**CERTIFY** [1] - 101:10
**Chair** [2] - 28:9, 87:3

**Chairman** [1] - 5:8
**CHAIRMAN** [64] - 1:8, 4:25, 5:4, 5:25, 6:4, 6:8, 6:11, 7:4, 7:10, 12:16, 12:21, 15:6, 19:7, 26:18, 26:24, 27:18, 28:5, 29:20, 30:15, 30:20, 31:4, 36:9, 36:11, 41:6, 41:17, 41:20, 42:11, 44:22, 45:20, 45:25, 46:5, 46:9, 50:4, 52:21, 64:19, 65:10, 65:14, 72:9, 72:15, 75:5, 75:12, 76:17, 77:3, 77:6, 77:10, 78:2, 79:21, 81:15, 81:17, 81:22, 81:25, 82:4, 82:7, 86:21, 93:16, 94:16, 94:19, 94:22, 95:12, 95:14, 100:3, 100:9, 100:12, 100:15
**CHAIRPERSON** [1] - 1:7
**chance** [1] - 26:21
**change** [6] - 71:10, 71:21, 71:23, 71:25, 85:2, 94:5
**changes** [1] - 47:1
**chapter** [3] - 62:2, 63:19, 64:10
**characteristics** [1] - 97:15
**charges** [1] - 63:23
**Chase** [43] - 1:4, 3:4, 3:7, 5:1, 8:14, 8:21, 9:16, 10:18, 10:22, 11:2, 14:2, 14:5, 14:10, 14:12, 14:18, 16:2, 17:19, 19:9, 19:17, 19:21, 19:23, 20:18, 21:19, 25:6, 37:15, 39:3, 47:5, 51:23, 52:15, 60:22, 65:3, 69:6, 69:7, 70:2, 70:6, 70:10, 70:11, 70:14, 71:2, 77:12, 77:24, 78:4, 97:25
**cheaper** [1] - 58:14
**check** [2] - 38:23, 51:13
**cherry** [1] - 41:2
**cherry-picked** [1] - 41:2
**CHERYL** [1] - 1:10
**Children** [1] - 81:3
**Chilhowie** [2] - 3:3, 7:14, 13:11

**choice** [2] - 35:24, 35:25
**Chrome** [1] - 9:20
**circle** [2] - 46:2, 46:13
**Circuit** [2] - 84:19, 84:20
**circumstances** [1] - 74:4
**citizen** [1] - 33:14
**civil** [2] - 32:24, 33:1
**claiming** [1] - 41:13
**clarification** [1] - 58:3
**clarify** [1] - 57:13
**Class** [1] - 38:6
**clause** [2] - 88:1, 88:24
**cleaning** [1] - 38:1, 68:6
**clear** [4] - 54:3, 83:16, 84:7
**clearance** [1] - 75:25
**clearly** [6] - 19:17, 22:5, 54:1, 54:2, 54:4, 54:5
**client** [1] - 96:6
**clinical** [4] - 28:13, 28:16, 29:9, 34:15
**close** [3] - 40:13, 75:20, 81:24
**closed** [4] - 68:1, 68:4, 82:6, 82:8
**closer** [2] - 40:11, 42:23
**closing** [1] - 47:23
**code** [2] - 57:3, 57:4
**cognitive** [1] - 51:20
**collected** [1] - 33:2
**column** [1] - 15:4
**combination** [1] - 84:5
**comfortable** [2] - 36:4, 98:18
**coming** [3] - 47:9, 48:17, 82:12
**COMMENCING** [1] - 1:2
**COMMENT** [1] - 3:1
**comment** [11] - 5:11, 5:15, 7:5, 12:17, 54:11, 64:25, 67:12, 81:24, 82:6, 82:7, 95:8
**commentary** [1] - 43:23
**commented** [1] - 98:22
**comments** [4] - 5:6, 6:25, 74:23, 98:15
**commercial** [12] - 8:18, 17:25, 23:23, 43:24, 44:8, 91:11,

92:13, 92:18, 92:23, 93:2, 93:8, 94:24
**Commercial** [2] - 44:2, 44:5
**commingling** [1] - 20:17
**Commission** [10] - 72:23, 73:1, 73:2, 73:13, 74:15, 76:1, 76:3, 76:13, 76:14, 76:22
**commission** [2] - 34:5, 62:22
**Commission's** [1] - 73:9
**communicate** [1] - 7:23
**Community** [1] - 55:18
**community** [22] - 8:1, 15:23, 16:21, 17:10, 17:12, 36:5, 39:4, 39:7, 39:15, 40:18, 47:24, 48:13, 48:14, 48:15, 48:22, 49:2, 66:8, 89:23, 89:24, 99:9, 99:19, 99:20
**Company** [1] - 65:17
**company** [2] - 17:20, 65:16
**compatibility** [1] - 97:19
**compelling** [2] - 89:21, 90:1
**complete** [1] - 31:11
**compliance** [1] - 35:20
**comply** [1] - 21:24
**concern** [6] - 8:21, 35:11, 78:5, 78:24, 93:20, 94:14
**concerned** [3] - 6:24, 27:24, 72:25
**concerning** [2] - 28:2, 29:7
**concerns** [3] - 8:9, 99:18
**concluded** [1] - 100:16
**condition** [2] - 5:20, 77:2
**conditioned** [1] - 66:25
**conditions** [2] - 90:7, 90:22
**conference** [1] - 72:22
**confirm** [2] - 6:13, 55:23
**congregant** [1] - 74:5
**congress** [1] - 83:5

**connected** [1] - 26:17
**connection** [2] - 28:1, 34:6
**consent** [4] - 32:12, 63:4, 63:11
**conservation** [3] - 69:1, 69:3, 69:22
**conservative** [1] - 98:4
**consider** [7] - 24:24, 75:24, 86:25, 87:5, 91:10, 91:16, 99:16
**considered** [3] - 91:5, 91:8, 94:12
**constantly** [1] - 99:12
**constitutes** [1] - 74:6
**construct** [1] - 86:8
**consumer** [1] - 53:16
**contact** [2] - 32:2, 52:24
**contacted** [1] - 52:23
**contain** [1] - 10:13
**contaminants** [2] - 70:15, 70:19
**contamination** [1] - 70:9
**continue** [6] - 5:11, 33:23, 36:7, 64:20, 72:16, 81:1
**Continued** [1] - 4:1
**contrary** [1] - 89:5
**conversation** [1] - 43:1
**convicted** [1] - 34:16
**convinced** [1] - 94:13
**cooking** [1] - 76:9
**cooperative** [8] - 53:11, 53:20, 53:21, 53:23, 83:12, 85:8, 88:11, 88:15
**cooperatively** [1] - 85:7
**copies** [2] - 9:3, 9:7
**copy** [4] - 9:1, 11:15, 43:9, 72:3
**corporation** [1] - 17:14
**corporations** [2] - 16:10, 16:13
**correct** [4] - 5:18, 6:3, 31:5, 56:13
**Correct** [3] - 6:8, 58:10, 58:11
**correctly** [1] - 45:4
**correlates** [1] - 14:12
**cost** [1] - 10:14
**counsel** [2] - 101:11, 101:13
**Counsel** [6] - 18:25, 26:2, 41:10, 43:25,

74:25, 94:10
**Counsel's** [1] - 72:24
**counseling** [2] - 28:13, 28:15
**count** [1] - 58:23
**counted** [1] - 13:1
**counter** [2] - 26:7, 41:10
**County** [4] - 49:14, 56:18, 58:9
**couple** [5] - 49:14, 74:23, 75:2, 85:17, 99:23
**course** [2] - 9:10, 92:21
**Court** [3] - 1:22, 86:10, 101:3
**court** [2] - 13:15, 89:15
**courtesy** [1] - 64:23
**courts** [2] - 87:13, 88:16
**cover** [1] - 34:24
**covertly** [1] - 35:13
**credit** [1] - 46:22
**crime** [1] - 34:1
**criteria** [16] - 57:3, 87:16, 87:22, 87:23, 89:1, 89:13, 89:16, 90:11, 90:13, 90:21, 91:3, 91:4, 91:13, 91:16, 92:7, 92:9
**critical** [1] - 23:15
**cross** [3] - 29:2, 41:18, 46:21
**cross-examination** [2] - 29:2, 41:18
**cross-hatch** [1] - 46:21
**crow** [2] - 38:21, 57:11
**CSLR** [44] - 8:17, 13:23, 15:22, 17:1, 20:19, 23:13, 23:15, 23:22, 23:23, 25:5, 26:4, 26:11, 26:12, 26:13, 26:22, 27:5, 27:6, 27:20, 27:23, 28:3, 28:19, 33:8, 33:19, 35:15, 35:16, 36:3, 40:16, 47:24, 48:22, 53:11, 53:17, 54:6, 54:8, 54:15, 54:20, 55:5, 55:10, 57:23, 58:13, 58:16, 85:13, 92:11
**CSLRs** [20] - 36:2, 36:18, 36:20, 36:22, 36:23, 49:7, 49:11, 49:23, 52:24, 53:1, 54:3, 55:12, 55:14,

55:25, 57:25, 83:24, 85:10, 85:19, 85:20, 92:24
**curb** [3] - 47:4, 47:5, 47:7
**cure** [2] - 74:12, 74:14
**current** [2] - 60:18, 98:10
**cut** [1] - 34:21

## D

**D(1** [12] - 8:10, 10:19, 83:20, 86:24, 87:6, 87:8, 87:16, 87:22, 91:13, 92:25, 95:4, 95:11
**D(1)** [1] - 92:23
**D(2** [1] - 88:20
**daily** [3] - 44:19, 44:21, 98:6
**damages** [1] - 33:4
**Darmofalski** [1] - 2:10
**dashed** [1] - 46:11
**data** [2] - 49:6, 49:7
**date** [10] - 9:17, 9:20, 11:21, 39:1, 60:11, 60:16, 71:8, 71:11, 71:12, 101:8
**dated** [1] - 61:11
**dates** [2] - 11:14, 18:23
**DB** [18] - 4:20, 38:3, 39:19, 39:23, 40:1, 40:10, 42:11, 50:2, 52:23, 54:12, 55:5, 55:22, 56:10, 56:11, 56:12, 59:24
**DCA** [2] - 85:12, 85:18
**DCA's** [2] - 55:13, 55:14
**deal** [1] - 67:3
**Debbie** [1] - 77:11
**Deborah** [1] - 3:7
**deceptive** [1] - 30:1
**decide** [4] - 86:14, 87:12, 92:2, 92:22
**decided** [1] - 83:5
**deciding** [1] - 93:10
**decision** [2] - 83:6, 97:24
**dedicated** [5] - 7:25, 8:18, 39:6, 55:8, 55:10
**deeply** [1] - 22:3
**DeFalco** [6] - 3:5, 72:18, 75:7, 75:13, 77:5
**defeating** [1] - 67:21
**defer** [1] - 91:18

**defining** [1] - 27:6
**definition** [4] - 28:11, 28:21, 73:16, 76:22
**degree** [1] - 34:2
**deliberate** [1] - 93:12
**deliberates** [2] - 91:21, 91:22
**deliberating** [1] - 93:17
**deliver** [1] - 79:5
**delivered** [1] - 94:2
**deliveries** [3] - 78:10, 78:13, 81:1
**delivery** [4] - 48:17, 79:7, 79:24, 80:5
**delve** [1] - 92:19
**democratic** [1] - 57:20
**demonstrated** [1] - 85:3
**deny** [2] - 95:11, 100:1
**denying** [3] - 58:17, 95:15, 95:18
**Denying** [1] - 95:20
**department** [1] - 47:19
**Department** [4] - 55:17, 63:25, 64:7, 71:18
**describe** [2] - 9:12, 9:13
**DESCRIPTION** [1] - 4:3
**design** [2] - 19:16, 71:22
**designation** [1] - 65:24
**designed** [2] - 97:25, 98:5
**detail** [1] - 83:22
**determination** [1] - 77:1
**determine** [4] - 90:5, 90:18, 91:23, 92:15
**determined** [4] - 87:13, 89:12, 94:11, 94:23
**determines** [4] - 87:17, 89:9, 90:19, 92:5
**detriment** [6] - 15:17, 16:21, 47:25, 89:2, 90:14, 90:24
**detrimental** [1] - 90:2
**devastation** [1] - 8:5
**developing** [1] - 87:24
**development** [1] - 90:23
**dialectical** [1] - 51:21
**difference** [3] - 67:25, 70:9, 70:10
**differences** [1] - 9:24

**different** [9] - 16:16, 16:17, 16:20, 17:6, 26:8, 70:23, 73:19, 85:6, 92:8
**difficult** [3] - 42:1, 49:24
**difficulties** [1] - 7:20
**dig** [1] - 67:22
**dilution** [1] - 69:18
**direct** [3] - 21:20, 31:24, 32:7
**direction** [1] - 37:13
**directly** [5] - 34:2, 35:12, 65:19, 76:14, 79:14
**disabilities** [3] - 83:6, 83:10, 86:17
**disabled** [1] - 93:24
**disagree** [1] - 27:21
**discard** [1] - 41:12
**discuss** [1] - 24:4
**discussed** [1] - 27:14
**discussing** [1] - 5:22
**discussion** [1] - 73:16
**dismissed** [1] - 99:15
**disorder** [5] - 8:5, 30:2, 32:15, 32:21, 34:11
**disposal** [3] - 45:12, 46:18, 46:20
**disqualified** [1] - 41:15
**disruption** [1] - 48:24
**disruptive** [1] - 48:21
**disseminated** [1] - 31:10
**distance** [9] - 37:13, 37:14, 38:21, 45:14, 57:3, 57:5, 57:6, 58:23, 58:24
**distinction** [1] - 54:3
**distinguish** [1] - 53:15
**distinguished** [1] - 54:2
**distinguishes** [1] - 39:11
**distribute** [1] - 9:4
**disturbance** [1] - 73:14
**disturbing** [1] - 73:16
**DO** [1] - 101:10
**document** [2] - 7:3, 24:25
**documentary** [1] - 97:20
**documents** [2] - 31:7, 89:7
**done** [8] - 12:13, 36:9, 76:16, 79:18, 88:17, 94:17

**double** [2] - 47:5, 51:13
**down** [6] - 5:12, 6:2, 45:10, 68:2, 70:15, 75:13
**downward** [1] - 68:9
**drain** [2] - 67:23, 68:2
**draining** [1] - 68:9
**drawing** [2] - 45:17, 65:13
**drilling** [1] - 77:14
**Drive** [3] - 3:3, 7:14, 13:11
**drive** [1] - 77:17
**driveway** [1] - 48:5
**driving** [4] - 20:2, 37:14, 38:22, 58:24
**drug** [5] - 27:8, 28:14, 37:24, 77:15, 78:19
**drugs** [1] - 78:23
**due** [1] - 90:3
**dug** [1] - 75:19
**duly** [1] - 13:12
**duplicate** [1] - 14:17
**duplicates** [2] - 10:24
**during** [1] - 77:13
**D'ARMINIO** [1] - 2:5

## E

**earnings** [1] - 40:9
**earth** [1] - 68:5
**easy** [2] - 50:1, 83:15
**Eats** [1] - 98:6
**echos** [1] - 99:18
**Ed** [1] - 82:2
**EDWARD** [1] - 2:5
**effect** [6] - 35:4, 61:22, 61:25, 62:1, 62:3, 64:2
**effectively** [1] - 68:16
**effects** [1] - 90:3
**effectuating** [1] - 85:25
**effort** [2] - 8:3
**egress** [1] - 98:7
**either** [2] - 34:2, 35:12
**elaborated** [1] - 92:14
**elderly** [1] - 48:8
**eliminated** [1] - 10:13
**Elmwood** [2] - 49:7, 97:6
**empathize** [1] - 48:3
**employee** [2] - 101:11, 101:13
**employees** [3] - 44:25, 48:5, 69:8
**enacted** [2] - 64:10, 64:11
**encroaches** [1] - 67:6

**end** [10] - 10:13, 21:9, 21:10, 27:4, 39:12, 45:6, 70:24, 82:22, 83:4, 85:18
**ends** [1] - 35:3
**energy** [1] - 93:14
**enforce** [1] - 66:13
**enforcement** [1] - 33:3
**enforcing** [1] - 63:18
**Engineer** [1] - 2:11
**engineering** [2] - 39:20, 98:21
**Engineering** [1] - 2:10
**enhanced** [1] - 93:3
**enhances** [1] - 29:25
**ensue** [2] - 90:3
**entire** [1] - 68:23
**entities** [1] - 26:10
**entitled** [3] - 39:24, 41:8, 83:7
**entity** [2] - 31:25, 63:18
**entry** [1] - 48:7
**environment** [4] - 27:9, 67:17, 69:24, 71:3
**environmentally** [1] - 68:7
**equal** [1] - 70:22
**equals** [1] - 69:23
**error** [2] - 44:11, 44:13
**especially** [1] - 59:24
**ESQUIRE** [2] - 2:2, 2:5
**essentially** [2] - 82:25, 91:9
**Essentially** [1] - 74:18
**establish** [2] - 40:16, 92:6
**establishment** [1] - 99:22
**et** [1] - 31:19
**evening** [7] - 7:9, 7:10, 13:8, 51:16, 64:21, 77:9, 77:10
**evidence** [33] - 8:20, 8:23, 11:4, 14:1, 15:11, 16:6, 16:10, 19:22, 21:20, 25:12, 28:1, 29:6, 42:8, 44:7, 51:13, 51:22, 52:5, 52:13, 52:17, 62:6, 62:11, 62:14, 62:16, 62:18, 62:19, 63:3, 63:9, 63:16, 77:15, 78:18, 79:8, 79:15, 97:21
**exact** [1] - 86:19
**exactly** [2] - 46:3, 73:17
**examination** [2] -

29:2, 41:18
**example** [1] - 70:1
**examples** [1] - 97:6
**excelled** [1] - 7:16
**except** [1] - 57:21
**exchange** [1] - 34:7
**exciting** [1] - 39:20
**exclusion** [1] - 82:23
**Excuse** [2] - 18:23, 30:22
**excuse** [1] - 27:24
**Exhibit** [21] - 10:6, 11:19, 12:25, 14:21, 15:2, 18:20, 20:8, 20:25, 21:3, 25:8, 25:10, 29:19, 30:8, 37:9, 39:23, 40:3, 43:9, 43:18, 50:10, 56:20, 78:1
**exhibit** [10] - 10:20, 12:23, 23:6, 24:10, 24:15, 24:16, 36:13, 56:22, 75:11, 77:18
**exhibits** [1] - 10:9, 22:8, 24:22, 47:22, 65:11
**exist** [2] - 61:20, 64:3
**existed** [3] - 64:2, 64:9, 74:19
**existing** [6] - 29:22, 29:25, 42:16, 46:12, 64:1, 83:13
**exists** [3] - 32:10, 75:19, 86:8
**exit** [1] - 68:9
**expand** [1] - 74:15
**expectations** [1] - 99:17
**expensive** [2] - 10:11, 86:12
**experiences** [1] - 99:10
**expert** [9] - 24:1, 24:7, 24:9, 41:1, 41:9, 41:13, 41:14, 46:1, 59:10
**explain** [3] - 15:16, 46:6, 46:7
**explained** [1] - 93:21
**explaining** [2] - 22:18, 24:15
**explanation** [1] - 38:5
**express** [5] - 8:2, 32:12, 63:4, 63:11, 100:1
**extend** [1] - 47:2
**extension** [1] - 46:20
**extent** [1] - 25:11

**F**

**facilitate** [1] - 21:15
**facilitating** [1] - 21:18
**facilities** [9] - 14:8, 14:9, 14:16, 18:15, 19:19, 21:15, 29:9, 37:5, 40:24
**Facilities** [5] - 4:9, 4:18, 18:19, 19:5, 37:8
**facility** [11] - 8:18, 15:15, 19:11, 19:21, 26:14, 33:9, 34:1, 34:9, 34:12, 43:4, 53:8
**Facility** [1] - 44:2
**fact** [5] - 8:9, 26:16, 52:8, 85:2, 85:10
**fact-based** [1] - 8:9
**factor** [2] - 15:18, 85:23
**facts** [1] - 96:19
**fails** [1] - 100:13
**Fair** [5] - 19:12, 41:24, 49:12, 82:17, 91:14
**fairly** [2] - 72:19, 74:9
**false** [5] - 31:21, 31:25, 32:4, 32:13, 32:16
**familiar** [2] - 8:4, 8:6
**family** [11] - 51:19, 74:2, 83:8, 83:9, 83:11, 83:13, 84:25, 88:9, 88:13, 92:20, 98:3
**far** [4] - 6:1, 54:10, 91:14, 97:10
**fashion** [1] - 99:8
**fathers** [1] - 40:6
**Fayson** [1] - 65:17
**Federal** [1] - 86:10
**fee** [2] - 34:5, 62:22
**feed** [1] - 68:13
**fees** [1] - 86:11
**feet** [7] - 45:16, 45:21, 66:2, 67:22, 73:18, 73:19, 75:21
**fellow** [2] - 42:9, 99:4
**female** [1] - 38:7
**fence** [1] - 5:24
**fences** [2] - 5:16, 5:19
**few** [2] - 50:7, 75:22
**FHAA** [7] - 82:19, 82:22, 83:21, 83:24, 86:5, 86:8, 86:13
**field** [6] - 24:7, 46:18, 46:20, 46:24, 47:11, 67:7
**figure** [1] - 93:11

**filed** [1] - 61:23
**filing** [1] - 73:21
**fill** [1] - 67:23
**final** [1] - 67:24
**financial** [4] - 17:5, 35:14, 62:10, 84:13
**financially** [1] - 101:14
**finder** [1] - 49:23
**findings** [1] - 88:7
**fine** [6] - 7:1, 28:21, 34:18, 34:19, 55:21, 67:18
**finish** [1] - 12:19
**finished** [1] - 47:15
**first** [17] - 8:23, 10:25, 14:11, 15:4, 21:6, 22:11, 23:8, 30:16, 37:11, 56:22, 66:10, 82:1, 89:18, 90:1, 91:23, 94:25, 96:3
**First** [2] - 7:24, 22:25
**fit** [2] - 49:3, 76:21
**fitted** [2] - 97:11, 97:13
**five** [5] - 14:9, 21:5, 37:2, 72:12, 98:5
**Five** [2] - 4:13, 21:2
**five-minute** [1] - 72:12
**five-page** [1] - 21:5
**flies** [2] - 38:22, 57:11
**flushing** [1] - 76:8
**focus** [1] - 54:12
**focusing** [1] - 20:5
**folks** [3] - 16:16, 77:6, 96:10
**follow** [2] - 44:20, 96:20
**following** [1] - 74:6
**follows** [1] - 13:12
**foot** [1] - 47:6
**for-profit** [1] - 95:1
**forced** [1] - 30:12
**foregoing** [1] - 101:6
**forgive** [1] - 16:1
**formally** [1] - 82:6
**forth** [7] - 15:14, 17:7, 19:15, 31:17, 35:18, 43:4, 101:9
**forward** [1] - 7:7
**forwarded** [1] - 88:22
**foundation** [2] - 23:1, 23:4
**Founder** [3] - 4:20, 39:24, 40:2
**founder's** [1] - 40:6
**founders's** [1] - 39:18
**four** [5] - 26:3, 34:21, 37:2, 80:25, 94:8
**fourth** [2] - 30:19,

38:11
**FRAN** [1] - 1:9
**free** [1] - 52:19
**freedom** [1] - 35:23
**Freedom** [1] - 72:22
**friendly** [1] - 19:15
**front** [5] - 14:16, 65:8, 78:5, 78:19, 79:10
**fulfills** [1] - 85:21
**full** [4] - 34:25, 38:17, 53:9, 68:24, 70:3
**full-time** [1] - 70:3
**fully** [2] - 48:14, 68:11
**function** [1] - 26:10
**functional** [1] - 37:22
**functioning** [2] - 8:17, 17:13
**fundamental** [1] - 84:15
**furnishing** [1] - 34:4
**FURTHER** [1] - 101:10
**future** [2] - 46:25, 55:20
**FYI** [1] - 86:13

**G**

**gain** [1] - 48:6
**gallons** [14] - 44:11, 44:25, 45:1, 69:9, 69:13, 69:14, 69:16, 69:17, 69:19, 69:20, 70:5, 70:17, 73:11
**galloons** [1] - 70:7
**garage** [1] - 5:23
**Gargiulo** [2] - 74:1
**GENE** [1] - 1:11
**general** [3] - 88:1, 88:23, 97:12
**gentleman** [1] - 42:20
**geographic** [2] - 32:17, 32:19
**get..** [1] - 49:21
**Gilhooley** [5] - 3:4, 3:7, 65:2, 77:12, 99:1
**GILHOOLEY** [36] - 1:15, 64:21, 65:1, 65:12, 65:16, 66:17, 67:9, 67:16, 67:19, 71:9, 71:13, 71:16, 71:20, 71:24, 72:3, 72:8, 75:10, 77:9, 77:11, 77:20, 77:23, 78:3, 78:16, 78:24, 79:6, 79:13, 79:19, 79:23, 80:7, 80:13, 80:17, 80:20, 81:6, 81:10, 81:16, 99:2
**given** [2] - 23:13,

35:23
**gladly** [1] - 21:15
**glut** [1] - 59:13
**Google** [3] - 9:20, 37:12, 98:2
**grams** [2] - 70:18, 70:21
**grant** [5] - 23:17, 86:4, 87:20, 90:3, 95:4
**granted** [1] - 88:19
**granting** [2] - 8:10, 90:9
**gray** [1] - 46:21
**greater** [1] - 44:13
**groundwater** [1] - 68:12
**group** [5] - 38:6, 50:20, 51:19, 93:22, 93:23
**GROUP** [1] - 2:2
**Grygiel** [1] - 83:18
**guess** [9] - 7:8, 15:13, 18:6, 19:16, 42:2, 59:4, 62:21, 81:23, 86:1
**guidance** [1] - 76:15
**guilty** [1] - 34:1
**gut** [1] - 59:21
**guy** [2] - 40:12, 42:6
**guys** [2] - 8:24, 20:9

### H

**Half** [2] - 36:19, 36:20
**half** [9] - 36:20, 36:21, 69:11, 69:17, 69:18, 69:19, 69:20, 70:6, 70:8
**hand** [3] - 13:6, 78:7, 78:9
**handicapped** [1] - 83:23
**handicaps** [1] - 82:23
**handing** [1] - 12:13
**handle** [1] - 66:19
**handles** [1] - 73:24
**handout** [2] - 21:6, 37:4
**hands** [1] - 19:15
**happy** [3] - 5:8, 96:17, 96:18
**hard** [2] - 40:8, 49:25
**hardship** [1] - 84:14
**harp** [1] - 98:9
**hatch** [1] - 46:21
**head** [1] - 45:12
**Health** [9] - 60:24, 64:1, 64:7, 66:5, 66:9, 66:13, 67:14, 71:19, 73:23

**health** [1] - 47:18
**healthcare** [2] - 27:22, 34:1
**Healthcare** [1] - 35:21
**hear** [6] - 48:21, 66:10, 96:8, 97:3, 97:5, 98:20
**heard** [16] - 8:12, 16:6, 17:11, 26:6, 40:11, 61:4, 61:5, 92:12, 97:16, 98:12, 98:14, 98:23, 99:4, 99:6, 99:19, 99:25
**hearing** [5] - 9:21, 56:2, 56:8, 62:9, 82:11
**hears** [1] - 66:11
**heightened** [2] - 91:4, 91:7
**held** [1] - 72:14
**help** [4] - 7:23, 8:6, 22:11, 22:13
**helpful** [1] - 82:14
**helping** [1] - 8:3
**hereby** [1] - 101:5
**herein** [1] - 101:9
**Herrington** [1] - 95:19
**HERRINGTON** [5] - 1:12, 93:19, 94:18, 95:10, 95:20
**Hi** [1] - 64:21
**high** [1] - 39:12
**high-end** [1] - 39:12
**HIGHERS** [11] - 2:9, 6:5, 6:22, 95:19, 95:21, 95:23, 95:25, 99:1, 100:2, 100:6, 100:11
**Highlands** [16] - 68:19, 68:22, 68:25, 72:22, 72:23, 73:1, 73:9, 73:12, 74:15, 76:1, 76:3, 76:12, 76:14, 76:22, 76:23, 77:1
**history** [1] - 48:20
**hmm** [1] - 54:11
**Hoffman** [1] - 84:18
**hold** [2] - 38:24, 75:25
**holistic** [1] - 51:18
**home** [19] - 16:11, 20:2, 27:7, 36:16, 37:23, 39:6, 39:9, 39:12, 41:22, 48:8, 51:23, 53:13, 57:17, 83:8, 84:20, 84:25, 93:22, 93:23, 93:25
**Home** [1] - 56:12
**homeowner** [1] - 42:2
**homepage** [3] - 11:1,

11:5, 13:21
**homes** [15] - 36:13, 37:5, 37:17, 38:7, 42:12, 42:17, 42:20, 49:8, 59:14, 80:6, 83:9, 83:11, 83:13, 97:2
**Homes** [3] - 4:18, 21:7, 37:7
**honest** [1] - 30:9
**hope** [1] - 75:24
**Hopefully** [1] - 72:19
**hospital** [3] - 89:22, 89:23, 89:25
**host** [1] - 36:3
**hosting** [1] - 36:4
**house** [21] - 25:13, 29:13, 38:1, 40:11, 47:16, 48:6, 48:9, 48:11, 58:15, 65:8, 66:1, 66:20, 69:8, 69:12, 70:16, 70:25, 80:10, 85:6, 92:20, 92:22, 98:1
**House** [21] - 4:20, 38:3, 39:23, 40:1, 40:10, 42:11, 49:23, 50:2, 52:24, 53:25, 54:4, 54:5, 55:5, 56:12, 56:17, 56:22, 57:13, 57:16, 57:17, 58:1, 59:24
**housed** [1] - 16:16
**household** [2] - 70:19, 71:2
**households** [1] - 70:3
**housekeeping** [6] - 5:14, 85:1, 85:4, 85:7, 85:11, 94:12
**houses** [6] - 29:13, 36:21, 36:23, 38:20, 40:13, 48:15
**Houses** [11] - 36:18, 38:19, 39:19, 54:3, 56:17, 58:5, 58:7, 58:8, 58:13, 58:20, 59:7
**housing** [5] - 8:18, 11:2, 15:15, 21:18, 58:17
**Housing** [2] - 82:18, 91:14
**hybrid** [1] - 92:18

### I

**idea** [5] - 39:2, 55:15, 96:25, 97:2, 98:19
**IDENT/EVID** [1] - 4:3
**identification** [12] -

10:7, 11:19, 15:2, 18:21, 20:8, 21:4, 25:10, 29:19, 30:8, 37:10, 40:3, 43:18
**identified** [1] - 4:14
**identify** [3] - 54:5, 89:19, 90:2
**identity** [2] - 32:1, 32:2
**illegal** [2] - 21:24, 26:19
**imagine** [1] - 14:11
**immediately** [1] - 35:4
**impact** [4] - 17:12, 67:17, 89:7, 90:8
**impacting** [1] - 17:10
**impacts** [5] - 8:10, 66:8, 90:7, 90:22, 99:9
**impairment** [2] - 89:3, 90:15
**impairments** [1] - 90:25
**imply** [2] - 32:8, 63:3
**important** [6] - 68:25, 74:3, 85:20, 85:21, 85:23, 90:17
**importantly** [1] - 90:12
**imposing** [1] - 90:7
**improper** [1] - 21:24
**impurities** [1] - 70:24
**impurity** [1] - 68:15
**IN** [1] - 1:3
**in-network** [1] - 31:23
**inception** [1] - 8:13
**include** [3] - 31:13, 32:4, 53:24
**includes** [1] - 92:3
**including** [1] - 33:25
**independence** [1] - 73:8
**indicate** [4] - 27:3, 32:13, 58:7, 59:13
**indicating** [2] - 8:13, 63:5, 63:11
**indication** [1] - 45:17
**indirectly** [2] - 34:3, 35:12
**individual** [1] - 51:19
**individuals** [2] - 27:7, 93:24
**Industrial** [1] - 44:2
**industry** [2] - 22:10, 22:19
**infer** [2] - 49:19, 96:10
**influenced** [1] - 35:23
**information** [16] - 10:14, 22:23, 31:12, 31:14, 32:1, 32:2, 32:4, 33:8, 39:19,

41:2, 49:20, 54:14, 55:12, 55:25, 56:8, 66:4
**ingress** [1] - 98:6
**inherently** [17] - 40:17, 83:17, 86:2, 87:11, 87:14, 87:17, 89:9, 89:12, 89:20, 89:22, 90:12, 90:19, 92:1, 92:2, 92:6, 93:11, 96:24
**inheritance** [1] - 40:9
**install** [1] - 5:21
**installing** [1] - 44:8
**instance** [1] - 89:21
**instead** [1] - 68:8
**Institutional** [1] - 44:5
**Insurance** [4] - 4:11, 20:7
**insurance** [4] - 17:20, 18:6, 19:25, 20:5
**intend** [1] - 27:8
**intensive** [1] - 51:16
**intent** [2] - 89:4, 90:15
**interest** [8] - 10:10, 10:12, 10:14, 53:3, 75:23, 85:24, 89:19, 90:1
**interested** [2] - 6:15, 101:14
**interesting** [1] - 49:22
**intermingling** [1] - 23:21
**internet** [2] - 32:5, 37:17
**interpolate** [1] - 49:13
**intervention** [2] - 50:15, 51:14
**introduce** [1] - 8:23
**introduced** [1] - 23:9
**introductory** [1] - 82:21
**investigation** [1] - 63:23
**investigations** [2] - 63:24, 64:7
**inviolate** [1] - 26:21
**involves** [1] - 86:24
**issue** [5] - 5:16, 31:5, 41:4, 67:8, 72:23
**issued** [1] - 34:12
**issues** [5] - 22:5, 45:18, 66:8, 91:23, 98:22
**issuing** [1] - 67:2
**item** [2] - 5:14, 44:2
**itself** [3] - 22:9, 92:13, 97:15

## J

**January** [1] - 40:5
**JENNIFER** [1] - 2:9
**Jersey** [75] - 1:23, 2:3, 2:6, 4:5, 4:7, 4:8, 4:10, 4:12, 4:18, 8:15, 8:22, 11:5, 11:9, 11:17, 12:24, 13:11, 13:22, 14:3, 14:6, 14:19, 14:21, 14:25, 15:15, 16:2, 17:19, 17:20, 18:5, 18:14, 18:18, 19:4, 19:24, 20:6, 20:14, 21:1, 21:7, 21:12, 22:8, 24:17, 25:3, 26:5, 27:13, 33:10, 33:11, 36:14, 37:6, 37:8, 37:14, 39:3, 39:11, 45:14, 50:21, 50:25, 51:2, 51:9, 53:18, 55:9, 55:17, 56:23, 57:5, 58:6, 58:8, 59:20, 62:7, 62:20, 63:5, 63:13, 63:25, 64:7, 64:8, 68:19, 68:20, 68:22, 77:21, 83:11, 101:4
**Jessica** [3] - 87:3, 91:21, 92:14
**JESSICA** [2] - 2:12, 3:8
**job** [2] - 96:4, 96:8
**Joe** [1] - 72:18
**joined** [1] - 21:22
**jointly** [1] - 73:23
**Jonas** [6] - 8:3, 8:12, 36:14, 41:24, 96:17, 99:6
**Jones** [1] - 8:2
**Joseph** [1] - 3:5
**journey** [1] - 36:15
**judged** [1] - 41:14
**judges** [1] - 96:16
**judicial** [1] - 96:21
**July** [4] - 9:22, 11:22, 60:24, 60:25
**jump** [1] - 93:19

## K

**keep** [3] - 64:20, 74:24, 80:24
**key** [2] - 79:10, 99:22
**kickback** [1] - 34:5
**kickbacks** [4] - 62:6, 62:12, 62:13, 62:16
**kind** [16] - 5:5, 34:3, 35:13, 35:17, 37:21,

48:15, 57:20, 66:15, 67:14, 74:14, 77:14, 82:19, 85:14, 92:19, 93:19, 95:6
**kinds** [1] - 35:17, 35:24, 96:9
**KINNELON** [2] - 1:1, 1:6
**Kinnelon** [19] - 7:14, 13:11, 39:6, 40:12, 40:13, 49:8, 49:21, 58:24, 68:19, 72:19, 73:3, 73:4, 73:24, 75:16, 75:21, 76:4, 83:24, 97:1, 98:3
**Kinnelon's** [1] - 92:25
**know..** [1] - 25:16
**known** [1] - 10:18
**knows** [1] - 37:18

## L

**lab** [1] - 34:15
**labeled** [1] - 19:5
**laboratories** [1] - 29:10
**lack** [1] - 99:16
**Lake** [1] - 2:6
**Lakes** [1] - 65:17
**Land** [6] - 72:21, 87:13, 88:1, 88:21, 91:17
**land** [1] - 33:21
**Lane** [35] - 1:4, 3:4, 3:6, 3:7, 5:1, 8:14, 8:21, 9:16, 10:18, 10:22, 11:2, 14:2, 14:6, 14:10, 14:12, 14:18, 16:2, 17:19, 19:18, 19:21, 19:23, 20:18, 25:6, 37:15, 47:6, 51:23, 52:15, 60:22, 65:3, 69:6, 70:2, 70:14, 71:2, 72:19, 78:4
**language** [1] - 31:12
**large** [6] - 78:6, 78:18, 79:9, 79:24, 80:9, 80:21
**larger** [2] - 78:9, 78:20
**last** [10] - 5:15, 6:15, 9:21, 19:1, 21:9, 21:11, 35:5, 61:23, 68:6, 93:20
**Last** [2] - 13:17, 72:21
**lastly** [1] - 90:10
**Lastly** [1] - 70:12
**latches** [1] - 48:10
**laudable** [1] - 85:21
**Laudable** [1] - 85:22

**laundry** [1] - 45:1
**LAW** [1] - 2:2
**law** [12] - 29:7, 29:11, 29:25, 30:5, 33:3, 82:20, 83:16, 87:23, 92:2, 96:19, 96:20
**Law** [5] - 87:13, 88:1, 88:21, 88:22, 91:17
**Lawn** [3] - 19:12, 41:24, 49:12
**laws** [6] - 29:23, 29:25, 62:3, 63:19, 64:2, 64:10
**leach** [1] - 67:7
**leaching** [1] - 68:10
**leads** [1] - 8:17
**least** [1] - 70:2
**leave** [1] - 68:9
**led** [1] - 99:6
**left** [4] - 40:9, 47:16, 65:4, 78:9
**left-hand** [1] - 78:9
**legal** [6] - 8:9, 27:1, 53:17, 76:20, 86:25, 92:16
**legitimate** [1] - 90:6
**lengthy** [1] - 43:6
**less** [1] - 69:22
**Less** [1] - 69:23
**letter** [3] - 73:25, 74:3, 85:12
**levels** [1] - 17:6
**liable** [1] - 32:24
**license** [1] - 38:6
**licensed** [1] - 34:9
**licensee** [2] - 28:15, 28:17
**lies** [1] - 94:15
**lieu** [1] - 5:24
**life** [1] - 97:19
**likely** [1] - 59:25
**limb** [1] - 39:8
**limit** [1] - 90:22
**limited** [1] - 33:25
**limits** [1] - 67:6
**line** [25] - 17:1, 30:14, 35:5, 44:1, 44:4, 45:8, 45:9, 45:11, 45:12, 45:15, 45:19, 45:21, 46:1, 46:16, 47:5, 47:10, 65:7, 65:18, 65:20, 65:22, 65:25, 67:6, 67:10, 67:20, 71:23
**lines** [3] - 46:11, 46:19, 47:18
**list** [4] - 49:11, 55:13, 56:24, 57:1
**listed** [3] - 16:11, 50:10, 87:12

**Listing** [2] - 4:15, 25:9
**listing** [3] - 25:4, 25:6, 50:22
**lists** [1] - 38:11
**live** [15] - 37:23, 47:23, 57:20, 65:2, 77:12, 78:25, 80:12, 83:7, 83:9, 83:11, 85:7, 92:20, 93:24, 93:25
**lived** [2] - 57:19, 65:3
**lives** [1] - 8:7
**Living** [6] - 4:12, 4:18, 15:5, 21:2, 21:7, 37:7
**living** [37] - 14:13, 14:14, 16:11, 20:22, 21:13, 21:14, 24:1, 24:3, 36:13, 36:21, 36:23, 36:24, 37:5, 38:6, 38:7, 39:13, 47:25, 49:24, 51:23, 53:2, 53:11, 53:13, 53:19, 53:20, 53:22, 53:23, 53:25, 74:5, 76:8, 83:12, 84:25, 85:4, 85:8, 87:6, 88:11, 88:15
**LLC** [3] - 1:5, 1:22, 2:7
**locate** [1] - 47:14
**located** [1] - 37:5
**location** [10] - 5:21, 19:13, 31:14, 32:18, 32:19, 33:8, 38:13, 97:10, 97:13, 97:14
**locations** [2] - 38:11, 38:12
**lock** [1] - 79:10
**locked** [1] - 78:6
**Lockwood** [1] - 100:2
**LOCKWOOD** [64] - 1:7, 4:25, 5:4, 5:25, 6:4, 6:8, 6:11, 7:4, 7:10, 12:16, 12:21, 15:6, 19:7, 26:18, 26:24, 27:18, 28:5, 29:20, 30:15, 30:20, 31:4, 36:9, 36:11, 41:6, 41:17, 41:20, 42:11, 44:22, 45:20, 45:25, 46:5, 46:9, 50:4, 52:21, 64:19, 65:10, 65:14, 72:9, 72:15, 75:5, 75:12, 76:17, 77:3, 77:6, 77:10, 78:2, 79:21, 81:15, 81:17, 81:22, 81:25, 82:4, 82:7, 86:21, 93:16, 94:16, 94:19, 94:22, 95:12, 95:14, 100:3, 100:9,

100:12, 100:15
**long-term** [2] - 93:25, 94:9
**look** [33] - 5:17, 10:22, 13:21, 14:4, 14:8, 19:20, 22:11, 30:13, 30:18, 37:22, 38:10, 38:20, 44:1, 44:3, 45:7, 45:25, 47:4, 47:19, 49:10, 53:6, 53:18, 53:20, 53:22, 53:23, 54:6, 57:2, 69:12, 70:19, 75:13, 81:13, 88:3, 88:22, 90:2
**looked** [7] - 6:23, 37:16, 37:17, 53:1, 53:5, 54:24, 55:3
**looking** [9] - 29:13, 33:21, 53:16, 55:25, 56:7, 71:7, 77:19, 90:8, 93:25
**looks** [4] - 9:16, 10:22, 34:24, 39:9, 65:9
**lost** [1] - 37:4
**luxury** [1] - 39:12

## M

**mail** [2] - 94:2, 94:5
**mainstream** [2] - 82:24, 86:17
**Major** [1] - 76:22
**male** [1] - 38:6
**MALETSKY** [1] - 1:9
**managed** [1] - 99:7
**manager** [1] - 58:16
**managing** [2] - 99:17, 99:22
**map** [1] - 65:24
**Maps** [1] - 37:12
**mark** [17] - 8:24, 8:25, 9:12, 11:6, 11:7, 14:23, 18:16, 20:4, 20:24, 22:20, 25:7, 29:16, 30:5, 37:2, 39:23, 43:9, 65:18
**mark-out** [1] - 65:18
**marked** [17] - 9:24, 10:1, 10:6, 11:18, 12:22, 15:1, 18:20, 19:2, 20:8, 21:3, 23:10, 25:10, 29:18, 30:7, 37:9, 40:2, 43:18
**marketing** [2] - 30:1, 31:9
**markup** [1] - 47:13
**master** [7] - 67:4, 89:4, 89:6, 90:16,

91:1, 91:5, 95:5
**material** [4] - 31:9, 75:16, 75:18, 75:20
**math** [2] - 7:15, 65:6
**mathematical** [1] - 44:12
**mathematics** [1] - 59:2
**matter** [6] - 16:20, 41:16, 69:5, 70:13, 76:5, 100:16
**matters** [3] - 41:15, 59:10, 69:15
**mean** [10] - 6:23, 25:3, 25:16, 36:22, 47:13, 53:11, 59:21, 66:10, 84:1, 97:24
**meaning** [2] - 89:5, 90:13
**means** [2] - 47:6, 84:2
**meant** [2] - 79:4, 82:24
**mechanism** [3] - 18:4, 18:5, 21:18
**medication** [2] - 51:15, 80:5
**medications** [1] - 80:6
**Medici** [6] - 83:20, 87:23, 92:14, 93:3, 93:5, 93:7
**MEESE** [1] - 2:5
**meet** [5] - 45:18, 73:4, 89:1, 89:13, 90:13
**Meet** [1] - 98:9
**meeting** [4] - 5:15, 6:15, 93:20, 94:25
**meetings** [1] - 37:25
**meets** [1] - 87:25
**member** [2] - 6:3, 6:17
**MEMBER** [9] - 1:9, 1:10, 1:11, 1:12, 1:13, 1:14, 1:15, 22:13, 46:6
**members** [4] - 12:4, 83:9, 96:21, 99:5
**men** [2] - 38:8, 51:17
**mention** [1] - 24:13
**mentioned** [1] - 84:18
**met** [4] - 83:19, 84:2, 84:10, 97:8
**methods** [1] - 31:13
**Michael** [1] - 3:4
**midst** [1] - 5:10
**might** [6] - 44:4, 49:6, 49:13, 56:4, 90:9, 97:5
**Mike** [1] - 65:2
**MIKE** [1] - 1:8
**miles** [5] - 37:15, 38:22, 57:8, 57:9,

75:17
**mind** [2] - 7:19, 95:2
**Mine** [1] - 31:5
**mine** [2] - 60:17, 78:24
**minimum** [2] - 37:18, 45:14
**minute** [1] - 72:12
**minutia** [1] - 67:14
**misheard** [1] - 18:11
**misleading** [7] - 31:21, 32:1, 32:4, 32:14, 32:17, 33:7, 33:13
**misrepresented** [1] - 33:11
**missing** [4] - 7:2, 35:8, 65:21, 66:4
**misstating** [1] - 61:16
**mistake** [1] - 48:15
**mistook** [1] - 48:9
**mixed** [1] - 39:18
**model** [5] - 39:7, 39:16, 40:16, 69:22, 96:13
**modification** [1] - 51:20
**Mondello** [2] - 95:25, 99:3
**MONDELLO** [16] - 1:14, 15:7, 15:10, 15:25, 16:8, 16:15, 17:15, 18:1, 18:10, 21:23, 41:23, 42:7, 49:5, 49:16, 50:3, 96:1
**money** [1] - 10:10
**month** [4] - 17:17, 17:21, 18:3, 19:1
**MORGAN** [1] - 1:13
**Morgan** [1] - 100:6
**Morris** [4] - 49:14, 56:18, 58:9
**Morristown** [1] - 85:10
**most** [3] - 74:3, 76:4, 99:5
**mother** [1] - 68:5
**motion** [2] - 95:9, 95:11
**move** [2] - 81:22, 94:1
**Moving** [1] - 41:22
**MR** [350] - 5:3, 5:7, 6:1, 6:6, 6:9, 6:12, 6:13, 6:18, 6:20, 6:23, 7:1, 7:8, 7:12, 8:25, 9:6, 9:8, 9:10, 9:11, 9:14, 9:17, 9:19, 10:1, 10:8, 11:7, 11:10, 11:11, 11:13, 11:20, 11:25, 12:2, 12:3, 12:6,

12:8, 12:10, 12:12, 12:14, 12:19, 13:22, 13:4, 13:5, 13:9, 13:13, 13:16, 13:19, 13:20, 14:23, 15:3, 15:7, 15:9, 15:10, 15:20, 15:25, 16:5, 16:8, 16:9, 16:15, 16:19, 17:15, 17:23, 18:1, 18:7, 18:10, 18:13, 18:16, 18:22, 19:2, 19:10, 20:3, 20:9, 20:10, 20:11, 20:24, 21:5, 21:8, 21:23, 22:1, 22:15, 22:20, 22:22, 23:2, 23:3, 23:5, 23:7, 23:12, 23:25, 24:12, 24:14, 24:19, 24:21, 24:23, 25:1, 25:7, 25:11, 25:15, 25:17, 25:19, 25:21, 25:23, 25:25, 26:2, 26:20, 27:2, 27:19, 28:7, 28:18, 28:20, 29:1, 29:3, 29:16, 29:21, 30:4, 30:9, 30:17, 30:21, 30:22, 30:25, 31:2, 31:6, 31:8, 34:23, 35:1, 35:3, 35:6, 35:7, 35:9, 36:10, 36:12, 36:17, 36:19, 36:22, 36:24, 37:1, 37:11, 39:21, 39:22, 40:4, 40:19, 40:21, 40:22, 41:7, 41:19, 41:21, 41:23, 42:5, 42:7, 42:9, 42:13, 43:8, 43:11, 43:13, 43:15, 43:19, 43:22, 43:23, 44:15, 44:16, 44:24, 45:23, 46:3, 46:10, 47:20, 49:5, 49:10, 49:16, 49:18, 50:3, 50:7, 50:13, 50:14, 50:18, 51:2, 51:4, 51:6, 51:8, 51:11, 51:24, 52:1, 52:2, 52:4, 52:7, 52:10, 52:11, 52:13, 52:16, 52:18, 52:19, 52:20, 52:22, 52:25, 53:5, 53:7, 53:10, 53:14, 53:24, 54:1, 54:9, 54:10, 54:11, 54:17, 54:18, 54:22, 54:24, 55:1, 55:4, 55:6, 55:11, 55:15, 55:17, 55:19, 55:21, 56:3, 56:6, 56:9, 56:10, 56:14,

56:16, 56:19, 56:20, 56:21, 56:24, 57:1, 57:6, 57:7, 57:8, 57:10, 57:12, 57:15, 58:2, 58:4, 58:10, 58:11, 58:12, 58:18, 58:22, 59:1, 59:4, 59:6, 59:8, 59:9, 59:15, 59:17, 59:19, 60:2, 60:7, 60:8, 60:10, 60:12, 60:15, 60:19, 60:23, 61:1, 61:4, 61:6, 61:7, 61:10, 61:13, 61:15, 61:18, 61:19, 61:20, 61:21, 61:24, 62:2, 62:4, 62:5, 62:9, 62:11, 62:13, 62:15, 62:17, 62:19, 62:24, 62:25, 63:1, 63:2, 63:7, 63:9, 63:15, 63:17, 63:20, 63:22, 64:4, 64:6, 64:12, 64:14, 64:16, 64:17, 64:18, 64:21, 64:22, 65:1, 65:12, 65:16, 66:6, 66:17, 66:21, 67:9, 67:12, 67:16, 67:18, 67:19, 71:5, 71:6, 71:9, 71:11, 71:13, 71:15, 71:16, 71:17, 71:20, 71:22, 71:24, 72:1, 72:3, 72:5, 72:8, 72:18, 75:7, 75:9, 75:11, 75:13, 76:19, 77:5, 77:18, 77:22, 77:25, 78:14, 78:21, 79:3, 79:11, 79:17, 80:2, 80:11, 80:15, 80:19, 81:4, 81:8, 81:20, 81:23, 82:2, 82:5, 82:9, 91:20, 95:13, 95:22, 95:24, 96:1, 100:4, 100:8, 100:14
**MS** [38] - 6:5, 6:22, 28:9, 28:19, 28:24, 75:10, 77:9, 77:11, 77:20, 77:23, 78:3, 78:16, 78:24, 79:6, 79:13, 79:19, 79:23, 80:7, 80:13, 80:17, 80:20, 81:6, 81:10, 81:16, 87:2, 93:19, 94:18, 95:10, 95:19, 95:20, 95:21, 95:23, 95:25, 99:1, 99:2, 100:2, 100:6, 100:14
**multiple** [1] - 9:3
**Municipal** [5] - 87:13, 88:1, 88:20, 88:21,

91:17
**municipality** [2] - 84:14, 84:15
**munition** [1] - 83:15
**must** [4] - 16:2, 65:9, 83:12, 86:4
**my..** [1] - 46:7

## N

**N.J.A.C** [1] - 74:7
**N.J.S.A** [1] - 27:11
**name** [13] - 7:11, 7:13, 13:14, 13:16, 13:17, 26:5, 31:16, 53:8, 65:2, 72:17, 73:24, 77:11, 85:8
**nature** [3] - 8:8, 17:11, 84:16
**near** [3] - 5:22, 10:24, 36:13
**nearly** [1] - 7:15
**necessarily** [1] - 54:6
**need** [11] - 21:16, 39:5, 40:15, 40:17, 40:24, 49:2, 56:4, 74:22, 80:8, 97:7, 97:23
**needed** [1] - 89:17
**needing** [1] - 37:23
**needs** [9] - 39:3, 85:23, 86:25, 88:25, 89:24, 91:10, 92:25, 96:15, 98:10
**negative** [12] - 8:10, 15:16, 15:18, 89:1, 89:7, 90:6, 90:11, 90:13, 90:21, 91:2, 92:9
**negatives** [1] - 93:13
**neighbor's** [1] - 48:8
**neighborhood** [11] - 26:15, 44:9, 78:25, 80:23, 80:24, 81:14, 88:10, 88:14, 89:3, 92:12, 97:18
**neighbors** [1] - 6:16
**network** [2] - 31:23, 31:24
**neurologic** [1] - 7:18
**never** [4] - 23:14, 51:24, 52:2, 52:8
**new** [3] - 22:4, 29:6, 29:22
**New** [14] - 1:23, 2:3, 2:6, 13:11, 45:14, 55:17, 58:8, 63:25, 64:7, 68:19, 68:20, 68:22, 83:11, 101:4
**newer** [2] - 61:12,

71:17
**next** [15] - 11:4, 19:25, 22:7, 23:6, 24:14, 24:15, 24:16, 24:25, 29:6, 36:13, 45:5, 45:13, 46:7, 67:10, 99:13
**Next** [1] - 18:13
**nice** [1] - 39:10
**niche** [1] - 85:21
**Nicosia** [1] - 95:23
**NICOSIA** [4] - 1:8, 57:12, 58:2, 95:24
**NO** [1] - 4:3
**nobody** [1] - 16:6
**non** [2] - 57:18, 59:11
**non-for-profit** [1] - 57:18
**none** [1] - 28:22
**nonetheless** [1] - 93:1
**nonexpert** [1] - 59:11
**noninherently** [2] - 87:19, 91:3
**normal** [1] - 85:5
**North** [61] - 4:5, 4:7, 4:8, 4:10, 4:12, 4:18, 8:15, 8:22, 11:5, 11:9, 11:17, 12:24, 13:21, 14:3, 14:6, 14:19, 14:21, 14:25, 15:15, 16:2, 17:19, 17:20, 18:5, 18:14, 18:18, 19:4, 19:23, 20:6, 20:14, 21:1, 21:7, 21:12, 22:8, 24:16, 25:3, 26:5, 27:13, 33:9, 33:11, 36:14, 37:6, 37:8, 37:14, 39:3, 39:11, 50:21, 50:25, 51:2, 51:8, 53:18, 55:9, 56:23, 57:5, 58:6, 59:20, 62:7, 62:20, 63:5, 63:13, 64:8, 77:21
**NorthJerseyRecovery.com** [1] - 50:11
**noted** [1] - 100:17
**notes** [1] - 98:11
**nothing** [2] - 24:9, 27:15
**Notwithstanding** [1] - 34:15
**November** [2] - 8:13, 61:23
**Number** [1] - 75:14
**number** [5] - 31:17, 50:10, 52:23, 70:24, 99:11
**numbers** [4] - 65:5,

69:5, 70:13, 71:9
**nursing** [1] - 84:20

## O

**O-1** [6] - 4:4, 9:1, 9:12, 10:2, 10:6, 12:25
**O-10** [3] - 4:17, 30:5, 30:8
**O-11** [5] - 4:18, 37:3, 37:9, 56:20
**O-12** [4] - 4:20, 37:2, 39:23, 40:3
**O-13** [3] - 4:21, 43:9, 43:18
**O-2** [7] - 4:5, 9:1, 11:8, 11:19, 12:23, 77:25, 78:1
**O-3** [4] - 4:7, 14:24, 15:2, 50:10
**O-4** [4] - 4:8, 18:17, 18:20, 19:3
**O-5** [3] - 4:10, 20:4, 20:8
**O-6** [3] - 4:12, 20:25, 21:3
**O-7** [2] - 4:14, 22:21
**O-8** [3] - 4:15, 25:8, 25:10
**O-9** [4] - 4:16, 29:17, 29:19, 34:23
**oath** [1] - 11:23
**oaths** [1] - 101:5
**object** [4] - 9:2, 24:10, 25:18, 41:4
**objected** [1] - 23:8
**objecting** [3] - 25:21, 25:22, 25:25
**objection** [2] - 24:24, 40:20
**objector** [1] - 25:12
**obtaining** [1] - 77:1
**obvious** [1] - 23:21
**obviously** [2] - 6:24, 15:17
**OF** [3] - 1:1, 1:1, 1:6
**offense** [1] - 34:17
**offer** [1] - 34:5
**offering** [1] - 64:25
**offers** [1] - 34:3
**Office@quickreporters.com** [1] - 1:24
**officially** [1] - 74:10
**often** [1] - 96:5
**OLGA** [1] - 1:15
**once** [2] - 81:20, 96:8
**one** [43] - 6:2, 6:6, 6:9, 9:4, 9:8, 11:21, 14:11, 18:22, 19:25,

20:4, 20:22, 23:8, 28:10, 31:1, 37:2, 38:10, 43:6, 50:1, 53:2, 53:5, 54:7, 55:4, 55:6, 61:13, 61:20, 69:20, 70:10, 70:16, 71:1, 73:15, 75:1, 78:7, 78:9, 78:20, 79:24, 80:22, 88:7, 91:22, 100:9
**One** [1] - 73:10
**ones** [2] - 29:22, 58:23
**onsite** [2] - 28:13, 28:15
**open** [3] - 23:16, 64:20, 73:15
**openings** [3] - 37:20, 38:16, 38:25
**operate** [2] - 18:2, 92:21
**operates** [1] - 18:2
**operating** [3] - 16:21, 23:18, 93:22
**operation** [5] - 21:21, 23:23, 33:16, 50:17, 50:19
**opinion** [5] - 41:8, 59:15, 59:18, 96:12, 97:5
**opinions** [2] - 41:15, 59:11
**opposite** [1] - 86:19
**options** [1] - 17:3
**order** [3] - 26:22, 65:8, 97:23
**ordinance** [3] - 89:5, 89:6, 91:6
**ordinances** [2] - 90:16, 95:6
**organization** [1] - 95:1
**otherwise** [2] - 34:4, 58:15
**out-of-network** [1] - 31:24
**outpatient** [7] - 37:19, 43:4, 50:15, 51:15, 51:16, 54:7
**outs** [1] - 85:15
**outside** [1] - 17:9
**overall** [1] - 91:13
**overflow** [1] - 97:19
**overhead** [1] - 58:13
**overlay** [1] - 73:3
**oversight** [3] - 57:21, 57:22, 57:25
**overtly** [1] - 35:12
**own** [5] - 6:24, 43:2, 48:1, 68:17, 93:6
**owned** [2] - 57:17, 57:18

**owner** [4] - 8:16, 38:14, 56:11, 74:2
**owns** [2] - 42:21
**Oxford** [23] - 36:18, 36:20, 36:21, 38:19, 49:8, 49:22, 53:25, 54:3, 54:4, 54:5, 56:17, 56:22, 57:13, 57:16, 57:17, 58:1, 58:5, 58:7, 58:8, 58:13, 58:20, 59:7

## P

**P-A-U-L** [1] - 13:17
**P.C** [1] - 2:5
**P.E** [1] - 2:10
**P.M** [1] - 1:2
**p.m** [1] - 100:17
**P.P** [2] - 2:12, 3:8
**package** [1] - 18:17
**Page** [4] - 4:7, 15:1, 75:9
**page** [43] - 10:25, 13:25, 14:4, 14:6, 14:22, 19:19, 19:20, 19:25, 20:23, 21:5, 21:6, 21:9, 21:10, 21:11, 22:12, 24:17, 25:4, 30:14, 30:16, 30:19, 30:24, 34:24, 37:4, 37:12, 38:4, 38:11, 39:24, 39:25, 44:1, 44:3, 44:4, 44:15, 44:16, 45:6, 45:13, 65:12, 74:3, 75:5, 75:7, 75:8, 78:2, 78:3
**PAGE** [1] - 3:1
**Pages** [12] - 4:6, 4:9, 4:11, 4:13, 4:19, 11:18, 18:20, 20:7, 21:3, 37:9
**pages** [13] - 10:3, 10:13, 11:2, 13:1, 18:14, 18:15, 19:3, 19:6, 20:5, 24:13, 34:21, 34:25
**Palisade** [2] - 1:5, 2:7
**Palisades** [21] - 4:4, 5:1, 9:15, 10:5, 10:18, 15:14, 16:16, 23:10, 23:25, 24:16, 24:17, 25:2, 27:13, 49:25, 53:21, 62:8, 62:20, 62:23, 63:6, 63:13, 63:25
**PalisadesProperties.com** [1] - 10:3
**paper** [1] - 24:8

**paragraph** [1] - 40:5
**parameter** [1] - 58:6
**parents** [1] - 51:18
**Park** [2] - 49:7, 97:6
**parked** [1] - 99:12
**parking** [1] - 5:23
**Parsippany** [2] - 2:3, 2:3
**part** [26] - 8:22, 14:2, 14:15, 14:19, 19:23, 20:20, 21:20, 23:24, 26:14, 28:19, 33:11, 43:21, 50:16, 50:19, 50:24, 50:25, 65:21, 66:17, 66:18, 68:21, 68:24, 74:3, 88:12, 88:17, 95:5, 99:20
**partial** [1] - 51:17
**participating** [1] - 82:13
**particular** [9] - 62:2, 87:21, 88:4, 88:8, 88:17, 88:18, 92:7, 97:10, 97:13
**particularly** [4] - 87:25, 88:10, 97:11
**parties** [1] - 101:12
**partnership** [1] - 21:14
**passage** [1] - 75:15
**Passaic** [1] - 38:7
**PASSALACQUA** [3] - 1:11, 20:10, 95:13
**passed** [2] - 22:4, 40:6, 95:5
**passing** [1] - 84:18
**past** [1] - 12:17
**patient** [4] - 7:21, 29:8, 35:24, 96:5
**patient's** [1] - 34:8
**patients** [3] - 17:3, 34:7, 35:22
**pattern** [1] - 47:10
**Paul** [10] - 3:2, 7:13, 13:17, 41:23, 49:5, 65:6, 71:14, 77:13, 78:17, 97:5
**pay** [3] - 34:18, 58:15, 68:7
**payment** [1] - 34:4
**pays** [1] - 17:20
**penalty** [3] - 32:24, 33:1, 33:2
**People** [2] - 53:22, 85:7
**people** [36] - 8:4, 8:6, 19:14, 22:10, 24:6, 29:14, 29:15, 36:2, 47:25, 48:15, 57:19, 58:17, 59:20, 59:25,

66:20, 69:8, 69:13, 69:23, 70:5, 70:7, 70:24, 71:1, 73:2, 80:5, 80:12, 82:23, 83:2, 83:6, 83:10, 84:25, 85:4, 86:17, 96:9, 98:1, 98:13

**Pequannock** [2] - 73:23, 73:24
**per** [5] - 18:3, 44:12, 44:25, 45:1, 69:13
**perc** [1] - 75:15
**perc-ability** [1] - 75:15
**perceive** [5] - 50:20, 50:23, 50:24, 51:1
**percent** [18] - 8:14, 38:23, 44:19, 45:1, 45:2, 45:3, 59:5, 59:6, 59:12, 68:20, 68:22, 70:16, 70:17, 70:23, 73:3, 75:17, 76:4, 94:13
**percentage** [2] - 59:3, 59:12
**perfectly** [1] - 28:21
**period** [2] - 74:11, 76:10
**permeability** [2] - 75:4, 75:14
**permitted** [5] - 5:17, 83:25, 84:20, 87:8, 92:24
**person** [10] - 18:3, 24:5, 31:25, 32:7, 33:25, 34:6, 34:16, 59:2, 69:14, 70:19
**personal** [2] - 28:16, 56:4
**personally** [1] - 80:3
**persons** [1] - 70:20
**perspective** [3] - 7:21, 82:19, 94:23
**pertains** [1] - 22:23
**PETRESKI** [4] - 2:10, 39:21, 44:15, 46:10
**pharmaceutical** [2] - 78:10, 80:5
**pharmaceuticals** [3] - 79:2, 79:3, 79:5
**pharmacy** [1] - 79:7
**phone** [1] - 31:16
**picked** [3] - 41:2, 60:23, 61:7
**picture** [10] - 10:17, 18:14, 43:7, 45:6, 70:4, 77:16, 77:20, 78:4, 78:18
**pictures** [18] - 10:23, 12:23, 13:23, 14:9, 14:17, 16:11, 19:4,

19:8, 19:14, 19:20, 20:12, 20:13, 24:17, 25:5, 25:13, 26:3, 94:2, 94:6
**piece** [9] - 11:4, 24:8, 29:6, 33:21, 74:10, 76:7, 87:24, 88:5, 88:19
**pieces** [1] - 39:18
**pipe** [3] - 68:3, 68:10, 68:12
**pipeline** [1] - 16:3
**pit** [1] - 75:19
**place** [14] - 16:17, 17:4, 28:22, 36:15, 37:24, 38:3, 51:22, 52:14, 53:2, 53:6, 73:4, 99:11, 101:8
**places** [4] - 19:12, 36:16, 53:2, 59:23
**plain** [1] - 31:12
**plaintiff** [1] - 86:11
**plan** [8] - 89:4, 89:6, 90:16, 90:25, 91:1, 91:6, 95:5
**Planner** [1] - 2:12
**planner** [6] - 87:3, 89:10, 93:6, 96:25, 97:4
**planning** [2] - 66:7, 73:6
**plans** [4] - 66:5, 67:4, 71:7, 71:8
**plays** [1] - 24:3
**plus** [1] - 44:17
**point** [14] - 16:24, 20:2, 41:3, 42:18, 53:16, 57:25, 66:6, 66:14, 66:21, 75:1, 79:9, 79:14, 80:14, 80:17
**points** [6] - 8:9, 16:23, 41:10, 41:18, 85:17, 99:24
**police** [2] - 48:12, 97:21
**ponds** [1] - 68:14
**population** [1] - 59:23
**portion** [6] - 44:20, 35:7, 73:8, 81:24, 82:6, 82:8
**position** [1] - 84:4
**positive** [6] - 87:22, 87:23, 89:13, 89:16, 90:11, 92:6
**positives** [1] - 93:12
**possibility** [1] - 22:2
**possible** [1] - 74:15
**possibly** [1] - 26:8
**potentially** [1] - 33:17

**power** [1] - 87:20
**practical** [1] - 86:15
**practice** [2] - 31:18, 33:17
**practices** [1] - 30:2
**prefer** [1] - 98:13
**prejudice** [1] - 96:10
**preparing** [1] - 82:20
**PRESENT** [1] - 1:6
**present** [2] - 10:16, 33:23
**presented** [5] - 8:22, 14:2, 14:19, 16:14, 19:23
**preserving** [1] - 47:12
**pressure** [2] - 46:17, 46:24
**presuming** [2] - 47:15, 47:16
**pretreatment** [4] - 46:15, 46:17, 46:23, 47:1
**prevention** [1] - 51:18
**previously** [1] - 98:22
**PRICE** [1] - 2:5
**price** [1] - 68:7
**print** [3] - 9:14, 10:11, 11:1
**printed** [4] - 9:20, 11:12, 11:22, 12:24
**Printout** [13] - 4:4, 4:5, 4:7, 4:8, 4:10, 4:12, 4:20, 10:5, 11:17, 14:25, 18:18, 21:1, 40:1
**printout** [7] - 9:15, 10:17, 11:8, 14:10, 14:13, 19:3, 39:23
**printouts** [1] - 10:2
**proactively** [2] - 99:8, 99:21
**probe** [1] - 24:10
**problem** [2] - 5:3, 67:10
**problems** [4] - 7:18, 97:17, 97:18
**proceed** [1] - 65:9
**process** [3] - 24:4, 57:20, 82:11
**producing** [3] - 69:9, 69:13, 70:16
**professional** [1] - 96:4
**Professional** [1] - 2:12
**profit** [2] - 57:18, 95:1
**program** [8] - 8:15, 37:19, 51:15, 51:17, 51:18, 54:7, 84:16
**Program** [1] - 50:12
**Programs** [2] - 4:7,

15:1
**programs** [5] - 14:22, 15:5, 16:18, 21:13, 50:23
**prohibits** [2] - 28:6, 30:1
**promise** [1] - 12:19
**prong** [1] - 89:18
**proof** [2] - 26:16, 93:4
**properties** [1] - 97:20
**Properties** [22] - 1:5, 2:7, 4:4, 5:1, 10:6, 10:18, 15:14, 16:16, 23:10, 23:25, 24:16, 24:18, 25:2, 27:13, 49:25, 53:21, 62:8, 62:20, 62:23, 63:6, 63:14, 63:25
**Properties'** [1] - 9:15
**property** [14] - 8:1, 10:19, 13:23, 26:4, 28:23, 69:11, 74:5, 74:10, 76:7, 87:6, 87:24, 88:3, 88:5, 88:19
**propose** [1] - 5:20
**proposed** [2] - 46:20, 89:25
**proposing** [2] - 5:24, 87:10
**proposition** [1] - 15:13
**protect** [3] - 29:15, 69:1, 69:2
**protecting** [1] - 7:25
**prove** [1] - 66:19
**proven** [1] - 76:6
**provide** [12] - 10:20, 13:7, 21:13, 22:25, 23:3, 24:2, 27:9, 31:11, 31:15, 31:25, 32:11, 78:22
**provided** [8] - 24:1, 31:14, 32:12, 58:21, 83:18, 85:2, 85:12
**provider** [10] - 31:11, 31:15, 31:24, 32:3, 32:10, 32:15, 32:18, 32:20, 32:22
**providers** [4] - 30:3, 31:20, 31:22, 32:6
**provides** [5] - 32:16, 32:21, 51:7, 51:9, 85:24
**providing** [3] - 24:10, 41:1, 56:1
**provision** [2] - 28:13, 50:14
**provisions** [2] - 32:23, 34:16

**proximity** [1] - 56:23
**Psychology** [6] - 4:15, 22:9, 22:17, 25:4, 25:9, 26:4
**PUBLIC** [1] - 3:1
**public** [22] - 5:10, 7:5, 7:6, 11:16, 12:4, 23:16, 64:20, 72:11, 77:7, 81:18, 81:24, 82:5, 82:7, 82:12, 85:21, 89:2, 89:19, 90:14, 90:24, 96:7, 96:15, 97:16
**published** [1] - 31:10
**pulled** [1] - 37:16
**pulling** [1] - 48:5
**pulmonary** [1] - 7:17
**pump** [1] - 46:13
**PURCELL** [115] - 2:5, 5:3, 5:7, 6:1, 6:6, 6:9, 6:12, 6:18, 6:23, 22:22, 23:3, 23:25, 25:11, 25:17, 25:23, 27:2, 28:18, 28:20, 29:1, 30:22, 31:2, 31:6, 36:17, 36:22, 40:19, 40:22, 41:19, 50:7, 50:14, 51:2, 51:6, 51:11, 52:1, 52:4, 52:10, 52:13, 52:18, 52:20, 52:22, 53:5, 53:10, 53:24, 54:9, 54:11, 54:18, 54:24, 55:4, 55:11, 55:17, 55:21, 56:6, 56:10, 56:16, 56:20, 56:24, 57:6, 57:8, 57:15, 58:4, 58:11, 58:18, 59:1, 59:6, 59:9, 59:17, 60:2, 60:8, 60:12, 60:19, 61:1, 61:6, 61:10, 61:15, 61:19, 61:21, 62:2, 62:5, 62:11, 62:15, 62:19, 62:25, 63:2, 63:9, 63:17, 63:22, 64:6, 64:14, 64:17, 71:6, 71:11, 71:15, 71:17, 71:22, 72:1, 72:5, 75:9, 75:11, 76:19, 77:18, 77:22, 77:25, 78:14, 78:21, 79:3, 79:11, 79:17, 80:2, 80:11, 80:15, 80:19, 81:4, 81:8, 82:5, 82:9, 100:14
**Purcell** [13] - 5:2, 5:4, 9:2, 9:9, 23:8, 26:25, 28:12, 50:6, 57:12,

76:18, 77:14, 82:4, 86:22
**Purcell's** [1] - 24:24
**purchase** [1] - 42:12
**purification** [2] - 67:24, 69:21
**purified** [1] - 68:11
**purity** [1] - 70:23
**Purpose** [1] - 87:25
**purpose** [10] - 10:20, 56:8, 56:22, 67:21, 82:22, 85:22, 86:18, 89:4, 90:15, 94:3
**purposes** [3] - 56:1, 80:2, 88:21
**pursuant** [4] - 31:19, 33:2, 34:13, 101:5
**purview** [5] - 66:9, 84:8, 91:17, 98:17, 98:18
**put** [8] - 25:12, 53:3, 67:22, 83:1, 94:2, 94:5, 98:20
**putting** [1] - 15:14, 26:13

## Q

**qualified** [1] - 40:25
**quality** [1] - 97:19
**quantity** [1] - 80:8
**quarter** [2] - 73:14, 73:17
**quasi** [1] - 96:21
**quasi-judicial** [1] - 96:21
**questioned** [1] - 43:25
**questions** [15] - 24:6, 50:4, 58:19, 72:9, 75:2, 76:17, 76:20, 78:15, 80:14, 81:8, 81:11, 96:23, 97:9, 98:24, 99:4
**quick** [4] - 1:22, 38:23, 49:5, 98:2
**quite** [2] - 7:22, 22:25
**quote** [1] - 27:4
**quoting** [1] - 45:24

## R

**R-O-S-E-N-W-A-S-S-E-R** [1] - 13:18
**R.S.41:2-2** [1] - 101:5
**RACHEL** [1] - 1:12
**Rachel** [1] - 94:17
**Raise** [1] - 13:6
**raise** [2] - 5:15, 8:8
**ran** [1] - 38:23
**random** [1] - 20:1

**rate** [1] - 70:23
**rather** [2] - 5:19, 22:15
**RE** [1] - 1:3
**reactive** [1] - 99:8
**read** [2] - 28:8, 33:24
**reading** [1] - 28:12
**ready** [2] - 36:7, 95:9
**Real** [1] - 49:5
**really** [31] - 11:23, 16:13, 17:10, 17:13, 17:25, 18:24, 23:18, 26:9, 39:10, 40:16, 41:14, 42:17, 44:20, 45:2, 46:1, 50:1, 66:12, 67:7, 75:25, 76:24, 82:15, 84:11, 85:20, 85:24, 88:16, 92:19, 92:25, 96:11, 98:8, 98:16, 98:19
**reason** [6] - 70:13, 88:8, 88:12, 88:18, 91:7, 100:1
**reasonable** [4] - 48:23, 58:23, 86:3, 90:7
**reasonably** [1] - 84:10
**reasons** [4] - 86:15, 87:21, 89:14, 92:7
**rebate** [2] - 34:6, 62:23
**recap** [1] - 5:5
**receive** [3] - 6:17, 6:18, 6:20
**received** [1] - 6:14
**receiving** [2] - 34:4, 62:22
**recenter** [1] - 56:15
**recess** [1] - 72:14
**recognizing** [1] - 89:20
**record** [1] - 13:14
**recover** [2] - 8:4, 27:8
**Recover** [1] - 62:20
**recovering** [1] - 27:7
**Recovery** [56] - 4:5, 4:7, 4:8, 4:10, 4:12, 8:16, 8:22, 11:5, 11:9, 11:18, 12:24, 13:22, 14:3, 14:6, 14:19, 14:21, 15:1, 15:15, 16:3, 17:19, 17:20, 18:5, 18:15, 18:19, 19:4, 19:24, 20:7, 20:14, 21:2, 21:12, 25:3, 26:5, 27:14, 33:10, 33:11, 36:14, 37:14, 39:3, 39:11, 50:21, 51:2, 51:9, 52:23, 54:13, 55:9, 55:22, 56:11,

56:12, 56:23, 57:5, 58:6, 59:20, 62:7, 63:6, 63:13, 64:8
**recovery** [30] - 8:6, 15:23, 16:17, 21:19, 27:10, 29:9, 29:14, 31:16, 31:20, 31:23, 32:3, 32:6, 32:11, 32:16, 32:18, 32:20, 34:14, 39:4, 39:6, 39:12, 39:15, 39:16, 40:17, 49:2, 51:7, 51:10, 56:13, 56:15, 57:19
**Recovery's** [2] - 24:17, 50:25
**rectangular** [1] - 46:11
**redirect** [1] - 32:7
**reduce** [1] - 90:6
**reduced** [1] - 99:14
**refer** [1] - 75:3
**reference** [1] - 23:10
**referral** [1] - 34:7
**referrals** [2] - 29:8, 62:23
**referred** [1] - 76:14
**referring** [1] - 30:16
**refuse** [1] - 97:17
**regarding** [4] - 8:9, 16:24, 22:8, 37:4
**region** [4] - 68:19, 68:22, 68:23, 69:1
**regional** [1] - 97:7
**regs** [5] - 45:14, 45:23, 45:24, 54:2, 67:14
**regular** [1] - 6:7
**regulate** [1] - 66:23
**regulation** [1] - 28:6
**regulations** [10] - 27:3, 27:5, 27:16, 27:17, 27:22, 47:17, 57:24, 66:14, 83:13
**rehab** [1] - 51:17
**REINSTEIN** [2] - 101:3, 101:24
**rejected** [1] - 36:16
**relapse** [1] - 51:17
**Related** [2] - 4:18, 37:8
**related** [2] - 24:4, 37:5
**relationship** [6] - 27:12, 32:9, 32:13, 35:14, 35:18, 62:10
**relative** [3] - 48:9, 101:11, 101:13
**relevant** [3] - 10:14, 22:24, 23:4
**rely** [1] - 98:14
**remedy** [1] - 48:19

**Remember** [1] - 36:14
**remember** [1] - 6:14
**remind** [1] - 65:10
**reminder** [1] - 12:16
**renowned** [1] - 22:18
**rent** [3] - 17:16, 42:2, 42:12
**repeat** [2] - 52:11, 63:7
**Reporter** [1] - 101:4
**reporter** [1] - 13:15
**Reporting** [1] - 1:22
**reports** [1] - 97:22
**representation** [1] - 10:21
**represented** [2] - 33:9, 96:12
**represents** [2] - 22:9, 86:3
**requested** [1] - 10:20
**requesting** [2] - 84:5, 84:12
**require** [1] - 54:8
**required** [1] - 37:24
**requirement** [1] - 45:18
**requirements** [4] - 17:1, 37:22, 45:15, 73:5
**requires** [1] - 92:3
**requiring** [2] - 87:8, 92:23
**reread** [1] - 82:20
**research** [2] - 64:4, 64:13
**researching** [1] - 63:21
**reserve** [1] - 46:25
**reserved** [1] - 46:22
**reservoir** [1] - 68:17
**reservoirs** [1] - 68:14
**Residence** [1] - 87:7
**residence** [17] - 8:14, 31:16, 32:3, 32:6, 32:10, 32:16, 32:19, 32:20, 53:12, 85:8, 87:7, 88:9, 88:11, 88:13, 88:15, 92:17, 94:1
**residences** [6] - 29:9, 31:20, 36:25, 39:14, 49:3, 83:12
**resident** [4] - 7:14, 17:18, 31:23, 32:12
**residential** [8] - 26:15, 27:6, 44:6, 44:8, 84:21, 91:12, 92:12, 93:4
**residents** [7] - 27:9, 34:15, 69:13, 70:3,

72:16, 83:23, 99:15
**resolution** [1] - 45:16
**resolved** [1] - 45:19
**resources** [1] - 39:5
**respect** [25] - 5:16, 7:21, 24:2, 27:15, 40:23, 40:24, 49:1, 50:9, 54:12, 55:22, 56:10, 58:20, 60:3, 60:4, 60:22, 61:21, 62:5, 63:2, 64:1, 64:8, 64:9, 71:7, 71:23, 96:7
**respectful** [1] - 96:6
**respectfully** [1] - 84:9
**Response** [2] - 81:19, 94:21
**responsibility** [2] - 95:4, 99:21
**responsible** [3] - 67:1, 67:15, 99:20
**rest** [1] - 83:7
**restitution** [1] - 34:17
**restricted** [1] - 76:4
**return** [1] - 7:4
**review** [1] - 73:9
**reviewed** [1] - 9:23
**revised** [7] - 60:5, 60:13, 60:14, 60:21, 60:25, 61:2, 61:8
**revision** [2] - 29:22, 71:25
**revisions** [1] - 61:24
**ridiculous** [1] - 96:11
**right-hand** [1] - 78:7
**rights** [1] - 8:1
**Ritacco** [1] - 48:4
**Road** [2] - 1:23, 2:3
**role** [1] - 24:3
**Ron** [1] - 99:2
**RONALD** [1] - 1:14
**RONDA** [2] - 101:3, 101:24
**room** [5] - 14:13, 14:14, 14:15, 47:2, 59:25
**rooms** [1] - 85:5
**ROSENWASSER** [139] - 7:8, 7:12, 9:6, 9:10, 9:14, 9:19, 10:8, 11:10, 11:13, 11:20, 12:2, 12:6, 12:10, 12:14, 12:19, 13:4, 13:9, 13:16, 13:20, 15:3, 15:9, 15:20, 16:5, 16:9, 16:19, 17:23, 18:7, 18:13, 18:22, 19:10, 20:9, 20:11, 21:8, 22:1, 22:15, 23:2,

23:5, 23:12, 24:14, 24:21, 25:1, 25:15, 25:19, 26:2, 26:20, 27:19, 28:7, 29:3, 29:21, 30:9, 30:17, 30:21, 30:25, 31:8, 35:1, 35:6, 35:9, 36:10, 36:12, 36:19, 36:24, 37:11, 40:4, 40:21, 41:7, 41:21, 42:5, 42:9, 42:13, 43:11, 43:15, 43:19, 43:23, 44:16, 44:24, 45:23, 46:3, 47:20, 49:10, 49:18, 50:13, 50:18, 51:4, 51:8, 51:24, 52:2, 52:7, 52:11, 52:16, 52:19, 52:25, 53:7, 53:14, 54:1, 54:10, 54:17, 54:22, 55:1, 55:6, 55:15, 55:19, 56:3, 56:9, 56:14, 56:19, 56:21, 57:1, 57:7, 57:10, 58:10, 58:12, 58:22, 59:4, 59:8, 59:15, 59:19, 60:7, 60:10, 60:15, 60:23, 61:4, 61:7, 61:13, 61:18, 61:20, 61:24, 62:4, 62:9, 62:13, 62:17, 62:24, 63:1, 63:7, 63:15, 63:20, 64:4, 64:12, 64:16, 64:18
**Rosenwasser** [12] - 3:2, 7:13, 13:2, 13:17, 13:18, 15:7, 24:12, 40:20, 40:25, 43:10, 50:5, 50:9
**Rosenwasser's** [1] - 40:22
**rulemaking** [1] - 85:19
**rules** [4] - 38:1, 66:14, 74:16, 74:17
**running** [2] - 67:10, 67:20
**runs** [1] - 68:11
**rural** [2] - 47:24, 48:14

### S

**safe** [1] - 80:23
**sake** [2] - 57:12, 80:3
**Sal** [2] - 74:1
**samples** [1] - 75:14
**sand** [2] - 75:18, 75:21
**saturated** [1] - 97:7
**saving** [1] - 10:10
**saw** [2] - 15:11, 53:2

**say..** [1] - 31:7
**scenario** [1] - 69:5
**scholarly** [1] - 55:3
**science** [1] - 7:16
**screen** [4] - 5:23, 9:14, 11:1, 12:23
**search** [2] - 57:2, 98:2
**Second** [1] - 90:2
**second** [10] - 29:24, 38:4, 38:25, 40:5, 45:6, 47:19, 73:14, 89:24, 95:12, 95:13
**secondary** [1] - 16:22
**Secretary** [1] - 2:9
**section** [3] - 32:23, 74:7, 82:21
**Section** [2] - 34:10, 88:20
**secured** [4] - 80:21, 81:2, 81:5, 81:9
**See** [1] - 42:13
**see** [28] - 5:13, 11:15, 13:22, 14:5, 14:18, 15:3, 17:10, 19:17, 25:5, 26:3, 36:1, 39:1, 40:4, 44:18, 44:19, 44:24, 45:10, 46:19, 46:21, 47:9, 47:10, 69:15, 78:4, 79:6, 82:2, 91:15, 93:23, 97:22
**seeing** [7] - 16:9, 20:20, 22:25, 28:1, 40:14, 47:2, 47:3
**seeking** [1] - 41:2
**segregate** [1] - 86:16
**sense** [2] - 75:3, 82:14
**sentenced** [1] - 34:17
**separate** [7] - 16:10, 16:13, 20:16, 24:5, 26:10, 28:2
**separately** [1] - 85:5
**separates** [1] - 48:13
**separation** [2] - 27:22, 47:18
**SEPTEMBER** [1] - 1:2
**septic** [43] - 43:7, 43:13, 43:15, 43:20, 43:24, 44:7, 45:7, 45:15, 45:19, 45:22, 46:2, 46:12, 46:16, 60:4, 60:5, 60:14, 60:21, 60:25, 61:3, 61:9, 61:11, 61:12, 65:5, 65:23, 65:25, 66:8, 66:13, 66:20, 66:23, 66:25, 67:11, 67:14, 67:20, 67:21, 67:22, 68:1, 68:5, 70:14, 73:11, 74:16,

75:19, 94:25, 98:15
**Septic** [2] - 4:21, 43:17
**septics** [2] - 66:11, 66:23
**seq** [1] - 31:19
**series** [3] - 10:2, 12:23, 88:7
**serious** [1] - 7:17
**serve** [6] - 15:22, 39:4, 39:6, 39:7, 40:15, 40:17
**served** [1] - 97:12
**serves** [1] - 26:11
**service** [8] - 7:25, 32:15, 34:8, 45:15, 45:21, 51:14, 56:5, 96:6
**services** [14] - 24:2, 28:14, 28:16, 28:22, 31:13, 34:11, 50:15, 50:16, 50:22, 51:1, 51:7, 51:10, 51:14, 52:14
**Services** [1] - 50:12
**serving** [4] - 15:24, 39:14, 39:15, 89:24
**set** [1] - 101:9
**setbacks** [1] - 67:4
**setting** [3] - 27:6, 50:20, 80:24
**Seven** [2] - 4:19, 37:8
**seven** [8] - 6:4, 6:5, 37:4, 38:11, 38:12, 40:13, 42:10, 42:20
**seven-page** [1] - 37:4
**Sewage** [1] - 44:4
**sewage** [1] - 44:11
**sewer** [3] - 67:25, 68:1, 68:2
**shaking** [1] - 19:14
**shall** [7] - 31:11, 31:12, 31:18, 32:24, 33:2, 34:17, 35:4
**shame** [1] - 34:20
**share** [2] - 9:2, 9:5
**shifts** [1] - 84:3
**Shoot** [1] - 34:21
**short** [1] - 94:7
**short-term** [1] - 94:7
**shot** [1] - 14:16
**show** [8] - 8:20, 45:5, 65:18, 69:5, 70:1, 84:11, 86:6
**showers** [1] - 76:9
**showing** [7] - 9:15, 17:12, 19:4, 22:6, 26:7, 39:4, 88:18
**shown** [1] - 83:23
**shows** [11] - 14:1,

19:22, 21:17, 26:8, 38:12, 44:7, 45:11, 77:16, 78:18, 85:10, 88:8
**SHULMAN** [1] - 2:5
**shut** [1] - 47:8
**siblings** [1] - 40:9
**Sica** [6] - 85:16, 89:11, 89:15, 89:18, 90:18, 92:4
**side** [8] - 46:14, 68:9, 70:2, 70:6, 70:10, 70:11, 78:8, 78:9
**sides** [1] - 69:6
**signed** [3] - 29:7, 29:10, 29:24
**significant** [1] - 70:9
**similar** [3] - 58:24, 93:22, 93:23
**simple** [2] - 74:9, 76:5
**simply** [2] - 73:6, 75:2
**single** [14] - 8:15, 17:18, 74:2, 83:8, 83:9, 83:11, 83:13, 84:25, 85:1, 85:3, 85:6, 85:11, 88:9, 88:13
**single-family** [8] - 74:2, 83:8, 83:9, 83:11, 83:13, 84:25, 88:9, 88:13
**sister** [1] - 66:13
**sit** [1] - 75:17
**site** [5] - 28:4, 68:3, 88:12, 92:8, 97:15
**Site** [2] - 4:12, 21:2
**situation** [2] - 56:4, 56:5
**Six** [1] - 100:9
**six** [4] - 37:2, 38:25, 70:2, 94:8
**size** [1] - 98:3
**slightly** [1] - 73:19
**slowness** [1] - 7:20
**small** [2] - 53:8, 98:7
**smaller** [2] - 78:7, 78:20
**smart** [2] - 40:8
**so..** [1] - 71:10
**Sober** [9] - 4:12, 4:18, 15:5, 21:2, 21:7, 36:22, 36:24, 37:7, 49:24
**sober** [30] - 16:11, 20:22, 21:13, 21:14, 24:1, 24:3, 36:13, 36:21, 37:5, 37:23, 38:6, 38:7, 39:13, 49:8, 51:23, 53:2, 53:11, 53:12, 53:19,

53:20, 53:22, 53:23, 53:25, 58:17, 83:12, 85:8, 87:6, 88:11, 88:15
**sobriety** [2] - 27:10, 37:24
**society** [1] - 86:18
**soil** [2] - 75:3, 75:14
**solely** [1] - 27:6
**solicit** [1] - 34:5
**soliciting** [1] - 34:3
**solid** [2] - 46:19, 47:5
**solution** [2] - 76:11, 76:12
**someone** [7] - 38:16, 38:18, 42:19, 43:5, 48:6, 56:4, 96:12
**sometime** [1] - 9:22
**Sometimes** [1] - 38:17
**somewhere** [4] - 47:11, 59:5, 70:18, 83:1
**soon** [2] - 12:8, 12:12
**sorry** [16] - 12:10, 16:1, 18:11, 20:11, 26:2, 37:3, 43:11, 52:21, 58:18, 61:15, 65:15, 79:18, 94:17, 98:10, 98:24
**sort** [5] - 24:4, 63:4, 67:4, 70:13, 84:2
**sound** [2] - 94:4, 94:6
**sounds** [2] - 28:24, 94:7
**space** [2] - 60:1, 69:23
**speaking** [2] - 62:21, 82:13
**speaks** [1] - 85:13
**special** [5] - 67:22, 87:21, 88:3, 89:14, 92:7
**specific** [3] - 37:21, 60:11, 62:17
**specifically** [2] - 53:1, 92:24
**specked** [1] - 45:4
**spell** [1] - 13:14
**squiggly** [1] - 45:9
**stable** [1] - 93:25
**staircase** [1] - 14:11
**stake** [1] - 89:19
**stand** [1] - 13:5
**standalone** [2] - 20:19, 27:19
**standard** [4] - 69:24, 83:19, 92:14, 92:17
**standards** [2] - 86:25, 87:15
**staples** [1] - 11:15
**start** [7] - 25:1, 40:10,

63:24, 67:5, 72:13, 82:15, 93:18
**started** [5] - 40:12, 42:16, 78:7, 79:24, 80:22
**starting** [2] - 5:12, 30:14
**State** [4] - 7:11, 68:20, 72:17, 101:4
**state** [7] - 13:14, 21:25, 54:14, 56:25, 58:8, 68:23, 84:9
**state's** [1] - 68:21
**statement** [6] - 21:9, 72:24, 76:21, 78:17, 79:20, 81:11
**statements** [6] - 31:22, 32:14, 32:17, 40:23, 41:5
**stating** [1] - 79:7
**status** [1] - 31:23
**statute** [3] - 25:2, 33:18, 58:16
**statutes** [17] - 15:22, 17:2, 21:25, 22:4, 23:19, 26:22, 29:12, 29:14, 35:21, 35:24, 61:22, 61:25, 64:1, 64:9, 82:21
**stay** [2] - 37:18, 58:14
**stays** [1] - 16:1
**steered** [2] - 17:4, 35:22
**steering** [1] - 36:2
**stenographically** [1] - 101:7
**step** [2] - 67:24, 68:6
**steps** [3] - 78:5, 78:20, 79:10
**STEVEN** [1] - 2:2
**still** [9] - 5:10, 7:19, 46:24, 62:22, 78:8, 89:16, 94:12, 94:14, 96:22
**stipulate** [1] - 77:1
**stipulated** [1] - 51:12
**stock** [1] - 19:14
**stolen** [1] - 81:3
**stone** [1] - 46:14
**stood** [1] - 99:3
**stop** [1] - 82:25
**story** [1] - 39:18
**streams** [1] - 68:14
**street** [7] - 45:9, 47:8, 65:7, 68:12, 68:13, 98:5, 98:7
**stressful** [1] - 48:18
**stretch** [1] - 41:22
**strongly** [1] - 93:8
**struggle** [1] - 7:22

**struggling** [1] - 96:23
**studied** [2] - 54:19, 55:1
**study** [1] - 54:19
**stuff** [8] - 25:20, 26:7, 28:8, 33:13, 34:19, 38:2, 44:13, 67:5
**subject** [2] - 61:23, 73:9
**subjective** [1] - 59:16
**submission** [1] - 72:2
**submit** [4] - 6:16, 6:17, 39:19, 86:9
**submitted** [7] - 60:5, 60:14, 60:21, 61:3, 61:17, 63:19, 71:18
**subsection** [1] - 32:24
**subsequent** [1] - 11:2
**Substance** [1] - 34:12
**substance** [7] - 8:5, 14:5, 29:8, 30:2, 32:14, 32:21, 34:11
**substantial** [6] - 89:2, 89:3, 90:13, 90:14, 90:24, 90:25
**subsumed** [1] - 91:13
**suburban** [1] - 48:14
**successful** [1] - 86:11
**suffering** [1] - 33:4
**suggest** [2] - 32:8, 63:3
**suggesting** [5] - 16:4, 17:18, 18:4, 21:23, 22:1
**suggests** [1] - 93:7
**suitability** [2] - 88:13, 92:8
**suitable** [2] - 88:14, 97:11
**Suite** [1] - 2:6
**suited** [2] - 87:25, 88:10
**summarize** [1] - 86:24
**summary** [3] - 82:3, 91:9, 91:22
**summation** [1] - 86:1
**support** [4] - 27:9, 95:6, 95:15, 95:18
**supports** [1] - 8:20
**supposed** [12] - 16:13, 18:25, 20:15, 20:17, 20:18, 20:19, 23:15, 26:12, 28:2, 35:23, 36:3, 67:23
**surreptitiously** [1] - 32:7
**surrounding** [3] - 49:8, 97:3, 98:10
**survey** [2] - 47:4, 47:14

**surveyor** [1] - 47:12
**suspect** [1] - 83:8
**suspend** [1] - 76:13
**swear** [8] - 11:25, 12:4, 12:5, 12:7, 12:9, 12:13, 13:3, 13:6
**SWORN** [1] - 3:1
**sworn** [5] - 12:5, 13:12, 41:9, 64:24, 98:13
**system** [14] - 45:3, 45:7, 46:12, 47:1, 68:1, 68:2, 68:5, 68:15, 70:15, 73:11, 74:16, 98:15, 98:20
**systems** [2] - 70:14, 70:22

**T**

**tab** [1] - 50:12
**table** [1] - 91:15
**tabs** [1] - 11:3
**tank** [8] - 45:16, 45:22, 46:2, 46:13, 46:17, 46:18, 47:1, 68:1
**tanks** [1] - 65:23
**tasked** [1] - 63:18
**television** [1] - 14:14
**ten** [1] - 80:9
**tend** [1] - 58:14
**term** [6] - 53:17, 53:25, 93:25, 94:7, 94:9, 96:20
**terminates** [1] - 47:11
**terms** [1] - 99:14
**test** [8] - 83:20, 85:16, 89:11, 89:18, 90:18, 90:20, 92:4
**testified** [1] - 89:10
**testifies** [1] - 13:12
**testifying** [1] - 78:22
**testimony** [43] - 7:23, 8:8, 8:12, 11:24, 12:17, 13:7, 17:11, 17:16, 18:8, 18:25, 23:12, 23:15, 24:2, 26:7, 30:10, 30:11, 36:8, 40:11, 41:12, 42:4, 42:8, 42:14, 42:25, 43:20, 47:22, 48:2, 48:4, 49:4, 55:23, 56:1, 77:13, 79:12, 83:18, 85:2, 92:12, 93:21, 97:4, 98:12, 98:15, 98:21, 99:6, 101:7
**tests** [1] - 37:25
**that..** [2] - 16:18,

17:22
**themselves** [1] - 57:22
**therapeutic** [2] - 50:22, 50:25
**therapy** [11] - 28:13, 28:15, 50:15, 50:20, 51:14, 51:19, 51:20, 51:21
**THERE** [1] - 1:6
**therefore** [1] - 76:23
**thinking** [1] - 59:19
**Third** [2] - 84:19
**third** [2] - 14:4, 78:3
**thirdly** [1] - 90:5
**Thomas** [1] - 73:25
**thoughts** [1] - 26:25
**three** [9] - 34:25, 37:2, 38:10, 60:8, 74:3, 76:2, 80:25, 96:25, 98:3
**Three** [2] - 4:9, 18:20
**three-page** [1] - 74:3
**threshold** [1] - 91:23
**Tice** [1] - 2:6
**tight** [1] - 26:10
**TIM** [1] - 1:7
**title** [1] - 5:16
**Today** [5] - 4:15, 22:10, 22:18, 25:4, 25:9
**today** [3] - 39:1, 58:25, 59:21
**Today's** [1] - 26:4
**together** [4] - 16:14, 26:11, 57:21, 99:13
**toilets** [1] - 76:9
**TOMBALAKIAN** [54] - 2:2, 6:13, 6:20, 7:1, 8:25, 9:8, 9:11, 9:17, 10:1, 11:7, 11:11, 11:25, 12:3, 12:8, 12:12, 12:22, 13:5, 13:13, 13:19, 14:23, 18:16, 19:2, 20:3, 20:24, 21:5, 22:20, 23:7, 24:12, 24:19, 24:23, 25:7, 25:21, 25:25, 29:16, 30:4, 34:23, 35:3, 35:7, 37:1, 39:22, 43:8, 43:13, 43:22, 64:22, 66:6, 66:21, 67:12, 67:18, 71:5, 81:20, 81:23, 82:2, 91:20, 100:4
**tonight** [3] - 5:13, 6:2, 82:20
**took** [2] - 37:21, 38:20
**top** [5] - 5:22, 44:16, 57:2, 66:2, 99:4,

99:23
**total** [1] - 10:23
**totally** [2] - 20:16
**touch** [1] - 74:20
**toward** [1] - 47:16
**towards** [1] - 67:17
**town** [6] - 33:15, 60:6, 81:2, 83:3, 88:6, 95:5
**Town** [1] - 2:10
**towns** [2] - 49:9, 98:10
**Township** [1] - 84:18
**tracks** [1] - 82:25
**traditional** [2] - 91:5, 91:6
**traffic** [1] - 97:18
**transcript** [1] - 101:7
**treat** [1] - 14:5
**treatment** [64] - 8:15, 8:19, 13:25, 15:24, 16:12, 17:6, 19:11, 19:21, 20:20, 23:13, 23:22, 23:24, 24:1, 24:3, 26:11, 26:14, 27:23, 28:4, 28:14, 28:16, 29:8, 30:2, 31:10, 31:15, 31:20, 31:22, 32:3, 32:5, 32:10, 32:11, 32:15, 32:18, 32:20, 32:21, 34:11, 34:12, 35:15, 35:16, 36:1, 37:21, 39:16, 42:21, 42:22, 42:23, 43:2, 50:17, 50:19, 51:3, 51:5, 51:6, 51:15, 51:16, 52:3, 52:8, 52:14, 54:16, 54:20, 55:8, 59:21, 68:3, 77:15, 78:12, 80:20
**Treatment** [3] - 4:9, 18:19, 19:5
**treatments** [1] - 19:19
**Tree** [2] - 3:6, 72:18
**triggers** [3] - 73:10, 92:14, 93:3
**true** [4] - 26:13, 28:21, 42:25, 101:6
**trust** [1] - 66:12
**truth** [2] - 13:8, 35:19
**try** [5] - 22:5, 48:6, 74:21, 90:6, 90:8
**trying** [5] - 15:19, 23:20, 48:10, 74:23, 97:13
**turn** [5] - 8:6, 21:9, 30:14, 45:13, 48:10
**turned** [1] - 48:8
**turns** [1] - 47:15
**twice** [1] - 31:3

**two** [25] - 14:8, 14:16, 16:10, 16:13, 20:4, 22:7, 24:13, 24:22, 26:9, 37:2, 38:10, 60:8, 63:18, 69:6, 70:3, 70:14, 70:23, 73:10, 78:19, 79:25, 80:21, 80:22, 87:15, 94:8, 100:4
**Two** [3] - 4:11, 20:7, 69:12
**type** [13] - 15:17, 15:18, 17:5, 36:3, 36:4, 40:15, 43:24, 49:21, 83:3, 92:16, 94:14, 99:8, 99:10
**Type** [1] - 44:2
**types** [1] - 31:13

## U

**Uber** [1] - 98:6
**Ubers** [1] - 98:6
**ultimately** [1] - 86:10
**Um-hmm** [1] - 54:11
**unable** [1] - 47:12
**under** [20] - 11:23, 15:5, 21:6, 26:4, 74:16, 76:22, 79:10, 83:13, 83:19, 83:23, 86:4, 87:15, 87:23, 88:2, 88:20, 89:17, 91:2, 91:5, 91:16, 91:17
**Under** [2] - 74:4, 87:19
**understood** [1] - 5:9
**undertaking** [1] - 86:13
**undue** [2] - 84:13, 84:14
**unfortunately** [1] - 58:16
**Unfortunately** [2] - 7:17, 11:20
**unfunctionable** [1] - 76:7
**unique** [2] - 88:4, 97:14
**unit** [7] - 43:24, 46:15, 46:17, 85:1, 85:4, 85:7, 94:12
**units** [2] - 44:25, 85:11
**unlawful** [2] - 27:16, 31:18
**unlawfully** [1] - 86:16
**unless** [1] - 32:10
**Unless** [1] - 75:18
**unnecessary** [1] - 82:22

**unreasonable** [5] - 84:6, 84:12, 84:22, 84:23, 86:7
**untenable** [1] - 76:7
**unusual** [4] - 54:15, 54:19, 54:20, 54:23
**up** [38] - 9:24, 12:20, 13:6, 37:3, 37:16, 41:18, 44:13, 44:17, 45:10, 46:2, 46:7, 46:13, 46:15, 47:15, 48:5, 55:4, 55:5, 55:24, 60:23, 61:7, 66:1, 67:22, 72:13, 72:16, 77:8, 78:5, 79:9, 79:14, 79:15, 80:14, 80:18, 80:22, 81:7, 92:22, 93:21, 94:11, 96:4, 98:4
**update** [1] - 91:6
**uses** [4] - 38:21, 67:4, 89:20, 90:12
**Usual** [1] - 50:19

## V

**vacancy** [1] - 59:7
**vacant** [3] - 58:21, 58:25, 59:1
**valid** [1] - 15:21
**values** [1] - 70:23
**Valve** [1] - 47:7
**variance** [21] - 8:11, 10:19, 13:24, 23:18, 33:22, 69:8, 83:20, 86:3, 86:24, 87:6, 87:9, 87:16, 87:22, 88:19, 90:4, 90:9, 91:11, 93:1, 93:3, 95:4, 95:11
**variances** [1] - 87:20
**variation** [1] - 96:14
**vehicles** [3] - 91:12, 99:11, 99:14
**version** [1] - 34:23
**versus** [2] - 69:17, 99:8
**VICE** [1] - 1:8
**vicinity** [1] - 49:12
**video** [1] - 11:1
**view** [4] - 16:15, 16:19, 16:20, 53:16
**viewing** [1] - 15:17
**viewpoint** [1] - 98:4
**violates** [1] - 32:22
**violation** [6] - 27:17, 27:24, 27:25, 33:1, 33:18, 74:6
**violations** [1] - 66:1
**visitors** [1] - 98:7

**visual** [1] - 10:21
**voice** [1] - 41:15
**volume** [3] - 44:19, 44:21, 69:15
**Volume** [1] - 44:4
**vote** [6] - 6:2, 95:15, 95:17, 96:16, 96:18, 100:1, 100:7
**votes** [1] - 100:5
**voting** [1] - 87:1

## W

**Wait** [1] - 52:21
**wall** [1] - 46:14
**wants** [2] - 23:9, 82:2
**wastewater** [7] - 69:9, 69:14, 69:16, 70:5, 70:7, 70:17, 70:21
**water** [24] - 45:11, 45:15, 45:21, 47:8, 47:10, 47:11, 47:18, 65:7, 65:16, 65:18, 65:19, 65:22, 67:6, 67:10, 67:20, 67:23, 68:8, 68:11, 68:21, 68:23, 69:2, 71:23, 75:15
**Water** [2] - 47:6, 65:17
**ways** [2] - 90:6, 90:8
**weakness** [1] - 42:18
**web** [7] - 10:13, 13:25, 14:6, 18:14, 19:20, 25:3, 39:24
**Website** [6] - 4:4, 4:6, 4:20, 10:6, 11:18, 40:2
**website** [35] - 9:15, 9:24, 10:3, 11:9, 12:24, 14:20, 15:12, 16:12, 19:4, 19:17, 20:5, 20:21, 21:6, 22:9, 22:10, 22:19, 24:8, 25:17, 26:4, 32:6, 32:8, 38:20, 38:21, 39:10, 39:24, 42:15, 49:21, 49:25, 50:11, 53:4, 53:19, 55:13, 55:14, 55:18, 68:20
**websites** [1] - 10:15
**week** [2] - 18:8, 72:21
**weeks** [4] - 60:9, 94:8
**weigh** [2] - 93:10, 96:19
**weighed** [1] - 85:23
**weight** [1] - 85:24
**WEINER** [1] - 2:2
**welfare** [3] - 88:1, 88:23, 97:12

**West** [1] - 1:23
**wetlands** [1] - 68:13
**Wetlands** [1] - 68:13
**Whereupon,Printout** [1] - 20:6
**white** [1] - 10:4, 10:10
**whole** [4] - 34:20, 38:1, 68:21, 92:8
**wildlife** [2] - 68:16, 69:2
**Wilkes** [1] - 95:21
**WILKES** [3] - 1:13, 95:22, 100:8
**wind** [1] - 5:12
**wishes** [1] - 25:12
**withdraw** [1] - 18:11
**withdrawing** [1] - 25:23
**witness** [1] - 25:19
**women** [1] - 38:9
**wondering** [2] - 78:11, 78:25
**Wood** [43] - 1:4, 3:4, 3:7, 5:1, 8:14, 8:21, 9:16, 10:18, 10:21, 11:1, 14:2, 14:5, 14:10, 14:12, 14:18, 16:2, 17:19, 19:8, 19:17, 19:21, 19:23, 20:18, 21:19, 25:5, 37:15, 39:3, 47:5, 51:23, 52:15, 60:22, 65:3, 69:6, 69:7, 70:2, 70:6, 70:10, 70:11, 70:14, 71:2, 77:12, 77:24, 78:4, 97:25
**Woodcliff** [1] - 2:6
**word** [3] - 53:1, 53:12, 55:2
**worker** [1] - 40:8
**workout** [1] - 14:15
**works** [1] - 98:16
**written** [3] - 32:12, 63:4, 63:11
**WV** [1] - 47:6

## Y

**years** [4] - 7:15, 7:25, 65:3, 96:13
**yelling** [1] - 48:11
**yes-or-no** [1] - 52:4

## Z

**zigzag** [1] - 47:10
**zigzags** [2] - 45:9, 45:10
**ZIP** [2] - 57:3, 57:4

**zone** [9] - 83:3, 83:25, 84:21, 87:7, 87:8, 90:15, 90:25, 91:12, 92:25
**Zoning** [2] - 63:17, 66:7
**zoning** [8] - 17:9, 56:1, 66:7, 84:16, 88:17, 89:4, 91:6, 92:20
**Zoom** [1] - 72:22

# EXHIBIT C

A-1
## PALISADES PROPERTIES / KINNELON / BOA
### 7/1/25

SAL GARGIULA
21 WOOD CHASE LANE
KINNELON, NJ 07405

## STATE OF NEW JERSEY DEPARTMENT
## OF COMMUNITY AFFAIRS DIVISION OF
## CODES AND STANDARDS

**LICENSE TO OWN**

**ISSUED TO:** SAL GARGIULA

**LICENSE CAPACITY:** 1 0

**LICENSE ISSUED:** MARCH 13, 2025



**FACILITY TYPE:**
CSLR

**FACILITY ADDRESS:**
21 WOOD CHASE LANE
KINNELON, NJ

**FACILITY #:** 1415-0002

**EXPIRATION DATE:** MARCH 31, 2026

This license is issued pursuant and subject to P.L. 1979, c. 496; N.J.S.A. 55:13B-1 et seq. and is valid only for the person or organization it is issued to and only to own and/or operate the facility indicated herein.

This renewal license is also subject to suspension or revocation, after opportunity for a hearing, in the event of non-compliance with applicable licensing requirements. Issuance of this renewal license is for the purpose of allowing continued operation and is not evidence of any determination that the facility is currently in compliance with applicable state regulations.

*Jay Raywood*

Bernard Raywood
Bureau of Rooming and Boarding House Standards

PALISADES PROPERTIES LLC
2 KENSINGTON COURT
TENAFLY, NJ 07670-0000

### STATE OF NEW JERSEY
### DEPARTMENT OF COMMUNITY AFFAIRS
### DIVISION OF CODES AND STANDARDS

**LICENSE** TO OWN

**ISSUED TO:** PALISADES PROPERTIES LLC

**LICENSE CAPACITY:** 10

**LICENSE ISSUED:** March 13, 2025



**FACILITY TYPE:**
CSLR

**FACILITY ADDRESS:**
21 WOOD CHASE LANE
KINNELON, NJ

**FACILITY #:** 1415-0002

**EXPIRATION DATE** March 31, 2026

This license is issued pursuant and subject to P.L. 1979, c. 496; N.J.S.A. 55:13B-1 et seq. and is valid only for the person or organization it is issued to and only to own and/or operate the facility indicated herein.

This renewal license is also subject to suspension or revocation, after opportunity for a hearing, in the event of non-compliance with applicable licensing requirements. Issuance of this renewal license is for the purpose of allowing continued operation and is not evidence of any determination that the facility is currently in compliance with applicable state regulations.

*Jay Raywood*

Bernard Raywood
Bureau of Rooming and Boarding House Standards

PROPERTIES LLC PALISADES
2 KENSINGTON COURT
TENAFLY, NJ 07670-0000

**STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF CODES AND STANDARDS**

**LICENSE TO OPERATE**

**ISSUED TO:** JAY JONAS

**LICENSE CAPACITY:** 10

**LICENSE ISSUED:** October 10, 2024



**FACILITY TYPE:**
CSLR

**FACILITY ADDRESS:**
21 WOOD CHASE LANE
KINNELON, NJ

**FACILITY #:** 1415-0002

**EXPIRATION DATE** September 30, 2025

This license is issued pursuant and subject to P.L. 1979, c. 496; N.J.S.A. 55:13B-1 et seq. and is valid only for the person or organization it is issued to and only to own and/or operate the facility indicated herein.

This renewal license is also subject to suspension or revocation, after opportunity for a hearing, in the event of non-compliance with applicable licensing requirements. Issuance of this renewal license is for the purpose of allowing continued operation and is not evidence of any determination that the facility is currently in compliance with applicable state regulations.

*Jay Raywood*

Bernard Raywood
Bureau of Rooming and Boarding House Standards



**A-2**
**PALISADES PROPERTIES**
**/ KINNELON / BOA**
**7/1/25**

SURVEYING TECH
NJP
23130
INC. SUR.

YELLOW CAP
DETAIL◎
(1" DIA)

CAPPED
IRON ROD
SET

S23°36'10"E 100.00'

N26°48'56"E 255.98'

SETBACK LINES PER FILED MAP (TYP)

CAPPED
IRON ROD
FOUND &
AFFIRMED

CAPPED IRON
ROD IN ROCK
PILE FOUND
N65°00'04"E
0.74'

TAX LOT 137
TAX BLOCK 56301
(FM LOT 41.09)
(FM BLOCK 93)
60,698 Sq. Ft.
1.393 Acres

116.5'

Δ=18°29'53"
R=222.64'

50'

S28°05'30"E 288.39'

63.1'

2-STORY
STONE &
STUCCO
DWELLING

68.0'

ACX4

3-CAR
GARAGE

CONC
PATIO

N28°05'31"W 169.53'

WOOD CHASE LANE (50' WIDE)

50'

EXISTING
SEPTIC

25'

POB

ASPHALT DRIVE

UTIL
BOXES

CAPPED
IRON ROD
SET

CAPPED
IRON ROD
SET

S61°54'30"W 190.00'

FILED MAP LOT NO. 41.10

**NOTES:**
1. COPIES OF THIS MAP NOT HAVING THE EMBOSSED SEAL OF THE LAND SURVEYOR SHALL NOT BE VALID.
2. FIELD WORK PERFORMED THROUGH 02/14/25.
3. IMPROVEMENTS ON OR UNDER THE LANDS AND NOT VISIBLE MAY NOT BE SHOWN.
4. THIS SURVEY IS SUBJECT TO THE REVIEW AND FINDINGS OF A CURRENT TITLE SEARCH AND REPORT.
5. BUILDING OFFSETS SHOWN HEREON NOT TO BE USED TO ESTABLISH PROPERTY LINE LOCATIONS.
6. LOCATION OF SEPTIC COMPONENTS PROTRACTED FROM A MAP ENTITLED: "ON-SITE SEWAGE DISPOSAL SYSTEM AS-BUILT" DATED 11/30/2022 BY HOUSER ENGINEERING, LLC.

**DEED REFERENCE:**
DEED BOOK 8424, PAGE 707 ET SEQ.

**MAP REFERENCE (FM):**
"MAP OF SUBDIVISION OF CRISPIN WOODS – SECTION II, BLOCK 93, LOT 41 TAX MAP SHEET NO. 48, BOROUGH OF KINNELON, MORRIS COUNTY, NEW JERSEY.", FILED IN THE OFFICE OF THE CLERK/REGISTER OF MORRIS COUNTY ON APRIL 20, 1990 AS MAP NO. 4848.

**SURVEY CERTIFICATION:**
THIS SURVEY IS SPECIFICALLY CERTIFIED TO:
PALISADES PROPERTIES, LLC AND PRICE MEESE SHULMAN & D'ARMINIO PC TO BE CORRECT AND ACCURATE AND DOES NOT EXTEND THROUGH ASSIGNMENT TO ANY FUTURE PURCHASER(S).

| | | |
|---|---|---|
| PETER C. KIRCH | **LOCATION SURVEY FOR** **PALISADES PROPERTIES, LLC** #21 WOOD CHASE LANE TAX LOT 137, BLOCK 56301 BOROUGH OF KINNELON    MORRIS COUNTY    NEW JERSEY SCALE: 1" = 50'    OCTOBER 25, 2024 | **REVISIONS** 1. 2/14/25 ADD RET. WALLS 2. 6/4/25 NUMBER GARAGES |

PROFESSIONAL LAND SURVEYOR
NJPLS #23130 / NYPLS #49208



43 SPRING STREET
RAMSEY, NEW JERSEY 07446
(201) 236-0033
WWW.SURTECH.COM
NJ CERTIFICATE OF AUTHORIZATION No. 24GA28151200

| DRN | PCK |
|---|---|
| CHKD | KCK |
| JOB# | 8736LS |



A-3
PALISADES PROPERTIES
/ KINNELON / BOA
7/1/25

















**Palisades Properties LLC**

**Housing Agreement**

**K1**

**21 Wood Chase Ln**
**Kinnelon NJ 07405**

A-4
PALISADES PROPERTIES
/ KINNELON / BOA
7/1/25

Residents First and Last Name _____

Housing Admission Date: _____

**READ CAREFULLY AND INITIAL ON EACH LINE PROVIDED.**

**Financial Expectations**

_____ Residents are expected to pay $200/monthly for rent.

**Program Expectations**

_____ Residents are not permitted to leave property, unless accompanied by a staff member of Palisades Properties, or given express permission by the Director of Housing.

_____ Residents agree to attend and participate in all required in-house meetings.

_____ Residents will use **NO** alcohol or illegal narcotic or mind-altering drugs while on or off Palisades Properties. You will be immediately asked to leave the property if you are under the influence of any Drugs or Alcohol.

_____ Residents agree to take random or requested UA tests and breathalyzed; any denied test will be considered a positive test.

_____ Residents agree to allow staff to perform random searches of any personal property on Palisades Properties premises.

_____ Residents agree to whatever consequence is deemed necessary by Palisades Properties Director for violation of Palisades Properties rules/polices.



**Palisades Properties LLC**

**Housing Agreement**

**K1**

**21 Wood Chase Ln**
**Kinnelon NJ 07405**

**General Expectations**

_____Residents agree that Palisades Properties uses drug detecting dogs for random searches.

_____**NO** smoking is allowed in Palisades Properties houses. Smoking is only permitted behind the house. Smoking in the driveway is prohibited.

_____Residents living spaces are to be tidy: beds made, clothes in dressers or hung up, and no personal items lying out.

_____Residents will be expected to deep clean the entire house weekly.

_____Residents must practice good hygiene.

_____Residents expect to share a room with a roommate.

_____Only water is allowed upstairs and in bedrooms.

_____Residents may not bring appliances, furniture, candles, excessive property or pets to the premises.

_____Palisades Properties supplies the following house supplies; Laundry Soap, dish soap, toilet paper etc... once a week.

**Behavioral Expectations**

_____Residents are not permitted to have a vehicle.

_____Residents are expected to maintain a positive attitude and properly resolve all conflicts.

_____Residents will be respectful, kind, and considerate to all Palisades Properties staff and community partners.



**Palisades Properties LLC**

**Housing Agreement**

**K1**

**21 Wood Chase Ln
Kinnelon NJ 07405**

_____Physical violence and threatening the same will result in 911 call and/or immediate discharge from Palisades Properties.

_____Theft will result in a law enforcement call and/or immediate discharge from Palisades Properties.

_____Residents will not use foul or abusive language.

_____Residents will focus on working a 12-step program and maintain their sobriety.

_____All common areas on Palisades Properties are to be treated with respect, cleanliness, and a sharing attitude.

_____Residents will gracefully honor other Residents limitations, allergies, and personal privacy.

_____Residents are not to borrow money from other residents and are dis-courage from borrowing anything from other residents.

_____**NO** visitors will be allowed in Palisades Properties Housing.

_____Residents should always protect their sobriety by informing a Palisades Properties staff of any concerns. Your name will never be brought to attention.


I, _____,

*(Printed Name)*

on this _____ day of _____,

20_____ agree to abide with each requirement and rules of Palisades Properties.

**Resident Signature:**

_____

**Date of Signature:**

_____

# Rachel Sugerman

22-08 Route 208, Suite ~
Fair Lawn, NJ 074~
844-978-0008

*PALISADES PROPERTIES / KINNELON / BOA*
*A-5*
*7/1/25*

## Education

**Ph.D., Counseling** - May 2021
Montclair State University, Montclair, NJ (CACREP-accredited)
Concentration: Crisis, Trauma, and Diversity
Dissertation: *The Cases They Carry: A Narrative Analysis of Crisis Counselors Working in Behavioral Health Emergency Settings*

**M.A., Clinical Mental Health Counseling** - May 2015
Montclair State University, Montclair, NJ (CACREP-accredited)

**M.A., Psychology** - January 2011
Fairleigh Dickinson University, Teaneck, NJ

**B.A., Psychology, Minor in Women's Studies** May 2008
Ramapo College of New Jersey, Mahwah, NJ

## Licenses / Certifications

- NJ Licensed Professional Counselor (LPC) – # 37PC00622400
- Approved Clinical Supervisor (ACS) - # ACS-4352
- Certified Clinical Supervisor (CCS) - # CCS-50263
- National Board-Certified Counselor (NCC) - # 718279
- Board-Certified Clinical Mental Health Counselor (CCMHC) - # 718279
- Crisis Prevention Institute (CPI) Certified Instructor

## Professional Overview

## Clinical Experience

**Clinical Director**                                                              April 2023 - present
North Jersey Recovery Center
Fair Lawn, NJ

Supervisee and oversee all aspects of the clinical department servicing individuals with substance use disorders and co-occurring mental health disorders; evaluate existing compliance, monitoring, and reporting to ensure all goals are met; implement plans for performance improvement; hire, supervise, evaluate, schedule, and promote all clinical staff; represent North Jersey Recovery Center in the community, corporate and donor environments; develop, plan, and implement strategies to manage program growth; review and recommend changes in program services to meet client needs; provide oversight of program evaluation and quality assurance function, including assessment of applicable legal and professional requirements and monitoring treatment plans for clients; ensure that the behavioral and pharmacologic approaches to treatment are evidence-based or based on objective information to provide

1

treatment services consistent with recognized treatment principles and practices for each level of care and type of consumer served by the program; review all clinical records to verify that such documents meet county, state, and federal agency standards; provide direct individual and group clinical supervision, provide clinical training to staff and interns, recruit clinical interns, conduct outreach, and maintain working relationships with graduate schools

**Program Manager, Acute Inpatient Services**

**Children's Crisis Intervention Services (CCIS) Director**            August 2022 – April 2023

University Behavioral Health Care (UBHC)
Rutgers, The State University of New Jersey
Piscataway, NJ

Provided administrative and clinical supervision to program staff servicing individuals with mental health and co-occurring substance use disorders; developed and monitored programs that deliver clinical services consistent with evidence based practices to patients while assuring program viability and compliance with regulatory requirements; served as the Children's Crisis Intervention Services (CCIS) Director and participated in Regional Coordinating Council, statewide CCIS Directors, and countywide SRC meetings; maintained oversight and coordination of research initiatives; served as lead liaison to mental health court system; ensured coordination of care within UBHC and the larger community; participate in quality assurance initiatives and QI subcommittees; prepared for licensing surveys and surveys by other accreditation and/or funding organizations; determined the appropriate course of action in emergency or stressful situations; maintained and prepared program statistical reports; ensured documentation met established guidelines; investigated incidents and untoward events and take appropriate actions as dictated by Rutgers UBHC policies; assumed direct care responsibilities for consumers/patients and provided clinical assessment, individual, group, family, and supportive therapy, crisis intervention, psychoeducation, and case management services

**Program Coordinator, Acute Inpatient Services**            January 2022 – August 2022

University Behavioral Health Care (UBHC)
Rutgers, The State University of New Jersey
Piscataway, NJ

Provided clinical and administrative leadership in the Acute Inpatient Services programs servicing individuals with mental health and co-occurring substance use disorders, including the Child/Adolescent Inpatient Services (CAIS) and the Adult Inpatient Unit (AIPU); provided supervision to multidisciplinary staff; ensure compliance with all regulations, managed daily operations of inpatient units; assumed direct care responsibilities for consumer/patients and provided clinical assessment, individual, group, family, and supportive counseling, crisis intervention, psychoeducation, and case management services; promoted effective working relationships and work effectively as part of the Inpatient Services unit team inter-and intra- departmentally to facilitate the units' ability to meet goals and objectives; participated in interdepartmental strategic initiatives, including the Patient Safety Workgroup, Zero Suicide Committee, monthly chart reviews, and monthly clinical case reviews; participate in county- and state-wide mental health leadership committees, including Systems Review Committee (SRC), CCIS Directors, and Middlesex County Children's Interagency Coordinating Council (CIACC)

**Clinician/Psychotherapist**            March 2018 – January 2022

Inspire Wellness
Psychological, Educational, and Performance Services
Glen Rock, NJ

Provided individual, couples, family, and group psychotherapy to children, adolescents, and adults with mental health and co-occurring substance use disorders in established private practice setting; conducted intake evaluations, formulated *DSM-5* diagnosis, and developed and implemented individualized treatment plans; provided family support and communicated with other professionals to ensure care coordination; performed case management activities as needed

**Clinician/Psychotherapist**                                                            September 2017 – September 2019
Intensive Outpatient Treatment and Support Services (IOTSS)
Crossroads to Wellness and Therapeutic Intervention Services
Care Plus NJ, Inc.
Paramus, NJ

Provided individual psychotherapy to adults experiencing psychiatric crisis in need of stop-gap treatment services; conducted intake evaluations and formulated provisional *DSM-5* diagnosis; provided crisis intervention and short-term therapeutic treatments in an outpatient clinic setting; collaborated with treating psychiatrists to address the individual needs of assigned clients; monitored high-risk clients; assisted clients with the development of Wellness Recovery Action Plans (WRAP), Illness Management and Recovery (IMR), and Psychiatric Advance Directives (PAD); conducted collateral sessions with involved family members; performed case management duties; coordinated discharge planning and linkage to appropriate ongoing care

**Clinical Manager**                                                                     February 2016 – September 2017
Integrated Case Management Services (ICMS)
Care Plus NJ, Inc.
Hasbrouck Heights, NJ

Provided direct clinical supervision to team of 8-10 staff working with adults with severe and persistent mental illness/co-occurring substance use diagnoses in order to enhance their clinical skills sets; evaluated staff productivity and documentation of service delivery; evaluated consumers and families upon intake to determine diagnostic and eligibility criteria; conducted outreaches and collaborated with other treatment providers to establish comprehensive service plans; formulated psychological service plans containing relevant goals and behaviorally measurable objectives; assessed medication compliance, provided substance abuse services, family consultation, crisis intervention and vocational/educational services utilizing a strengths-based approach; participated in Residential Task Force meetings at Greystone Park Psychiatric Hospital; completed unusual occurrence investigations and reported findings to the NJ Division of Mental Health and Addiction Services (DMHAS); interviewed, hired, and trained employees; evaluated employee performance and created performance improvement plans when needed; presented at Crisis Intervention Team (CIT) trainings

**Certified Mental Health Screener**                                                     August 2012 – April 2016
Bergen County Psychiatric Emergency Screening Program
Care Plus NJ, Inc.
Paramus, NJ

Conducted mental health evaluations to determine the most clinically appropriate, least restrictive therapeutic intervention for mental health consumers (children and adults) in psychiatric crisis; provided assessment/formulated provisional *DSM-5* diagnosis; completed legal documentation for civil commitment process; provided crisis intervention, psychoeducation and supportive counseling; developed individual recovery plans; collaborated with other mental health professionals, ER resident and attending psychiatrists, families, and law enforcement; provided service-coordination, linkage, and referral; provided psychiatric emergency hotline coverage; coordinated outreach services to community and area hospitals

***Rehabilitation Counselor***                                                    June 2011 – August 2012
North Jersey Friendship House
Partial Care Day Treatment Program
Hackensack, NJ

Provided personal, social, and vocational counseling to adults with severe and persistent mental health needs and those with co-occurring substance use disorders; assisted clients in the development of individual rehabilitation plans; conducted intake evaluations; developed and facilitated psychosocial group therapy programs and social skills training; provided psychoeducation, medication education, prevocational skill building, and relapse prevention training; performed case management duties; conducted collateral sessions with families; coordinated recreational outings with mental health consumers in the community

## Academic Experience

***Adjunct Professor***                                                              Summer 2019
Montclair State University
Department of Counseling
Montclair, NJ

Provided instruction to master's level Group Counseling course; planned, prepared, and implemented activities to facilitate active learning experiences; provided direct clinical supervision of experiential aspects of the course; developed lesson plans and assessment measures; evaluated and provided feedback to stimulate student learning

***Doctoral Research Assistant***                                        September 2017 – June 2020
Montclair State University
Department of Counseling
Montclair, NJ

Provided direct support to counseling faculty on research projects; cleaned and managed data sets; reviewed research literature; participated in article writing for peer-reviewed journals; provided assistance with compiling teaching materials for students in counseling master's program; developed and administered CACREP mandated surveys for current students, alumni, and site supervisors

***PhD Practicum Group Counseling Facilitator***                         January 2019 – May 2019
Montclair State University
Department of Counseling
Montclair, NJ

Acted as facilitator for master's level Group Counseling course training/process group; provided triadic supervision to same group of students during their own co-facilitation of groups; provided formative and summative feedback to supervisees both verbally and in writing

***Teaching Co-Instructor***                                         September 2018 – December 2018
Counseling Techniques
Montclair State University
MA in Counseling Program
Department of Counseling and Educational Leadership
Montclair, NJ

Acted as co-instructor to master's level Counseling Techniques course; planned, prepared, and implemented instructional activities to facilitate active learning experiences; developed lesson plans and assessment measures;

4

evaluated and provided feedback to stimulate student learning

**PhD Practicum Counseling Supervisor**                                    January 2018 – May 2018
Center for Clinical Services
Montclair State University
Montclair, NJ
Provided individual clinical supervision to master's level counseling students enrolled in practicum and internship courses; organized supervision experiences to yield productive outcomes for supervisees and their clients; provided formative and summative feedback to supervisees both verbally and in writing

# Scholarly Research

## Dissertation

Sugerman, R. E. (2021). *The Cases They Carry: A Narrative Analysis of Crisis Counselors Working in Behavioral Health Emergency Settings.* [Doctoral dissertation, Montclair State University].

## Peer-Reviewed Articles

Mundy, R. J., & **Sugerman, R. E.** (2017). "What can you possibly know about my experience?": Toward a practice of self-reflection and multicultural competence. *The Peer Review: Journal for Writing Center Practitioners, 1*(2).

## Conference Papers/Presentations

### International

Mundy, R. J., & **Sugerman, R. E.** (2018, October). *Turning to the self: Consultant identity and multicultural competence.* Presentation at the International Writing Center Association (IWCA) annual conference, Atlanta, GA.

### Regional

Sugerman, R. E., & Levitt, D. H. (2018, September) *Addressing vicarious traumatization in counselor education and supervision.* Presentation at the North Atlantic Region Association for Counselor Education and Supervision (NARACES) 2018 Regional Conference, Burlington, VT.

Sugerman, R. E., & Flores, C. A. (2018, February). *#Metoo: How high-profile sexual assault cases in the media affect counselors.* Presentation at the 2018 Winter Roundtable Conference at Teachers College, Columbia University, New York, NY.

Sugerman, R. E., Mundy, R. J., & Ziek, P. (2017, April). *Off the clock but still hard at work: Transference, countertransference, and center self-care.* Presentation at the Northeast Writing    Center Association (NEWCA) annual conference, Pleasantville, NY.

Ziek, P., & **Sugerman, R. E.** (2017, October). *Positive psychology, appreciative inquiry and higher education.* Conference paper presented at The New York State Communication Association, Callicoon, NY.

*Invited Speaker Presentations*

Sugerman, R. E. (2018, March). *Duty to warn.* Invited speaker presentation at Montclair State University, Montclair, NJ.

# Internships and Additional Training

*Counseling Intern*                                                          September 2014 – January 2016

Intensive Outpatient Treatment and Support Services (IOTSS)
Crossroads to Wellness
Care Plus NJ, Inc.
Paramus, NJ

Provided individual, couples, family, and group psychotherapy; conducted psychiatric intake evaluations and formulated provisional *DSM-5* diagnosis; provided crisis intervention and short-term therapeutic treatments for adults in an outpatient clinic setting; collaborated with treating psychiatrists to address the individual needs of assigned clients; monitored high risk clients; assisted clients with the development of Wellness Recovery Action Plans (WRAP); conducted collateral sessions with involved family members; performed case management duties; coordinated discharge planning and linkage to appropriate level of care

*Psychology Intern*                                                          September 2007 – February 2008
Touchstone Hall
Vantage Health Systems
Rockleigh, NJ

Conducted individual therapy sessions for substance abuse and disruptive disordered adolescent males ages 13-17; co-facilitated and facilitated group therapy sessions; conducted intake evaluations; conducted collateral sessions with parents; performed case management duties

*Additional Training*

- EMDR Basic Training: Big Oak Psychotherapy Training Institute
- Certified Clinical Trauma Professional (CCTP) Intensive Training Course
- Supervisor Training in Psychiatric Rehabilitation (Rutgers School of Health-Related Professions)
- New Jersey Mental Health Basic Screener Certification
- Crisis Intervention Team Certification
- Motivational Interviewing (MI)
- Considerations in Working with the Transgender Client in Crisis
- Illness Management and Recovery (IMR)
- Wellness Recovery Action Plan (WRAP) development
- Crisis intervention / de-escalation
- Trauma-informed care

# Professional Affiliations

Member, American Counseling Association (ACA)

6

Member, Association for Counselor Education and Supervision (ACES)
Member, North Atlantic Region Association for Counselor Education and Supervision (NARACES)
Member, International Association for Resilience and Trauma Counseling
Member, International Association for Trauma Professionals (IATP)
Member, Crisis Intervention Team New Jersey (CIT – NJ)

## Academic Distinctions

Chi Sigma Iota (CSI): Counseling Academic and Professional Honors Society International);
Alpha Epsilon Lambda (AEL): Honor Society for Graduate and Professional Students; Ramapo College
General Honors; Dean's Award for Excellence; Ramapo College Faculty's Award for Distinction in
Psychology; Ramapo College Merit Scholarship; Ramapo College Honors Society

A-6
**PALISADES PROPERTIES / KINNELON / BOA 8/5/25**

July 28, 2025

Kinnelon Borough Zoning Board of Adjustment
Kinnelon Municipal Building
130 Kinnelon Road
Kinnelon, NJ 07405

Re:    Application #1571
       Palisade Properties, LLC
       21 Wood Chase Lane
       Block 56301, Lot 137

Dear Chairman Lockwood and Honorable Members of the Kinnelon Borough Zoning Board of Adjustment:

As requested by Chairman Lockwood, please accept this letter as a follow up to my July 1, 2025 testimony. A member of the public requested information regarding relapse rates for individuals in treatment for drug and alcohol addiction. My answer is as follows: Individual rates of relapse vary depending on substance type, physical health status, presence of a co-occurring mental health disorder, access to medication assisted treatment, and various environmental and psychosocial factors. Because addiction is a chronic condition, it often requires long-term management and multiple attempts by individuals with substance use disorders to achieve sustained recovery. The National Institute on Drug Abuse (NIDA) estimates that 40% to 60% of individuals undergoing treatment for substance use disorders will experience a relapse. Note that these rates are comparable to the relapse rates of other chronic illnesses that also require long-term management, such as hypertension, diabetes, and asthma. Addiction treatment is not a cure; rather, it is a means for managing a chronic condition. Like other chronic conditions, individuals who do not follow their medical treatment plan are likely to relapse.

The main difference between those diagnosed with other chronic medical conditions and those diagnosed with a substance use disorder is the stigma associated with seeking treatment. Individuals in recovery from substance use disorders deserve a safe and stable place to live. As testified before the Board previously, research overwhelmingly supports the positive outcomes associated with sober living homes, including decreased substance use, reduced likelihood of return to use, lower rates of incarceration and criminal justice involvement, improvements in mental health, higher income, increased employment, and improved family relationships. The sober living environment functions as a milieu that is supportive of recovery by providing individuals with substance use disorders the opportunity to develop prosocial relationships, a sense of community, and healthy coping strategies.

Additionally, when asked a question by a member of the public regarding research to support the maximum number of residents authorized under the CSLR license, I referenced the incorrect Mericle et al. article. The correct citation is as follows: Mericle A.A., Karriker-Jaffe K., Patterson D., Mahoney E., Cooperman, L., Polcin, D. L. (2020). Recovery in context: Sober living houses and the ecology of recovery. *Journal of Community Psychology; 48*(8):2589-2607. doi: 10.1002/jcop.22447. Please allow me to correct the record on that question.

Sincerely,

*Rachel Sugerman*

Rachel Sugerman, PhD, LPC, ACS, CCS
Clinical Director
North Jersey Recovery Center
22-08 Route 208, Suite 2
Fair Lawn, NJ 07410

EMPLOYEE TRAININGS

PALISADES PROPERTIES, LLC

**A-7
PALISADES PROPERTIES
/ KINNELON / BOA
8/5/25**

1. CPR

2. ETHICS: BOUNDARY PROBLEMS & SEXUAL MISCONDUCT

3. THE CONFIDENTIALITY OF ALCOHOL AND DRUG ABUSE PATIENT RECORDS REGULATION AND THE HIPAA PRIVACY RULE: IMPLICATIONS FOR ALCOHOL AND SUBSTANCE ABUSE PROGRAMS

4. RISK MANAGEMENT FOR RECOVERY RESIDENCE ADMINISTRATORS

5. AGGRESSION CONTROL: RECOGNITION, PROACTIVE APPROACHES AND DIFFUSION

6. COMORBIDITY ADDICTION AND OTHER MENTAL ILLNESS

7. DEVELOPING A RECOVERY AND WELLNESS LIFESTYLE

8. REDUCE IDENTIFIED PHYSICAL RISKS/ PERSONAL SAFETY PLANNING

9. SUICIDE PREVENTION

10. DOMESTIC VIOLENCE – THE BASICS

11. OPIOID OVERDOSE TOOLKIT BY SAMHSA (NARCAN)

12. HEALTH AND SAFETY PRACTICES – FIRST AID

13. FIRE SAFETY COURSE

**CE – Classes .com**

**145 Ethics**

**Course Description :**
This course discusses the problematic issue of boundary violations and sexual misconduct between therapists and their clients. The discussion includes risk factors and preventive measures. The course is targeted for beginner, intermediate and advanced practitioners.

2141 Confidentiality of alcohol

**Course Description:**

This course on confidentiality is designed for practitioners working in substance abuse programs that are already in compliance with 45 CFR part 2.  It explains which programs must comply with the privacy rule and outlines what compliance will require.   The guidance in this course is not a legal opinion, rather helpful suggestions developed by the US Department of Health and Human Services.

1649 Risk Management for administrators

**Course Description:**

This one-hour course on risk management for recovery residence administrators begins with a definition of risk and a discussion of common risks in behavioral healthcare.  The various types of risk are covered, as are the characteristics of risk.  Risk management is identified as a five-step process, and each step is reviewed in-depth.  The concepts of risk reduction, avoidance, and transfer are reviewed.  Risks associated with drug addiction, mental health, and residence provision are discussed.  The course wraps up with a review of how to handle specific crises which may present themselves in recovery residences.

247 aggression control diffusion

**Course Description:**

This course is based on a PowerPoint presentation developed by Ce-Classes.com about how to control aggression in clients.  This course first defines aggression and details the various types of aggression.  Facts about workplace violence are discussed including the types, incidence and consequences of workplace violence.  The course then goes on to discuss both warning signs and common triggers for aggressive behavior.  Prevention strategies are reviewed as well as strategies for diffusion of aggressive situations as they are occurring.  The course then reviews what to do when responding to an aggressive or violent client.  The course ends with what to do after an incident of aggression or violence has occurred, including instructions for documentation.

1024 Comorbidity addiction and other mental illness

**Course Description:**

This course is based on an article published by the National Institute on Drug Abuse, a division of the National Institute of Health and is part of their Research Report Series. The publication can also be found on the National Institute on Drug Abuse website. The publication describes comorbidity and the state of science in this area.


1617 Developing a recovery and wellness lifestyle

**Course Description:** This course is based upon material published SAMHSA and is an open access article.

This course is part of the educational requirements for certification as a peer support specialists and certified recovery support specialists in Florida. It specifically addresses professional development and self-care for recovering individuals who wish to work as a peer support specialist.


1896 Reduce identified physical risks

**Course Description:**

This course is based on a PowerPoint presentation developed by Ce-Classes.com about how to control aggression in clients. This course first defines aggression and details the various types of aggression. Facts about workplace violence are discussed including the types, incidence and consequences of workplace violence. The course then goes on to discuss both warning signs and common triggers for aggressive behavior. Prevention strategies are reviewed as well as strategies for diffusion of aggressive situations as they are occurring. The course then reviews what to do when responding to an aggressive or violent client. The course ends with what to do after an incident of aggression or violence has occurred, including instructions for documentation.


166 Suicide Prevention

**Course Description:**

This training equips mental health professionals with the knowledge and tools to recognize, assess, and intervene in situations involving suicidal risk. Participants will learn to identify key risk and protective factors, recognize early warning signs, and implement evidence-based strategies to prevent suicide. The course also introduces effective intervention techniques, including Safety Planning Intervention (SPI) and Lethal Means Counseling (LMC), as well as actionable steps for supporting individuals in crisis. Emphasis is placed on empowering clients, enhancing safety, and fostering strong connections to support systems and resources.

213 Domestic Violence – basics
**Course Description:**

This course is based on several publications about domestic violence and intimate partner violence. It provides an overview of domestic violence by describing characteristic behaviors, dynamics, risk factors, consequences, and treatments. It also describes methods for preventing domestic violence. Additional information is provided on intimate partner violence statistics and prevention strategies. This course focuses on domestic and intimate partner violence occurring in both adult and teen relationships. It serves as an excellent resource for mental health professionals who would like to build or refresh their knowledge about intimate partner violence.

1654 Opioid Overdose

**Course Description:** This course gives an overview of opioid overdose and treatment using Naloxone. Facts for community members include a discussion of the scope of the problem and strategies to prevent overdose deaths. First responders are given five essential steps to care for an overdose victim, and prescribers are given information on several topics including treating opioid overdose, legal and liability concerns, and claims coding and billing. Safety advice is presented for patients and their family members including the use, storage, and side effects of Naloxone. Finally, resources are presented for use by those recovering from opioid overdose and their families.

1887 Health and Safety

**Course Description:**

This course is a compilation of first aid and emergency response advice from multiple credible services. It is designed to be a primer for how to re-act in an emergency situation. It is not designed to substitute for medical care from a licensed professional. This course covers the basics of first aid with most of the most common medical emergencies that one might encounter in the workplace.

1115 Fire Safety

**Course Description:**

Fire safety is an introductory course for agencies and their employees. It explains why fire safety is important for everyone. The material includes how fires occur and strategies for preventing them. Have a survey coming up? This course meets the requirements for numerous accrediting bodies.

**A-8**

PALISADES PROPERTIES
/ KINNELON / BOA
8/5/25



# Borough of Kinnelon
# Fire Prevention Bureau

### CERTIFICATE OF INSPECTION

**STATE**

Reg. No.: 1415-75132-001-01

Code Use: AF04

Insp. No.: 0262

**LOCAL**

Insp. No.:

Is issued to **PALISADES PROPERTIES/SOBOR HOME** for premises at **21 WOOD CHASE LANE**

Kinnelon, N.J. for having met in accordance with terms and provisions of the ordinances of the Borough of Kinnelon and the requirements of the State of New Jersey Uniform Fire Safety Code. This Certificate may be revoked at any time for violations and will not be reissued until all violations are satisfactorily corrected.

This Certifies that the above referenced property has been inspected pursuant to the Uniform Fire Safety Act and satisfies minimum requirements of the New Jersey Uniform Fire Code.

Issuance authorized on: **August 27, 2024**          by _____

*Mark Lime*

Mark Lime, Fire Official

This Certificate Expires: **August 27, 2025**

Business Owner: **WILLIAM ENNIS**
**316 Forest Rd**

**Kinnelon, Nj 07405**

Building Owner: **SAL GARGIULO**
**21 WOOD CHASE LANE**

**KINNELON, NJ 07405**

*This certificate must be posted on vestibule wall.*

PALISADES PROPERTIES
/ KINNELON / BOA
8/5/25

# ELECTRICAL SUBCODE
## TECHNICAL SECTION

**A. IDENTIFICATION—APPLICANT:** COMPLETE ALL APPLICABLE INFO..... CONTRACTORS, NOTIFY THIS OFFICE. CALL UTILITY DIG NO: 1-800-272-1000.

Block _____ Lot _____ Qualification Code _____

Work Site Location 21 Woodchase La.
Kinnelon

Owner in Fee: Sal Gargiulo

Tel. (201) 394-3619        e-mail salgargiulo@hotmail.com

Address _____
_street_        _municipality_        _zip code_

Contractor: Martin Franzol Electrical Contracting LLC   Tel. (201) 410-5453

Address 25 Hamilton Ave.
Hasbrouck Heights, NJ 07604      e-mail mfranzelec@gmail.com

Contractor License No. 15073        Exp. Date 03/01/2027

Home Improvement Contractor Registration No. or Exemption Reason _____

Federal Emp. ID No. 205362920        FAX: _____

**B. ELECTRICAL CHARACTERISTICS**

Use Group    Present _____    Proposed _____

[ ] Pole/Pad   # _____   [ ] Temporary   [ ] Other _____

Building Occupied as _____

Est. Cost of Elec. Work  $ _____    Utility Co. _____

---

**JOB SUMMARY** (Office Use Only)

**PLAN REVIEW**

[ ] No Plans Required

[ ] Partial -Underslab Utilities Approved

Date: _____ Approved by: _____

[ ] Electric Plans Approved

Date: _____ Approved by: _____

Joint Plan Review Required:
[ ] Bldg.  [ ] Plumb.  [ ] Fire.  [ ] Elev.

**SUBCODE APPROVAL for PERMIT**

Date: _____

Approved by: _____

**SUBCODE APPROVAL for CERTIFICATE**

[ ] CO   [ ] CCO   [ ] CA

Date: _____

Approved by: _____

**INSPECTIONS**

| Type: | Failure | Failure | Approval | Initial |
|---|---|---|---|---|
| Rough | | | | |
| Barrier-Free | | | | |
| Trench | | | | |
| Temp. Serv. | | | | |
| Constr. Serv. | | | | |
| TCO | | | | |
| Other | | | | |
| Service | | | | |
| Final | | | | |
| Barrier-Free | | | | |

Dates (Month/Day)

Temp. Cut-in-Card Date Issued _____
Final Cut-in-Card Date Issued _____
Annual Pool Inspection _____
Date of Grounding and Bonding Certification _____

---

**C. ...I LIEU ALL OATH**

I hereby certify that I am the (agent of) owner of record and am authorized to make this application and perform the work listed on this application.

Applicant sign/Contractor sign and seal here: _____

Print name here: Martin Franzol

[X] Licensed Electrical Contractor        [ ] Exempt Applicant

**D. TECHNICAL SITE DATA**

Date Received _____
Control # _____
Date Issued _____
Permit # _____

DESCRIPTION OF WORK:
Replace 100 amp sub panel

| QTY. | SIZE | ITEMS | FEE (Office Use Only) |
|---|---|---|---|
| ___ | | Lighting Fixtures | |
| ___ | | Receptacles | |
| ___ | | Switches | |
| ___ | | Detectors | |
| ___ | | Light Poles | |
| ___ | | Motors—Fract. HP | |
| ___ | | Emergency & Exit Lights | |
| ___ | | Communications Points | |
| ___ | | Alarm Devices/F.A.C. Panel | |
| 0 | | TOTAL NUMBERS | $ ___ |
| ___ | | Pool Permit/with UW Lights | ___ |
| ___ | | Storable Pool/Spa/Hot Tub | ___ |
| ___ | | KW Elec. Range/Receptacle | ___ |
| ___ | | KW Oven/Surface Unit | ___ |
| ___ | | KW Elec. Water Heater | ___ |
| ___ | | KW Elec. Dryer/Receptacle | ___ |
| ___ | | KW Dishwasher | ___ |
| ___ | | HP Garbage Disposal | ___ |
| ___ | | KW Central A/C Unit | ___ |
| ___ | | HP/KW Space Heater/Air Handler | ___ |
| ___ | | KW Baseboard Heat | ___ |
| ___ | | HP Motors 1/+ HP | ___ |
| ___ | | KW Transformer/Generator | ___ |
| ___ | | AMP Service | ___ |
| 1 | 100 | AMP Subpanels | ___ |
| ___ | | AMP Motor Control Center | ___ |
| ___ | | KW Elec. Sign/Outline Light | ___ |

Administrative Surcharge $ _____
Minimum Fee $ _____
State Permit Surcharge Fee $ _____
TOTAL FEE $ _____

U.C.C. F120 (rev. 01/21)
Internet version

Applicant: When submitting this form to your Local Construction Code Enforcement Office, please provide one original plus three photocopies.

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF CODES AND S___
BUREAU OF ROOMING AN___
HOUSE STANDARDS
(609) 984-1704

**A-10**
**PALISADES PROPERTIES**
**/ KINNELON / BOA**
**8/5/25**

PAGE 1 OF _____ 2
Control No. _1415 - 0002_
No. of Stories __2__ Units __5__
Lic. Capacity __10__ No. of Res. __10__
Class _____ F
DATE: _7 / 11 / 2025_

BRBHS-1
10/22

## EVALUATION REPORT AND ORDERS OF THE COMMISSIONER

| Owner's Name, Address, Zip, County | Property Address |
|---|---|
| PALISADES PROPERTIES LLC | 21 WOOD CHASE LANE KINNELON |
| Owner's Phone Number | Property Phone Number |
| Administrator | |

## TYPE OF EVALUATION

SOCIAL ☒    ADDENDUM ☐
PHYSICAL ☒    CYCLICAL ☒

## -PLEASE READ CAREFULLY-

This evaluation performed by the Bureau of Rooming and Boarding House Standards is being conducted pursuant to the ROOMING AND BOARDING HOUSE ACT OF 1979 (N.J.S.A. 55:13B-1 et seq)

You are ORDERED to correct the conditions described in the attached notice of violations by the compliance date indicated for each violation. Failure to comply with these orders will result in penalties and/or a court action in accordance with the Act. Please review the violations with the Bureau representative.

**You may contest** these orders at an administrative hearing. The request for a hearing must be made within 15 days after receipt of these orders. Each issue intended to be raised at the hearing must be set forth in detail in the letter. Any issue not so raised shall be deemed waived. The hearing shall be held pursuant to The Administrative Procedure Act, (C.52:14B-1 et seq.). Refer to the property address and date of compliance (if applicable) and address the hearing request to:

   **Division of Codes and Standards, Hearing Coordinator, P.O. Box 804, Trenton, New Jersey 08625** with a copy to the **Chief, Bureau of Rooming and Boarding House Standards**, at the same address. A corporation may be represented only by a licensed attorney.

   **You will be notified of the time and place of the hearing.**

**If you find an extension** of time necessary to abate any violation, a letter must be submitted two (2) weeks prior to the date of compliance which states in detail: (1) The violations abated to date; (2) The reason why each unabated violation cannot be corrected prior to the date of penalty; and (3) The date by which all violations can be abated.

By requesting an extension, one expressly waives the right to a hearing and admits that the Notice and Orders are correct and free from procedural and substantive defects.

| | Commissioner |
|---|---|
| _____ | By_____ _Bernard A. Raywood, Chief_ |
| Received By | Bureau of Rooming and Boarding House Standards |
| _Richard Brown_ | |
| Printed Name of Person Served | _NEW BOGHEAN_ |
| Date _7/11/25_   Time Served | Bureau Representative |

White – Owner's Copy          Yellow – File Copy          Pink and Goldenrod – Evaluator Copies

BRBHS – 2
4/24

Page 2 of 2

1415- 0002
21 WOOD CHASE LANE KINNELON

**EVALUATION REPORT AND ORDERS OF THE COMMISSIONER**

NJAC

| Administrative Code Reference | | Compliance Date | Reinspection Date | Compliance Date |
|---|---|---|---|---|
| 5:27 13.3(a) | LICENSEE SHALL NOTIFY THE | 7/9/25 | 7/11/25 NO | |
| | DEPARTMENT OF COMMUNITY | | | |
| | AFFAIRS, BUREAU OF ROOMING | | | |
| | AND BOARDING IMMEDIATELY | | | |
| | BY TELEPHONE AT (609) | | | |
| | 984 - 1704, FOLLOWED | | | |
| | WITHIN 72 HOURS BY | | | |
| | WRITTEN CONFIRMATION, | | | |
| | OF ANY EVENT WHERE FIRST | | | |
| | RESPONDERS RESPOND TO A | | | |
| | SERIOUS INCIDENT, INCLUDING | | | |
| | BUT NOT LIMITED TO DEATH, | | | |
| | OVERDOSE, OR ASSAULT. SUCH | | | |
| | NOTICE SHALL BE LIMITED TO | | | |
| | DATE, TIME, AND NATURE | | | |
| | OF INCIDENT. (SMOKING ELECTRIC | | | |
| | PANEL WITH FD RESPONSE ON | | | |
| | 7/6/2025 2:30 AM ) | | | |
| | | | | |
| 5:27 - 3.11(k) | DCA IS SOLE ENFORCING AGENCY | 8/9/25 | | |
| | WITH RESPECT TO UCC. PROVIDE | | | |
| | PERMIT INFORMATION OBTAINED | | | |
| | FROM DCA OFFICE OF LOCAL | | | |
| | CODE ENFORCEMENT - NORTH, | | | |
| | FOR EMERGENT ELECTRICAL | | | |
| | PANEL REPLACEMENT AND | | | |
| | ANY OTHER POTENTIAL WORK | | | |

JON TEMPLETON - SUPERVISER
NJ DCA
OFFICE OF LOCAL
CODE ENFORCEMENT
NORTHERN REGION

171 ROUTE 173
ASBURY NJ 08802
(NOT ASBURY PARK)

(908) 713 - 0722
jonathan.templeton@dca.nj.gov

# EXHIBIT D

**RESOLUTION**
**Borough of Kinnelon**
**Board of Adjustment**
**In the Matter of Palisades Properties LLC**
**Application Number 1571**
**Decided on September 2, 2025**
**Memorialized on October 7, 2025**
**Denial of Use Variance**

**WHEREAS,** Palisades Properties LLC (hereinafter the "Applicant") has made application to the Kinnelon Borough Board of Adjustment ("Board") for a use variance for property known as Block 56301, Lot 137 as shown on the Tax Map of the Borough of Kinnelon, located at 21 Wood Chase Lane in the R Zone (hereinafter the "Subject Property"); and,

**WHEREAS,** public hearings were held on July 1, 2025, August 5, 2025 and September 2, 2025, after the Board determined it had jurisdiction; and,

**WHEREAS,** the Applicant was represented by Edward W. Purcell, Esq.

**NOW THEREFORE,** the Board of Adjustment makes the following findings of fact, based on evidence presented at its public hearing, at which a record was made. The following materials were reviewed by the Board and comprise the record before the Board:

1. Cover Letter from the Applicant's Attorney, Edward W. Purcell, Esq., dated November 1, 2024;

2. Board of Adjustment of the Borough of Kinnelon, Application for Development, no date;

3. Hearing Notice, Zoning Board of Adjustment, Borough of Kinnelon, not signed, not dated;

4. Application Addendum, Palisades Properties, LLC, no date;

5. Licensed Class F Rooming House expressly for Cooperative Sober Living Residence, from the NJ Department of Community Affairs, dated May 24, 2022;

6. Tax Assessment Map, Sheet No. 63, prepared by Robert L. Cigol PLS No. 24GS04026100 of DMC Associates, dated January I, 2014, bearing three (3) revisions, last revised October 18, 2019;

7.    Letter from the Borough of Kinnelon Zoning Official, Leonard Perre, dated October 1, 2024;

8.    Affidavit of Consent of Owner, signed by the homeowner, Sal J. Gargulo, dated October 8, 2024;

9.    Cover Letter from the Applicant's Attorney, Edward W. Purcell, Esq., dated November, 1, 2024;

10.    Board Engineer Review Letter dated December 23, 2024;

11.    Location Survey for Palisades Properties, LLC, prepared by Peter C. Kirch, PLS No. 23130 of Surveying Technologies, Inc., dated October 25, 2024, revised February 14, 2025;

12.    Zoning Table, no date, no name;

13.    Owner Disclosure Statement, signed by Edward W. Purcell, Esq., dated February 17, 2025;

14.    Checklist Waiver Request, no date, no name;

15.    List of Other Governmental Approvals Required, no name, no date;

16.    Request for Certified List, dated November 1, 2024, signed by Chris Lauver, Borough Assessor;

17.    Board Engineer Review Letter dated April 21, 2025;

18.    Board Planner Report #1 dated June 27, 2025;

19.    Exhibit A-1 – DCA Licenses;

20.    Exhibit A-2 – Property Survey;

21.    Exhibit A-3 – Photographs;

22.    Exhibit A-4 – Palisades Property Home Rules;

23.    Exhibit A-5 - Curriculum Vitae of Dr. Sugerman;

24.    Exhibit A-6 - Letter from Dr . Sugarman dated July 25, 2025;

25.    Exhibit A-7 - Employee Training Course Description List;

26.    Exhibit A-8  - Borough of Kinnelon Fire Safety Certificate issued August 27, 2024;

27.    Exhibit A-9 – Electrical Code Permit for 100 AMP Panel;

#5356747v1

28.    Exhibit A-10 - Evaluation Report of DCA dated July 11, 2025;

29.    Exhibit O-1- Palisade Properties LLC Website Screenprint from August 4, 2025 (5 pages);

30.    Exhibit O-2 - North Jersey Recovery Centers Website Screenprint from August 4, 2025;

31.    Exhibit O-3 - NJRC "Programs" Website Screenprint from August 4, 2025;

32.    Exhibit O-4 - NJRC "Our Treatment Facilities" Website Screenprint from August 3, 2025;

33.    Exhibit O-5 - NJRC "Insurance" Website Screenprint;

34.    Exhibit O-6 - NJRC "Sober Living" Website Screenprint (5 pages);

35.    Exhibit O-7 – Psychology Today Website Screenprint (2 pages);

36.    Exhibit O-8 – NJRC advertisement from Psychology Today Website Screenprint;

37.    Exhibit O-9 - Assembly Bill A-3973 (signed into law August 11, 2025);

38.    Exhibit O-10 Assembly Bill A-3974 (signed into law August 11, 2025);

39.    Exhibit O-11 CSLRs in New Jersey (7 pages);

40.    Exhibit O-12 DB Homes "About the Founder" Website Screenprint; and

41.    Exhibit O-13 Septic Application.

The Subject Property is known as Block 56301, Lot 137 on the Borough of Kinnelon Tax Maps and is more commonly known as 21 Wood Chase Lane.  The Subject Property is a conforming lot in the Borough's Residential Zone with a lot area of 60,698 square feet with lot frontage of approximately 242 feet where minimums of 60,000 SF and 200 feet are required. The Subject Property is improved upon with a two-story single-family residence, concrete patio, asphalt driveway, stone walkway, several dry laid boulder retaining walls, and a septic system.  The Applicant represented that the existing single-family dwelling is leased, and has five (5) bedrooms and 4.5 bathrooms, with a total living space of 4,372 square feet.

3

The Applicant requests a d(1) use variance for the Subject Property to permit operation of a sober living home licensed by the State of New Jesey as a Cooperative Sober Living Residence ("CSLR"). The Borough Code does not permit such use. Borough Code §207-27 permits the following principal uses in the Residential Zone: i. Single-family dwellings; ii. Borough-owned parks and playgrounds; iii. Public schools; iv. Publicly owned buildings; v. Public libraries; vi. Poultry and livestock farming; vii. Truck gardening or nurseries; viii. Community residences for the developmentally disabled; ix. Community shelters for victims of domestic violence; x. Community residences for the terminally ill and community residences for persons with head injuries; xi. Retail bakeries; xii. Launderettes; xiii. Offices; xiv. Banks; xv. Restaurants; xvi. Salesrooms or showrooms; xvii. Retail dyeing and cleaning establishments; xviii. Retail stores, theaters, and motion-picture houses; and xix. Billboard pursuant to § 207-17M.

The Application provides that up to ten (10) persons will temporarily reside at the Subject Property while receiving off-site treatment for drug and alcohol dependency (i.e., no treatment takes place on the Subject Property). The Application provides that all residents are driven to an out-patient treatment facility, operated by North Jersey Recovery Center, 22-08 Route 208, Suite 2, Fair Lawn, NJ 07410. The Application provides that at any one time, there will be three (3) employees on site to help manage the facility.

Testifying before the Board on behalf of the Applicant were (i) Jay Jonas, Applicant's part owner, (ii) Dr. Rachel Sugerman, the Applicant's mental health expert, and (iii) Paul Grygiel, the Applicant's Professional Planner.

First, Mr. Jay Jonas testified that the purpose of this facility was to provide a residence for persons receiving clinical treatment off-site at the North Jersey Recovery Center in Fair Lawn, NJ ("NJRC", of which Mr. Jonas is also a part owner). Residents are not permitted to have their own

4

cars; transportation to and from NJRC is provided utilizing passenger vans operated by NJRC. The typical resident schedule provides for off-site treatment at NJRC between 9 am and 4 pm. There are two (2) employee shifts at the facility, with three (3) staff present between 4 pm and 12 am; and two (2) staff during the overnight hours of 12 am to 8 am. Mr. Jonas explained that the Subject Property has been utilized in this capacity since issuance of a NJDCA Class F License in 2019. Mr. Jonas was unaware whether the Subject Property had ever accepted any persons not otherwise undergoing treatment at NJRC. Mr. Jonas testified as to the reasons for selecting the Subject Property as that it was of suitable size and number of bedrooms, and was made available for lease (the current lease term runs until 2028). Mr. Jonas confirmed that the Applicant was a commercial, for profit entity, adding that CSLRs may only be operated within single family residences by administrative code.

Next, Dr. Rachel Sugerman testified as the Applicant's mental health expert on addiction. Dr. Sugerman serves as Clinical Director for the North Jersey Recovery Center. Dr. Sugerman provided an overview of the types of off-site treatment that NJRC provides to those temporarily residing at the Subject Property. Lastly, the Applicant presented the planning testimony of Paul Grygiel. Mr. Grygiel's review of the Borough Code confirmed that sober homes of the type operated by the Applicant were not permitted in any of the Borough's zone districts. Mr. Grygiel provided an overview of the Borough's Residential Zone standards, which permit certain group homes as principally permitted use, but sober homes are not included as permitted uses, thereby triggering the need for a d-1 use variance. Mr. Grygiel explained the burdens of proof to support the use variance required here. First the Applicant would need to satisfy special reasons, or what is otherwise known as the positive criteria. There are three (3) recognized means of satisfying special reasons, which are: (i) the use is inherently beneficial to the general welfare; (ii) the property is particularly well suited to accommodate the proposed use; and (iii) economic inutility. It was Mr.

5

Grygiel's opinion that special reasons were available here under both (i) and (ii). As to whether the use was inherently beneficial, Mr. Grygiel was unable to identify whether any other CSLR or sober home had ever been formally recognized as inherently beneficial in any court decision by a court at the appellate level. As to particular site suitability, Mr. Grygiel pointed to the willingness of the property owner to lease the Subject Property for this use, the size of the driveway to accommodate the commercial passenger vans that transport the residents to and from NJRC's off-site treatment facility, and that the existing residence was large enough to support this use, which he found consistent with the MLUL planning purpose "a" ("promotes the public health, safety, morals and general welfare"). Turning to the first prong of the negative criteria, Mr. Grygiel believed that granting the use variance would not result in a substantial detriment to the public good primarily because the residences would not possess their own motor vehicles. As to the second prong, whether granting the use variance would result in a substantial impairment of the zone plan, Mr. Grygiel explained that the Borough had not updated its zoning since the Subject Property began being used as a sober home nearly six years ago. The entire CSLR concept is a relatively modern construct, and Mr. Grygiel believes that many municipalities, including the Borough, have not yet had the opportunity to update their ordinances to permit these. He pointed to other community residences for disabled persons as already being principally permitted within the Borough's Residential Zone, finding the sober home use to be not too great a departure from those comparable uses. Mr. Grygiel did nevertheless confirm that the sober home use was not consistent with the Master Plan or any of its Reexamination Reports, rendering it contrary to the enhanced quality of proof the Board was obliged to find if approving a commercial use variance such as that sought by the Applicant. That being said, Mr. Grygiel believed the Board was authorized by law to grant use variance relief as a reasonable accommodation under the Federal Fair Housing Act Amendments.

6

The hearing was opened to the public at which time Mr. Paul Rosenwasser, 39 Chilhowie Drive, questioned the Applicant's Planner regarding the inconsistencies between the proposed use and the Borough's Master Plan and Zoning Ordinance.    Mr. Rosenwasser questioned the Applicant's Planner about the bases for his opinions regarding the negative criteria, particularly regarding the detriments associated with placing a commercial use within a residential neighborhood.  Mr. Rosenwasser introduced Exhibits O-1 through O-13 challenging the Applicant's claim that the sober home operates independently of the NJRC, when the NJRC's marketing materials include the Subject Property as being an available amenity.  Mr. Rosenwasser asked the Board to deny the use variance due to the Applicant's failure to satisfy the required burdens of proof.

Mr. and Mrs. Joseph DeFalco, 15 Ben5 Tree Lane, provided a historical overview of the neighborhood, including limitations provided within the granting deeds, among other issues, the absence of fencing as well as septic utilization.   The DeFalcos asked the Board to deny the use variance.

Ms. Nancy Fegan, 21 Chilhowie Drive, commented that the amount of services required to support the Applicant's use was too intense for a residential neighborhood and local roadways ill equipped to handle it.  Ms. Fegan asked the Board to deny the use variance.

Dr. Sreepadraj Venkatarao, 122 Wood Chase Lane, challenged how the Subject Property was particularly suitable for such a use when the same criteria would means pretty much every large house in the Borough would be similarly suitable?  Dr. Venkatarao also challenged the claim that the sober home residents lived and resided akin to a family unit and was opposed to any use variance relief.

7

Ms. Dana Torsiello, 22 Wood Chase Lane, commented that the sober home's use across the street from her property created a substantial detriment with respect to increased traffic, lack of sanitation and maintenance, as well as concerns over septic overuse. Ms. Torsiello asked the Board to deny the use variance.

Mr. Jenn Ritacco, 11 Bent Tree Lane, took exception to the Applicant's delay in seeking use variance authorization for the Subject Property, particularly when it sought appropriate approvals for a sober home it operated in Mahwah, New Jersey. Ms. Ritacco also explained how she personally filed several police reports regarding activities that were taking place on her street associated with the sober home. Ms. Ritacco asked the Board to deny the use variance.

Mr. Ed Gilhooley, 15 Wood Chase Lane, took exception to any commercial use of the Subject Property as being contrary to the Highlands Act. Mr. Gilhooley also found it inappropriate that the water line serving the Subject Property appeared to pass through the septic leach field. Mr. Gilhooley asked the Board to deny the use variance.

**NOW THEREFORE,** the Board of Adjustment makes the following conclusions of law, based on the foregoing findings of fact. The Applicant is requesting a use variance to utilize an existing single-family dwelling on the Subject Property as a sober home akin to a Cooperative Sober Living Residence, which is not a permitted principal use in the Borough's Residential Zone.

It is the Board's responsibility, acting in a quasi-judicial manner, to weigh all the evidence presented before it by both the applicant and all objectors, and reach a decision which is based upon findings of fact and conclusions of law and is not arbitrary, unreasonable or capricious. The Board has exclusive jurisdiction to grant "d(1)" variances to permit non-permitted uses and/or non-permitted principal structures pursuant to N.J.S.A. 40:55D-70d(1) "in particular cases and for special reasons." This is the so-called positive criteria of a "d(1)" variance. The courts have held

8

that the promotion of the general welfare is the zoning purpose that most clearly amplifies the meaning of "special reasons" Medici v. BPR Co., 107 N.J. 1 (1987). For non-inherently beneficial uses, the benefit to the general welfare comes from the development of a site in the community that is particularly suited for the proposed use.

Providing proofs that the proposed application promotes at least one of the purposes of zoning found in MLUL at N.J.S.A. 40:55D-2, also provides one aspect of the positive criteria for a non-inherently beneficial use application. The Applicant does not have to demonstrate that there are no other viable locations for the project. Price v. Himeji, 214 N.J. 263, 292-293 (2013). For this criterion, it is the Applicant's burden to identify those aspects of the site that render it particularly suitable to the use.

While the MLUL itself does not define special reasons, "subsequent judicial interpretations have `infus[ed] substantive meaning into the "special reasons" standard.'" In particular, the Supreme Court has held that the term "'special reasons' takes its definition and meaning from the general purposes of the zoning laws," that have been specifically identified by the Legislature as providing general purposes of zoning as identified in N.J.S.A. 40:55D-2. It remains the applicant's burden to prove special reasons because the grant of a use variance always represents an exception to the generally applicable zoning scheme. The Appellate Division observed that because of the Legislature's strong policy preference for planning by ordinance, "only exceptional cases warrant use variances."

At present, there are only three recognized categories of circumstances that constitute special reasons for a (d)(1) use variance: (i) an inherently beneficial use; (ii) the property is zoned into economic inutility; and (iii) "the use promotes the general welfare because the proposed site is particularly suitable for the proposed use." An application for a use variance based on the assertion

9

that a property is particularly suitable for a project requires an evaluation of whether the use, otherwise not permitted in the zone, when authorized for the particular parcel, will promote the general welfare as defined by the MLUL. The New Jersey Supreme Court has held that particularly suitable means that "…the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought…"   The Supreme Court has observed that, in the context of the specific parcel, it means that strict adherence to the established zoning requirements would be less beneficial to the general welfare. Our Supreme Court has further commented that an application demonstrates a special reason if there is proof that "the subject property was particularly suitable for the proposed use." Our courts also recognize that almost all lawful uses of property can be said to promote the general welfare to some degree, with the result that if general societal benefit alone constituted "…an adequate special reason, a special reason almost always would exist for a use variance."

Here, the Board declines to find that the Applicant's sober home satisfies special reasons under the inherently beneficial standard.  The Board's review of the operation of this sober home is quite distinct from other community residences or group homes, where residents live cohesively together in a family-like environment.  The Board can only conclude based on the evidence before it that frequent cycling of short term residents in and out of this sober home renders it far too transient to allow for development of any cohesive residential bonds between and among the residents, which is far different than a traditional community residence or group home.  The Board further concludes that the Applicant has not proven the existence of any demonstrable need within the Borough for sober living residences.  If anything, the proofs offered by the public confirmed no shortage of available capacity that has heretofore satisfied existing need.

10

Further, the Applicant confirms that it is a commercial "for profit" use and was unable to identify any prior precedent or appellate-level determination that a comparable facility so qualified. The Board also concludes that the existing sober home is being operated less like a CSLR, as that term is defined by N.J.A.C. 5:27-2.1, and more like an off-site dormitory that has to date, without exception, exclusively served clients of North Jersey Recovery Center. The Board concludes that the named Applicant, Palisades Properties LLC, is indistinguishable from North Jersey Recovery Center, or is in effect an alter ego of that commercial entity. The Supreme Court in Medici explained that because commercial uses generally do not qualify as inherently beneficial, "...any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise." The Board concludes that the Subject Property is not particularly appropriate for such a use, as the Applicant itself admitted that it was chosen only because it was both available and had a owner willing to lease it for such a use.

Where, as here, undue hardship would not be encountered in the Applicant's attempt to adapt the Subject Property to a conforming use within the Residential Zone, the Applicant's only remaining argument in support of use variance relief is necessarily based on the particularly suited standard. The Board recognizes that this special reasons requires a site-specific analysis to confirm that particular suitability for the use must be due to special characteristics of the property itself. Moreover, any review under particular site suitability standard further requires a careful review of the whether the proposed use is consistent with the planning purposes to be advanced by the MLUL. Here, the Board concludes that the proofs in the record created before it were inadequate to establish that the Subject Property was "particularly suitable" for the proposed use. Merely having a sufficient number of bedrooms together with an amenable lessor does nothing to distinguish the

11

Subject Property from any other residential property in this neighborhood specifically or the Borough in general.

Next, the Board concludes that the Applicant has not satisfied the "negative criteria." The negative criteria require a two-part proof: (1) that the proposed use can be granted without any substantial detriment to the public and (2) the proposed use will not substantially impair the intent and the purpose of the master plan and zoning ordinance. The Board concludes that the Applicant was unable to satisfy the first prong of the negative criteria because its sober home had already demonstrated that it was causing a substantial detriment to the public good. Extensive public comment and participation during the public hearings identified myriad problems attributable to sober home, such as the lack of proper sanitation and maintenance, trespassing, excessive traffic, and the presence of medical office-style laboratory boxes, all collectively highlighting the fact that this residence was being utilized as a commercial facility rather than a residence.

Moreover, for use variances that do not involve inherently beneficial uses, Medici further provides that satisfaction of the second prong of the negative criteria requires applicants to demonstrate through an enhanced quality of proof that the variance sought is not inconsistent with the intent and purpose of the Master Plan and Zoning Ordinance, which is known as the "enhanced burden of proof" standard. This enhanced burden of proof requires an applicant "reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district."

As to the zone plan and zoning ordinance, Medici held that an applicant must prove an "enhanced quality or proof" that there will be no substantial impairment to the zone plan and ordinance. The Applicant must "reconcile" the use proposed with the ordinance's omission of the use from those permitted in the zone. Medici further explains that the MLUL exhibits a preference

12

for municipal land use planning by ordinance rather than by variance. Here, after considering the planning testimony provided by the Applicant's professional planner, together with the guidance offered by the Board's own professional planner, as well as undertaking a careful examination of the Borough's Master Plan and Reexamination Reports, the Board concludes that the use variance is inconsistent with the Borough's prior planning. The Board recognizes that the Borough's Planning Board and Governing Body, which have exclusive jurisdiction over planning and zoning within the Borough, have chosen to neither update the Master Plan nor change the ordinance to permit sober homes. After review, the Board infers that the Borough's inaction was deliberate. Accordingly, the Board concludes the Applicant has failed to provide any compelling reason for the Board to exercise its use variance power that would in effect usurp the legislative power reserved to the Borough's Governing Body to amend or revise the zone plan to permit sober homes or CSLRs within the Residential Zone.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Adjustment that the application of Palisades Properties LLC for property known as Block 56301, Lot 137 as shown on the Tax Map of the Borough of Kinnelon, located at 21 Wood Chase Lane in the R Zone requesting a use variance is **DENIED**.

The undersigned secretary certifies the within resolution was adopted by this Board on September 2, 2025 and memorialized herein pursuant to N.J.S.A. 40:55D-10(g) on October 7, 2025.

FOR: Mr. Lockwood, Mrs. Canale, Mrs. Herrington, Mr. Wilkes, Mr. Nicosia & Mrs. Maletsky

AGAINST:

ABSTAIN: Mr. Mondello

Board Member(s) Eligible to Vote: All

13

#5356747v1